# EXHIBIT 1

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

555 Mission Street
San Francisco, CA 94105-0921
Tel 415.393.8200
www.gibsondunn.com

Ethan Dettmer
Direct: +1 415.393.8292
Fax: +1 415.374.8444
EDettmer@gibsondunn.com

November 2, 2020

VIA ELECTRONIC MAIL

Lauren Moskowitz
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475

Rachele Byrd
Wolf Haldenstein Adler Freeman & Herz LLC
Symphony Towers
750 B. Street - Ste. 2770
San Diego, CA  92101

Benjamin J. Siegel
Hagens Berman Sobol Shapiro LLP
715 Hearst Avenue
Suite 202
Berkeley, CA 94710

Re:    Related App Store Antitrust Actions—Document Production Validation

Dear Counsel:

As we have discussed, Apple continues to agree with class plaintiffs that the parties should employ a validation protocol for document productions in these matters.  That protocol should apply equally to all parties, regardless of whether they use Technology Assisted Review ("TAR"), as Apple is doing, or search terms for review, as Epic is doing.  Such an arrangement would be fair to all parties, would help ensure that appropriate amounts of responsive ESI are produced across the board, and would avoid "inappropriate[ly] . . . hold[ing] TAR to a higher standard than keywords or manual review."  *Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 129 (S.D.N.Y. 2015).  Epic is simply wrong to suggest that validation is appropriate for Apple's production (based on TAR) but not for review of Epic's production (based on search terms).

While of course  "key word searching is a recognized method to winnow relevant documents from large repositories," "[c]ommon sense dictates that sampling and other

**GIBSON DUNN**

Lauren Moskowitz
Rachele Byrd
Benjamin J. Siegel
November 2, 2020
Page 2

quality assurance techniques must be employed to meet requirements of completeness." *In re Seroquel Prod. Liab. Litig.*, 244 F.R.D. 650, 662 (M.D. Fla. 2007). In light of this reality, the "case law dictates that appropriate validation be utilized to test search results"—including where a party like Epic "prefer[s] to use the custodian-and-search term approach" rather than TAR. *In re Mercedes-Benz Emissions Litigation*, 2020 WL 103975, at *2 (D.N.J. Jan. 9, 2020) (adopting a review protocol calling for "three different kinds of validation, including validation of documents that did not hit on search terms and a four-step post-production validation process"). Conducting "a random sample of the null set," for example, "provides validation and quality assurance of [a] document production when performing key word searches" just as it would when such validation methods are "used in TAR." *City of Rockford v. Mallinckrodt ARD Inc.*, 326 F.R.D. 489, 494 (N.D. Ill. 2018).

In *City of Rockford*, the court ordered the parties to adopt a review protocol that required validation for search-term review. *Id.* at 496. As the court explained, the parties had identified "no reason establishing that a random sampling of the null set cannot be done when using key word searching." *Id.* at 494. So too here: at bottom, it cannot reasonably be disputed that "sampling the null set when using key word searching provides for validation to defend the search and production process, and [indeed] was commonly used before the movement towards TAR." *Id.*; *see also William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) ("[W]here counsel are using keyword searches for retrieval of ESI, . . . the proposed methodology *must* be quality control tested to assure accuracy in retrieval and elimination of 'false positives'" (emphasis added)). Thus, establishing a validation protocol for *all* parties, regardless of whether they use a search-term approach or TAR, is wholly appropriate and consistent with the case law.

Accordingly, we propose that all parties agree to validation language similar to what Apple included in its draft ESI protocol circulated in October, which was based on negotiations between Apple and the class plaintiffs earlier in the year. That language states:

> Review of all documents will continue until a recall of at least 75% is achieved and confirmed by a subject matter expert ("SME")—i.e., an attorney-employee of the producing Party's outside counsel, who is knowledgeable about the subject matter of the litigation and assigned to work on the above-captioned cases. Recall shall be based upon sufficient validation as obtained through: (1) statistical sampling by the SME as set forth in this Section 4; and (2) calculations obtained by application of the formula set forth in this Section 4. Once a recall rate of 75% is achieved and confirmed by an SME, the review may cease. If the requesting party believes that additional documents should be reviewed after a 75% recall rate is

**GIBSON DUNN**

Lauren Moskowitz
Rachele Byrd
Benjamin J. Siegel
November 2, 2020
Page 3

achieved and confirmed by an SME, the requesting party must make a detailed showing as to how the probative value outweighs the burden of further document review.

