Pages 1 - 121

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS S. HIXSON, MAGISTRATE JUDGE


| | |
|---|---|
| IN RE APPLE IPHONE ANTITRUST LITIGATION. ) ) | No. 11-cv-06714-YGR (TSH) |
| _____)<br>)<br>DONALD R. CAMERON, et al., )<br>)<br>Plaintiffs, )<br>)<br>VS. )<br>)<br>APPLE INC., )<br>)<br>Defendant. )<br>_____) | No. 19-cv-03074-YGR (TSH) |
| EPIC GAMES, INC., )<br>)<br>Plaintiff/ )<br>Counter-defendant, )<br>)<br>VS. )<br>)<br>APPLE INC., )<br>)<br>Defendant/ )<br>Counterclaimant. )<br>_____) | No. 20-cv-05640-YGR (TSH) |

San Francisco, California
Tuesday, December 15, 2020



**TRANSCRIPT OF PROCEEDINGS VIA ZOOM WEBINAR**



(Appearances on next page)



Reported By:  Katherine Powell Sullivan, CSR #5812, CRR, RMR
              Official Reporter - U.S. District Court

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**APPEARANCES:** (via Zoom Webinar)

Interim Class Counsel in In re Apple iPhone Antitrust
Litigation, Case No. 4:11-06714-YGR:

                WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
                750 B Street, Suite 1820
                San Diego, California 92101
       **BY:  RACHELE R. BYRD, ESQ.**

Interim Lead Class Counsel in Cameron, et. al v. Apple Inc.,
Case No. 4:19-cv-03074-YGR:

                HAGENS BERMAN SOBOL SHAPIRO LLP
                1301 Second Avenue, Suite 2000
                Seattle, Washington 98101
       **BY:  STEVE W. BERMAN, ESQ.**
            **ROBERT F. LOPEZ, ESQ.**
            **THEODORE WOJCIK, ESQ.**

                HAGENS BERMAN SOBOL SHAPIRO LLP
                715 Hearst Avenue, Suite 202C
                Berkeley, California 94710
       **BY:  BENJAMIN J. SIEGEL, ESQ.**

For Plaintiff Epic Games, Inc.:

                CRAVATH, SWAINE & MOORE LLP
                825 Eighth Avenue
                New York, New York 10019
       **BY:  LAUREN A. MOSKOWITZ, ESQ.**

For Plaintiff Edward Lawrence:

                LAW OFFICES OF LAWRENCE G. PAPALE
                The Cornerstone Building
                1308 Main Street, Suite 117
                St. Helena, California 94574
       **BY:  LAWRENCE GENARO PAPALE, ESQ.**

For Defendant Apple Inc.:

                GIBSON, DUNN & CRUTCHER LLP
                333 South Grand Avenue
                Los Angeles, California 90071-3197
       **BY:  JAY P. SRINIVASAN, ESQ.**

                GIBSON, DUNN & CRUTCHER LLP
                555 Mission Street
                San Francisco, California 94105-0921
       **BY:  ETHAN D. DETTMER, ESQ.**

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

| | |
|---|---|
| 1 | **Tuesday, December 15, 2020**                              **10:48 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  All right, everyone.  Good morning.  Thank |
| 5 | you for joining us this morning. |
| 6 | All right.  We're here in Civil Action 11-6714, In re |
| 7 | Apple iPhone Antitrust Litigation, and Civil Action 19-3074, |
| 8 | Cameron, et al. versus Apple Inc., and Case Number 20-5640, |
| 9 | Epic Games, Inc. versus Apple Inc.  The Honorable Thomas S. |
| 10 | Hixson presiding. |
| 11 | Counsel, let's state the appearances.  Let's start with |
| 12 | the Apple iPhone Antitrust counsel. |
| 13 | **MS. BYRD:**  Good morning, Your Honor.  Rachele Byrd, |
| 14 | Walf Haldenstein, on behalf of the consumer plaintiffs. |
| 15 | **THE COURT:**  Good morning. |
| 16 | And how about the Cameron plaintiffs? |
| 17 | **MR. LOPEZ:**  Good morning, Your Honor.  This is Rob |
| 18 | Lopez for the Cameron plaintiffs.  Hagens Berman. |
| 19 | **THE COURT:**  Good morning. |
| 20 | **THE CLERK:**  And Epic. |
| 21 | **MS. MOSKOWITZ:**  Good morning, Your Honor.  Lauren |
| 22 | Moskowitz, from Cravath, Swaine & Moore, on behalf of Epic. |
| 23 | **THE COURT:**  Good morning. |
| 24 | **MR. SIEGEL:**  Good morning, Your Honor.  This is also |
| 25 | Ben Siegel, of Hagens Berman Sobol Shapiro, on behalf of the |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   Cameron plaintiffs.
 2            THE COURT:  Good morning.
 3            MR. WOJCIK:  And Ted Wojcik, too, on behalf of the
 4   Cameron plaintiffs, with Hagens Berman.
 5            THE COURT:  Good morning.
 6            MR. BERMAN:  Good morning, Your Honor.  Steve Berman,
 7   Hagens Berman, for the plaintiffs.
 8            THE COURT:  Good morning.
 9            MR. PAPALE:  Your Honor, my name's is Lawrence Papale.
10   I'm appearing on behalf of Mr. Lawrence, Edward Lawrence, who
11   is a plaintiff in these proceedings.
12            THE COURT:  Okay.  Good morning.
13       Now let's hear from Apple.
14            MR. SRINIVASAN:  Sure.  Good morning, Your Honor.  Jay
15   Srinivasan, Gibson Dunn, for Apple.
16            THE COURT:  Good morning.
17            MR. SRINIVASAN:  Good morning.
18            MR. DETTMER:  And good morning, Your Honor.  Ethan
19   Dettmer, from Gibson, Dunn, also.  Also on behalf of Apple.
20            THE COURT:  Good morning.
21       All right.  Quite a group here today.
22       First, I saw the stipulation about the validation
23   protocol, so I'm glad the parties were able to work that out.
24   And the Court has granted that.
25       With respect to deposition limits, I've reviewed the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   letter brief and the exhibits that were submitted, and I'm
 2   inclined not to issue an order today but to give you some
 3   guidance and to tell you to meet and confer, because despite
 4   the length and perhaps the tone of the joint discovery letter
 5   brief, I feel like you're not that far apart and you should be
 6   able to get there.
 7         But let me just give you some overall thoughts that I
 8   have, and then I'll invite the parties to talk about -- to give
 9   their reactions to that.
10         A few things that seem clear to me.  First, the plaintiffs
11   need to know how many depositions they're going to be able to
12   take because they have to be able to plan.  And I feel like the
13   plaintiffs are entitled to an answer to that question this
14   week.
15         Maybe it won't be today.  It could be Friday, when I'm
16   going to schedule the follow-up hearing for, but I think
17   they're entitled to know that this week because they have a mid
18   February cutoff in the Epic Games case for depositions, and
19   they have to plan, and so I think they're entitled to that
20   answer now.
21         I disagree with Apple's suggestion that first they should
22   do ten depositions and then they could brief whether there
23   should be more.  If we had more time, that might be feasible,
24   but I don't think we have that kind of time.  So I think the
25   plaintiffs are entitled to know now how many depositions they
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   get.

2       In terms of the number of depositions, as I indicated last

3   time, this is three cases, so you would -- if there's ten per

4   case, you could start out with 30.  Of course, that would

5   defeat the purpose of relating cases, right.  The whole point

6   is to have greater efficiency, so you wouldn't want 30

7   depositions because then you would have defeated the goal of

8   relating cases.

9       And so in terms of the number of depositions, based on the

10  submission plaintiffs have provided, I feel like the answer is

11  somewhere in the 14 to 16 range.

12      Plaintiffs have identified five different subject areas.

13  I understand that these are not totally distinct subject areas.

14  There's definitely overlap between them.  But there are five

15  areas of inquiry, and they want a few depositions in each area.

16      And that was thoughtful.  That came across as a

17  well-structured way of thinking about these cases, and so I

18  think a few depositions on each of those areas seems like it

19  could be warranted.

20      I don't know if the right number is 14 or 15 or 16, but I

21  also feel like if you're in that area where you're not that far

22  apart, probably the parties could reach an agreement on the

23  number of depositions.

24      And then another issue, though, is I don't feel like I

25  have enough information today to rule on any of the apex

1   issues.  I understand that for some of those witnesses their

2   documents haven't even been produced yet, so it may be hard for

3   the plaintiffs even to brief the apex issue.

4        And I don't think I need to rule this week on the apex

5   questions.  I think the parties can finish document production

6   and do a few depositions and then come back in January, and

7   then we could have informed briefing on the apex issues.

8        So I don't feel like I'm in a position where I need to

9   rule on that or should rule on that right now.  So what I'm

10  inclined to do is to tell the parties to go meet and confer

11  further on the number of Apple depositions.

12       And if you can reach an agreement, then, by noon on

13  Thursday, which would be December 17th, file a stipulation and

14  proposed order.  And if you can't, then by the same deadline

15  file a joint discovery letter brief not to exceed ten pages.

16  And then we'll schedule a hearing for this Friday,

17  December 18th, at 9 a.m., to follow up on the number of

18  depositions.

19       And the reason I'm setting a deadline of Thursday at noon

20  is so that if you file a stipulation and proposed order because

21  you've reached an agreement, then I can vacate the hearing the

22  following morning, and we'd only need that hearing if the

23  parties are unable to get an agreement.

24       So those are just the tentative thoughts I have, having

25  seen the parties' letter brief, but I certainly want to hear

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    comments from the parties.

2        Let me start with counsel for Epic Games.  What are your

3    thoughts?

4        **MS. MOSKOWITZ:**  Thank you, Your Honor.  Really

5    appreciate your feedback on the issue.  I think you're right

6    that we're not that far apart.  We thought we were pretty

7    close, actually, on the 14 that Apple agreed to.

8        We understand Your Honor's position with respect to the

9    apex issue.  We do have concern that the wait-and-see approach

10   on those two individuals, Mr. Cue and Mr. Federighi, while

11   maybe don't need to be addressed this very minute, I'm not sure

12   we can wait until January.

13       We're not even going to get the documents for these folks

14   well -- until well after January 6th.  That's particularly true

15   with respect to Mr. Federighi.  And I know you're going to be

16   hearing about that today, as well, whether you order those

17   documents produced.  But assuming you do, Apple's already

18   stated that they will not be able to get documents from these

19   new custodians out to us until well into the January, possibly

20   even February time period.

21       So the whole exhaustion issue with respect to apex

22   witnesses just isn't feasible under the schedule, which we are

23   really working hard, as I think Your Honor recognized, to

24   comply with.

25       And I know class plaintiffs feel even more pressure to

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    complete these depositions before their class certification

2    deadline, current deadline of February 3rd.

3        So the issue about the apex witnesses is that really

4    nothing is going to change between now and when we actually

5    have to sit down to take these depositions.  We won't get the

6    documents.  We really won't have taken the depositions that

7    they are saying are duplicative, including some other apex

8    folks.  So I just -- it seems difficult to do the wait and see

9    for these two witnesses.

10       And we do think it would be helpful, even if it's not

11   today, to understand what Your Honor needs from us to support

12   it and to get that submitted to the Court in the way you would

13   see it most useful so we could get an earlier ruling on that if

14   Your Honor were amenable.

15            **THE COURT:**  Okay.  Well, I think right now I -- I took

16   a look at the red line that Apple had attached, and it looks

17   like there was a change in emphasis in the letter brief, that

18   originally plaintiffs were focused more on the apex issue and

19   then have switched to the number issue.  And so that's why I'm

20   looking at the current letter brief.  I don't feel like it

21   provides me with what I would want to read about on the apex

22   issue.

23       What you could do is -- I guess I have forgotten about the

24   deadline for the plaintiffs' move for class certification, and

25   I guess we need to resolve the apex issue in time for

1  depositions to happen, if they're going to happen, in time for

2  the class plaintiffs to use them.

3      So you could come back next week or the first week in

4  January with a joint discovery letter brief.  I would just want

5  one to be focused on the apex issues in the way that the

6  current one isn't.

7      Obviously, ideally, I'd like to have you be able to review

8  documents that get produced or be able to refer to other

9  deposition testimony.  However, if the time table just doesn't

10  allow for that, and you need to move sooner, then I understand,

11  and I'll rule on it then.

12      But right now the focus of the current letter brief

13  doesn't give me an informed view on the apex issue.  So I don't

14  know if that's helpful or not in terms of guidance, but that's

15  what I'm thinking.

16      **MS. MOSKOWITZ:**  Your Honor, it's very helpful.

17      And we had intended, as you saw from the red line, to

18  brief the two individuals we thought were in dispute.  But

19  given that Apple told us all 14 that they had previously agreed

20  to were no longer agreed to unless we had a global deal, we

21  felt like we had to come to Your Honor with the support for all

22  14.

23      So you do see what we shifted on and we are -- we have a

24  lot of information that does already allow us, we think, to

25  support these two individuals.  It's not Mr. Federighi's own

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  documents, but we do have a fair amount, as you saw from the

2  red line.

3      So we appreciate your feedback, and we will certainly meet

4  and confer with Apple and, I suspect, given class plaintiffs'

5  timing and our timing, propose an earlier schedule to Your

6  Honor to try to get this done well before the close of

7  documents.

8          **THE COURT:**  All right.  Okay.

9      Let me hear from consumer plaintiffs.

10         **MS. BYRD:**  Your Honor, I don't have anything

11 additional to add to what Ms. Moskowitz said.  There was some

12 confusion in the briefing about what -- whether Your Honor

13 wanted us to give justification for each of the witnesses that

14 we wanted to depose or if it was just about the number.

15     We thought it was Your Honor wanted the former, so we were

16 surprised over the weekend to see Apple's response, and that's

17 why there was that shift.

18     If we could brief the apex issues by noon on Thursday so

19 that Your Honor could address it on Friday, I think that would

20 be preferable.  But, of course, it's up to Your Honor and your

21 schedule.

22         **THE COURT:**  That's a little fast.  I also think

23 that -- I'm trying to divorce these two different subjects

24 because I feel like if we table the apex issue for right now it

25 may be easier for the parties to agree on the number of Apple

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

 1  depositions.

 2          **MS. MOSKOWITZ:**  Your Honor, if I may, I know you're

 3  going through the line -- Lauren Moskowitz again -- I

 4  understand that.

 5          One logistical challenge may be we've been hearing from

 6  Apple that Apple goes into a holiday shutdown period where they

 7  will be not having access to their client such that I think the

 8  idea that we might be able to brief this over the course of the

 9  coming weeks, before the new year, I think, becomes, from

10  Apple's perspective, unless we hear otherwise, impossible such

11  that it may be, even if we don't do it for this Friday, could

12  we have a deadline of next week sometime to come back before

13  the holidays so that we don't lose our window?

14          **THE COURT:**  All right.  Well, why don't we go through

15  the line, and I will ask Apple their thoughts on timing of apex

16  briefing.

17          And as for the consumer plaintiffs, I did want you to both

18  talk about how many depos and who the witnesses would be.  If

19  you just -- because I need -- discussion about who the

20  witnesses would be and what the subject matters of the

21  depositions would be helps me to better understand why there

22  should be a particular number of depositions.

23          If I just have a particular number, that's too abstract.

24  And that's why I wanted kind of both discussions blended

25  together, because if you start talking about particular people

1  and subjects then that'll help me to better understand why the

2  number of depositions.  So I do see the two subjects as

3  related.

4         MS. BYRD:  So the gap between the 14 and the 16 are

5  just the two apex deponents that Apple is not willing to agree

6  that we can depose.  So, you know, we may be able to -- I don't

7  know how we agree on 16 without Apple also agreeing for us to

8  depose those two apex --

9         THE COURT:  You're clever people.  You could say it's

10  either 14 or 16 depending on the outcome of the apex motion, if

11  you wanted.  And then that -- that resolves this issue, and

12  then it just comes down to the apex.  Or you could just say 16

13  but we're going to table the apex issue or something like that.

14         MS. BYRD:  Okay.  Well, we'll talk to Apple about it.

15         THE COURT:  All right.  Let me hear from the developer

16  plaintiffs if you have anything additional to add.

17         MR. LOPEZ:  Good morning, Your Honor.  Actually,

18  Ms. Moskowitz stated what I was going to state, which is we

19  were very concerned about the shutdown that Apple is going to

20  have shortly before the holidays in light of our current

21  deadline of February 3rd.

22         And we're also very concerned as far as that is -- goes

23  with respect to scheduling depositions, which Apple seems to be

24  indicating that long period is off limits.  And as the Court

25  has observed, the current deadline for class certification

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    briefing is right around the corner.

2        So I understand what the Court is saying in terms of

3    wanting the parties to work things out, but I would simply echo

4    what Ms. Byrd said, which is that we are very concerned and the

5    sooner the better for ordering any additional briefing on apex

6    depositions.

7            **THE COURT:**  Okay.  Thank you.

8        Let me hear from Apple any and all thoughts you may have

9    on my tentative rulings and then any thoughts you may have on

10   the timing of how we should resolve the apex issue.

11           **MR. SRINIVASAN:**  Yes.  Thank you, Your Honor.

12       I want to just back up a bit on this issue.  I want to

13   address the numbers issue first.  First of all, we agree with

14   Your Honor that that is what we were supposed to brief.  We had

15   a meet and confer on Saturday that we initiated, and we were

16   trying to drive to a resolution on the number.

17       Now, 14, I just want to give you some context for that 14,

18   which we found -- we thought was more than generous.  Now,

19   Judge Gonzalez Rogers has, in the coordination order, asked the

20   parties to coordinate.  They've asked plaintiffs to coordinate,

21   and they have.  And to their credit, they have.

22       And, in fact, what they have told us is that all of these

23   depositions that they're asking for will be coordinated.  In

24   other words, each one of the plaintiffs will be asking

25   questions of these Apple witnesses; and, therefore, Your

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   Honor's comment that you get ten per plaintiff is more than

2   exhausted with 14.

3       Each one of these plaintiffs is going to be asking those

4   questions.  And, by the way, in recognition of that, Judge

5   Rogers said these depositions aren't seven hours, they're ten,

6   because they're all sharing these folks.

