Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Ted Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL
SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tedw@hbsslaw.com

Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
Ben M. Harrington (SBN 313877)
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com
benh@hhbsslaw.com

*Interim Lead Class Counsel*

[Additional Counsel on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DONALD R. CAMERON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC. <br><br> Defendant. | No. 4:19-cv-03074-YGR <br><br> DEVELOPER PLAINTIFFS' MOTION FOR CLASS CERTIFICATION <br><br> Date:  November 16, 2021 <br> Time:  10:00 a.m. <br> Dept:  Courtroom 1, 4th Flo <br> Judge  Hon. Yvonne Gonzalez Rogers |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 16, 2021, at 10:00 a.m., or as soon thereafter as the matter may be heard before the Honorable Judge Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California, Oakland Division, located at Courtroom 1, 4th Floor, 1301 Clay Street, Oakland, CA 94612, Developer Plaintiffs will and hereby do move for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

This motion is based on this Notice of Motion and Motion for Class Certification, the accompanying memorandum of points of authorities, and all accompanying declarations and exhibits, the pleadings and papers on file in this action, oral argument and such other matters as the Court may consider in hearing this motion.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**TABLE OF CONTENTS**

Page

I.      PRELIMINARY STATEMENT ..................................................................................1

II.     BACKGROUND .......................................................................................................3

     A.  Apple Has Foreclosed Competition in the Distribution of iOS Apps
        and In-App Products. ...................................................................................3

     B.  Apple Imposes the Challenged Restraints on Each Class Member
        Without Exception. .......................................................................................4

     C.  The App Store Generates Blockbuster Profits on the Back of Each
        Member of the Class. ....................................................................................5

III.    ARGUMENT ...........................................................................................................7

     A.  Legal Standard. ...........................................................................................7

     B.  The Putative Class Satisfies Rule 23(a)'s Four Requirements. ....................7

     C.  Common Questions of Law and Fact Predominate Under Rule
        23(b)(3). .......................................................................................................9

         1.  Common Issues Predominate on Plaintiffs' Monopolization
            Claim. ............................................................................................10

            a.  Common Proof Will Establish Apple's Monopoly
                Power in a Relevant Market. ............................................10

            b.  Common Proof Will Establish Apple's Willful
                Acquisition of Monopoly Power. ......................................13

            c.  Common Proof Will Establish Causal Antitrust
                 Injury. ..............................................................................14

            d.  Professor Economides Has Developed a Classwide
                Damages Methodology That Flows From Plaintiffs'
                Liability Theory. ...............................................................17

         2.  Common Issues Predominate on Plaintiffs' Attempted
            Monopolization Claim. ..................................................................21

         3.  Common Issues Predominate on Plaintiffs' UCL Claim. ..............21

     D.  A Class Action is The Superior Method for Resolving This
        Dispute. ........................................................................................................23

     E.  Class Certification Also is Appropriate Under Rule 23(b)(2). ....................25

     F.  The Court Should Appoint Class Counsel. ..................................................25

IV.     CONCLUSION .......................................................................................................25

## **TABLE OF AUTHORITIES**

**Page(s)**

### **FEDERAL CASES**

*Aguirre v. Genesis Logistics*,
    2016 WL 6573986 (C.D. Cal. July 20, 2016) ...........................................................24

*Alger v. FCA US LLC*,
    334 F.R.D. 415 (E.D. Cal. 2020)...........................................................................22

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ...............................................................................2, 23

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013) ..............................................................................9, 13

*In re Apple Inc. Device Perf. Litig.*,
    386 F. Supp. 3d 1155 (N.D. Cal. 2019)..................................................................21

*In re Apple iPod iTunes Antitrust Litig.*,
    2008 WL 5574487 (N.D. Cal. Dec. 22, 2008) .......................................................12

*B.K. by next Friend Tinsley v. Snyder*,
    922 F.3d 969-70 (9th Cir. 2019)...........................................................................8

*Brice Yingling v. eBay, Inc.*,
    2010 WL 11575128 (N.D. Cal. July 16, 2010) ......................................................24

*Briseno v. Conagra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017)..............................................................................24

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 297 (E.D. Mich. 2001)........................................................................24

*Cascade Health Sols. v. PeaceHealth*,
    515 F.3d 883 (9th Cir. 2008)...........................................................................13, 14

*Castro v. Sanofi Pasteur Inc.*,
    134 F. Supp. 3d 820 (D.N.J. 2015)................................................................12, 13, 15

*CollegeNET, Inc. v. Common App., Inc.*,
    711 F. App'x 405 (9th Cir. 2017)...........................................................................14

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ...........................................................................2, 7, 17, 18

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   2006 WL 1530166 (N.D. Cal. June 5, 2006)............................................................18

*Epic Games, Inc. v. Apple Inc.*,
   493 F. Supp. 3d 817 (N.D. Cal. 2020) (Rogers, J.) ................................10, 12, 13, 21

*Fed. Trade Comm'n v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ...............................................................................10, 13

*Gaudin v. Saxon Mortg. Servs., Inc.*,
   297 F.R.D. 417 (N.D. Cal. 2013) .............................................................................22

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003)....................................................................................14

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1999)..................................................................................24

*Hatamian v. Advanced Micro Devices, Inc.*,
   2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) (Rogers, J.)......................................24

*In re High-Tech Employee Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013)..............................................................8, 9, 15

*Hubbard v. RCM Techs. (USA), Inc.*,
   2020 WL 6149694 (N.D. Cal. Oct. 20, 2020) (Rogers, J.)...................................7, 13

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997)..................................................................................21

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981) .................................................................................................18

*Kleen Prod. LLC v. Int'l Paper*,
   306 F.R.D. 585 (N.D. Ill. 2015) ..........................................................................15, 16

*Knutson v. The Daily Review*,
   548 F.2d 795 (9th Cir. 1976)....................................................................................17

*In re Lithium Ion Batteries Antitrust Litig.*,
   2017 WL 1391491 (N.D. Cal. Apr. 12, 2017)........................................................8, 14

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001)..................................................................................23

*Lozano v. AT & T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007)....................................................................................22

*Maldonado v. Apple, Inc.*,
   2021 WL 1947512 (N.D. Cal. May 14, 2021)..........................................................21

*Moore v. Ulta Salon, Cosms. & Fragrance, Inc.,*
   311 F.R.D. 590 (C.D. Cal. 2015)........................................................................24

*In re Mushroom Direct Purchaser Antitrust Litig.,*
   319 F.R.D. 158 (E.D. Pa. 2016) .......................................................................12

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.,*
   2013 WL 5979327 (N.D. Cal. Nov. 8, 2013) ...................................................13

*Northrop Corp. v. McDonnell Douglas Corp.,*
   705 F.2d 1030 (9th Cir. 1983) ........................................................................17

*Ohio v. Am. Express,*
   138 S. Ct. 2274 (2018) .....................................................................................13

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
   993 F.3d 774 (9th Cir. 2021) .....................................................................14, 15

*Pecover v. Elec. Arts, Inc.*
   2010 WL 8742757 (N.D. Cal. Dec.21. 2010) ...................................................8

*Pulaski & Middleman, LLC v. Google, Inc.,*
   802 F.3d 979 (9th Cir. 2015) ..........................................................................23

*In re Qualcomm Antitrust Litig.,*
   328 F.R.D. 280 (N.D. Cal. 2018) ......................................................................9

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
   282 U.S. 555 (1931) ...................................................................................17, 18

*Tawfilis v. Allergan, Inc.,*
   2017 WL 3084275 (C.D. Cal. June 26, 2017) ................................................15

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   2012 WL 555090 (N.D. Cal. Feb. 21, 2012) ..................................................14