Validation and determination of estimated recall shall proceed as follows, regardless of whether the producing Party used TAR or a review based on search terms or some other means:

First, the producing party or its vendor shall gather: (1) a random sample of 500 documents from those identified as responsive during the course of the review (the "Reviewed Responsive Documents"); (2) a random sample of 500 documents from those identified as non-responsive during the course of the review (the "Reviewed Nonresponsive Documents"); and (3) a random sample of 500 documents from those documents that were unreviewed at the time of validation, including documents held by designated custodians that went unreviewed because they were not identified as containing search terms (the "Unreviewed Documents") (collectively, these samples are the "Validation Sample").

Second, the Validation Sample shall be coded by an SME. For purposes of the SME's validation review, the SME will not be provided with any information regarding how any document in the Validation Sample was initially categorized during the course of the review.

Third, the estimated recall of the review will then be calculated as follows: the total number of documents correctly identified as responsive during the course of the review, divided by the sum of: (1) the total number of documents correctly identified as responsive during the course of the review; (2) the number of reviewed documents incorrectly marked nonresponsive; and (3) the number of unreviewed but responsive documents. For purposes of the foregoing recall calculation: (1) the total number of documents correctly identified as responsive during the course of the review will be calculated by multiplying the number of documents identified as responsive during the course of the review by the percentage of the 500 Reviewed Responsive Documents that were correctly marked as responsive; (2) the reviewed documents incorrectly marked nonresponsive will be calculated by multiplying the total number of documents marked as nonresponsive by the percentage of the 500 Reviewed Nonresponsive Documents that were incorrectly marked as nonresponsive (as determined by the SME); and (3) the unreviewed but responsive documents will be calculated as the percentage of the 500 Unreviewed Documents subsequently

Lauren Moskowitz
Rachele Byrd
Benjamin J. Siegel
November 2, 2020
Page 4

coded responsive by the SME multiplied by the total number of unreviewed documents.

The producing Party agrees to provide the requesting Party with the recall calculation based on the Validation Sample.

The class plaintiffs have, in the past, proposed that the recall rate required for validation be 95% rather than 75%, but a recall rate of 95% would also be unduly burdensome and lacks support in the case law and guidance from The Sedona Conference. For example, the validation protocol in *In re Broiler Chicken Antitrust Litig.*, Case No. 1:16-cv-08637, Dkt. 586 at 10 (N.D. Ill. Jan. 3, 2018), recognized that a "recall estimate on the order of 70% to 80% is consistent . . . with an adequate (i.e. high-quality) review." *See also*, *e.g.*, *Independent Living Center of S. Cal. v. City of Los Angeles*, Case No. 2:12-cv-00551-FMO-PJW, Dkt. 375 at 3 (C.D. Cal. June 26, 2014) (adopting a recall rate of 75%); *Global Aerospace v. Landow Aviation*, Case No. CL 61040 (Va. Cir. Ct. Loudon Co. April 23, 2012) (use of predictive coding approved where defendant committed to achieving recall of 75%); The Sedona Conference, The Sedona Conference TAR Case Law Primer, 18 Sedona Conf. J. 1, 37-39 (2017) (collecting cases).

Requiring recall at 95% or above is problematic because recall (the percentage of all responsive documents that are identified in a review) and precision (the percentage of documents reviewed that are relevant) "are often in tension with each other." *Dynamo Holdings Ltd. P'ship v. Comm'r of Internal Revenue*, 2016 WL 4204067, at *4 (T.C. July 13, 2016). In *Dynamo Holdings*, the selection of a rate of 95% corresponded with a precision rate of 3%. *Id.* That means that, to find single responsive document, on average, one would need to review *33 documents*. Such a standard would do away with all of the efficiency benefits of TAR review, while also being inconsistent with the case law set forth above.

If Plaintiffs would like to discuss validation procedures further, we would propose that the parties engage in a further meet and confer on Wednesday, November 4, ahead of the November 9 deadline for submitting a validation agreement or dispute to the Court. As also discussed in our meet and confer call on October 21, Apple will not accept any resolution that subjects only Apple to validation. Accordingly, if Plaintiffs do not accept Apple's proposal above, they should coordinate to ensure that what they propose instead is even-handed among the parties. Please let us know what time will work for Plaintiffs for such a meet and confer discussion.

GIBSON DUNN

Lauren Moskowitz
Rachele Byrd
Benjamin J. Siegel
November 2, 2020
Page 5


Sincerely,

Ethan Dettmer

EDD/eml