7       And so we're talking about 14 times 10, 140 hours of

8   deposition testimony that we agree -- or at least, as a

9   compromise proposal, said, look, we think it's too early.

10      And, Your Honor, we take your comment today that they

11  deserve some certainty.  And so we said it's hard for us to

12  divine.  We're not convinced by your list of 15 or 16 people.

13  In fact, you have five categories.  You could probably make due

14  with two per category.

15      But in the interest of resolving this dispute, we said we

16  would accept 14 ten-hour depositions.  And, by the way, Your

17  Honor, that's in context of where Epic came in and got an

18  expedited trial date telling the judge that, quote:

19          "We would plan to use the limited time that we have

20      efficiently and replicate that.  We will need some

21      additional discovery on the in-app payment processing,

22      some limited targeted additional discovery, and some

23      depositions."

24      That was the representation they made.  That was the basis

25  on which Judge Gonzalez Rogers gave a very expedited schedule,

1  one that Apple did not want.  Apple said, "We need more time."

2       And I'll just bring up the holiday shutdown.  We noted

3  that Apple is shut down for two weeks.  We noted that to them

4  from day one when we got the schedule.  They needed to know it.

5  We couldn't have shouted it to them or repeated it to them more

6  frequently.

7       In any event, notwithstanding all of that, Your Honor, we

8  said we will give you 14, let's resolve this, let's not waste

9  more time briefing all weekend and into the evening on Monday

10 night.

11      They wouldn't take yes for an answer.  Instead, they said,

12 no, no, no, this is not what Judge Hixson wants.  He wants us

13 to brief the apex issue.  We said how in the world can we brief

14 the apex issues at this early junction?  So, as a segue, Your

15 Honor, I'll go to that point.

16      But on the first point, on the number, we agree with you.

17 We're happy to go back to the table.  And when we say 14, we

18 don't think Your Honor -- we understand Your Honor's point that

19 they need some certainty on the number.  I don't think they

20 need certainty on each of the individuals at this point.

21      And we're certainly not prepared to say yes, yes, yes,

22 yes.  We'll give you a number.  We'll be reasonable.  Out of

23 their list of 16, I think we said 10 to 12 are probably fine.

24 We don't have an objection, at all, with 10 or 12 of those.

25      And, by the way, Your Honor, those 10 or 12 include Phil

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Schiller, who is as apex as it gets in terms of Apple.  He is

2    in charge of the App Store.  He is the person who provided a

3    number of declarations in this case.  He's the person who

4    corresponded with Tim Sweeney, their CEO.  He is the person at

5    Apple.

6          In addition, in the interest of compromise, we said we'll

7    offer you Tim Cook, Mr. Cook, Apple's CEO, as a deponent, but

8    we want it to be limited to four hours.  He's a busy person,

9    you don't need him.  But we're trying to work with you here,

10   and so we offered that as well.

11         They don't take yes for an answer.  They say no, we want

12   more, more, more.  And what we've said is take some

13   depositions.  Take some of the many depositions we're offering,

14   well more than you're entitled under the rules, before we can

15   assess, because we disagree with you that Mr. Cue and

16   Mr. Federighi are appropriate deponents in this case.

17         In fact, Your Honor, on that score, on the timing, you can

18   see that they're pushing for briefing this week, briefing next

19   week.  This is another recurring problem in this case.  We get

20   a letter from them.  They have a bee in their bonnet about

21   something, and then they want to bring it to you immediately.

22         Many of these issues are premature, and this issue in

23   particular, Your Honor, is premature.  Their idea of an apex

24   showing is to go through our documents -- by the way, we

25   produced three and a half million documents in this case before

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    Epic showed up.

 2         Now, remember, again, Epic said they wanted targeted and

 3    limited discovery.  We're going to be producing another

 4    million-and-a-half documents to them in this short time as a

 5    result of them pushing and pushing and pushing and Apple being

 6    accommodated notwithstanding the fact we don't have to.

 7         So they have millions of documents.  That Mr. Cue or

 8    Mr. Federighi's name is on some of these documents is no

 9    surprise.  That's not the apex showing.  It's not even a

10    surprise that you can quote him from emails.  That's not the

11    apex showing either.

12         And Ms. Moskowitz is, I'm sorry to say, just wrong when

13    she represented to you that they don't have Mr. Cue's

14    documents.  They have the lion's share, the substantial

15    majority -- I don't know what the percentage is -- of Mr. Cue's

16    documents.  Class plaintiffs have had it since July.  Epic has

17    had it since September, whenever we gave them to them.  They

18    have those documents.

19         But the documents are beside the point.  The first issue

20    is, yes, they should exhaust the documents.  The second thing

21    they should try to do is take a 30(b)(6) deposition.  The next

22    thing they should do, most importantly, is take some other

23    Apple depositions.

24         And, by the way, Your Honor, that's happening.  There's a

25    deposition of one senior executive, Mr. Okomoto of Apple.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   That's taking place over the next few days.  They're taking

2   another deposition of Matt Fisher.  And, by the way, both these

3   people are on their list.  That's taking place on Friday.

4         So they're doing the work, but they need to do that work

5   and they need to get through four or five people, five, six

6   people, before they can even think about whether Mr. Cue and

7   Mr. Federighi are appropriate apex witnesses in this case.

8         We don't see the rush.  There is no prejudice to that.  Of

9   their 14 people on that list that we didn't immediately push

10  back on, they're taking two of those people.  I think we're

11  scheduling a third one in early January, it looks like.

12        We've asked them, by the way, Your Honor, to give us the

13  names of four more people of Apple's other than Mr. Cue and

14  Mr. Federighi so we can schedule those depositions in early

15  January.

16        We are doing the work that's necessary.  They should be

17  able to do the work that's necessary before coming back to you.

18  And I can tell you, Your Honor, if we come back on this apex

19  briefing in two weeks, when there haven't been more than two

20  Apple depositions done, we're going to be no further towards

21  the goal of what they need to do.

22        And, quite frankly, it's their showing.  The law is clear

23  that they have to show they took other depositions, they asked

24  questions of these other people, they looked for documents, and

25  the only individuals that could provide relevant information

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   are either Mr. Cue or Mr. Federighi, two people who are not.

2        So we will not be in a position to prove a negative, but

3   it's their burden.  But, Your Honor, I think you should wait

4   until early January, after they've taken some depositions.

5        You are showing to us that you are able to put these

6   hearings on quickly.  We can brief these things in a matter of

7   days, and they can have one of these apex depositions if they

8   prove it out before the deadline in mid February.  There is no

9   rush.  And, frankly, a rush would not be appropriate.

10        **THE COURT:**  In terms of Apple closing down over the

11   holidays, does that affect your ability to do a letter brief

12   or, as long as in-house counsel can read it and review, are you

13   okay?  Like, does the shutdown affect your ability to brief

14   things?

15        **MR. SRINIVASAN:**  Well, Your Honor, it -- it would in

16   the sense of I do think our in-house counsel are also shut

17   down, although they work pretty hard.  You know, we probably

18   could get ahold of them.

19        But one of the things, again, that we would want to do as

20   part of an apex showing, if we had, you know, a comprehensive

21   opportunity to do that, would be to have the witness perhaps

22   provide a declaration, have maybe other people provide

23   declarations.

24        And the reason we'd be forced to do that, Your Honor, is

25   because we don't have a record.  And it's not our fault that we

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    don't have a record.

2        Class plaintiffs, incidentally -- you know, we've been

3    focusing on Epic -- have had months to take depositions.

4    They've had since July to take these depositions when they had

5    these documents.  They could have built that record.

6        And it's not our fault that they've waited.  And now we

7    have to rush a apex issue before you have the record, Your

8    Honor, that you can make a ruling on this.  And if you wait a

9    few weeks, we can do it.

10           **THE COURT:**  All right.  What would you -- okay.  I'll

11   come back to Epic in a minute.

12       But the other part of my tentative ruling was for the

13   parties to meet and confer, and then by noon on Thursday either

14   tell me you've got an agreement on the number -- not the

15   identities, just the number -- and if not, submit a letter

16   brief.

17       Does that procedure work for Apple?

18           **MR. SRINIVASAN:**  That works well for us, Your Honor.

19   We see no reason why we'd have to come back to the Court on

20   that issue.  We should be able to work that out.

21           **THE COURT:**  Okay.  Then let's talk about the timing

22   for apex briefing.  When would you propose that the letter

23   brief get filed?

24           **MR. SRINIVASAN:**  Well, you know, again, Your Honor, we

25   have asked them to schedule depositions in January.  If that

1    takes place in the first few weeks of January -- just looking

2    at my calendar here, Your Honor, if we did a briefing in, you

3    know, the week of January 18th, and if you could give us a

4    hearing at the end of that week or even early next week, that

5    still leaves us three weeks to fit these depositions in.

6        Your Honor, this is going to be a frenzied time.  They

7    want to take 14 depositions -- they want to take 16 per side.

8    That's 32 party depositions.  That doesn't include 30(b)(6).

9    That doesn't include third parties.

10       You know, this is going to be a free-for-all as it is.

11   There is no reason why we can't fit these apex depositions at

12   the end, if they have made their showing, and we will not be in

13   a position to do that until the second half of January.

14       And I think we have time to do it.  It won't be futile.

15   We will have time to do them after we have a ripe record to

16   make the assessment.  We think, of course, it won't be

17   necessary, but we think that's the proper time.

18           **THE COURT:**  All right.  For the class plaintiffs, both

19   the consumer and the developer, do you need the apex

20   depositions just to get a class cert motion on file?

21           **MR. LOPEZ:**  I think we do.  And, listen, I don't want

22   to say that we can't do it, that we can't make our showing

23   without these folks, but these folks --

24           **THE COURT:**  Of course, you never want to say something

25   like that, do you?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **MR. LOPEZ:**  Exactly, Your Honor.  But these folks are

2     very important individuals.  Mr. Federighi is not simply an

3     apex deponent, if he's even an apex deponent under the law, he

4     simply sits behind a desk and quietly does his work.

5          He's a very public executive.  One can go on to YouTube

6     and see the presentations he makes not only to consumers but to

7     developers as well, being as heavily involved in software as he

8     is, and privacy issues and those sorts of things, which Apple

9     has put squarely at issue in terms of their defenses in this

10     case.

11          I would also add that Mr. Cue is a very public executive

12     as well.  These, again, are folks who are very much engaged

13     with the developer and the consumer communities.  They don't

14     simply sit behind desks and do their work quietly and apart and

15     not engage in the details of day-to-day workings of the

16     company.

17          **THE COURT:**  All right.

18          **MR. SRINIVASAN:**  Your Honor, can I just address that?

19          Mr. Federighi, just to be clear -- and, again, I think you

20     don't want to get into this issue, but this notion that he's

21     relevant, he's necessary for class certification, he is not on

22     anybody's disclosure list, initial disclosures.  He's not on

23     theirs, he's not on ours.

24          They've thrown him into this letter.  He is a high-level

25     executive.  He's the top engineer at Apple.  And the standard

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    isn't that a person makes speeches on YouTube.  The standard is

2    do they need him and is he nonduplicative of other people.

3        In the letter they submitted -- I think Your Honor saw

4    it -- on December 11th, they have him listed with two other

5    people who, you know, we would offer for deposition.

6        Scott Forstall, who actually had Mr. Federighi's job,

7    who's the person who actually, you know, preceded him and was

8    there when the App Store was created, oversaw the decisions,

9    was part of that process, we've offered him.  They could take

10   him.

11       In fact, he's there from 2007, when the App Store is

12   created, to 2012.  Mr. Federighi came on the scene later than

13   that.  So we have offered other people.  So the notion that

14   they need these guys is far-fetched.

15       Let me just say one other thing.  Eddy Cue, on the

16   website -- this is on Apple's website, he's again another apex

17   guy.  You can read about him on the website.  It says he's in

18   charge of -- responsibilities are focused on iTune Store and

19   Apple Music, not the App Store.

20       That's what the website has about Mr. Cue.  In fact, he's

21   iTunes, Apple Music, Apple Pay, Cloud services.  App Store not

22   mentioned.  The person who is mentioned is Phil Schiller, who

23   is the apex executive in charge of the App Store.

24       Now, those are the people they need for class

25   certification.  Those folks are available.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **MR. SIEGEL:**  Your Honor, may I --

2          **THE COURT:**  Sure.  Go ahead.

3          **MR. LOPEZ:**  Mr. Srinivasan has pointed to Mr.

4     Forstall, Mr. Federighi's predecessor, and indicated that they

5     agree that he can be put up because he's irrelevant.  Well,

6     that only speaks to the fact that his successor is working in

7     these same fields over these last several years, since

8     Mr. Forstall left, is also plainly relevant to these issues as

9     well.

10         The other thing that we noticed in the documents, and I

11    think that this is pretty irrefutable, is that this is a pretty

12    tight-knit group of executives.  They're all weighing in on

13    important decisions, including Mr. Cue.

14         I know Ms. Moskowitz has cited to various documents to

15    illustrate that.  So, again, I think these folks are highly

16    relevant people.

17         And this is a case of very -- very much -- it's very much

18    a significant case.  It's very much in the public

19    consciousness.  We recently had the Congressional hearings.

20    Judge Gonzales-Rogers has observed how important these issues

21    are.

22         And, also, this is a case of very high dollar value.  And

23    so, again, I think all those things considered speak to the

24    reasonableness of deposing these folks.

25         **MS. MOSKOWITZ:**  Your Honor --

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1      THE COURT:  Go ahead.

2      MR. SRINIVASAN:  Your Honor, one quick thing.  I did

3  misspeak.  Mr. Federighi is on Epic's initial disclosures, but

4  he's not on ours.  He's not a witness that we will be relying

5  on.

6      THE COURT:  All right.

7      MS. MOSKOWITZ:  Your Honor, just briefly.  And Apple

8  doesn't think they should have to talk about apex but spent

9  quite a bit of time just now speaking about the apex witness

10  issue.  I'm not going to respond to everything that Apple's

11  counsel said, much of which is just not correct.

12      But one thing that they said that's absolutely not correct

13  is the burden here is on Apple.  This is not a burden on the

14  plaintiffs to show why we are entitled to these witnesses.

15      It is Apple's burden, and all of the cases say that, and

16  all of the cases we cited and Apple cited say that.  They're

17  the ones who have to show the extraordinary circumstances that

18  justify saying no way to a deposition.  All of the apex cases

19  say that.  It's Apple's burden to show why we are not entitled

20  to take them.

21      We have basically already noticed them.  We gave them the

22  names in this letter, and we told them we want them, and we

23  told them why.  And we told them in our joint statement many,

24  many reasons and many, many documents why.

25      That wound up getting deleted because we only had five

```
1    pages to do 16 instead of two.  But Apple knows and we know

2    enough right now to brief this issue.  We do have plenty of

3    documents.  We have plenty of reasons.

4         We have plenty of issues in this case that are just at the

5    absolute highest level of the policy decisions, the business

6    decisions, the integration decisions, from marketing to

7    engineering to all of the absolute apex issues at Apple are

8    implicated in this case.

9         We believe we can brief this issue right now.  And if Your

10   Honor doesn't want it right now, meaning this week, we would

11   like it to be next week.

12             THE COURT:  I see.  Okay.  Well, thank you, everyone.

13             MR. SRINIVASAN:  Can I address one last thing, Your

14   Honor?  I'm sorry.

15             THE COURT:  Okay.

16             MR. SRINIVASAN:  I don't know if I agree with

17   Ms. Moskowitz that the burden is ours.  But if the Court

18   believes the burden is ours, then Apple will be absolutely

19   prejudiced by any early briefing on that issue.

20        There is no way that we can defend ourselves against these

21   apex depositions without pointing to the other witnesses that

22   we're putting forward, including the topmost people in the

23   company, including Mr. Cook, to say you got this from Mr. Cook

24   or you got this from Mr. Schiller, and that's why you don't

25   need this.
```

1        And if that's their position, then we absolutely need to

2   wait until the end of January when we have a record of

3   depositions that we can defend ourselves with.

4        **THE COURT:**  All right.  Thank you, Counsel.

5        So I don't think -- if these apex depositions, or if they

6   are apex depositions -- I guess I should rephrase that.

7        The dispute here is about two particular witnesses.  And I

8   don't think that the class plaintiffs need to depose these two

9   witnesses before they get a class cert motion on file.  I just

10   don't think that's necessary.

11        So I don't think the beginning of February is the deadline

12   for those depositions to happen, if they're going to take

13   place.  And I would like to proceed in a deliberate fashion

14   where we have other people get deposed first, and then that can

15   inform the apex analysis as the parties brief it and as the

16   Court considers it.

17        So I am inclined to have the parties submit a letter brief

18   the week of January the 18th.  It wouldn't be the 18th itself,

19   because that's MLK Day, but sometime -- I'm just looking at my

20   schedule now.  Let me see.