*In re Twitter Inc. Sec. Litig.,*
   326 F.R.D. 619 (N.D. Cal. 2018) ....................................................................21

*Tyson Foods, Inc. v. Bouaphakeo,*
   577 U.S. 442 (2016) .....................................................................................9, 16

*Wal-Mart Stores, Inc. v. Dukes,*
   564 U.S. 338 (2011) .....................................................................................8, 9

*In re Washington Mut. Mortg.-Backed Sec. Litig.,*
   276 F.R.D. 658 (W.D. Wash. 2011) ................................................................24

*West v. Cal. Servs. Bureau, Inc.,*
   323 F.R.D. 295 (N.D. Cal. 2017) ....................................................................25

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
   549 U.S. 312, 320 (2006) ....................................................................................... 17

**STATE CASES**

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999).....................................................................................21, 22

*Drum v. San Fernando Valley Bar Assn.*,
   182 Cal. App. 4th 247 (2010) ................................................................................ 22

**FEDERAL LAWS**

FTC Act, 15 U.S.C. § 5 ................................................................................................ 22

Sherman Act ...................................................................................................... 2, 21, 22

**STATE LAWS**

California Unfair Competition Law,
   Cal. Bus. & Prof. Code §§ 17200 *et seq*...................................................1, 21, 22, 23

**FEDERAL RULES**

Federal Rule of Civil Procedure Rule 23 ...............................................................*passim*

**OTHER AUTHORITIES**

IIA Phillip E. Areeda et al., Antitrust Law, ¶ 395b3 (3d ed. 2007)............................... 18

2 Newberg on Class Actions § 4:70 (5th ed.)................................................................ 24

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
| --- | --- |
| **Berman Decl.** | Declaration of Steve W. Berman in Support of Developer Plaintiffs' Motion for Class Certification, concurrently filed herewith. |
| **Ex.** | Exhibit to the Declaration of Steve W. Berman in Support of Developer Plaintiffs' Motion for Class Certification, concurrently filed herewith. |
| **Cameron Decl.** | Declaration of Donald R. Cameron in Support of Developer Plaintiffs' Motion for Class Certification, concurrently filed herewith. |
| **Pure Sweat Decl.** | Declaration of Richard Czeslawski in Support of Developer Plaintiffs' Motion for Class Certification, concurrently filed herewith. |
| **CAC** | Plaintiffs' Consolidated Class Action Complaint for Violations of the Sherman Act and California Unfair Competition Law (ECF NO. 53). |
| **Apple FOF** | Defendant Apple Inc.'s Final Proposed Findings of Fact, *Epic Games v. Apple Inc.,* Case No. 4:20-cv-05640 (ECF No. 779-1). |
| **Apple COL** | Defendant Apple Inc.'s Final Proposed Conclusions of Law, *Epic Games v. Apple Inc.,* Case No. 4:20-cv-05640 (ECF No. 779-1). |
| **Elhauge** | Expert Class Certification Report of Professor Einer Elhauge, concurrently filed herewith. |
| **Economides** | Expert Class Certification Report of Professor Nicholas Economides, concurrently filed herewith. |
| **Tregillis** | Expert Report of Christian Tregillis, CPA, ABV, CFF, CLP, concurrently filed herewith. |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.       PRELIMINARY STATEMENT

Developers of iOS[1] apps and in-app products create digital goods for a billion-plus end users of Apple mobile devices, including the iPhone, iPad, and iPod touch music player. Plaintiffs Donald R. Cameron and Pure Sweat Basketball, Inc. are U.S. members of this developer community. They allege that Apple has willfully acquired, maintained, and abused monopoly power in a U.S. market for the distribution services that they need to get their iOS native apps and in-app products to iOS device users. They also allege, in the alternative, that Apple has willfully acquired, maintained, and abused monopsony power as a bottleneck retailer of their products. *See* CAC ¶¶ 6, 22-23, 28, 47, 100, 121, 132. Additionally, they claim that Apple's abusive behavior violates the unlawful and unfair prongs of California's Unfair Competition Law. They allege that Apple has harmed competition and caused all similarly situated iOS developers to suffer readily quantifiable monetary injury, such that they are entitled to damages or restitution, together with appropriate injunctive relief to halt Apple's ongoing violations of the law.

Apple's policies and practices are uniform, giving rise to numerous common questions answerable by common evidence. Thus, Plaintiffs respectfully move pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3) to certify the following Class:

> All U.S. developers of any Apple iOS application or in-app product (including subscriptions) sold for a non-zero price via Apple's iOS App Store at any time on or after June 4, 2015.[2]

Each requirement for class certification is readily met in this case. *First*, the numerosity requirement of Rule 23(a)(1) is satisfied because Class members are too numerous to join with practicality. *Second*, there are many common questions to resolve, including whether Plaintiffs identify a relevant market and whether Apple's business practices are anticompetitive. *Third*, as Rule 23(a)(3) requires, Plaintiffs' claims are typical of the claims of all putative Class members; they are

---

[1] For economy's sake, Plaintiffs refer to iOS throughout, which for purposes of the instant motion encompasses iPad OS, the tablet operating system that Apple introduced in 2019.

[2] The limitation to June 4, 2015 is based on the four-year statutes of limitations applicable to Plaintiffs' state and federal law claims and the June 4, 2019 date of filing of their initial complaint.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    premised on the anticompetitive effects of restraints that applied (and apply) to Class members in

2    uniform manners. *Fourth*, Rule 23(a)(4)'s adequacy requirement is met because the interests of

3    Plaintiffs and the proposed Class are fully aligned; Plaintiffs are also represented by counsel who

4    satisfy the requirements of Rule 23(g). *See infra* Sec. III.B.

5           Further, common issues overwhelmingly predominate, such that certification under Rule

6    23(b)(3) is appropriate. For example, Plaintiffs' Sherman Act claims entail a bundle of related

7    common questions, including inquiry into the relevant market; whether Apple exercises monopoly

8    (or monopsony) power within that market; whether Apple has engaged in anticompetitive

9    conduct; and whether putative Class members can demonstrate and quantify classwide impact and

10   damages resulting from Apple's conduct. *See infra* Sec. III.C.

11          To help demonstrate the propriety of class certification, including with respect to the

12   predominance of common issues, Plaintiffs submit the reports of Professor Einer Elhauge,

13   Professor Nicholas Economides, and Christian Tregillis. These experts help explain how Apple

14   acquired and misused immense power, not by selling better iOS digital-product distribution

15   services, but by purposely excluding competition in the relevant market. Professor Economides also

16   shows by common evidence that Apple's commission rates have been unlawfully inflated, which

17   allows him to calculate damages (or restitution) for each putative Class member by comparing what

18   developers actually took home versus what they would have taken home in the counterfactual

19   world free from Apple's restraints. This methodology is consistent with Plaintiffs' theory of

20   liability, as required under *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013).

21          Class treatment is also superior under Rule 23(b)(3). Apple has caused billions of dollars'

22   worth of economic injury, but the harm is dispersed across more than ████████████████

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ███████████████████████████████ The expense of litigating this

26   action—which involves costly analyses of massive datasets—greatly exceeds individual damages.

27   *Cf. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the

28   class action mechanism is to overcome the problem that small recoveries do not provide the

incentive for any individual to bring a solo action prosecuting his or her rights."). And even if individual claims could be pursued, their multiplicity would over-burden the judicial system.

Thus, class treatment is apt and will provide the most efficient and pragmatic means of adjudicating this matter. Plaintiffs respectfully request that the Court certify the proposed Class.