21        I think the parties should submit a joint discovery letter

22   brief on the apex issues for these two witnesses by end of the

23   day on January 19th, 2021.  And then we're going to set this

24   for hearing at 10:00 a.m. on January 21st of 2021.  And the

25   joint discovery letter brief, let's -- my thought is ten pages

```
 1   total, so five pages for each side.
 2       So let me ask plaintiffs.  I know this isn't the timing
 3   that you preferred, but the other procedural aspects of this,
 4   what are your comments?
 5           MS. MOSKOWITZ:  Your Honor, I think that's
 6   understandable.  And I would ask if Apple could get dates for
 7   both of these witnesses within the deadline period on hold so
 8   that we do have a date when Your Honor resolves this and, as we
 9   hope, orders the depositions, that we already have them on the
10   calendar and that we don't slip in with our deadline, which is
11   absolutely critical for us to meet.
12           THE COURT:  Well, I think Apple should understand that
13   I might order the depositions to take place.  So just -- you're
14   going to need to plan in the event that there's -- deponents
15   have to make themselves available.
16       Is that understood, Mr. Srinivasan?
17           MR. SRINIVASAN:  Yes, we understand, Your Honor.
18           THE COURT:  All right.  Any other procedural comments
19   from the plaintiffs?
20       All right.
21       And then, Apple, does that schedule -- is that workable
22   from your point of view?
23           MR. SRINIVASAN:  It is, Your Honor.
24       I still have some concerns that we won't have enough
25   depositions under our belts, but I think that puts the onus on
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    plaintiffs to give us dates and start getting these scheduled.

2    And if they don't, you're going to hear that argument from us.

3              THE COURT:  All right.  Okay.  Then this is what I'm

4    ordering for the apex issue.  I'm not resolving that today.

5    Instead, I order the parties to file a joint discovery letter

6    brief not to exceed ten pages, so that's five pages per side,

7    by the end of the day January 19th, 2021.  And then I'm going

8    to set this for hearing 10:00 a.m., January 21st, 2021, on

9    those apex issues.

10         With respect to the remaining depositions, as I said

11   before, I'm ordering the parties to meet and confer further and

12   then, by noon on December 17th, to file either a stipulation

13   and proposed order concerning the number of Apple depositions

14   or a joint discovery letter brief, not to exceed ten pages,

15   concerning the number.

16         And then if there is a joint discovery letter brief, we'll

17   have a hearing at 9:00 a.m. on Friday, December 18th.  And if

18   there isn't a letter brief and there's a stip and proposed

19   order instead, then we'll vacate the hearing.  So that's what

20   I'm doing on depositions.

21         Any further questions on the depositions?

22             MS. MOSKOWITZ:  No.  Thank you, Your Honor.

23             MR. SRINIVASAN:  No.  Thank you.

24             THE COURT:  Okay.  Great.

25         Now let's turn to the other discovery letter briefs.  I'm

1   going to -- let's start with -- in the low-numbered case,

2   11-6714.  It's ECF number 269.  And these are the consumer

3   plaintiffs' requests for production.

4        I'm just -- I'm going to go down the line.  For RFPs 33,

5   34, 36 through 38, and 44, Apple says that it has produced or

6   will produce nonprivileged documents responsive to those RFPs.

7        What I would think that language means is you're producing

8   the nonprivileged responsive documents.  Some of them are

9   already in what you produced.  The rest will be in what you

10  will produce.  But there's no fight about those RFPs.

11       Is that right or have I misunderstood?

12            MR. DETTMER:  Your Honor, thank you.  Ethan Dettmer

13  for Apple.  That's correct.  The upshot, as Your Honor knows,

14  is that we are doing a custodial production here where we have

15  a, you know, fairly large group of custodians from whom we're

16  producing.

17       We've gathered documents.  And both in the App Store case,

18  and now going forward in the production that Mr. Srinivasan

19  referenced, you know, documents that would be responsive to

20  those requests are within the scope of what our reviewers are

21  tagging and marking for production to the extent they're not

22  privileged.

23       So, yeah, I agree there should be no dispute on these.

24            THE COURT:  All right.  Let me ask plaintiffs.

25       Do you see a dispute here?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **MS. BYRD:**  Your Honor, the problem was that Apple's

2    initial responses were all objections.  And then we met and

3    conferred, and there was no agreement by Apple to produce

4    anything in response to those.  There may have been some, you

5    know, I'll take it back to my client or we'll look into it.

6          Then the correspondence that followed was vague about

7    whether Apple was going to search for these documents or

8    whether it felt like the documents it had already produced to

9    other responses satisfied enough that they didn't need to do

10   another search.

11         And so we were concerned, based on Apple's vague and

12   noncommittal language in its letters, that it was standing on

13   what it had already produced, even though not responsive

14   completely to these new RFPs.

15         So -- and I wrote a letter to Mr. Dettmer or his associate

16   specifically asking for a clear response about what does "or"

17   mean?  Are you doing a new search or are you just stating that

18   what we've already -- we've already produced some documents

19   that happened to be responsive to these, so that's good enough?

20   And I didn't get a clear answer.

21         And so I felt compelled to include it in the letter

22   because we couldn't wait any longer for Apple to get back to us

23   or decide when it was going to be clear about if it was or was

24   not going to search for these documents.

25         **THE COURT:**  Okay.  Well, I'm not blaming you for

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    raising the issue.  That's perfectly fine.  I just feel like at

2    this point we do have an answer and that they are producing the

3    documents.

4         Does that sound right to you?

5         **MS. BYRD:**  Yes.  If Mr. Dettmer is saying that Apple

6    is searching for these documents, then I'm satisfied.

7         **THE COURT:**  He's not saying that.  Apple is not going

8    to do a new search each time they get an RFP.  What he's saying

9    is they're producing responsive documents, but that most likely

10   because they've been embraced in prior searches.

11        I know the plaintiffs, at times, seem to be taking the

12   position that Apple has to go out and do a fresh search for

13   each RFP.  And they're definitely not doing that, and I don't

14   think they're obligated to.

15        **MS. BYRD:**  Well, I don't know what Apple's TAR

16   methodology has been in terms of what they've told the computer

17   to look for.  So if Mr. Dettmer is telling me that what they

18   told the computer to look for a year ago encompasses these

19   requests, then, yes, that's fine.  But I haven't -- until today

20   I hadn't heard that either.

21        **MR. DETTMER:**  Your Honor, first of all, I disagree

22   with that.  On meet and confer calls I've told the plaintiffs

23   counsel exactly what I said to you this morning, which is that

24   our reviewers are tagging as responsive and producing documents

25   that are responsive to these requests.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1        And, frankly, these requests are largely overlapping with

2    ones for which we have been tagging and producing as responsive

3    for some time.  So, you know, in other words, documents

4    responsive to these are within the scope of what we are

5    producing and -- both in the past and going forward.

6        **THE COURT:**  Okay.  All right.  I don't see a dispute

7    here.

8        So Apple's language that you use to talk about RFPs 39 to

9    41 and 50 is different, just the phrasing.  Apple says that its

10   productions to date have included nonprivileged documents

11   responsive to these RFPs.

12       Just as I read that language, it sounds to me like some of

13   the responsive documents are being produced, but it's

14   definitely different than the verbiage you used for the prior

15   RFPs we just talked about.  So I'm wondering if Apple can

16   clarify.

17       **MR. DETTMER:**  Sure, Your Honor.  And, I'm sorry, which

18   specific responses were you just referring to?  And I

19   apologize.

20       **THE COURT:**  Sure.  RFPs 39, 40, 41, and 50.  And let

21   me -- on the letter brief, let me turn to Apple's section.

22       It's in the first paragraph under Apple's position where

23   it says that Apple has investigated and confirmed that its

24   productions to date have included nonprivileged documents

25   responsive to those RFPs.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **MR. DETTMER:**  Yes.  So thank you, Your Honor.  I
2     appreciate the clarification.  And I apologize if -- if the
3     difference in language has caused any confusion.

4          Those categories should go in exactly the same category as
5     what I just described.

6          **THE COURT:**  All right.

7          **MR. DETTMER:**  Documents that are responsive to those
8     requests will come within the scope of what we are marking as
9     responsive and producing, to the extent they're nonprivileged,
10    with the current custodians as well as past custodians.

11         **THE COURT:**  Got it.  Okay.  Well, that's a helpful
12    clarification.  I appreciate that.

13         Plaintiffs, any response to Apple?

14         **MS. BYRD:**  Well, Your Honor, you picked up exactly on
15    why I grouped these differently.  That language concerned me,
16    the "some documents."  But if Mr. Dettmer is telling me that
17    they're treating this group the same as the other group, then
18    that's fine.

19         **THE COURT:**  Okay.  Good.

20         RFP 47, this is a tricky one because I don't think RFP 47
21    is relevant at all to the consumer plaintiffs' claim, which is
22    a Kodak-style aftermarket claim.  It's clearly relevant to the
23    developers' claim because the impact on the developers matters.
24    But the developer plaintiffs say they're not moving on this RFP
25    because they're trying to work out a deal with Apple.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          So why should I grant the motion that the consumer

2    plaintiffs are bringing if the developer plaintiffs are not

3    moving on it and are trying to work out a deal?  That's the

4    question I have for you.

5          **MS. BYRD:**  Your Honor, I was not involved in the

6    discussions between developer plaintiffs and Apple.  That's

7    part of the problem as to why we sort of lagged a little bit

8    behind here, is we saw the developer plaintiffs had requested

9    this data.  We told Apple we wanted, too, but we didn't

10   propound a duplicative request because we were trying to follow

11   the discovery coordination stipulation and order.

12         Then Apple and the developers had some discussions, that I

13   was not privy to, and came to some sort of agreement that Apple

14   didn't have to produce, now, the international -- the foreign

15   transactional data.

16         And then when I reminded Apple, well, we need it too, you

17   know, I've been telling you we're also seeking that same

18   information, Apple said, well, you didn't propound your own

19   RFP, so sorry.  So we turned around and propounded an RFP.

20         The reason we need it is because our experts are telling

21   us they need it for their impact and damages model.  It's --

22   it's relevant to whether a developer is going to invest the

23   money into developing apps.  So it's relevant to profitability.

24         If a developer develops an app here in the U.S., and it's

25   sold in the U.S. but it's also sold in China or some other

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    country, the revenues that that developer is going to see from
 2    worldwide sales is relevant to that developer's decision to
 3    invest that money in producing that app.
 4         So while we're not seeking damages for international
 5    antitrust conduct, the discovery is still relevant to the
 6    demand analysis that our experts are telling us they need to do
 7    for their model.
 8         THE COURT:  But that's not your lawsuit.  Your lawsuit
 9    is about the investment that current consumers make when they
10    purchase an expensive iPhone and the lock-in effect that has
11    that -- that binds them at that point.  That's what your case
12    is about.
13         MS. BYRD:  Right.  But relevant to that impact on
14    consumers is, what do developers do?  We allege that consumers
15    are harmed because developers can only sell through the App
16    Store and consumers can only buy through the App Store.
17         So what developers do in response to the monopolization is
18    relevant to the impact that that has on consumers and the
19    damages that they suffer.  It's relevant to whether innovation
20    suffers and whether consumer choice is affected.  So it's all
21    wrapped into the analysis.
22         THE COURT:  All right.  Let me ask the developer
23    plaintiffs, have you worked out a deal with Apple on these
24    types of the revenues?  You're on mute.
25         MR. LOPEZ:  Beg your pardon, Your Honor.
```

```
 1        We're still in the process of working out the details with

 2   Apple.  First of all, we have always contended that the

 3   international data is relevant to our claims, that it's within

 4   our claims, and that it's apt here.  And Apple has raised

 5   certain issues regarding the FTAIA.  And we think that the

 6   FTAIA does not apply, and if it does, there are exceptions.

 7        So, for now, at least in the hopes of completing this deal

 8   with Apple, we're willing to stand down.  And we anticipate

 9   looking at this in phase two.  Not that it would simply go away

10   from the case, but that we would defer it, see how this turns

11   out for now, again, assuming that we can work out the details

12   with Apple, and then revisit the production of this data.

13        And part of the reason we did that is because of the size

14   of the data here at issue, and we thought that it made some

15   sense to do this in a phased fashion.

16        THE COURT:  All right.  Okay.  Thank you.

17        Let me hear from Apple.

18        MR. DETTMER:  Sure, Your Honor.  Thank you.

19        As Your Honor pointed out, and we certainly agree, this

20   information is not in any way conceivably relevant to the

21   consumers' case.

22        We also think it's of, at best, you know, small tangential

23   relevance to the developer case.  So, as Your Honor points out,

24   that's not at issue right now.

25        And I think the third issue -- and, Your Honor, I'm sure,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  got a sense of this from the transactional data separate

2  letter.  You know, this is a massive database.  And I can go

3  into some detail about, you know, the amount of work that's

4  been done to gather and prepare for production that other

5  database.

6        **THE COURT:**  Go ahead, because I'm going to ask you

7  about that later in this hearing.

8        **MR. DETTMER:**  Sure.

9        **THE COURT:**  Are you thinking of producing the foreign

10  transactional data or is it just revenue figures for app

11  styles?

12        **MR. DETTMER:**  I'm sorry, for foreign transactions?

13        **THE COURT:**  Well, you're working out a deal with the

14  developers, but I -- I guess maybe I misunderstood.  I thought

15  they were just interested in revenue figures.

16        **MR. DETTMER:**  Yes.  Well, I guess -- that's what we

17  were discussing with the developers.  I think the consumers are

18  asking for much more than that, I believe.  In any event --

19        **THE COURT:**  They've narrowed it in the letter brief, I

20  think, to revenue figures.

21        **MR. DETTMER:**  Yes.  And that -- that information

22  would, similarly, be extremely burdensome to generate.  I mean,

23  it would have to be gathered.  This would take, according to

24  our discussions with the computer scientists, literally

25  hundreds, maybe four, five, six hundred hours of computer

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1    scientists' time in order to gather that information, probably

2    even more time to synthesize it and aggregate it in order to

3    produce it.

4         It's a really significant investment of time by the

5    computer scientists, not to mention lawyers and other employees

6    who would have to be involved in that.  And that's something

7    we've learned from doing the domestic data gathering that we've

8    been working on.

9         So, you know, given the either no or extremely tangential

10   relevance of these issues to this case, plus the FTAIA issues

11   that Mr. Lopez mentioned, obviously, we have a different

12   understanding of what that statute prohibits here, plus the

13   burdens that this would cause that that -- you know, that

14   production just doesn't make sense here and would be vastly

15   disproportional to the benefits of the case.

16        THE COURT:  All right.  Ms. Byrd, I'm inclined not to

17   grant the motion to compel on RFP 47, mostly because the

18   developer plaintiffs and Apple are still working on it, and I

19   want to see if they can come up with some agreement.  So any --

20   that's where I'm going with this.

21        MS. BYRD:  Your Honor, I would ask if you're inclined

22   to deny the motion, that we be given an opportunity.  It would

23   be a premature disclosure of our expert, but we could submit a

24   declaration explaining -- you know, from our expert explaining

25   why he needs this information.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **THE COURT:**  Okay.  Well, that makes sense.

2      I'm just taking notes here.

3          **MS. BYRD:**  I mean, the model is complicated.  I don't

4  even pretend to understand the economic, you know, intricacies

5  that go into developing an antitrust impacted-damages model.

6      But I do understand that it's important for the model that

7  they're working on, and so --

8          **THE COURT:**  Would this -- this would be an expert

9  declaration in support of class cert motion?

10          **MS. BYRD:**  Well, the declaration I had just mentioned

11  would be in support of --

12          **THE COURT:**  No, no, no.  I know the declaration would

13  go to me to explain why he wants it.  But what is the report

14  itself for?

15          **MS. BYRD:**  Right.  For class certification, to show

16  that impact and damages can be proven on a class-wide basis.

17          **THE COURT:**  Okay.  Then I guess we need a follow-up

18  procedure.  Here, I'm just looking at my calendar now.

19      So you would want to submit a declaration from your

20  expert.  I think in fairness -- then you would have an

21  argument.  And, in fairness, I think Apple should be given an

22  opportunity to also discuss your expert's declarations.

23      So I'm thinking a joint discovery letter brief that

24  provides your expert's declaration and then arguments by both

25  sides would be the way to go.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1          And, Apple, the burden argument didn't come through in the

2     briefing, so you probably want to beef that up in what you

3     file.

4          So let me ask, Ms. Byrd, when would you like to get that

5     on file?

6          MS. BYRD:  I'm not sure what the expert's schedule

7     looks like over the next couple of weeks.  We're getting into

8     Christmas, the Christmas holiday.

9          I would ask for at least a week.

10         THE COURT:  All right.  Apple, your thoughts?

11         MR. DETTMER:  Well, Your Honor, after we get that

12    letter or that declaration, we're going to have to obviously

13    have our expert look at it as well.  And, you know, given,

14    obviously, the holidays I don't know that we're going to be

15    able to get that done.

16         So if we got the declaration at some point next week, I

17    think we'd need, you know, until early January at least, given

18    the holidays, for our experts to look at that and have comment

19    on it.

20         THE COURT:  Okay.  Because your expert might have a

21    declaration too.  Is that right?

22         MR. DETTMER:  Well, I don't know, not seeing what

23    the -- what we're going to get from the consumer plaintiffs,

24    but it's certainly a possibility.

25         THE COURT:  Okay.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **MR. DETTMER:**  We're going to need our expert to look

2     at it and tell us what the response is.

3          **THE COURT:**  Fair enough.  So you would want the first

4     week of January for this letter brief to go in?

5          **MR. DETTMER:**  I think that's right, Your Honor.  That

6     would be -- maybe toward the end of that week, just to take the

7     holidays into account.

8          **THE COURT:**  I'm just looking at my schedule here.  I'm

9     thinking that the parties file a joint discovery letter brief

10    by January 6th.  And then I'll set it for a hearing 9:00 a.m.

11    on January 8th.

12         How does that work for the consumer plaintiffs' schedule?

13         **MS. BYRD:**  That should be fine, Your Honor.

14         **THE COURT:**  And for Apple?

15         **MR. DETTMER:**  Yes, Your Honor.  Thank you.

16         **THE COURT:**  Let's set a hearing for January 8th, at

17    9:00 a.m.  Okay.  So that's what we'll do on RFP 47.

18         RFP 48, let me pull up what that one was.

19         RFP 48 struck me as not ripe for review.  I would like

20    Apple to do some more investigation, and then I want the

21    parties to meet and confer further.

22         And if this dispute comes back to me, I would like the

23    plaintiffs to spend more than one sentence explaining why the

24    material sought by RFP 48 are relevant.

25         And so I'm inclined to sort of just tell you to go

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   investigate and meet and confer further and not do anything

2   further on RFP 48.

3       But let me ask the plaintiffs if you have any further

4   thoughts.

5       **MS. BYRD:**  Again, this is something that our experts

6   are telling us that they need for their model, and so we're

7   happy to meet and confer with Apple further on it.

8       **THE COURT:**  All right.

9       And, Apple, can you productively investigate and then

10  figure out what is there, what exists, and then meet and confer

11  with the plaintiffs?

12      **MR. DETTMER:**  Yes, Your Honor.  That's been in

13  process, and we're certainly happy to do that.

14      **THE COURT:**  All right.  Thank you.

15      RFPs 51 and 52, these are the documents for data that

16  Apple provided to Analysis Group in connection with the two

17  published reports.

18      So I understand, I guess Apple has also retained Analysis

19  Group to consult in this litigation.  Is that right?

20      **MR. DETTMER:**  Yes, Your Honor.  They are -- those are

21  experts we are working with in this case on the same issues.

22      **THE COURT:**  So my view is, just because you hire the

23  same experts to do basically different things -- one is to

24  draft reports that are published publicly, and the other is to

25  consult in litigation -- I don't think that work product creeps

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    all over everything just as a result of that.

2         And so what I'm inclined to say is that Apple has to

3    produce all the documents and data that it gave to Analysis

4    Group in connection with the two public reports.

5         As for communications, that's a little trickier because

6    you could have communications now with Analysis Group in their

7    consultative capacity about their reports.  And, in fact, you

8    probably would.

9         So I'm thinking maybe communications considering the

10   reports through the date of their publication.  What I want to

11   do is have you produce the nonwork product stuff and not the

12   work product stuff.  I'm just trying to figure out where to

13   draw the line.

14        And so I'd like your thoughts on that proposed line.

15        MR. DETTMER:  Well, Your Honor, the fact of the

16   matter -- oh, I'm sorry, did I interrupt?

17        THE COURT:  No.  Go ahead.

18        MR. DETTMER:  The fact of the matter is that those

19   communications were -- were by my firm, you know, by lawyers

20   who were having these communications with the consultants.

21        Sorry.  I may be having a network issue.

22        THE COURT:  Well, I can hear you.

23        MR. DETTMER:  Oh, good.  Okay.  I'm sorry, the screen

24   froze.

25        So these communications were occurring between Gibson,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Dunn lawyers and these consultants regarding issues that are,

2    you know, obviously directly relevant to this litigation, and

3    it's in the capacity with, you know, exactly what we're doing

4    in connection with this case.

5        So, you know, these communications are privileged work

6    product communications.  You know, we can look and see,

7    obviously, whether there are any that fall outside that, but I

8    don't anticipate that there are.

9            **THE COURT:**  I just don't understand how any of those

10   can be privileged or work product.

11       If the attorneys at your firm are working with Analysis

12   Group so that they can create this public report that is then

13   released, that's not the expert report in this lawsuit.  It's

14   just a public thing that's on their website that anybody can

15   get by searching on Google.

16       The fact that you've used the same people to have these

17   communications, I don't think you -- I mean, I just don't see

18   how that makes it work product.

19           **MR. DETTMER:**  Well, Your Honor, it's talking about the

20   same issues, and it's obviously talking about these

21   communications would have attorney work product in them.  To

22   the extent that those are being sent out to these consultants,

23   that obviously doesn't lose its work product character just by

24   the fact it's being communicated with consultants.

25           **THE COURT:**  But if it's all about helping them to

1    draft those published reports, that's just a different task

2    than providing an expert report for litigation.  I mean, it's

3    more like advertising and marketing.

4         **MR. DETTMER:**  No, Your Honor, because it's talking

5    about these specific legal issues.  And then, obviously, the

6    legal issues are also at issue in those reports, and they're

7    related to this.

8         Maybe one thing to do is for us to actually look at those

9    communications, and to the extent they're outside of work

10   product, it would be a different -- a different story.

11        But, you know, obviously, as Your Honor knows, work

12   product isn't waived by communications with consultants,

13   period.  So it shouldn't be an issue.

14        **THE COURT:**  Well, if Apple hires an advertising

15   company and they tell Gibson Dunn to go work with the

16   advertising company to, you know, come up with a campaign that

17   explains why Apple's integrated ecosystem is great, why would

18   these communications have a work product quality to them

19   anyway?

20        **MR. DETTMER:**  Well, because, again, in your

21   hypothetical, if Gibson Dunn said to the advertising firm,

22   well, you're planning on doing this sort of -- planning on

23   making this statement, here's how it would affect the

24   litigation and here's how it interacts with our legal theories

25   about this litigation, that communication is work product, and

1    it maintains its work product character even if it's being

2    communicated to consultants about something else, because it's

3    discussing the litigation and litigation strategy.

4         **THE COURT:**  But if you've hired these people to do

5    essentially an advertising function, then haven't you waived

6    work product by disclosing all of this to them?

7         **MR. DETTMER:**  No, Your Honor.  I mean, that's not my

8    understanding of how the work product doctrine works.  I mean,

9    the work product doctrine is -- obviously, it's not waived

10   unless the communications themself are made public, and that's

11   not, obviously, what's happening here.

12        **THE COURT:**  All right.  Well, what -- all right.

13        Let me hear from the plaintiffs.

14        **MS. BYRD:**  I don't think a communication even becomes

15   work product in the first place unless it's made for purposes

16   of litigation.  If the communication is made for purposes of

17   creating these reports to tell the public how awesome Apple is,

18   that's not work product to begin with.

19        So -- and to the extent that there is work product that

20   Gibson Dunn handed over to these consultants for the purpose of

21   creating these public marketing reports, they've waived.  I

22   would agree with Your Honor on that.

23        **THE COURT:**  All right.  Well, Mr. Dettmer, is there a

24   way we can test the work product claim without me having to go

25   yea or nay right now on all of that stuff?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **MR. DETTMER:**  Well, sure, Your Honor.  I mean, I

2    think, at a minimum, if Your Honor was inclined to look at

3    this, at a minimum what we would do is log it.  I mean, that's

4    not something that's required under the expert discovery order

5    in this case.

6          But I hear what Your Honor is saying.  At a minimum, we

7    would log those communications and, you know, they would be

8    then, you know, more ripe for review by Your Honor.

9          Although, again, I think that's -- that's not consistent

10   with the -- with the discovery order in this -- I'm sorry --

11   the expert discovery order in this case.

12          **THE COURT:**  Normally, you don't log communications

13   with your expert.  I mean, you just don't do that at all.

14          **MR. DETTMER:**  Right.

15          **THE COURT:**  The issue I'm having is that it seems

16   Analysis Group was being used in two different roles, one as an

17   expert consultant in the litigation, and the other is more of a

18   public relations capacity, but Apple used the same people to

19   communicate with them for both projects.

20          What about the request -- I think RFP 51 was the documents

21   or data that Apple provided to Analysis Group in connection

22   with the reports.

23          Would you claim work product for any of that, leaving

24   aside communications?

25          **MR. DETTMER:**  No, Your Honor.  I think -- I mean,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1   we've planned and we've told the plaintiffs that we would

2   produce the documents relied on, you know, with -- by this --

3   by these consultants, and that's something we're planning on

4   producing.

5           THE COURT:  All right.

6           MS. BYRD:  Your Honor, I think there's a slight

7   distinction between what they gave AG and what they relied

8   upon.  I just point that out.

9           THE COURT:  Oh, for sure.  The tentative is whatever

10  Apple gave to AG, not what they relied on.

11          MR. DETTMER:  I don't know, as I sit here, whether

12  there is, in reality, a difference between those two things.  I

13  mean, in practice is what I mean.  And that's certainly

14  something we can figure out.

15          THE COURT:  Okay.

16          MR. DETTMER:  So, Your Honor, I guess, just to

17  reiterate, what I would propose, if Your Honor believes that

18  there's questions about whether this should be protected by the

19  work product doctrine -- and it sounds like maybe you are

20  thinking that -- at a minimum, we should be able to log this

21  information so that that can be tested in a more granular way.

22          THE COURT:  All right.  Thank you.  I think that makes

23  sense.  We don't want to barrel ahead on work product if there

24  might be a slower implemental step that we can take.

25          Any more comments from plaintiffs?
```