## II.       BACKGROUND

### A.       Apple Has Foreclosed Competition in the Distribution of iOS Apps and In-App Products.

Native iOS apps and in-app products operate on iOS mobile devices. They are incompatible with non-iOS devices. For this simple reason, distribution services for native apps that work on non-iOS devices, such as those that operate on Android OS devices, are useless to developers with iOS digital products to sell. *See* Ex. 2 (House Judiciary Rep.) at 94-95.

No wonder Apple, the operator of the one and only iOS App Store, is impervious to the pricing behavior of other digital-product store operators. While it claims to compete with Google and its parallel Google Play store, it pays little attention to Google's commission rate, or changes thereto.

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████   As the Congressional Subcommittee on Antitrust and Commercial Administrative Law found, "the App Store and the Play Store do not compete against one another . . . so the dominance of the Play Store is not constrained by the App Store and vice versa." *See* Ex. 2 at 94. Instead, Apple moves prices up and down, in huge increments, when it suits its purposes—but not in response to the actions of supposed competitors.

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████   *See, e.g.*, Ex. 4 (noting IAP was first implemented in 2009); ███████████████████████████████████████████ .

Many years later, it dropped the rate from 30% to 15%, with no steps in between, in just three circumstances: (a) for participants in its Video Partner Program ("VPP"); (b) with respect to subscriptions sold in-app, via IAP, that are in place for longer than a year; and, most recently (c) for sales by developers who qualify for its Small Business Program ("SBP"). ███████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

Apple CEO Tim Cook's candid trial testimony underscores that during the proposed class period, Apple has *never* priced its commissions in response to *any* supposed competition:

> **The Court**: The issue with the $1 million Small Business Program, at least from what I've seen thus far: that really wasn't the result of competition. That seemed to be a result of the pressure that you're feeling from investigations, from lawsuits, not competition.
>
> **Mr. Cook**: It was the result of feeling like we should do something from a COVID point of view, and then electing to instead of doing something very temporary, to do something permanent. And of course we had the lawsuits and all the rest of the stuff in the back of our head, but the thing that triggered it was, we were very worried about small business.
>
> **The Court**: Okay, but it wasn't competition.
>
> **Mr. Cook**: It was competition after we did our 15, it was competition that made Google drop theirs to 15 percent.
>
> **The Court**: I understand perhaps that when Google changed its price, but your action wasn't the result of competition.
>
> **Mr. Cook**: It was the result of feeling like we should do something for small business, which in our . . . vernacular is small developer.

Ex. 7 (Epic Trial Tr. Vol. 15) at 3992:4-3993:1. As to Apple's default 30% commission, the Court put it succinctly: "[T]he 30 percent number has been there since the inception . . . [a]nd if there was real competition, that number would move, and it hasn't." Ex. 8 (Epic Trial Tr. Vol. 16) at 4081:3-7.

## B.   Apple Imposes the Challenged Restraints on Each Class Member Without Exception.

Apple's restraints apply uniformly to developers, pursuant to the program rules it unilaterally sets. It's a one size fits all program. Apple allows iOS developers to distribute their native iOS apps to consumers only through its App Store. It imposes no contractual term on device end-users restricting them to the App Store; it simply applies the restraint unilaterally. Additionally, the only way consumers can pay for digital products from within an iOS native app is by way of its in-app

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

payment (IAP) system, and Apple prohibits all developers from telling end-users inside their apps that they can pay for in-app digital products outside the app, even where its guidelines permit such purchases. Ex. 9 at § 3.1.1, § 3.1.3.

9.

**C.      The App Store Generates Blockbuster Profits on the Back of Each Member of the Class.**

Mr. Tregillis has conducted a detailed analysis to confirm the accuracy of these figures by verifying their consistency with other Apple P/Ls and by rolling them up to Apple's audited financial statements. *See* Tregillis ¶¶ 32-49.

---

3

*See* Tregillis ¶ 51.

1   ██████████████████████████████████████████████. *See* Economides ¶¶ 19-

2   23. ███████████████████████████████████████████████████████████

3   ██████████████████████████████████████████████████████

4   ███████████████████████████████████████████████████████████████

5   ███████████████████████████████████████████████████████████

6   ████   *See id.*; *see also* Economides ¶ 23. █████████████████████████

7   ██████████████████████████████████████████████████████████

8   ███████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████

10  ████████████████████

11  ████████████████████████████████████████████████████████████

12  ███████████████████████████████████ and that Apple has sustained those

13  commissions at supracompetitive levels by foreclosing competition. *See* Elhauge ¶¶ 233-97.

14  ██████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████

18  ███████████████████████████████████████████████████

19  █████████████████████████████████████████████████

20  ████████████████████████████████████████████. Facing inquiries

21  from Congress as to potentially discounted pricing for Amazon, Cook was emphatic in this regard:

22      The suggestion that Apple granted unique terms to the Amazon Prime Video app that
23      allows it to pay a lower commission is false.  Apple does not play favorites in this
        manner.  That would be counter to our goal of attracting the highest-quality
24      developers to the App Store.

    Ex. 16 at 8.

25

26  ███████████████████████████████████████████████████

27  ██████████████████████████████████████████████████

28  ███████████████████████████████████████████████████████



## III.   ARGUMENT

### A.   Legal Standard.

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. To satisfy Rule 23(a), class plaintiffs must show: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."

In addition to the prerequisites of Rule 23(a), plaintiffs seeking class certification must also satisfy one of the provisions of Rule 23(b). *See Comcast,* 569 U.S. at 1432. Plaintiffs here move for certification of a damages class under Rule 23(b)(3) and injunctive relief class under Rule 23(b)(2).

### B.   The Putative Class Satisfies Rule 23(a)'s Four Requirements.

**The Class is Sufficiently Numerous.** Classes are generally sufficiently numerous when they are comprised of 40 or more members. *See Hubbard v. RCM Techs. (USA), Inc.*, 2020 WL 6149694, at *1 (N.D. Cal. Oct. 20, 2020) (Rogers, J.). The Class here includes more than ███ members, and that number is growing. *See* Elhauge ¶¶ 343, 345. Numerosity cannot be disputed.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**Common Questions of Law and Fact Exist.** To satisfy the commonality requirement, "[e]ven a single [common] question will do," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011),[4] and "[a]ntitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke.'" *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) (quoting *Dukes*, 131 S. Ct. at 2551). Here, additional common questions abound, including whether Plaintiffs identify a relevant market, whether Apple's business practices are anticompetitive, and whether the Class has been injured.

**The Named Plaintiffs' Claims Are Typical of the Class.** To satisfy Rule 23(a)(3)'s typicality requirement, Plaintiffs' claims must be "reasonably coextensive with those of absent class members; they need not be substantially identical." *B.K. by next Friend Tinsley v. Snyder*, 922 F.3d 969-70 (9th Cir. 2019) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1999)). "In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants." *High-Tech*, 985 F. Supp. 2d at 1181; *Pecover v. Elec. Arts, Inc.* 2010 WL 8742757, at *11 (N.D. Cal. Dec.21. 2010). Named Plaintiffs here are U.S. iOS App developers who sold their apps or in-app products on the Apple App Store to consumers, and Apple received a commission from each sale. Plaintiffs allege the same antitrust violation and injury for every Class member—elimination of market alternatives and overpayment of commissions to Apple—making their claims typical of the Class as a whole.