1          **MS. BYRD:**  No, Your Honor.

2          **THE COURT:**  All right.  Thank you.

3      RFP 53, this is about Apple's decision to change its app

4   review procedure that it announced on August 2020.

5      My thought is to order Apple to produce documents

6   responsive to this RFP, but I don't think you have to do a new

7   or a fresh search for those documents if your previous searches

8   found the responsive ones.

9      What is Apple's thought?

10         **MR. DETTMER:**  Your Honor, with respect to that RFP, on

11  our current review and production that's going forward, we will

12  be capturing those documents to the extent they're within

13  that -- you know, the universe of those custodians and are

14  nonprivileged.

15         **THE COURT:**  All right.  Thank you.

16     Any more comments from plaintiffs?

17         **MS. BYRD:**  No, Your Honor.  That's fine if they're

18  including this RFP in their current searching.

19         **THE COURT:**  Okay.  All right.

20     Now let's turn to Apple's production of cost and expense

21  documents and data.  And for case 11-6714, that's ECF number

22  270.  Hold on while I pull that up on the screen.

23     Oh, before I address the merits of ECF 270, there were a

24  number of motions to seal that were filed in connection with

25  these letter briefs.  The general form is that plaintiffs moved

1   to put everything under seal just because Apple had designated

2   some things, and Apple responded by having some more granular

3   proposed redactions.

4        And all of Apple's proposed redactions seemed fine to me.

5   And since Apple both -- under seal showed what was redacted and

6   then not under seal actually filed something that has those

7   redactions, I don't think there's -- I would just say Apple's

8   redactions look good, and Apple doesn't need to file -- doesn't

9   need to do anything else on the motions to seal because they

10  already have redacted versions in the public records.

11       Do plaintiffs have any concerns about that?

12            **MR. LOPEZ:**  No, Your Honor.

13            **MS. BYRD:**  No, Your Honor.

14            **MR. DETTMER:**  Thank you, Your Honor.

15            **THE COURT:**  Let's go to 270.

16       The hyperlinked documents.  Yikes.  What a nightmare that

17  sounds like.

18       Let me tell you what I think Apple's obligations are with

19  respect to the hyperlinked documents, and then if you disagree,

20  you can all tell me why you think I'm wrong.

21       My view is that if a custodian's email has a hyperlink to

22  a document that was stored in a cloud-based storage system or

23  some other file transfer system, that shows the custodian is

24  using that system as a custodial source of documents.

25       So I think that Apple has an obligation to go to those

```
 1   systems and do its best to find those documents that the
 2   hyperlink related to.  And I think Apple has an obligation to
 3   go find anything that might have been a linked document, even
 4   if you can't know for sure if it's exactly the same as it
 5   existed at the time the email was sent.  For example, I
 6   understand the versions could change over time.
 7        And I also think that for each email like that, Apple has
 8   to tell the plaintiffs, by Bates number, which document or
 9   documents might have been the linked document.  And the reason
10   is, this knowledge is only in Apple's possession.
11        If Apple produces a big pile of emails that have
12   hyperlinks in them and then separately a big pile of documents,
13   it's too difficult or impossible for the plaintiffs to know
14   which hyperlink is which document.  I think that's only
15   something Apple can figure out.
16        However, I don't think Apple is obligated to represent
17   with certainty that a particular document is the thing that the
18   hyperlink related to on that day, because I think Apple has at
19   least persuasively explained to me that Apple can't really know
20   that for sure.
21        But that's my sense of what Apple is obligated to do, but
22   let me ask the plaintiffs if you think they should have to do
23   more than that.
24        MR. LOPEZ:  So I think, Your Honor, that the tie to
25   these links is a separate consideration, as the Court has
```

 1   identified.  And, certainly, if that information is available,

 2   if Apple is able to track it in the way that the Court just

 3   indicated now, then obviously we want that information.

 4        But what we really want are the costs and budget documents

 5   and the cost and budget data.  And I think what the Court has

 6   described is a good way to get that information beyond what we

 7   have now.

 8        And, again, we've been pushing for this information since

 9   we discovered these links, and it's taken us this long to get

10   this far.  And, obviously, again, we're very close to the

11   February 3rd deadline.

12        So anything like this we, first of all, think is within

13   Apple's obligations regardless of the fact that it continues to

14   insist that this is merely custodial-based production.  That's

15   Apple's limit, as you will, on this.  We never agreed to that.

16        So wherever those documents are, whether it's in the cloud

17   or a document management system on the hard drives of people

18   that they've been transmitted to, they're really within a

19   call -- a reasonable call of our requests for production.

20            **THE COURT:**  Okay.  Thank you.

21        Let me ask Apple, do you think the way I've described --

22   what I think your obligations are, do you agree?

23            **MR. DETTMER:**  Your Honor, no, for one reason.  Well,

24   let me say it this way.  In a limited sense, yes.  But the

25   burden of actually doing the work to tie those documents, the

 1   email link to a document in a custodian's cloud or on their
 2   hard drive or something like that, we've -- you know, as Your
 3   Honor has seen from the briefing, we've done that for the 30
 4   links that the plaintiffs identified in their correspondence to
 5   us.
 6        And the burden per link is something like five to seven
 7   hours per link, and that means lawyer time of searching, you
 8   know, doing database searches, potentially interviewing a
 9   witness, a custodian, going and talking to them for half an
10   hour or an hour, and going through whatever they have, then
11   technical time of trying to match up, you know, the actual
12   documents that are recovered, if any, with metadata of time
13   stamps.
14        So, you know, what our solution to this was -- and Your
15   Honor saw this in the briefing -- is that we said give us some
16   reasonable number of documents that you think are important and
17   we will go search out, to the best of our ability, which
18   documents they are.  And we've done that for the 30 documents
19   that -- I'm sorry -- the 30 links that the plaintiffs
20   identified.
21        And, you know, I can actually kind of go through that the
22   results of that really show the challenges of this.  For
23   example, for the 17 file transfer links that were -- or,
24   actually, I'm sorry, 19 file transfer links that were among
25   those 30 emails, we found over -- let's see -- 128 documents

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    that may have been the documents that were referenced in those

2    links.

3         So, you know, we identified those to the plaintiffs.  And

4    that took, you know, some -- nearly a hundred hours of time,

5    both lawyer time and talking to witnesses and trying to figure

6    out if that's there, and we don't get a reliable linkage.

7         So the issue is, if we had to do this for every linked

8    document -- and, first of all, just identifying that universe

9    would be an enormous task.

10        I mean, we would probably, if we were going to do it in

11   any kind of reliable way, have to go back and re-review all of

12   the emails that we've produced and have people just identify

13   links in that review process, and then go and investigate

14   those.  And that, obviously, is not practical in any way.

15        You know, we've tried to do some word searches to come up

16   with, you know, emails that have these links in them, and

17   that's not reliable because the link nomenclature can be so

18   different in each and every instance.  That's just not a

19   reliable way to do it.

20        So our solution, which we proposed to the plaintiffs on

21   numerous occasions, was give us some, you know, manageable

22   number of the ones you think are important and we will follow

23   up on that and, you know, do this work that Your Honor

24   identified.

25        And the plaintiffs have refused to do that, saying not

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1    only do we need to do that for all of the documents where it's

2    a custodian who sent it, but for everyone.  And, obviously, if

3    we're going to have to look for noncustodian documents, I mean,

4    that's even more work because we have to then go talk to that

5    person, get their data, look through their iCloud or their hard

6    drive or something like that.

7         And, you know, if you're talking about five to seven or

8    even more hours per instance, you know, you can very quickly

9    see how that becomes an extremely unmanageable number of hours.

10   And, the value of it is low because there's so much

11   unreliability in matching up that link with a particular

12   document.

13        THE COURT:  Well, then, let me ask what Apple's

14   procedure is before the plaintiffs complained.

15        Say you have a custodian.  You collect that custodian's

16   emails, you produce the ones that are responsive, and they have

17   a bunch of hyperlinks in them.  Before plaintiffs pipe up or

18   say anything, what effort, if any at all, does Apple undertake

19   to find those linked documents?