Typicality is particularly evident here because ███████████████████████ ████████████████████████████████ ¶¶ 356-63, 366-70; *see supra* Sec. II.C; *infra* Sec. III.C.1.c. Typical of all Class members, named Plaintiffs paid Apple's standardized commissions, which Plaintiffs allege would have been lower but-for Apple's restraints. *See infra* Sec. III.C.1.c; *see also In re Lithium Ion Batteries Antitrust Litig.*, 2017 WL 1391491, at *4 (N.D. Cal. Apr. 12, 2017) ("'The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members

---

[4] For this and all other citations herein, internal quotation, bracket, and ellipses marks are omitted (unless otherwise noted).

1   have been injured by the same course of conduct.'") (quoting *Wolin v. Jaguar Land Rover N. Am.,*

2   *LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010)).

3         **Named Plaintiffs and Proposed Class Counsel Will Adequately Represent the Class.**

4   Plaintiffs and Interim Class Counsel meet Rule 23(a)(4)'s adequacy requirement. The test for

5   adequacy turns on two questions: "(1) whether named plaintiffs and their counsel have any conflicts

6   of interest with other class members, and (2) whether named plaintiffs and their counsel will

7   prosecute the action vigorously on behalf of the class." *High-Tech*, 985 F. Supp. 2d at 1181. Neither

8   Plaintiffs nor Interim Class Counsel have any conflicts with the Class. Plaintiffs have also

9   demonstrated that they will prosecute this action vigorously; each has produced documents,

10  consulted with counsel about the facts of the case and strategy, and discussed discovery sent to

11  Defendants. Cameron Decl. ¶¶ 4-5; Pure Sweat Decl. ¶¶ 5-6.

12        The Court already concluded in its interim appointment of Steve Berman of Hagens Berman

13  Sobol Shapiro LLP as Lead Counsel that Mr. Berman and Hagens Berman satisfy the requirements

14  articulated in Rule 23(g). *See* ECF No. 65. Hagens Berman has vigorously prosecuted this case,

15  working efficiently and collaboratively with the Plaintiffs' Executive Committee.

16  **C.**      **Common Questions of Law and Fact Predominate Under Rule 23(b)(3).**

17        Plaintiffs' claims raise common questions that will predominate over any individual issues,

18  thus satisfying Rule 23(b)(3). While the predominance inquiry "must be 'rigorous' and may 'entail

19  some overlap with the merits of the plaintiff's underlying claim," *Amgen, Inc. v. Conn. Ret. Plans &*

20  *Trust Funds*, 568 U.S. 455, 465-66, (2013) (quoting *Dukes*, 131 S. Ct. at 2251), courts ought not

21  "engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. To assess

22  predominance, courts compare the common questions to the individual questions, but there is no

23  requirement that common questions predominate for each element of the claim. *See Amgen*, 568 U.S.

24  at 469 ("Rule 23(b)(3) . . . does *not* require a plaintiff seeking class certification to prove that each

25  element of her claim is susceptible to class-wide proof." (emphasis in original)); *accord Tyson*

26  *Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

27        While the predominance inquiry is comparative in nature, it is not "bean counting." *High-*

28  *Tech*, 985 F. Supp. 2d at 1187. Courts must also make a "qualitative assessment" as to the magnitude

and importance of the common and uncommon issues. *See id.* This ordinarily is done by predicting how a trial might unfold. *See In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 316 (N.D. Cal. 2018). Predictions are not required here, however. Having already tried the claims of one putative class member (Epic), the Court is well versed in the issues that will dominate further class proceedings and drive the resolution of this case. As detailed below, those issues are predominately—indeed, overwhelmingly—common across the Class.

### 1.    Common Issues Predominate on Plaintiffs' Monopolization Claim.

To prevail on their unlawful monopolization claim, Plaintiffs must establish "'(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury.'" *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 834 (N.D. Cal. 2020) (Rogers, J.) (quoting *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020)). Common evidence establishes each element.

### a.    Common Proof Will Establish Apple's Monopoly Power in a Relevant Market.

A substantial portion of the *Epic* trial was devoted to the parties' competing views on market definition, and this issue will likewise take center stage in the Class proceedings. But the trial will not necessarily dictate a result. Developer Plaintiffs' analysis of the relevant market differs in significant respects from the analysis presented by Apple and Epic.

Professor Elhauge shows that the relevant market is the U.S. market for iOS App and digital in-App-purchase (IAP) distribution services ("iOS app distribution market"). *See* Elhauge ¶ 28. This is a two-sided market that consists of the App Store, rival iOS app distributors, and direct distribution of native iOS apps. *Id.* Rival iOS app distributors and the direct distribution of native iOS apps are clearly the closest substitutes to the App Store because they are the only products that provide the App Store's primary function to consumers and developers: distribution of native iOS apps. *Id.* ¶ 77.

Common qualitative *and empirical* evidence support Professor Elhauge's market definition. The relevant market consists of the smallest set of closest substitutes for the Defendant's product that passes the "Hypothetical Monopolist Test" ("HMT"). A market passes the HMT if the price a hypothetical 100% monopolist would charge is at least 5% higher than the price that would prevail if

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    multiple firms competed against each other in the market. *Id.* ¶ 33. Apple is a near-100% monopolist,

2    so its average commission percentage ███ is the price a 100% monopolist would charge. *Id.* ¶

3    105. Therefore, evidence that average commissions in this market would be at least 5% lower ███

4    ████████ with competition would show that this market passes the HMT. *Id.* Professor Elhauge

5    presents such evidence: the average commission in the Windows PC App Distribution Market, an

6    analogous two-sided market that is not tainted by Apple's anticompetitive restraints, is only ███ a

7    key statistic not presented by Epic. *See id.* ¶¶ 113-14; Economides ¶ 38 & Table 4.  Similarly,

8    Professor Economides's rival profits yardstick indicates that the average commission in the iOS app

9    distribution market in the but-for world would range from 13.0-14.8%. *See* Elhauge ¶ 116;

10   Economides ¶ 52 & Table 6. Each of these estimates of competitive prices in the iOS app distribution

11   market ████████  ███  ████████████████████████████

12        Further, Professor Elhauge shows *why* more distant substitutes—such as the Google Play

13   Store or video game console app stores—cannot constrain an iOS app distribution monopolist from

14   charging a price at least 5% higher than the competitive price and are therefore *outside* the properly

15   defined market. Substitution between the App Store and video game console app stores is low

16   because ████████████████████████████████████

17   ████████████████████████████████████████

18   ████████████████████████████████

19   ████████  Thus, consumers can almost never substitute from the App Store to the

20   Google Play Store for their smartphone apps. And because there is almost no overlap between iOS

21   smartphone owners and Android smartphone owners, when developers create apps that run on both

22   operating systems, they generally distribute them through both the App Store and the Google Play

23   Store to access each store's distinct set of consumers, instead of substituting between the stores in

24   response to changes in commissions. *Id.* ¶ 61.

25        In contrast, Apple's experts improperly include nearly every potential substitute for the App

26   Store in their market definition, even though the Merger Guidelines caution against this. *Id.* ¶¶ 172-

27   76. Apple's experts also rely on the wrong economic test to assert that there are separate markets for

28   the distribution of "games" versus "non-games." They incorrectly apply the "cluster market" test,

which is inapplicable here because Apple's product—iOS app distribution—is the *same* for every transaction, regardless of genre of the app; indeed, █████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* ¶¶ 166-68. Professor Elhauge explains that the relevant test is instead the "targeted customers" test, which here shows that one should *not* split the sales of iOS app distribution platforms into separate markets for games versus non-games because Apple's anticompetitive conduct increased commissions for both types of apps. *Id.* ¶¶ 156-59, 160-64. ████

████████████████████████████████████████████████████████████████████████████████

████████████████████████. *Id.* ¶¶ 388-93, Figures 8 & 9.