20        MR. DETTMER:  Well, so we -- it's not tied to the

21   linked document issue.  What we would do is, in talking to that

22   custodian, you know, you pick a custodian who's here, we would

23   get their email, but we would also look at their iCloud, we

24   would look at their hard drive, we would look at whatever other

25   sources of data that they have and go through and find
```

1   documents that are relevant to the matter.

2       So, in other words --

3           THE COURT:  Would that include file transfer systems?

4           MR. DETTMER:  Well, the file transfer system, I mean,

5   the way that would work, Your Honor, is, you know, the file

6   transfer systems are transient.  They don't -- they don't stay.

7   So, you know --

8           THE COURT:  I thought the links were active for only a

9   short period of time but that Apple isn't aware of any data

10  being destroyed.

11          MR. DETTMER:  Right.  So the way that would work is,

12  I -- say I have a large document, a spreadsheet, on my -- on my

13  hard drive, and I want to send it to a co-worker through one of

14  these transient links.  I would, you know, hook it up that way,

15  and the co-worker could open it and look at it.

16      But the document would stay on my hard drive, and so that

17  document would then be collected in our process because it's

18  responsive and relevant and made available.

19      And, in fact, you know, we've -- we've, in this process,

20  found those documents, to the extent they exist, on

21  custodian -- well, if they do exist, on a custodian, you know,

22  either in their iCloud or hard drive or some other storage

23  mechanism.

24          THE COURT:  So are you saying, then, that for

25  custodians who have responsive emails with hyperlinks, you, on

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    your own, are searching the places that those links -- where

 2    those documents would be that are linked, that's part of your

 3    collection process, and that the burden is, instead, on doing

 4    the linking, identifying this email had that document?  Is that

 5    what you're saying?

 6         MR. DETTMER:  Right.  I mean, the first part of that,

 7    the collection, is not connected to the linking.  I mean, we're

 8    just going through all of the custodians' data sources to

 9    determine if there are relevant and responsive --

10         THE COURT:  But I want a representation from you about

11    whether that would -- I understand it's not connected to the

12    linking, but would it capture the places where the -- get the

13    documents that were linked?  Is it --

14         MR. DETTMER:  Yes.

15         THE COURT:  -- possible to do that?  Okay.

16       Well, then, that seems like you're getting the right

17    documents, but now the complaint that you're making is

18    identifying when you have the emails and then you have the

19    documents that are collected linking the two, and saying this

20    could have been this document over here.  Is that the issue?

21         MR. DETTMER:  Right.  I mean, making that connection

22    between the link, right, which may have been an email five

23    years ago, with a particular document.

24       I'm sorry, Your Honor, I may be having technical issues.

25    I apologize, Your Honor.  I think you're talking, but I can't
```

```
 1   hear you.
 2              THE COURT:  Oh, I'm not talking.  I can hear you just
 3   fine.
 4          MR. DETTMER:  Okay.  Well, yes, and so -- and I
 5   apologize for the technical issue.
 6        So the issue is, yes, we've collected all of the relevant
 7   responsive documents from these custodians.  It may be that
 8   there is an email five years ago with a link.  And doing the
 9   work of connecting the link to the document is -- is labor
10   intensive and unreliable just because of the nature of this
11   technology.  So that's really the issue.
12        But we have collected all --
13              THE COURT:  Okay.  I want to impose some obligation on
14   Apple to do that labor-intensive issue.
15        How would you state -- what did you offer to the
16   plaintiffs or how would you have me state that?
17          MR. DETTMER:  Well, what we offered and what we did
18   for the 30 documents they identified was we did that work,
19   right, to the extent it's possible, and what we offered was
20   give us some, you know, reasonable number.
21        I would start with another 30 documents.  Tell us the next
22   30 that you think are the most important, and we'll do that
23   work.  And, you know, we can kind of go from there.
24        But, you know, that's something like 150 hours of lawyer
25   time plus witness time, and it's -- that's a lot of work.  So,
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1   you know, we're happy to do that.  Well, I shouldn't say happy.

2   We're willing to do that, and we think it makes sense, but we

3   just want to be reasonable and focused on things that matter

4   instead of willy-nilly looking at everything.

5           THE COURT:  Okay.  So you've produced the emails,

6   you've produced the documents, to the extent they're

7   responsive.  But then the obligation to link the two you want

8   limited to whatever's reasonable.

9       How about I say that?  I just say your obligation is to do

10  what is reasonable and then -- without putting numerical limits

11  on it right now, in the hope the parties will then do something

12  reasonable?

13          MR. DETTMER:  That makes sense to me, Your Honor.

14      And, obviously, we're happy to talk with the developers

15  about -- about what that means and work that through.

16          THE COURT:  Okay.  Let me ask the plaintiffs.  Your

17  thoughts on what I've said.

18          MR. LOPEZ:  So the most troubling aspect of this, of

19  course, Your Honor, is that we are now in the middle of

20  December and, again, our class cert motions deadline is the

21  beginning of February.

22      And we began raising these issues with Apple as late as

23  July 9, 2020, as we indicated in our letter.  We actually began

24  raising the issues of this sort of cost and budget data very

25  early, probably in February of this year, and we didn't get a
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   response to our January queries until sometime in September.

2   And so this is a pattern with Apple, unfortunately, for

3   whatever reason.

4        And I think one of the Court's questions was an extremely

5   good one, which is, as you were doing this investigation and

6   you saw these links, what did you do about that?

7        And Apple wants to come back with this technical

8   explanation about these ephemeral links and how they're just

9   meant for transferring large documents.  But that begs the

10  question of where those documents were stored and did Apple

11  then go and look at those sources, whether it was a document

12  management system or some sort of a shared drive or something

13  that we all used ourselves.

14       In a giant company like Apple, of a technical nature, that

15  ought to be something that's pretty easy to answer.  And they

16  should have followed that trail, and, instead, evidently they

17  didn't.

18       So what we did is we saw these linked documents and we

19  said, hey, we're having trouble finding these cost and expense

20  documents.  Here's some links, here's a clue that's evincing

21  that these documents indeed existed, which, of course, they did

22  in a company this size that puts together large budgets.  And

23  yet we keep getting this obfuscation and this foot dragging.

24       It isn't anything personal.  I consider Mr. Dettmer a

25  friend.  There's been no rancor here.  It's just been this

1  frustrating process of not hearing back from them for months at

2  a time.  And now, again, here we are, these critical documents,

3  obviously relevant in an antitrust case of this nature, and we

4  still don't have it.

5     So I understand what Mr. Dettmer is saying about, you

6  know, it's going to take however many hours to look at these

7  documents, but my goodness, you know, this should have been

8  done long before and they should be on it right now.

9     **THE COURT:**  Apple is saying that they did find the

10  documents and they did produce them to you.  What they're

11  saying is their follow-up now is about linking documents to

12  emails.

13     So if you're saying the documents aren't there at all,

14  that's a completely different issue.

15     **MR. LOPEZ:**  Yeah.  So, Your Honor, my concern is that,

16  again, if you listen carefully to what Mr. Dettmer is saying,

17  he insists on this being a custodian-based production.  And so

18  that's basically where Apple reverts to consistently.

19     They want to go back and say, well, we've identified these

20  custodians, that they identified themselves.  Only added, I

21  think, like one or two that we requested beyond that.  And if

22  it isn't there, then we're not going to really look any

23  further.  So we might look on Jill's iCloud or Jill's hard

24  drive, and then maybe we're just going to stop.  Evidently,

25  that's what they've done.

```
 1        And let's not forget there's been a litigation hold in

 2   place in this matter since the consumers brought their case in

 3   2011.  So we're very concerned about this.  I mean, why -- why

 4   aren't we able to find these documents more easily?

 5        I want to add one other thing.  In Apple's briefing

 6   they've indicated, well, you know, maybe these documents had

 7   name changes or something, and that makes them more difficult

 8   to find.

 9        My goodness, if it's a budget doc, you might change the

10   version, but you're not going to name it Sam or Pete.  It's

11   going to retain the notion that it's a budget doc.  So it just

12   seems highly unreasonable to us that at this late stage of the

13   game we don't have a more fulsome production.

14        So, yes, to sum up, we've done some detective work.  We

15   saw these links, we asked to follow up on it.  But it's a

16   broader problem.  And I think the Court's initial approach was

17   getting closer to what we need, but immediately, I mean,

18   because we are so close to the cert class deadline.

19        And we truly have been prejudiced by this.  I mean, it's

20   cascading prejudice to our experts, to our ability to brief,

21   for our ability to take depositions.  It's -- it's enormous

22   prejudice.