As the foregoing illustrates, determining whether Plaintiffs have identified a relevant market ultimately requires intricate factual analysis of "the nature of the iOS market *as a whole.*" *Epic Games*, 493 F. Supp. 3d at 839. This is not an individualized inquiry. "Whether or not Plaintiffs have correctly defined the relevant market is a question which applies to the claims of all class members." *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 197 (E.D. Pa. 2016); *In re Apple iPod iTunes Antitrust Litig.*, 2008 WL 5574487, at *4 (N.D. Cal. Dec. 22, 2008) ("[W]hether an 'online music market exists'" is "complex factually inquir[y] that do[es] not depend in any way upon individualized proof"); *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015) ("Defining the relevant market focuses on common data, expert analysis, and economic tests; such proof generally does not vary by class member.").

Once the fact finder identifies the relevant market, it will need to determine whether Apple exercises monopoly (or monopsonist) power within that market. This is an equally important, and entirely common, question that binds the proposed Class together. *See In re Apple iPod iTunes Antitrust Litig.*, 2008 WL 5574487, at *4 (whether defendant has market power is a "broad question[] that exist[s] independently of each individual Plaintiff"); *Castro*, 134 F. Supp. 3d at 845 ("Evidence concerning market power is common to the class."). And there is ample common evidence to establish monopoly power here. *See* Elhauge ¶¶ 198-215.

Ultimately, class certification does not require that the Court resolve whether Apple exercises monopoly power in a relevant market. Predominance "requires a showing that *questions* common to

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

the class predominate, not that those questions will be answered on the merits, in favor of the class." *Amgen*, 568 U.S. at 459; *accord Hubbard*, 2020 WL 6149694, at *2. Either plaintiffs have defined a relevant market, or they have not. Either Plaintiffs can establish Apple's monopoly power in that market, or they cannot. However these questions are answered, the answers are classwide.

### b. Common Proof Will Establish Apple's Willful Acquisition of Monopoly Power.

If Apple possesses monopoly power in a relevant market, it will not be condemned absent "'an element of anticompetitive *conduct.*'" *Epic Games, Inc.*, 493 F. Supp. at 836 (quoting *Qualcomm*, 969 F.3d at 990). This is what distinguishes "willful acquisition or maintenance of [monopoly] power from growth or development as a consequence of a superior product, business acumen, or historical accident." *Id.* Whether conduct is "anticompetitive" is gauged under the rule of reason and its familiar burden-shifting framework. *See id.* Each step of the rule of reason analysis will be adjudicated with common evidence.

The initial burden is on Plaintiffs to show that Apple's conduct "harm[ed] the competitive process." *Qualcomm, Inc.*, 969 at 990. This analysis is classwide. It is not enough to show "harm to one or more competitors." *Id.* Rather, as Apple observes, "a plaintiff must show injury to 'competition in the market as a whole.'" Apple COL ¶ 186 (quoting *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024-25 (9th Cir. 2013)).

If Plaintiffs demonstrate anticompetitive effects, the burden shifts to Apple "to show a procompetitive rationale for the restraint." *Ohio v. Am. Express*, 138 S. Ct. 2274, 2284 (2018). Apple has claimed a host of procompetitive justifications—for example, that its restraints promote user security and prevent free riding. *See, e.g.*, Apple FOF ¶¶ 581-602. Whatever one makes of these claims, they concern the rationale and market-wide effect of the restraints and, thus, are common to the Class. *See Castro*, 134 F. Supp. 3d at 844-45 ("procompetitive justifications" are "common issues"); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2013 WL 5979327, at *4 (N.D. Cal. Nov. 8, 2013) (same). Equally common is the issue of whether, "[i]f the plaintiff cannot rebut the monopolist's procompetitive justification, . . . the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Qualcomm*, 969 F.3d at 991; *see also Cascade Health Sols. v.*

*PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) ("Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way.").

### c.     Common Proof Will Establish Causal Antitrust Injury.

Plaintiffs must also establish that Apple's restraints have caused Class members to suffer an antitrust injury or "antitrust impact." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 788 (9th Cir. 2021). This often is described in the case law as "common impact" and, like all elements of Plaintiffs' claims, it must be proven only with a "preponderance of the evidence." *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 555090, at *3 (N.D. Cal. Feb. 21, 2012). Certainty is not required.

Two antitrust injuries (or impacts) are alleged here. ***First***, Plaintiffs contend that by preventing alternative iOS distribution channels, Apple has diminished—indeed foreclosed—market alternatives. The elimination of market alternatives is an independently actionable form of antitrust injury that does not require any showing of pecuniary harm. *See Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 374 (9th Cir. 2003); *see also CollegeNET, Inc. v. Common App., Inc.*, 711 F. App'x 405, 407 (9th Cir. 2017) (reversing dismissal where alleged antitrust injury involved not higher prices but conduct that limited "choice" and "foreclosed rivals from entry into the market").

***Second***, common evidence shows that, had Apple not foreclosed competition in the relevant market, commissions for App distribution and in-App purchases would have been lower, and they would have been lower for each Class member.

This is not a case where Plaintiffs need to unravel a complicated pricing structure involving one-off negotiations, or other individualized issues, to show common impact. Inquiries of this sort can be a sticking point in antitrust class actions. *See, e.g.*, *Batteries*, 2017 WL 1391491, at *12 (denying class certification in part because plaintiffs' expert did not account for bundling, rebates, and discounts that would affect accuracy of cost data). ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

As Tim Cook put it to Congress, "Apple does not play favorites in this manner,"

. *See id.* Ex. 16 at 8; *see supra* Sec. II.C.

*See supra* Sec. II.C.

. *See* Elhauge ¶¶ 366-70.[5]

Apple's standardized pricing structure simplifies the common impact analysis. If a firm maintains standardized prices, as here, whether those prices would be lower in a more competitive environment is necessarily a common question. Either the standardized prices would fall, benefitting all Class members, or they would not. That is precisely the type of common inquiry that supports (rather than undercuts) class treatment. *See, e.g.*, *High-Tech*, 985 F. Supp. 2d at 1221-22 (finding that "rigid compensation structures" indicated that adjustments in employee compensation in but-for world "would have had classwide effect and would have impacted all or nearly all [Class] members"); *Castro*, 134 F. Supp. 3d at 848 (finding common impact where defendant maintained "a rigid price structure with little price variance between customers" such that competition could be expected to "reduce price across the board"); *see also Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *14 (C.D. Cal. June 26, 2017) ("[B]ecause this case involves a large group of direct purchasers who paid one list price (with percentage-based, retrospective rebates deducted from this list price), it is particularly well suited for resolution on a classwide basis."); *Kleen Prod. LLC v. Int'l Paper*, 306 F.R.D. 585, 595 (N.D. Ill. 2015), *aff'd sub nom. Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919 (7th Cir. 2016) ("Courts have long held that a plaintiff can demonstrate impact by showing that the conspiracy caused an increase to the standard market price of the product at issue").[6]

---

[5] *See* Elhauge ¶¶ 367-70.

[6] that would not defeat predominance because restraints that elevate an "initial list price" can "affect the range of prices that resulted from negotiation." *Olean*, 993 F.3d at 790.