23        THE COURT:  Well, and, Mr. Dettmer, your response is

24   Apple has produced the custodial documents.

25        MR. DETTMER:  Yes, Your Honor.  Exactly.  I mean, you
```

know, they raised this linked documents issue, I believe, for
the first time in July, I believe, and we started investigating
it.

As Your Honor notes, it's a complicated issue.  It took a
lot of sleuthing to try to make these -- excuse the term --
these links between the email links and the ultimate documents,
but for the 30 emails that the plaintiffs have identified, the
30 links, you know, we have identified upwards of 150 documents
that we believe, you know, may be the documents referred to.
And it took a lot of work to do that.

And we have repeatedly told the plaintiffs if they have
other documents they want us to look at and investigate, we'll
do that, but given the amount of work, it has to be a
reasonable number.

The notion that we should go and look at noncustodians is
just -- in a case like this, that just becomes very quickly
unmanageable.  We already had, as Mr. Srinivasan said, you
know, over 20 custodians in these cases.  You know, we will
have produced more than 5 million documents by the end of
production, almost certainly.  And that's a huge burden.

And, obviously, the rules provide for proportionality.
And having us go out and do this, you know, document by
document, try to search out to see if it's linked to some
document that may belong to somebody else somewhere in the
company, that's an enormous amount of work.  And especially

1   given, as I've said, the lack of reliability and being able to

2   know if you're actually getting the document that you think

3   you're getting by that link, just given the passage of time,

4   makes it of lesser value.

5        So, you know, we think that this solution makes a lot of

6   sense.  We've collected from the custodians all their relevant

7   and responsive documents from each of their data sources.

8   We've offered to, you know, go out and do this sleuthing work,

9   despite the time commitment, for a reasonable number of

10  documents, and we think that's a good compromise solution.

11       **THE COURT:**  Okay.  I think I understand the issue.

12  I'll take that under submission.

13       Let's turn to RFP 72.  And let me ask Apple.  What I'm

14  inclined to do is to order Apple to produce the data that are

15  used to generate App Store-specific P&L and gross margin

16  information and documents that show the methodology by which

17  that information is generated, including any apportionment or

18  allocation methods, and then leave it to you to go find out

19  where that stuff is.

20       What's wrong with that?

21       **MR. DETTMER:**  Because it doesn't exist, Your Honor.

22  It just doesn't -- it's not something that Apple maintains.

23       **THE COURT:**  I don't believe you, because the plaintiff

24  submitted App Store-specific P&L statements that had gross

25  margin information.  That didn't -- Apple has that.

1          **MR. DETTMER:**  So -- so the way that that is

2     actually -- and, you know, we've described this to the

3     plaintiffs, and they could certainly take a 30(b)(6)

4     deposition.

5          And I'm sorry, Your Honor, again, I apologize it seems

6     you're talking.

7          **THE COURT:**  Oh, I'm not talking.

8          **MR. DETTMER:**  Oh, okay.  I'm having technical issues,

9     and I apologize.

10         So those are estimates that are not based on any actual

11    data that are -- are, you know, sort of, this is the amount

12    from this business unit or that business unit, because Apple

13    doesn't have business units in that way.

14         I was actually just reading this morning an article from

15    the *Harvard Business Review* called "How Apple is Organized for

16    Innovation."  It says "Apple is under one P&L and combined

17    disparate functional departments of the business units into one

18    functional organization."

19         So while it does do occasional, you know, just sort of

20    snapshot estimates of how much is allocated to each business

21    unit, it does not maintain separate numbers for the App Store

22    or other business units.

23         It makes estimates, from time to time, that are just based

24    on overall revenue or something like that.  That's something

25    the plaintiffs could learn, if they took a 30(b)(6), about the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   methodology.

2        There are no methodology documents that we've found or are

3   aware of in our investigation that explain how this is done.

4   It really is something that they could ask, you know, a finance

5   person who could explain this.

6        And costs are not -- are not allocated or maintained by

7   business unit in this sense.  There aren't App Store costs.

8        The only two exceptions we found to that are, one, as

9   we've said in our papers, in the company-wide employment

10  database there are -- there's one category of employees who

11  strictly work for the App Store, and that's app reviewers.

12       All other employees, you know, they may occasionally do

13  some work for the App Store, but it's not -- you don't sign up

14  and say, you know, 20 percent of my time is going to be App

15  Store.  It just doesn't work that way.

16       It's a one-function business unit with, again, these minor

17  exceptions, one being the app reviewers.  And we're producing

18  that data to the plaintiffs and giving them, you know, the

19  costs for that group that is specifically tied to the App

20  Store.

21       And the other one is, again, a minor -- a minor cost,

22  which is marketing costs that are, again, specifically tied to

23  the App Store.  But other than that, there just isn't data

24  maintained in that way.

25            **THE COURT:**  I don't believe anything you're saying.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1        The plaintiffs have submitted P&L statements that have

 2   gross margin information.  Data were used to generate those.

 3   That's just true.  You can call it an estimate, you can call it

 4   whatever it wants, but it does exist.

 5        Maybe Apple doesn't record this as methodically or

 6   continuously as it does for other areas, but if Apple's

 7   executives are able to generate P&L statements and they're able

 8   to provide some estimates, why don't plaintiffs get discovery

 9   into that?  The data does exist.  They didn't just make it up.

10        MR. DETTMER:  Your Honor, what they did -- and, again,

11   the plaintiffs can ask about this -- is they take the overall

12   number and then they take revenues and they make an estimation.

13        So the underlying data is really the financials for the

14   whole company, which it's not broken up in that way, except

15   from time to time they'll do this -- this rough estimate.

16        THE COURT:  So why don't -- then why don't they just

17   produce whatever the numbers are that people use to create

18   those estimates?  Produce that.

19        MR. DETTMER:  I'm just trying to think of how that

20   would even be done, Your Honor.

21        THE COURT:  Why don't you ask the people who did it?

22   They know how it's done.

23        MR. DETTMER:  Okay.  All right, Your Honor.  Let me go

24   back, and I will again talk to them about that and see what

25   exactly the underlying data is.
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1      I do think that the easy solution to this and what, you

2  know, we think the best way for the plaintiffs to do this is

3  just to have a quick 30(b)(6) and ask how is this done, and it

4  can be explained and clarified.

5          THE COURT:  And as for the methodology documents, I'm

6  going to order you to produce them.  If none exist, then

7  there's nothing to produce.

8      But I'm looking at P&L statements that do exist.  And it

9  could be that the person who just wrote them made up the

10  methodology in his head when he invented them.  If that's what

11  happened, then there's no methodology documents to produce.

12  But if that's not what happened, if the author, you know, had

13  something written down, I think plaintiffs are entitled to

14  that.

15          MR. DETTMER:  Again, I'm not aware of any, Your Honor.

16  We have looked into it.  I mean, obviously we can look again,

17  but we are aware of no methodology-type documents.

18          THE COURT:  All right.  Let me ask plaintiffs.  Any

19  further comments?

20          MR. LOPEZ:  Very few, Your Honor.  Just underscore a

21  few things.

22      As far as the methodology documents go, whether or not

23  there's some sort of manual that says this must be done one way

24  or another, plainly, as the Court has observed, it's being

25  done.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1      So there may be emails when calls are made or when it's

2  time to do this on a yearly basis that call for this

3  information to be compiled, and those would certainly be

4  responsive as to the notion of methodology.

5      Then, just to underscore some of what the Court was saying

6  in terms of the evidence that all of this is occurring, Apple,

7  in its financials, breaks out services every year, and it touts

8  that.  It makes a big deal about how much it's made in its

9  services, and the App Store is a part of that.

10     The other thing is, we found documents that specifically

11  speak to margins, very large margins, for the App Store.  And,

12  again, there has to be underlying data there, as the Court has

13  observed.

14          **THE COURT:**  All right.  Okay.

15     Now, transactional data in 11-6714, that's ECF number 271.

16  Hold on while I pull up that letter brief so I have it in front

17  of me.

18     And, first, the 65 billion records, I'd appreciate it if

19  Apple could just, in a kind of just factual way, tell me what

20  this stuff is and what's involved in getting it and what kind

21  of systems.

22     I don't need or want every last detail.  I'm sure there

23  are many.  Sounds like there are 65 billion details.  But just

24  to paint a picture for me of what this stuff is.

25          **MR. DETTMER:**  Sure, Your Honor.  I mean, there are

1   obviously a number of databases within Apple that have a number
2   of fields that record various types of data that, you know, the
3   company uses.
4        And we, when we got the requests from plaintiffs, started
5   talking with them in the spring about, you know, what -- what
6   kind of fields made sense, and we talked to them about various
7   fields.  We talked about doing a sample.
8        As Your Honor saw, we produced a hundred-thousand-document
9   sample -- I'm sorry -- a hundred-thousand-row sample that had
10  28 fields that were responsive to the various questions that
11  plaintiffs had asked or requests for production that plaintiffs
12  had.
13       We then, you know, provided a description, we created,
14  actually, and provided a description of what those fields were.
15  Plaintiffs came back and said, you know, here's some other
16  things we want, here's some others we don't want.
17       And as part of that, we said, look, this is an enormous
18  amount of data and work.  Our computer scientists are working
19  very hard on that in order to create what these were.
20       So let me actually just back up because Your Honor asked
21  what are these?  These are records of sales of apps, of
22  downloads of free apps, in-app purchases, subscriptions.  I
23  mean, there are various ways of measuring and looking at all
24  those different things that the plaintiffs have asked about.
25       So we were trying to figure out how to take all those

1    records that exist at Apple and sort of -- or the ones that do

2    exist, because some of the things the plaintiffs asked about

3    there weren't records of.  And then we gave them the sample.

4    They looked at it.  They had their experts look at it.

5          And then we told plaintiffs that we were only going to do

6    this one time, and they said, well, look, why don't you give us

7    a bigger sample so we can figure out if this is going to work

8    and if it has what we want.

9          And so at the beginning of September we produced a sample

10   that had a hundred million rows on it.  And this one now had 36

11   fields because we'd added a bunch based on the plaintiffs'

12   requests.

13         And, you know, we've obviously had discussions with them

14   since then and have been standing ready to produce the same

15   record but all 65 billion records with, now, 37 different

16   fields of different types of data.

17         And I can explain to Your Honor, unless Your Honor has

18   questions about what the kind of burden of producing that has

19   been, in sort of more granular terms.

20            **THE COURT:**  But in terms of when it's going to be

21   produced, it's going to be a relational data set.  Is that

22   right?

23            **MR. DETTMER:**  That's correct, Your Honor, at the

24   plaintiffs' request.

25            **THE COURT:**  All right.  What other outstanding

1    disputes about what fields should be included in what you

2    produced or is the nature that you -- if you produce it now,

3    you don't want to have new requests come after you produce it?

4         **MR. DETTMER:**  There is one field that has become a

5    matter of dispute in the time since the last letter was -- was

6    sent to us by the plaintiffs shortly before this was filed.

7    That's what we call the proceeds reason field.  That's the only

8    one in dispute.

9         **THE COURT:**  That's the one in dispute.  Okay.

10        And then once we resolve that, then you would do a

11   production.  And, I guess, at that point you don't want them to

12   come back and say, oh, we just thought of these 15 other fields

13   that you should have added, because you don't want to have to

14   redo it?

15        **MR. DETTMER:**  That's correct, Your Honor, because it

16   would take literally hundreds of hours of computer scientists'

17   time in order to, again, redo what would need to be done in

18   order to produce that.

19        **THE COURT:**  Right.

20        Okay.  I'm just scrolling through your letter brief here.

21        What is difficult about adding the proceeds reason field?

22        **MR. DETTMER:**  So that field, we would have to go to a

23   separate business unit, separate set of databases, and do

24   essentially the work that the computer scientists do, which is

25   sort of figuring out exactly where in the database that is,

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    extracting the data, sort of stitching it, quote/unquote, into

2    the larger database, doing all of the work that needs to be

3    done for quality control, and making sure that the data works

4    correctly.

5        We've been told by the engineers that it would take about

6    three weeks of engineering time in order to do all those tasks

7    in order to produce this data.  And, you know, we think it's of

8    zero additional value to the plaintiffs because the data that

9    that field would show is, frankly, already in -- in what is

10   already being produced to them, which is, is the developer

11   getting 15 percent or 30 percent commission.

12       **THE COURT:**  Okay.  That didn't come through to me.

13       Are you saying there's a different field that, for each

14   transaction, will say what the size of the commission is?

15       **MR. DETTMER:**  What they would have to do is just see

16   how long a developer has -- has been doing this sort of work.

17   And that would show -- whether you've been on the program for a

18   year or not depends on whether you get 15 percent or

19   30 percent.  So they just have to look at the time period.

20       **THE COURT:**  So if somebody has been with a developer

21   for over a year, does it go down?

22       **MR. DETTMER:**  With this particular program, that's

23   right.  And they could see from the database whether they're in

24   that program, and the amount of time, which would show whether

25   it's 15 percent or 30 percent.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **THE COURT:**  Okay.  So they would see how long that

2     person has been in that database, and then they could infer

3     what the commission would be.  Is that right?

4          **MR. DETTMER:**  Correct.  Yes.

5          **THE COURT:**  So it would take three weeks of

6     engineering time to add it, but is that one engineer working

7     solid for three weeks, or what does that mean?

8          **MR. DETTMER:**  That's basically right, Your Honor.

9     It's a little more nuanced just because there's so much -- you

10    know, there's some waiting time in there where you'd have to

11    get into the lab and, you know, do certain sort of work, but,

12    yes, it's essentially three weeks of one engineer.

13         **THE COURT:**  Okay.  I'm just taking down notes here.  I

14    see.

15         **MR. SIEGEL:**  Your Honor, can I speak to some of these

16    issues?  Or I can wait if you have more questions from

17    Mr. Dettmer.

18         **THE COURT:**  I'm almost done.

19      So say I said yes add this table, would that -- say the

20    answer is no, you don't have to add the table.  How fast could

21    you produce this data set?

22         **MR. DETTMER:**  So I'm told that, by the engineering

23    team, it's going to take them about another 130 hours to

24    complete this production.  And, you know, obviously, if we had

25    to do the proceeds reason, that would add to that.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1     But, you know, we think that if we're just going ahead and

2  producing what we think we're going to produce now, it would be

3  produced sort of -- I think, you know, we had talked about

4  earlier the issue with Apple's shutdown at the end of the

5  month.

6     That includes, obviously, the labs in Santa Clara County

7  where, you know, people would have to go in to do some of this

8  work.  But we think we can get the production out the door by

9  the middle of January.

10     **THE COURT:**  So if you don't have to add proceeds

11  reason, it would be middle of January.  And if you do have to

12  add proceeds reason, would it be the first week of February?

13     **MR. DETTMER:**  Well, I think there's some overlap.

14  There would be some efficiency, and we could get somebody doing

15  it.  So I think it would probably add a week to the work.

16     **THE COURT:**  Okay.

17     **MR. DETTMER:**  Probably like January 22nd, something

18  like that.

19     **THE COURT:**  Of course, they could do some of that work

20  in tandem.

21     **MR. DETTMER:**  Indeed.

22     **THE COURT:**  So they could do January 22nd.  Because

23  the issue is, I understand their point that they could go

24  developer by developer, look up when this person started being

25  in the database and then this particular sale was made, but

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    that kind of foists the burden all on the plaintiffs.

2        Conversely, if you added this table, then the information

3    would be just right there and easy for them to see.

4        **MR. DETTMER:**  Well, no, I think I would put it a

5    different way, Your Honor, because I think -- as I understand

6    it, if you look at this proceeds reason field, essentially,

7    what the engineers tell us is if that field is blank, then the

8    commission is 30 percent.  And if there's something in there,

9    like a binary 1 or 2, it shows it as 15 percent.

10       And, you know, the way the database works is I think you

11   can look at a different field.  And, I'm sorry, I don't know

12   which one right off the top of my head, but if you look at that

13   field, it will show how long this developer has been in the

14   program.

15       And, therefore, I think it's the billings and royalties

16   field will show, you know, how you can just query that in the

17   same way you can query the -- the proceeds reason field and it

18   would show that.  So it's just looking at a different -- at a

19   different field that would show essentially the same

20   information.

21       **THE COURT:**  Oh, I see.  A proceeds reason, because

22   30 percent is the default, they just leave that blank unless

23   there's something different to say.  Is that right?

24       **MR. DETTMER:**  I think that's right, Your Honor.  I

25   don't know exactly what the reasoning was, but that's the

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    effect.

2         **THE COURT:**  Okay.  Mr. Siegel, let's hear from you.

3         **MR. SIEGEL:**  I think it's good to start with proceeds

4    reason because I think it exemplifies a lot of the problems

5    that have been happening in this case so far.

6         First of all, it's just purely incorrect that we don't

7    need proceeds reasons.  It's highly relevant to the case.  It

8    indicates both which 15 percent commissions are pursuant to

9    Apple's standard policies and which are negotiated pursuant to

10   individually negotiated agreements, which are pursuant to the

11   subscription issue.  If the subscription is greater than a

12   year, that goes to 15 percent.

13        With proceeds reasons, if you know that the 15 percent is

14   pursuant to that variable, then it's because of the

15   descriptions issue.  Our experts have looked in the sample

16   data, and we've seen many examples in just the data, like 140

17   examples where -- with a one-time IAP charge of 15 percent, for

18   example, to purchase a basketball game.

19   ████████████████████████████████████████████████████

20   █████████████████████████████████████████████████████████

21   ████████████████████████.  So without proceeds reason, we don't know

22   if the 15 percent being charged was because of the subscription

23   policy that was adopted in 2016 or these other issues.

24        And if you put the burden on developers and our experts to

25   then go for each 15 percent and figure out individually if they

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    can infer by some other way whether the 15 percent was due to

2    the subscription policy or something else, that's just unfair

3    to us, especially when Apple has this data.

4         And, again, let me emphasize, this is very important.  Our

5    case is about the commissions.  Our case --

6         **THE COURT:**  Let me interrupt briefly.

7         So one thing you're saying is that there are multiple

8    reasons why a commission might not be 30 percent.  One of them

9    is that the developer has been there for over a year.  But

10   you're saying there are also other reasons.  Is that right?

11        **MR. SIEGEL:**  Exactly.  And the proceed reasons

12   variable, according to what Apple tells its developers, that we

13   had to find out on our own, is there if the 15 percent is

14   because of the subscription policy.

15        So what Mr. Dettmer just said is completely incorrect.  So

16   we could just figure out, okay, if it's 15 percent and then go

17   look and see if it's because of a subscription issue, that's

18   just not true.

19        And I think this highlights a bigger issue.  We've been

20   asking since --

21        **THE COURT:**  Can we stay with the smaller issue?

22        **MR. SIEGEL:**  Sure.

23        **THE COURT:**  Does the proceeds reason just say a

24   commission number or does it tell you why?

25        **MR. DETTMER:**  Are you asking me that, Your Honor?

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1          **THE COURT:**  Let me ask Mr. Siegel first.

2          **MR. SIEGEL:**  As far as I understand what Apple says in

3     it's App Store Connect Help says that if a subscription has

4     been active for more than a year, then you will receive

5     85 percent of the customer price minus applicable taxes.  And

6     this field equals rate after one year.  Otherwise, you receive

7     70 percent and the field is left blank.

8          So this particular -- so according to Apple, and I'm

9     quoting from their website, the way the field exists and what

10    actually is the data in the field will indicate whether or not

11    the 15 percent is charged because of the subscription or for

12    something else.

13         **THE COURT:**  What I think -- the way I interpreted what

14    you were saying is that proceeds reason will only measure

15    deviations from 30 percent that are due to the fact that

16    someone has been a subscriber for more than one year.  And then

17    if there are other reasons why it's 15 percent, that would be

18    maybe not depicted.

19         But, Mr. Dettmer, let me ask you, what exactly is showing

20    up there?

21         **MR. DETTMER:**  So my understanding, Your Honor, is that

22    that field, proceeds reason, is just a binary value.  It just

23    is 15 percent or 30 percent.  And that is the only data it

24    contains.  Those are the only data it contains, so there's

25    nothing -- there's nothing else to that field.

1      **THE COURT:**  But in terms of -- okay.  Thank you.

2  That's helpful.

3      But then in terms of -- do you agree that there can be

4  reasons other than just length of time why a commission could

5  be less than 30 percent?

6      **MR. DETTMER:**  I don't know the answer to that

7  question, Your Honor.  I think there are some, but it is -- it

8  is a, you know, small group.

9      **THE COURT:**  Okay.  Let's say -- let's posit that there

10  are some other reasons why the commission would be 15 percent.

11  Does proceeds reason only record commissions that are

12  15 percent because somebody has been in the system for more

13  than a year or would it reflect all the 15 percent commissions

14  regardless of reason?

15      **MR. DETTMER:**  I believe it is all.  It is any.

16      Oh, I'm sorry, no, it would -- no, that is correct.  That

17  is correct.

18      **THE COURT:**  It reflects all of them?

19      **MR. DETTMER:**  I believe that's right, Your Honor.

20      **THE COURT:**  Well, then we have the situation where if

21  the plaintiffs did a query on how long a developer had been in

22  the system, that wouldn't necessarily tell them what's in the

23  proceeds reason table if there's some other reason for the

24  15 percent.  Is that right?

25      **MR. DETTMER:**  I think that is possible, Your Honor.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Again, I think this is a de minimus, is my understanding, group

2    of items.  But it is possible.

3              THE COURT:  Okay.

4          MR. SIEGEL:  Again, we only got a sample of .2 percent

5    of Apple's transactional data.  And our experts were able to

6    draw from that 140 examples of where it appears there's a

7    15 percent charge, some sort of singular IAP reason, like if

8    someone purchased a basketball game.

9          And, also, there was 15 percent that was charged before

10   this policy even took place.  So, clearly, there are reasons

11   for 15 percent other than the subscription policy change,

12   because they occurred before the policy was even in place.  So

13   that's just without a doubt.

14             THE COURT:  Okay.  Here's where I'm leaning, Apple.

15   I'm leaning towards saying you do have to include proceeds

16   reason because it appears that it's not quite true that the

17   plaintiffs can just query how long a developer has been a

18   subscriber and know what's in the proceeds reason tab.

19         There could be -- if there are other reasons for a

20   15 percent commission, they would need to have that -- that

21   field included as well.

22         You say that's probably not very often, and they say they

23   have reason to think it happens fairly frequently.  But, of

24   course, they don't know until they get that tab.

25             MR. DETTMER:  Well, I would say, I heard Mr. Siegel

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   say 140 times in the hundred-million-row sample.  So I think

2   that's a -- that's an extremely small percentage, 140 over a

3   hundred million, but -- and I would say that's de minimus.

4       I would repeat, my understanding of this -- of this row is

5   it really is binary.  It only shows 15 percent or 30 percent.

6   And I am not sure, based on what Mr. Siegel said, if there is

7   some way of reverse engineering that data in order to figure

8   out what he says he's going to figure out.

9       But, you know, I can't do the math in my head quickly, but

10  140 is truly a tiny percentage of a hundred million, if that's

11  representative.

12          **THE COURT:**  Well, one thing that they could do, or

13  their experts could do, is to -- if they do a query against

14  proceeds reason and find out all the times a commission was

15  15 percent, and then do a query, I guess, for developers to see

16  how long they were subscribers, they could calculate what

17  percentage of the time the commission is 15 percent for someone

18  who has not yet met the one-year mark.  Or at least in theory

19  that would be possible; right?

20          **MR. DETTMER:**  I mean, what you're saying makes sense.

21  I don't know, as a technical matter, whether that's possible or

22  not.  I just don't --

23          **THE COURT:**  Whether someone can actually do those

24  queries, that's a different question.  And I don't know the

25  answer to that.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1      But plaintiffs, any further thoughts, including that if

2   you get this other data tab, you have to wait another week to

3   get the data?

4          **MR. SIEGEL:**  Well, I guess my thought is -- and this

5   is what I was going to explain as part of a bigger picture.

6      We've been asking for data related to the commissions

7   charge for a year.  We asked for fields from Apple at least

8   starting last January.  They didn't give it to us.  We asked

9   for samples at that time.  They didn't give it to us.  We

10  didn't get it until, like, seven months later, until the end of

11  July.

12     We asked for descriptions of their databases.  We didn't

13  get it.  And they even went so far -- this, I think, again,

14  exemplifies the issues that are going on here.  What they told

15  us when we asked for, is there data that indicates why

16  something other than 30 percent was charged, they said -- and I

17  can quote you -- they said to us there's no field in the

18  transactional database that has that, without letting us know

19  that there's actually a field in another database that has it.

20     We actually then had to go do an independent

21  investigation.  And we told Apple that's weird, because we see

22  that you're telling developers that you have this field

23  somewhere.

24     And then Apple said, oh, yeah, yeah, you're right, you're

25  right, we do have the field, it's just burdensome to produce

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    and it's in another database.

2         So the problem -- what's been going on in this case from

3    the very beginning is that, to me, frankly, Apple is hiding the

4    ball and misleading us with a lot of things they say.

5         So, to answer your question, that is -- proceeds reason is

6    one field that we need.  There were also other fields that were

7    under discussion with Apple.

8         The bigger picture is we don't know if there are other

9    fields because they've never -- unlike in a normal antitrust

10   case, they've never told us all the fields.

11        And I think what's indicated by that is they told us the

12   reason why they weren't going to give us the field for July is

13   because, trust us, we're going to give you all the relevant and

14   responsive fields.  But then when they gave us the sample

15   fields, it was clear they hadn't given us all relevant and

16   responsive fields.

17        So we had to go independently ask them a lot of questions

18   in August, and then after that do independent research in

19   publicly available sources.  We found a lot of other fields.

20        And I can give you examples, six prominent examples, of

21   fields they didn't give us initially, and then they agreed to

22   produce them, which -- which shows the reason why we can't

23   agree now that we're never going to ask for more fields,

24   because when we trusted Apple before that, we learned that

25   there were a lot of fields they didn't give us, which turned

1    out to be relevant, and they didn't tell us about other

2    databases, such as the database with proceeds reason, which

3    turned out to be relevant.

4         So like in any other case in discovery, all we want --

5    this is October 27, I wrote to Mr. Dettmer, and I said, you

6    know what, in good faith we met and conferred for a long time,

7    but we need production of the data now because we can't wait

8    any longer.  It takes a long time to produce this data.  It

9    takes a long time to analyze it.  Produce it now.  We

10   understand you'll make a burden argument if we ask for more

11   fields later, but we have to get it now.

12        Mr. Dettmer said no, we're only going to produce once,

13   which to me was nothing but prejudicial to plaintiffs because

14   now, here we are, December 15th, we haven't gotten the

15   transactional data yet.

16        And we weren't saying that Apple didn't reserve its rights

17   to argue, if we asked for more fields, that it's unduly

18   burdensome, that we had our -- we had our shot and now to do

19   something else would cost so much money that either plaintiffs

20   have to pay for it or not.  Then we could discuss it at that

21   point, reach a resolution or go to Your Honor to resolve it.

22        But, instead, what happened is they've been holding this

23   data hostage since the end of October, and here we are December

24   15th.  And what Mr. Dettmer said at the time, he said, if

25   you -- he told me this in a November 2nd letter; I can quote

1    you -- if you say now that you want the data, we'll give it to

2    you in approximately two weeks.

3        I can quote you the letter.  It's actually in one of the

4    exhibits.

5        Now, when I asked him last week, I said, you know, we're

6    going to need the data because we don't know if the -- our

7    motion date is going to be moved.  Now he tells me that it's

8    going to take until the middle of January.  So November 2nd, he

9    tells me it's going to take two weeks.  Now he tells me it's

10   going to be the middle of January.

11       And, clearly, as long as it's going to take Mr. Dettmer to

12   produce the data to us, it's going to take us that long to

13   process it for ourselves.  Our experts probably won't even be

14   able to really look at it in a serious way until the beginning

15   of February.

16       If Mr. Dettmer -- if Apple had done what was typical in

17   these cases, produced after we requested in October, reserved

18   their rights to argue burden, we would already have the data

19   and we would be negotiating over these other fields.  But that

20   didn't happen, so we're in the situation we're in right now.

21       And what we told the Court when we moved to modify the

22   schedule is that we need the data by the end of December just

23   for experts to have enough time to analyze it by the middle of

24   April, which is our proposed date to move the schedule, okay.

25       If we don't get the data until the middle of January,