Professor Elhauge also analyzed whether Apple might initiate new forms of price discrimination in the but-for world, such that only some developers (and not all) would have benefitted from increased competition. He finds no evidence to support this hypothesis, and ample evidence that commissions would be lower across the board. ████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████ *See* Elhauge ¶¶ 352-54. If Mr. Cook believes (as he told Congress) that differentiated pricing "would be counter to [Apple's] goal of attracting the highest quality developers," that rationale would apply in the but-for world no differently than it does in the world Mr. Cook occupies. *See id.* ¶ 353 & n.532. Second, Professor Elhauge shows that in the but-for world *every* developer would have the option of self-distributing its Apps, or using rival iOS distributors. *See id.* ¶ 346. Confronting increased competition for *every* developer, Apple's economically rational response would be to reduce commissions for all. *See id.*

Professor Elhauge explains further that, in the but-for world, Apple would likely maintain █ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

To be sure, Apple claims that its commissions are already at or below the "competitive rate"—implying they would be no different absent the challenged restraints. *See* Apple COL ¶ 230. If that is true, however, *no* Class member could establish an overcharge or damages.[7] Common defenses of this sort are why class actions exist. *See Tyson Foods,* 577 U.S. at 457 ("When, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action—courts

---

[7] As noted above, this would not preclude Class members from establishing a loss of market alternatives, which is a separate antitrust injury not predicated on pecuniary harm.

should engage that question as a matter of summary judgment, not class certification.").

Regardless, Apple's common defense defies the common evidence. As Professors Economides and Elhauge show, without the challenged restraints, Apple would face serious competition from both rival iOS App Stores and self-distribution by developers. *See* Economides ¶¶ 11-17; Elhauge ¶¶ 300-14. There are multiple firms positioned to compete (*see* Elhauge ¶¶ 307-312), and the Windows PC App Distribution Market provides a useful (albeit conservative) model of how competition would unfold. ███████████████████████████████████████████

███████████████████████████████████████████ *See infra* Sec. III.C.1.d. That is how competition works. The whole "premise of the antitrust laws [is] that competition will assure the consumer the best product at the lowest price." *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1055 (9th Cir. 1983). There is no reason to believe that the App Store, facing competitors, would be immune to these basic laws of economics. *See* Elhauge ¶¶ 315-36.[8]

> ### d.   Professor Economides Has Developed a Classwide Damages Methodology That Flows From Plaintiffs' Liability Theory.

At this stage, Plaintiffs must only show that "damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. Individual damages will differ, but the rule is clear: "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Olean*, 993 F.3d at 790. Moreover, antitrust damage "[c]alculations need not be exact." *Comcast*, 569 U.S. at 35. Once the fact of injury is established, courts apply a "relaxed standard," *Knutson v. The Daily Review*, 548 F.2d 795, 811 (9th Cir. 1976), under which damage must be based on a "just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson*

---

[8] While Plaintiffs also allege that the App Store could be treated as a monopsony (rather than a monopoly), this alternate framing does not affect the foregoing predominance analysis. As explained by the U.S. Supreme Court in *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, "monopsony is to the buy side of the market what a monopoly is to the sell side." 549 U.S. 312, 320 (2006). Thus, "monopsony pricing … is analytically the same as monopoly or cartel pricing and [is] so treated by the law." *Id.* at 321-22. Here, for example, an overcharge on a 30% commission is the mirror image of an underpayment based on Apple-the-retailer remunerating developers at the rate of $.70 on the dollar for their digital products. That is, "monopoly and monopsony are symmetrical distortions of competition from an economic standpoint." *Id.* Whatever framing is applied— monopoly or monopsony—the same common issues arise and predominate.

*Parchment Paper Co.*, 282 U.S. 555, 563 (1931). Courts accept this "degree of uncertainty" because "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981).

Here, using a common methodology, Professor Economides constructed a damages model that is capable of measuring classwide damages and (when the time comes) individual damages for each Class member. The model is straightforward. It compares the commissions Class members paid in the actual world for App distribution and in-App purchases (as shown in Apple's own data) to the commissions that Class members would have paid in a more competitive market. This approach is entirely consistent with Plaintiffs' liability theory, as *Comcast* requires.

To estimate the commissions that would have prevailed but-for Apple's restraints, Professor Economides develops three mutually reinforcing competitive yardsticks. This is a commonly accepted methodology for calculating antitrust damages. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *10 (N.D. Cal. June 5, 2006) (yardstick methodology has been found a "valid means of proving damages on a class-wide basis"); IIA Phillip E. Areeda et al., Antitrust Law, ¶ 395b3 (3d ed. 2007) (observing that yardstick model "is especially useful" where prices in the same market cannot be analyzed "before-and-after" the challenged restraints).[9] Professor Economides's yardsticks derive from common proof.

***First***, Professor Economides analyzed the commission levels in the Windows PC App Distribution Market, an analogous market that "features evidence of competition that is not present in the iOS app distribution market." Economides ¶ 36.

Windows is an operating platform like iOS, and developers for the Windows platform, like developers for iOS, create software enabled to run on consumers' devices. *See id.* ¶¶ 35-36. Although the devices differ, what primarily distinguishes the Windows PC App Distribution Market is the availability of alternative App distribution channels. Professor Economides identified eight

---

[9] A "before-and-after" look is impossible here because Apple has *never* opened the App Store to alternative distribution channels. The restraints at issue have existed since day one.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

online stores or self-distribution platforms in the Windows PC App Distribution Market for which sales data are available. *Id.* ¶ 38 & Table 4. ██████████████████████████████

█████████████████████████████████████████████████████████████████████████████████

████ *See id.* Table 4. As Professor Economides illustrates, this is a reliable, albeit conservative, yardstick for the effective rate of iOS commissions in the but-for world. *See id.* ¶ 39 & n. 77.

**Second**, Professor Economides has constructed two rival profit yardsticks. *See id.* ¶¶ 40-55. This approach conservatively models the commission levels that would prevail if rival firms entered the market and sustained competitive operating margins. To estimate those margins, Professor Economides identifies a set of comparator firms that, like the App Store, operate online marketplaces—namely eBay, Etsy, Rakuten, Alibaba, and MercadoLibre. *See id.* ¶ 43. These firms are comparable to the App Store in key respects, including because they recognize revenue based on the commissions they receive. *See id.*; *see also* Tregillis ¶¶ 79.

Mr. Tregillis shows that average operating margins for these comparator firms in years 2015-2019 range from 6.0% to 44.3%. *See* Economides ¶ 45 & Table 5; Tregillis ¶ 81. Although margins above 40% are high, ███████████████████████████████████████████████████

████████████████ . *See supra* Sec. II.C. ███████████████████████████████████

██████████████████████████████████████████████████ Conservatively, however, Professor Economides limits his analysis to the narrower set of comparator firms that, like the App Store, operate on a commission-based model.

Professor Economides's rival profit analysis conservatively posits that there would be a maximum of two rival distribution channels in the but-for world. *See id.* ¶ 47. He further grants that Apple could maintain an outsized market share—65% in a one-entrant scenario and 50% in a two-entrant scenario. ███████████████████████████████████████████████████

████████ . He then sets the rivals' profits within the comparator range, albeit at the high end—44.3% in a one-entrant scenario (the highest level among comparator firms) and 23.0% in a two-entrant scenario (the second highest level among comparator firms). *See id.* ¶ 50.