```
 1   clearly, we're not going to have enough time to meet the
 2   February deadline, and probably it's going to be a struggle to
 3   reach the April deadline.
 4        This all could have been avoided when I offered to
 5   Mr. Dettmer, produce now based on the agreements to date, like
 6   plaintiffs and defendants do with custodians or other discovery
 7   issues all the time, and you just produce that and reserve
 8   Apple's rights to argue burden later.
 9        And, by the way, all these burden arguments that they're
10   making, we asked them -- and I can point you again to
11   exhibits -- what is exactly the burden of adding this field or
12   adding this field?
13        They did not do it, which, under the case law in the
14   Northern District of California, they were obligated to tell us
15   the specific burden, meet and confer about -- in good faith
16   about it.  They didn't do it.  Now they're coming to this
17   hearing and talking about burden.
18        So I'm frankly at a loss about what's happened thus far.
19   And all I can see, the only thing that's consistent is that we
20   don't have the data and we've been prejudiced by Apple's lack
21   of transparency in telling us about the fields, telling us
22   about the databases, and getting the data that we need for our
23   class certification motion.
24        So -- and there are certain other things that -- that
25   Mr. Dettmer said.
```

1          **THE COURT:**  I feel like you're arguing for a motion to

2    change the case schedule rather than really arguing the

3    discovery issues that are in front of me.

4          **MR. SIEGEL:**  Right.

5          **THE COURT:**  It's December 15th, and I can't go back in

6    time.

7          **MR. SIEGEL:**  Well, I guess all I can say is that if

8    we're going to have any hope of, even in a very cursory way,

9    use the data that's being produced in these datasets, we think

10   Apple should be told -- ordered to produce this by the end of

11   December.

12        Our experts tell us even to do the very minimal kind of

13   analysis that's necessary, they need the data by the end of

14   December.

15        And, again, I can quote you from Mr. Dettmer's previous

16   letter to me saying it'll take about two weeks to do it.  Now

17   he's saying it'll take a month and he's pointing to Apple's

18   holiday schedule.

19        Well, I mean, again, if they didn't produce the data like

20   they should have before, then plaintiffs can't be prejudiced by

21   the fact that, you know, Apple, one of the largest companies in

22   the world, wants to take two weeks off for the holidays.

23        I think it's relevant to this motion because they should

24   be ordered to produce the transactional data today by the end

25   of December.

1    **THE COURT:**  Well, I'm not going to do that.

2        I think that the January time frame they've outlined,

3    under the circumstances and considering when this issue was

4    surfaced to me to resolve, is fine.

5        But what I want to make sure plaintiffs understand is, I'm

6    very sympathetic to Apple's position that they should only have

7    to produce this data once.  So you need to understand that,

8    when they produce this data, if you then come back and say what

9    about this field, what about that field, what about all these

10   other fields, the burden is going to be on you to show that

11   there was no way you could have raised those issues earlier.

12       I mean, I am sympathetic to Apple in that position because

13   this is a lot of data.  So I need you to make sure you

14   understand that, that once you get this data it's going to be

15   hard for you to have them go back and do it again.

16       Do you understand?

17    **MR. SIEGEL:**  I totally understand.  That's what we

18   told them the end of October.  We said produce it, we

19   understand you reserve the right, you have a good argument on

20   burden, we just can't afford to wait any longer.

21       All we asked for was production.  We didn't ask for Apple

22   to waive their rights on burden.

23    **THE COURT:**  Okay.  Thank you.

24    **MR. SIEGEL:**  Yeah.

25    **THE COURT:**  Let's turn to RFPs 45 and 46.  And let me

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1   turn to Apple.

2       How many databases are there that contain transactional

3   information for The App Store, which is what I think you're

4   asking about?

5            MR. DETTMER:  Your Honor, I don't know the answer to

6   that question.  I mean, what we have been investigating is

7   specifically what databases have data responsive to what the

8   plaintiffs are asking for.

9       And that's what -- you know, we've sort of investigated

10  from that query outward, if that makes sense.  And it looks

11  like most of the data is on one database, but there are three

12  others that have some of the data.

13      So, you know, there are obviously many, many databases

14  within Apple.  Only some of them have data that's relevant to

15  what the plaintiffs have asked for, and that's what we've been

16  going out and looking for.

17           THE COURT:  Well, then let me ask plaintiffs.

18      For RFPs 45 and 46, what is your ask to Apple at this

19  point?

20           MR. SIEGEL:  I mean, I think for those databases that

21  Mr. Dettmer has identified -- I think he said four; there was a

22  transactional database and three others -- we want Apple to

23  identify the fields in those databases and produce -- and the

24  description of the fields in the databases or produce documents

25  that describe the fields -- that identify the fields and
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
1    describe them.

2        So it can either be in the form of a written, like an

3    interrogatory response, or it can be producing the documents.

4    We don't care either way.  We just want the information for

5    those particular databases.  Not all databases that Apple has,

6    just those databases.

7             THE COURT:  Okay.  So those four databases, you want

8    to know what the fields are, like just state these are the

9    fields, and then what they mean.  Is that right?

10            MR. SIEGEL:  Yes, Your Honor.

11            THE COURT:  Okay.  Mr. Dettmer, what's the burden

12   involved for Apple to do that?

13            MR. DETTMER:  Well, a couple things, Your Honor.  One,

14   I mean, I don't know how many fields those databases have.

15   They are not limited to the fields that are relevant and

16   responsive to these requests.

17       So, as far as I understand it, there are a number of --

18   maybe many fields on these databases that simply have nothing

19   to do with this case.  And so, you know, that's just -- that's

20   just a big problem, right.  I mean, it would be asking us to

21   produce data that just has nothing to do with this dispute.

22       We have looked at -- at great length for some kind of

23   dictionary document, and that doesn't exist.  There is not one.

24   You have to go and ask the various engineers about what

25   different fields mean, and it's, frankly, a lot of work and it
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    takes a lot of doing.

2        We did that early in this process for the plaintiffs, and

3    we put together a document that described the various fields

4    that we were discussing with them, and we did do that.

5        But doing it for a whole bunch of fields that have nothing

6    to do with this dispute is, A, it's unduly burdensome because,

7    you know, many of those fields are just not going to have

8    anything to do with this case.

9        **THE COURT:**  Okay.  Let me ask plaintiffs.

10       Do the documents responsive to RFPs 45 and 46, or as

11   narrowed now, the fields in these four databases and

12   descriptions of those fields, does that have utility to you

13   independent of getting the transactional data set that you're

14   going to get in January?

15       **MR. SIEGEL:**  I think it has utility in understanding

16   how the fields relate to each other.  Now, I mean, I hadn't

17   thought about this question, to be honest, but the thing about

18   databases that are unique -- and I do a lot of expert work --

19   is that it's not just about getting the fields with the

20   substantive information, it's also getting the fields that kind

21   of explain how the fields talk to each other, how they relate

22   to each other.

23       So I think getting this list is helpful because, one, it

24   helps for, you know, understanding what's relevant and

25   responsive data that we should get but, also, it is relevant to

1   understanding how the fields related to one another.

2       And the only other thing I would say is that, again, we're

3   not asking for data from every field like Mr. Dettmer was

4   implying.  We just want identity of the fields in describing

5   them, which I think is a different relevant inquiry than the

6   one that would ask should we actually get the data for those

7   fields.

8       All we're asking for is identifying the fields and a

9   description of them, not that we get data for every field.  I

10  do think, Your Honor, that it is relevant to understanding how

11  the data fields talk to each other.

12      **THE COURT:**  Let me -- hold up there.

13      Mr. Dettmer, when you produce this transactional

14  relational data set in January, it'll have fields in it.

15      **MR. DETTMER:**  Correct.

16      **THE COURT:**  Have you described or will you describe to

17  plaintiffs what those fields mean?

18      **MR. DETTMER:**  So, as I said, we did produce to them

19  a -- basically, a dictionary of what those fields are.  We

20  created it in order to do that, and we have explained it.

21      We also, as mentioned before, produced a sample data set

22  of a hundred million fields of this data.  So they have been

23  able to work with this data and see how it works.  And we've

24  answered many questions about how this data works.  We have

25  been -- obviously aren't hiding the ball.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1              **THE COURT:**  Okay.

2              **MR. DETTMER:**  Pretty open Kimono.

3              **THE COURT:**  So for RFPs 45 and 46, as far as you're

4    concerned, they don't need more of a dictionary.  Once they get

5    the transactional data set, you've told them this is what these

6    fields are?

7              **MR. DETTMER:**  That's right, Your Honor.

8              **THE COURT:**  Okay.  So let me go back to the

9    plaintiffs.

10        If RFPs 45 and 46 were simply a mechanism to make sure

11   that you get the right transactional data, then I'm -- I'm

12   wondering why we need to do anything more with these RFPs since

13   I'm going to tell Apple to add the proceeds reason field and

14   then produce the transactional data.

15        Why should we do anything further with 45 and 46?

16             **MR. SIEGEL:**  I think there are a couple of things.

17   One, I just -- well, I want to address your question directly

18   because I think that's the best way to proceed.

19        Based on the history that I've described here, there are a

20   lot of unknown unknowns.  For example, it may be that there's a

21   database or a field that we had no idea about, and it wasn't

22   reasonable for us to be able to have learned about it based on

23   the information that Apple gave us.

24        So if we decide that that's true and we talk to Apple

25   about it and they're still unwilling to supplement their data

```
 1   production, and they haven't convinced us that it's too

 2   burdensome to do so, then I think we would go to Your Honor and

 3   say, meeting the high standard that you've set, which is a fair

 4   high standard, say we had no reason to know about this data

 5   field, Apple has not convinced us and can't convince the Court

 6   that we should have known, and they haven't shown it's unduly

 7   burden and, therefore, Your Honor, we think they should

 8   supplement the data production with this field.

 9       We think we should be able to get the fields to be able to

10   at least try to make that showing, keeping in mind the high

11   standard that Your Honor has set.

12       Beyond that, I think what's interesting is what -- Apple

13   gave us early on -- and I think it was in July, could be June;

14   I could be mistaken -- is they gave us, you know, a very small

15   set of fields they were willing to produce with some

16   information early in the case.

17       It certainly was not all the fields that were in the

18   initial sample, and it definitely wasn't all the fields that

19   now they've agreed to produce.  We had to again go and

20   independently investigate this.

21       So it's not true that Apple just voluntarily gave us all

22   the fields that were relevant and a description of them.  What

23   they gave us at first was a very narrow subset of them.  I'll

24   give you an example.  This is like a very clear example.

25       In their sample that they gave us, they didn't give us a
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    variable that indicated whether or not a developer was a U.S.
 2    developer or not.  Now, we have a U.S. developer class.  How
 3    are we going to proceed and show impact and damages if we don't
 4    even have a variable that shows whether a developer is a U.S.
 5    developer or not?
 6        We had to go and then ask Apple about that, do you have
 7    this -- do you have this field, can you produce it?  They
 8    eventually did agree to, but they obviously had it within the
 9    contours of our class.
10        My point being is that I think we're entitled to these
11    fields, given the history of the case and given the potential
12    relevance of identifying additional fields that are relevant
13    and proportional for Apple to produce keeping in mind Your
14    Honor's high standards.
15             THE COURT:  Okay.
16             MR. SIEGEL:  And we also don't know if we have all the
17    information necessary to know how the fields interact with each
18    other.  I mean, that's Apple's representation today, but how
19    can we be sure of that without seeing all the fields
20    themselves, again especially given the history of what's
21    happened in discovery so far.
22             THE COURT:  Okay.  Thank you.
23        Here's what I think.  I think that for RFPs 45 and 46 the
24    dispute is not quite ripe.  Apple has identified that there are
25    four databases that have some -- that may be relevant here, but
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Mr. Dettmer doesn't know exactly how many fields there are for

2    each of those databases.

3        So I think Apple needs to do some more investigation

4    promptly.  You should do that work and figure out how many

5    fields are there and what they are.  And then I think there

6    needs to be further meet and confer between the parties.  And

7    so my inclination is to tell you all to go do that.

8        Plaintiffs, any comments?

9        **MR. SIEGEL:**  As long as this can be resolved very

10   quickly, because again -- and I appreciate that -- I think

11   that, you know, we're getting data production, but, you know,

12   given the current timing and the schedule, we need to be able

13   to either resolve this issue with Apple or go to the Court and

14   ask for those fields very, very quickly.

15       **THE COURT:**  All right.  Mr. Dettmer, I will expect you

16   to investigate promptly and meet and confer with the plaintiffs

17   to put this issue to bed as soon as you can.  All right?

18       **MR. DETTMER:**  Okay.  We will, Your Honor.

19       One thing I just want to say is, I mean, the engineers who

20   need to do this and who are familiar with these databases are

21   the ones who are also doing the work to produce, you know, the

22   database to the plaintiffs.  And, you know, I -- they only have

23   so much time.