Under these conservative parameters, Apple would remain highly profitable. Indeed, Apple's profits would double the rivals' in the two-entrant scenario (46.8% vs. 23.0%). *See id.* Table 6. But

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1    Apple would not need to impose commissions approaching 30%. Rather, Professor Economides

2    shows that the market-wide commission level in this more competitive market would range from

3    **13.0**% (two-entrant scenario) to **14.8**% (one-entrant scenario). *See id.*

4        In sum, Professor Economides develops three competitive yardsticks for what the average

5    commission rate would have been in the but-for world (**13.0**%, █, and **14.8**%). The yardsticks

6    are conservative and they align within a tight band, underscoring their reliability as a means of

7    estimating Classwide damages. Professor Economides has applied these yardsticks and calculated

8    Classwide damages ranging from ██████ over the portion of the Class period (June

9    4, 2015 – September 30, 2019) for which Apple has produced data. *See id.* ¶ 76.[10]

10       Although individual damages need not be calculated at the class certification stage, Professor

11    Economides's model can be put to that task as well. Apple's transactional data can be used to readily

12    calculate the total commissions paid by each Class member, and the effective commission rate each

13    paid. *See id.* ¶¶ 71-73 & Table 8. Individual damages equal each Class member's paid commissions

14    multiplied by the difference between the commission rate they paid and the but-for commission rate

15    Professor Economides estimates. *See id.* ¶ 71. This is a straightforward undertaking that relies on a

16    common dataset and methodology. It requires no individualized inquiry beyond identifying and

17    aggregating each Class member's transactions. *See id.*

18       As noted above, the common evidence indicates that Apple likely would have maintained two

19    commission tiers in the but-for world, just at lower levels than the 30% and 15% tiers it used in the

20    actual world. *See* Elhauge ¶¶ 372-75. For purpose of estimating individual damages, Professor

21    Economides provides two reasonable methodologies for specifying the but-for tiers—the first posits

22    that Apple would keep the same 2:1 ratio between the tiers, the second presumes that Apple would

23    keep the 2:1 ratio after accounting for variable costs. *See* Economides ¶¶ 56-62. Both methodologies

24    rely on marketwide inputs and are common to the Class.

25

26       [10] These estimates, and all other analyses of Apple's transactional data set forth in the reports of
Professors Elhauge and Economides, are limited to the transactional data Apple has produced, which

27    does not extend past September 2019. While Apple belatedly committed to produce additional
transactional data, it has not done so as of the date of this submission. Plaintiffs have reserved all

28    rights to update their analyses, and those of their experts, when the additional data are provided.

**2.   Common Issues Predominate on Plaintiffs' Attempted Monopolization Claim.**

Monopolization and attempted monopolization claims "are similar, differing primarily in the requisite intent and the necessary level of monopoly power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). Attempted monopolization can be established without an actual monopoly, provided the defendant has a "dangerous probability of achieving monopoly power." *Id.* It must be shown, however, that the defendant operated with "a specific intent to control prices or destroy competition." *Id.*

Plaintiffs will rely on the same common proof to establish monopolization and attempted monopolization. The distinct "intent" element of attempt does not raise any individual issues; it turns on what *Apple* intended to achieve through the restraints at issue. Proof of that intent is necessarily common to the Class. *See In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 626 (N.D. Cal. 2018) (whether "Defendants acted with the requisite state of mind" is a common question).

**3.   Common Issues Predominate on Plaintiffs' UCL Claim.**

Plaintiffs also allege that Apple's restraints violate California's Unfair Competition Law ("UCL"), which proscribes "unlawful, unfair, or fraudulent" business practices. *See* Cal. Bus. & Prof. Code §§ 17200 *et seq*. The UCL applies nationwide here by virtue of the California choice-of-law provision in Apple's DPLA, which all Class members must accept to create iOS Apps. *See* Ex. 21, at § 14.10 ("This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law"). Courts in this district have applied the UCL to nationwide classes based on similar choice-of-law clauses. *See Maldonado v. Apple, Inc.*, 2021 WL 1947512, at *6-8 (N.D. Cal. May 14, 2021) (certifying nationwide UCL class based on choice-of-law clause in Apple Care terms); *In re Apple Inc. Device Perf. Litig.*, 386 F. Supp. 3d 1155, 1169 (N.D. Cal. 2019) (substantially same). Accordingly, the Court need not evaluate predominance through the prism of multiple consumer protection laws. There is but one statute to apply—the UCL.

As this Court has recognized, the UCL is broader than the Sherman Act. It extends to "any 'unlawful, unfair, *or* fraudulent' practice," meaning "a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel.*

1    *Co.*, 20 Cal. 4th 163, 180 (1999); *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir.

2    2007) ("Each prong of the UCL is a separate and distinct theory of liability; thus, the 'unfair'

3    practices prong offers an independent basis for relief."); *see* Ex. 8 (Trial Tr. Vol. 16) at 4095.

4            Although the UCL's "unfairness" prong does not require a violation of the Sherman Act (or

5    other law), the standard is unsettled. There are two dominant approaches. Some courts apply a

6    balancing test, which assesses whether the "alleged business practice is immoral, unethical,

7    oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the

8    utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Drum v. San*

9    *Fernando Valley Bar Assn.*, 182 Cal. App. 4th 247, 257 (2010). Following *Cel-Tech*, other courts

10   require "conduct that threatens an incipient violation of an antitrust law, or violates the policy or

11   spirit of one of those laws." *Cel-Tech*, 182 Cal. App. 4th at 187. Apple's position is that the *Cel-Tech*

12   standard displaced the balancing test for all plaintiffs. *See* Apple COL ¶¶ 621-22.[11]

13           Ultimately, this Court need not fix the appropriate "unfairness" test to certify UCL claims.

14   Whatever test applies, the inquiry necessarily focuses on Apple's conduct, which is common to the

15   Class. As addressed above, Apple imposes the challenged restraints uniformly on each Class

16   member, *see supra* Sec. III.C.1.c, and Plaintiffs challenge them not because they injure particular

17   developers, but because they foreclose *marketwide* competition that would inure to the benefit of all

18   developers in the form of market alternatives and lower prices. *See id*. If the challenged restraints are

19   "unfair" in this regard, they are unfair for every Class member. *See Gaudin v. Saxon Mortg. Servs.,*

20   *Inc.*, 297 F.R.D. 417, 430 (N.D. Cal. 2013) (UCL unfairness prong claim would focus on

21   "Defendants' uniform practices" and thus "not require an individualized inquiry that would

22   predominate over the common issues"); *Alger v. FCA US LLC*, 334 F.R.D. 415, 426 (E.D. Cal. 2020)

23   (granting certification under UCL "unfairness" prong because class challenged "the same conduct.").

24

25

26           [11] For completeness, Plaintiffs note that some courts have recognized a third test derived from § 5
     of the FTC Act, but the Ninth Circuit has rejected its application absent "a clear holding from the
27   California Supreme Court." *Lozano*, 504 F.3d at 736. Other courts have applied the *Cel-Tech*
     principle more generally outside the antitrust context to require invocation of a policy "tethered to
28   specific constitutional, statutory or regulatory provisions." *Drum*, 182 Cal. App. 4th at 257.

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1   Another distinct feature of the UCL is that it provides for restitution rather than damages, but

2   this does not complicate the predominance inquiry. If Plaintiffs establish UCL liability, all Class

3   members are entitled to restitution as a matter of law. *See Pulaski & Middleman, LLC v. Google,*

4   *Inc.*, 802 F.3d 979, 986 (9th Cir. 2015) ("[A] court need not make individual determinations

5   regarding entitlement to restitution."). As with damages, any need to make "individualized

6   calculations" with respect to restitution cannot defeat predominance. *Id.* at 987.

7   **D.      A Class Action is The Superior Method for Resolving This Dispute.**

8   Certification of a 23(b)(3) class also requires the Court to assess whether a class action is

9   "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.

10   R. Civ. P. 23(b)(3). The first Rule 23 superiority factor supports class treatment when there are class

11   members for whom it would be "uneconomical to litigate individually." *Loc. Joint Exec. Bd. of*

12   *Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001). "The

13   policy at the very core of the class action mechanism is to overcome the problem that small

14   recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or

15   her rights." *Amchem*, 521 U.S. at 617.

16   Here, prosecution of Plaintiffs' claims is a multi-million dollar undertaking against a well-

17   resourced and lawyered adversary—in fact, the largest publicly traded company in the world. █

18   ████████████████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████████

22   █████████████████ Even if the entire commission could be claimed as damages—something

23   Plaintiffs do not allege—it would be economically irrational for nearly all Class members to bring

24   individual claims.

25   Granted, there are some large developers in the class that sustained substantial damages and

26   may possess resources sufficient to take on Apple (e.g., Epic). But they are the exception to the rule.

27   "The mere fact that some class members may have suffered significant damages does not detract

28   from the overall efficiency and economy of resolving the claims of the entire class in a single

1   action." *Brice Yingling v. eBay, Inc.*, 2010 WL 11575128, at *6 (N.D. Cal. July 16, 2010); *see also*

2   *Hanlon*, 150 F.3d at 1023 (superiority met where "most cases" would be negative-value); *In re*

3   *Washington Mut. Mortg.-Backed Sec. Litig.*, 276 F.R.D. 658, 668 (W.D. Wash. 2011) (superiority

4   met even though "some of the absent members may have large claims or are sophisticated

5   investors"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 325 (E.D. Mich. 2001) ("[T]he

6   presence of large claimants in a proposed antitrust class and the possibility that some of them might

7   proceed on their own does not militate against class certification."). Large claimants will also have

8   the opportunity to opt out of any Rule 23(b)(3) class, if they so desire.

9       The second factor—existence of any individual lawsuits—reinforces the first. If a *substantial*

10   number individual class members have brought individual cases, this can be evidence that class

11   members "want individual litigation." 2 Newberg on Class Actions § 4:70 (5th ed.). On the other

12   hand, "the filing of but a few individual cases indicates that a minute percentage of the class has an

13   interest in individual litigation." *Id.*; *Moore v. Ulta Salon, Cosms. & Fragrance, Inc.*, 311 F.R.D.

14   590, 624 (C.D. Cal. 2015) (same). Here, Epic is the only class member (of roughly ▮▮▮▮ to have

15   brought an individual action. This is a powerful indication of class cohesion and the superiority of

16   class treatment. *See Aguirre v. Genesis Logistics*, 2016 WL 6573986, at *8 (C.D. Cal. July 20, 2016)

17   (one individual suit "only further suggests that a class action is a superior method of adjudication").

18       The third factor—desirability of concentration in this forum—further supports class

19   certification because Apple is headquartered in this district. *See Hatamian v. Advanced Micro*

20   *Devices, Inc.*, 2016 WL 1042502, at *10 (N.D. Cal. Mar. 16, 2016) (Rogers, J.).

21       The final factor, potential difficulties of managing a class action, "involves the same

22   considerations as Rule 23(b)(3)'s predominance requirement." *Id.* With common issues

23   predominating here, a class action would not be unmanageable. Any case management challenges

24   must also be measured against the alternative—potentially thousands of duplicative individual

25   lawsuits. *Briseno v. Conagra Foods, Inc.*, 844 F.3d 1121 at 1128 (9th Cir. 2017) (superiority

26   involves "comparative assessment of the costs and benefits of class adjudication"). A multiplicity of

27   such lawsuits would only compound management difficulties and risk inconsistent outcomes.

28

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**E.      Class Certification Also is Appropriate Under Rule 23(b)(2).**

Certification of an injunctive relief class under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ .P. 23(b)(2). Here, there can be no dispute that Apple's distribution restraints apply classwide without exception. As Apple puts it, these "policies are set forth transparently in the DPLA and its incorporated App Review Guidelines, and apply to all developers equally." Apple FOF ¶ 8. An injunction lifting these restrictions would therefore benefit the entire class, making certification under Rule 23(b)(2) appropriate.

That Plaintiffs also seek certification of a damages class is no impediment to certification of a separate injunctive-relief class. "[W]here a plaintiff seeks both declaratory and monetary relief, courts may certify a damages-seeking class under Rule 23(b)(3), and an injunction-seeking class under Rule 23(b)(2)." *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295, 307 (N.D. Cal. 2017) (Rogers, J.) (observing that this "promotes judicial efficiency," because if classwide damages are not established, the "Court may still enter an injunction against the defendant").

**F.      The Court Should Appoint Class Counsel.**

Plaintiffs respectfully request that the Court appoint (a) Hagens Berman Sobol Shapiro LLP as Class Counsel and (b) Saveri & Saveri, Inc., Freed Kanner London & Millen, LLC, and Sperling & Slater, P.C. as the constituents of the Plaintiffs' Executive Committee. The Court issued these appointments on an interim basis in October 2019. *See* ECF No. 65. The same considerations that guided the Court's interim Order apply here. If appointed under Rule 23(g), counsel will continue zealously to litigate this case, fairly and adequately safeguarding the interests of the Class.

## IV.      CONCLUSION

For the reasons foregoing, Plaintiffs respectfully request that the Court certify the proposed Class, appoint the named Plaintiffs as class representatives, and appoint Class Counsel.

1    DATED: June 1, 2021                    HAGENS BERMAN SOBOL SHAPIRO LLP

2

3                                          By    */s/ Steve W. Berman*
                                                STEVE W. BERMAN (*pro hac vice*)

4                                          Robert F. Lopez (*pro hac vice*)

5                                          Ted Wojcik (*pro hac vice*)
                                           1301 Second Avenue, Suite 2000

6                                          Seattle, WA  98101
                                           Telephone: (206) 623-7292

7                                          Facsimile:  (206) 623-0594
                                           steve@hbsslaw.com

8                                          robl@hbsslaw.com
                                           tedw@hbsslaw.com

9
                                           Shana E. Scarlett (SBN 217895)

10                                         Benjamin J. Siegel (SBN 260260)
                                           Ben M. Harrington (SBN 313877)

11                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                           715 Hearst Avenue, Suite 202

12                                         Berkeley, CA 94710
                                           Telephone: (510) 725-3000

13                                         Facsimile:  (510) 725-3001
                                           shanas@hbsslaw.com

14                                         bens@hbsslaw.com
                                           benh@hbsslaw.com

15

16                                         *Interim Class Counsel*

17                                         Joseph M. Vanek (*pro hac vice*)

18                                         Eamon P. Kelly (*pro hac vice*)
                                           Alberto Rodriguez (*pro hac vice*)

19                                         SPERLING & SLATER, P.C.
                                           55 W. Monroe Street, 32nd Floor

20                                         Chicago, IL 60603
                                           Telephone: (312) 676-5845

21                                         Facsimile: (312) 641-6492
                                           jvanek@sperling-law.com

22                                         ekelly@sperling-law.com
                                           arodriguez@sperling-law.com

23

24                                         Guido Saveri (SBN 22349)
                                           R. Alexander Saveri (SBN 173102)

25                                         Cadio Zirpoli (SBN 179108)
                                           Sarah Van Culin (SBN 293181)

26                                         SAVERI & SAVERI, INC.
                                           706 Sansome Street

27                                         San Francisco, CA 94111
                                           Telephone: (415) 217-6810

28                                         Facsimile: (415) 217-6813

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

guido@saveri.com
rick@saveri.com
cadio@saveri.com
sarah@saveri.com

Kimberly A. Justice (*pro hac vice*)
Jonathan M. Jagher (*pro hac vice*)
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6487
Facsimile: (224) 632-4521
kjustice@fklmlaw.com
jjagher@fklmlaw.com

Douglas A. Millen (*pro hac vice*)
Brian M. Hogan (*pro hac vice*)
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, #130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
dmillen@fklmlaw.com
bhogan@fklmlaw.com

*Plaintiffs' Executive Committee*