24       And I will -- I will ask them to do it promptly, but, you

25   know, we're asking the same people to do multiple things while

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1    they also have a day job.  And I just want to make clear that
 2    there's a lot of -- a lot of competing demands on these people
 3    who do this.
 4         I will say, also, that, you know, I think the history
 5    here, far from showing that we've been hiding the ball, has
 6    been that we've been cooperative.  I mean, we've given them two
 7    massive samples of data, a lot of information about these
 8    samples and what they are.  And, you know, I think the record
 9    has shown that for -- with very few exceptions, we've agreed to
10    pretty much everything they've asked for.
11         THE COURT:  All right.  I don't need a whole lot more
12    rehashing of what has led us to this date.  But I -- I think
13    I've made clear I want Apple to investigate and meet and confer
14    with the plaintiffs quickly, and so I urge you to go do that.
15         MR. DETTMER:  Will do, Your Honor.
16         THE COURT:  Okay.
17         MR. SIEGEL:  Can I ask Your Honor for more specifics?
18    What exactly -- in this meet and confer what exactly is
19    the obligation for Apple to tell us?  It would help me to know
20    how quickly this will move.  Are they supposed to identify how
21    many fields there are in those databases?
22         THE COURT:  I think they do need to identify how many
23    fields are in those databases.  And then if it's not a huge
24    number, then they should tell you what they are.  If it is a
25    large number, then they should say these are the ones they
```

1   think are relevant and explain why they think other ones

2   aren't.

3           **MR. SIEGEL:**  Okay.  Thank you, Your Honor.

4           **THE COURT:**  Let me -- Apple custodians.  The issue

5   with --

6           **THE CLERK:**  Judge, can I interrupt for a minute?

7   We've been going for two hours.  I think the reporter might

8   need a couple minutes' break.  Is that okay?

9           **THE COURT:**  Oh, sure.  That's fine with me.

10       And so, Ms. Sullivan, how long a break would you like?

11       (Reporter responds)

12          **THE COURT:**  How about -- it's 12:15 now, Pacific Time.

13  Let's all come back at 12:30.  All right?  So we'll take a

14  15-minute break and then -- so we'll just -- the Court will

15  stand in recess between now and 12:30 Pacific, and then we'll

16  resume.

17      See you all in 15 minutes.

18          **MR. SIEGEL:**  Your Honor, can I ask for just one

19  clarification on the transactional data piece?

20          **THE COURT:**  Sure.

21          **MR. SIEGEL:**  Is Apple being ordered to produce the

22  data, now, by middle of January, or where do we stand with

23  that, just so we know when we're going to get it?

24          **THE COURT:**  I'm ordering them to add the proceeds

25  reasons field and then to produce the relational data set.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1        I'm not putting a date in my order.  I do expect Apple to

 2   live up to the schedule that it had broadcast, but I don't -- I

 3   usually don't put in a date unless there's a reason why I need

 4   to order it by a specific date.

 5        I guess if you got near the 22nd and it looked like Apple

 6   wasn't ready to produce, then we could have a quick hearing on

 7   that.

 8            MR. DETTMER:  And, Your Honor, we'll obviously keep

 9   the plaintiffs up to date on the process of that, and we expect

10   that, you know, the 22nd should be doable.

11            THE COURT:  All right.

12            MR. SIEGEL:  Okay.  Thank you, Your Honor.

13            THE COURT:  All right.  We stand in recess.

14   See you all at 12:30.

15            THE CLERK:  Thank you, everyone.  We're off the

16   record.

17                 (Recess taken at 12:16 p.m.)

18              (Proceedings resumed at 12:31 p.m.)

19            THE COURT:  All right, everyone, we are back on the

20   record, and I think we are at our last letter brief, which, in

21   case 11-6714, is ECF number 298.  And it's about custodians.

22        With respect to Tim Cook, it looks like Apple has agreed

23   to make him a document custodian on the condition that

24   plaintiffs limit their deposition of him to four hours.  And it

25   looks to me like the dispute is that condition.  That's the
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

only thing that the parties have briefed.

My inclination is to say, we have briefing coming up in January about apex issues.  If you want to take it up then, Apple can do that.  But I don't think it's okay to maintain this condition now, in part because I don't see how plaintiffs can really argue this thoughtfully until -- how long the deposition should be until they see Mr. Cook's documents.

But let me hear Apple's thoughts.

MR. SRINIVASAN:  Sure, Your Honor.

So on this, Your Honor, it's sort of a broader idea in terms of what we have come to do in terms of documents in this case and how far we have come compared to what we signed up for.  And it's really, you know, in that context that this can be -- that condition can be explained.

And that is -- and I won't take too long to explain it, but, again, we came into this case litigating against class plaintiffs for quite some time.  And in that time we had 15 custodians, which was more than enough.

Plaintiffs did ask -- the class plaintiffs did ask for more, but it wasn't -- they had -- we said no back in the spring, and then they didn't come back to us.

And when Epic came on the scene in August, they, again -- and I can read again from the transcript, but Your Honor has probably seen it already, but they came in and said we want only limited targeted additional discovery.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    In fact, they said the additional discovery is just on the

2    in-app payment processing.  That's what they said to get to the

3    head of the line to get a May hearing date -- trial.

4    So Apple said, fine.  Apple said, "We need more time," but

5    Judge Gonzales-Rogers said, no, I'm going to hold them to their

6    word and I'm going to make you do this in May.

7    So what was their idea of incremental, limited targeted

8    discovery was -- we had 122 document requests from plaintiffs,

9    class plaintiffs.  Epic came in the case and asked for 83 more.

10   83 new subjects.  Not just on IAP but on 83 new subjects.

11   And they came in and said, you know what, your document

12   custodians are not enough, your 15 are not enough.  So we

13   immediately said, okay, we'll give you four more that are very

14   Epic-focused on the dispute, including the IAP aspect of it.

15   So that put us up to 19.

16   That was already constraining our limit to produce

17   documents by January 6th, which was the date that the court

18   ordered documents had to be produced by.

19   And, again, we're not talking about -- we're not Apple

20   here asking for equivalence with the other party.  We know

21   that, you know, we're in a different position.  And while we

22   think it could be fair to do that, we're not asking for that.

23   But what we're doing is we're producing -- we had already

24   produced three and a half million, that I mentioned this

25   morning, tracked to produce another one and a half million

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

 1   more.  Epic might produce a third of that.  This is the party

 2   that asked for expedited relief.  Their burden is far, far

 3   less.

 4        But that all said, they came back to us again and they

 5   said, you know what, 19 custodians is not enough -- remember,

 6   we started with 15 -- we want ten more.  We effectively want

 7   you to double the number of custodians, the four we offered

 8   plus ten more, to 29 document custodians in a case, again,

 9   where they said this was going to be implemental, targeted IAP.

10        We then said, you know what, we want to work with you.  We

11   can't really produce any more documents by January 6th, but if

12   you'll give us relief from that, we will voluntarily produce

13   four more document custodians.

14        And we could have easily retreated to the deadline, to the

15   cutoff, and said we just can't do any more, take it up.  So we

16   said we'll add Tim Cook subject to the four-hour limitation.

17   We said we would add Scott Forstall, who was the guy who was

18   Craig Federighi's role when the actual App Store was founded

19   and actually knows about that issue.  And they asked for -- we

20   gave them Steve Jobs and we gave them documents for Sean

21   Pruden.

22        We made a huge step.  And we made very clear, by the way,

23   this is -- we're bursting at the seams.  You can't argue that

24   later we're not going to get you all of these documents by

25   January 6th, because this is a major concession.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    And the way they have taken the approach of this case is

2  every concession we make, they simply put under their belt and

3  say we want more, more, more.

4    And for both Mr. Federighi, which we'll get into in a

5  second, and for Tim Cook, we at least feel like equity demands

6  that we are beyond what we need to do.  We're up to 24 document

7  custodians in this case.  At a minimum, constrain them in some

8  way.

9    And so we think that the Tim Cook issue, a half measure of

10  saying, well, you'll still get four hours with him, which is

11  four hours -- you know, we don't know that they even need that

12  many -- that's the spirit, Your Honor, in which we have made

13  these concessions.  And in response, we get nothing but more

14  demands.  And so that was why we asked for the four-hour

15  limitation, and we think the Court should do equity here,

16  acknowledge that Apple has gone above and beyond what it needs

17  to, and impose this limitation now.

18    **THE COURT:**  All right.  Well, I'm not going to.  And

19  if you want to include this in apex briefing in January, that's

20  fine.  I just think it's premature.

21    All right.  Do plaintiffs want to respond?  I hope the

22  answer is no.

23    **MS. MOSKOWITZ:**  The answer is no, Your Honor.

24    **THE COURT:**  Thank you.

25    All right.  Let's turn to the other two.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

 1        Plaintiffs want Craig Federighi, and Apple's not inclined

 2    to produce him.  I thought plaintiffs made a fairly good

 3    showing why they want Federighi -- and I apologize if I'm

 4    butchering his last name -- and I wasn't as persuaded by

 5    Apple's response.

 6        And, I guess, at some level the plaintiffs -- if the

 7    plaintiffs guess wrong and they pick the wrong document

 8    custodian, that's their problem.  So why shouldn't we be --

 9    we're just choosing between two custodians.  You think one is

10    worse than the other, and they want the one that you think is

11    worse.  Why not let them pick their poison?

12        **MR. SRINIVASAN:**  So, Your Honor, there's really --

13    there's, I think, a preliminary question which I, you know,

14    sort of laid some foundation for in the prior comments.  And

15    that is, I don't think it's an unlimited world.  Right.

16        I don't think plaintiffs just get to say, well, you've

17    just compromised and given us 23 document custodians, we needed

18    24, because we can look through your document production of

19    three and a half million documents and say, hey, look, this

20    guy's on -- on some of these documents, and he's opined on

21    things on those documents.

22        They could do that for hundreds of Apple employees.  The

23    showing they made for Craig Federighi they could do for

24    hundreds of Apple employees.  When does it end?  There's no end

25    in sight, and there's no rationale for it.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1      What we have said to them and what the Sedona Principle

2   says is, we, as a defendant, have an obligation to cover your

3   document requests with our document custodians.  We have done

4   that.  They have not shown that we haven't.

5      And, Your Honor, if you'll indulge me, I can run down

6   their list of what they say they need, and I can point to you a

7   number of people in the pool already, a very large pool, that

8   we have already provided for.

9          **THE COURT:**  I'm not very interested in that because I

10  understand the negotiation of back and forth about the number

11  of custodians.  But the only thing that the parties have teed

12  up for me as between these two custodians is not how many

13  custodians, it's just, for the last slot, which person is it.

14     And so I get -- now, let me add, thank you for not

15  throwing every discovery issue at me.  I'm glad that the

16  parties have reached agreement and that the letter briefs were

17  focused -- at least with respect to document custodians,

18  focused on just two issues.  I do appreciate narrowing the

19  dispute.

20     But the dispute before me is narrow.  It's just with

21  respect to the 19th custodian.  Is it this guy or is it his

22  boss?  That's just a very narrow dispute.

23     And since a lot of Apple's business justification defense

24  comes down to the benefits of the integrated Apple ecosystem,

25  it seems to me like there's a good case that somebody higher

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    up, rather than somebody lower up, might be a more useful

2    witness for the plaintiffs.  But if they guess wrong, that's

3    their problem.  They just would have someone whose documents

4    are less useful.  That's kind of how I'm looking at it.

5         **MR. SRINIVASAN:**  Your Honor, I mean, I think I've made

6    my point.  I think our, you know, position here is that

7    Mr. Niswander, who we did offer, has more rich, relevant

8    documents.

9         We don't believe Mr. Federighi is related to this case.

10   We don't have him -- or at least in a nonunique way.  We don't

11   have him as an initial disclosee.  We don't think he should be

12   bothered in this case.

13        And, more importantly, we're still struggling to

14   understand why him.  Does anybody just get to rein in a

15   document custodian from the other side just by showing that his

16   name is on a number of documents?  We think that's -- that's

17   not the right standard.

18        We, as Apple, should be able to say this is the person who

19   completes the piece, because we are the ones that are obligated

20   to produce documents to them and we have that obligation.

21        I would also say that they -- you know, their entire

22   rationale has to do with why the App Store was set up in a

23   particular way and why the security measures and privacy

24   measures and the technology and the integration are all done in

25   a particular way.  That's not Mr. Federighi.  That's -- that's

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1  Mr. Forstall, who was there when all of this was done.  We have

2  offered to give his documents.

3       You know, and I -- I think that this is -- this is just --

4  you know, we should -- we should -- a defendant is typically

5  able to decide who their document custodian should be.  And I

6  think the Court should defer to that, but, you know, I think

7  I've now made that clear.

8       **THE COURT:**  All right.  Thank you.

9       Any response from the plaintiffs?

10      **MS. MOSKOWITZ:**  Generally, no, Your Honor.

11      And I -- I'm taking everything you say to not want to go

12 into any of the history.  We'll just say we disagree with it.

13 I think we have made much more of a showing than Apple is

14 alluding to here and as Your Honor has seen in the papers.

15      And the very fact that they're offering Mr. Forstall,

16 Mr. Federighi's actual exact position through 2012, shows, I

17 think, just right there the relevance of Mr. Federighi.

18      And we will take a look at those documents.  And Your

19 Honor's right, if there's nothing there, sorry about that.  But

20 we absolutely do not want a privacy custodian who has

21 absolutely nowhere close to the scope of responsibilities,

22 decision-making, and involvement that Mr. Federighi does.

23      **THE COURT:**  Okay.  All right.  Thank you, counsel.

24      I think I have what I need.  Let me just make sure I got

25 to the end of my outline.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1        Yes.  Okay.  It's been a long day.

2        I appreciate the argument, and I understand I have some

3    additional letter briefs I will be getting in the next couple

4    of weeks, as we've discussed, but now I'll take this matter

5    under submission.

6            MS. MOSKOWITZ:  Your Honor, may I raise briefly, at

7    the risk of going a little bit longer, just one other issue?

8        Given that Your Honor has set a tentative hearing date for

9    9:00 a.m. on Friday, there is one other issue that we have been

10   having trouble getting productive meet and confers out of

11   Apple, and that is regarding a series of data-related requests.

12   Not database production, but data-related requests.

13       We've served a series of documents sufficient to show

14   requests that we have tried to meet and confer with Apple

15   about, but given the timing and how we need to get this stuff

16   in hand, we just can't really afford to have another meet and

17   confer where someone shows up without any authority to actually

18   give us any productive discussion or progress.

19       So we would ask that Your Honor set the same briefing

20   schedule as you have for the deposition issue and allow us to

21   brief that and to be in front of Your Honor on Friday morning.

22           THE COURT:  Can you flesh out just a little bit

23   what -- what you're talking about, just what's at issue?

24           MS. MOSKOWITZ:  Yes, Your Honor.  There's a series of

25   requests for production that Epic served on top of the class

1    plaintiffs' document requests.  There's a number of them.

2        We sent a letter to -- we served these requests about a

3    month -- month-plus ago.  At the same time, we asked Apple to

4    meet and confer before their responses were due.  They didn't

5    take us up on that.

6        We got responses that basically said a combination of, A,

7    we won't give you any information about anything outside of the

8    United States, B, you're only going to get what you get in

9    response to our ordinary course document custodial production,

10   and we will not go do any targeted go-gets for these types of

11   documents, or just an entire refusal or meet and confer

12   suggestion.

13       We sent them a letter asking to meet and confer last -- on

14   December 9th.  We tried to have that meet and confer this

15   weekend.  They pushed it to Monday.  We had it on Monday.  And

16   the right people I don't think were on and couldn't give us

17   any -- anything at all in terms of how they would propose to

18   compromise on any of these.

19       They're not all document types requests, and they're not

20   documents that we'd expect to see in email files.  In fact, we

21   did targeted documents sufficient to show.  For example,

22   documents sufficient to show revenue on a yearly basis for

23   certain business lines.

24       For example, Document Request Number 8, which, again, we

25   would imagine briefing in front of Your Honor if we needed to,

1  documents sufficient to show actual and projected revenue,

2  costs, and expenses for the iOS App Store.

3      These are just basic generalized information that we're

4  trying to get from them in a document sufficient to show way.

5  And we've asked the same for IAP.

6      So we actually thought we were being quite targeted, not

7  trying to boil the ocean, but these are basic requests that our

8  experts are going to need to do their work, and we are going to

9  need to depose witnesses on these.

10     And saying you'll get what you get if it happens to come

11  up in a document search is sort of the exact opposite of the

12  spirit in which we were trying to serve these very targeted

13  requests.

14     So we wanted to meet and confer.  That has failed yet

15  again.  And so without a deadline, we just don't think Apple is

16  going to come to the table, and we just can't wait, especially

17  with the break.

18         **THE COURT:**  All right.  Let me hear from Apple.

19         **MR. SRINIVASAN:**  Thank you, Your Honor.

20     What we're seeing here is a repeat of what happened last

21  week.  Last week, at the hearing, plaintiffs wanted to meet and

22  confer on an issue that the parties had actually met and

23  conferred on, the number of depositions.  They then turned that

24  into a briefing on apex as a complete surprise to us.  The

25  issue had not been joined at all.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

 1          Now, on Wednesday, just this past Wednesday, less than a
 2     week ago, they sent us a letter identifying 20, 20-plus RFPs
 3     that they wanted to talk about for the first time.
 4          We were in the middle of briefing these other issues.  We
 5     didn't have time to prepare for that.  They insisted on going
 6     forward with the meet and confer yesterday while we were
 7     briefing needlessly on today's dispute on the depositions,
 8     which we didn't need to.  And so we had some folks on that call
 9     to listen to what they had to say.
10          One of the things we heard from them is they haven't even
11     looked at Apple's production to determine if they have some of
12     the things they're asking for now.
13          We've pointed out -- my colleagues pointed out that they
14     have received some of these things.  Have you looked?  And they
15     said no.  In many cases they said no, that's -- that's too
16     hard, you've produced 3 million documents, why would we look
17     first?
18          And so we are far from teeing this issue up.  We haven't
19     even looked at the issue.  We haven't considered 20-plus RFPs
20     that they wrote about for the first time.  We are happy to work
21     with them on that.
22          We do think that they have an obligation to look at our
23     production of what we already have before they come to us and
24     say give us more.  So I don't think any of the parties are
25     ready for this.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1        And I can guarantee you that if you set this hearing for
 2   Friday with briefing, you're going to get briefing that is,
 3   again, going to be ships passing in the night because we have
 4   not joined issue with a meet and confer.
 5        This is not the proper way in which to hold these hearings
 6   and to use Your Honor's authority and time.
 7             THE COURT:  All right.
 8        Any response from Epic?
 9             MS. MOSKOWITZ:  Yes, Your Honor.
10        Mr. Srinivasan was not on the meet and confer, so I would
11   recommend he not state what happened because he misrepresented
12   what happened on that call.  We said we looked.  We couldn't
13   find.  We asked them, in fact, would you point us to Bates
14   numbers?  They said they had to take that back.
15        So we are joining issue, we are asking Your Honor not to
16   rule right now but to put this on the calendar.  We just --
17   we're really working hard to get this schedule done.  There's a
18   lot to do.
19        And, you know, as many times as Apple wants to point out
20   that we said we were going to be targeted, we have been.  We
21   did serve target requests.  They're refusing to answer.  And
22   we're respectfully requesting another hearing with Your Honor
23   so that we can join issue and get these things resolved without
24   taking weeks and weeks that we just can't afford to take.
25             MR. SRINIVASAN:  And I would just add, Your Honor, I
```

have talked to my colleagues at length about that meeting

yesterday, and I've now even further gotten a note indicating

they didn't even make it through most of the list.  So these

are not issues on which we have met and conferred.

            **THE COURT:**  I see.

            **MS. MOSKOWITZ:**  The reason we didn't get through the

list, Your Honor, is we were on the phone for two hours with

very clear lack of authority on the participants, which Apple's

counsel just confirmed that they were sent to listen and not to

engage.

        And so there's really no point in having a pointless meet

and confer.  We're trying to get actual disputes resolved.  And

if they want to come to the table today and tomorrow to have

that real meet and confer, I'm happy to tell Your Honor on

Thursday that we have no dispute to present.

        But we'd like the deadline, and we'd like the hearing if

Your Honor is willing to hear us out.

            **THE COURT:**  It sounds like there needs to be some more

meeting and conferring.  You should at least get through the

list of what the different items are.

        So now I'm looking at when else we can set this.  I can

set this for December 22nd, for a hearing on that date, if you

can do the letter brief by noon on the 21st.

            **MR. SRINIVASAN:**  Your Honor, I -- I don't want to have

a repeat of what happened today.  We spent a lot of time and

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    effort briefing something needlessly because the parties had

2    not met and conferred because there was a deadline hanging over

3    our head.

4         And we have a very short time to trial.  We're trying to

5    get the work done.  We're actually trying to respond to

6    discovery, prepare for depositions.  And this constant writing

7    a letter, asking for a meet and confer the next day, and then

8    on the third day, if they're not satisfied, running to the

9    magistrate I don't think is the way it should work.

10        I don't think the 22nd is enough time for us to deal with

11   25 or so RFPs.  They want to follow up on 25 different

12   complicated data requests, many of -- some of which we believe

13   have already been produced.

14        But to track all that down and even give them a meaningful

15   response will take us a week.  And to brief this in parallel is

16   a lot of make work that is going to get us a messy hearing

17   where the sides are talking past each other again.

18        Give us a chance to at least respond to them meaningfully

19   and get back to our client on significant categories of

20   documents.  You know, you've spent an hour and a half talking

21   about, you know, some dozen.  We're talking about at least

22   twice that number of RFPs.

23             THE COURT:  When were the RFPs served?

24             MS. MOSKOWITZ:  Your Honor, I believe they were

25   served -- give me one moment.  I have the chronology right

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    here.  Sorry.  One moment, please.

2        October 23rd, Your Honor.

3        **MR. SRINIVASAN:**  I think we responded right around

4    Thanksgiving.  And that's just our written objections and

5    responses.  Right.  I mean, this is also having to go and look

6    for documents, talk to our client about data and other things.

7        **THE COURT:**  Right.  But we do have a case schedule

8    that we need to manage things to.  When would you propose I set

9    a hearing?

10       **MR. SRINIVASAN:**  We would propose, Your Honor, the

11   following week at the earliest.  I mean, I'm -- I'm just

12   anticipating, and I'm trying to save a bunch of people work

13   over the weekend for basically a bunch of empty responses

14   because we haven't joined issue.

15       So at least the week after.  You know, it gives us a

16   chance to respond to -- and even to explore, which they first

17   only asked us about on Wednesday.

18       **MS. MOSKOWITZ:**  That's just not right.  We did -- we

19   asked these requests a long time ago, on October 23rd.  At the

20   same day we said, let's not do the silly thing where we wait 30

21   days on the schedule to get a whole bunch of nos.  Let's meet

22   and confer.  And their objections were, we don't understand

23   what this request is asking, so we're not going to give you

24   anything.

25       That discussion could have happened.  I'm trying not to

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    rehash how we got here because I know Your Honor does not want

2    to hear that.   But Apple is saying they're about to go into a

3    shutdown, and that shutdown is going to impact whether we can

4    get our hands on these documents.   And that's why we think we

5    really do need to have these meet and confers and resolve any

6    disputes immediately.

7            **THE COURT:**   All right.   Here is what I'm inclined to

8    do is to order the parties to meet and confer.   If you can

9    reach an agreement, that's great.   If not, then the parties

10   should file a joint discovery letter brief by noon on Monday,

11   December 28th.   And then I will schedule a hearing for

12   10:00 a.m. on Tuesday, December 29th.

13       Do you want more pages than just the standard five?

14           **MR. SRINIVASAN:**   Your Honor, if I can address a

15   related issue?

16           **THE COURT:**   Do you want more than five pages?

17           **MR. SRINIVASAN:**   No, it gets into your page limit.

18       I think if we're going to join issue on this, we have

19   similar data requests that we will get a letter out to them in

20   the next day or two, and we would ask that that also be part of

21   this hearing on the 28th.

22       I mean, we served our RFPs at the same time they served

23   theirs, and so we may as well have, you know, the table on both

24   sides.   And if we can then do it in five, great.   If not, we

25   might need two briefs of, you know, five a side, meaning ten

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    pages each.

2          **THE COURT:**  All right.  There's no limit on the number

3    of discovery letter briefs.  I mean, I'm certainly going to

4    regret saying that, but like if you have a bunch of issues

5    you're raising and a bunch of issues they're raising, you don't

6    have to thread them all into the same brief.  You can break

7    them up.

8        What I want is each discovery letter brief should discuss

9    the number of things that you can logically and feasibly talk

10   about in that page limit.  So if there are some of these that

11   you need to break up in different briefs, then go ahead and do

12   that.

13         **MR. SRINIVASAN:**  Okay.

14         **THE COURT:**  So it sounds like I have a number of

15   issues coming my way.

16         **THE CLERK:**  What time on the 29th do you want the

17   hearing?

18         **THE COURT:**  10:00 a.m.  Let's set it for 10:00 a.m.

19       So how about this.  We'll say another round of joint

20   discovery letter briefs are due on December 28th at noon, and

21   I'll have a hearing the following day, December 29th, at

22   10:00 a.m.

23         **MR. SRINIVASAN:**  That'd be wonderful.  Thank you, Your

24   Honor.

25         **THE COURT:**  All right.  Anything further for

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

```
 1   plaintiffs today?

 2          MS. MOSKOWITZ:  Not for Epic, Your Honor.  Thank you

 3   very much for your time.

 4          THE COURT:  The other plaintiffs?

 5          MR. LOPEZ:  No, Your Honor.

 6          MS. BYRD:  No, Your Honor.

 7          THE COURT:  Anything further from Apple?

 8          MR. SRINIVASAN:  No.  Thank you, Your Honor.

 9          THE COURT:  All right.  Thank you, counsel.

10      The matter stands submitted.

11          MR. SIEGEL:  Thanks, Your Honor.

12          MR. LOPEZ:  Thank you, Your Honor.

13          THE CLERK:  Thank you, counsel.  We're off the record.

14   Court is in recess.

15      (At 12:56 p.m. the proceedings were adjourned.)

16                      - - - - -

17                CERTIFICATE OF REPORTER

18      I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20   DATE: Tuesday, December 16, 2020

21

22

23              Katherine Sullivan

24   _____

25      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                 U.S. Court Reporter
```

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED