# EXHIBIT 21

PLAINTIFF
U.S. District Court - NDCAL
**4:20-cv-05640-YGR-TSH**
*Epic Games, Inc. v. Apple Inc.*
Ex. No. __PX-2557__
Date Entered _____
By _____

# EXHIBIT

# B

**PLEASE READ THE FOLLOWING APPLE DEVELOPER PROGRAM LICENSE AGREEMENT TERMS AND CONDITIONS CAREFULLY BEFORE DOWNLOADING OR USING THE APPLE SOFTWARE OR APPLE SERVICES. THESE TERMS AND CONDITIONS CONSTITUTE A LEGAL AGREEMENT BETWEEN YOU AND APPLE.**

# Apple Developer Program License Agreement

## Purpose

You would like to use the Apple Software (as defined below) to develop one or more Applications (as defined below) for Apple-branded products. Apple is willing to grant You a limited license to use the Apple Software and Services provided to You under this Program to develop and test Your Applications on the terms and conditions set forth in this Agreement.

Applications developed under this Agreement for iOS Products, Apple Watch, or Apple TV can be distributed in four ways: (1) through the App Store, if selected by Apple, (2) through the Custom App Distribution, if selected by Apple, (3) on a limited basis for use on Registered Devices (as defined below), and (4) for beta testing through TestFlight. Applications developed for macOS can be distributed through the App Store, if selected by Apple, or separately distributed under this Agreement.

Applications that meet Apple's Documentation and Program Requirements may be submitted for consideration by Apple for distribution via the App Store, Custom App Distribution, or for beta testing through TestFlight. If submitted by You and selected by Apple, Your Applications will be digitally signed by Apple and distributed, as applicable. Distribution of free (no charge) Applications (including those that use the In-App Purchase API for the delivery of free content) via the App Store or Custom App Distribution will be subject to the distribution terms contained in Schedule 1 to this Agreement. If You would like to distribute Applications for which You will charge a fee or would like to use the In-App Purchase API for the delivery of fee-based content, You must enter into a separate agreement with Apple (" Schedule 2"). If You would like to distribute paid Applications via Custom App Distribution, You must enter into a separate agreement with Apple ("Schedule 3"). You may also create Passes (as defined below) for use on Apple-branded products running iOS or watchOS under this Agreement and distribute such Passes for use by Wallet.

## 1. Accepting this Agreement; Definitions

### 1.1 Acceptance

In order to use the Apple Software and Services, You must first accept this Agreement. If You do not or cannot accept this Agreement, You are not permitted to use the Apple Software or Services. Do not download or use the Apple Software or Services in that case. You accept and agree to the terms of this Agreement on Your own behalf and/or on behalf of Your company, organization, educational institution, or agency, instrumentality, or department of the federal government as its authorized legal representative, by doing either of the following:
(a) checking the box displayed at the end of this Agreement if You are reading this on an Apple website; or
(b) clicking an "Agree" or similar button, where this option is provided by Apple.

### 1.2 Definitions

Whenever capitalized in this Agreement:

"**Ad Network APIs**" means the Documented APIs that provide a way to validate the successful conversion of advertising campaigns on supported Apple-branded products using a combination of cryptographic signatures and a registration process with Apple.

PX-2557.2

"**Ad Support APIs**" means the Documented APIs that provide the Advertising Identifier and Advertising Preference.

"**Advertising Identifier**" means a unique, non-personal, non-permanent identifier provided through the Ad Support APIs that are associated with a particular Apple-branded device and are to be used solely for advertising purposes, unless otherwise expressly approved by Apple in writing.

"**Advertising Preference**" means the Apple setting that enables an end-user to set an ad tracking preference.

"**Agreement**" means this Apple Developer Program License Agreement, including any attachments, Schedule 1 and any exhibits thereto which are hereby incorporated by this reference. For clarity, this Agreement supersedes the iOS Developer Program License Agreement (including any attachments, Schedule 1 and any exhibits thereto), the Safari Extensions Digital Signing Agreement, the Safari Extensio ns Gallery Submission Agreement, and the Mac Developer Program License Agreement.

"**App Store**" means an electronic store and its storefronts branded, owned, and/or controlled by Apple, or an Apple Subsidiary or other affiliate of Apple, through which Licen sed Applications may be acquired.

"**App Store Connect**" means Apple's proprietary online content management tool for Applications.

"**Apple**" means Apple Inc., a California corporation with its principal place of business at One Apple Park Way, Cupertino, California 95014, U.S.A.

"**Apple Certificates**" means the Apple-issued digital certificates provided to You by Apple under the Program.

"**Apple Maps Service**" means the mapping platform and Map Data provided by Apple via the MapKit API for use by You only in connection with Your Applications , or the mapping platform and Map Data provided by Apple via MapKit JS and related tools for capturing map content (e.g., MapSnapshotter) for use by You only in connection with Your Applications, websites, or web applications.

"**Apple Pay APIs**" means the Documented APIs that enable end-users to send payment information they have stored on a supported Apple-branded product to an Application to be used in payment transactions made by or through the Application, and includes other payment-related functionality as described in the Documentation.

"**Apple Pay Payload**" means a customer data package passed through the Apple Software and Apple Pay APIs as part of a payment transaction (e.g., name, email, billing address, shipping address, and device account number).

"**Apple Push Notification Service**" or "**APN**" means the Apple Push Notification service that Apple may provide to You to enable You to transmit Push Notifications to Your Application or for use as otherwise permitted herein.

"**APN API**" means the Documented API that enables You to use the APN to deliver a Push Notification to Your Application or for use as otherwise permitted herein.

"**Apple Services**" or "**Services**" means the developer services that Apple may provide or make available through the Apple Software or as part of the Program for use with Your Covered

PX-2557.3

Products or development, including any Updates thereto (if any) that may be provided to You by Apple under the Program.

"**Apple Software**" means Apple SDKs, iOS, watchOS, tvOS, iPadOS, and/or macOS, the Provisioning Profiles, FPS SDK, FPS Deployment Package, and any other software that Apple provides to You under the Program, including any Updates thereto (if any) that may be provided to You by Apple under the Program.

"**Apple SDKs**" means the Apple-proprietary Software Development Kits (SDKs) provided hereunder, including but not limited to header files, APIs, libraries, simulators, and software (source code and object code) labeled as part of iOS, watchOS, tvOS, iPadOS, or Mac SDK and included in the Xcode Developer Tools package for purposes of targeting Apple-branded products running iOS, watchOS, tvOS, iPadOS, and/or macOS, respectively.

"**Apple Subsidiary**" means a corporation at least fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are owned or controlled, directly or indirectly, by Apple, and that is involved in the operation of or otherwise affiliated with the App Store, Custom App Distribution, TestFlight, and as otherwise referenced herein (e.g., Attachment 4).

"**Apple TV**" means an Apple-branded product that runs the tvOS.

"**Apple Watch**" means an Apple-branded product that runs the watchOS.

"**Application**" means one or more software programs (including extensions, media, and Libraries that are enclosed in a single software bundle) developed by You in compliance with the Documentation and the Program Requirements, for distribution under Your own trademark or brand, and for specific use with an Apple-branded product running iOS, iPadOS, watchOS, tvOS, or macOS, as applicable, including bug fixes, updates, upgrades, modifications, enhancements, supplements to, revisions, new releases and new versions of such software programs.

"**Authorized Developers**" means Your employees and contractors, members of Your organization or, if You are an educational institution, Your faculty and staff who (a) each have an active and valid Apple Developer account with Apple, (b) have a demonstrable need to know or use the Apple Software in order to develop and test Covered Products, and (c) to the extent such individuals will have access to Apple Confidential Information, each have written and binding agreements with You to protect the unauthorized use and disclosure of such Apple Confidential Information.

"**Authorized Test Units**" means Apple-branded hardware units owned or controlled by You that have been designated by You for Your own testing and development purposes under this Program, and if You permit, Apple-branded hardware units owned or controlled by Your Authorized Developers so long as such units are used for testing and development purposes on Your behalf and only as permitted hereunder.

"**Beta Testers**" means end-users whom You have invited to sign up for TestFlight in order to test pre-release versions of Your Application and who have accepted the terms and conditions of the TestFlight Application.

"**ClassKit APIs**" means the Documented APIs that enable You to send student progress data for use in a school-managed environment.

"**CloudKit APIs**" means the Documented APIs that enable Your Applications, Web Software, and/or Your end-users (if You permit them) to read, write, query and/or retrieve structured data from public and/or private containers in iCloud.

PX-2557.4

"**Configuration Profile(s)**" means an XML file that allows You to distribute configuration information (e.g., VPN or Wi-Fi settings) and restrictions on device features (e.g., disabling the camera) to compatible Apple-branded products through Apple Configurator or other similar Apple branded software tools, email, a webpage, or over-the-air deployment, or via Mobile Device Management (MDM). For the sake of clarity, unless otherwise expressly permitted by Apple in writing, MDM is available only for enterprise use and is separately licensed for under the Apple Developer Enterprise Program License Agreement.

"**Corresponding Products**" means web-based or other versions of Your software applications that have the same title and substantially equivalent features and functionality as Your Licensed Application (e.g., feature parity).

"**Covered Products**" means Your Applications, Libraries, Passes, Safari Extensions, Safari Push Notifications, and/or FPS implementations developed under this Agreement.

"**Custom App Distribution**" means the store or storefront functionality that enables users to obtain Licensed Applications through the use of Apple Business Manager, Apple School Manager, or as otherwise permitted by Apple.

"**DeviceCheck APIs**" means the set of APIs, including server-side APIs, that enable You to set and query two bits of data associated with a device and the date on which such bits were last updated.

"**DeviceCheck Data**" means the data stored and returned through the DeviceChe ck APIs.

"**Documentation**" means any technical or other specifications or documentation that Apple may provide to You for use in connection with the Apple Software, Apple Services, Apple Certificates, or otherwise as part of the Program.

"**Documented API(s)**" means the Application Programming Interface(s) documented by Apple in published Apple Documentation and which are contained in the Apple Software.

"**Face Data**" means information related to human faces (e.g., face mesh data, facial map data , face modeling data, facial coordinates or facial landmark data, including data from an uploaded photo) that is obtained from a user's device and/or through the use of the Apple Software (e.g., through ARKit, the Camera APIs, or the Photo APIs), or that is provided by a user in or through an Application (e.g., uploads for a facial analysis service).

"**FPS**" or "**FairPlay Streaming**" means Apple's FairPlay Streaming Server key delivery mechanism as described in the FPS SDK.

"**FPS Deployment Package**" means the D Function specification for commercial deployment of FPS, the D Function reference implementation, FPS sample code, and set of unique production keys specifically for use by You with an FPS implementation, if provided by Apple to You.

"**FPS SDK**" means the FPS specification, FPS server reference implementation, FPS sample code, and FPS development keys, as provided by Apple to You.

"**FOSS**" (Free and Open Source Software) means any software that is subject to terms that, as a condition of use, copying, modification or redistribution, require such software and/or derivative works thereof to be disclosed or distributed in source code form, to be licensed for the purpose of making derivative works, or to be redistributed free of charge, including without li mitation software distributed under the GNU General Public License or GNU Lesser/Library GPL.

"**Game Center**" means the gaming community service and related APIs provided by Apple for use by You in connection with Your Applications that are associated with Your developer account.

PX-2557.5

"**HealthKit APIs**" means the Documented APIs that enable reading, writing, queries and/or retrieval of an end-user's health and/or fitness information in Apple's Health application.

"**HomeKit Accessory Protocol**" means the proprietary protocol licensed by Apple under Apple's MFi/Works with Apple Program that enables home accessories designed to work with the HomeKit APIs (e.g., lights, locks) to communicate with compatible iOS Products, Apple Watch and other supported Apple-branded products.

"**HomeKit APIs**" means the Documented APIs that enable reading, writing, queries and/or retrieval of an end-user's home configuration or home automation information from that end-user's designated area of Apple's HomeKit Database.

"**HomeKit Database**" means Apple's repository for storing and managing information about an end-user's Licensed HomeKit Accessories and associated information.

"**iCloud**" or "**iCloud service**" means the iCloud online service provided by Apple that includes remote online storage.

"**iCloud Storage APIs**" means the Documented APIs that allow storage and/or retrieval of user-generated documents and other files, and allow storage and/or retrieval of key value data (e.g., a list of stocks in a finance App, settings for an App) for Applications and Web Software through the use of iCloud.

"**In-App Purchase API**" means the Documented API that enables additional content, functionality or services to be delivered or made available for use within an Application with or without an additional fee.

"**Intermediary Party**" means a party that passes an Apple Pay end-user's Apple Pay Payload to a Merchant for processing such end-user's payment transaction outside of an Application.

"**iOS**" means the iOS operating system software provided by Apple for use by You only in connection with Your Application development and testing, including any successor versions thereof.

"**iOS Product**" means an Apple-branded product that runs iOS or iPadOS.

"**iPadOS**" means the iPadOS operating system software provided by Apple for use by You only in connection with Your Application development and testing, including any successor versions thereof.

"**iPod Accessory Protocol**" or "**iAP**" means Apple's proprietary protocol for communicating with supported Apple-branded products and which is licensed under the MFi/Works with Apple Program.

"**Library**" means a code module that cannot be installed or executed separately from an Application and that is developed by You in compliance with the Documentation and Program Requirements only for use with iOS Products, Apple Watch, or Apple TV.

"**Licensed Application**" means an Application that (a) meets and complies with all of the Documentation and Program Requirements, and (b) has been selected and digitally signed by Apple for distribution, and includes any additional permitted functionality, content or services provided by You from within an Application using the In-App Purchase API.

"**Licensed Application Information**" means screen shots, images, artwork, previews, icons and/or any other text, descriptions, representations or information relating to a Licensed

PX-2557.6

Application that You provide to Apple for use in accordance with Schedule 1, or, if applicable, Schedule 2 or Schedule 3.

"**Licensed HomeKit Accessories**" means hardware accessories licensed under the MFi/Works with Apple Program that support the HomeKit Accessory Protocol.

"**Local Notification**" means a message, including any content or data therein, that Your Application delivers to end-users at a pre-determined time or when Your Application is running in the background and another application is running in the foreground.

"**macOS**" means the macOS operating system software provided by Apple for use by You, including any successor versions thereof.

"**MFi Licensee**" means a party who has been granted a license by Apple under the MFi/Works with Apple Program.

"**MFi/Works with Apple Accessory**" or "**MFi Accessory**" means a non-Apple branded hardware device that interfaces, communicates, or otherwise interoperates with or controls an Apple branded product using technology licensed under the MFi/Works with Apple Program (e.g., the ability to control a supported Apple-branded product through the iPod Accessory Protocol).

"**MFi/Works with Apple Program**" means a separate Apple program that offers developers, among other things, a license to incorporate or use certain Apple technology in or with hardware accessories or devices for purposes of interfacing, communicating or otherwise interoperating with or controlling select Apple-branded products.

"**Map Data**" means any content, data or information provided through the Apple Maps Service including, but not limited to, imagery, terrain data, latitude and longitude coordinates, transit data, points of interest and traffic data.

"**MapKit API**" means the Documented API that enables You to add mapping features or functionality to Applications.

"**MapKit JS**" means the JavaScript library that enables You to add mapping features or functionality to Your Applications, websites, or web applications.

"**Merchant**" means a party who processes Apple Pay payment transactions under their own name, trademark, or brand (e.g., their name shows up on the end-user's credit card statement).

"**Motion & Fitness APIs**" means the Documented APIs that are controlled by the Motion & Fitness privacy setting in a compatible Apple-branded product and that enable access to motion and fitness sensor data (e.g., body motion, step count, stairs climbed), unless the end-user has disabled access to such data.

"**Multitasking**" means the ability of Applications to run in the background while other Applications are also running.

"**MusicKit APIs**" means the set of APIs that enable Apple Music users to access their subscription through Your Application or as otherwise permitted by Apple in the Documentation.

"**MusicKit Content**" means music, video, and/or graphical content rendered through the MusicKit APIs.

"**MusicKit JS**" means the JavaScript library that enables Apple Music users to access their subscription through Your Applications, websites, or web applications.

PX-2557.7

"**Network Extension Framework**" means the Documented APIs that provide Applications with the ability to customize certain networking features of compatible Apple-branded products (e.g., customizing the authentication process for WiFi Hotspots, VPN features, and content filtering mechanisms).

"**Pass(es)**" means one or more digital passes (e.g., movie tickets, coupons, loyalty reward vouchers, boarding passes, membership cards, etc.) developed by You under this Agreement, under Your own trademark or brand, and which are signed with Your Pass Type ID.

"**Pass Information**" means the text, descriptions, representations or information relating to a Pass that You provide to or receive from Your end-users on or in connection with a Pass.

"**Pass Type ID**" means the combination of an Apple Certificate and Push Application ID that is used by You to sign Your Passes and/or communicate with the APN.

"**Program**" means the overall Apple development, testing, digital signing, and distribution program contemplated in this Agreement.

"**Program Requirements**" mean the technical, human interface, design, product category, security, performance, and other criteria and requirements specified by Apple, including but not limited to the current set of requirements set forth in **Section 3.3**, as they may be modified from time to time by Apple in accordance with this Agreement.

"**Provisioning Profiles**" means the files (including applicable entitlements or other identifiers) that are provided by Apple for use by You in connection with Your Application development and testing, and limited distribution of Your Applications for use on Registered Devices and/or on Authorized Test Units.

"**Push Application ID**" means the unique identification number or other identifier that Apple assigns to an Application, Pass or Site in order to permit it to access and use the APN.

"**Push Notification**" or "**Safari Push Notification**" means a notification, including any content or data therein, that You transmit to end-users for delivery in Your Application, Your Pass, and/or in the case of macOS, to the macOS desktop of users of Your Site who have opted in to receive such messages through Safari on macOS.

"**Registered Devices**" means Apple-branded hardware units owned or controlled by You, or owned by individuals who are affiliated with You, where such Products have been specifically registered with Apple under this Program.

"**Safari Extensions**" means one or more software extensions developed by You under this Agreement only for use with Safari in compliance with this Agreement.

"**Security Solution**" means the proprietary Apple content protection system marketed as Fairplay, to be applied to Licensed Applications distributed on the App Store to administer Apple's standard usage rules for Licensed Applications, as such system and rules may be modified by Apple from time to time.

"**Sign In with Apple**" means the Documented APIs and JavaScript libraries that allow You to log users into Your Application (and Corresponding Products) with their Apple ID or anonymized credentials.

"**SiriKit**" means the set of APIs that allow Your Application to access or provide SiriKit domains, intents, shortcuts, donations, and other related functionality, as set forth in the Documentation.

"**Site**" means a website provided by You under Your own name, trademark or brand.

PX-2557.8

"**Single Sign-on Specification**" means the Documentation provided by Apple hereunder for the Single Sign-On API, as updated from time to time.

"**Term**" means the period described in **Section 11**.

"**TestFlight**" means Apple's beta testing service for pre-release Applications made available through Apple's TestFlight Application.

"**TestFlight Application**" means Apple's application that enables the distribution of prerelease versions of Your Applications to a limited number of Your Authorized Developers and to a limited number of Beta Testers (as specified in App Store Connect) through TestFlight.

"**TV App API**" means the API documented in the TV App Specification that enables You to provide Apple with TV App Data.

"**TV App Data**" means the data described in the TV App Specification to be provided to Apple through the TV App API.

"**TV App Features**" means functionality accessible via the TV App and/or tvOS, iOS, iPadOS, and/or macOS devices, which functionality provides the user the ability to view customized information and recommendations regarding content and to access such content through the user's apps, and/or provides the user the ability to continue play of previously viewed content.

"**TV App Specification**" means the Documentation provided by Apple hereunder for the TV App API, as updated from time to time.

"**tvOS**" means the tvOS operating system software, including any successor versions thereof.

"**Updates**" means bug fixes, updates, upgrades, modifications, enhancements, supplements, and new releases or versions of the Apple Software or Services, or to any part of the Apple Software or Services.

"**Wallet**" means Apple's application that has the ability to store and display Passes for use on iOS Products, Apple Watch, or Safari on macOS.

"**WatchKit Extension**" means an extension bundled as part of Your Application that accesses the WatchKit framework on iOS to run and display a WatchKit app on the watchOS.

"**watchOS**" means the watchOS operating system software, including any successor versions thereof.

"**Web Software**" means web-based versions of Your software applications that have the same title and substantially equivalent features and functionality as Your Licensed Application (e.g., feature parity).

"**Website Push ID**" means the combination of an Apple Certificate and Push Application ID that is used by You to sign Your Site's registration bundle and/or communicate with the APN.

"**You**" and "**Your**" means and refers to the person(s) or legal entity (whether the company, organization, educational institution, or governmental agency, instrumentality, or department) that has accepted this Agreement under its own developer account and that is using the Apple Software or otherwise exercising rights under this Agreement.

**Note:** For the sake of clarity, You may authorize contractors to develop Applications on Your behalf, but any such Applications must be owned by You, submitted under Your own developer

PX-2557.9

account, and distributed as Applications only as expressly permitted herein. You are responsible to Apple for Your contractors' activities under Your account (eg., adding them to Your team to perform development work for You) and their compliance with this Agreement. Any actions undertaken by Your contractors arising out of this Agreement shall be deemed to have been taken by You, and You (in addition to Your contractors) shall be responsible to Apple for all such actions.

## 2. Internal Use License and Restrictions

### 2.1 Permitted Uses and Restrictions; Program services

Subject to the terms and conditions of this Agreement, Apple hereby grants You during the Term, a limited, non-exclusive, personal, revocable, non-sublicensable and non-transferable license to:

(a) Install a reasonable number of copies of the Apple Software provided to You under the Program on Apple-branded products owned or controlled by You, to be used internally by You or Your Authorized Developers for the sole purpose of developing or testing Covered Products designed to operate on the applicable Apple-branded products, except as otherwise expressly permitted in this Agreement;

(b) Make and distribute a reasonable number of copies of the Documentation to Authorized Developers for their internal use only and for the sole purpose of developing or testing Covered Products, except as otherwise expressly permitted in this Agreement;

(c) Install a Provisioning Profile on each of Your Authorized Test Units, up to the number of Authorized Test Units that You have registered and acquired licenses for, to be used internally by You or Your Authorized Developers for the sole purpose of developing and testing Your Applications, except as otherwise expressly permitted in this Agreement;

(d) Install a Provisioning Profile on each of Your Registered Devices, up to the limited number of Registered Devices that You have registered and acquired licenses for, f or the sole purpose of enabling the distribution and use of Your Applications on such Registered Devices; and

(e) Incorporate the Apple Certificates issued to You pursuant to this Agreement for purposes of digitally signing Your Applications, Passes, Safari Extensions, Safari Push Notifications, and as otherwise expressly permitted by this Agreement.

Apple reserves the right to set the limited number of Apple -branded products that each Licensee may register with Apple and obtain licenses for under this Program (a "**Block of Registered Device Licenses**"). For the purposes of limited distribution on Registered Devices under **Section 7.3 (Ad Hoc distribution)**, each company, organization, educational institution or affiliated group may only acquire one (1) Block of Registered Device Licenses per company, organization, educational institution or group, unless otherwise agreed in writing by Apple. You agree not to knowingly acquire, or to cause others to acquire, more than one Block of Registered Device Licenses for the same company, organization, educational institution or group.

Apple may provide access to services by or through the Program for You to use with Your developer account (e.g., device or app provisioning, managing teams or other account resources). You agree to access such services only through the Program web portal (which is accessed through Apple's developer website) or through Apple branded products that are designed to work in conjunction with the Program (e.g., Xcode, App Store Connect) and only as authorized by Apple. If You (or Your Authorized Developers) access Your developer account through these other Apple-branded products, You acknowledge and agree that this Agreement shall continue to apply to any use of Your developer account and to any features or functionality of the Program that are made available to You (or Your Authorized Developers) in this manner (e.g., Apple Certificates and Provisioning Profiles can be used only in the limited manner permitted herein, etc.). You agree not to create or attempt to create a substitute or similar service through use of or access to the services provided by or through the Program. If Apple provides power and performance metrics for Your Application, You agree that such metrics may be used solely for Your own internal use and may not be provided to any third party (except as set forth in **Section 2.9**). Further, You may only access such services using the Apple ID associated with

PX-2557.10

Your developer account or authentication credentials (e.g., keys, tokens, password) associated with Your developer account, and You are fully responsible for safeguarding Your A pple ID and authentication credentials from compromise and for using them only as authorized by Apple and in accordance with the terms of this Agreement, including but not limited to **Section 2.8** and **5**. Except as otherwise expressly permitted herein, You a gree not to share, sell, resell, rent, lease, lend, or otherwise provide access to Your developer account or any services provided therewith, in whole or in part, to anyone who is not an Authorized Developer on Your team, and You agree not to solicit or request Apple Developer Program members to provide You with their Apple IDs, authentication credentials, and/or related account information and materials (e.g., Apple Certificates used for distribution or submission to the App Store or TestFlight). You understand that each team member must have their own Apple ID or authentication credentials to access Your account, and You shall be fully responsible for all activity performed through or in connection with Your account. To the extent that You own or control an Apple-branded computer running Apple's macOS Server or Xcode Server ("**Server**") and would like to use it for Your own development purposes in connection with the Program, You agree to use Your own Apple ID or other authentication credentials for such Server, and You shall be responsible for all actions performed by such Server.

## 2.2    Authorized Test Units and Pre-Release Apple Software

As long as an Authorized Test Unit contains any pre -release versions of the Apple Software or uses pre-release versions of Services, You agree to restrict access to such Authorized Test Unit to Your Authorized Developers and to not disclose, show, rent, lease, lend, sell or otherwise transfer such Authorized Test Unit to any third party. You further agree to take reasonable precautions to safeguard, and to instruct Your Authorized Developers to safeguard, all Authorized Test Units from loss or theft. Further, subject to the terms of this Agreement, You may deploy Your Applications to Your Authorized Develo pers for use on a limited number of Authorized Test Units for Your own internal testing and development purposes.

**You acknowledge that by installing any pre-release Apple Software or using any pre-release Services on Your Authorized Test Units, these Units may be "locked" into testing mode and may not be capable of being restored to their original condition.** Any use of any pre-release Apple Software or pre-release Services are for evaluation and development purposes only, and You should not use any pre-release Apple Software or pre-release Services in a commercial operating environment or with important data. You should back up any data prior to using the pre-release Apple Software or pre-release Services. Apple shall not be responsible for any costs, expenses or other liabilities You may incur as a result of provisioning Your Authorized Test Units and Registered Devices, Your Covered Product development or the installation or use of this Apple Software or any pre-release Apple Services, including but not limited to any damage to any equipment, or any damage, loss, or corruption of any software, information or data.

## 2.3    Confidential Nature of Pre-Release Apple Software and Services

From time to time during the Term, Apple may provide You with pre -release versions of the Apple Software or Services that constitute Apple Confidential Information and are subject to the confidentiality obligations of this Agreement, except as otherwise set forth herein. Such pre release Apple Software and Services should not be relied upon to perform in the same manner as a final-release, commercial-grade product, nor used with data that is not sufficiently and regularly backed up, and may include features, functionality or APIs for software or services that are not yet available. You acknowledge that Apple may not have publicly announced the availability of such pre-release Apple Software or Services, that Apple has not promised or guaranteed to You that such pre-release software or services will be announced or made available to anyone in the future, and that Apple has no express or implied obligation to You to announce or commercially introduce such software or services or any similar or compatible technology. You expressly acknowledge and agree that any research or development that You perform with respect to pre-release versions of the Apple Software or Services is done entirely at Your own risk.

PX-2557.11

## 2.4 Copies

You agree to retain and reproduce in full the Apple copyright, disclaimers and other proprietary notices (as they appear in the Apple Software and Documentation provided) in all copies of the Apple Software and Documentation that You are permitted to make under this Agreement.

## 2.5 Ownership

Apple retains all rights, title, and interest in and to the Apple Software, Services, and any Updates it may make available to You under this Agreement. You agree to cooperate with Apple to maintain Apple's ownership of the Apple Software and Services, and, to the extent that You become aware of any claims relating to the Apple Software or Services, You agree to use reasonable efforts to promptly provide notice of any such claims to Apple. The parties acknowledge that this Agreement does not give Apple any ownership interest in Your Covered Products.

## 2.6 No Other Permitted Uses

Except as otherwise set forth in this Agreement, You agree not to rent, lease, lend, upload to or host on any website or server, sell, redistribute, or sublicense the Apple Software, Apple Certificates, or any Services, in whole or in part, or to enable others to do so. You may not use the Apple Software, Apple Certificates, or any Services provided hereunder for any purpose not expressly permitted by this Agreement, including any applicable Attachments and Schedules. You agree not to install, use or run the Apple SDKs on any non -Apple-branded computer, and not to install, use or run iOS, watchOS, tvOS, iPadOS, macOS and Provisioning Profiles on or in connection with devices other than Apple-branded products, or to enable others to do so. You may not and You agree not to, or to enable others to, copy (except as expressly permitted under this Agreement), decompile, reverse engineer, disassemble, attempt to derive the source code of, modify, decrypt, or create derivative works of the Apple Software, Apple Certificates or any Services provided by the Apple Software or otherwise provided hereunder, or any part thereof (except as and only to the extent any foregoing restriction is prohibited by applicable law or to the extent as may be permitted by licensing terms governing use of opensourced components or sample code included with the Apple Software). You agree not to exploit any Apple Software, Apple Certificates, or Services provided hereunder in any unauthorized way whatsoever, including but not limited to, by trespass or burdening network capacity, or by harvesting or misusing data provided by such Apple Software, Apple Certificates, or Services. Any attempt to do so is a violation of the rights of Apple and its licensors of the Apple Software or Services. If You breach any of the foregoing restrictions, You may be subject to prosecution an d damages. All licenses not expressly granted in this Agreement are reserved and no other licenses, immunity or rights, express or implied are granted by Apple, by implication, estoppel, or otherwise. This Agreement does not grant You any rights to use a ny trademarks, logos or service marks belonging to Apple, including but not limited to the iPhone or iPod word marks. If You make reference to any Apple products or technology or use Apple's trademarks, You agree to comply with the published guidelines at https://www.apple.com/legal/intellectual-property/guidelinesfor3rdparties.html, as they may be modified by Apple from time to time.

## 2.7 FPS SDK and FPS Deployment Package

You may use the FPS SDK to develop and test a server -side implementation of FPS, solely for use with video streamed by You (or on Your behalf) through Your Applications, or video downloaded for viewing through Your Applications, on iOS Products and/or Apple TV, through Safari on macOS, or as otherwise approved by Apple in writing (collec tively, "**Authorized FPS Applications**"). You understand that You will need to request the FPS Deployment Package on the Program web portal prior to any production or commercial use of FPS. As part of such request, You will need to submit information about Your requested use of FPS. Apple will review Your request and reserves the right to not provide You with the FPS Deployment Package at its sole discretion, in which case You will not be able to deploy FPS. Any development and testing You perform with the FPS SDK is at Your own risk and expense, and Apple will not be liable to You for such use or for declining Your request to use FPS in a production or commercial environment.

Program Agreement

PX-2557.12

If Apple provides You with the FPS Deployment Package, You agree to use it solely as approved by Apple and only in connection with video content streamed by You (or on Your behalf) to Authorized FPS Applications or downloaded for viewing through Your Authorized FPS Applications. Except as permitted in **Section 2.9 (Third-Party Service Providers)**, You will not provide the FPS Deployment Package to any third party or sublicense, sell, resell, lease, disclose, or re-distribute the FPS Deployment Package or FPS SDK to any third party (or any implementation thereof) without Apple's prior written consent.

You acknowledge and agree that the FPS Deployment Package (including the set of FPS production keys) is Apple Confidential Information as set forth in **Section 9 (Confidentiality)**. Further, such FPS keys are unique to Your company or organization, and You are solely responsible for storing and protecting them. You may use such FPS keys solely for the purpose of delivering and protecting Your content key that is used to decrypt video content streamed by You to Authorized FPS Applications or downloaded for viewing through Y our Authorized FPS Applications. Apple will have no liability or responsibility for unauthorized access to or use of any FPS key or any content streamed or otherwise delivered under this Agreement in connection with FPS. In the event that Your FPS key is disclosed, discovered, misappropriated or lost, You may request that Apple revoke it by emailing product-security@apple.com, and You understand that Apple will have no obligation to provide a replacement key. Apple reserves the right to revoke Your FPS key at any time if requested by You, in the event of a breach of this Agreement by You, if otherwise deemed prudent or reasonable by Apple, or upon expiration or termination of this Agreement for any reason.

You acknowledge and agree that Apple reserves the right to revoke or otherwise remove Your access to and use of FPS (or any part thereof) at any time in its sole discretion. Further, Apple will have no obligation to provide any modified, updated or successor version of the FPS Deployment Package or the FPS SDK to You and will have no obligation to maintain compatibility with any prior version. If Apple makes new versions of the FPS Deployment Package or FPS SDK available to You, then You agree to update to them within a reasonable time period if requested to do so by Apple.

## 2.8    Use of Apple Services

Apple may provide access to Apple Services that Your Covered Products may call through APIs in the Apple Software and/or that Apple makes available to You through other mechanisms, e.g., through the use of keys that Apple may make accessible to You under the Program. You agree to access such Apple Services only through the mechanisms provided by Apple for such access and only for use on Apple-branded products. Except as permitted in **Section 2.9 (Third-Party Service Providers)** or as otherwise set forth herein, You agree not to share access to mechanisms provided to You by Apple for the use of the Services with any third party. Further, You agree not to create or attempt to create a substitute or similar service through use of or access to the Apple Services.

You agree to access and use such Services only as necessary for providing services and functionality for Your Covered Products that are eligible to use such Services and only as permitted by Apple in writing, including in the Documentation. You may not use the Apple Services in any manner that is inconsistent with the terms of this Agreement or that infringes any intellectual property rights of a third party or Apple, or that violates any applicable laws or regulations. You agree that the Apple Services contain proprietary content, information and material owned by Apple and its licensors, and protected by applicable intellectual property and other laws. You may not use such proprietary content, information or materials in any way whatsoever, except for the permitted uses of the Apple Services under this Agreement, or as otherwise agreed by Apple in writing.

You understand there may be storage capacity, transmission, and/or transactional limits for the Apple Services both for You as a developer and f or Your end-users. If You reach or Your end-

PX-2557.13

user reaches such limits, then You or Your end-user may be unable to use the Apple Services or may be unable to access or retrieve data from such Services through Your Covered Products or through the applicable end-user accounts.  You agree not to charge any fees to end-users solely for access to or use of the Apple Services through Your Covered Products or for any content, data or information provided therein, and You agree not to sell access to the Apple Services in any way.  You agree not to fraudulently create any end-user accounts or induce any end-user to violate the terms of their applicable end-user terms or service agreement with Apple or to violate any Apple usage policies for such end-user services.  Except as expressly set forth herein, You agree not to interfere with an end-user's ability to access or use any such services.

Apple reserves the right to change, suspend, deprecate,  deny, limit, or disable access to the Apple Services, or any part thereof, at any time without notice (including but not limited to revoking entitlements or changing any APIs in the Apple Software that enable access to the Services or not providing You with an entitlement).  In no event will Apple be liable for the removal of or disabling of access to any of the foregoing.  Apple may also impose limits and restrictions on the use of or access to the Apple Services, may remove the Apple Services for indefinite time periods, may revoke Your access to the Apple Services, or may cancel the Apple Services (or any part thereof) at any time without notice or liability to You and in its sole discretion.

Apple does not guarantee the availability, accuracy, completeness, reliability, or timeliness of  any data or information displayed by any Apple Services.  To the extent You choose to use the Apple Services with Your Covered Products, You are responsible for Your reliance on any such data or information.  You are responsible for Your use of the Apple Software and Apple Services, and if You use such Services, then it is Your responsibility to maintain appropriate alternate backup of all Your content, information and data, including but not limited to any content that You may provide to Apple for hosting as part of Your use of the Services  You understand and agree that You may not be able to access certain Apple Services upon expiration or termination of this Agreement and that Apple reserves the right to suspend access to or delete content, data or information that You or Your Covered Product have stored through Your use of such Services provided hereunder.  You should review the Documentation and policy notices posted by Apple prior to using any Apple Services.

Apple Services may not be available in all languages or in all countries,  and Apple makes no representation that any such Services would be appropriate, accurate or available for use in any particular location or product.  To the extent You choose to use the Apple Services with Your Applications, You do so at Your own initiative  and are responsible for compliance with any applicable laws.  Apple reserves the right to charge fees for Your use of the Apple Services.  Apple will inform You of any Apple Service fees or fee changes by email and information about such fees will be posted in the Program web portal, App Store Connect, or the CloudKit dashboard.  Apple Service availability and pricing are subject to change.  Further, Apple Services may not be made available for all Covered Products and may not be made available to all developers.  Apple reserves the right to not provide (or to cease providing) the Apple Services to any or all developers at any time in its sole discretion.

## 2.9     Third-Party Service Providers

Unless otherwise prohibited by Apple in the Documentation or this Agreement, You are permitted to employ or retain a third party ("**Service Provider**") to assist You in using the Apple Software and Services provided pursuant to this Agreement, including, but not limited to, engaging any such Service Provider to maintain and administer Your Applications' servers on Your behalf, provided that any such Service Provider's use of the Apple Software and Services or any materials associated therewith is done solely on Your behalf and only in accordance with these terms.  Notwithstanding the foregoing, You may not use a Service Provider to submit an Application to the App Store  or use TestFlight on Your behalf.  You agree to have a binding written agreement with Your Service Provider with terms at least as restrictive and protective of Apple as those set forth herein.  Any actions undertaken by any such Service Provider in relation

PX-2557.14

to Your Applications or use of the Apple Software or Apple Services and/or arising out of this Agreement shall be deemed to have been taken by You, and You (in addition to the Service Provider) shall be responsible to Apple for all such actions (or any inactions). In the event of any actions or inactions by the Service Provider that would constitute a violation of this Agreement or otherwise cause any harm, Apple reserves the right to require You to cease using such Service Provider.

**2.10    Updates; No Support or Maintenance**

Apple may extend, enhance, or otherwise modify the Apple Software or Services (or any part thereof) provided hereunder at any time without notice, but Apple shall not be obligated to provide You with any Updates to the Apple Software or Services. If Updates are made available by Apple, the terms of this Agreement will govern such Updates, unless the Update is accompanied by a separate license in which case the terms of that license will govern. You understand that such modifications may require You to change or update Your Covered Products. Further, You acknowledge and agree that such modifications may affect Your ability to use, access, or interact with the Apple Software and Services. Apple is not obligated to provide any maintenance, technical or other support for the Apple Software or Services. You acknowledge that Apple has no express or implied obligation to announce or make available any Updates to the Apple Software or to any Services to anyone in the future. Should an Update be made available, it may have APIs, features, services or functionality that are different from those found in the Apple Software licensed hereunder or the Services provided hereunder.

# 3.    Your Obligations

### 3.1    General

You certify to Apple and agree that:

(a) You are of the legal age of majority in the jurisdiction in which You reside (at least 18 years of age in many countries) and have the right and authority to enter into this Agreement on Your own behalf, or if You are entering into this Agreement on behalf of Your company, organization, educational institution, or agency, instrumentality, or department of the federal government, that You have the right and authority to legally bind such entity or organization to the terms and obligations of this Agreement;

(b) All information provided by You to Apple or Your end-users in connection with this Agreement or Your Covered Products, including without limitation Licensed Application Information or Pass Information, will be current, true, accurate, supportable and complete and, with regard to information You provide to Apple, You will promptly notify Apple of any changes to such information. Further, You agree that Apple may share such information (including email address and mailing address) with third parties who have a need to know for purposes related thereto (e.g., intellectual property questions, customer service inquiries, etc.);

(c) You will comply with the terms of and fulfill Your obligations under this Agreement, including obtaining any required consents for Your Authorized Developers' use of the Apple Software and Services, and You agree to monitor and be fully responsible for all such use by Your Authorized Developers and their compliance with the terms of this Agreement;

(d) You will be solely responsible for all costs, expenses, losses and liabilities incurred, and activities undertaken by You and Your Authorized Developers in connection with the Apple Software and Apple Services, the Authorized Test Units, Registered Devices, Your Covered Products and Your related development and distribution efforts, including, but not limited to, any related development efforts, network and server equipment, Internet service(s), or any other hardware, software or services used by You in connection with Your use of any services;

(e) For the purposes of Schedule 1 (if applicable), You represent and warrant that You own or control the necessary rights in order to appoint Apple and Apple Subsidiaries as Your worldwide agent for the delivery of Your Licensed Applications, and that the fulfillment of such appointment by Apple and Apple Subsidiaries shall not violate or infringe the rights of any third party; and

(f) You will not act in any manner which conflicts or interferes with any existing commitment or obligation You may have and no agreement previously entered into by You will interfere with Your performance of Your obligations under this Agreement.

PX-2557.15

## 3.2    Use of the Apple Software and Apple Services

As a condition to using the Apple Software and any Apple Services, You agree that:

(a) You will use the Apple Software and any services only for the purposes and in the manner expressly permitted by this Agreement and in accordance with all applicable laws and regulations;

(b) You will not use the Apple Software or any Apple Services for any unlawful or illegal activity, nor to develop any Covered Product, which would commit or facilitate the commission of a crime, or other tortious, unlawful or illegal act;

(c) Your Application, Library and/or Pass will be developed in compliance with the Documentation and the Program Requirements, the current set of which is set forth in Section 3.3 below;

(d) To the best of Your knowledge and belief, Your Covered Products, Licensed Application Information, and Pass Information do not and will not violate, misappropriate, or infringe any Apple or third party copyrights, trademarks, rights of privacy and publicity, trade secrets, patents, or other proprietary or legal rights (e.g., musical composition or performance rights, video rights, photography or image rights, logo rights, third party data rights, etc. for content and materials that may be included in Your Application);

(e) You will not, through use of the Apple Software, Apple Certificates, Apple Services or otherwise, create any Covered Product or other code or program that would disable, hack or otherwise interfere with the Security Solution, or any security, digital signing, digital rights management, verification or authentication mechanisms implemented in or by iOS, watchOS, iPadOS, tvOS, the Apple Software, or any Services, or other Apple software or technology, or enable others to do so (except to the extent expressly permitted by Apple in writing);

(f) You will not, directly or indirectly, commit any act intended to interfere with the Apple Software or Services, the intent of this Agreement, or Apple's business practices including, but not limited to, taking actions that may hinder the performance or intended use of the App Store, Custom App Distribution, or the Program (e.g., submitting fraudulent reviews of Your own Application or any third party application, choosing a name for Your Application that is substantially similar to the name of a third party application in order to create consumer confusion, or squatting on application names to prevent legitimate third party use). Further, You will not engage, or encourage others to engage, in any unlawful, unfair, misleading, fraudulent, improper, or dishonest acts or business practices relating to Your Covered Products (e.g., engaging in bait-and-switch pricing, consumer misrepresentation, deceptive business practices, or unfair competition against other developers); and

(g) Applications for iOS Products, Apple Watch, or Apple TV developed using the Apple Software may be distributed only if selected by Apple (in its sole discretion) for distribution via the App Store, Custom App Distribution, for beta distribution through TestFlight, or through Ad Hoc distribution as contemplated in this Agreement. Passes developed using the Apple Software may be distributed to Your end-users via email, a website or an Application in accordance with the terms of this Agreement, including Attachment 5. Safari Extensions signed with an Apple Certificate may be distributed to Your end-users in accordance with the terms of this Agreement, including Attachment 7. Applications for macOS may be distributed outside of the App Store using Apple Certificates and/or tickets as set forth in Section 5.3 and 5.4.

## 3.3    Program Requirements

Any Application that will be submitted to the App Store, Custom App Distribution, or TestFlight, or that will be distributed through Ad Hoc distribution, must be developed in compliance with the Documentation and the Program Requirements, the current set of which is set forth below in this Section 3.3. Libraries and Passes are subject to the same criteria:

**APIs and Functionality:**

**3.3.1**    Applications may only use Documented APIs in the manner prescribed by Apple and must not use or call any private APIs. Further, macOS Applications submitted to Apple for distribution on the App Store may use only Documented APIs included in the default installation of macOS or as bundled with Xcode and the Mac SDK; deprecated technologies (such as Java)

may not be used.

**3.3.2**     Except as set forth in the next paragraph, an Application may not download or install executable code.  Interpreted code may be downloaded to an Application but only so long as such code: (a) does not change the primary purpose of the Application by providing features or functionality that are inconsistent with the intended and advertised purpose of the Application as submitted to the App Store, (b) does not create a store or storefront for other code or applications, and (c) does not bypass signing, sandbox, or other security features of the OS.

An Application that is a programming environment intended for use in learning how to program may download and run executable code so long as the following requirements are met: (i) no more than 80 percent of the Application's viewing area or screen may be taken over with executable code, except as otherwise permitted in the Documentation, (ii) the Application must present a reasonably conspicuous indicator to the user within the Application to indicate that the user is in a programming environment, (iii) the Application must not create a store or storefront for other code or applications, and (iv) the source code provided by the Application must be completely viewable and editable by the user (e.g., no precompiled libraries or frameworks may be included with the code downloaded).

**3.3.3**     Without Apple's prior written approval or as permitted under **Section 3.3.25 (In-App Purchase API)**, an Application may not provide, unlock or enable additional features or functionality through distribution mechanisms other than the App Store, Custom App Distribution or TestFlight.

**3.3.4**     An Application for iOS, watchOS, iPadOS, or tvOS may only read data from or write data to an Application's designated container area on the device, except as otherwise specified by Apple. For macOS Applications submitted to Apple for distribution on the App Store: (a) all files necessary for the Application to execute on macOS must be in the Application bundle submitted to Apple and must be installed by the App Store; (b) all localizations must be in the same Application bundle and may not include a suite or collection of independent applications within a single Application bundle; (c) native user interface elements or behaviors of macOS (e.g., the system menu, window sizes, colors, etc.) may not be altered, modified or otherwise changed; (d) You may not use any digital rights management or other copy or access control mechanisms in such Applications without Apple's written permission or as specified in the Documentation; and (e) except as otherwise permitted by **Section 3.3.25 (In-App Purchase API)**, such Applications may not function as a distribution mechanism for software and may not include features or functionality that create or enable a software store, distribution channel or other mechanism for software delivery within such Applications (e.g., an audio application may not include an audio filter plug-in store within the Application).

**3.3.5**     An Application for an iOS Product must have at least the same features and functionality when run by a user in compatibility mode on an iPad (e.g., an iPhone app running in an equivalent iPhone-size window on an iPad must perform in substantially the same manner as when run on the iPhone; provided that this obligation will not apply to any feature or functionality that is not supported by a particular hardware device, such as a video recording feature on a device that does not have a camera).  Further, You agree not to interfere or attempt to interfere with the operation of Your Application in compatibility mode.

**3.3.6**     You may use the Multitasking services only for their intended purposes as  described in the Documentation.

**User Interface, Data Collection, Local Laws and Privacy:**

**3.3.7**     Applications must comply with the Human Interface Guidelines  (HIG) and other Documentation provided by Apple .  You agree to follow the HIG to develop  an appropriate user interface and functionality for Your Application that is compatible with the design of Apple-

Program Agreement

PX-2557.17

branded products (e.g., a watch App should have a user interface designed for quick interactions in accordance with the HIG's watchOS design themes).

**3.3.8**    If Your Application captures or makes any video, microphone, screen recordings, or camera recordings, whether saved on the device or sent to a server (e.g., an image, photo, voice or speech capture, or other recording) (collectively "**Recordings**"), a reasonably conspicuous audio, visual or other indicator must be displayed to the user as part of the Application to indicate that a Recording is taking place.

- In addition, any form of data, content or information collection, processing maintenance, uploading, syncing, storage, transmission, sharing, disclosure or use performed by, through or in connection with Your Application must comply with all applicable privacy laws and regulations as well as any related Program Requirements, incl uding but not limited to any notice or consent requirements.

**3.3.9**    You and Your Applications (and any third party with whom You have contracted to serve advertising) may not collect user or device data without prior user consent, whether such data is obtained directly from the user or through the use of the Apple Software, Apple Services, or Apple SDKs, and then only to provide a service or function that is directly  relevant to the use of the Application, or to serve advertising in accordance with  **Sections 3.3.12**.  You may not broaden or otherwise change the scope of usage for previously collected user or device data without obtaining prior user consent for such expanded or otherwise changed data collection  You may not use analytics software in Your Application to collect and send device data to a third party. Further, neither You nor Your Application will use any permanent, device -based identifier, or any data derived therefrom, for purposes of uniquely identifying a device.

**3.3.10**   You must provide clear and complete information to users regarding Your collection, use and disclosure of user or device data, e.g., a description of Your use of user and device data in the App Description on the App Store.  Furthermore, You must take appropriate steps to protect such data from unauthorized use, disclosure or access by third parties.  If a user ceases to consent or affirmatively revokes consent for Your collection, use or disclosure of his or her user or device data, You (and any third party with whom You have contracted to serve advertising) must promptly cease all such use. You must provide a privacy policy in Your Application, on the App Store, and/or on Your website  explaining Your collection, use, disclosure, sharing, retention and deletion of user or device data.  You agree to notify Your users, in accordance with applicable law, in the event of a data breach in which user data collected from Your Application is compromised (e.g., You will send an email notifying Your users if there has been an unintentional disclosure or misuse of their user data).

**3.3.11**   Applications must comply with all applicable criminal, civil and statutory laws and regulations, including those in any jurisdictions in which Your Applications may be offered or made available.  In addition:

- You and the Application must comply with all applicable privacy and data collection laws and regulations with respect to any collection, use or disclosure of user or device data (e.g., a user's IP address, the name of the user's device, and any installed apps associated with a user);

- Applications may not be designed or marketed for the purpose of harassing, abusing, spamming, stalking, threatening or otherwise violating the legal rights (such as the rights of privacy and publicity) of others;

- Neither You nor Your Application may perform any functions or link to any content, services, information or data or use any robot, spider, site search or other retrieval application or device to scrape, mine, retrieve, cache, analyze or index software, data or services provided by Apple or its licensors, or obtain (or try to obtain) any such data, except the data that Apple expressly provides

PX-2557.18

or makes available to You in connection with such services.  You agree that You will not collect, disseminate or use any such data for any unauthorized purpose; and

-  If Your Application is intended for human subject research or uses the HealthKit APIs for clinical health-related uses which may involve personal data (e.g., storage of health records), then You agree to inform participants of the intended uses and disclosures of their personally identifiable data as part of such research or clinical health uses and to obtain consent from such participants (or their guardians) who will be using Your Application for such research or clinical health purposes.  Further, You shall prohibit third parties to whom You provide any deidentified or coded data from re-identifying (or attempting to re-identify) any participants using such data without participant consent, and You agree to require that such third parties pass the foregoing restriction on to any other parties who receive such deidentified or coded data.

**Advertising Identifier and Preference; Ad Network APIs:**

**3.3.12**   You and Your Applications (and any third party with whom You have contracted to serve advertising) may use the Advertising Identifier, and any information obtained through the use of the Advertising Identifier, only for the purpose of serving advertising.  If a user resets the Advertising Identifier, then You agree not to combine, correlate, link or otherwise associate, either directly or indirectly, the prior Advertising Identifier and any derived information with the reset Advertising Identifier.  For Applications compiled for any Apple-branded product providing access to the Ad Support APIs, You agree to check a user's Advertising Preference prior to serving any advertising using the Advertising Identifier, and You agree to abide by a user's setting in the Advertising Preference in Your use of the Advertising Identifier.  In addition, You may request to use the Ad Network APIs to track application advertising conversion events  If You are granted permission to use the Ad Network APIs, You agree not to use such APIs, or any information obtained through the use of the Ad Network APIs, for any purpose other than verifying ad validation information as part of an advertising conversion event.  You agree not to combine, correlate, link, or otherwise associate, either directly or indirectly, information that is provided as part of the ad validation through the use of the Ad Network APIs with other information You may have about a user. Apple reserves the right to reject any requests to use the Ad Network APIs, in its sole discretion.

**Location and Maps; User Consents:**

**3.3.13**   Applications that use location-based APIs (e.g., Core Location, MapKit API) or otherwise provide location-based services may not be designed or marketed for automatic or autonomous control of vehicle behavior, or for emergency or life-saving purposes.

**3.3.14**   Applications that offer location-based services or functionality, or that otherwise obtain a user's location through the use of the Apple Software or Apple Services, must notify and obtain consent from an individual before his or her location data is collected, transmitted or otherwise used by the Application and then such data must be used only as consented to by the user and as permitted herein.  For example, if You use the "Always" location option in Your Application for the purpose of continuous collection and use of a user's location data, You should provide a clearly defined justification and user benefit that is presented to the user at the time of the permission.

**3.3.15**   If You choose to provide Your own location-based service, data and/or information in conjunction with the Apple maps provided through the Apple Maps Service (e.g., overlaying a map or route You have created on top of an Apple map), You are solely responsible for ensuring that Your service, data and/or information correctly aligns with any Apple maps used.  For Applications that use location-based APIs for real-time navigation (including, but not limited to, turn-by-turn route guidance and other routing that is enabled through the use of a sensor), You must have an end-user license agreement that includes the following notice:  YOUR USE OF

PX-2557.19

THIS REAL TIME ROUTE GUIDANCE APPLICATION IS AT YOUR SOLE RISK.  LOCATION DATA MAY NOT BE ACCURATE.

**3.3.16**   Applications must not disable, override or otherwise interfere with any Apple - implemented system alerts, warnings, display panels, consent panels and the like, including, but not limited to, those that are intended to notify the user that the user's location data, address book data, calendar, photos, audio data, and/or reminders are being collected, transmitted, maintained, processed or used, or intended to obtain consent for such use. Further, if You have the ability to add a description in such alerts, warnings, and display panels (e.g., information in the purpose strings for the Camera APIs), any such description must be accurate and not misrepresent the scope of use.  If consent is denied or withdrawn, Applications may not collect, transmit, maintain, process or utilize such data or perform any other actions for which the user's consent has been denied or withdrawn.

**3.3.17**   If Your Application (or Your website or web application, as applicable) uses or accesses the MapKit API or MapKit JS from a device running iOS version 6 or later, Your Application (or Your website or web application, as applicable)  will access and use the Apple Maps Service.  All use of the MapKit API, MapKit JS, and Apple Maps Service must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 6 (Additional Terms for the use of the Apple Maps Service).

**Content and Materials:**

**3.3.18**   Any master recordings and musical compositions embodied in Your Application must be wholly-owned by You or licensed to You on a fully paid-up basis and in a manner that will not require the payment of any fees, royalties and/or sums by Apple to You or any third party.  In addition, if Your Application will be distributed outside of the United States, any master recordings and musical compositions embodied in Your Application (a) must not fall within the repertoire of any mechanical or performing/communication rights collecting or licensing organization now or in the future and (b) if licensed, must be exclusively licensed to You for Your Application by each applicable copyright owner.

**3.3.19**   If Your Application includes or will include any other content, You must either own all such content or have permission from the content owner to use it in Your Application.

**3.3.20**   Applications may be rejected if they contain content or materials of any kind (text, graphics, images, photographs, sounds, etc.) that in Apple's reasonable judgment may be found objectionable or inappropriate, for example, materials that may be considered obscene, pornographic, or defamatory.

**3.3.21**   Applications must not contain any malware, malicious or harmful code, program, or other internal component (e.g., computer viruses, trojan horses, "backdoors") which could damage, destroy, or adversely affect the Apple Software, services, Apple-branded products, or other software, firmware, hardware, data, systems, services, or networks.

**3.3.22**   If Your Application includes any FOSS, You agree to comply with all applicable FOSS licensing terms.  You also agree not to use any FOSS in the development of Your Application in such a way that would cause the non-FOSS portions of the Apple Software to be subject to any FOSS licensing terms or obligations.

**3.3.23**   Your Application may include promotional sweepstake or contest functionality provided that You are the sole sponsor of the promotion and that You and Your Application comply with any applicable laws and fulfill any applicable registration requirements in the country or territory where You make Your Application available and the promotion is open.  You agree that You are solely responsible for any promotion and any prize, and also agree to clearly state in binding

PX-2557.20

official rules for each promotion that Apple is not a sponsor of, or responsible for conducting, the promotion.

**3.3.24**   Your Application may include a direct link to a page on Your web site where You include the ability for an end-user to make a charitable contribution, provided that You comply with any applicable laws (which may include providing a receipt), and fulfill any applicable regulation or registration requirements, in the country or territory where You enable the charitable contribution to be made.  You also agree to clearly state that Apple is not the fundraiser.

**In-App Purchase API:**

**3.3.25**   All use of the In-App Purchase API and related services must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 2 (Additional Terms for Use of the In-App Purchase API).

**Network Extension Framework:**

**3.3.26**   Your Application must not access the Network Extension Framework unless Your Application is primarily designed for providing networking capabilities, and You have received an entitlement from Apple for such access.  You agree to the following if You receive such entitlement:

-  You agree to clearly disclose to end-users how You and Your Application will be using their network information and, if applicable, filtering their network data, and You agree to use such data and information only as expressly consented to by the end-user and as expressly permitted herein;

-  You agree to store and transmit network information or data from an end-user in a secure and appropriate manner;

-  You agree not to divert an end-user's network data or information through any undisclosed, improper, or misleading processes, e.g., to filter it through a website to obtain advertising revenue or spoof a website;

-  You agree not to use any network data or information from end-users to bypass or override any end-user settings, e.g., You may not track an end-user's WiFi network usage to determine their location if they have disabled location services for Your Application; and

-  Notwithstanding anything to the contrary in **Section 3.3.9**, You and Your Application may not use the Network Extension Framework, or any data or information obtained through the Network Extension Framework, for any purpose other than providing networking capabilities in connection with Your Application (e.g., not for using an end-user's Internet traffic to serve advertising or to otherwise build user profiles for advertising).

Apple reserves the right to not provide You with an entitlement to use the Network Extension Framework in its sole discretion and to revoke such entitlement at any time.  In addition, if You would like to use the Access WiFi Information APIs (which provide the WiFi network to which a device is connected), then You must request an entitlement from Apple for such use and, notwithstanding anything to the contrary in **Section 3.3.9**, You may use such APIs only for providing a service or function that is directly relevant to the Application (e.g., not for serving advertising).

**MFi Accessories:**

**3.3.27**   Your Application may interface, communicate, or otherwise interoperate with or control an MFi Accessory (as defined above) through wireless transports or through Apple's lightning or 30 -

PX-2557.21

pin connectors only if (i) such MFi Accessory is licensed under Apple's MFi/Works with Apple Program at the time that You initially submit Your Application, (ii) the MFi Licensee has added Your Application to a list of those approved for interoperability with their MFi Accessory, and (iii) the MFi Licensee has received approval from the Apple MFi/Works with Apple Program for such addition.

**Regulatory Compliance:**

**3.3.28**   You will fulfill any applicable regulatory requirements, including  full compliance with all applicable laws, regulations, and policies related to the manufacturing, marketing, sale and distribution of Your Application in the United States, and in particular the requirements of the U.S. Food and Drug Administration (FDA) as well as other U.S. regulatory bodies such as the FAA, HHS, FTC, and FCC, and the laws, regulations and policies  of any other applicable regulatory bodies in any countries or territories where You use or make Your Application available, e.g., MHRA, CFDA. However, You agree that You will not seek any  regulatory marketing permissions or make any determinations that may result in any Apple products being deemed regulated or that may impose any obligations or limitations on Apple.  By submitting Your Application to Apple for selection for distribution, You represent and warrant that You are in full compliance with any applicable laws, regulations, and policies, including but not limited to all FDA laws, regulations and policies, related to the manufacturing, marketing, sale and distribution of Your Application in the United States, as well as in other countries or territories where You plan to make Your Application available.  You also represent and warrant that You will market Your Application only for its cleared or approved intended use/indication for use, and only in strict compliance with applicable regulatory requirements.  Upon Apple's request, You agree to promptly provide any such clearance documentation to support the marketing of Your Application.  If requested by the FDA or by another government body that has a need to review or test Your Application as part of its regulatory review process, You may provide Your Application to such entity for review purposes.  You agree to promptly notify Apple in accordance with the procedures set forth in **Section 14.5** of any complaints or threats of complaints regarding Your Application in relation to any such regulatory requirements, in which case Apple may remove Your Application from distribution.

**Cellular Network:**

**3.3.29**   If an Application requires or will have access to the cellular network, then additionally such Application:

- Must comply with Apple's best practices and other guidelines on how Applications should access and use the cellular network; and

- Must not in Apple's reasonable judgment  excessively use or unduly burden network capacity or bandwidth.

**3.3.30**   Because some mobile network operators may prohibit or restrict the use of Voice over Internet Protocol (VoIP) functionality over their network, such as the use of VoIP telephony over a cellular network, and may also impose additional fees, or other charges in connection with VoIP. You agree to inform end-users, prior to purchase, to check the terms of agreement with their operator, for example, by providing such notice in the marketing text that You provide accompanying Your Application on the App Store.  In addition, if Your Application allows end-users to send SMS messages or make cellular voice calls, then You must inform the end-user, prior to use of such functionality, that standard text messaging rates or other carrier charges may apply to such use.

**Apple Push Notification Service and Local Notifications:**

PX-2557.22

**3.3.31** All use of Push Notifications via the Apple Push Notification Service or Local Notifications must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 1 (Additional Terms for Apple Push Notification Service and Local Notifications).

**Game Center:**

**3.3.32** All use of the Game Center must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 3 (Additional Terms for the Game Center).

**iCloud:**

**3.3.33** All use of the iCloud Storage APIs and CloudKit APIs, as well as Your use of the iCloud service under this Agreement, must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 4 (Additional Terms for the use of iCloud).

**Wallet:**

**3.3.34** Your development of Passes, and use of the Pass Type ID and Wallet under this Agreement, must be in accordance with the terms of this Agreement (including the Program Requirements) and Attachment 5 (Additional Terms for Passes).

**Additional Services or End-User Pre-Release Software:**

**3.3.35** From time to time, Apple may provide access to additional Services or pre-release Apple Software for You to use in connection with Your Applications, or as an end-user for evaluation purposes. Some of these may be subject to separate terms and conditions in addition to this Agreement, in which case Your usage will also be subject to those terms and conditions. Such services or software may not be available in all languages or in all countries, and Apple makes no representation that they will be appropriate or available for use in any particular location. To the extent You choose to access such services or software, You do so at Your own initiative and are responsible for compliance with any applicable laws, including but not limited to applicable local laws. To the extent any such software includes Apple's FaceTime or Messages feature, You acknowledge and agree that when You use such features, the telephone numbers and device identifiers associated with Your Authorized Test Units, as well as email addresses and/or Apple ID information You provide, may be used and maintained by Apple to provide and improve such software and features. Certain services made accessible to You through the Apple Software may be provided by third parties. You acknowledge that Apple will not have any liability or responsibility to You or any other person (including to any end-user) for any third-party services or for any Apple services. Apple and its licensors reserve the right to change, suspend, remove, or disable access to any services at any time. In no event will Apple be liable for the removal or disabling of access to any such services. Further, upon any commercial release of such software or services, or earlier if requested by Apple, You agree to cease all use of the prerelease Apple Software or Services provided to You as an end-user for evaluation purposes under this Agreement.

**3.3.36** If Your Application accesses the Google Safe Browsing service through the Apple Software such access is subject to Google's terms of service set forth at: https://developers.google.com/safe-browsing/terms. If You do not accept such terms of service, then You may not use the Google Safe Browsing Service in Your Application, and You acknowledge and agree that such use will constitute Your acceptance of such terms of service.

**3.3.37** If Your Application accesses data from an end-user's Address Book through the Address Book API, You must notify and obtain consent from the user before his or her Address Book data is accessed or used by Your Application. Further, Your Application may not provide an automated mechanism that transfers only the Facebook Data portions of the end-user's Address Book altogether to a location off of the end-user's device. For the sake of clarity, this does not

PX-2557.23

prohibit an automated transfer of the user's entire Address Book as a whole, so long as user notification and consent requirements have been fulfilled; and does not prohibit enabling users to transfer any portion of their Address Book data manually (e.g., by cutting and pasting) or enabling them to individually select particular data items to be transferred.

**Extensions:**

**3.3.38**  Applications that include extensions in the Application bundle must provide some functionality beyond just the extensions (e.g., help screens, additional settings), unless an Application includes a WatchKit Extension.  In addition:

-  Extensions (excluding WatchKit Extensions) may not include advertising, product promotion, direct marketing, or In-App Purchase offers in their extension view;

-  Extensions may not block the full screen of an iOS Product or Apple TV, or redirect, obstruct or interfere in an undisclosed or unexpected way with a user's use of another developer's application or any Apple-provided functionality or service;

-  Extensions may operate only in Apple -designated areas of iOS, watchOS, iPadOS, or tvOS as set forth in the Documentation;

-  Extensions that provide keyboard functionality must be capable of operating independent of any network access and must include Unicode characters (vs. pictorial images only);

-  Any keystroke logging done by any such extension must be clearly disclosed to the end -user prior to any such data being sent from an iOS Product, and notwithstanding anything else in **Section 3.3.9**, such data may be used only for purposes of providing or improving the keyboard functionality of Your Application (e.g., not for serving advertising);

-  Any message filtering done by an extension must be clearly disclosed to the end -user, and notwithstanding anything else in **Section 3.3.9**, any SMS or MMS data (whether accessed through a message filtering extension or sent by iOS to a messaging extension's corresponding server) may be used only for purposes of providing or improving the message experience of the user by reducing spam or messages from unknown sources, and must not be used for serving advertising or for any other purpose.  Further, SMS or MMS data from a user that is accessed within the extension may not be exported from the extension's designated container area in any way; and

-  Your Application must not automate installation of extensions or otherwise cause extensions to be installed without the user's knowledge, and You must accurately specify to the user the purpose and functionality of the extension.

**HealthKit APIs and Motion & Fitness APIs:**

**3.3.39**  Your Application must not access the HealthKit APIs or Motion & Fitness APIs unless it is primarily designed to provide health, motion, and/or fitness services, and this usage is clearly evident in Your marketing text and user interface  In addition:

-  Notwithstanding anything to the contrary in  **Section 3.3.9**, You and Your Application may not use the HealthKit APIs or the Motion & Fitness APIs, or any information obtained through the HealthKit APIs or the Motion & Fitness APIs, for  any purpose other than providing health, motion, and/or fitness services in connection with Your Application (e.g., not for serving advertising);

-  You must not use the HealthKit APIs or the Motion & Fitness APIs, or any information obtained through the HealthKit APIs or the Motion & Fitness APIs, to disclose or provide an end -user's health, motion, and/or fitness information to a third party without prior express end-user consent,

PX-2557.24

and then only for purposes of enabling the third party to provide health, motion, and/or fitness services as permitted herein.  For example, You must not share or sell an end-user's health information collected through the HealthKit APIs or Motion & Fitness APIs to advertising platforms, data brokers, or information resellers.  For clarity, You may allow end-users to consent to share their data with third parties for medical research purposes; and

- You agree to clearly disclose to end-users how You and Your Application will be using their health, motion, and/or fitness information and to use it only as expressly consented to by the end-user and as expressly permitted herein.

**Configuration Profiles:**

**3.3.40**   Configuration Profiles cannot be delivered to consumers other than for the purposes of configuration of WiFi, APN, or VPN settings, or as otherwise expressly permitted by Apple in the then-current Configuration Profile Reference Documentation. You must make a clear declaration of what user data will be collected and how it will be used on an app screen or other notification mechanism prior to any user action to use a Configuration Profile.  You may not share or sell user data obtained through a Configuration Profile to advertising platforms, data brokers, or information resellers.  In addition, You may not override the consent panel for a Configuration Profile or any other mechanisms of a Configuration Profile.

**HomeKit APIs:**

**3.3.41**   Your Application must not access the HomeKit APIs unless it is primarily designed to provide home configuration or home automation services (e.g., turning on a light, lifting a garage door) for Licensed HomeKit Accessories and this usage is clearly evident in Your marketing text and user interface.  You agree not to use the HomeKit APIs for any purpose other than interfacing, communicating, interoperating with or otherwise controlling a Licensed HomeKit Accessory or for using the HomeKit Database, and then only for home configuration or home automation purposes in connection with Your Application.  In addition:

- Your Application may use information obtained from the HomeKit APIs and/or the HomeKit Database only on a compatible Apple-branded product and may not export, remotely access or transfer such information off of the applicable product (e.g., a lock password cannot be sent off an end-user's device to be stored in an external non-Apple database), unless otherwise expressly permitted by Apple in the Documentation; and

- Notwithstanding anything to the contrary in **Section 3.3.9**, You and Your Application may not use the HomeKit APIs, or any information obtained through the HomeKit APIs or through the HomeKit Database, for any purpose other than providing or improving home configuration or home automation services in connection with Your Application (e.g., not for serving advertising).

**Apple Pay APIs:**

**3.3.42**   Your Application may use the Apple Pay APIs solely for the purpose of facilitating payment transactions that are made by or through Your Application, and only for the purchase of goods and services that are to be used outside of any iOS Product or Apple Watch, unless otherwise permitted by Apple in writing. For clarity, nothing in this **Section 3.3.42** supplants any of the rules or requirements for the use of the In-App Purchase API, including but not limited to **Section 3.3.3** and the guidelines.  In addition:

- You acknowledge and agree that Apple is not a party to any payment transactions facilitated through the use of the Apple Pay APIs and is not responsible for any such transactions, including but not limited to the unavailability of any end-user payment cards or payment fraud. Such payment transactions are between You and Your bank, acquirer, card networks, or other parties You utilize for transaction processing, and You  are responsible for complying with any

PX-2557.25

agreements You have with such third parties. In some cases, such agreements may contain terms specifying specific rights, obligations or limitations that You accept and assume in connection with Your decision to utilize the functionality of the Apple Pay APIs;

- You agree to store any private keys provided to You as part of Your use of the Apple Pay APIs in a secure manner (e.g., encrypted on a server) and in accordance with the Documentation. You agree not to store any end-user payment information in an unencrypted manner on an iOS Product.  For clarity, You may not decrypt any such end-user payment information on an iOS Product;

- You agree not to call the Apple Pay APIs or otherwise attempt to gain  information through the Apple Pay APIs for purposes unrelated to facilitating end-user payment transactions; and

- If You use Apple Pay APIs in Your Application, then You agree to use commercially reasonable efforts to include Apple Pay Cash as a payment option with Your use of the Apple Pay APIs in accordance with the Documentation and provided that Apple Pay Cash is available in the jurisdiction in which the Application is distributed.

**3.3.43**   As part of facilitating an end-user payment transaction through the Apple Pay APIs, Apple may provide You (whether You are acting as the Merchant or as an Intermediary Party) with an Apple Pay Payload.  If You receive an Apple Pay Payload, then You agree to the following:

- If You are acting as the Merchant, then You may use the Apple Pay Payload to process the end-user payment transaction and for other uses that You disclose to the end-user, and only in accordance with applicable law; and

- If You are acting as an Intermediary Party, then:

(a)  You may use the Apple Pay Payload only for purposes of facilitating the payment transaction between the Merchant and the end-user and for Your own order management purposes (e.g., customer service) as part of such transaction;
(b)  You agree that You will not hold the Apple Pay Payload data for any longer than necessary to fulfill the payment transaction and order management purposes for which it was collected;
(c)  You agree not to combine data obtained through the Apple Pay APIs, including but not limited to, the Apple Pay Payload with any other data that You may have about such end-user (except to the limited extent necessary for order management purposes).  For clarity, an Intermediary Party may not use data obtained through the Apple Pay APIs for advertising or marketing purposes, for developing or enhancing a user profile, or to otherwise target end-users;
(d)  You agree to disclose to end-users that You are an Intermediary Party to the transaction and to provide the identity of the Merchant for a particular transaction on the Apple Pay Payment Sheet (in addition to including Your name as an Intermediary Party) ; and
(e)  If You use a Merchant, then You will be responsible for ensuring that the Merchant You select uses the Apple Pay Payload provided by You only for purposes of processing the end-user payment transaction and for other uses they have disclosed to the end-user, and only in accordance with applicable law.  You agree to have a binding written agreement with such Merchant with terms at least as restrictive and protective of Apple as those set forth herein.  Any actions undertaken by any such Merchant in relation to such Apple Pay Payload or the payment transaction shall be deemed to have been taken by You, and You (in addition to such Merchant) shall be responsible to Apple for all such actions (or any inactions).  In the event of any actions or inactions by such Merchant that would constitute a violation of this Agreement or otherwise cause any harm, Apple reserves the right to require You to cease using such Merchant.

**SiriKit:**

**3.3.44**   Your Application may register as a destination  to use the Apple-defined SiriKit domains, but only if Your Application is designed to provide relevant responses to a user, or otherwise

PX-2557.26

carry out the user's request or intent, in connection with the applicable SiriKit domain (e.g., ride sharing) that is supported by Your Application and this usage is clearly evident in Your marketing text and user interface. In addition, Your Application may contribute actions to SiriKit, but only if such actions are tied to user behavior or activity within Your Application and for which You can provide a relevant response to the user. You agree not to submit false information through SiriKit about any such user activity or behavior or otherwise interfere with the predictions provided by SiriKit (e.g., SiriKit donations should be based on actual user behavior)

**3.3.45**  Your Application may use information obtained through SiriKit only on supported Apple products and may not export, remotely access or transfer such information off a device except to the extent necessary to provide or improve relevant responses to a user or carry out a user's request or in connection with Your Application. Notwithstanding anything to the contrary in **Section 3.3.9**, You and Your Application may not use SiriKit, or any information obtained through SiriKit, for any purpose other than providing relevant responses to a user or otherwise carrying out a user's request or intent in connection with an SiriKit domain, intent, or action supported by Your Application and/or for improving Your Application's responsiveness to user requests (e.g., not for serving advertising).

**3.3.46**  If Your Application uses SiriKit to enable audio data to be processed by Apple, You agree to clearly disclose to end-users that You and Your Application will be sending their recorded audio data to Apple for speech recognition, processing and/or transcription purposes, and that such audio data may be used to improve and provide Apple products and services. You further agree to use such audio data, and recognized text that may be returned from SiriKit, only as expressly consented to by the end-user and as expressly permitted herein.

**Single Sign-On API:**

**3.3.47**  You must not access or use the Single Sign-On API unless You are a Multi-channel Video Programming Distributor (MVPD) or unless Your Application is primarily designed to provide authenticated video programming via a subscription-based MVPD service, and You have received an entitlement from Apple to use the Single Sign-On API. If You have received such an entitlement, You are permitted to use the Single Sign-On API solely for the purpose of authenticating a user's entitlement to access Your MVPD content for viewing on an Apple Product, in accordance with the Single Sign-on Specification. Any such use must be in compliance with the Documentation for the Single Sign-On Specification. You acknowledge that Apple reserves the right to not provide You such an entitlement, and to revoke such entitlement, at any time, in its sole discretion.

If You use the Single Sign-On API, You will be responsible for providing the sign-in page accessed by users via the Single Sign-On API where users sign in to authenticate their right to access Your MVPD content. You agree that such sign-in page will not display advertising, and that the content and appearance of such page will be subject to Apple's prior review and approval. If You use the Single Sign-On API and Apple provides an updated version of such API and/or the Single Sign-on Specification, You agree to update Your implementation to conform with the newer version and specification within 3 months after receiving the update from Apple.

You authorize Apple to use, reproduce, and display the trademarks provided by You for use in connection with the Single-Sign-On feature, including use in the user interface screens in Apple products where the user selects the provider and authenticates through Single Sign-on, and/or to provide the user with a list of apps that are accessible to such user through Single Sign-On. You also grant Apple the right to use screen shots and images of such user interface, including but not limited to use in instructional materials, training materials, marketing materials, and advertising in any medium. Data provided via the Single Sign-On API will be considered Licensed Application Information hereunder, but will be subject to the use limitations set forth in this Section.

You must not collect, store or use data provided via the Single Sign-On API for any purpose other

PX-2557.27

than to authenticate a user's entitlement to access Your MVPD content on an Apple product, to provide the user access to Your MVPD content, and/or to address performance and technical problems with Your MVPD service. You will not provide or disclose data, content or information obtained from use of the Single Sign-On API to any other party except for authentication information provided to a video programming provider whose programming is offered as part of an MVPD subscription offered by You, and solely for the purpose of authenticating the user's entitlement to access such video programming on an Apple product under the user's MVPD subscription.

## TV App API:

**3.3.48**  You may not use the TV App API unless (a) Your Application is primarily designed to provide video programming, (b) You have received an entitlement from Apple, and (c) Your use is in accordance with the TV App Specification. To the extent that You provide TV App Data to Apple, Apple may store, use, reproduce and display such data solely for the purposes of: (a) providing information and recommendations to users of TV App Features, (b) enabling users to link from such recommendations and/or information to content for viewing via Your Licensed Application, and/or (c) servicing, maintenance, and optimization of TV App Features. With respect to any TV App Data that has been submitted by You prior to termination of this Agreement, Apple may continue to use s uch data in accordance with this **Section 3.3.48** after termination of this Agreement. TV App Data will be considered Licensed Application Information under this Agreement, but will be subject to the use limitations set forth in this Section. You acknowledge that Apple reserves the right to not include Your Licensed Application in the TV App Features, in its sole discretion.

Apple will obtain user consent based on the user's Apple ID before including Your Licensed Application in the TV App Features displ ayed under that Apple ID. Apple will also provide users with the ability to withdraw such consent at any time thereafter and to delete their TV App Data from Apple's systems. In addition, You may solicit user consent based upon Your own subscriber ID system. You are responsible for Your compliance with all applicable laws, including any applicable local laws for obtaining user consent with respect to Your provision of TV App Data to Apple.

## Spotlight-Image-Search Service:

**3.3.49**  To the extent that You provide Apple's spotlight-image-search service with access to any of Your domains that are associated with Your Licensed Applications (the "Associated Domain(s)"), You hereby grant Apple permission to crawl, scrape, copy, transmit and/or cache the content found in the Associated Domain(s) (the "Licensed Content") for the purposes set forth in this section. The Licensed Content shall be considered Licensed Application Information under this Agreement. You hereby further grant Apple a license to use, make, h ave made, reproduce, crop and/or modify the file format, resolution and appearance of the Licensed Content (for the purposes of reducing file size, converting to a supported file type and/or displaying thumbnails), and to publicly display, publicly perform, integrate, incorporate and distribute the Licensed Content to enhance search, discovery, and end -user distribution of the Licensed Content in Apple's Messages feature. Upon the termination of this Agreement for any reason, end users of Apple-branded products will be permitted to continue using and distributing all Licensed Content that they obtained through the use of Apple-branded products prior to such termination.

## MusicKit:

**3.3.50**  You agree not to call the MusicKit APIs or use MusicKit JS (or otherwise attempt to gain information through the MusicKit APIs or MusicKit JS) for purposes unrelated to facilitating access to Your end users' Apple Music subscriptions. If You access the Mu sicKit APIs or MusicKit JS, then You must follow the Apple Music Identity Guidelines. You agree not to require payment for or indirectly monetize access to the Apple Music service (e.g. in app purchase,

advertising, requesting user info) through Your use of the MusicKit APIs, MusicKit JS, or otherwise in any way. In addition:

- If You choose to offer music playback through the MusicKit APIs or MusicKit JS, full songs must be enabled for playback, and users must initiate playback and be able to navigate playback using standard media controls such as "play," "pause," and "skip," and You agree to not misrepresent the functionality of these controls;

- You may not, and You may not permit Your end users to, download, upload, or modify any MusicKit Content and MusicKit Content cannot be synchronized with any other content, unless otherwise permitted by Apple in the Documentation;

- You may play MusicKit Content only as rendered by the MusicKit APIs or MusicKit JS and only as permitted in the Documentation (e.g., album art and music-related text from the MusicKit API may not be used separately from music playback or managing playlists);

- Metadata from users (such as playlists and favorites) may be used only to provide a service or function that is clearly disclosed to end users and that is directly relevant to the use of Your Application, website, or web application, as determined in Apple's sole discretion; and

- You may use MusicKit JS only as a stand-alone library in Your Application, website, or web application and only as permitted in the Documentation (e.g., You agree not to recombine MusicKit JS with any other JavaScript code or separately download and re-host it).

### DeviceCheck APIs:

**3.3.51** If You use DeviceCheck APIs to store DeviceCheck Data, then You must provide a mechanism for customers to contact You to reset those values, if applicable (e.g. resetting a trial subscription or re-authorizing certain usage when a new user acquires the device). You may not rely on the DeviceCheck Data as a single identifier of fraudulent conduct and must use the DeviceCheck Data only in connection with other data or information, e.g., the DeviceCheck Data cannot be the sole data point since a device may have been transferred or resold. Apple reserves the right to delete any DeviceCheck Data at any time in its sole discretion, and You agree not to rely on any such Data. Further, You agree not to share the DeviceCheck tokens You receive from Apple with any third party, except a Service Provider acting on Your behalf.

### Face Data:

**3.3.52** If Your Application accesses Face Data, then You must do so only to provide a service or function that is directly relevant to the use of the Application, and You agree to inform users of Your intended uses and disclosures of Face Data by Your Application and to obtain clear and conspicuous consent from such users before any collection or use of Face Data. Notwithstanding anything to the contrary in **Section 3.3.9**, neither You nor Your Application (nor any third party with whom You have contracted to serve advertising) may use Face Data for serving advertising or for any other unrelated purposes. In addition:

- You may not use Face Data in a manner that will violate the legal rights of Your users (or any third parties) or to provide an unlawful, unfair, misleading, fraudulent, improper, exploitative, or objectionable user experience and then only in accordance with the Documentation;

- You may not use Face Data for authentication, advertising, or marketing purposes, or to otherwise target an end-user in a similar manner;

- You may not use Face Data to build a user profile, or otherwise attempt, facilitate, or encourage third parties to identify anonymous users or reconstruct user profiles based on Face Data;

Program Agreement

PX-2557.29

- You agree not to transfer, share, sell, or otherwise provide Face Data to advertising platforms, analytics providers, data brokers, information resellers or other such parties; and

- Face Data may not be shared or transferred off the user's device unless You have obtained clear and conspicuous consent for the transfer and the Face Data is used only in fulfilling a specific service or function for Your Application (e.g., a face mesh is used to display an image of the user within the Application) and only in accordance with these terms and the Documentation. You agree to require that Your service providers use Face Data only to the limited extent consented to by the user and only in accordance with these terms.

**ClassKit APIs:**

**3.3.53**   Your Application must not include the ClassKit APIs unless it is primarily designed to provide educational services, and this usage is clearly evident in Your marketing text and user interface. You agree not to submit false or inaccurate data through the ClassKit APIs or to attempt to redefine the assigned data categories for data submitted through the ClassKit APIs (e.g., student location data is not a supported data type and should not be submitted).

**Sign In with Apple:**

**3.3.54**   You may use Sign In with Apple in Your Corresponding Products only so long as Your use is comparable to including Sign In with Apple in Your Application. You may not share or sell user data obtained through Sign In with Apple to advertising platforms, data brokers, or information resellers. If a user has chosen to anonymize their user data as part of Sign In with Apple, You agree not to attempt to link such anonymized data with information that directly identifies the individual and that is obtained outside of Sign In with Apple without first obtaining user consent.

## 4.      Changes to Program Requirements or Terms

Apple may change the Program Requirements or the terms of this Agreement at any time.   New or modified Program Requirements will not retroactively apply to Applications already in distribution via the App Store or Custom App Distribution; provided however that You agree that Apple reserves the right to remove Applications from the App Store or  Custom App Distribution that are not in compliance with the new or modified Program Requirements at any time.  In order to continue using the Apple Software, Apple Certificates or any Services, You must accept and agree to the new Program Requirements and/or new terms of this Agreement.  If You do not agree to new Program Requirements or new terms, Your use of the Apple Software, Apple Certificates and any Services will be suspended or terminated by Apple.  You agree that Your acceptance of such new Agreement terms or Program Requirements may be signified electronically, including without limitation, by Your checking a box or clicking on an "agree" or similar button.  Nothing in this Section shall affect Apple's rights under  **Section 5 (Apple Certificates; Revocation)**.

## 5.      Apple Certificates; Revocation
### 5.1      Certificate Requirements
All Applications must be signed with an Apple Certificate in order to be installed on Authorized Test Units, Registered Devices, or submitted to Apple for distribution via the App Store, Custom App Distribution, or TestFlight.  Similarly, all Passes must be signed with an Apple Certificate to be recognized and accepted by Wallet. Safari Extensions must be signed with an Apple Certificate to run in Safari on macOS.  You must use a Website ID to send Safari Push Notifications to the macOS desktop of users who have opted in to receive such Notifications for Your Site through Safari on macOS.  You may  also obtain other Apple Certificates and keys for other purposes as set forth herein and in the Documentation.

In relation to this, You represent and warrant to Apple that:

PX-2557.30

(a) You will not take any action to interfere with the normal operation of any Apple Certificates, keys, or Provisioning Profiles;

(b) You are solely responsible for preventing any unauthorized person or organization from having access to Your Apple Certificates and keys, and You will use Your best efforts to safeguard Your Apple Certificates and keys from compromise (e.g., You will not upload Your Apple Certificate for App Store distribution to a cloud repository for use by a third-party);

(c) You agree to immediately notify Apple in writing if You have any reason to believe there has been a compromise of any of Your Apple Certificates or keys;

(d) You will not provide or transfer Apple Certificates or keys provided under this Program to any third party (except for a Service Provider who is using them on Your behalf in compliance with this Agreement and only to the limited extent expressly permitted by Apple in the Documentation or this Agreement (e.g., You are prohibited from providing or transferring Your Apple Certificates that are used for distribution or submission to the App Store to a Service Provider), and You will not use Your Apple Certificates to sign any third party's application, pass, extension, notification, implementation, or site;

(e) You will use any Apple Certificates or keys provided under this Agreement solely as permitted by Apple and in accordance with the Documentation; and

(f) You will use Apple Certificates provided under this Program exclusively for the purpose of signing Your Passes, signing Your Safari Extensions, signing Your Site's registration bundle, accessing the APN service, and/or signing Your Applications for testing, submission to Apple and/or for limited distribution for use on Registered Devices or Authorized Test Units as contemplated under this Program, or as otherwise permitted by Apple, and only in accordance with this Agreement. As a limited exception to the foregoing, You may provide versions of Your Applications to Your Service Providers to sign with their Apple-issued development certificates, but solely for purposes of having them perform testing on Your behalf of Your Applications on Apple-branded products running iOS, watchOS, iPadOS, and/or tvOS and provided that all such testing is conducted internally by Your Service Providers (e.g., no outside distribution of Your Applications) and that Your Applications are deleted within a reasonable period of time after such testing is performed. Further, You agree that Your Service Provider may use the data obtained from performing such testing services only for purposes of providing You with information about the performance of Your Applications (e.g., Your Service Provider is prohibited from aggregating Your Applications' test results with other developers' test results).

You further represent and warrant to Apple that the licensing terms governing Your Application, Your Safari Extension, Your Site's registration bundle, and/or Your Pass, or governing any third party code or FOSS included in Your Covered Products, will be consistent with and not conflict with the digital signing or content protection aspects of the Program or any of the terms, conditions or requirements of the Program or this Agreement. In particular, such licensing terms will not purport to require Apple (or its agents) to disclose or make available any of the keys, authorization codes, methods, procedures, data or other information related to the Security Solution, digital signing or digital rights management mechanisms or security utilized as part of any Apple software, including the App Store. If You discover any such inconsistency or conflict, You agree to immediately notify Apple of it and will cooperate with Apple to resolve such matter. You acknowledge and agree that Apple may immediately cease distribution of any affected Licensed Applications or Passes, and may refuse to accept any subsequent Application or Pass submissions from You until such matter is resolved to Apple's reasonable satisfaction.

## 5.2    Relying Party Certificates

The Apple Software and Services may also contain functionality that permits digital certificates, either Apple Certificates or other third-party certificates, to be accepted by the Apple Software or Services (e.g., Apple Pay) and/or to be used to provide information to You (e.g., transaction receipts, App Attest receipts). It is Your responsibility to verify the validity of any certifications or receipts You may receive from Apple prior to relying on them (e.g., You should verify that the receipt came from Apple prior to any delivery of content to an end-user through the use of the In-App Purchase API). You are solely responsible for Your decision to rely on any such certificates and receipts, and Apple will not be liable for Your failure to verify that any such certificates or

PX-2557.31

receipts came from Apple (or third parties) or for Your reliance on Apple Certificates or other digital certificates.

### 5.3    Notarized Applications for macOS

To have Your macOS Application notarized, You may request a digital file for authentication of Your Application from Apple's digital notary service (a " **Ticket**").  You can use this Ticket with Your Apple Certificate to receive an improved developer signing and user experience for Your Application on macOS.  To request this Ticket from Apple's digital notary service, You must upload Your Application to Apple through Apple's developer tools (or other requested mechanisms) for purposes of continuous security checking.  This continuous security checking will involve automated scanning, testing, and analysis of Your Application by Apple for malware or other harmful or suspicious code or components or security flaws, and, in limited cases, a manual, technical investigation of Your Application by Apple for such purposes.  By uploading Your Application to Apple for this digital notary service, You agree that Apple may perform such security checks on Your Application for purposes of detecting malware or other harmful or suspicious code or components, and You agree that Apple may retain and use Your Application for subsequent security checks for the same purposes.

If Apple authenticates Your developer signature and Your Application passes the initial security checks, Apple may provide You with a Ticket to use with Your Apple Certificate.  Apple reserves the right to issue Tickets in its sole discretion, and Apple may revoke Tickets at any time in its sole discretion in the event that Apple has reason to believe, or has reasonable suspicions, that Your Application contains malware or malicious, suspicious or harmful code or components or that Your developer identity signature has been compromised.  You may request that Apple revoke Your Ticket at any time by emailing: product-security@apple.com.  If Apple revokes Your Ticket or Your Apple Certificate, then Your Application may no longer run on macOS.

You agree to cooperate with Apple regarding Your Ticket requests and to not hide, attempt to bypass, or misrepresent any part of Your Application from Apple's security checks or otherwise hinder Apple from being able to perform such security checks. You agree not to represent that Apple has performed a security check or malware detection for Your Application or that Apple has reviewed or approved Your Application for purposes of issuing a Ticket to You from Apple's digital notary service.  You acknowledge and agree that Apple is performing security checks solely in connection with Apple's digital notary service and that such security checks should not be relied upon for malware detection or security verification of any kind. You are fully responsible for Your own Application and for ensuring that Your Application is safe, secure, and operational for Your end-users (e.g., informing Your end-users that Your Application may cease to run if there is an issue with malware).  You agree to comply with export requirements in Your jurisdiction when uploading Your Application to Apple, and You agree not to upload any Application that is: (a) subject to International Traffic in Arms Regulations; or (b) that cannot be exported without prior written government authorization, including, but not limited to, certain types of encryption software and source code, without first obtaining that authorization. Apple will not be liable to You or any third-party for any inability or failure to detect any malware or other suspicious, harmful code or components in Your Application or other security issues, or for any ticket issuance or revocation. Apple shall not be responsible for any costs, expenses, damages, losses or other liabilities You may incur as a result of Your Application development, use of the Apple Software, Apple Services (including this digital notary service), or Apple Certificates, tickets, or participation in the Program, including without limitation the fact that Apple performs security checks on Your Application.

### 5.4    Certificate Revocation

Except as otherwise set forth herein, You may revoke Apple Certificates issued to You at any time.  If You want to revoke the Apple Certificates used to sign Your Passes and/or issued to You for use with Your macOS Applications distributed outside of the App Store, You may request that Apple revoke these Apple Certificates at any time by emailing: product-security@apple.com. Apple also reserves the right to revoke any Apple Certificates at any time, in its sole discretion. By way of example only, Apple may choose to do this if: (a) any of Your Apple Certificates or

PX-2557.32

corresponding private keys have been compromised or Apple has reason to believe that either have been compromised; (b) Apple has reason to believe or has reasonable suspicions that Your Covered Products contain malware or malicious, suspicious or harmful code or components (e.g., a software virus); (c) Apple has reason to believe that Your Covered Products adversely affect the security of Apple-branded products, or any other software, firmware, hardware, data, systems, or networks accessed or used by such products; (d) Apple's certificate issuance process is compromised or Apple has reason to believe that such process has been compromised; (e) You breach any term or condition of this Agreement; (f) Apple ceases to issue the Apple Certificates for the Covered Product under the Program; (g) Your Covered Product misuses or overburdens any Services provided hereunder; or (h) Apple has reason to believe that such action is prudent or necessary. Further, You understand and agree that Apple may notify end-users of Covered Products that are signed with Apple Certificates when Apple believes such action is necessary to protect the privacy, safety or security of end-users, or is otherwise prudent or necessary as determined in Apple's reasonable judgment. Apple's Certificate Policy and Certificate Practice Statements may be found at: http://www.apple.com/certificateauthority.

## 6. Application Submission and Selection

### 6.1 Submission to Apple for App Store or Custom App Distribution

You may submit Your Application for consideration by Apple for distribution via the App Store or Custom App Distribution once You decide that Your Application has been adequately tested and is complete. By submitting Your Application, You represent and warrant that Your Application complies with the Documentation and Program Requirements then in effect as well as with any additional guidelines that Apple may post on the Program web portal or in App Store Connect. You further agree that You will not attempt to hide, misrepresent or obscure any features, content, services or functionality in Your submitted Applications from Apple's review or otherwise hinder Apple from being able to fully review such Applications. In addition, You agree to inform Apple in writing through App Store Connect if Your Application connects to a physical device, including but not limited to an MFi Accessory, and, if so, to disclose the means of such connection (whether iAP, Bluetooth Low Energy (BLE), the headphone jack, or any other communication protocol or standard) and identify at least one physical device with which Your Application is designed to communicate. If requested by Apple, You agree to provide access to or samples of any such devices at Your expense (samples will not be returned). You agree to cooperate with Apple in this submission process and to answer questions and provide information and materials reasonably requested by Apple regarding Your submitted Application, including insurance information You may have relating to Your Application, the operation of Your business, or Your obligations under this Agreement. Apple may require You to carry certain levels of insurance for certain types of Applications and name Apple as an additional insured. If You make any changes to an Application (including to any functionality made available through use of the In-App Purchase API) after submission to Apple, You must resubmit the Application to Apple. Similarly all bug fixes, updates, upgrades, modifications, enhancements, supplements to, revisions, new releases and new versions of Your Application must be submitted to Apple for review in order for them to be considered for distribution via the App Store or Custom App Distribution, except as otherwise permitted by Apple.

### 6.2 App Thinning and Bundled Resources

As part of Your Application submission to the App Store or Custom App Distribution, Apple may optimize Your Application to target specific devices by repackaging certain functionality and delivered resources (as described in the Documentation) in Your Application so that it will run more efficiently and use less space on target devices ("**App Thinning**"). For example, Apple may deliver only the 32-bit or 64-bit version of Your Application to a target device, and Apple may not deliver icons or launch screens that would not render on the display of a target device. You agree that Apple may use App Thinning to repackage Your Application in order to deliver a more optimized version of Your Application to target devices.

PX-2557.33

As part of App Thinning, You can also request that Apple deliver specific resources for Your Application (e.g., GPU resources) to target devices by identifying such bundled resources as part of Your code submission ("**Bundled Resources**"). You can define such Bundled Resources to vary the timing or delivery of assets to a target device (e.g., when a user reaches a certain level of a game, then the content is delivered on-demand to the target device). App Thinning and Bundled Resources are not available for all Apple operating systems, and Apple may continue to deliver full Application binaries to some target devices.

### 6.3    iOS and iPadOS apps on Mac

If You compile Your Application for iOS or iPadOS (collectively "iOS" for purposes of this Section 6.3) and submit such Application for distribution on the App Store, You agree that Apple will make Your Application available on both iOS and macOS via the App Store, unless You choose to opt out of making Your Application available on macOS by following the opt out process in App Store Connect. You agree that the foregoing applies to an Application for iOS submitted by You and currently available on the App Store and to any future Application compiled for iOS and submitted by You to the App Store. Notwithstanding the foregoing, such availability on the App Store will apply only if such Application has been selected by Apple for distribution on the App Store pursuant to Section 7 and only if such Application can function appropriately on, and be compatible with, macOS, as determined in Apple's sole discretion. You are responsible for obtaining and determining if You have appropriate rights for Your Application to operate on macOS. If You do not have such rights, You agree to opt out of making such Application available on macOS. You are responsible for testing such Application on macOS.

### 6.4    Bitcode Submissions

For Application submissions to the App Store or Custom App Distribution for some Apple operating systems (e.g., for watchOS), Apple may require You to submit an intermediate representation of Your Application in binary file format for the LLVM compiler (**Bitcode**"). You may also submit Bitcode for other supported Apple operating systems. Such Bitcode submission will allow Apple to compile Your Bitcode to target specific Apple-branded devices and to recompile Your Bitcode for subsequent releases of Your Application for new Apple hardware, software, and/or compiler changes. When submitting Bitcode, You may choose whether or not to include symbols for Your Application in the Bitcode; however, if You do not include symbols, then Apple will not be able to provide You with symbolicated crash logs or other diagnostic information as set forth in **Section 6.6 (Improving Your Application)** below. Further, You may be required to submit a compiled binary of Your Application with Your Bitcode.

By submitting Bitcode to Apple, You authorize Apple to compile Your Bitcode into a resulting binary that will be targeted for specific Apple-branded devices and to recompile Your Bitcode for subsequent rebuilding and recompiling of Your Application for updated hardware, software, and/or compiler changes (e.g., if Apple releases a new device, then Apple may use Your Bitcode to update Your Application without requiring resubmission) You agree that Apple may compile such Bitcode for its own internal use in testing and improving Apple's developer tools, and for purposes of analyzing and improving how applications can be optimized to run on Apple's operating systems (e.g., which frameworks are used most frequently, how a certain framework consumes memory, etc.). You may use Apple's developer tools to view and test how Apple may process Your Bitcode into machine code binary form. Bitcode is not available for all Apple operating systems.

### 6.5    TestFlight Submission

If You would like to distribute Your Application to Beta Testers outside of Your company or organization through TestFlight, You must first submit Your Application to Apple for review. By submitting such Application, You represent and warrant that Your Application complies with the Documentation and Program Requirements then in effect as well as with any additional guidelines that Apple may post on the Program web portal or in App Store Connect. Thereafter, Apple may permit You to distribute updates to such Application directly to Your Beta Testers without Apple's review, unless such an update includes significant changes, in which case You

PX-2557.34

agree to inform Apple in App Store Connect and have such Application re-reviewed.  Apple reserves the right to require You to cease distribution of Your Application through TestFlight, and/or to any particular Beta Tester, at any time in its sole discretion

### 6.6    Improving Your Application
Further, if Your Application is submitted for distribution via the App Store,  Custom App Distribution or TestFlight, You agree that Apple may use Your Application for the limited purpose of compatibility testing of Your Application with Apple products and services, for finding and fixing bugs and issues in Apple products and services and/or Your Applications, for internal use in evaluating iOS, watchOS, tvOS, iPadOS, and/or macOS performance issues in or with Your Application, for security testing, and for purposes of providing other information to You (e.g., crash logs).  Except as otherwise set forth herein, You may opt in to send app symbol information for Your Application to Apple, and if You do so, then You agree that Apple may use such symbols to symbolicate Your Application for purposes of providing You with symbolicated crash logs and other diagnostic information.  In the event that Apple provides You with crash logs or other diagnostic information for Your Application, You agree to use such crash logs and information only for purposes of fixing bugs and improving the performance of Your Application and related products.  You may also collect numeric strings and variables from Your Application when it crashes, so long as You collect such information only in an anonymous, non-personal manner and do not recombine, correlate, or use such information to attempt to identify or derive information about any particular end-user or device.

### 6.7    App Analytics
To the extent that Apple provides an Analytics service through App Store Connect for Applications distributed through the App Store, You agree to use any data provided through such App Analytics service solely for purposes of improving Your Applications and related  products. Further, You agree not to provide such information to any third parties, except for a  Service Provider who is assisting You in processing and analyzing such data on Your behalf and who is not permitted to use it for any other purpose or disclose it to any other party.  For clarity, You must not aggregate (or permit any third-party to aggregate) analytics information provided to You by Apple for Your Applications as part of this App Analytics service with other developers' analytics information, or contribute such information to a repository for cross-developer analytics. You must not use the App Analytics service or any analytics data to attempt to identify or derive information about any particular end-user or device.

### 6.8    Compatibility Requirement with Current Shipping OS Version
Applications that are selected for distribution via the App Store must be compatible with the currently shipping version of Apple's applicable operating system (OS) software at the time of submission to Apple, and such Applications must stay current and maintain compatibility with each new release of the applicable OS version so long as such Applications are distributed through the App Store.  You understand and agree that Apple may remove Applications from the App Store when they are not compatible with the then -current shipping release of the OS at any time in its sole discretion.

### 6.9    Selection by Apple for Distribution
You understand and agree that if You submit Your Application to Apple for distribution via the App Store, Custom App Distribution , or TestFlight, Apple may, in its sole discretion:

(a) determine that Your Application does not meet all or any part of the Documentation or Program Requirements then in effect;
(b) reject Your Application for distribution for any reason, even if Your Application meets the Documentation and Program Requirements; or
(c) select and digitally sign Your Application for distribution via the App Store, Custom App Distribution , or TestFlight.

PX-2557.35

Apple shall not be responsible for any costs, expenses, damages, losses (including without limitation lost business opportunities or lost profits) or other liabilities You may incur as a result of Your Application development, use of the Apple Software, Apple Services, or Apple Certificates or participation in the Program, including without limitation the fact that Your Application may not be selected for distribution via the App Store or Custom App Distribution. You will be solely responsible for developing Applications that are safe, free of defects in design and operation, and comply with applicable laws and regulations. You will also be solely responsible for any documentation and end-user customer support and warranty for such Applications. The fact that Apple may have reviewed, tested, approved or selected an Application will not relieve You of any of these responsibilities.

## 7.    Distribution of Applications and Libraries

**Applications:**

Applications developed under this Agreement for iOS, watchOS, iPadOS, or tvOS may be distributed in four ways: (1) through the App Store, if selected by Apple, (2) through the Custom App Distribution, if selected by Apple, (3) through Ad Hoc distribution in accordance with **Section 7.3**, and (4) for beta testing through TestFlight in accordance with **Section 7.4**. Applications for macOS may be submitted to Apple for selection and distribution on the App Store, or may be separately distributed.

**7.1    Delivery of Free Licensed Applications via the App Store or Custom App Distribution**
If Your Application qualifies as a Licensed Application, it is eligible for delivery to end-users via the App Store or Custom App Distribution by Apple and/or an Apple Subsidiary. If You would like Apple and/or an Apple Subsidiary to deliver Your Licensed Application or authorize additional content, functionality or services You make available in Your Licensed Application through the use of the In-App Purchase API to end-users for free (no charge) via the App Store or Custom App Distribution, then You appoint Apple and Apple Subsidiaries as Your legal agent and/or commissionaire pursuant to the terms of Schedule 1 for Licensed Applications designated by You as free-of-charge applications.

**7.2    Schedule 2 and Schedule 3 for Fee-Based Licensed Applications; Receipts**
If Your Application qualifies as a Licensed Application and You intend to charge end-users a fee of any kind for Your Licensed Application or within Your Licensed Application through the use of the In-App Purchase API, You must enter into a separate agreement (Schedule 2) with Apple and/or an Apple Subsidiary before any such commercial distribution of Your Licensed Application may take place via the App Store or before any such commercial delivery of additional content, functionality or services for which You charge end-users a fee may be authorized through the use of the In-App Purchase API in Your Licensed Application. If You would like Apple to sign and distribute Your Application for a fee through Custom App Distribution, then You must enter into a separate agreement (Schedule 3) with Apple and/or an Apple Subsidiary before any such distribution may take place. To the extent that You enter (or have previously entered) into Schedule 2 or Schedule 3 with Apple and/or an Apple Subsidiary, the terms of Schedule 2 or 3 will be deemed incorporated into this Agreement by this reference.

When an end-user installs Your Licensed Application, Apple will provide You with a transaction receipt signed with an Apple Certificate. It is Your responsibility to verify that such certificate and receipt were issued by Apple, as set forth in the Documentation. You are solely responsible for Your decision to rely on any such certificates and receipts. YOUR USE OF OR RELIANCE ON SUCH CERTIFICATES AND RECEIPTS IN CONNECTION WITH A PURCHASE OF A LICENSED APPLICATION IS AT YOUR SOLE RISK. APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, RELIABILITY, SECURITY, OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO SUCH APPLE

PX-2557.36

CERTIFICATES AND RECEIPTS. You agree that You will only use such receipts and certificates in accordance with the Documentation, and that You will not interfere or tamper with the normal operation of such digital certificates or receipts, including but not limited to any falsification or other misuse.

**7.3    Distribution on Registered Devices (Ad Hoc Distribution)**

Subject to the terms and conditions of this Agreement, You may also distribute Your Applications for iOS, watchOS, iPadOS, and tvOS to individuals within Your company, organization, educational institution, group, or who are otherwise affiliated with You for use on a limited number of Registered Devices (as specified on the Program web portal), if Your Application has been digitally signed using Your Apple Certificate as described in this Agreement. By distributing Your Application in this manner on Registered Devices, You represent and warrant to Apple that Your Application complies with the Documentation and Program Requirements then in effect and You agree to cooperate with Apple and to answer questions and provide information about Your Application, as reasonably requested by Apple. You also agree to be solely responsible for determining which individuals within Your company, organization, educational institution or affiliated group should have access to and use of Your Applications and Registered Devices, and for managing such Registered Devices. Apple shall not be responsible for any costs, expenses, damages, losses (including without limitation lost business opportunities or lost profits) or other liabilities You may incur as a result of distributing Your Applications in this manner, or for Your failure to adequately manage, limit or otherwise control the access to and use of Your Applications and Registered Devices. You will be responsible for attaching or otherwise including, at Your discretion, any relevant usage terms with Your Applications. Apple will not be responsible for any violations of Your usage terms. You will be solely responsible for all user assistance, warranty and support of Your Applications.

**7.4     TestFlight Distribution**

**A.       Internal Distribution to Authorized Developers and App Store Connect users**

You may use TestFlight for internal distribution of pre-release versions of Your Applications to a limited number of Your Authorized Developers or Your App Store Connect users who are members of Your company or organization, but solely for their internal use in testing, evaluating and/or developing Your Applications. Apple reserves the right to require You to cease distribution of such Applications to Your Authorized Developers or Your App Store Connect users through TestFlight, or to any particular Authorized Developer or App Store Connect user, at any time in its sole discretion.

**B.       External Distribution to Beta Testers**

You may also use TestFlight for external distribution of pre-release versions of Your Applications to a limited number of Beta Testers (as specified in App Store Connect), but solely for their testing and evaluation of such pre-release versions of Your Applications and only if Your Application has been approved for such distribution by Apple as set forth in **Section 6.5 (TestFlight Submission)**. You may not charge Your Beta Testers fees of any kind to participate in Apple's TestFlight or for the use of any such pre-release versions. You may not use TestFlight for purposes that are not related to improving the quality, performance, or usability of pre-release versions of Your Application (e.g., continuous distribution of demo versions of Your Application in an attempt to circumvent the App Store or providing trial versions of Your Applications for purposes of soliciting favorable App Store ratings are prohibited uses). Further, if Your Application is primarily intended for children, You must verify that Your Beta Testers are of the age of majority in their jurisdiction. If You choose to add Beta Testers to TestFlight, then You are assuming responsibility for any invitations sent to such end-users and for obtaining their consent to contact them. Apple will use the email addresses that You provide through TestFlight only for purposes of sending invitations to such end-users via TestFlight. By uploading email addresses for the purposes of sending invites to Beta Testers, You warrant that You have an appropriate legal basis for using such emails addresses for the purposes of sending invites. If a Beta Tester requests that You stop contacting them (either through TestFlight or otherwise), then You agree to promptly do so.

PX-2557.37

### C.  Use of TestFlight Information
To the extent that TestFlight provides You with beta analytics information about Your end-user's use of pre-release versions of Your Application (e.g., installation time, frequency of an individual's use of an App, etc.) and/or other related information (e.g. tester suggestions, feedback, screenshots), You agree to use such data solely for purposes of improving Your Applications and related products.  You agree not to provide such information to any third parties, except for a Service Provider who is assisting You in processing and analyzing such data on Your behalf and who is not permitted to use it for any other purpose or disclose it to any other party  (and then only to the limited extent not prohibited by Apple)  For clarity, You must not aggregate (or permit any third-party to aggregate) beta analytics information provided to You by Apple for Your Applications as part of TestFlight with other developers' beta analytics information, or contribute such information to a repository for cross-developer beta analytics information.  Further, You must not use any beta analytics information provided through TestFlight for purposes of de-anonymizing information obtained from or regarding a particular device or end-user outside of TestFlight (e.g., You may not attempt to connect data gathered through TestFlight for a particular end-user with information that is provided in an anonymized form through Apple's analytics service).

### Libraries:

### 7.5  Distribution of Libraries
You can develop Libraries using the Apple Software.  Notwithstanding anything to the contrary in the Xcode and Apple SDKs Agreement, under this Agreement You may develop Libraries for iOS, watchOS, iPadOS, and tvOS using the applicable Apple SDKs that are provided as part of the Xcode and Apple SDKs license, provided that any such Libraries are developed and distributed solely for use with an iOS Product, Apple Watch, or Apple TV and that You limit use of such Libraries only to use with such products.  If Apple determines that Your Library is not designed for use with an iOS Product, Apple Watch, or Apple TV, then Apple may require You to cease distribution of Your Library at any time, and You agree to promptly cease all distribution of such Library upon notice from Apple and cooperate with Apple to remove any remaining copies of such Library.  For clarity, the foregoing limitation is not intended to prohibit the development of libraries for macOS.

### 7.6  No Other Distribution Authorized Under this Agreement
Except for the distribution of freely available Licensed Applications through the App Store or Custom App Distribution in accordance with **Sections 7.1** and **7.2**, the distribution of Applications for use on Registered Devices as set forth in **Section 7.2** (Ad Hoc Distribution), the distribution of Applications for beta testing through TestFlight as set forth in  **Section 7.4**, the distribution of Libraries in accordance with **Section 7.5**, the distribution of Passes in accordance with Attachment 5, the delivery of Safari Push Notifications on macOS , the distribution of Safari Extensions on macOS, the distribution of Applications and libraries developed for macOS, and/or as otherwise permitted herein, no other distribution of programs or applications developed using the Apple Software is authorized or permitted hereunder. In the absence of a separate agreement with Apple, You agree not to distribute Your Application for iOS Products, Apple Watch, or Apple TV to third parties via other distribution methods or to enable or permit others to do so.  You agree to distribute Your Covered Products only in accordance with the terms of  this Agreement.

## 8.  Program Fees
As consideration for the rights and licenses granted to You under this Agreement and Your participation in the Program, You agree to pay Apple the annual Program fee set forth on the Program website, unless You have received a valid fee waiver from Apple  Such fee is non-refundable, and any taxes that may be levied on the Apple Software, Apple Services or Your use of the Program shall be Your responsibility.  Your Program fees must be paid up and not in

arrears at the time You submit (or resubmit) Applications to Apple under this Agreement, and Your continued use of the Program web portal and Services is subject to Your payment of such fees, where applicable. If You opt-in to have Your annual Program fees paid on an auto-renewing basis, then You agree that Apple may charge the credit card that You have on file with Apple for such fees, subject to the terms You agree to on the Program web portal when You choose to enroll in an auto-renewing membership.

## 9.    Confidentiality

### 9.1    Information Deemed Apple Confidential

You agree that all pre-release versions of the Apple Software and Apple Services (including pre-release Documentation), pre-release versions of Apple hardware, the FPS Deployment Package, any terms and conditions contained herein that disclose pre-release features, and the terms and conditions of Schedule 2 and Schedule 3 will be deemed "Apple Confidential Information"; provided however that upon the commercial release of the Apple Software the terms and conditions that disclose pre-release features of the Apple Software or services will no longer be confidential. Notwithstanding the foregoing, Apple Confidential Information will not include: (i) information that is generally and legitimately available to the public through no fault or breach of Yours, (ii) information that is generally made available to the public by Apple, (iii) information that is independently developed by You without the use of any Apple Confidential Information, (iv) information that was rightfully obtained from a third party who had the right to transfer or disclose it to You without limitation, or (v) any FOSS included in the Apple Software and accompanied by licensing terms that do not impose confidentiality obligations on the use or disclosure of such FOSS. Further, Apple agrees that You will not be bound by the foregoing confidentiality terms with regard to technical information about prerelease Apple Software and services disclosed by Apple at WWDC (Apple's Worldwide Developers Conference), except that You may not post screen shots of, write public reviews of, or redistribute any pre-release Apple Software, Apple Services or hardware.

### 9.2    Obligations Regarding Apple Confidential Information

You agree to protect Apple Confidential Information using at least the same degree of care that You use to protect Your own confidential information of similar importance, but no less than a reasonable degree of care. You agree to use Apple Confidential Information solely for the purpose of exercising Your rights and performing Your obligations under this Agreement and agree not to use Apple Confidential Information for any other purpose, for Your own or any third party's benefit, without Apple's prior written consent. You further agree not to disclose or disseminate Apple Confidential Information to anyone other than: (i) those of Your employees and contractors, or those of Your faculty and staff if You are an educational institution, who have a need to know and who are bound by a written agreement that prohibits unauthorized use or disclosure of the Apple Confidential Information; or (ii) except as otherwise agreed or permitted in writing by Apple. You may disclose Apple Confidential Information to the extent required by law, provided that You take reasonable steps to notify Apple of such requirement before disclosing the Apple Confidential Information and to obtain protective treatment of the Apple Confidential Information. You acknowledge that damages for improper disclosure of Apple Confidential Information may be irreparable; therefore, Apple is entitled to seek equitable relief, including injunction and preliminary injunction, in addition to all other remedies.

### 9.3    Information Submitted to Apple Not Deemed Confidential

Apple works with many application and software developers and some of their products may be similar to or compete with Your Applications. Apple may also be developing its own similar or competing applications and products or may decide to do so in the future. To avoid potential misunderstandings and except as otherwise expressly set forth herein, Apple cannot agree, and expressly disclaims, any confidentiality obligations or use restrictions, express or implied, with respect to any information that You may provide in connection with this Agreement or the Program, including but not limited to information about Your Application, Licensed Application Information, and metadata (such disclosures will be referred to as "**Licensee Disclosures**"). You

agree that any such Licensee Disclosures will be **non-confidential**.  Except as otherwise expressly set forth herein, Apple will be free to use and disclose any Licensee Disclosures on an unrestricted basis without notifying or compensating You.  You release Apple from all liability and obligations that may arise from the receipt, review, use, or disclosure of any portion of any Licensee Disclosures.  Any physical materials You submit to Apple will become Apple property and Apple will have no obligation to return those materials to You or to certify their destruction.

**9.4     Press Releases and Other Publicity**
You may not issue any press releases or make any other public statements regarding this Agreement, its terms and conditions, or the relationship of the parties without Apple's express prior written approval, which may be withheld at Apple's discretion.

# 10.     Indemnification

To the extent permitted by applicable law, You agree to indemnify and hold harmless, and upon Apple's request, defend, Apple, its directors, officers, employees, independent contractors and agents (each an "Apple Indemnified Party") from any and all claims, losses, liabilities, damages, taxes, expenses and costs, including without limitation, attorneys' fees and court costs (collectively, "Losses"), incurred by an Apple Indemnified Party and arising from or related to any of the following (but excluding for purposes of this Section, any Application for macOS that is distributed outside of the App Store and does not use any Apple Services or Certificates): (i) Your breach of any certification, covenant, obligation, representation or warranty in this Agreement, including Schedule 2 and Schedule 3 (if applicable); (ii) any claims that Your Covered Product or the distribution, sale, offer for sale, use or importation of Your Covered Product (whether alone or as an essential part of a combination), Licensed Application Information, metadata, or Pass Information violate or infringe any third party intellectual property or proprietary rights; (iii) Your breach of any of Your obligations under the EULA (as defined in Schedule 1 or Schedule 2 or Schedule 3 (if applicable)) for Your Licensed Application; (iv) Apple's permitted use, promotion or delivery of Your Licensed Application, Licensed Application Information, Safari Push Notification, Safari Extension (if applicable), Pass, Pass Information, metadata, related trademarks and logos, or images and other materials that You provide to Apple under this Agreement, including Schedule 2 or Schedule 3 (if applicable); (v) any claims, including but not limited to any end -user claims, regarding Your Covered Products, Licensed Application Information, Pass Information, or related logos, trademarks, content or images; or (vi) Your use (including Your Authorized Developers' use) of the Apple Software or services, Your Licensed Application Information, Pass Information, metadata, Your Authorized Test Units, Your Registered Devices, Your Covered Products, or Your development and distribution of any of the foregoing.

You acknowledge that neither the Apple Software nor any Services are intended for use in the development of Covered Products in which errors or inaccuracies in the content, functionality, services, data or information provided by any of the foregoing or the failure of any of the foregoing, could lead to death, personal injury, or severe physical or environmental damage, and, to the extent permitted by law, You hereby agree to indemnify, defend and hold harmless each Apple Indemnified Party from any Losses incurred by such Apple Indemnified Party by reason of any such use.

In no event may You enter into any settlement or like agreement with a third party that affects Apple's rights or binds Apple in any way, without the prior written consent of Apple.

# 11.     Term and Termination

**11.1     Term**
The Term of this Agreement shall extend until the one (1) year anniversary of the original activation date of Your Program account.  Thereafter, subject to Your payment of annual renewal fees and compliance with the terms of this Agreement, the Term will automatically renew for successive one (1) year terms, unless sooner terminated in accordance with this Agreement.

PX-2557.40

## 11.2    Termination

This Agreement and all rights and licenses granted by Apple hereunder and any services provided hereunder will terminate, effective immediately upon notice from Apple:

(a) if You or any of Your Authorized Developers fail to comply with any term of this Agreement other than those set forth below in this **Section 11.2** and fail to cure such breach within 30 days after becoming aware of or receiving notice of such breach;

(b) if You or any of Your Authorized Developers fail to comply with the terms of **Section 9 (Confidentiality)**;

(c) in the event of the circumstances described in the subsection entitled "Severability" below;

(d) if You, at any time during the Term, commence an action for patent infringement against Apple;

(e) if You become insolvent, fail to pay Your debts when due, dissolve or cease to do business, file for bankruptcy, or have filed against You a petition in bankruptcy; or

(f) if You engage, or encourage others to engage, in any misleading, fraudulent, improper, unlawful or dishonest act relating to this Agreement, including, but not limited to, misrepresenting the nature of Your submitted Application (e.g., hiding or trying to hide functionality from Apple's review, falsifying consumer reviews for Your Application, engaging in payment fraud, etc.).

Apple may also terminate this Agreement, or suspend Your rights to use the Apple Software or services, if You fail to accept any new Program Requirements or Agreement terms as described in **Section 4**. Either party may terminate this Agreement for its convenience, for any reason or no reason, effective 30 days after providing the other party with written notice of its intent to terminate.

## 11.3    Effect of Termination

Upon the termination of this Agreement for any reason, You agree to immediately cease all use of the Apple Software and services and erase and destroy all copies, full or partial, of the Apple Software and any information pertaining to the services (including Your Push Application ID) and all copies of Apple Confidential Information in Your and Your Authorized Developers' possession or control.  At Apple's request, You agree to provide written certification of such destruction to Apple.  Upon the expiration of the Delivery Period defined and set forth in Schedule 1, all Licensed Applications and Licensed Application Information in Apple's possession or control shall be deleted or destroyed within a reasonable time thereafter, excluding any archival copies maintained in accordance with Apple's standard business practices or required to be maintained by applicable law, rule or regulation. The following provisions shall survive any termination of this Agreement: Sections 1, 2.3, 2.5, 2.6, 3.1(d), 3.1(e), 3.1(f), 3.2(d), 3.2(e), 3.2(f), 3.2(g), and 3.3, the second paragraph of Section 5.1 (excluding the last two sentences other than the restrictions, which shall survive), the third paragraph of Section 5.1,  the last sentence of the first paragraph of Section 5.3 and the limitations and restrictions of Section 5.3, Section 5.4, the first sentence of and the restrictions of Section 6.6, the restrictions of Section 6.7, the second paragraph of Section 6.9, Section 7.1 (Schedule 1 for the Delivery Period), the restrictions of Section 7.3, 7.4, and 7.5, Section 7.6, Section 9 through 14 inclusive; within Attachment 1, the last sentence of Section 1.1, Section 2, Section 3.2 (but only for existing promotions), the second and third sentences of Section 4, Section 5, and Section 6; within Attachment 2, Sections 1.3, 2, 3, 4, 5, 6, and 7; within Attachment 3, Sections 1, 2 (except the second sentence of Section 2.1), 3 and 4; within Attachment 4, Sections 1.2, 1.5, 1.6, 2, 3, and 4; within Attachment 5,  Sections 2.2, 2.3, 2.4 (but only for existing promotions), 3.3, and 5; within Attachment 6, Sections 1.2, 1.3, 2, 3, and 4; and within Attachment 7, Section 1.1 and Section 1.2.  Apple will not be liable for compensation, indemnity, or damages of any sort as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement will be without prejudice to any other right or remedy Apple may have, now or in the future.

# 12.    NO WARRANTY

The Apple Software or Services may contain inaccuracies or errors that could cause failures or loss of data and it may be incomplete.  Apple and its licensors reserve the right to change,

PX-2557.41

suspend, remove, or disable access to any Services (or any part thereof) at any time without notice. In no event will Apple or its licensors be liable for the removal of or disabling of access to any such Services. Apple or its licensors may also impose limits on the use of or access to certain Services, or may remove the Services for indefinite time periods or cancel the Services at any time and in any case and without notice or liability. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, YOU EXPRESSLY ACKNOWLEDGE AND AGREE THAT USE OF THE APPLE SOFTWARE, SECURITY SOLUTION, AND ANY SERVICES IS AT YOUR SOLE RISK AND THAT THE ENTIRE RISK AS TO SATISFACTORY QUALITY, PERFORMANCE, ACCURACY AND EFFORT IS WITH YOU. THE APPLE SOFTWARE, SECURITY SOLUTION, AND ANY SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE", WITH ALL FAULTS AND WITHOUT WARRANTY OF ANY KIND, AND APPLE, APPLE'S AGENTS AND APPLE'S LICENSORS (**COLLECTIVELY REFERRED TO AS "APPLE" FOR THE PURPOSES OF SECTIONS 12 AND 13**) HEREBY DISCLAIM ALL WARRANTIES AND CONDITIONS WITH RESPECT TO THE APPLE SOFTWARE, SECURITY SOLUTION, AND SERVICES, EITHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, TIMELINESS, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS. APPLE DOES NOT WARRANT AGAINST INTERFERENCE WITH YOUR ENJOYMENT OF THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES, THAT THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES WILL MEET YOUR REQUIREMENTS, THAT THE OPERATION OF THE APPLE SOFTWARE, SECURITY SOLUTION, OR THE PROVISION OF SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE, THAT DEFECTS OR ERRORS IN THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES WILL BE CORRECTED, OR THAT THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES WILL BE COMPATIBLE WITH FUTURE APPLE PRODUCTS, SERVICES OR SOFTWARE OR ANY THIRD PARTY SOFTWARE, APPLICATIONS, OR SERVICES, OR THAT ANY INFORMATION STORED OR TRANSMITTED THROUGH ANY APPLE SOFTWARE OR SERVICES WILL NOT BE LOST, CORRUPTED OR DAMAGED. YOU ACKNOWLEDGE THAT THE APPLE SOFTWARE AND SERVICES ARE NOT INTENDED OR SUITABLE FOR USE IN SITUATIONS OR ENVIRONMENTS WHERE ERRORS, DELAYS, FAILURES OR INACCURACIES IN THE TRANSMISSION OR STORAGE OF DATA OR INFORMATION BY OR THROUGH THE APPLE SOFTWARE OR SERVICES COULD LEAD TO DEATH, PERSONAL INJURY, OR FINANCIAL, PHYSICAL, PROPERTY OR ENVIRONMENTAL DAMAGE, INCLUDING WITHOUT LIMITATION THE OPERATION OF NUCLEAR FACILITIES, AIRCRAFT NAVIGATION OR COMMUNICATION SYSTEMS, AIR TRAFFIC CONTROL, LIFE SUPPORT OR WEAPONS SYSTEMS. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY APPLE OR AN APPLE AUTHORIZED REPRESENTATIVE WILL CREATE A WARRANTY NOT EXPRESSLY STATED IN THIS AGREEMENT. SHOULD THE APPLE SOFTWARE, SECURITY SOLUTION, OR SERVICES PROVE DEFECTIVE, YOU ASSUME THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION. Location data as well as any maps data provided by any Services or software is for basic navigational purposes only and is not intended to be relied upon in situations where precise location information is needed or where erroneous, inaccurate or incomplete location data may lead to death, personal injury, property or environmental damage. Neither Apple nor any of its licensors guarantees the availability, accuracy, completeness, reliability, or timeliness of location data or anyother data or information displayed by any Services or software.

## 13.    LIMITATION OF LIABILITY

TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT WILL APPLE BE LIABLE FOR PERSONAL INJURY, OR ANY INCIDENTAL, SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES WHATSOEVER, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, LOSS OF DATA, BUSINESS INTERRUPTION OR ANY OTHER COMMERCIAL DAMAGES OR LOSSES, ARISING OUT OF OR RELATED TO THIS AGREEMENT, YOUR USE OR INABILITY TO USE THE APPLE

PX-2557.42

SOFTWARE, SECURITY SOLUTION, SERVICES, APPLE CERTIFICATES, OR YOUR DEVELOPMENT EFFORTS OR PARTICIPATION IN THE PROGRAM, HOWEVER CAUSED, WHETHER UNDER A THEORY OF CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCTS LIABILITY, OR OTHERWISE, EVEN IF APPLE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY. In no event shall Apple's total liability to You under this Agreement for all damages (other than as may be required by applicable law in cases involving personal injury) exceed the amount of fifty dollars ($50.00).

## 14. General Legal Terms

### 14.1 Third Party Notices
Portions of the Apple Software or Services may utilize or include third party software and other copyrighted material. Acknowledgements, licensing terms and disclaimers for such material are contained in the electronic documentation for the Apple Software and Services, and Your use of such material is governed by their respective terms.

### 14.2 Consent to Collection and Use of Data
### A. Pre-Release Versions of iOS, watchOS, tvOS, iPadOS, and macOS
In order to provide, test and help Apple, its partners, and third party developers improve their products and services, and unless You or Your Authorized Developers opt out in the pre-release versions of iOS, watchOS, tvOS, iPadOS, or macOS, as applicable, You acknowledge that Apple and its subsidiaries and agents will be collecting, using, storing, transmitting, processing and analyzing (collectively, "**Collecting**") diagnostic, technical, and usage logs and information from Your Authorized Test Units (that are running pre-release versions of the Apple Software and services) as part of the developer seeding process. This information will be Collected in a form that does not personally identify You or Your Authorized Developers and may be Collected from Your Authorized Test Units at any time. The information that would be Collected includes, but is not limited to, general diagnostic and usage data, various unique device identifiers, various unique system or hardware identifiers, details about hardware and operating system specifications, performance statistics, and data about how You use Your Authorized Test Unit, system and application software, and peripherals, and, if Location Services is enabled, certain location information. You agree that Apple may share such diagnostic, technical, and usage logs and information with partners and third-party developers for purposes of allowing them to improve their products and services that operate on or in connection with Apple-branded products. **By installing or using pre-release versions of iOS, watchOS, tvOS, iPadOS, or macOS on Your Authorized Test Units, You acknowledge and agree that Apple and its subsidiaries and agents have Your permission to Collect all such information and use it as set forth above in this Section.**

### B. Other Pre-Release Apple Software and Services
In order to test, provide and improve Apple's products and services, and only if You choose to install or use other pre-release Apple Software or Services provided as part of the developer seeding process or Program, You acknowledge that Apple and its subsidiaries and agents may be Collecting diagnostic, technical, usage and related information from other pre-release Apple Software and Services. Apple will notify You about the Collection of such information on the Program web portal, and You should carefully review the release notes and other information disclosed by Apple in such location prior to choosing whether or not to install or use any such pre-release Apple Software or Services. **By installing or using such pre-release Apple Software and Services, You acknowledge and agree that Apple and its subsidiaries and agents have Your permission to Collect any and all such information and use it as set forth above.**

### C. Device Deployment Services
In order to set up and use the device provisioning, account authentication, and deployment features of the Apple Software and Services, certain unique identifiers for Your computer, iOS Products, watchOS devices, tvOS devices, and account information may be needed. These

PX-2557.43

unique identifiers may include Your email address, Your Apple ID, a hardware identifier for Your computer, and device identifiers entered by You into the Apple Software or Services for such Apple-branded products.  Such identifiers may be logged in association with Your interaction with the Service and Your use of these features and the Apple Software and Services. **By using these features, You agree that Apple and its subsidiaries and agents may Collect this information for the purpose of providing the Apple Software and Services, including using such identifiers for account verification and anti-fraud measures.**  If You do not want to provide this information, do not use the provisioning, deployment or authentication features of the Apple Software or Services.

**D.     Apple Services**
In order to test, provide and improve Apple's products and services, and only if You choose to use the Services provided hereunder (and except as otherwise provided herein), You acknowledge that Apple and its subsidiaries and agents may be Collecting diagnostic, technical, usage and related information from the Apple Services.  Some of this information will be Collected in a form that does not personally identify You.  However, in some cases, Apple may need to Collect information that would personally identify You, but only if Apple has a good faith belief that such Collection is reasonably necessary to: (a) provide the Apple Services; (b) comply with legal process or request; (c) verify compliance with the terms of this Agreement; (d) prevent fraud, including investigating any potential technical issues or violations; or (e) protect the rights, property, security or safety of Apple, its developers, customers or the public as required or permitted by law.  **By installing or using such Apple Services, You acknowledge and agree that Apple and its subsidiaries and agents have Your permission to Collect any and all such information and use it as set forth in this Section.** Further, You agree that Apple may share the diagnostic, technical, and usage logs and information (excluding personally identifiable information) with partners and third-party developers for purposes of allowing them to improve their products and services that operate on or in connection with Apple-branded products.

**E.     Privacy Policy**
Data collected pursuant to this **Section 14.2** will be treated in accordance with Apple's Privacy Policy which can be viewed at http://www.apple.com/legal/privacy.

**14.3     Assignment; Relationship of the Parties**
This Agreement may not be assigned, nor may any of Your obligations under this Agreement be delegated, in whole or in part, by You by operation of law, merger, or any other means without Apple's express prior written consent and any attempted assignment without such consent will be null and void.  To submit a request for Apple's consent to assignment, please email l devprograms@apple.com, or, notwithstanding **Section 14.5**, send a written request to Developer Relations Customer Support, 1 Infinite Loop MS 301-1TEV Cupertino, CA, USA 95014.  Except for the agency appointment as specifically set forth in Schedule 1 (if applicable), this Agreement will not be construed as creating any other agency relationship, or a partnership, joint venture, fiduciary duty, or any other form of legal association between You and Apple, and You will not represent to the contrary, whether expressly, by implication, appearance or otherwise.  This Agreement is not for the benefit of any third parties.

**14.4     Independent Development**
Nothing in this Agreement will impair Apple's right to develop, acquire, license, market, promote, or distribute products or technologies that perform the same or similar functions as, or otherwise compete with, Licensed Applications, Covered Products, or any other products or technologies that You may develop, produce, market, or distribute.

**14.5     Notices**
Any notices relating to this Agreement shall be in writing, except as otherwise set forth in **Section 14.3**.  Notices will be deemed given by Apple when sent to You at the email address or mailing address You provided during the sign-up process.  Except as set forth in **Section 14.3**, all notices to Apple relating to this Agreement will be deemed given (a) when delivered personally, (b) three

PX-2557.44

business days after having been sent by commercial overnight carrier with written proof of delivery, and (c) five business days after having been sent by first class or certified mail, postage prepaid, to this Apple address: Apple Developer Program Licensing, Apple Inc., App Store Legal, One Apple Park Way, 169-4ISM, Cupertino, California, 95014 U.S.A. You consent to receive notices by email and agree that any such notices that Apple sends You electronically will satisfy any legal communication requirements. A party may change its email or mailing address by giving the other written notice as described above.

### 14.6    Severability

If a court of competent jurisdiction finds any clause of this Agreement to be unenforceable for any reason, that clause of this Agreement shall be enforced to the maximum extent permissible so as to effect the intent of the parties, and the remainder of this Agreement shall continue in full force and effect. However, if applicable law prohibits or restricts You from fully and specifically complying with, or appointing Apple and Apple Subsidiaries as Your agent under Schedule 1 or the Sections of this Agreement entitled "Internal Use License and Restrictions", "Your Obligations" or "Apple Certificates; Revocation", or prevents the enforceability of any of those Sections or Schedule 1, this Agreement will immediately terminate and You must immediately discontinue any use of the Apple Software as described in the Section entitled "Term and Termination."

### 14.7    Waiver and Construction

Failure by Apple to enforce any provision of this Agreement shall not be deemed a waiver of future enforcement of that or any other provision. Any laws or regulations that provide that the language of a contract will be construed against the drafter will not apply to this Agreement. Section headings are for convenience only and are not to be considered in construing or interpreting this Agreement.

### 14.8    Export Control

You may not use, export, re-export, import, sell, release, or transfer the Apple Software, Services, or Documentation except as authorized by United States law, the laws of the jurisdiction in which You obtained the Apple Software, and any other applicable laws and regulations. In particular, but without limitation, the Apple Software, Services, and Documentation may not be exported, or re-exported, transferred, or released (a) into any U.S. embargoed countries or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Department of Commerce's Denied Persons List or Entity List or any other restricted party lists. By using the Apple Software, Services, or Documentation, You represent and warrant that You are not located in any such country or on any such list. You also agree that You will not use the Apple Software, Services, or Documentation for any purposes prohibited by United States law, including, without limitation, the development, design, manufacture or production of nuclear, missile, chemical or biological weapons. You certify that pre-release versions of the Apple Software, Services or Documentation will only be used for development and testing purposes, and will not be rented, sold, leased, sublicensed, assigned, or otherwise transferred. Further, You certify that You will not transfer or export any product, process or service that is a direct product of such pre-release Apple Software, Services, or Documentation.

### 14.9    Government End-users

The Apple Software and Documentation are "Commercial Items", as that term is defined at 48 C.F.R. §2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation", as such terms are used in 48 C.F.R. §12.212 or 48 C.F.R. §227.7202, as applicable. Consistent with 48 C.F.R. §12.212 or 48 C.F.R. §227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end-users (a) only as Commercial Items and (b) with only those rights as are granted to all other end-users pursuant to the terms and conditions herein. Unpublished-rights reserved under the copyright laws of the United States.

### 14.10   Dispute Resolution; Governing Law

Program Agreement

PX-2557.45

Any litigation or other dispute resolution between You and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in the Northern District of California, and You and Apple hereby consent to the personal jurisdiction of and exclusive venue in the state and federal courts within that District with respect to any such litigation or dispute resolution. This Agreement will be governed by and construed in accordance with the laws of the United States and the State of California, except that body of California law concerning conflicts of law. Notwithstanding the foregoing:

(a) If You are an agency, instrumentality or department of the federal government of the United States, then this Agreement shall be governed in accordance with the laws of the United States of America, and in the absence of applicable federal law, the laws of the State of California will apply. Further, and notwithstanding anything to the contrary in this Agreement (including but not limited to **Section 10 (Indemnification)**), all claims, demands, complaints and disputes will be subject to the Contract Disputes Act (41 U.S.C. §§601-613), the Tucker Act (28 U.S.C. § 1346(a) and § 1491), or the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 24012402, 2671-2672, 2674-2680), as applicable, or other applicable governing authority. For the avoidance of doubt, if You are an agency, instrumentality, or department of the federal, state or local government of the U.S. or a U.S. public and accredited educational institution, then Your indemnification obligations are only applicable to the extent they would not cause You to violate any applicable law (e.g., the Anti-Deficiency Act), and You have any legally required authorization or authorizing statute;
(b) If You (as an entity entering into this Agreement) are a U.S. public and accredited educational institution or an agency, instrumentality, or department of a state or local government within the United States, then (a) this Agreement will be governed and construed in accordance with the laws of the state (within the U.S.) in which Your entity is domiciled, except that body of state law concerning conflicts of law; and (b) any litigation or other dispute resolution between You and Apple arising out of or relating to this Agreement, the Apple Software, or Your relationship with Apple will take place in federal court within the Northern District of California, and You and Apple hereby consent to the personal jurisdiction of and exclusive venue of such District unless such consent is expressly prohibited by the laws of the state in which Your entity is domiciled; and
(c) If You are an international, intergovernmental organization that has been conferred immunity from the jurisdiction of national courts through Your intergovernmental charter or agreement, then any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be determined by arbitration administered by the International Centre for Dispute Resolution in accordance with its International Arbitration Rules. The place of arbitration shall be London, England; the language shall be English; and the number of arbitrators shall be three. Upon Apple's request, You agree to provide evidence of Your status as an intergovernmental organization with such privileges and immunities.

This Agreement shall not be governed by the United Nations Convention on Contracts for the International Sale of Goods, the application of which is expressly excluded.

**14.11   Entire Agreement; Governing Language**
This Agreement constitutes the entire agreement between the parties with respect to the use of the Apple Software, Apple Services and Apple Certificates licensed hereunder and, except as otherwise set forth herein, supersedes all prior understandings and agreements regarding its subject matter. Notwithstanding the foregoing, to the extent that You are provided with pre release materials under the Program and such prerelease materials are subject to a separate license agreement, You agree that the license agreement accompanying such materials in addition to **Section 9 (Confidentiality)** of this Agreement shall also govern Your use of such materials. If You have entered or later enter into the Xcode and Apple SDKs Agreement, this Apple Developer Program License Agreement will govern in the event of any inconsistencies between the two with respect to the same subject matter; provided, however, that this Apple Developer Program License Agreement is not intended to prevent You from exercising any rights granted to You in the Xcode and Apple SDKs Agreement in accordance with the terms and conditions set forth therein. This Agreement may be modified only: (a) by a written amendment signed by both parties, or (b) to the extent expressly permitted by this Agreement (for example,

PX-2557.46

by Apple by written or email notice to You).  Any translation is provided as a courtesy to You, and in the event of a dispute between the English and any non-English version, the English version of this Agreement shall govern, to the extent not prohibited by local law in Your jurisdiction.  If You are located in the province of Quebec, Canada or are a government organization within France, then the following clause applies to You:  The parties hereby confirm that they have requested that this Agreement and all related documents be drafted in English. *Les parties ont exigé que le présent contrat et tous les documents connexes soient rédigés en anglais.*

# Attachment 1
## (to the Agreement)
## Additional Terms for Apple Push Notification Service and Local Notifications

The following terms are in addition to the terms of the Agreement and apply to any use of the APN (Apple Push Notification Service):

## 1.      Use of the APN and Local Notifications

**1.1**      You may use the APN only in Your Applications, Your Passes, and/or in sending Safari Push Notifications to the macOS desktop of users of Your Site who have opted in to receive Notifications through Safari on macOS.  You, Your Application and/or Your Pass m ay access the APN only via the APN API and only if You have been assigned a Push Application ID by Apple. Except for a Service Provider who is assisting You with using the APN You agree not to share Your Push Application ID with any third party.  You und erstand that You will not be permitted to access or use the APN after expiration or termination of Your Agreement.

**1.2**      You are permitted to use the APN and the APN APIs only for the purpose of sending Push Notifications to Your Application, Your Pass,  and/or to the macOS desktop of users of Your Site who have opted in to receive Notifications through Safari on macOS as expressly permitted by the Agreement, the APN Documentation and all applicable laws and regulations (including all intellectual property laws).  You further agree that You must disclose to Apple any use of the APN as part of the submission process for Your Application.

**1.3**      You understand that before You send an end -user any Push Notifications through the APN, the end-user must consent to receive such Notifications.  You agree not to disable, override or otherwise interfere with any Apple-implemented consent panels or any Apple system preferences for enabling or disabling Notification functionality.  If the end-user's consent to receive Push Notifications is denied or later withdrawn, You may not send the end-user Push Notifications.

## 2.      Additional Requirements

**2.1**      You may not use the APN or Local Notifications for the purpose of sending unsolicited messages to end-users or for the purpose of phishing or spamming, including, but not limited to, engaging in any types of activities that violate anti-spamming laws and regulations, or that are otherwise improper, inappropriate or illegal.  The APN and Local Notifications should be used for sending relevant messages to a user that provide a benefit(e.g., a response to an end -user request for information, provision of pertinent information relevant to the Application).

**2.2**      You may not use the APN or Local Notifications for the purposes of  advertising, product promotion, or direct marketing of any kind (e.g., upselling, cross-selling, etc.), including, but not limited to, sending any messages to promote the use of Your Application oradvertise the availability of new features or versions. Notwithstanding the foregoing, You may use the APN or Local Notifications for promotional purposes in connection with Your Pass so long as such use is directly related to the Pass, e.g., a store coupon may be sent to Your Pass in Wallet.

**2.3**      You may not excessively use the overall network capacity or bandwidth of the APN, or unduly burden an iOS Product, Apple Watch, macOS or an end-user with excessive Push Notifications or Local Notifications, as ma y be determined by Apple in its reasonable discretion. In addition, You agree not to harm or interfere with Apple's networks or servers, or any third party servers or networks connected to the APN, or otherwise disrupt other developer's use of the APN.

**2.4**      You may not use the APN or Local Notifications to send material that contains any obscene, pornographic, offensive or defamatory content or materials of any kind (text, graphics,

PX-2557.48

images, photographs, sounds, etc.), or other content or materials that in Apple's reasonable judgment may be found objectionable by the end-user of Your Application, Pass or Site.

**2.5**    You may not transmit, store or otherwise make available any material that contains viruses or any other computer code, files or programs that may harm, disrupt or limit the normal operation of the APN or an iOS Product, Apple Watch, or macOS, and You agree not to disable, spoof, hack or otherwise interfere with any security, digital signing, verification or authentication mechanisms that are incorporated in or used by the APN, or enable others to do so.

**3.    Additional Terms for Website Push IDs**

**3.1**    Subject to the terms of this Agreement, You understand and agree that Safari Push Notifications that You send using Your Website Push ID must be sent under Your own name, trademark or brand (e.g., a user should know that the communication is coming from Your Site) and must include an icon, trademark, logo or other identifying mark for Your Site. You agree not to misrepresent or impersonate another Site or entity or otherwise mislead users about the originator of the Safari Push Notification.  To the extent that You reference a third party's trademark or brand within Your Safari Push Notification, You represent and warrant that You have any necessary rights.

**3.2**    By enabling the APN and sending Safari Push Notifications for Your Site as permitted in this Agreement, You hereby permit Apple to use (i) screen shots of Your Safari Push Notifications on macOS; and (ii) trademarks and logos associated with such Notifications, for promotional purposes in Apple's marketing materials, excluding those portions which You do not have the right to use for promotional purposes and which You identify in writing to Apple.  You also permit Apple to use images and other materials that You may provide to Apple, at Apple's reasonable request, for promotional purposes in marketing materials.

**4.    Delivery by the APN or via Local Notifications**.  You understand and agree that in order to provide the APN and make Your Push Notifications available on iOS Products, Apple Watch, or macOS, Apple may transmit Your Push Notifications across various public networks, in various media, and modify or change Your Push Notifications to comply with the technical and other requirements for connecting to networks or devices.  You acknowledge and agree that the APN is not, and is not intended to be a, guaranteed or secure delivery service, and You shall not use or rely upon it as such.  Further, as a condition to using the APN or delivering Local Notifications, You agree not to transmit sensitive personal or confidential information belonging to an individual (e.g., a social security number, financial account or transactional information, or any information where the individual may have a reasonable expectation of secure transmission) as part of any such Notification, and You agree to comply with any applicable notice or consent requirements with respect to any collection, transmission, maintenance, processing or use of an end-user's personal information.

**5.    Your Acknowledgements.**  You acknowledge and agree that:

**5.1**    Apple may at any time, and from time to time, with or without prior notice to You (a) modify the APN, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish the APN APIs.  You understand that any such modifications may require You to change or update Your Applications, Passes or Sites at Your own cost.  Apple has no express or implied obligation to provide, or continue to provide, the APN and may suspend or discontinue all or any portion of the APN at any time.  Apple shall not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any such service suspension or discontinuation or any such modification of the APN or APN APIs.

**5.2**    The APN is not available in all languages or in all countries and Apple makes no representation that the APN is appropriate or available for use in any particular location.  To the

PX-2557.49

extent You choose to access and use the APN, You do so at Your own initiative and are responsible for compliance with any applicable laws, including but not limited to any local laws.

**5.3**      Apple provides the APN to You for Your use with Your Application, Pass, or Site, and does not provide the APN directly to any end-user.  You acknowledge and agree that any Push Notifications are sent by You, not Apple, to the end -user of Your Application, Pass or Site, and You are solely liable and responsible for any data or content transmitted therein  and for any such use of the APN.  Further, You acknowledge and agree that any Local Notifications are sent by You, not Apple, to the end-user of Your Application, and You are solely liable and responsible for any data or content transmitted therein.

**5.4**      Apple makes no guarantees to You in relation to the availability or uptime of the APN and is not obligated to provide any maintenance, technical or other support for the APN.

**5.5**      Apple reserves the right to remove Your access to the APN, limit Your use of the APN, or revoke Your Push Application ID at any time in its sole discretion.

**5.6**      Apple may monitor and collect information (including but not limited t o technical and diagnostic information) about Your usage of the APN to aid Apple in improving the APN and other Apple products or services and to verify Your compliance with this Agreement; provided however that Apple will not access or disclose the content of any Push Notification unless Apple has a good faith belief that such access or disclosure is reasonably necessary to: (a) comply with legal process or request; (b) enforce the terms of this Agreement, including investigation of any potential violation hereof; (c) detect, prevent or otherwise address security, fraud or technical issues; or (d) protect the rights, property or safety of Apple, its developers, customers or the public as required or permitted by law. Notwithstanding the foregoing, You acknowledge and agree that iOS, iPadOS, macOS, and watchOS may access Push Notifications locally on a user's device solely for the purposes of responding to user requests and personalizing user experience and suggestions on device.

**6.      Additional Liability Disclaimer.**  APPLE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY USE OF THE APN, INCLUDING ANY INTERRUPTIONS TO THE APN OR ANY USE OF NOTIFICATIONS, INCLUDING, BUT NOT LIMITED TO, ANY POWER OUTAGES, SYSTEM FAILURES, NETWORK ATTACKS, SCHEDULED  OR UNSCHEDULED MAINTENANCE, OR OTHER INTERRUPTIONS.

PX-2557.50

**Attachment 2**
(to the Agreement)
**Additional Terms for Use of the In-App Purchase API**

The following terms are in addition to the terms of the Agreement and apply to any use of the In-App Purchase API in Your Application:

**1.      Use of the In-App Purchase API**

**1.1**      You may use the In-App Purchase API only to enable end-users to access or receive content, functionality, or services that You make available for use within Your Application (e.g., digital books, additional game levels, access to a turn-by-turn map service).  You may not use the In-App Purchase API to offer goods or services to be used outside of Your Application.

**1.2**      You must submit to Apple for review and approval all content, functionality, or services that You plan to provide through the use of the In-App Purchase API in accordance with these terms and the processes set forth in **Section 6 (Application Submission and Selection)** of the Agreement.  For all submissions, You must provide the name, text description, price, unique identifier number, and other information that Apple reasonably requests (collectively, the "**Submission Description**").  Apple reserves the right to review the actual content, functionality or service that has been described in the Submission Descriptions at any time, including, but not limited to, in the submission process and after approval of the Submission Description by Apple. If You would like to provide additional content, functionality or services through the In-App Purchase API that are not described in Your Submission Description, then You must first submit a new or updated Submission Description for review and approval by Apple prior to making such items available through the use of the In-App Purchase API.  Apple reserves the right to withdraw its approval of content, functionality, or services previously approved, and You agree to stop making any such content, functionality, or services available for use within Your Application.

**1.3**      All content, functionality, and services offered through the In-App Purchase API are subject to the Program Requirements for Applications, and after such content, services or functionality are added to a Licensed Application, they will be deemed part of the Licensed Application and will be subject to all the same obligations and requirements.  For clarity, Applications that provide keyboard extension functionality may not use the In-App Purchase API within the keyboard extension itself; however, they may continue to use the In-App Purchase API in separate areas of the Application.

**2.      Additional Restrictions**

**2.1**      You may not use the In-App Purchase API to enable an end-user to set up a pre-paid account to be used for subsequent purchases of content, functionality, or services, or otherwise create balances or credits that end-users can redeem or use to make purchases at a later time.

**2.2**      You may not enable end-users to purchase Currency of any kind through the In-App Purchase API, including but not limited to any Currency for exchange, gifting, redemption, transfer, trading or use in purchasing or obtaining anything within or outside of Your Application. "Currency" means any form of currency, points, credits, resources, content or other items or units recognized by a group of individuals or entities as representing a particular value and that can be transferred or circulated as a medium of exchange.

**2.3**      Content and services may be offered through the In-App Purchase API on a subscription basis (e.g., subscriptions to newspapers and magazines).  Rentals of content, services or functionality through the In-App Purchase API are not allowed (e.g., use of particular content may not be restricted to a pre-determined, limited period of time).

Program Agreement

PX-2557.51

**2.4**     You may not use the In-App Purchase API to send any software updates to Your Application or otherwise add any additional executable code to Your Application.  An In-App Purchase item must either already exist in Your Application waiting to be unlocked, be streamed to Your Application after the In-App Purchase API transaction has been completed, or be downloaded to Your Application solely as data after such transaction has been completed.

**2.5**     You may not use the In-App Purchase API to deliver any items that contain content or materials of any kind (text, graphics, images, photographs, sounds, etc.) that in Apple's reasonable judgment may be found objectionable or inappropriate, for example, materials that may be considered obscene, pornographic, or defamatory.

**2.6**     With the exception of items of content that an end-user consumes or uses up within Your Application (e.g., virtual supplies such as construction materials) (a "Consumable"), any other content, functionality, services or subscriptions delivered through the use of the In-App Purchase API (e.g., a sword for a game) (a "Non-Consumable") must be made available to end-users in accordance with the same usage rules as Licensed Applications (e.g., any such content, services or functionality must be available to all of the devices associated with an end-user's account). You will be responsible for identifying Consumable items to Apple and for disclosing to end-users that Consumables will not be available for use on other devices.

### 3.     Your Responsibilities

**3.1**     For each successfully completed transaction made using the In-App Purchase API, Apple will provide You with a transaction receipt.  It is Your responsibility to verify the validity of such receipt prior to the delivery of any content, functionality, or services to an end-user and Apple will not be liable for Your failure to verify that any such transaction receipt came from Apple.

**3.2**     Unless Apple provides You with user interface elements, You are responsible for developing the user interface Your Application will display to end-users for orders made through the In-App Purchase API.  You agree not to misrepresent, falsely claim, mislead  or engage in any unfair or deceptive acts or practices regarding the promotion and sale of items through Your use of the In-App Purchase API, including, but not limited to, in the Licensed Application Information and any metadata that You submit through App Store Connect.  You agree to comply with all applicable laws and regulations, including those in any jurisdictions in which You make content, functionality, services or subscriptions available through the use of the In-App Purchase API, including but not limited to consumer laws and export regulations.

**3.3**     Apple may provide hosting services for Non-Consumables that You would like to provide to Your end-users through the use of the In-App Purchase API.  Even if Apple hosts such Non-Consumables on Your behalf, You are responsible for providing items ordered through the In-App Purchase API in a timely manner (i.e., promptly after Apple issues the transaction receipt, except in cases where You have disclosed to Your end-user that the item will be made available at a later time) and for complying with all applicable laws in connection therewith, including but not limited to, laws, rules and regulations related to cancellation or delivery of ordered items.  You are responsible for maintaining Your own records for all such transactions.

**3.4**     You will not issue any refunds to end-users of Your Application, and You agree that Apple may issue refunds to end-users in accordance with the terms of Schedule 2.

### 4.     Apple Services

**4.1**     From time to time, Apple may choose to offer additional services and functionality relating to In-App Purchase API transactions.  Apple makes no guarantees that the In-App Purchase API or any Services will continue to be made available to You or that they will meet Your requirements, be uninterrupted, timely, secure or free from error, that any information that You

PX-2557.52

obtain from the In-App Purchase API or any Services will be accurate or reliable or that any defects will be corrected.

**4.2**      You understand that You will not be permitted to acce ss or use the In-App Purchase API after expiration or termination of Your Agreement.

**5.      Your Acknowledgements.**  You acknowledge and agree that:
Apple may at any time, and from time to time, with or without prior notice to You (a) modify the In -App Purchase API, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish the In-App Purchase API.  You understand that any such modifications may require You to change or update Your Applications at Your own cost  in order to continue to use the In-App Purchase API.  Apple has no express or implied obligation to provide, or continue to provide, the In-App Purchase API or any services related thereto and may suspend or discontinue all or any portion of thereof at anytime.  Apple shall not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any suspension, discontinuation or modification of the In-App Purchase API or any services related thereto. Apple makes no guarantees to You in relation to the availability or uptime of the In -App Purchase API or any other services that Apple may provide to You in connection therewith, and Apple is not obligated to provide any maintenance, technical or other sup port related thereto. Apple provides the In-App Purchase API to You for Your use with Your Application, and may provide services to You in connection therewith (e.g., hosting services for Non-Consumable items).  Apple is not responsible for providing or unlocking any content, functionality, services or subscriptions that an end-user orders through Your use of the In-App Purchase API.  You acknowledge and agree that any such items are made available by You, not Apple, to the end user of Your Application, and You are solely liable and responsible for such items ordered through the use of the In-App Purchase API and for any such use of the In -App Purchase API in Your Application or for any use of services in connection therewith.

**6.      Use of Digital Certificates for In-App Purchase** .  When an end-user completes a transaction using the In-App Purchase API in Your Application, Apple will provide You with a transaction receipt signed with an Apple Certificate.  It is Your responsibility to verify that such certificate and receipt were issued by Apple, as set forth in the Documentation.  You are solely responsible for Your decision to rely on any such certificates and receipts.  YOUR USE OF OR RELIANCE ON SUCH CERTIFICATES AND RECEIPTS IN CONNECTION WITH THE IN -APP PURCHASE API IS AT YOUR SOLE RISK.  APPLE MAKES NO WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, ACCURACY, RELIABILITY, SECURITY, OR NON - INFRINGEMENT OF THIRD PARTY RIGHTS WITH RESPECT TO SUCH APPLE CERTIFICATES AND RECEIPTS.  You agree that You will only use such receipts and certificates in accordance with the Documentation, and that You will not interfere or tamper with the normal operation of such digital certificates or receipts, including but not limited to any falsification or other misuse.

**7.      Additional Liability Disclaimer** .  APPLE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM THE USE OF THE IN-APP PURCHASE API AND ANY SERVICES, INCLUDING, BUT NOT LIMITED TO, (I) ANY LOSS OF PROFIT (WHETHER INCURRED DIRECTLY OR INDIRECTLY), ANY LOSS OF GOODWILL OR BUSINESS REPUTATION, ANY LOSS OF DATA SUFFERED, OR OTHER INTANGIBLE LOSS, (II) ANY CHANGES WHICH APPLE MAY MAKE TO THE IN -APP PURCHASE API OR ANY SERVICES, OR FOR ANY PERMANENT OR TEMPORARY CESSATION IN THE PROVISION OF THE IN - APP PURCHASE API OR ANY SERVICES (OR ANY FEATURES WITHIN THE SERVICES) PROVIDED THEREWITH, OR (III) THE DELETION OF, CORRUPTION OF, OR FAILURE TO PROVIDE ANY DATA TRANSMITTED BY OR THROUGH YOUR USE OF THE IN -APP PURCHASE API OR SERVICES.  It is Your responsibility to maintain appropriate alternate backup of all Your information and data, including but not limited to any Non-Consumables that You may provide to Apple for hos ting services.

PX-2557.53

**Attachment 3**
(to the Agreement)
**Additional Terms for the Game Center**

The following terms are in addition to the terms of the Agreement and apply to any use of the Game Center service by You or Your Application.

**1.      Use of the Game Center service**

**1.1**      You and Your Application may not connect to or use the Game Center service in any way not expressly authorized by Apple.  You agree to only use the Game Center service in accordance with this Agreement (including this Attachment 3), the Game Center Documentation and in accordance with all applicable laws.  You understand that neither You nor Your Application will be permitted to access or use the Game Center service after expiration or termination of Your Agreement.

**1.2**      Apple may provide You with a unique identifier wh ich is associated with an end-user's alias as part of the Game Center service (the "Player ID").  You agree to not display the Player ID to the end-user or to any third party, and You agree to only use the Player ID for differentiation of end-users in connection with Your use of the Game Center.  You agree not to reverse lookup, trace, relate, associate, mine, harvest, or otherwise exploit the Player ID, aliases or other data or information provided by the Game Center service, except to the extent expressly permitted herein.  For example, You will not attempt to determine the real identity of an end-user.

**1.3**      You will only use information provided by the Game Center service as necessary for providing services and functionality for Your Applications.  For example, You will not host or export any such information to a third party service.  Further, You agree not to transfer or copy any user information or data (whether individually or in the aggregate) obtained through the Game Center service to a third party except as necessary for providing services and functionality for Your Applications, and then only with express user consent and only if not otherwise prohibited in this Agreement.

**1.4**      You will not attempt to gain (or enable others to gain) unauthorize d use or access to the Game Center service (or any part thereof) in any way, including but not limited to obtaining information from the Game Center service using any method not expressly permitted by Apple. For example, You may not use packet sniffers to  intercept any communications protocols from systems or networks connected to the Game Center, scrape any data or user information from the Game Center, or use any third party software to collect information through the Game Center about players, game data, accounts, or service usage patterns.

**2.      Additional Restrictions**

**2.1**      You agree not to harm or interfere with Apple's networks or servers, or any third party servers or networks connected to the Game Center service, or otherwise disrupt other developers' or end-users' use of the Game Center.  You agree that, except for testing and development purposes, You will not create false accounts through the use of the Game Center service or otherwise use the Game Center service to misrepresent information about You or Your Application in a way that would interfere with an end -users' use of the Game Center service, e.g., creating inflated high scores through the use of cheat codes or falsifying the number of user accounts for Your Application.

**2.2**      You will not institute, assist, or enable any disruptions of the Game Center, such as through a denial of service attack, through the use of an automated process or service such as a spider, script, or bot, or through exploiting any bug in the Game Center service or App le Software. You agree not to probe, test or scan for vulnerabilities in the Game Center service.  You further

PX-2557.54

agree not to disable, spoof, hack, undermine or otherwise interfere with any data protection, security, verification or authentication mechanisms that are incorporated in or used by the Game Center service, or enable others to do so.

2.3     You will not transmit, store or otherwise make available any material that contains viruses or any other computer code, files or programs that may harm, disrupt or limit the normal operation of the Game Center or an iOS Product.

2.4     You agree not to use any portion of the Game Center service for sending any unsolicited, improper or inappropriate messages to end-users or for the purpose of poaching, phishing or spamming of Game Center users.  You will not reroute (or attempt to reroute) users of the Game Center to another service using any information You obtain through the use of the Game Center service.

2.5     You shall not charge any fees to end-users for access to the Game Center service or for any data or information provided therein.

2.6     To the extent that Apple permits You to manage certain Game Center features and functionality for Your Application through App Store Connect (e.g., the ability to block fraudulent users or eliminate suspicious leaderboard scores from Your Application's leaderboard), You agree to use such methods only when You have a reasonable belief that such users or scores are the result of misleading, fraudulent, improper, unlawful or dishonest acts.

3.     **Your Acknowledgements.**  You acknowledge and agree that:

3.1     Apple may at any time, and from time to time, with or without prior notice to You (a) modify the Game Center service, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish the Game Center APIs or related APIs.  You understand that any such modifications may require You to change or update Your Applications at Your own cost.  Apple has no express or implied obligation to provide, or continue to provide, the Game Center service and may suspend or discontinue all or any portion of the Game Center service at any time.  Apple shall not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any such service suspension or discontinuation or any such modification of the Game Center service or Game Center APIs.

3.2     Apple makes no guarantees to You in relation to the availability or uptime of the Game Center service and is not obligated to provide any maintenance, technical or other support for such service.  Apple reserves the right to remove Your access to the Game Center service at any time in its sole discretion.  Apple may monitor and collect information (including but not limited to technical and diagnostic information) about Your usage of the Game Center service to aid Apple in improving the Game Center and other Apple products or services and to verify Your compliance with this Agreement.

4.     **Additional Liability Disclaimer.**  APPLE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY INTERRUPTIONS TO THE GAME CENTER OR ANY SYSTEM FAILURES, NETWORK ATTACKS, SCHEDULED OR UNSCHEDULED MAINTENANCE, OR OTHER INTERRUPTIONS.

PX-2557.55

**Attachment 4**
**(to the Agreement)**
**Additional Terms for the use of iCloud**

The following terms are in addition to the terms of the Agreement and apply to Your use of the iCloud service for software development and testing in connection with Your Application, or Web Software.

**1.      Use of iCloud**

**1.1**      Your Applications and/or Web Software may access the iCloud service only if You have been assigned an entitlement by Apple.  You agree not to access the iCloud service, or any content, data or information contained therein, other than through the iCloud Storage APIs, CloudKit APIs or via the CloudKit dashboard provided as part of the Program.  You agree not to share Your entitlement with any third party or use it for any purposes not expressly permitted by Apple.  You agree to use the iCloud service, the iCloud Storage APIs, and the CloudKit APIs only as expressly permitted by this Agreement and the iCloud Documentation, and in accordance with all applicable laws and regulations.  Further, Your Web Software is permitted to access and use the iCloud service (e.g., to store the same type of data that is retrieved or updated in a Licensed Application) only so long as Your use of the iCloud service in such Web Software is comparable to Your use in the corresponding Licensed Application, as determined in Apple's sole discretion.  In the event Apple Services permit You to use more than Your allotment of storage containers in iCloud in order to transfer data to another container for any reason, You agree to only use such additional container(s) for a reasonable limited time to perform such functions and not to increase storage and transactional allotments.

**1.2**      You understand that You will not be permitted to access or use the iCloud service for software development or testing after expiration or termination of Your Agreement; however end-users who have Your Applications or Web Software installed and who have a valid end-user account with Apple to use iCloud may continue to access their user-generated documents, private containers and files that You have chosen to store in such end-user's account via the iCloud Storage APIs or the CloudKit APIs in accordance with the applicable iCloud terms and conditions and these terms.  You agree not to interfere with an enduser's ability to access iCloud (or the end-user's own user-generated documents, private containers and files) or to otherwise disrupt their use of iCloud in any way and at any time.  With respect to data You store in public containers through the CloudKit APIs (whether generated by You or the end-user), Apple reserves the right to suspend access to or delete such data, in whole or in part, upon expiration or termination of Your Agreement, or as otherwise specified by Apple in the CloudKit dashboard.

**1.3**      Your Application is permitted to use the iCloud Storage APIs only for the purpose of storage and retrieval of key value data (e.g., a list of stocks in a finance App, settings for an App) for Your Applications and Web Software and for purposes of enabling Your end-users to access user-generated documents and files through the iCloud service.  Your Application or Web Software application is permitted to use the CloudKit APIs for storing, retrieving, and querying of structured data that You choose to store in public or private containers in accordance with the iCloud Documentation.  You agree not to knowingly store any content or materials via the iCloud Storage APIs or CloudKit APIs that would cause Your Application to violate any of the iCloud terms and conditions or the Program Requirements for Your Applications (e.g., Your Application may not store illegal or infringing materials).

**1.4**      You may allow a user to access their user-generated documents and files from iCloud through the use of Your Applications as well as from Web Software.  However, You may not share key value data from Your Application with other Applications or Web Software, unless You are sharing such data among different versions of the same title, or You have user consent.

**1.5**     You are responsible for any content and materials that You store in iCloud through the use of the CloudKit APIs and iCloud Storage APIs and must take reasonable and appropriate steps to protect information You store through the iCloud service.  With respect to third party claims related to content and materials stored by Your end-users in Your Applications through the use of the iCloud Storage APIs or CloudKit APIs (e.g., user-generated documents, end-user posts in public containers), You agree to be responsible for properly handling and promptly processing any such claims, including but not limited to Your compliance with notices sent pursuant to the Digital Millennium Copyright Act (DMCA).

**1.6**     Unless otherwise expressly permitted by Apple in writing, You will not use iCloud, the iCloud Storage APIs, CloudKit APIs, or any component or function thereof, to create, receive, maintain or transmit any sensitive, individually-identifiable health information, including "protected health information" (as such term is defined at 45 C.F.R §160.103), or use iCloud in any manner that would make Apple (or any Apple Subsidiary) Your or any third party's "business associate" as such term is defined at 45 C.F.R. §160.103.  You agree to be solely responsible for complying with any reporting requirements under law or contract arising from Your breach of this Section.

**2.     Additional Requirements**

**2.1**     You understand there are storage capacity, transmission, and transactional limits for the iCloud service, both for You as a developer and for Your end-users.  If You reach or Your end-user reaches such limits, then You or Your end-user may be unable to use the iCloud service until You or Your end-user have removed enough data from the service to meet the capacity limits, increased storage capacity or otherwise modified Your usage of iCloud, and You or Your end-user may be unable to access or retrieve data from iCloud during this time.

**2.2**     You may not charge any fees to users for access to or use of the iCloud service through Your Applications or Web Software, and You agree not to sell access to the iCloud service in any other way, including but not limited to reselling any part of the service.  You will only use the iCloud service in Your Application or Web Software to provide storage for an end-user who has a valid end-user iCloud account with Apple and only for use in accordance with the terms of such user account, except that You may use the CloudKit APIs to store of data in public containers for access by end-users regardless of whether such users have iCloud accounts.  You will not induce any end-user to violate the terms of their applicable iCloud service agreement with Apple or to violate any Apple usage policies for data or information stored in the iCloud service.

**2.3**     You may not excessively use the overall network capacity or bandwidth of the iCloud service or otherwise burden such service with unreasonable data loads or queries.  You agree not to harm or interfere with Apple's networks or servers, or any third party servers or networks connected to the iCloud, or otherwise disrupt other developers' or users' use of the iCloud service.

**2.4**     You will not disable or interfere with any warnings, system settings, notices, or notifications that are presented to an end-user of the iCloud service by Apple.

**3.     Your Acknowledgements**

You acknowledge and agree that:

**3.1**     Apple may at any time, with or without prior notice to You (a) modify the iCloud Storage APIs or the CloudKit APIs, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish such APIs.  You understand that any such modifications may require You to change or update Your Applications or Web Software at Your own cost. Apple has no express or implied obligation to provide , or continue to provide, the iCloud service and may suspend or discontinue all or any portion of the iCloud service at any time.  Apple shall

Program Agreement

PX-2557.57

not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any such service suspension or discontinuation or any such modification of the iCloud service, iCloud Storage APIs or the CloudKit APIs.

**3.2**     The iCloud service is not available in all languages or in all countries and Apple makes no representation that the iCloud service is appropriate or available for use in any particular location.  To the extent You choose to provide access to the iCloud service in Your Applications or Web Software through the iCloud Storage APIs or CloudKit APIs (e.g., to store data in a public or private container), You do so at Your own initiative and are responsible for compliance with any applicable laws or regulations.

**3.3**     Apple makes no guarantees to You in relation to the availability or uptime of the iCloud service and is not obligated to provide any maintenance, technical or other support for the iCloud service.  Apple is not responsible for any expenditures, investments, or commitments made by You in connection with the iCloud service, or for any use of or access to the iCloud service.

**3.4**     Apple reserves the right to suspend or revoke Your access to the iCloud service or impose limits on Your use of the iCloud service at any time in Apple's sole discretion.  In addition, Apple may impose or adjust the limit of transactions Your Applications or Web Software may send or receive through the iCloud service or the resources or capacity that they may use at any time in Apple's sole discretion.

**3.5**     Apple may monitor and collect information (including but not limited to technical and diagnostic information) about usage of the iCloud service through the iCloud Storage APIs, CloudKit APIs, or CloudKit dashboard, in order to aid Apple in improving the iCloud service and other Apple products or services; provided however that Apple will not access or disclose any end-user data stored in a private container through CloudKit, any Application data stored in a public container through CloudKit, or any user-generated documents, files or key value data stored using the iCloud Storage APIs and iCloud service, unless Apple has a good faith belief that such access, use, preservation or disclosure is reasonably necessary to comply with a legal or regulatory process or request, or unless otherwise requested by an end-user with respect to data stored via the iCloud Storage APIs in that end-user's iCloud account or in that end-user's private container via the CloudKit APIs.

**3.6**     Further, to the extent that You store any personal information  relating to an individual or any information from which an individual can be identified (collectively, "Personal Data") in the iCloud service through the use of the iCloud Storage APIs or CloudKit APIs, You agree that Apple (and any applicable Apple Subsidiary for purposes of this Section 3.6) will act as Your agent for the processing, storage and handling of any such Personal Data. Apple agrees to ensure that any persons authorized to process such Personal Data have agreed to maintain confidentiality (whether through terms or under an appropriate statutory obligation). Apple shall have no right, title or interest in such Personal Data solely as a result of Your use of the iCloud service. You agree that You are solely liable and responsible for ensuring Your compliance with all applicable laws, including privacy and data protection laws, regarding the use or collection of data and information through the iCloud service. You are also responsible for all activity related to such Personal Data, including but not limited to, monitoring such data and activity, preventing and addressing inappropriate data and activity, and removing and terminating access to data. Further, You are responsible for safeguarding and limiting access to such Personal Data by Your personnel and for the actions of Your personnel who are permitted access to use the iCloud service on Your behalf. Personal Data provided by You and Your users to Apple through the iCloud service may be used by Apple only as necessary to provide and improve the iCloud service and to perform the following actions on Your behalf.  Apple shall:

(a) use and handle such Personal Data only in accordance with the instructions and permissions from You set forth herein, as well as applicable laws, regulations, accords, or treaties. In the EEA

PX-2557.58

and Switzerland, Personal Data will be handled by Apple only in accordance with the instructions and permissions from You set forth herein unless otherwise required by European Union or Member State Law, in which case Apple will notify You of such other legal requirement (except in limited cases where Apple is prohibited by law from doing so);

(b) provide You with reasonable means to manage any user access, deletion, or restriction requests as defined in applicable law. In the event of an investigation of You arising from Your good faith use of the iCloud service by a data protection regulator or similar authority regarding such Personal Data, Apple shall provide You with reasonable assistance and support;

(c) notify You by any reasonable means Apple selects, without undue delay and taking account of applicable legal requirements applying to You which mandate notification within a specific timeframe, if Apple becomes aware that Your Personal Data has been altered, deleted or lost as a result of any unauthorized access to the Service. You are responsible for providing Apple with Your updated contact information for such notification purposes in accordance with the terms of this Agreement;

(d) make available to You the information necessary to demonstrate compliance obligations set forth in Article 28 of Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 (GDPR) and to allow for and contribute to audits required under these provisions; provided however that You agree that Apple's ISO 27001 and 27018 certifications shall be considered sufficient for such required audit purposes;

(e) assist You, by any reasonable means Apple selects, in ensuring compliance with its obligations pursuant to Articles 33 to 36 of the GDPR. If Apple receives a third party request for information You have stored in the iCloud service, then unless otherwise required by law or the terms of such request, Apple will notify You of its receipt of the request and notify the requester of the requirement to address such request to You. Unless otherwise required by law or the request, You will be responsible for responding to the request;

(f) use industry-standard measures to safeguard Personal Data during the transfer, processing and storage of Personal Data. Encrypted Personal Data may be stored at Apple's geographic discretion; and

(g) ensure that where Personal Data, arising in the context of this Agreement, is transferred from the EEA or Switzerland it is only to a third country that ensures an adequate level of protection or using the Model Contract Clauses/Swiss Transborder Data Flow Agreement which will be provided to You upon request if you believe that Personal Data is being transferred.

**4.     Additional Liability Disclaimer**.  NEITHER APPLE NOR ITS SERVICE PROVIDERS SHALL BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY USE, MISUSE, RELIANCE ON, INABILITY TO USE, INTERRUPTION, SUSPENSION OR TERMINATION OF iCLOUD, iCLOUD STORAGE APIS, OR CLOUDKIT APIS, OR FOR ANY UNAUTHORIZED ACCESS TO, ALTERATION OF, OR DELETION, DESTRUCTION, DAMAGE, LOSS OR FAILURE TO STORE ANY OF YOUR DATA OR ANY END-USER DATA OR ANY CLAIMS ARISING FROM ANY USE OF THE FOREGOING BY YOUR END-USERS, INCLUDING ANY CLAIMS REGARDING DATA PROCESSING OR INAPPROPRIATE OR UNAUTHORIZED DATA STORAGE OR HANDLING BY YOU IN VIOLATION OF THIS AGREEMENT.

PX-2557.59

## Attachment 5
**(to the Agreement)**
## Additional Terms for Passes

The following terms are in addition to the terms of the Agreement and apply to Your development and distribution of Passes:

### 1. Pass Type ID Usage and Restrictions

You may use the Pass Type ID only for purposes of digitally signing Your Pass for use with Wallet and/or for purposes of using the APN service with Your Pass. You may distribute Your Pass Type ID as incorporated into Your Pass in accordance with **Section 2** below only so long as such distribution is under Your own trademark or brand. To the extent that You reference a third party's trademark or brand within Your Pass (e.g., a store coupon for a particular good), You represent and warrant that You have any necessary rights. You agree not to share, provide or transfer Your Pass Type ID to any third party (except for a Service Provider and only to the limited extent permitted herein), nor use Your Pass Type ID to sign a third party's pass.

### 2. Pass Distribution; Marketing Permissions

**2.1** Subject to the terms of this Agreement, You may distribute Your Passes to end-users by the web, email, or an Application. You understand that Passes must be accepted by such users before they will be loaded into Wallet and that Passes can be removed or transferred by such users at any time.

**2.2** By distributing Your Passes in this manner, You represent and warrant to Apple that Your Passes comply with the Documentation and Program Requirements then in effect and the terms of this Attachment 5. Apple shall not be responsible for any costs, expenses, damages, losses (including without limitation lost business opportunities or lost profits) or other liabilities You may incur as a result of distributing Your Passes in this manner.

**2.3** You agree to state on the Pass Your name and address, and the contact information (telephone number; email address) to which any end-user questions, complaints, or claims with respect to Your Pass should be directed. You will be responsible for attaching or otherwise including, at Your discretion, any relevant end-user usage terms with Your Pass. Apple will not be responsible for any violations of Your end-user usage terms. You will be solely responsible for all user assistance, warranty and support of Your Pass. You may not charge any fees to end-users in order to use Wallet to access Your Pass.

**2.4** By distributing Your Passes as permitted in this Agreement, You hereby permit Apple to use (i) screen shots of Your Pass; (ii) trademarks and logos associated with Your Pass; and (iii) Pass Information, for promotional purposes in marketing materials and gift cards, excluding those portions which You do not have the right to use for promotional purposes and which You identify in writing to Apple. You also permit Apple to use images and other materials that You may provide to Apple, at Apple's reasonable request, for promotional purposes in marketing materials and gift cards.

### 3. Additional Pass Requirements

**3.1** Apple may provide You with templates to use in creating Your Passes, and You agree to choose the relevant template for Your applicable use (e.g., You will not use the boarding pass template for a movie ticket).

**3.2** Passes may only operate and be displayed in Wallet, which is Apple's designated container area for the Pass, through Wallet on the lock screen of a compatible Apple-branded product in accordance with the Documentation.

PX-2557.60

**3.3.**    Notwithstanding anything else in **Section 3.3.9** of the Agreement, with prior user consent, You and Your Pass may share user and/or device data with Your Application so long as such sharing is for the purpose of providing a service or function that is directly relevant to the use of the Pass and/or Application, or to serve advertising in accordance with **Sections 3.3.12** of the Agreement.

**3.4**    If You would like to use embedded Near Field Communication (NFC) technology with Your Pass, then You may request an Apple Certificate for the use of NFC with a Pass from the Developer web portal. Apple will review Your request and may provide You with a separate agreement for the use of such Apple Certificate. Apple reserves the right to not provide You with such Apple Certificate.

**4.    Apple's Right to Review Your Pass; Revocation.** You understand and agree that Apple reserves the right to review and approve or reject any Pass that You would like to distribute for use by Your end-users, or that is already in use by Your end-users, at any time during the Term of this Agreement. If requested by Apple, You agree to promptly provide such Pass to Apple. You agree not to attempt to hide, misrepresent, mislead, or obscure any features, content, services or functionality in Your Pass from Apple's review or otherwise hinder Apple from being able to fully review such Pass, and, You agree to cooperate with Apple and answer questions and provide information and materials reasonably requested by Apple regarding such Pass. If You make any changes to Your Pass after submission to Apple, You agree to notify Apple and, if requested by Apple, resubmit Your Pass prior to any distribution of the modified Pass to Your end-users. Apple reserves the right to revoke Your Pass Type ID and reject Your Pass for distribution to Your end-users for any reason and at any time in its sole discretion, even if Your Pass meets the Documentation and Program Requirements and terms of this Attachment 5; and, in that event, You agree that You may not distribute such Pass to Your end-users.

**5.    Additional Liability Disclaimer.** APPLE SHALL NOT BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY USE, DISTRIBUTION, MISUSE, RELIANCE ON, INABILITY TO USE, INTERRUPTION, SUSPENSION, OR TERMINATION OF WALLET, YOUR PASS TYPE ID, YOUR PASSES, OR ANY SERVICES PROVIDED IN CONNECTION THEREWITH, INCLUDING BUT NOT LIMITED TO ANY LOSS OR FAILURE TO DISPLAY YOUR PASS IN WALLET OR ANY END-USER CLAIMS ARISING FROM ANY USE OF THE FOREGOING BY YOUR END-USERS.

PX-2557.61

**Attachment 6**
(to the Agreement)
**Additional Terms for the use of the Apple Maps Service**

The following terms are in addition to the terms of the Agreement and apply to any use of the Apple Maps Service in Your Application , website, or web application.

**1.      Use of the Maps Service**

**1.1**      Your Application may access the Apple Maps Service only via the MapKit API or through MapKit JS, and Your website or web application may access the Apple Maps Service only via MapKit JS.  You agree not to access the Apple Maps Service or the Map Data other than through the MapKit API or MapKit JS, as applicable, and You agree that Your use of the Apple Maps Service in Your Applications, websites, or web applications must comply with the Program Requirements.

**1.2**      You will use the Apple Maps Service and Map Data only as necessar y for providing services and functionality for Your Application, website, or web application.  You agree to use the Apple Maps Service, MapKit API and MapKit JS only as expressly permitted by this Agreement (including but not limited to this Attachment 6) and the MapKit and MapKit JS Documentation, and in accordance with all applicable laws and regulations. MapKit JS may not be used in Your website and/or application running on non -Apple hardware for the following commercial purposes: fleet management (including dispatch), asset tracking, enterprise route optimization, or where the primary purpose of such website and/or application is to assess vehicle insurance risk.

**1.3**      You acknowledge and agree that results You receive from the Apple Maps Service may vary from actual conditions due to variable factors that can affect the accuracy of the Map Data, such as weather, road and traffic conditions, and geopolitical events.

**2.      Additional Restrictions**

**2.1**      Neither You nor Your Application, website or web appli cation may remove, obscure or alter Apple's or its licensors' copyright notices, trademarks, logos, or any other proprietary rights or legal notices, documents or hyperlinks that may appear in or be provided through the Apple Maps Service.

**2.2**      You will not use the Apple Maps Service in any manner that enables or permits bulk downloads or feeds of the Map Data, or any portion thereof, or that in any way attempts to extract, scrape or reutilize any portions of the Map Data.  For example, neither You nor Your Application may use or make available the Map Data, or any portion thereof, as part of any secondary or derived database.

**2.3**      Except to the extent expressly permitted herein, You agree not to copy, modify, translate, create a derivative work of, publish or publicly display the Map Data in any way.  Further, You may not use or compare the data provided by the Apple Maps Service for the purpose of improving or creating another mapping service. You agree not to create or attempt to create a substitute or similar service through use of or access to the Apple Maps Service

**2.4**      Your Application, website, or web application may display the Map Data only as permitted herein, and when displaying it on a map, You agree that it will be displayed only on an Apple map provided through the Apple Maps Service. Further, You may not surface Map Data within Your Application, website, or web application without displaying the corresponding Apple map (e.g., if You surface an address result through the Apple Maps Service, You must display the corresponding map with the address result).

**2.5**      Unless otherwise expressly permitted in the MapKit Documentation  or MapKit JS

PX-2557.62

Documentation, Map Data may not be cached, pre-fetched, or stored by You or Your Application, website, or web application other than on a temporary and limited basis solely to improve the performance of the Apple Maps Service with Your Application, website, or web application.

**2.6** You may not charge any fees to end-users solely for access to or use of the Apple Maps Service through Your Application, website, or web application, and You agree not to sell access to the Apple Maps Service in any other way.

**2.7** You acknowledge and agree that Apple may impose restrictions on Your usage of the Apple Maps Service (e.g., limiting the number of transactions Your Application can make through the MapKit API) or may revoke or remove Your access to the Apple Maps Service (or any part thereof) at any time in its sole discretion. Further, You acknowledge and agree that results You may receive from the Apple Maps Service may vary from actual conditions due to variable factors that can affect the accuracy of Map Data, such as road or weather conditions.

**3.** **Your Acknowledgements.** You acknowledge and agree that:

**3.1** Apple may at any time, with or without prior notice to You (a) modify the Apple Maps Service and/or the MapKit API or MapKit JS, including changing or removing any feature or functionality, or (b) modify, deprecate, reissue or republish the MapKit API or MapKit JS. You understand that any such modifications may require You to change or update Your Applications, website, or web applications at Your own cost. Apple has no express or implied obligation to provide, or continue to provide, the Apple Maps Service and may suspend or discontinue all or any portion of the Apple Maps Service at any time. Apple shall not be liable for any losses, damages or costs of any kind incurred by You or any other party arising out of or related to any such service suspension or discontinuation or any such modification of the Apple Maps Service, MapKit API, or MapKit JS.

**3.2** The Apple Maps Service may not be available in all countries or languages, and Apple makes no representation that the Apple Maps Service is appropriate or available for use in any particular location. To the extent You choose to provide access to the Apple Maps Service in Your Applications, website, or web applications or through the MapKit API or MapKit JS, You do so at Your own initiative and are responsible for compliance with any applicable laws.

**4.** **Apple's Right to Review Your MapKit JS Implementation.** You understand and agree that Apple reserves the right to review and approve or reject Your implementation of MapKit JS in Your Application, website, or web applications, at any time during the Term of this Agreement. If requested by Apple, You agree to promptly provide information regarding Your implementation of MapKit JS to Apple. You agree to cooperate with Apple and answer questions and provide information and materials reasonably requested by Apple regarding such implementation. Apple reserves the right to revoke Your MapKit JS keys and similar credentials at any time in its sole discretion, even if Your use of MapKit JS meets the Documentation and Program Requirements and terms of this Attachment. By way of example only, Apple may do so if Your MapKit JS implementation places an excessive and undue burden on the Apple Maps Service, obscures or removes the Apple Maps logo or embedded links when displaying a map, or uses the Apple Maps Service with corresponding offensive or illegal map content.

**5.** **Additional Liability Disclaimer.** NEITHER APPLE NOR ITS LICENSORS OR SERVICE PROVIDERS SHALL BE LIABLE FOR ANY DAMAGES OR LOSSES ARISING FROM ANY USE, MISUSE, RELIANCE ON, INABILITY TO USE, INTERRUPTION, SUSPENSION OR TERMINATION OF THE APPLE MAPS SERVICE, INCLUDING ANY INTERRUPTIONS DUE TO SYSTEM FAILURES, NETWORK ATTACKS, OR SCHEDULED OR UNSCHEDULED MAINTENANCE.

PX-2557.63

# Attachment 7
## (to the Agreement)
## Additional Terms for Safari Extensions

The following terms are in addition to the terms of the Agreement and apply to Safari Extensions signed with an Apple Certificate:

## 1.1 Safari Extension Requirements

If You would like to distribute Your Safari Extension signed with an Apple Certificate, then You agree to abide by the following requirements for such Safari Extensions, as they may be modified by Apple from time to time:

- Your Safari Extension must not contain any malware, malicious or harmful code, or other internal component (e.g. computer viruses, trojan horses, "backdoors"), which could damage, destroy, or adversely affect Apple hardware, software or services, or other third party software, firmware, hardware, data, systems, services, or networks;

- Your Safari Extensions must not be designed or marketed for the purpose of harassing, abusing, stalking, spamming, misleading, defrauding, threatening or otherwise violating the legal rights (such as the rights of privacy and publicity) of others. Further, You may not create a Safari Extension that tracks the behavior of a user (e.g., their browsing sites) without their express consent;

- Your Safari Extension must only operate in the designated container area for the Safari Extension, and must not disable, override or otherwise interfere with any Apple-implemented system alerts, warnings, display panels, consent panels and the like;

- Your Safari Extension must have a single purpose and updates must not change the single purpose of Your Safari Extension. You agree to accurately represent the features and functionality of Your Safari Extension to the user and to act in accordance with such representations. For example, You must not redirect user searches to a different search provider than the one previously selected by the user in Safari without their express consent. In addition, Your Safari Extension may not redirect a link (or any affiliate link) on a website unless that behavior is disclosed to the user. You agree not to conceal the features or functionality of Your Safari Extension (e.g., containing obfuscated code);

- Your Safari Extension must not be bundled with an app that has a different purpose than the Safari Extension. Your Safari Extension must not inject ads into a website and may not display pop up ads. You must not script or automate turning on Your Safari Extension or enable others to do so; and

- Safari Extensions must not interfere with security, user interface, user experience, features or functionality of Safari, macOS, iOS, or other Apple-branded products.

## 1.2 Compliance; Certificates.

Your Safari Extensions must comply with the Documentation and all applicable laws and regulations, including those in any jurisdictions in which such Safari Extensions may be offered or made available. You understand that Apple may revoke the Apple Certificates used to sign Your Safari Extensions at any time, in its sole discretion. Further, You acknowledge and agree that Apple may block Your Safari Extension (such that it may be unavailable or inaccessible to Safari users) if it does not comply with the requirements set forth above in this **Section 1.1** or otherwise adversely affects users of Safari or Apple-branded products.

PX-2557.64

# Schedule 1

## 1.    Appointment of Agent

**1.1**      You hereby appoint Apple and Apple Subsidiaries (collectively "Apple") as: (i) Your agent for the marketing and delivery of the Licensed Applications to end-users located in those countries listed on Exhibit A, Section 1 to this Schedule 1, subject to change; and (ii) Your commissionaire for the marketing and delivery of the Licensed Applications to end-users located in those countries listed on Exhibit A, Section 2 to this Schedule 1, subject to change, during the Delivery Period.  The most current list of App Store countries among which You may select shall be set forth in the App Store Connect tool and the Custom App Distribution Site and may be updated by Apple from time to time.  You hereby acknowledge that Apple will market and make the Licensed Applications available for download by end-users, through one or more App Stores or the Custom App Distribution Site, for You and on Your behalf. For purposes of this Schedule 1, the following terms apply:

"Custom App" or "Custom Application" means a Licensed Application custom developed by You for use by specific organizations or third-party business customers, including proprietary Licensed Applications developed for Your organization's internal use.

(a) "You" shall include App Store Connect users authorized by You to submit Licensed Applications and associated metadata on Your behalf; and

(b) "end-user" includes individual purchasers as well as eligible users associated with their account via Family Sharing.  For institutional customers, "end-user" shall mean the individual authorized to use the Licensed Application, the institutional administrator responsible for management of installations on shared devices, as well as authorized institutional purchasers themselves, including educational institutions approved by Apple, which may acquire the Licensed Applications for use by their employees, agents, and affiliates.

(c) For the purposes of this Schedule 1, the term "Licensed Application" shall include any content, functionality, extensions, stickers, or services offered in the software application.

"Volume Content Service" means an Apple service that offers the ability to obtain Custom Applications and make purchases of Licensed Applications in bulk subject to the Volume Content Terms, conditions, and requirements.

**1.2**      In furtherance of Apple's appointment under Section 1.1 of this Schedule 1, You hereby authorize and instruct Apple to:

(a) market, solicit and obtain orders on Your behalf for Licensed Applications from end-users located in the countries identified by You in the App Store Connect tool;

(b) provide hosting services to You subject to the terms of the Agreement, in order to allow for the storage of, and end-user access to, the Licensed Applications and to enable third party hosting of such Licensed Applications solely as otherwise licensed or authorized by Apple;

(c) make copies of, format, and otherwise prepare Licensed Applications for acquisition and download by end-users, including adding the Security Solution and other optimizations identified in the Agreement;

(d) allow or, in the case of cross-border assignments of certain purchases, arrange for end-users to access and re-access copies of the Licensed Applications, so that end-users may acquire from You and electronically download those Licensed Applications, Licensed Application Information,

PX-2557.65

and associated metadata through one or more App Stores or the Custom App Distribution Site, and You hereby authorize distribution of Your Licensed Applications under this Schedule 1 to end-users with accounts associated with another end-user's via Family Sharing. You also hereby authorize distribution of Your Licensed Applications under this Schedule 1 for use by multiple end users under a single Apple ID when the Licensed Application is provided to such end-users through Apple Configurator in accordance with the Apple Configurator software license agreement or requested by a single institutional customer via Custom App Distribution for use by its end-users and/or for installation on devices with no associated iTunes Account that are owned or controlled by that institutional customer in accordance with the Volume Content Terms, conditions, and program requirements;

(e) use (i) screen shots, previews, and/or up to 30 second excerpts of the Licensed Applications; (ii) trademarks and logos associated with the Licensed Applications; and (iii) Licensed Application Information, for promotional purposes in marketing materials and gift cards and in connection with vehicle displays, excluding those portions of the Licensed Applications, trademarks or logos, or Licensed Application Information which You do not have the right to use for promotional purposes, and which You identify in writing at the time that the Licensed Applications are delivered by You to Apple under Section 2.1 of this Schedule 1, and use images and other materials that You may provide to Apple, at Apple's reasonable request, for promotional purposes in marketing materials and gift cards and in connection with vehicle displays. In addition, and subject to the limitation set forth above, You agree that Apple may use screen shots, icons, and up to 30 second excerpts of Your Licensed Applications for use at Apple Developer events (e.g., WWDC, Tech Talks) and in developer documentation;

(f) otherwise use Licensed Applications, Licensed Application Information and associated metadata as may be reasonably necessary in the marketing and delivery of the Licensed Applications in accordance with this Schedule 1. You agree that no royalty or other compensation is payable for the rights described above in Section 1.2 of this Schedule 1; and

(g) facilitate distribution of pre-release versions of Your Licensed Applications ("Beta Testing") to end-users designated by You in accordance with the Agreement, availability, and other program requirements as updated from time to time in the App Store Connect tool. For the purposes of such Beta Testing, You hereby waive any right to collect any purchase price, proceeds or other remuneration for the distribution and download of such prerelease versions of Your Licensed Application. You further agree that You shall remain responsible for the payment of any royalties or other payments to third parties relating to the distribution and user of Your pre-release Licensed Applications, as well as compliance with any and all laws for territories in which such Beta Testing takes place. For the sake of clarity, no commission shall be owed to Apple with respect to such distribution.

1.3     The parties acknowledge and agree that their relationship under this Schedule 1 is, and shall be, that of principal and agent, or principal and commissionaire, as the case may be, as described in Exhibit A, Section 1 and Exhibit A, Section 2 respectively, and that You, as principal, are, and shall be, solely responsible for any and all claims and liabilities involving or relating to, the Licensed Applications, as provided in this Schedule 1. The parties acknowledge and agree that Your appointment of Apple as Your agent or commissionaire, as the case may be, under this Schedule 1 is non-exclusive. You hereby represent and warrant that You own or control the necessary rights in order to appoint Apple and Apple Subsidiaries as Your worldwide agent and/or commissionaire for the delivery of Your Licensed Applications, and that the fulfillment of such appointment by Apple and Apple Subsidiaries shall not violate or infringe the rights of any third party.

1.4     For purposes of this Schedule 1, the "Delivery Period" shall mean the period beginning on the Effective Date of the Agreement, and expiring on the last day of the Agreement or any renewal thereof; provided, however, that Apple's appointment as Your agent shall survive expiration of the Agreement for a reasonable phase-out period not to exceed thirty (30) days and

PX-2557.66

further provided that, solely with respect to Your end-users, subsections 1.2(b), (c), and (d) of this Schedule 1 shall survive termination or expiration of the Agreement unless You indicate otherwise pursuant to sections 4.1 and 6.2 of this Schedule 1.

**1.5**     All of the Licensed Applications delivered by You to Apple under Section 2.1 of this Schedule 1 shall be made available by Apple for download by end-users at no charge. Apple shall have no duty to collect any fees for the Licensed Applications for any end-user and shall have no payment obligation to You with respect to any of those Licensed Applications under this Schedule 1. In the event that You intend to charge end-users a fee for any Licensed Application or In-App Purchase, You must enter (or have previously entered) into a separate extension of this agreement (Schedule 2) with Apple with respect to that Licensed Application. In the event that You intend to charge end-users a fee for any Custom Apps, You must enter (or have previously entered) into a separate extension of this agreement (Schedule 3) with Apple with respect to that Custom App.

## 2.     Delivery of the Licensed Applications to Apple

**2.1**     You will deliver to Apple, at Your sole expense, using the App Store Connect tool or other mechanism provided by Apple, the Licensed Applications, Licensed Application Information and associated metadata, in a format and manner prescribed by Apple, as required for the delivery of the Licensed Applications to end-users in accordance with this Schedule 1. Metadata You deliver to Apple under this Schedule 1 will include: (i) the title and version number of each of the Licensed Applications; (ii) the countries You designate, in which You wish Apple to allow end-users to download those Licensed Applications (iii) the end-users You designate as authorized downloaders of the Custom App; (iv) any copyright or other intellectual property rights notices; (v) Your privacy policy; (vi) Your end-user license agreement ("EULA"), if any, in accordance with Section 3.2 of this Schedule 1; and (vii) any additional metadata set forth in the Documentation and/or the App Store Connect Tool as may be updated from time to time, including metadata designed to enhance search and discovery for content on Apple-branded hardware.

**2.2**     All Licensed Applications will be delivered by You to Apple using software tools, a secure FTP site address and/or such other delivery methods as prescribed by Apple.

**2.3**     You hereby certify that all of the Licensed Applications You deliver to Apple under this Schedule 1 are authorized for export from the United States to each of the countries designated by You under Section 2.1 hereof, in accordance with the requirements of all applicable laws, including but not limited to the United States Export Administration Regulations, 15 C.F.R. Parts 730-774 and the International Traffic in Arms Regulations 22 C.F.R. Parts 120-130. Without limiting the generality of this Section 2.3, You certify that (i) none of the Licensed Applications contains, uses or supports any data encryption or cryptographic functions; or (ii) in the event that any Licensed Application contains, uses or supports any such data encryption or cryptographic functionality, You certify that You have complied with the United States Export Administration Regulations, and are in possession of, and will, upon request, provide Apple with a PDF copy of Your Encryption Registration Number (ERN), or export classification ruling (CCATS) issued by the United States Commerce Department, Bureau of Industry and Security and PDF copies of appropriate authorizations from other countries that mandate import authorizations for this Licensed Application, as required. You acknowledge that Apple is relying upon Your certification in this Section 2.3 in allowing end-users to access and download the Licensed Applications under this Schedule 1. Except as provided in this Section 2.3, Apple will be responsible for compliance with the requirements of the Export Administration Regulations in allowing end-users to access and download the Licensed Applications under this Schedule 1.

**2.4**     You shall be responsible for determining and implementing any age ratings or parental advisory warnings required by the applicable government regulations, ratings board(s), service(s), or other organizations (each a "Ratings Board") for any video, television, gaming or other content

PX-2557.67

offered in Your Licensed Application for each locality in the Territory. Where applicable, you shall also be responsible for providing any content restriction tools or age verification functionality before enabling end-users to access mature or otherwise regulated content within Your Licensed Application.

**3.     Ownership and End-User Licensing and Delivery of the Licensed Applications to End Users**

**3.1**     You acknowledge and agree that Apple, in the course of acting as agent and/or commissionaire for You, is hosting, or pursuant to Section 1.2(b) of this Schedule 1 may enable authorized third parties to host, the Licensed Application(s), and is allowing the download of those Licensed Application(s) by end-users, on Your behalf. However, You are responsible for hosting and delivering content or services sold or delivered by You using the In-App Purchase API, except for content that is included within the Licensed Application itself (i.e., the In-App Purchase simply unlocks the content) or content hosted by Apple pursuant to Section 3.3 of Attachment 2 of the Agreement. The parties acknowledge and agree that Apple shall not acquire any ownership interest in or to any of the Licensed Applications or Licensed Applications Information, and title, risk of loss, responsibility for, and control over the Licensed Applications shall, at all times, remain with You. Apple may not use any of the Licensed Applications or Licensed Application Information for any purpose, or in any manner, except as specifically authorized in the Agreement or this Schedule 1.

**3.2**     You may deliver to Apple Your own EULA for any Licensed Application at the time that You deliver that Licensed Application to Apple, in accordance with Section 2.1 of this Schedule 1; provided, however, that Your EULA must include and may not be inconsistent with the minimum terms and conditions specified on Exhibit B to this Schedule 1 and must comply with all applicable laws in all countries where You wish Apple to allow end-users to download that Licensed Application. Apple shall enable each end-user to review Your EULA (if any) at the time that Apple delivers that Licensed Application to that end-user, and Apple shall notify each end-user that the end-user's use of that Licensed Application is subject to the terms and conditions of Your EULA (if any). In the event that You do not furnish Your own EULA for any Licensed Application to Apple, You acknowledge and agree that each end-user's use of that Licensed Application shall be subject to Apple's standard EULA (which is part of the App Store Terms of Service).

**3.3**     You hereby acknowledge that the EULA for each of the Licensed Applications is solely between You and the end-user and conforms to applicable law, and Apple shall not be responsible for, and shall not have any liability whatsoever under, any EULA or any breach by You or any end-user of any of the terms and conditions of any EULA.

**3.4**     A Licensed Application may read or play content (magazines, newspapers, books, audio, music, video) that is offered outside of the Licensed Application (such as, by way of example, through Your website) provided that You do not link to or market external offers for such content within the Licensed Application. You are responsible for authentication access to content acquired outside of the Licensed Application.

**3.5**     To the extent You promote and offer in-app subscriptions, You must do so in compliance with all legal and regulatory requirements.

**3.6**     If Your Licensed Application is periodical content-based (e.g., magazines and newspapers), Apple may provide You with the name, email address, and zip code associated with an end-user's account when they request an auto-renewing subscription via the In-App Purchase API, provided that such user consents to the provision of data to You, and further provided that You may only use such data to promote Your own products and do so in strict compliance with Your publicly posted Privacy Policy, a copy of which must be readily viewed and

PX-2557.68

is consented to in Your Licensed Application.

## 4.      Content Restrictions and Software Rating

**4.1**      You represent and warrant that: (a) You have the right to enter into this Agreement, to reproduce and distribute each of the Licensed Applications, and to authorize Apple to permit end users to download and use each of the Licensed Applications through one or more App Stores or the Custom App Distribution Site; (b) none of the Licensed Applications, or Apple's or end-users' permitted uses of those Licensed Applications, violate or infringe any patent, copyright, trademark, trade secret or other intellectual property or contractual rights of any other person, firm, corporation or other entity and that You are not submitting the Licensed Applications to Apple on behalf of one or more third parties;  (c) none of the Custom Apps, or Apple's or end-users' permitted uses of those Custom Apps, violate or infringe any patent, copyright, trademark, trade secret or other intellectual property or contractual rights of any other person, firm, corporation or other entity and that You are not submitting the Custom Apps to Apple on behalf of one or more third parties other than under license grant from one or more third parties subject to Apple's Volume Content Terms and/or Custom App Distribution ; (d) each of the Licensed Applications is authorized for distribution, sale and use in, export to, and import into each of the countries designated by You under Section 2.1 of this Schedule 1, in accordance with the laws and regulations of those countries and all applicable export/import regulations; (e) none of the Licensed Applications contains any obscene, offensive or other materials that are prohibited or restricted under the laws or regulations of any of the countries You designate under Section 2.1 of this Schedule 1; (f) all information You provide using the App Store Connect tool, including any information relating to the Licensed Applications, is accurate and that, if any such information ceases to be accurate, You will promptly update it to be accurate using the App Store Connect tool; and (g) in the event a dispute arises over the content of Your Licensed Applications or use of Your intellectual property on the App Store  or the Custom App Distribution Site, You agree to permit Apple to share Your contact information with the party filing such dispute and to follow Apple's app dispute process on a non -exclusive basis and without any party waiving its legal rights.

**4.2**      You shall use the software rating tool set forth on  App Store Connect to supply information regarding each of the Licensed Applications delivered by You for marketing and fulfillment by Apple through the App Store or the Custom App Distribution Site under this Schedule 1 in order to assign a rating to each such Licensed App lication.  For purposes of assigning a rating to each of the Licensed Applications, You shall use Your best efforts to provide correct and complete information about the content of that Licensed Application with the software rating tool.  You acknowledge and agree that Apple is relying on:  (i) Your good faith and diligence in accurately and completely providing the requested information for each Licensed Application; and (ii) Your representations and warranties in Section 4.1 hereof, in making that Licensed Application available for download by end-users in each of the countries You designate hereunder.  Furthermore, You authorize Apple to correct the rating of any Licensed Application of Yours that has been assigned an incorrect rating; and You agree to an y such corrected rating.

**4.3**      In the event that any country You designate hereunder requires the approval of, or rating of, any Licensed Application by any government or industry regulatory agency as a condition for the distribution and/or use of that Licensed Application, You acknowledge and agree that Apple may elect not to make that Licensed Application available for download by end -users in that country from any App Stores or the Custom App Distribution Site.

## 5.      Responsibility and Liability

**5.1**      Apple shall have no responsibility for the installation and/or use of any of the Licensed Applications by any end-user.  You shall be solely responsible for any and all product warranties, end-user assistance and product support with respect to each of the Licensed Applications.

PX-2557.69

**5.2** You shall be solely responsible for, and Apple shall have no responsibility or liability whatsoever with respect to, any and all claims, suits, liabilities, losses, damages, costs and expenses arising from, or attributable to, the Licensed Applications and/or the use of those Licensed Applications by any end-user, including, but not limited to: (i) claims of breach of warranty, whether specified in the EULA or established under applicable law; (ii) product liability claims; and (iii) claims that any of the Licensed Applications and/or the end-user's possession or use of those Licensed Applications infringes the copyright or other intellectual property rights of any third party.

## 6. Termination

**6.1** This Schedule 1, and all of Apple's obligations hereunder, shall terminate upon the expiration or termination of the Agreement.

**6.2** In the event that You no longer have the legal right to distribute the Licensed Applications, or to authorize Apple to allow access to those Licensed Applications by end-users, in accordance with this Schedule 1, You shall promptly notify Apple and withdraw those Licensed Applications from the App Store or the Custom App Distribution Site using the tools provided on the App Store Connect site; provided, however, that such withdrawal by You under this Section 6.2 shall not relieve You of any of Your obligations to Apple under this Schedule 1, or any liability to Apple and/or any end-user with respect to those Licensed Applications.

**6.3** Apple reserves the right to cease marketing, offering, and allowing download by end-users of the Licensed Applications at any time, with or without cause, by providing notice of termination to You. Without limiting the generality of this Section 6.3, You acknowledge that Apple may cease allowing download by end-users of some or all of the Licensed Applications, or take other interim measures in Apple's sole discretion, if Apple reasonably believes that: (i) those Licensed Applications are not authorized for export to one or more of the countries designated by You under Section 2.1 hereof, in accordance with the Export Administration Regulations; (ii) those Licensed Applications and/or any end-user's possession and/or use of those Licensed Applications, infringe patent, copyright, trademark, trade secret or other intellectual property rights of any third party; (iii) the distribution and/or use of those Licensed Applications violates any applicable law in any country You designate under Section 2.1 of this Schedule 1; or (iv) You have violated the terms of the Agreement, this Schedule 1, or other documentation including without limitation the App Store Review Guidelines. An election by Apple to cease allowing download of any Licensed Applications, pursuant to this Section 6.3, shall not relieve You of Your obligations under this Schedule 1.

**6.4** You may withdraw any or all of the Licensed Applications from the App Store or the Custom App Distribution Site, at any time, and for any reason, by using the tools provided on the App Store Connect site, except that, with respect to Your end-users, You hereby authorize and instruct Apple to fulfill sections 1.2(b), (c), and (d) of this Schedule 1, which shall survive termination or expiration of the Agreement unless You indicate otherwise pursuant to sections 4.1 and 6.2 of this Schedule 1.

## 7. Legal Consequences

The relationship between You and Apple established by this Schedule 1 may have important legal consequences for You. You acknowledge and agree that it is Your responsibility to consult with Your legal advisors with respect to Your legal obligations hereunder.

PX-2557.70

# EXHIBIT A
## (to Schedule 1)

**1.      Apple as Agent**

You appoint Apple Canada, Inc. ("Apple Canada") as Your agent for the marketing and end -user download of the Licensed Applications by end-users located in the following country:

Canada

You appoint Apple Pty Limited ("APL") as Your agent for the marketing and end -user download of the Licensed Applications by end-users located in the following countries:

Australia
New Zealand

You appoint Apple Inc. as Your agent pursuant to California Civil Code §§ 2295 *et seq.* for the marketing and end-user download of the Licensed Applications by end-users located in the following countries, as updated from time to time via the App Store Connect site:*

| Argentina | Cayman Islands | Guatemala | St. Kitts & Nevis |
|---|---|---|---|
| Anguilla | Chile | Honduras | St. Lucia |
| Antigua & Barbuda | Colombia | Jamaica | St. Vincent & The Grenadines |
| Bahamas | Costa Rica | Mexico | Suriname |
| Barbados | Dominica | Montserrat | Trinidad & Tobago |
| Belize | Dominican Republic | Nicaragua | Turks & Caicos |
| Bermuda | Ecuador | Panama | Uruguay |
| Bolivia | El Salvador | Paraguay | Venezuela |
| Brazil | Grenada | Peru | United States |
| British Virgin Islands | Guyana | | |

* Upon notice to You of the effective date by Apple, You shall appoint Apple Services LATAM LLC as Your agent pursuant to California Civil Code §§ 2295 *et seq.* for the marketing and End-User download of the Licensed Applications by End -Users located in the countries identified above, except the United States, as updated from time to time via the App Store Connect site.

You appoint iTunes KK as Your agent pursuant to Article 643 of the Japanese Civil Code for the marketing and end-user download of the Licensed Applications by end-users located in the following country:

Japan

**2.      Apple as Commissionaire**

You appoint Apple Distribution International  Ltd. as Your commissionaire for the marketing and end-user download of the Licensed Applications by end-users located in the following countries, as updated from time to time via the App Store Connect site. For the purposes of this Agreement, "commissionaire" means an agent who purports to act on his own behalf and concludes agreements in his own name but acts on behalf of other persons, as generally recognized in many Civil Law legal systems

| Afghanistan | Gabon | Malawi | Saudi Arabia |
|---|---|---|---|

Program Agreement

PX-2557.71

| | | | |
|---|---|---|---|
| Albania | Gambia | Malaysia | Senegal |
| Algeria | Georgia | Maldives | Serbia |
| Angola | Germany | Mali | Seychelles |
| Armenia | Ghana | Malta, Republic of | Sierra Leone |
| Austria | Greece | Mauritania | Singapore |
| Azerbaijan | Guinea-Bissau | Mauritius | Slovakia |
| Bahrain | Hong Kong | Micronesia, Fed States of | Slovenia |
| Belarus | Hungary | Moldova | Solomon Islands |
| Belgium | Iceland | Mongolia | South Africa |
| Benin | India | Montenegro | Spain |
| Bhutan | Indonesia | Morocco | Sri Lanka |
| Bosnia and Herzegovina | Iraq | Mozambique | Swaziland |
| Botswana | Ireland | Myanmar | Sweden |
| Brunei | Israel | Namibia | Switzerland |
| Bulgaria | Italy | Nauru | Taiwan |
| Burkina-Faso | Jordan | Nepal | Tajikistan |
| Cambodia | Kazakhstan | Netherlands | Tanzania |
| Cameroon | Kenya | Niger | Thailand |
| Cape Verde | Korea | Nigeria | Tonga |
| Chad | Kosovo | Norway | Tunisia |
| China | Kuwait | Oman | Turkey |
| Congo (Democratic Republic of) | Kyrgyzstan | Pakistan | Turkmenistan |
| Congo (Republic of) | Laos | Palau | UAE |
| Cote d'Ivoire | Latvia | Papua New Guinea | Uganda |
| Croatia | Lebanon | Philippines | Ukraine |
| Cyprus | Liberia | Poland | United Kingdom |
| Czech Republic | Libya | Portugal | Uzbekistan |
| Denmark | Lithuania | Qatar | Vanuatu |
| Egypt | Luxembourg | Romania | Vietnam |
| Estonia | Macau | Russia | Yemen |
| Fiji | Macedonia | Rwanda | Zambia |
| Finland | Madagascar | Sao Tome e Principe | Zimbabwe |
| France | | | |

PX-2557.72

**EXHIBIT B**
**(to Schedule 1)**
**Instructions for Minimum Terms of Developer's**
**End-User License Agreement**

**1.        Acknowledgement**:  You and the end-user must acknowledge that the EULA is concluded between You and the end-user only, and not with Apple, and You, not Apple, are solely responsible for the Licensed Application and the content thereof.  The EULA may not provide for usage rules for Licensed Applications that are in conflict with, the App Store Terms of Service as of the Effective Date (which You acknowledge You have had  the opportunity to review).

**2.        Scope of License**:  The license granted to the end-user for the Licensed Application must be limited to a non-transferable license to use the Licensed Application on any Apple-branded Products that the end-user owns or controls and as permitted by the Usage Rules set forth in the App Store Terms of Service, except that such Licensed Application may be accessed, acquired, and used by other accounts associated with the purchaser via Family Sharing or volume purchasing.

**3.        Maintenance and Support**:  You must be solely responsible for providing any maintenance and support services with respect to the Licensed Application, as specified in the EULA, or as required under applicable law.  You and the end-user must acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the Licensed Application.

**4.        Warranty**:  You must be solely responsible for any product warranties, whether express or implied by law, to the extent not effectively disclaimed.  The EULA must provide that, in the event of any failure of the Licensed Application to conform to any applicable warranty, the end-user may notify Apple, and Apple will refund the purchase price for the Licensed Application to that end-user; and that, to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the Licensed Application, and any other claims, losses, liabilities, damages, costs or expenses attributable to any failure to conform to any warranty will be Your sole responsibility.

**5.        Product Claims**:  You and the end-user must acknowledge that You, not Apple, are responsible for addressing any claims of the end-user or any third party relating to the Licensed Application or the end-user's possession and/or use of that Licensed Application, including, but not limited to: (i) product liability claims; (ii) any claim that the Licensed Application fails to conform to any applicable legal or regulatory requirement; and (iii)claims arising under consumer protection or similar legislation. The EULA may not limit Your liability to the end-user beyond what is permitted by applicable law.

**6.        Intellectual Property Rights**:  You and the end-user must acknowledge that, in the event of any third party claim that the Licensed Application or the end-user's possession and use of that Licensed Application infringes that third party's intellectual property rights, You, not Apple, will be solely responsible for the investigation, defense, s ettlement and discharge of any such intellectual property infringement claim.

**7.        Legal Compliance**:  The end-user must represent and warrant that (i) he/she is not located in a country that is subject to a U.S. Government embargo, or that is on Title 15, Part 740 Supplement 1 Country Group E of the U.S. Code of Federal Regulations ; and (ii) he/she is not listed on any U.S. Government list of prohibited or restricted parties.

**8.        Developer Name and Address**:  You must state in the EULA Your name and address, and the contact information (telephone number; E-mail address) to which any end-user questions,

PX-2557.73

complaints or claims with respect to the Licensed Application should be directed.

**9.      Third Party Terms of Agreement:**  You must state in the EULA that the end-user must comply with applicable third party terms of agreement when using Your Application, e.g., if You have a VoIP application, then the end-user must not be in violation of their wireless data service agreement when using Your Application.

**10.      Third Party Beneficiary**:  You and the end-user must acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries of the EULA, and that, upon the end-user's acceptance of the terms and conditions of the EULA, Apple will have the right (and will be deemed to have accepted the right) to enforce the EULA against the enduser as a third party beneficiary thereof.

PX-2557.74

# EXHIBIT C
## (to Schedule 1)
## App Store Promo Code Terms

Notwithstanding any other provisions of the Agreement or this Schedule 1, You hereby agree that the following terms shall apply to all promotional Custom Codes requested by You via the App Store Connect tool. For the purposes of this Exhibit C, "You" shall include additional members of Your App Store Connect team (e.g. individuals in the marketing and technical roles).

Except as otherwise expressed in writing herein, nothing in this Exhibit C shall be construed to modify the Agreement or this Schedule 1 in any way, and all capitalized terms not defined below shall have the meanings set forth in the Program Agreement.

**1.     DEFINITIONS:**

"Holder" means an individual located in a Territory to whom You provide one or more Custom Codes;

"Custom Code" means a unique alphanumeric code generated and provided to You by Apple pursuant to this Exhibit C which allows a Holder who is an App Store customer to download or access for free from the App Store the Licensed Application for which You have requested such code via the App Store Connect tool, whether offered for free or for a fee on the App Store (the "Promo Content"); and

"Effective Period" means the period between the Custom Code Activation Date and the Custom Code Expiration Date.

**2.     AUTHORIZATION AND OBLIGATIONS:** You hereby authorize and instruct Apple to provide You with Custom Codes upon request, pursuant to the terms of this Exhibit C, and You take full responsibility for ensuring that any team member that requests such codes shall abide by the terms of this Exhibit C. You shall be responsible for securing all necessary licenses and permissions relating to use of the Custom Codes and the Licensed Application, including any uses by You of the name(s) or other indicia of the Licensed Application, or name(s) or likenesses of the person(s) performing or otherwise featured in the Licensed Application, in any advertising, marketing, or other promotional materials, in any and all media. Apple reserves the right to request and receive copies of such licenses and permissions from You, at any time, during the Effective Period.

**3.     NO PAYMENT:** Except for Your obligations set forth in Section 10 of this Exhibit C, You are not obligated to pay Apple any commission for the Custom Codes.

**4.     DELIVERY:** Upon request by You via the App Store Connect tool, Apple shall provide the Custom Codes electronically to You via App Store Connect, email, or other method as may be indicated by Apple.

**5.     CUSTOM CODE ACTIVATION DATE:** Custom Codes will become active for use by Holders upon delivery to You.

**6.     CUSTOM CODE EXPIRATION DATE:** All unused Custom Codes, whether or not applied to an Apple ID, expire at midnight 11:59 PT on the earlier of: (a) the date that is twenty-eight (28) days after the delivery of the Custom Codes; or (b) the termination of the Agreement.

**7.     PERMITTED USE:** You may distribute the Custom Codes until that date which is ten (10) calendar days prior to the Custom Code Expiration Date solely for the purpose of offering instances of the app for media review or promotional purposes. You may not distribute the

PX-2557.75

Custom Codes to Holders in any Territory in which You are not permitted to sell or distribute Your Licensed Application.

**8.      ADDITIONAL MATERIALS:**  Apple shall not be responsible for developing and producing any materials in relation to the Custom Codes other than the Custom Codes themselves.

**9.      REPRESENTATIONS, WARRANTIES, AND INDEMNIFICATION:**  You represent and warrant that: (i) You own or control all rights necessary to make the grant of rights, licenses, and permissions listed in Section 2, and that the exercise of such rights, licenses, and permissions shall not violate or infringe the rights of any third party, and (ii) any use of the Custom Codes shall be in accordance with the terms of this Exhibit C and shall not infringe any third party rights or violate any applicable laws, directives, rules, and regulations of any governmental authority in the Territory or anywhere else in the world.  You  agree to indemnify and hold Apple, its subsidiaries and affiliates (and their respective directors, officers, and employees) harmless from all losses, liabilities, damages, or expenses (including reasonable attorneys' fees and costs) resulting from any claims, demands, actions, or other proceedings arising from a breach of the representations and warranties set for h in this Section, or a breach of any other term of the Agreement and this Schedule 1.

**10.     PAYMENT WAIVER:**  You hereby waive any right to coll ect any royalties, proceeds, or remuneration for the distribution and download of the Licensed Application via the Custom Codes, regardless of whether any remuneration would otherwise be payable under the Agreement, including Schedule 1 thereto, if applica ble.  The parties acknowledge that, as between Apple and You, the parties' respective responsibilities for the payment of any royalties or other similar payments to third parties with respect to distribution and download of the Licensed Application via the  Custom Codes shall be as set forth in the Agreement.

**11.     TERMS AND CONDITIONS:**  You further agree to the following terms:

(a) You shall not sell the Custom Codes or accept any form of payment, trade-in-kind, or other compensation in connection with the distribution of the Custom Codes and You shall prohibit third parties from doing so.

(b) Nothing in this Exhibit C shall cause the parties to become partners, joint venturers or co-owners, nor shall either party constitute an agent, employee, or representa tive of the other, or empower the other party to act for, bind, or otherwise create or assume any obligation on its behalf, in connection with any transaction under this Exhibit C; provided, however, that nothing in this Section 11(b) shall affect, impair, or modify either of the Parties' respective rights and obligations, including the agency or commissionaire relationship between them under Schedules 1, 2, and 3 of the Agreement.

(c) You shall prominently disclose any content age restrictions or warnings legally required in the Territories and ensure that Custom Codes are distributed only to persons of an age appropriate and consistent with the App Store rating for the associated Licensed Application.

(d) You shall conduct Yourself in an honest and ethical manner and shall not make any statement, orally or in writing, or do any act or engage in any activity that is obscene, unlawful, or encourages unlawful or dangerous conduct, or that may disparage, denigrate, or be detrimental to Apple or its business.

(e) Apple shall not be responsible for providing any technical or customer support to You or Holders above what Apple provides to standard or ordinary App Store users.

(f) You agree to the additional Custom Code Terms and Conditions attached hereto as Attachment 1.

PX-2557.76

(g) YOU SHALL INCLUDE THE COUNTRY SPECIFIC CODE USER TERMS AS WELL AS THE EXPIRATION DATE OF THE CUSTOM CODE ON ANY INSTRUMENT USED TO DISTRIBUTE THE CUSTOM CODE TO HOLDERS (E.G. CERTIFICATE, CARD, EMAIL, ETC). YOU SHALL RECEIVE AN EMAIL WITH THIS INFORMATION LOCALIZED FOR EACH TERRITORY UPON REQUESTING THE CUSTOM CODES IN THE APP STORE CONNECT TOOL.

Code expires on [date] and is redeemable only on the App Store for [territory]. Requires an iTunes account, subject to prior acceptance of license and usage terms. Compatible software and hardware, and internet access (fees may apply) required. Not for resale. Full terms apply; see [www.apple.com/legal/internet-services/us/terms.html]. For more information, see www.apple.com/support/ In-app purchases sold separately. This app is provided to You by [Developer's name].

(h) You shall be solely responsible for Your use of the Custom Codes, including any use by other members of Your App Store Connect team, and for any loss or liability to You or Apple therefrom.

(i) In the event Your Licensed Application is removed from the App Store for any reason, You agree to cease distribution of the Custom Codes and that Apple may deactivate such Custom Codes.

(j) You agree that Apple shall have the right to deactivate the Custom Codes, even if already delivered to Holders, in the event You violate any of the terms of this Exhibit C, the Agreement, or Schedules 1, 2, or 3 thereto.

(k) You may distribute the Custom Codes within the Territories, but agree that You shall not export any Custom Code for use outside the Territories nor represent that You have the right or ability to do so. Risk of loss and transfer of title for the Custom Codes pass to You upon delivery to You within App Store Connect, via email, or other method provided by Apple.

**12.  APPLE TRADEMARKS:** Your use of Apple trademarks in connection with the Custom Codes is limited only to "iTunes" and "App Store" (the "Marks") subject to the following and any additional guidelines Apple may issue from time to time:

(a) You may use the Marks only during the Effective Period

(b) You shall submit any advertising, marketing, promotional or other materials, in any and all media now known or hereinafter invented, incorporating the Marks to Apple prior t o use for written approval. Any such materials not expressly approved in writing by Apple shall be deemed disapproved by Apple.

(c) You may only use the Marks in a referential manner and may not use the Marks as the most prominent visual element in any materials. Your company name, trademark(s), or service mark(s) should be significantly larger than any reverence to the Marks.

(d) You may not directly or indirectly suggest Apple's sponsorship, affiliation, or endorsement of You, Your Licensed Applications, or any promotional activities for which You are requesting the Custom Codes.

(e) You acknowledge that the Marks are the exclusive property of Apple and agree not to claim any right, title, or interest in or to the Marks or at any time challenge or attack Apple's rights in the Marks. Any goodwill resulting from Your use of the Marks shall inure solely to the benefit of Apple and shall not create any right, title, or interest for You in the Marks.

**13.  GOVERNING LAW:** Any litigation or other dispute resolution between You and Apple arising out of or relating to this Exhibit C or facts relating thereto shall be governed by Section 14.10 of the Agreement.

PX-2557.77

**Attachment 1**
**(to Exhibit C of Schedule 1)**
**Custom Code Terms and Conditions**

1.      All Custom Codes delivered pursuant to this Exhibit C, whether or not applied to an App Store account, expire as indicated in this Exhibit C.

2.      Custom Codes, and unused balances, are not redeemable for cash and cannot be returned for a cash refund, exchanged, or used to purchase any other merchandise, or provide allowances or iTunes Gifts by either You or Holder. This includes Custom Codes that have expired unused.

3.      Custom Codes may only be redeemed through the App Store in the Territory, open only to persons in the Territory with a valid Apple ID. Not all App Store products may be available in all Territories. Internet access (fees may apply), the latest version of iTunes software, and other compatible software and hardware are required.

4.      Access to, redemption of Custom Codes on, or purchases from, and use of products purchased on, the App Store, are subject to acceptance of its Terms of Service presented at the time of redemption or purchase, and found at http://www.apple.com/legal/itunes/ww/.

5.      Latest version of iTunes software required to access the App Store, and can be downloaded at no charge at www.apple.com/itunes/download/. Use of iTunes software is subject to acceptance of its software license agreement presented at the time of installation. The minimum system requirements for running the software are available at www.apple.com/itunes/download/.

6.      Custom Codes will be placed in the Holder's applicable iTunes account and are not transferable.

7.      If a Holder's order exceeds the amount available on the Custom Codes, Holder must establish an iTunes Store Purchaser account and pay for the balance with a credit card.

8.      Except as stated otherwise, data collection and use are subject to Apple's Privacy Policy, which can be found at http://www.apple.com/legal/privacy.

9.      Apple is not responsible for lost or stolen Custom Codes. If Holders have any questions, they may visit Apple's iTunes Store Purchaser Service at www.apple.com/support/itunes/.

10.      Apple reserves the right to close Holder accounts and request alternative forms of payment if Custom Codes are fraudulently obtained or used on the App Store.

11.      APPLE AND ITS LICENSEES, AFFILIATES, AND LICENSORS MAKE NO WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO CUSTOM CODES OR THE APP STORE, INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  IN THE EVENT A CUSTOM CODE IS NON-FUNCTIONAL, HOLDER'S OR COMPANY'S SOLE REMEDY, AND APPLE'S SOLE LIABILITY, SHALL BE THE REPLACEMENT OF SUCH CUSTOM CODE. THESE LIMITATIONS MAY NOT APPLY. CERTAIN LOCAL AND TERRITORY LAWS DO NOT ALLOW LIMITATIONS ON IMPLIED WARRANTIES OR THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES. IF THESE LAWS APPLY, SOME OR ALL OF THE ABOVE DISCLAIMERS, EXCLUSIONS, OR LIMITATIONS MAY NOT APPLY, AND YOU OR HOLDER MAY ALSO HAVE ADDITIONAL RIGHTS.

12.      Apple reserves the right to change any of the terms and conditions set forth in this Attachment 1 from time to time without notice.

13.      Any part of these terms and conditions may be void where prohibited or restricted by law.

PX-2557.78

# EXHIBIT D
## (to Schedule 1)
## Additional App Store Terms

**1.      Discoverability on the App Store**:  The discoverability of Your Licensed Application in the App Store depends on several factors, and Apple is under no obligation to display, feature, or rank Your Licensed Application in any particular manner or order in the App Store.

(a)  The main parameters used for app ranking  and discoverability are text relevance, such as using an accurate title, adding relevant keywords/metadata, and selecting descriptive categories in the Licensed Application; customer behavior relating to the number and quality of ratings and reviews and application downloads; date of launch in the App Store may also be considered for relevant searches; and whether You have violated any rules promulgated by Apple.  These main parameters deliver the most relevant results to customer search queries.

(b) When considering apps to feature in the App Store, our editors look for high -quality apps across all categories, with a particular focus on new apps and apps with significant updates. The main parameters that our editors consider are UI design, user experience, innovation and uniqueness, localizations, accessibility, App Store product page screenshots, app previews, and descriptions; and additionally for games, gameplay, graphics and performance, audio, narrative and story depth, ability to replay, and gameplay controls. These main parameters showcase high-quality, well-designed, and innovative apps.

(c)  If You use an Apple service for paid promotion of Your app on the App Store, Your app may be presented in a promotional placement on the Search results page and designated as advertising content.

To learn more about app discoverability, visit  https://developer.apple.com/app-store/discoverability/.

**2.      Access to App Store Data**

You can access data concerning your Licensed Application's financial performance and user engagement in App Store Connect by using App Analytics, Sales and Trends, and Payments and Financial Reports. Specifically,  You can obtain all of Your Licensed Application's financial results for individual app sales and in-app purchases (including subscriptions) in Sales and Trends, or download the data from Financial Reports; and You can view App Analytics for non-personally identifiable data that allows You to understand how consumers engage with your Licensed Applications. More information can be found at https://developer.apple.com/app-store/measuring-app-performance/. App Analytics data is provided only with the consent of our customers. For more information, see https://developer.apple.com/app-store-connect/analytics/. Apple does not provide You with access to personal or other data provided by or generated through use of the App Store by other developers ; nor does Apple provide other developers with access to personal or other data provided by or generated through Your use of the App Store. Such data sharing would conflict with Apple's Privacy Policy, and with our customers ' expectations about how Apple treats their data. You can seek to collect information from customers directly, so long as such information is collected in a lawful manner, and You follow the App Store Review Guidelines.

Apple handles personal and non-personal information as outlined in Apple's Privacy Policy. Information about Apple's access to and practices concerning developer and customer data can be found in "App Store & Privacy," accessible at https://support.apple.com/enus/HT210584. Apple may provide some non-personal information to strategic partners that work with Apple to provide our products and services, help Apple market to customers, and sell ads on Apple's behalf to display in the App Store and Apple News and Stocks. Such partners are obligated to protect that information and may be located wherever Apple operates.

PX-2557.79

3.      **P2B Regulation Complaints and Mediation for EU**

These provisions become effective 12 July 2020 .

Developers established in, and which offer goods or services to customer located in, the European Union may submit complaints pursuant to the Regulation of the European Parliament and of the Council on promoting fairness and transparency for business users of online intermediation services ("P2B Regulation") related to the following issues at developer.apple.com/contact (a) Apple's alleged non-compliance with any obligations set forth in the P2B Regulation which affect You in the European Union; (b) technological issues relating directly to distribution of Your Licensed Application on the App Store in the European Union that affect You; or (c) measures taken by or behavior of Apple relating directly to distribution of Your Licensed Application on the App Store in the European Union that affect You.  Apple will consider and process such complaints and communicate the outcome to You.

Pursuant to the P2B Regulation, Apple identifies the following panel of mediators with which Apple is willing to engage to attempt to reach an agreement with  developers established in, and which offer goods or services to customer located in, the European Union  on the settlement, out of court, of any disputes between Apple and You arising in relation to the provision of the App Store services concerned, including complaints that could not be resolved by means of our complaint-handling system:

Centre for Effective Dispute Resolution
P2B Panel of Mediators
70 Fleet Street
London
EC4Y 1EU
United Kingdom
https://www.cedr.com/p2bmediation/

# EXHIBIT 22

# Newsroom

PRESS RELEASE
November 18, 2020

# Apple announces App Store Small Business Program



New program reduces App Store commission to 15 percent for small businesses earning up to $1 million per year

Cupertino California — Apple today announced an industry-leading new developer program to accelerate innovation and help small businesses and

Case 4:19-cv-03074-YGR Document 332-14 Filed 06/01/21 Page 84 of 248

independent developers propel their businesses forward with the next generation of groundbreaking apps on the App Store. The new App Store Small Business Program will benefit the vast majority of developers who sell digital goods and services on the store, providing them with a reduced commission on paid apps and in-app purchases. Developers can qualify for the program and a reduced, 15 percent commission if they earned up to $1 million in proceeds during the previous calendar year.

The App Store Small Business Program, which will launch on January 1, 2021, comes at an important time as small and independent developers continue working to innovate and thrive during a period of unprecedented global economic challenge. Apps have taken on new importance as businesses adapt to a virtual world during the pandemic, and many small businesses have launched or dramatically grown their digital presence in order to continue to reach their customers and communities. The program's reduced commission means small developers and aspiring entrepreneurs will have more resources to invest in and grow their businesses in the App Store ecosystem.



"Small businesses are the backbone of our global economy and the beating heart of innovation and opportunity in communities around the world. We're launching this program to help small business owners write the next chapter of creativity and prosperity on the App Store, and to build the kind of quality apps our customers love," said Tim Cook, Apple's CEO. "The App Store has been an engine of economic growth like none other, creating millions of new jobs and a pathway to entrepreneurship accessible to anyone with a great idea. Our new program carries that progress forward — helping developers fund their small businesses, take risks on new ideas, expand their teams, and continue to make apps that enrich people's lives."

While the comprehensive details will be released in early December, the essentials of the program's participation criteria are easy and streamlined:

- Existing developers who made up to $1 million in 2020 for all of their apps, as well as developers new to the App Store, can qualify for the program and the reduced commission.
- If a participating developer surpasses the $1 million threshold, the standard commission rate will apply for the remainder of the year.
- If a developer's business falls below the $1 million threshold in a future calendar year, they can requalify for the 15 percent commission the year after.

The App Store's standard commission rate of 30 percent remains in place for apps selling digital goods and services and making more than $1 million in proceeds, defined as a developer's post-commission earnings. Earlier this year, an independent study by the Analysis Group found that Apple's commission structure is in the mainstream for app distribution and gaming platforms.

Small business owners will continue to benefit from Apple's unparalleled suite of developer tools — including development applications, programming languages, a secure payment interface, and more than 250,000 essential software building blocks called APIs. Apple is committed to giving developers the tools to turn their brightest ideas into apps that change the world. Tools like HealthKit give engineers secure access to user health data, ARKit empowers developers to explore new frontiers of augmented reality, and Core ML harnesses the speed and intelligence of machine learning to help developers build powerful features with just a few lines of code.



Earning the trust of users and developers has been an important goal of the App Store from the beginning. It's why every one of the 1.8 million apps on the App Store undergoes a review process that developers and their customers can rely on — one that helps make sure every app is reliable, performs as expected, is free of objectionable content, and upholds the highest standards to protect users' privacy and security.

Developers of all sizes have built successful businesses while benefitting from the App Store's global reach encompassing users of the more than 1.5 billion Apple devices around the world in 175 countries and over 40 languages, with more than 180 local payment methods and 45 accepted currencies. In 2019 alone, the App Store ecosystem facilitated $519 billion in commerce worldwide — with over 85 percent of that total accruing solely to third-party developers and businesses of all sizes. The new App Store Small Business Program will build on that progress to generate even more digital commerce and app innovations, support new jobs, and help small and independent developers continue to bring great software to Apple users.

The App Store, which launched in 2008, is the world's safest and most vibrant app marketplace, currently offering 1.8 million apps and visited by half a billion people each week. It helps creators, dreamers, and learners of all ages and backgrounds connect with the tools and information they need to build a brighter future and a better world.

**Share article**



Apple revolutionized personal technology with the introduction of the Macintosh in 1984. Today, Apple leads the world in innovation with iPhone, iPad, Mac, Apple Watch, and Apple TV. Apple's five software platforms — iOS, iPadOS, macOS, watchOS, and tvOS — provide seamless experiences across all Apple devices and empower people with breakthrough services including the App Store, Apple Music, Apple Pay, and iCloud. Apple's more than 100,000 employees are dedicated to making the best products on earth, and to leaving the world better than we found it.

---

## Press Contacts

**Fred Sainz**
Apple
sainz@apple.com
(669) 227-0492

**Katie Clark Alsadder**
Apple
kclarkalsadder@apple.com
(408) 974-9976

**Apple Media Helpline**
media.help@apple.com
(408) 974-2042

---

## Latest News

UPDATE
**Apple's WWDC21 Swift Student Challenge winners**



**code to change the world**

June 1, 2021

---



FEATURE

**Apple Entrepreneur Camp participants break barriers on their coding journeys**

May 26, 2021

---



PRESS RELEASE

**Apple Via del Corso opens Thursday, May 27, in Rome**

May 26, 2021

---

## The latest news and updates, direct from Apple.

**Read more** ›

---

Newsroom    Apple announces App Store Small Business Program

| Shop and Learn | Services | Apple Store | For Business | Apple Values |
|---|---|---|---|---|
| Mac | Apple Music | Find a Store | Apple and Business | Accessibility |
| iPad | Apple TV+ | Shop Online | Shop for Business | Education |
| iPhone | Apple Fitness+ | Genius Bar | | Environment |
| Watch | Apple News+ | Today at Apple | **For Education** | Inclusion and Diversity |
| TV | Apple Arcade | Apple Camp | Apple and Education | Privacy |
| Music | iCloud | Apple Store App | Shop for K-12 | Racial Equity and Justice |
| AirPods | Apple One | Refurbished and Clearance | Shop for College | Supplier Responsibility |
| HomePod | Apple Card | Financing | | |
| iPod touch | Apple Books | Apple Trade In | **For Healthcare** | **About Apple** |
| AirTag | App Store | Order Status | Apple in Healthcare | Newsroom |
| Accessories | | Shopping Help | Health on Apple Watch | Apple Leadership |
| Gift Cards | **Account** | | Health Records on iPhone | Career Opportunities |
| | Manage Your Apple ID | | | Investors |
| | Apple Store Account | | **For Government** | Ethics & Compliance |
| | iCloud.com | | Shop for Government | Events |
| | | | Shop for Veterans and Military | Contact Apple |

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE.

---

Copyright © 2021 Apple Inc. All rights reserved.    Privacy Policy    Terms of Use    Sales and Refunds    Legal    Site Map    United States

# EXHIBIT 23



## HAGENS BERMAN





# EXPERIENCE.
# INNOVATION.
# RESULTS.

Hagens Berman is a leader in class-action litigation and an international law firm driven by a team of legal powerhouses. With a tenacious spirit, we are motivated to make a positive difference in people's lives.

# Table of Contents

## INTRODUCTION

The Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
Locations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

## PRACTICE AREAS

Anti-Terrorism . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
Antitrust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
Automotive - Non-Emissions Cases . . . . . . . . . .13
Automotive - Emissions Litigation . . . . . . . . . . . .15
Civil and Human Rights . . . . . . . . . . . . . . . . . . . .17
Consumer Protection - General Class Litigation . .18
Consumer Protection - Drug and Supplement
    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20
Employment Litigation . . . . . . . . . . . . . . . . . . . . .23
Environmental Litigation . . . . . . . . . . . . . . . . . . . .25
Governmental Representation . . . . . . . . . . . . . . . .27
Intellectual Property . . . . . . . . . . . . . . . . . . . . . . .29
Investor Fraud - Individual and Class Action
    Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
Investor Fraud - Institutional Investor Portfolio
    Monitoring and Recovery Services . . . . . . . . .33
Personal Injury and Abuse . . . . . . . . . . . . . . . . . .34
Sexual Abuse amd Harassment . . . . . . . . . . . . . .35
Sports Litigation . . . . . . . . . . . . . . . . . . . . . . . . .38
Whistleblower Litigation . . . . . . . . . . . . . . . . . . . . 41

## APPELLATE VICTORIES

Strengthening Consumer Law . . . . . . . . . . . . . . .45

## U.S. LEGAL TEAM
### MANAGING PARTNER

Steve W. Berman . . . . . . . . . . . . . . . . . . .47

### PARTNER, EXECUTIVE COMMITTEE MEMBER

Thomas M. Sobol . . . . . . . . . . . . . . . . . . 52
Robert B. Carey . . . . . . . . . . . . . . . . . . . 55

### PARTNER

Leonard W. Aragon . . . . . . . . . . . . . . . . 58
Gregory T. Arnold . . . . . . . . . . . . . . . . . 59
Lauren Guth Barnes . . . . . . . . . . . . . . . 62
Ian M. Bauer . . . . . . . . . . . . . . . . . . . . . 65
Elaine T. Byszewski . . . . . . . . . . . . . . . . .67
Catherine Y.N. Gannon . . . . . . . . . . . . 69
Kristen A. Johnson . . . . . . . . . . . . . . . . .71
Reed R. Kathrein . . . . . . . . . . . . . . . . . .74
Daniel J. Kurowski . . . . . . . . . . . . . . . . .76
Thomas E. Loeser . . . . . . . . . . . . . . . . . .78
Robert F. Lopez . . . . . . . . . . . . . . . . . . 80
Jessica R. MacAuley . . . . . . . . . . . . . . . 82
Barbara Mahoney . . . . . . . . . . . . . . . . . 83
Sean R. Matt . . . . . . . . . . . . . . . . . . . . . 85
Martin D. McLean . . . . . . . . . . . . . . . . .87
David P. Moody . . . . . . . . . . . . . . . . . . . 88
David S. Nalven . . . . . . . . . . . . . . . . . . . 89
Ben Harrington . . . . . . . . . . . . . . . . . . . 90
Christopher A. O'Hara . . . . . . . . . . . . . .91
Jerrod C. Patterson . . . . . . . . . . . . . . . . 92
Rio Pierce . . . . . . . . . . . . . . . . . . . . . . . 94
Shana E. Scarlett . . . . . . . . . . . . . . . . . . 95
Craig R. Spiegel . . . . . . . . . . . . . . . . . . .97
Ronnie Seidel Spiegel . . . . . . . . . . . . . . 98
Shayne C. Stevenson . . . . . . . . . . . . . . .100
Andrew M. Volk . . . . . . . . . . . . . . . . . . .103
Garth Wojtanowicz . . . . . . . . . . . . . . . . .104

### SENIOR COUNSEL

Lucas E. Gilmore . . . . . . . . . . . . . . . . . .105
Kevin K. Green . . . . . . . . . . . . . . . . . . . .106
Anne F. Johnson . . . . . . . . . . . . . . . . . .109

### OF COUNSEL

Karl Barth . . . . . . . . . . . . . . . . . . . . . . . 110
Jeniphr A.E. Breckenridge . . . . . . . . . . 111
Erin C. Burns . . . . . . . . . . . . . . . . . . . . 112
Mark S. Carlson . . . . . . . . . . . . . . . . . . 114
Jeannie Evans . . . . . . . . . . . . . . . . . . . . 116
Philip J. Graves . . . . . . . . . . . . . . . . . . . 117
Laura Hayes . . . . . . . . . . . . . . . . . . . . . 119
John D. Jenkins . . . . . . . . . . . . . . . . . . .120
Robert A. Jigarjian . . . . . . . . . . . . . . . . . 121
Michella A. Kras . . . . . . . . . . . . . . . . . . .122
James J. Nicklaus . . . . . . . . . . . . . . . . .123
Greer N. Shaw . . . . . . . . . . . . . . . . . . . .124
Benjamin J. Siegel . . . . . . . . . . . . . . . . .126
Nick Styant-Browne . . . . . . . . . . . . . . . .127
Hannah Schwarzschild . . . . . . . . . . . . . .128
Nathaniel A. Tarnor . . . . . . . . . . . . . . . .129

### ASSOCIATE

Tory Beardsley . . . . . . . . . . . . . . . . . . . .130
Jacob Berman . . . . . . . . . . . . . . . . . . . . 131
Hannah Brennan . . . . . . . . . . . . . . . . . .132
Rochella T. Davis . . . . . . . . . . . . . . . . . .135
John DeStefano . . . . . . . . . . . . . . . . . . .136
Rachel E. Fitzpatrick . . . . . . . . . . . . . . . .138
Anthea D. Grivas . . . . . . . . . . . . . . . . . .139
Kristie A. LaSalle . . . . . . . . . . . . . . . . . . 141
Abbye Klamann Ognibene . . . . . . . . . . .142
Christopher R. Pitoun . . . . . . . . . . . . . . .143
Whitney K. Siehl . . . . . . . . . . . . . . . . . . .144
Emilee Sisco . . . . . . . . . . . . . . . . . . . . .146
Danielle Smith . . . . . . . . . . . . . . . . . . . .147
Shelby R. Smith . . . . . . . . . . . . . . . . . . .148
Jessica Thompson . . . . . . . . . . . . . . . . .149
Breanna Van Engelen . . . . . . . . . . . . . . 151
Mark Vazquez . . . . . . . . . . . . . . . . . . . .152
Gordie Verhovek . . . . . . . . . . . . . . . . . .153
Bradley J. Vettraino . . . . . . . . . . . . . . . .154
Ted Wojcik . . . . . . . . . . . . . . . . . . . . . . .155
Wesley A. Wong . . . . . . . . . . . . . . . . . . .156

### U.K. LEGAL TEAM

Michael J. Gallagher Jr. . . . . . . . . . . . . .158
Molly Ahmed . . . . . . . . . . . . . . . . . . . . .160

**INTRODUCTION**

# The Firm

Hagens Berman Sobol Shapiro LLP was founded in 1993 with one purpose: to help victims with claims of fraud and negligence that adversely impact a broad group. The firm initially focused on class action and other types of complex, multi-party litigation, but we have always represented plaintiffs, victims and the underdog. As the firm grew, it expanded its scope while staying true to its mission of taking on important cases that implicate the public interest. The firm represents plaintiffs including investors, consumers, inventors, workers, the environment, governments, whistleblowers and others.

*We are one of the nation's leading class-action law firms and have earned an international reputation for excellence and innovation in ground-breaking litigation against large corporations.*

**OUR FOCUS.** Our focus is to represent plaintiffs/victims in product liability, tort, antitrust, consumer fraud, sexual harassment, securities and investment fraud, employment, whistleblower, intellectual property, environmental, and employee pension protection cases. Our firm is particularly skilled at managing multi-state and nationwide class actions through an organized, coordinated approach that implements an efficient and aggressive prosecutorial strategy to place maximum pressure on defendants.

**WE WIN.** We believe excellence stems from a commitment to try each case, vigorously represent the best interests of our clients, and obtain the maximum recovery. Our opponents know we are determined and tenacious and they respect our skills and recognize our track record of achieving top results.

**WHAT MAKES US DIFFERENT.** We are driven to return to the class every possible portion of its damages—our track record proves it. While many class action or individual plaintiff cases result in large legal fees and no meaningful result for the client or class, Hagens Berman finds ways to return real value to the victims of corporate fraud and/or malfeasance.

**A NATIONWIDE REACH.** The scope of our practice is truly nationwide. We have flourished through our network of offices in eight cities across the United States, including Seattle, Boston, Chicago, Los Angeles, New York, Phoenix, San Diego and San Francisco, and one international office in London, and our eyes are always open to trends of fraud, negligence and wrongdoing that may be taking form anywhere in the world.  Our reach is not limited to the cities where we maintain offices. We have cases pending in courts across the country and have a vested interest in global instances of oppression, wrongdoing and injustice.



**INTRODUCTION**

# Locations

**SEATTLE**

1301 Second Avenue, Suite 2000
Seattle, WA 98101
(206) 623-7292 phone
(206) 623-0594 fax

**BERKELEY**

715 Hearst Avenue, Suite 202
Berkeley, CA 94710
(510) 725-3000 phone
(510) 725-3001 fax

**BOSTON**

55 Cambridge Parkway. Suite 301
Cambridge, MA  02142
(617) 482-3700 phone
(617) 482-3003 fax

**LONDON**

Hagens Berman UK LLP
10 Finsbury Square
Finsbury
London
0203 150 1445 phone

**CHICAGO**

455 N. Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
(708) 628-4949 phone
(708) 628-4950 fax

**LOS ANGELES**

301 North Lake Avenue, Suite 920
Pasadena, CA 91101
(213) 330-7150 phone
(213) 330-7152 fax

**NEW YORK**

322 8th Avenue, Suite 802
New York, NY 10001
(212) 752-5455 phone
(917) 210-3980 fax

**PHOENIX**

11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
(602) 840-5900 phone
(602) 840-3012 fax

**SAN DIEGO**

533 F Street
Suite 207
San Diego, CA 92101
(619) 929-3340 phone

HAGENS BERMAN SOBOL SHAPIRO LLP

…the track record of Hagens Berman['s] **Steve Berman is… impressive**, having racked… a $1.6 billion settlement in the Toyota Unintended Acceleration Litigation and a substantial number of really outstanding big-ticket results.

— *Milton I. Shadur, Senior U.S. District Judge, naming Hagens Berman Interim Class Counsel in Stericycle Pricing MDL*

Class counsel has **consistently demonstrated extraordinary skill and effort.**

— *U.S. District Judge James Selna, Central District of California, In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liability Litigation*

Berman is considered **one of the nation's top class-action lawyers**.

— *Associated Press*

## Elite Trial Lawyers
*The National Law Journal*

## The Plaintiffs' Hot List: The Year's Hottest Firms
*The National Law Journal*

## Most Feared Plaintiffs Firms
*Law360*

**Landmark consumer cases are business as usual** for Steve Berman.

— *The National Law Journal, naming Steve Berman one of the 100 most influential attorneys in the nation for the third time in a row*

[A] **clear choice** emerges. That choice is the Hagens Berman firm.

— *U.S. District Court for the Northern District of California, In re Optical Disk Drive Products Antitrust Litigation (appointing the firm lead counsel)*

All right, I think I can conclude on the basis with my five years with you all, watching this litigation progress and seeing it wind to a conclusion, that **the results are exceptional**… You did an exceptionally good job at organizing and managing the case…

— *U.S. District Court for the Northern District of California, In re Dynamic Random Access Memory Antitrust Litigation (Hagens Berman was co-lead counsel and helped achieve the $325 million class settlement)*

VISA-MASTERCARD ANTITRUST LITIGATION

The firm served as co-lead counsel in what was then the largest antitrust settlement in history – valued at $27 billion.

VOLKSWAGEN FRANCHISE DEALERS LITIGATION

The firm served as lead counsel representing VW franchise dealers in this suit related to the automaker's Dieselgate scandal. A $1.6 billion settlement was reached, and represents a result of nearly full damages for the class.

VOLKSWAGEN EMISSIONS LITIGATION

Hagens Berman was named a member of the Plaintiffs' Steering Committee and part of the Settlement Negotiating team in this monumental case that culminated in the largest automotive settlement in history – $17.4 billion.

TOYOTA UNINTENDED ACCELERATION LITIGATION

Hagens Berman obtained the then largest automotive settlement in history in this class action that recovered $1.6 billion for vehicle owners.

---

STATE OF WASHINGTON, ET AL. V. PHILIP MORRIS, ET AL.

## Hagens Berman represented 13 states in the largest recovery in litigation history – $206 billion.

---

E-BOOKS ANTITRUST LITIGATION

Hagens Berman served as co-lead counsel in this matter and secured a combined $560 million settlement on behalf of consumers against Apple and five of the nation's largest publishing companies.

LCD ANTITRUST LITIGATION

Hagens Berman served as a member of the Executive Committee representing consumers against multiple defendants in multi-district litigation. The total settlements exceeded $470 million.

MCKESSON DRUG LITIGATION

Hagens Berman was lead counsel in these racketeering cases against McKesson for drug pricing fraud that settled for more than $444 million on the eve of trials.

DAVITA HEALTHCARE PERSONAL INJURY LITIGATION

A Denver jury awarded a monumental $383.5 million jury verdict against GranuFlo dialysis provider DaVita Inc. on June 27, 2018, to families of three patients who suffered cardiac arrests and died after receiving dialysis treatments at DaVita clinics.

DRAM ANTITRUST LITIGATION

The firm was co-lead counsel, and the case settled for $345 million in favor of purchasers of dynamic random access memory chips (DRAM).

AVERAGE WHOLESALE PRICE DRUG LITIGATION

Hagens Berman was co-lead counsel in this ground-breaking drug pricing case against the world's largest pharmaceutical companies, resulting in a victory at trial. The court approved a total of $338 million in settlements.

ENRON ERISA LITIGATION

Hagens Berman was co-lead counsel in this ERISA litigation, which recovered in excess of $250 million, the largest ERISA settlement in history.

CHARLES SCHWAB SECURITIES LITIGATION

The firm was lead counsel in this action alleging fraud in the management of the Schwab YieldPlus mutual fund; a $235 million class settlement was approved by the court.

# Practice Areas

**PRACTICE AREAS**

# Anti-Terrorism

With a long track record of upholding the rights of the voiceless, Hagens Berman fights for justice on behalf of victims of international terrorism. Our anti-terrorism legal team builds on our robust history to forge innovative cases, bringing action against those that support terrorism.

Hagens Berman has always believed in fighting for the rights of those with no voice – those who are victims to tragic circumstances beyond their control. With our guiding principles driving our efforts, the firm has expanded its practice areas to include anti-terrorism litigation.

It's no secret that some businesses and individuals have pled guilty to violating United States laws that prohibit financial transactions with terrorist organizations and foreign states that support terrorism. We believe that the law is one of the most powerful tools to combat terrorism, and our renowned team of litigators brings a fresh perspective to the fight for victims' rights in this complex arena.

Through a deep understanding of both U.S. and international anti-terrorism laws, Hagens Berman builds on its foundation to investigate acts of terrorism and forge ironclad cases against anyone responsible, to help ensure that those at the mercy of the world's most egregious perpetrators of violence are represented with the utmost integrity and determination.

The firm's new practice area carries out our mission of building a safer world through novel applications of the law and steadfast dedication.

## › Chiquita Bananas

Hagens Berman represents American citizens who were victims of terrorism in Colombia. The victims were harmed by Colombian terrorists that Chiquita Brands International Inc. paid so that it could grow bananas in Colombia in regions that were controlled by the terrorists. Chiquita is one of the world's largest producers and marketers of fruits and vegetables and admitted it paid Colombian terrorist organizations as part of a guilty plea to settle criminal charges brought by the U.S. Department of Justice

Chiquita was placed on corporate probation and paid a $25 million dollar fine because of its conduct in Colombia.

Plaintiffs have sued Chiquita under the U.S. Anti-Terrorism Act, which allows American victims of international terrorism to sue anyone responsible and to recover treble damages and attorney's fees. The claims are pending in the U.S. District Court for the Southern District of Florida as part of the consolidated multi-district litigation to resolve claims related to Chiquita's payments to Colombian terrorist organizations.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Antitrust

Hagens Berman works to preserve healthy marketplace competition and fair trade by protecting consumers and businesses that purchase goods and services from price fixing, market allocation agreements, monopolistic schemes and other trade restraints. The firm's lawyers have earned an enviable reputation as experts in this often confusing and combative area of commercial litigation. Our attorneys have a deep understanding of the legal and economic issues within the marketplace, allowing us to employ groundbreaking market theories that shed light on restrictive anti-competitive practices.

Hagens Berman represents millions of consumers in several high-profile class-action lawsuits, and takes on major antitrust litigation to improve market conditions for consumers, businesses and investors. We have represented plaintiffs in markets as diverse as debit and credit card services, personal computer components, electric and gas power, airlines, and internet services, and we have prevailed against some of the world's largest corporations.

The firm has also generated substantial recoveries on behalf of health plans and consumers in antitrust involving pharmaceutical companies abusing patent rights to block generic drugs from coming to market. Hagens Berman has served as lead or co-lead counsel in landmark litigation challenging anti-competitive practices, in the Paxil Direct Purchaser Litigation ($100 million), Relafen Antitrust Litigation ($75 million), Tricor Indirect Purchaser Antitrust Litigation ($65.7 million), and Augmentin Antitrust Litigation ($29 million). Representative antitrust successes on behalf of our clients include:

## › Visa/MasterCard

Helped lead this record-breaking antitrust case against credit card giants Visa and MasterCard that challenged charges imposed in connection with debit cards.

RESULT: $3.05 billion settlement and injunctive relief valued at more than $20 billion.

## › NCAA: Scholarships/Grants-In-Aid (GIAs)

In a first-of-its-kind antitrust action and potentially far-reaching case, Hagens Berman filed a class-action affecting approximately 40,000 Division I collegiate athletes who played men's or women's basketball, or FBS football, brought against the NCAA and its most powerful members, including the Pac-12, Big Ten, Big-12, SEC and ACC, claiming these entities violated federal antitrust laws by drastically reducing the number of scholarships and financial aid student-athletes receive to an amount below the actual cost of attendance and far below what the free market would bare.

The firm continues to fight on behalf of student-athletes to level the playing field and bring fairness to college sports and players.

RESULT: $208.9 million settlement, bringing an estimated average amount of $6,500 to each eligible class member who played his or her sport for four years.

## › Apple E-books

With state attorneys general, the firm secured a $166 million settlement with publishing companies that conspired with Apple to fix e-book prices. The firm then look on Apple for its part in the price-fixing conspiracy. In the final stage in the lawsuit, the Supreme Court denied appeal from Apple, bringing the consumer payback amount to more than twice the amount of losses suffered by the class of e-book purchasers. This represents one of the most successful recovery of damages in any antitrust lawsuit in the country.

RESULT: $560 million total settlements.

**PRACTICE AREAS**

# Antitrust

> **Animation Workers Antitrust**

Hagens Berman represents a nationwide class of animators and other artistic workers in an antitrust class-action case filed against defendants Pixar, Lucasfilm and its division Industrial Light & Magic, DreamWorks Animation, The Walt Disney Company, Sony Pictures Animation, Sony Pictures Imageworks, Blue Sky Studios, ImageMovers LLC, ImageMovers Digital LLC and others.

RESULT: Total settlements have reached $168 million, resulting in a payment of more than $13,000 per class member.

> **TFT LCDs**

Hagens Berman Sobol Shapiro filed a class-action lawsuit against several major manufacturers of TFT LCD products, claiming the companies engaged in a conspiracy to fix, raise, maintain and stabilize the price of televisions, desktop and notebook computer monitors, mobile phones, personal digital assistants (PDAs) and other devices. After years of representing consumers against multiple defendants in multi-district litigation, the case against Toshiba went to trial. Toshiba was found guilty of price-fixing in 2012, and settled.

RESULT: $470 million in total settlements.

> **DRAM**

The suit claimed DRAM (Dynamic Random Access Memory) manufacturers secretly agreed to reduce the supply of DRAM, a necessary component in a wide variety of electronics which artificially raised prices. The class included equipment manufacturers, franchise distributors and purchasers.

RESULT: $375 million settlement.

> **Optical Disk Drives**

Hagens Berman fought on behalf of consumers in a lawsuit filed against Philips, Pioneer and others for artificially inflating the price of ODDs for consumers.

RESULT: $180 million in total settlements reclaimed for consumers.

> **Lithium Ion Batteries**

Hagens Berman filed a class-action lawsuit against some of the largest electronics manufacturers including Sony, Samsung and Panasonic for illegally fixing the price of lithium ion batteries, pushing costs higher for consumers. Defendants collectively controlled between 60 to 90 percent of the market for lithium-ion batteries between 2000 and 2011 and used that power to fix battery prices.

RESULT: $65 million in total settlements against multiple defendants.

> **AC Nielsen**

Represented Information Resources, Inc. ("IRI"), in a suit claiming that AC Nielsen's anti-competitive practices caused IRI to suffer significant losses.

RESULT: $55 million settlement.

> **Dairy Products**

The firm filed a class-action suit against several large players in the dairy industry, including the National Milk Producers Federation, Dairy Farmers of America, Land O'Lakes, Inc., Agri-Mark, Inc. and Cooperatives Working Together (CWT) that together produce nearly 70 percent of the milk consumed in the United States. The suit alleging that the groups conspired to fix the price of milk throughout the United States through an organized scheme to limit production, involving the needless and premature slaughtering of 500,000 cows.

RESULT: $52 million settlement on behalf of consumers in 15 states and the District of Columbia who purchased dairy products.

> **Toys "R" Us Baby Products**

The firm brought this complaint on behalf of consumers claiming Toys "R" Us and several baby product manufacturers violated provisions of the Sherman Antitrust Act by conspiring to inflate prices of high-end baby products, including car seats, strollers, high chairs, crib bedding, breast pumps and infant carriers. The suit asked the court to end what it claims are anti-competitive activities and seeks damages caused by the company's actions.

RESULT: $35.5 million settlement.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Antitrust

> **EA Madden**

Class action claimed that video game giant Electronic Arts used exclusive licensing agreements with various football organizations to nearly double the price of several of its games.

RESULT: $27 million settlement and imposed limits on EA's ability to pursue exclusive licensing agreements.

> **Resistors Antitrust Litigation**

Hagens Berman is co-lead lead counsel, representing direct purchasers of linear resistors (a device in electronics used to limit electric current) against an alleged cartel of manufacturers who conspired to limit linear resistor price competition for nearly a decade.  The case is in its early stages and discovery is ongoing.

> **Nespresso**

Hagens Berman has assumed responsibility for a large antitrust case against Nespresso, a leading single-serve espresso and coffee maker, for its anticompetitive efforts to exclude environmentally friendly, biodegradable coffee capsules from the market.

In May 2010, our client Ethical Coffee Company ("ECC") sought to introduce an environmentally sound and more economical coffee capsule to be used in Nespresso's widely used coffee makers. It manufactured a single-use coffee capsule that did not contain harmful aluminum found in Nespresso's capsules. Nespresso knew that ECC posed a formidable challenge to its business model, which relied on captive consumers buying coffee capsules only from Nespresso. With a captive market, Nespresso could continue to charge consumers an inflated price, and continue to use the aluminum capsules that harm the environment.

The U.S. Court has already ruled that these claims can proceed to discovery. Hagens Berman anticipates damages associated with Nespresso's actions to be in the hundreds of millions of dollars.

**PRACTICE AREAS**

# Automotive - Non-Emissions Cases

In litigating cases we strive to make an impact for a large volume of consumers, especially those who fall victim to the gross negligence and oversight of some of the nation's largest entities: automakers. Hagens Berman's automotive litigation team has been named a 2016 Practice Group of the Year by Law360, highlighting its "eye toward landmark matters and general excellence," in this area of law.

The federal court overseeing the massive multi-district litigation against Toyota appointed the firm to co-lead one of the largest consolidations of class-action cases in U.S. history. The litigation combined more than 300 state and federal suits concerning acceleration defects tainting Toyota vehicles. Hagens Berman and its two co-lead firms were selected from more than 70 law firms applying for the role. Since then, the firm's automotive practice area has grown by leaps and bounds, pioneering new investigations into defects, false marketing and safety hazards affecting millions of drivers across the nation.

The firm was recently named to the National Law Journal's list of Elite Trial Lawyers for its work fighting corporate wrongdoing in the automotive industry. The firm's auto team members who worked on Toyota were also named finalists for Public Justice's Trial Lawyer of the Year award.

› **General Motors Ignition Switch Litigation**

Co-lead counsel in high-profile case on behalf of millions of owners of recalled GM vehicles affected by a safety defect linked to more than 120 fatalities. The suit alleges GM did not take appropriate measures, despite having prior knowledge of the defect. The case is pending, and most recently, the Supreme Court refused to hear GM's appeal regarding the pending suits when it claimed the cases were barred by its 2009 bankruptcy.

› **Toyota Sudden, Unintended Acceleration Litigation**

Co-lead counsel for the economic loss class in this lawsuit filed on behalf of Toyota owners alleging a defect causes vehicles to undergo sudden, unintended acceleration. In addition to safety risks, consumers suffered economic loss from decreased value of Toyota vehicles following media coverage of the alleged defect.

**RESULT:** Settlement package valued at up to $1.6 billion, which was at the time the largest automotive settlement in history.

› **MyFord Touch**

Hagens Berman represents owners of Ford vehicles equipped with MyFord Touch, an in-car communication and entertainment package, who claim that the system is flawed, putting drivers at risk of an accident while causing economic hardship for owners. The complaint cites internal Ford documents that purportedly show that 500 of every 1,000 vehicles have issues involving MyFord Touch due to software bugs, and failures of the software process and architecture. Owners report that Ford has been unable to fix the problem, even after repeated visits. A federal judge overseeing the case recently certified nine subclasses of owners of affected vehicles in various states.

› **Nissan Quest Accelerator Litigation**

Represented Nissan Quest minivan owners who alleged that their vehicles developed deposits in a part of the engine, causing drivers to apply increased pressure to push the accelerator down.

**RESULT:** Settlement providing reimbursement for cleanings or replacements and applicable warranty coverage.

› **Hyundai Kia MPG**

Hagens Berman sued Hyundai and Kia on behalf of owners after the car manufacturers overstated the MPG fuel economy ratings on 900,000 of its cars. The suit seeks to give owners the ability to recover a lump-sum award for the lifetime extra fuel costs, rather than applying every year for that year's losses.

**RESULT:** $255 million settlement. Lump-sum payment plan worth $400 million on a cash basis, and worth even more if owners opt for store credit (150 percent of cash award) or new car discount (200 percent of cash award) options.

PRACTICE AREAS

# Automotive - Non-Emissions Cases

### › BMW i3 REx

Hagens Berman is representing BMW owners in a national class-action lawsuit, following reports that BMW's i3 REx model electric cars contain a defect that causes them to suddenly and without warning lose speed and power mid-drive, putting drivers and passengers at risk of crash and injury.

### › Fiat Chrysler Gear Shifter Rollaway Defect

Hagens Berman has filed a national class-action lawsuit representing owners of Jeep Grand Cherokee, Chrysler 300 and Dodge Charger vehicles. The lawsuit states that Fiat Chrysler fraudulently concealed and failed to remedy a design defect in 811,000 vehicles that can cause cars to roll away after they are parked, causing injuries, accidents and other serious unintended consequences.

### › Ford Shelby GT350 Mustang Overheating

Hagens Berman represents owners of certain 2016 Shelby GT350 Mustang models in a case alleging that Ford has sold these vehicles as track cars built to reach and sustain high speeds, but failed to disclose that the absence of a transmission and differential coolers can greatly diminish the vehicle's reported track capabilities. Shelby owners are reporting that this defect causes the vehicle to overheat and go into limp mode, while in use, even when the car is not being tracked

### › Tesla AP2 Defect

The firm represents Tesla owners in a lawsuit against the automaker for knowingly selling nearly 50,000 cars with nonfunctional Enhanced Autopilot AP2.0 software that still has not met Tesla's promises, including inoperative Standard Safety Features on affected models sold in Q4 2016 and Q1 2017.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Automotive - Emissions Litigation

Having played a lead role in the record-breaking Volkswagen diesel emissions case, Hagens Berman knew the story wasn't over. Since the Dieselgate scandal began, the firm has uniquely dedicated resources to uncovering cheating devices used by other automakers. The firm has become a trailblazer in this highly specialized realm, outpacing federal agencies in unmasking fraud in emissions reporting.

When news broke in 2015 of Volkswagen's massive diesel emissions-cheating scandal, Hagens Berman was the first firm in the nation to file suit against the automaker for its egregious fraud, going on to represent thousands of owners in litigation and take a leading role on the Plaintiffs' Steering Committee that would finalize a $14.7 billion, record-breaking settlement for owners. Since this case emerged, Hagens Berman has been on the forefront of emissions litigation, relying on our legal team's steadfast and intensive investigative skills to unearth many other emissions-cheating schemes perpetrated by General Motors, Fiat Chrysler, Mercedes and other automakers, staying one step ahead of government regulators in our pursuit of car manufacturers that have violated emissions standards and regulations, as well as consumer confidence.

Hagens Berman's managing partner, Steve Berman, has dedicated the firm's resources to upholding the rights of consumers and the environment, becoming a one-man EPA. The firm is uniquely dedicated to this cause, and is the only firm that has purchased an emission testing machine to determine if other diesel car manufacturers install similar cheating devices, bringing new cases based on the firm's own research, time and testing.

### Volkswagen Diesel Emissions Litigation

Hagens Berman was the first firm in the nation to file a lawsuit against Volkswagen for its emissions fraud, seeking swift remedies for consumers affected by Volkswagen's fraud and violation of state regulations. The firm was named to the Plaintiffs' Steering Committee leading the national fight against VW, Porsche and Audi on behalf of owners and lessors of affected vehicles, and also served as part of the Settlement Negotiating team.

**RESULT:** The largest automotive settlement in history, $14.7 billion.

### Volkswagen Dealers Litigation

Hagens Berman served as lead counsel in a first-of-its-kind lawsuit brought by a franchise dealer. Three family-owned Volkswagen dealers filed a class action against VW stating that it intentionally defrauded dealers by installing so-called "defeat devices" in its diesel cars, and separately carried out a systematic, illegal pricing and allocation scheme that favored some dealers over others and illegally channeled financing business to VW affiliate, Volkswagen Credit, Inc. The settlement garnered nearly unanimous approval of dealers, with 99 percent participation in the settlement.

**RESULT:** $1.67 billion in benefits to Volkswagen dealers.

### Mercedes BlueTEC Emissions Litigation

Judge Jose L. Linares appointed the firm as interim class counsel in this class-action case against Mercedes concerning emissions of its BlueTEC diesel vehicles. Hagens Berman currently represents thousands of vehicle owners who were told by Mercedes that their diesel cars were "the world's cleanest and most advanced diesel," when in fact testing at highway speeds, at low temperatures, and at variable speeds, indicate a systemic failure to meet emissions standards. Low temperature testing at highway speeds for example, produced emissions that were 8.1 to 19.7 times the highway emissions standard. The lawsuit adds that testing at low temperatures at variable speeds produced emissions as high as 30.8 times the standard.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Automotive - Emissions Litigation

> **Chevy Cruze Diesel Emissions Litigation**

Hagens Berman filed a class-action lawsuit against Chevrolet (a division of General Motors) for installing emissions-cheating software in Cruze Clean Turbo Diesel cars, forcing consumers to pay high premiums for vehicles that pollute at illegal levels. While Chevy marketed these cars as a clean option, the firm's testing has revealed emissions released at up to 13 times the federal standard. In a recent ruling, U.S. District Judge Thomas L. Ludington upheld claims brought by owners.

> **Audi Emissions Litigation**

Hagens Berman unearthed additional emissions-cheating by Audi, affecting its gasoline 3.0-liter vehicles. The firm's investigation shows that the newly discovered defeat device is installed in gasoline engines and changes how the transmission operates when testing is detected to lower CO2 emissions, but otherwise allows excessive CO2 emissions in normal, on-road driving.

> **Fiat Chrysler EcoDiesel Emissions Litigation**

The firm is leading charges against Fiat Chrysler that it sold hundreds of thousands of EcoDiesel-branded vehicles that release illegally high levels of NOx emissions, despite explicitly selling these "Eco" diesels to consumers who wanted a more environmentally friendly vehicle. Hagens Berman was the first firm in the nation to uncover this scheme and file against Fiat Chrysler on behalf of owners of Dodge RAM 1500 and Jeep Grand Cherokee EcoDiesel vehicles. Following the firm's groundbreaking suit, the EPA took notice, filing formal accusations against Fiat Chrysler.

> **Dodge RAM 2500/3500 Diesel Emissions Litigation**

According to the firm's investigation, Dodge has sold hundreds of thousands of Dodge RAM 2500 and 3500 trucks equipped with Cummins diesel engines that release illegally high levels of NOx emissions at up to 14 times the legal limit. This defect causes certain parts to wear out more quickly, potentially costing owners between $3,000 and 5,000 to fix. The firm is leading a national class action against Fiat Chrysler for knowingly inducing consumers to pay premium prices for vehicles that fail to comply with federal regulations, and ultimately lead to higher costs of repairs for purchasers.

> **General Motors Duramax Emissions Litigation**

Hagens Berman recently pioneered another instance of diesel emissions fraud. The firm's independent testing revealed that GM had installed multiple emissions-masking defeat devices in its Duramax trucks, including Chevy Silverado and GMC Sierra models, in a cover-up akin to Volkswagen's Dieselgate concealment. In real world conditions the trucks emit 2 to 5 times the legal limit of deadly NOx pollutants, and the emissions cheating devices are installed in an estimated 705,000 affected vehicles.

**PRACTICE AREAS**

# Civil and Human Rights

Hagens Berman has represented individuals and organizations in difficult civil rights challenges that have arisen in the past two decades. In doing so, we have managed cases presenting complex legal and factual issues that are often related to highly charged political and historical events. Our clients have included such diverse communities as World War II prisoners of war, conscripted civilians and entire villages.

In this cutting-edge practice area, the firm vigilantly keeps abreast of new state and national legislation and case-law developments. We achieve positive precedents by zealously prosecuting in our clients' interests. Some examples of our work in this area include:

## › World Trade Organization Protests

During the 1999 World Trade Organization (WTO) protests in Seattle, tens of thousands of Seattle citizens became targets after Seattle officials banned all forms of peaceful protest. Seattle police attacked anyone found in the designated "no protest" zones with rubber bullets and tear gas. Hundreds of peaceful protesters were arrested and incarcerated without probable cause for up to four days. The firm won a jury trial on liability and ultimately secured a settlement from Seattle officials after filing a class action alleging violations of the First and Fourth Amendments.

## › Hungarian Gold Train

Following the firm's representation of former forced and enslaved laborers for German companies in the Nazi Slave Labor Litigation, Hagens Berman led a team of lawyers against the U.S. on behalf of Hungarian Holocaust survivors in the Hungarian Gold Train case. The suit claimed that, during the waning days of World War II, the Hungarian Nazi government loaded plaintiffs' valuable personal property onto a train, which the U.S. Army later seized, never returning the property to its owners and heirs.

## › Dole Bananas

Hagens Berman filed suit against the Dole Food Company, alleging that it misled consumers about its environmental record. The complaint alleged that Dole purchased bananas from a grower in Guatemala that caused severe environmental damage and health risks to local residents. Dole ultimately agreed to take action to improve environmental conditions, collaborating with a non-profit group on a water filtration project for local communities.

PRACTICE AREAS

# Consumer Protection - General Class Litigation

Hagens Berman is a leader in protecting consumers, representing millions in large-scale cases that challenge unfair, deceptive and fraudulent practices.

We realize that consumers suffer the brunt of corporate wrongdoing and have little power to hold companies responsible or to change those tactics. We believe that when backed by a tenacious spirit and determination, class action cases have the ability to serve as a powerful line of defense in consumer protection.

Hagens Berman pursues class litigation on behalf of clients to confront fraudulent practices that consumers alone cannot effectively dispute. We make consumers' concerns a priority, collecting consumer complaints against suspected companies and exploring all avenues for prosecution.

Hagens Berman's legacy of protecting consumer rights reflects the wide spectrum of scams that occur in the marketplace. The cases that we have led have challenged a variety of practices such as:

› False, deceptive advertising of consumer products and services

› False billing and over-charging by credit card companies, banks, telecommunications providers, power companies, hospitals, insurance plans, shipping companies, airlines and Internet companies

› Deceptive practices in selling insurance and financial products and services such as life insurance and annuities

› Predatory and other unfair lending practices, and fraudulent activities related to home purchases

A few case examples are:

› **Expedia Hotel Taxes and Service Fees Litigation**
Hagens Berman led a nationwide class-action suit arising from bundled "taxes and service fees" that Expedia collects when its consumers book hotel reservations. Plaintiffs alleged that by collecting exorbitant fees as a flat percentage of the room rates, Expedia violated both the Washington Consumer Protection Act

and its contractual commitment to charge as service fees only "costs incurred in servicing" a given reservation.
RESULT: Summary judgment in the amount of $184 million. The case settled for cash and consumer credits totaling $123.4 million.

› **Stericycle**
The firm served as court-appointed lead counsel in a class-action lawsuit against Stericycle alleging that the company violated contracts and defrauded them by hundreds of millions of dollars through an automatic price-increasing scheme. In February of 2017, a federal judge certified a nationwide consumer class. The class had more than 246,000 class members, with damages estimated preliminarily at $608 million.
RESULT: $295 million settlement

› **Tenet Healthcare**
In a pioneering suit filed by Hagens Berman, plaintiffs alleged that Tenet Healthcare charged excessive prices to uninsured patients at 114 hospitals owned and operated by Tenet subsidiaries in 16 different states.
RESULT: Tenet settled and agreed to refund to class members amounts paid in excess of certain thresholds over a four-and-a-half year period.

**PRACTICE AREAS**

# Consumer Protection - General Class Litigation

> **Wells Fargo Force-Placed Insurance**

Hagens Berman brought a case against Wells Fargo alleging it used "force-placed" insurance clauses in mortgage agreements, a practice that enables the bank to charge homeowners insurance premiums up to 10 times higher than normal rates. RESULT: Hagens Berman reached a settlement in this case, under which all class members will be sent checks for more than double the amount of commissions that Wells Fargo wrongfully extracted from the force placement of insurance on class members' properties.

> **Consumer Insurance Litigation**

Hagens Berman has pioneered theories to ensure that in first- and third-party contexts consumers and health plans always receive the treatment and benefits to which they are entitled. Many of our cases have succeeded in expanding coverage owed and providing more benefits; recovering underpayments of benefits; and returning uninsured/underinsured premiums from the misleading tactics of the insurer.

PRACTICE AREAS

# Consumer Protection - Drug and Supplement Litigation

Hagens Berman aggressively pursues pharmaceutical industry litigation, fighting against waste, fraud and abuse in healthcare. For decades, pharmaceutical manufacturers have been among the most profitable companies in America. But while pharmaceutical companies become richer, consumers, health plans and insurers pay higher costs for prescription and over-the-counter drugs and supplements. We shine the light of public scrutiny on this industry's practices and represent individuals, direct and indirect purchasers, and the nation's most forward-thinking public-interest groups.

The firm's pharmaceutical and dietary supplement litigation practice is second to none in the nation in terms of expertise, commitment and landmark results. Hagens Berman's attorneys have argued suits against dozens of major drug companies and the firm's aggressive prosecution of pharmaceutical industry litigation has recovered more than $1 billion in gross settlement funds.

## RECENT ANTITRUST RESOLUTIONS

In the last few years, Hagens Berman – as lead or co-lead class counsel – has garnered significant settlements in several antitrust cases involving prescription drugs. In each case, the plaintiffs alleged that a manufacturer of a brand-name drug violated federal or state antitrust laws by delaying generic competitors from coming to market, forcing purchasers to buy the more expensive brand name version instead of the generic equivalent. Examples of our recent successes include:

### › Flonase Antitrust Litigation

Hagens Berman represented purchasers in this case alleging pharmaceutical giant GlaxoSmithKline filed petitions to prevent the emergence of generic competitors to its drug Flonase, all to overcharge consumers and purchasers of the drug, which would have been priced lower had a generic competitor been allowed to come to market.

RESULT: $150 million class settlement.

### › Prograf Antitrust Litigation

Hagens Berman represented purchasers who alleged Astellas Pharma US, Inc. unlawfully maintained its monopoly and prevented generic competition for Prograf, an immunosuppressant used to help prevent organ rejection in transplant patients, harming purchasers by forcing them to pay inflated brand name prices for longer than they should have absent the anticompetitive conduct.

RESULT: The parties' motion for final approval of the $98 million class settlement is under advisement with the court.

### › Relafen Antitrust Litigation

Hagens Berman filed a class-action lawsuit against GlaxoSmithKline, SmithKline Beecham Corporation, Beecham Group PLC and SmithKline Beecham PLC, on behalf of consumers and third-party payors who purchased the drug Relafen or its generic alternatives. The suit alleged that the companies who manufacture and sell Relafen unlawfully obtained a patent which allowed them to enforce a monopoly over Relafen and prevented competition by generic prescription drugs, causing consumers to pay inflated prices for the drug.

RESULT: Under the terms of the settlement, the defendants will pay damages of $75 million to those included in the class. Of the total settlement amount, $25 million will be allocated to consumers and $50 million will be used to pay the claims of insurers and other third-party payors.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Consumer Protection - Drug and Supplement Litigation

> **Skelaxin Antitrust Litigation**

The firm represented purchasers in this case alleging King Pharmaceuticals LLC and Mutual Pharmaceutical Company alleging conspired to suppress generic competition and preserve King's monopoly in the market for the brand name muscle relaxant Skelaxin.

RESULT: $73 million class settlement.

> **Tricor Antitrust**

In June 2005, Hagens Berman filed an antitrust lawsuit on behalf of a class of consumers and third party payors against pharmaceutical manufacturers Abbott Laboratories and Fournier Industries concerning the brand name cholesterol drug Tricor. HBSS was appointed co-lead class counsel by the Court.

RESULT: $65.7 million recovery for consumers and third party payors who sued Abbott Laboratories and Fournier Industies in an antitrust action concerning the cholesterol drug Tricor.

**FRAUDULENT DRUG PRICING RESOLUTIONS**

Hagens Berman has led many complex cases that take on fraud and inflated drug prices throughout the U.S. This includes sweeping manipulation of the average wholesale price benchmark used to set prices for prescription drugs nationwide, fraudulent marketing of prescription drugs and the rampant use of co-pay subsidy cards that drive up healthcare costs. These efforts have led to several significant settlements:

> **McKesson and First DataBank Drug Litigation**

The firm discovered a far-reaching fraud by McKesson and became lead counsel in this RICO case against McKesson and First DataBank, alleging the companies fraudulently inflated prices of more than 400 prescription drugs.

RESULT: $350 million settlement and a four percent rollback on the prices of 95 percent of the nation's retail branded drugs, the net impact of which could be in the billions of dollars. The states and federal government then used Hagens Berman's work to bring additional suits. Hagens Berman represented several states and obtained settlements three to seven times more than that of the Attorneys General. Almost $1 billion was recovered from the McKesson fraud.

> **Average Wholesale Price Drug Litigation**

Hagens Berman served as co-lead counsel and lead trial counsel in this sprawling litigation against most of the nation's largest pharma companies, which alleges defendants artificially inflated Average Wholesale Price.

RESULT: Approximately $338 million in class settlements. Hagens Berman's work in this area led to many state governments filing suit and hundreds of millions in additional recovery.

**FRAUDULENT MARKETING RESOLUTIONS**

Hagens Berman also litigates against drug companies that fraudulently promote drugs for uses not approved by the Food and Drug Administration (FDA), commonly known as "off-label" uses. We also litigate cases against dietary supplement manufacturers for making false claims about their products. Recent successes include:

> **Neurontin Third Party Payor Litigation**

Hagens Berman served as lead trial counsel in this case alleging that Pfizer fraudulently and unlawfully promoted the drug Neurontin for uses unapproved by the FDA.

RESULT: A jury returned a $47 million verdict in favor of a single third-party payor plaintiff, automatically trebled to $142 million, and the court recently approved a $325 million class settlement.

> **Lupron**

Hagens Berman prosecuted a lawsuit against TAP Pharmaceuticals Products, Inc. on behalf of a class of consumers and third-party payors who purchased the drug Lupron. The suit charged that TAP Pharmaceutical Products, Inc., Abbott Laboratories and Takeda Pharmaceutical Company Limited conspired to fraudulently market, sell and distribute Lupron, causing consumers to pay inflated prices for the drug.

RESULT: Judge Richard Stearns issued a preliminary approval of the proposed settlement between TAP Pharmaceuticals and the class. Under the terms of the settlement, $150 million will be paid by TAP on behalf of all defendants.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS
# Consumer Protection – Drug and Supplement Litigation

## › Celebrex/Bextra

Hagens Berman filed a class-action lawsuit against Pfizer on behalf of individual consumers and third-party payors who paid for the drug Bextra. The firm was praised by Judge Breyer for its "unstinting" efforts on behalf of the class, adding, "The attorneys on both sides were sophisticated, skilled, professional counsel whose object was to zealously pursue their clients' interest, but not at the cost of abandoning the appropriate litigation goals, which were to see, whether or not, based upon the merits of the cases, a settlement could be achieved."

RESULT: $89 million settlement.

## › Vioxx Third Party Payor Marketing and Sales Practices Litigation

The firm served as lead counsel for third party payors in the Vioxx MDL, alleging that Merck & Co. misled physicians, consumers and health benefit providers when it touted Vioxx as a superior product to other non-steroidal anti-inflammatory drugs. According to the lawsuit,
The drug had no benefits over less expensive medications, but carried increased risk of causing cardiovascular events.

RESULT: $80 million settlement.

## › Serono Drug Litigation

Hagens Berman served as lead counsel for a class of consumers and third party payors in a suit alleging that global biotechnology company Serono, Inc. schemed to substantially increase sales of the AIDS drug Serostim by duping patients diagnosed with HIV into believing they suffered from AIDS-wasting and needed the drug to treat that condition.

RESULT: $24 million settlement.

## › Bayer Combination Aspirin/Supplement Litigation

Hagens Berman served as lead counsel on behalf of consumers in a suit alleging that Bayer Healthcare LLC deceptively marketed Bayer® Women's Low-Dose Aspirin + Calcium, an 81 mg aspirin pill combined with calcium, and  Bayer® Aspirin With Heart Advantage, an 81 mg aspirin pill combined with phytosterols. Plaintiffs alleged that Bayer overcharged consumers for these products or that these products should not have been sold, because these products were not FDA-approved, could not provide all advertised health benefits, and were inappropriate for long-term use.

RESULT: $15 million settlement.

## OTHER LANDMARK CASES

## › New England Compounding Center Meningitis Outbreak

In 2012, the Center for Disease Control confirmed that New England Compounding Center sold at least 17,000 potentially tainted steroid shots to 75 clinics in 23 states across the country, resulting in more than 64 deaths and 751 cases of fungal meningitis, stroke or paraspinal/peripheral joint infection. HBSS attorneys Thomas M. Sobol and Kristen A. Johnson serve as Court-appointed Lead Counsel for the Plaintiffs' Steering Committee on behalf of plaintiff-victims in MDL 2419 consolidated before The Honorable Ray W. Zobel in the United States District Court for the District of Massachusetts.

RESULT: $100 million settlement.

**PRACTICE AREAS**

# Employment Litigation

Hagens Berman takes special interest in protecting workers from exploitation or abuse. We take on race and gender discrimination, immigrant worker issues, wage and hour issues, on-the-job injury settlements and other crucial workplace issues.

Often, employees accept labor abuses or a curbing of their rights because they don't know the law, respect their superiors or fear for their jobs. We act on behalf of employees who may lack the individual power to bring about meaningful change in the workplace. We take a comprehensive approach to rooting out systemic employee abuses through in-depth investigation, knowledgeable experts and fervent exploration of prosecution strategies. Hagens Berman is a firm well-versed in taking on complicated employee policies and bringing about significant results. Representative cases include:

## CB Richard Ellis Sexual Harassment Litigation

Filed a class action against CB Richard Ellis, Inc., on behalf of 16,000 current and former female employees who alleged that the company fostered a climate of severe sexual harassment and discriminated against female employees by subjecting them to a hostile, intimidating and offensive work environment, also resulting in emotional distress and other physical and economic injuries to the class.

RESULT: An innovative and unprecedented settlement requiring changes to human resources policies and procedures, as well as the potential for individual awards of up to $150,000 per class member. The company agreed to increase supervisor accountability, address sexually inappropriate conduct in the workplace, enhance record-keeping practices and conduct annual reviews of settlement compliance by a court appointed monitor.

## Costco Wholesale Corporation Wage & Hour Litigation

Filed a class action against Costco Wholesale Corporation on behalf of 2,000 current and former ancillary department employees, alleging that the company misclassified them as "exempt" executives, denying these employees overtime compensation, meal breaks and other employment benefits.

RESULT: $15 million cash settlement on behalf of the class.

## Washington State Ferry Workers Wage Litigation

Represented "on-call" seamen who alleged that they were not paid for being "on call" in violation of federal and state law.

RESULT: Better working conditions for the employees and rearrangement in work assignments and the "on-call" system.

## SunDance Rehabilitation Corporation

Filed a class action against SunDance challenging illegal wage manipulation, inconsistent contracts and other compensation tricks used to force caregivers to work unpaid overtime.

RESULT: $3 million settlement of stock to be distributed out of the company's bankruptcy estate.

## Schneider National Carriers - Regional Drivers

The firm represents a certified class of regional drivers in a suit filed against Schneider National Carriers, claiming that the company failed to pay its workers for all  of their on duty time devoted to a variety of work tasks, including vehicle inspections, fueling, and waiting on customers and assignments. The suit also claims that the company does not provide proper meal and rest breaks and the company is liable for substantial penalties under the California Labor Code.

RESULT: A $28 million settlement on behalf of drivers.

## Schneider National Carriers - Mechanics

Hagens Berman filed a class-action lawsuit alleging that Schneider National Carriers failed to provide mechanics with proper overtime compensation, meal and rest break premiums, and accurate wage statements as required by California law.

RESULT: In March of 2013, the case was settled on terms mutually acceptable to the parties.

**PRACTICE AREAS**

# Employment Litigation

> **Swift Transportation Co. of Arizona LLC**

The firm represents a certified class of Washington-based truck
drivers against Swift Transportation. The suit alleges that Swift
failed to pay the drivers overtime and other earned wages in
violation of Washington state law.

An agreement to settle the case was granted preliminary approval
in October 2018. Final approval is pending.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS
# Environmental Litigation

Since Hagens Berman's founding, the firm has sought to work toward one simple goal: work for the greater good. Hagens Berman has established a nationally recognized environmental litigation practice, having handled several landmark cases in the Northwest, the nation and internationally.

Hagens Berman believes that protecting and restoring our environment from damage caused by irresponsible and illegal corporate action is some of the most rewarding work a law firm can do. As our firm has grown, we have established an internationally recognized environmental litigation practice.

**SCIENCE AND THE LAW**
Hagens Berman's success in environmental litigation stems from a deep understanding of the medical and environmental science that measures potential hazards. That expertise is translated into the courtroom as our attorneys explain those hazards to a judge or jury in easily understood terms.

**ENVIRONMENTAL EXPERTS**
Our firm's fostered deep relationships with top-notch environmental experts result in resonating arguments and court victories, as well as thoroughly researched and vetted investigations.

**REAL IMPACTS**
Environmental law is a priority at our firm and we have taken an active role in expanding this practice area. In 2003, Steve Berman and his wife Kathy worked with the University of Washington to create the Kathy and Steve Berman Environmental Law Clinic, giving law students the training and opportunities needed to become hands-on advocates for the environment.

Hagens Berman's significant environmental cases include:

**❯ Exxon Valdez Oil Spill Litigation**
Hagens Berman represented various classes of claimants, including fisherman and businesses located in Prince William Sound and other impacted areas who were damaged by one of the worst oil spills in United States history.
RESULT: A $5 billion judgment was awarded by a federal jury, and a $98 million settlement was achieved with Alyeska, the oil company consortium that owned the output of the pipeline.

**❯ Chinook Ferry Litigation**
The firm represented a class of property owners who challenged Washington State Ferries' high-speed operation of a new generation of fast ferries in an environmentally sensitive area of Puget Sound. Two of the ferries at issue caused environmental havoc and property damage, compelling property owners to act. A SEPA study conducted in response to the suit confirmed the adverse environmental impacts of the fast ferry service
RESULT: A $4.4 million settlement resulted that is among the most favorable in the annals of class litigation in Washington state.

**❯ Grand Canyon Litigation**
The firm represented the Sierra Club in a challenge to a Forest Service decision to allow commercial development on the southern edge of the Grand Canyon National Park.
RESULT: The trial court enjoined the project.

**❯ Kerr-McGee Radiation Case**
The firm brought a class action on behalf of residents of West Chicago, Illinois who were exposed to radioactive uranium tailings from a rare earth facility operated by Kerr-McGee.
RESULT: A medical monitoring settlement valued in excess of $5 million

**❯ Skagit Valley Flood Litigation**
Hagens Berman represented farmers, homeowners and businesses who claimed damages as a result of the 1990 flooding of this community. The case was in litigation for ten years and involved a jury trial of more than five months.
RESULT: Following the entry of 53 verdicts against Skagit County, the trial court entered judgments exceeding $6.3 million. Ultimately, the State Supreme Court reversed this judgment. Despite this reversal, the firm is proud of this representation and believes that the Supreme Court erred.

**❯ Idaho Grass Burning Case**
In 2002, Hagens Berman brought a class-action lawsuit on

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Environmental Litigation

behalf of Idaho residents who claimed grass-burning farmers released more than 785 tons of pollutants into the air, including concentrations of polycyclic aromatic hydrocarbons (PAHs), proven carcinogens. Burning the fields annually caused serious health problems, especially to those with respiratory ailments such as cystic fibrosis and asthma. The suit also asserted that Idaho's grass burning policies are far below the standards of other states such as neighboring Washington, where farmers use other techniques to remove grass residue from the fields.

**RESULT:** The lawsuit settled in 2006 under confidential terms.

## › Dole Bananas Case

The firm took on Dole Food Company Inc. in a class-action lawsuit claiming the world's largest fruit and vegetable company lied to consumers about its environmental record and banana-growing practices. The suit alleged that Dole misrepresented its commitment to the environment in selling bananas from a Guatemalan banana plantation that did not comply with proper environmental practices.

**RESULT:** The suit culminated in 2013. Dole and non-profit organization Water and Sanitation Health, Inc. collaborated on a water filter project to assist local communities in Guatemala.

## › Diesel Emissions Litigation

Second to none in uncovering emissions-cheating, the firm has dedicated its time and resources to breaking up the dirty diesel ring. After filing the first lawsuit in the country against Volkswagen, Audi and Porsche for its massive Dieselgate scandal in 2015, the firm went on to unmask emissions-cheating devices installed in vehicles made by Fiat Chrysler, Mercedes and General Motors and continues to investigate diesel cars for excessive, illegal and environmentally harmful levels of emissions.

**RESULT:** The firm's independently researched active cases have led to investigations by the EPA, DOJ and European authorities.

## › San Francisco and Oakland Climate Change Litigation

Hagens Berman represents the cities of San Francisco and Oakland, Calif. in two lawsuits filed against BP, Chevron Corp., Exxon Mobil Corp., Royal Dutch Shell PLC and ConocoPhillips alleging that the Big Oil giants are responsible for the cities' costs of protecting themselves from global warming-induced sea level rise, including expenses to construct seawalls to protect the two cities' more than 5 million residents. The newly filed case seek an order requiring defendants to abate the global warming-induced sea level rise by funding an abatement program to build

sea walls and other infrastructure. Attorneys for the cities say this abatement fund will be in the billions.

## › Florida Sugarcane Burning

Hagens Berman filed a class-action lawsuit against the sugar industry's largest entities on behalf of residents of various areas and townships of Florida that have long suffered from the corporations' wildly hazardous and damaging methods of harvesting sugarcane. The lawsuit states that this outdated method of harvesting has wreaked havoc on these Florida communities. The wildly archaic method of harvesting brings devastating toxic smoke and ash, often called "black snow," raining onto poor Florida communities for six months of the year. The lawsuit's defendants, commonly known as Big Sugar, farm sugarcane on approximately 400,000 acres in the area south and southeast of Lake Okeechobee.

## › Kivalina Global Warming Litigation

A tiny impoverished Alaskan village of Inupiat Eskimos took action against some of the world's largest greenhouse gas offenders, claiming that contributions to global warming are leading to the destruction of their village and causing erosion to the land that will eventually put the entire community under water. Hagens Berman, along with five law firms and two non-profit legal organizations, filed a suit against nine oil companies and 14 electric power companies that emit large quantities of greenhouse gases into the atmosphere. The lawsuit alleged their actions resulted in the destruction of protective ice, exposing the village to severe storms that destroy the ground the village stands on. Relocating the village of Kivalina could cost between $95 and $400 million, an expense the community cannot afford.

## › Cane Run Power Plant Coal Ash Case

In 2013, Hagens Berman filed a class-action lawsuit against Louisville Gas and Electric Company alleging it illegally dumped waste from a coal-fired power plant onto neighboring property and homes where thousands of Kentucky residents live. According to the complaint, Louisville Gas and Electric Company's Cane Run Power Plant is fueled by the burning of coal, which also produces coal combustion byproducts—primarily fly ash and bottom ash—that contain significant quantities of toxic materials, including arsenic, chromium and lead. The dust spewed by Cane Run contains known carcinogens, posing significant potential health hazards.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Governmental Representation

Hagens Berman has been selected by public officials to represent government agencies and bring civil law enforcement and damage recoupment actions designed to protect citizens and the treasury. We understand the needs of elected officials and the obligation to impartially and zealously represent the interests of the public, are often chosen after competitive bidding and have been hired by officials from across the political spectrum.

Hagens Berman has assisted governments in recovering billions of dollars in damages and penalties from corporate wrongdoers and, in the process, helped reform how some industries do business. In serving government, we are often able to leverage the firm's expertise and success in related private class-action litigation. Successes on behalf of government clients include:

› **Big Tobacco**

We represented 13 states in landmark Medicaid-recoupment litigation against the country's major tobacco companies. Only two states took cases to trial – Washington and Minnesota. The firm served as trial counsel for the state of Washington, becoming only one of two private firms in the entire country to take a state case to trial.

Hagens Berman was instrumental in developing what came to be accepted as the predominant legal tactic to use against the tobacco industry: emphasizing traditional law enforcement claims such as state consumer protection, antitrust and racketeering laws. This approach proved to be nearly universally successful at the pleading stage, leaving the industry vulnerable to a profits-disgorgement remedy, penalties and double damages. The firm also focused state legal claims on the industry's deplorable practice of luring children to tobacco use.

RESULT: $206 billion for state programs, the largest settlement in the history of civil litigation in the U.S.

› **McKesson Average Wholesale Price Litigation**

This litigation is yet another example of fraudulent drug price inflation impacting not just consumers and private health plans, but public health programs such as Medicaid and local government-sponsored plans as well.

RESULT: Hagens Berman has started the AWP class action, which resulted in many states filing cases. The firm represented several of those states in successful litigation.

› **McKesson Government Litigation**

On the heels of Hagens Berman's class action against McKesson, the firm led lawsuits by states (Connecticut, Utah, Virginia, Montana, Arizona).

RESULT: These states obtained recoveries three to seven times larger than states settling in the multi-state Attorneys General settlement. In addition, the firm obtained $12.5 million for the City of San Francisco and $82 million for a nationwide class of public payors.

› **Zyprexa Marketing & Sales Practices Litigation - Connecticut**

Hagens Berman served as outside counsel to then-Attorney General Richard Blumenthal in litigation alleging that Lilly engaged in unlawful off-label promotion of the atypical antipsychotic Zyprexa. The litigation also alleged that Lilly made significant misrepresentations about Zyprexa's safety and efficacy, resulting in millions of dollars in excess pharmaceutical costs borne by the State and its taxpayers.

RESULT: $25 million settlement.

› **General Motors Ignition Switch Litigation**

Hagens Berman is pleased to be assisting the Arizona Attorney General in its law enforcement action versus GM, as well as the district attorney of Orange County, California who filed a consumer protection lawsuit against GM, claiming the automaker deliberately endangered motorists and the public by intentionally concealing widespread, serious safety defects.

PRACTICE AREAS

# Governmental Representation

> ### State Opioid Litigation

Hagens Berman was hired to assist multiple municipalities in lawsuits brought against large pharmaceutical manufacturers including Purdue Pharma, Cephalon, Janssen Pharmaceuticals, Endo Health Solutions and Actavis charging that these companies and others deceived physicians and consumers about the dangers of prescription painkillers.

The firm was first hired by California governmental entities for the counties of Orange and Santa Clara. The state of Mississippi also retained the firm's counsel in its state suit brought against the manufacturer of opioids. The suit alleges that the pharma companies engaged in tactics to prolong use of opioids despite knowing that opioids were too addictive and debilitating for long-term use for chronic non-cancer pain.

In a third filing, Hagens Berman was retained as trial counsel for the state of Ohio. Filed on May 31, 2017, the firm is assisting the Ohio Attorney General's office in its case against five opioid makers. Ohio Attorney General Mike DeWine stated that "drug companies engaged in fraudulent marketing regarding the risks and benefits of prescription opioids which fueled Ohio's opioid epidemic," and that "these pharmaceutical companies purposely misled doctors about the dangers connected with pain meds that they produced, and that they did so for the purpose of increasing sales."

> ### Municipal Lending

Hagens Berman represents the cities of Los Angeles and Miami in a series of lawsuits filed against the nation's largest banks, including CitiGroup, JP Morgan, Wells Fargo and Bank of America alleging that they engage in systematic discrimination against minority borrowers, resulting in reduced property tax receipts and other damages to the cities. The suits seek damages for the City, claiming that the banks' alleged discriminatory behavior resulted in foreclosures, causing a reduction of property tax revenues and increased municipal service costs.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Intellectual Property

The Hagens Berman intellectual property team has deep experience in all aspects of intellectual property litigation. We specialize in complex and significant damages cases against some of the world's largest corporations.

The firm is primarily engaged in patent infringement litigation at this time. We seek to represent intellectual property owners, including inventors, universities, non-practicing entities, and other groups whose patent portfolios represents a significant creative and capital investment.

Our current and recent engagements include the following:

› **Bombadier Inc.**

The firm represented Arctic Cat Inc. in patent infringement litigation against Bombardier Recreational Products and BRP U.S. Inc. The complaint alleges that Bombardier's Sea-Doo personal watercraft infringe Arctic Cat's patents covering temporary steerable thrust technology used when the rider turns in off-throttle situations.

RESULT: Florida U.S. District Judge Beth Bloom issued a final judgment of $46.7 million against defendants, trebling initial damages of $15.5 million awarded in a unanimous jury verdict.

› **Angry Birds**

Hagens Berman represented a Seattle artist who filed a lawsuit against Hartz Mountain Corporation – one of the nation's largest producers of pet-related products – claiming the company illegally sold the artist's trademarked Angry Birds pet toy line to video game giant Rovio Entertainment Ltd, robbing her of millions of dollars of royalty fees.

RESULT: The case settled under confidential terms, which the firm found to be extremely satisfactory for the plaintiff.

› **Samsung, LG, Apple**

The firm represents FlatWorld Interactives LLC in patent litigation against Samsung, LG and Apple. The complaints allege that the defendants' mobile handsets, tablets, media players and other devices infringe a FlatWorld patent covering the use of certain gestures to control touchscreen displays.

RESULT: The case settled.

› **Oracle**

The firm represents Thought Inc. against Oracle Corporation in a suit alleging infringement of seven patents covering various aspects of middleware systems providing application to database mapping, reading and persistence.

› **Salesforce**

The firm represents Applications in Internet Time LLC in patent litigation against Salesforce Inc. The suit alleges that our client's patents cover the core architecture of Salesforce's platform for developing, customizing, and updating cloud-based software applications.

› **Nintendo**

The firm represented Japan-based Shinsedai Company in patent infringement litigation against Nintendo. The suit alleged that our client's patents were infringed by various sports games for the Nintendo Wii.

*Unlike other intellectual property firms, Hagens Berman only represents plaintiffs. This reduces the risk of potential conflicts of interest which often create delays in deciding whether or not to take a case at larger firms.*

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Intellectual Property

› **Electronic Arts**

Hagens Berman represents the original software developer of the
Electronic Arts (EA) NFL Madden Football video game series in
a suit alleging that he is owed royalties on EA Madden NFL titles
as well as other derivative products. We prevailed in two trials
against EA, and the verdicts were designated as the Top Verdict
of the Year (2013) by The Daily Journal. The judgment is on
appeal and if upheld will return for a final damages phase.

Hagens Berman is also skilled in other aspects of intellectual
property law, including trademark, trade dress, trade secret and
copyright litigation.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Investor Fraud - Individual and Class Action Litigation

Investing is a speculative business involving assessment of a variety of risks that can only be properly weighed with full disclosure of accurate information. No investor should suffer undue risk or incur losses due to misrepresentations related to their investment decisions.

Our attorneys work for institutional and individual investors defrauded by unscrupulous corporate insiders and mutual funds. The firm vigorously pursues fraud recovery litigation, forcing corporations and mutual funds to answer to deceived investors.

Hagens Berman is one of the country's leading securities litigation firms advising clients in both individual and class-action cases. The firm has experience, dedication and a team with the horsepower required to drive complex cases to exemplary outcomes. Our attorneys are authorities in an array of issues unique to federal and state securities statutes and related laws. We use a variety of highly experienced experts as an integral part of our prosecution team. Successes on behalf of our investor clients include:

### › Charles Schwab Securities Litigation
Lead counsel, alleging fraud in the management of the Schwab YieldPlus mutual fund.
RESULT: $235 million class settlement for investors.

### › Oppenheimer
Additional counsel for lead plaintiffs in class action alleging Oppenheimer misled investors regarding its Champion and Core Bond Funds.
RESULT: $100 million for the classes.

### › Tremont
Co-lead counsel in a case alleging Tremont Group Holdings breached its fiduciary duties by turning over $3.1 billion to Bernard Madoff. On Sept. 14, 2015, after nearly two years of negotiations and mediation, the court granted final approval of the plan of allocation and distribution of the funds which markets estimate could yield investors as much as $1.45 billion.
RESULT: $100 million settlement between investors, Tremont and its affiliates.

### › Boeing
Uncovered critical production problems with the 777 airliner documented internally by Boeing, but swept under the rug until a pending merger with McDonnell Douglas was completed.
RESULT: Record-breaking settlement of more than $92.5 million.

### › J.P. Morgan – Madoff
Case alleges that banking and investment giant J.P. Morgan was complicit in aiding Bernard Madoff's Ponzi scheme. Investors claim that J.P. Morgan operated as Bernard L. Madoff Investment Securities LLC's primary banker for more than 20 years.
RESULT: $218 million settlement amount for the class and a total of $2.2 billion paid from JPMorgan that will benefit victims of Madoff's Ponzi scheme.

### › Morrison Knudsen
Filed a shareholder class action, alleging that MK's senior officers concealed hundreds of millions in losses.
RESULT: More than $63 million for investors.

### › Raytheon/Washington Group
Charged Raytheon with deliberately misrepresenting the true financial condition of Raytheon Engineers & Constructors division in order to sell this division to the Washington Group at an artificially inflated price.
RESULT: $39 million settlement.

### › U.S. West
Represented shareholders of U.S. West New Vector in a challenge to the proposed buyout of minority shareholders by U.S. West.
RESULT: The proposed buyout was stayed, and a settlement was achieved, resulting in a $63 million increase in the price of the buyout.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Investor Fraud – Individual and Class Action Litigation

Our current casework includes:

> **Theranos Investor Litigation**

Hagens Berman represents Theranos investors in a lawsuit that states that Theranos and its officers set in motion a publicity campaign to raise billions of dollars for Theranos and themselves, and to induce investors to invest in Theranos, all the while knowing that its "revolutionary" blood test technology was essentially a hoax. The suit filed against the company, its CEO Elizabeth Holmes and Ramesh Balwani, alleges that Theranos' statements to investors were built on false statements. At the crux of the court's recent decision to uphold the investor case against Theranos was a finding that while plaintiffs did not directly purchase their securities from defendants, claims made by Theranos, Holmes and Balwani constituted fraud.

> **Aequitas Investor Litigation**

The firm represents a group of investors alleging that national law firm Sidley Austin LLP, Oregon law firm Tonkon Torp LLP and accounting firms Deloitte & Touche LLP and EisnerAmper LLP violated Oregon securities laws by participating or materially aiding in misrepresentations made by Aequitas Management LLC and contributing to a $350 million Ponzi scheme. Investors state, amongst other allegations, that in 2011 Aequitas began purchasing loan receivables from Corinthian College Inc. and had bought the rights to collect $444 million in loans. Investment managers hid the details of the transactions from investors, and deceived them when Corinthian's business was hit with regulatory challenges in 2014. When Corinthcollapsed in May 2015, the investment group and its managers continued to sell securities and used the money to pay off other investors and fund a lavish lifestyle, until Aequitas ultimately imploded in 2017, the investors claim.

> **China MediaExpress**

Hagens Berman represents investors in a case against China MediaExpress, which purported to be the owner of a network of advertising terminals on buses throughout China. The case alleges that the company and its auditor (Deloitte Touche Tohmatsu) participated in accounting fraud that ultimately led to the demise of the company. In early 2014, the court entered a default judgment in the amount of $535 million and certified a proposed class against China Media Express Holdings Inc. The case will proceed separately against Deloitte Touche Tohmatsu.

On May 6, 2015 Hagens Berman obtained a $12 million settlement from Deloitte Touche Tohmatsu, one of the largest settlements against an auditor in a Chinese "reverse merger" case which is now awaiting final approval from the court.

> **Altisource Asset Management Corporation**

The firm was appointed lead counsel in this institutional investor lawsuit brought on behalf of purchasers of Altisource Asset Management (AAMC). The complaint alleges that AAMC misrepresented or outright concealed its relationship with these companies and the extent to which the interconnected entities engaged in conflicted transactions with themselves. Estimates of class-wide damages are in the hundreds of millions of dollars. The firm recently filed the consolidated complaint and motions to dismiss are pending before the U.S. District Court for the District of the Virgin Islands.

**WHISTLEBLOWERS**

In an effort to curb Wall Street excesses, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, which built vigorous whistleblower protections into the legislation known as the "Wall Street Tip-Off Law." The law empowers the U.S. Securities and Exchange Commission to award between 10 and 30 percent of any monetary sanctions recovered in excess of $1 million to whistleblowers who provide information leading to a successful SEC enforcement. It also provides similar rewards for whistleblowers reporting fraud in the commodities markets.

Hagens Berman represents whistleblowers with claims involving violations of the Securities Exchange Act and the Commodities Exchange Act. Unlike traditional whistleblower firms who have pivoted into this area, Hagens Berman has a strong background and history of success in securities, antitrust and other areas of fraud enforcement, making us an ideal partner for these cases. Our matters before the SEC/CFTC include a range of claims, including market manipulation and fraudulent financial statements.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Investor Fraud – Institutional Investor Portfolio Monitoring and Recovery Services

Hagens Berman is a leading provider of specialized securities litigation services to public, private and Taft-Hartley pension funds. We offer proprietary and unparalleled asset protection and recovery services to both foreign and domestic institutions. Our institutional services provide participants with the ability to identify, investigate and react to potential wrongdoing by companies in which the institution invests.

**PORTFOLIO MONITORING.** Timely information and analysis are the critical ingredients of a successful fraud recovery program. Institutions must receive quick, reliable determinations concerning the source and extent of their losses, the likelihood of recoupment and the best manner for pursuing it. Our Portfolio Monitoring Service provides these services at no cost to participating institutions. The Hagens Berman Portfolio Monitoring Service has three primary components:

**TRACKING.** Alerts clients of any significant portfolio losses due to suspected fraud.

**ANALYSIS.** Provide clients with necessary legal and factual analyses regarding possible recovery options, removing from the institution any burden connected with scrutinizing myriad instances of potential wrongdoing and attempt to decipher whether direct, recoverable injuries have resulted.

**REPORTING.** Attorneys and forensic accounting fraud experts deliver a concise monthly report that furnishes comprehensive answers to these inquiries. On a case-by-case basis, the report specifies each of the securities in which the client lost a significant amount of money, and matches those securities with an analysis of potential fraud likelihood, litigation options and an expert recommendation on how best to proceed for maximum recovery.

Our Portfolio Monitoring Service performs its functions with almost no inconvenience to participating institutions. A client's custodian bank provides us with records detailing the client's transactions from the prior several years and on a regular basis thereafter. Importantly, none of the institution's own personnel is required to share in this task, as we acquire the information directly from the custodian bank.

We provide our Portfolio Monitoring service with no strings attached and allow our clients to act without cost or commitment. In instances where a litigation opportunity arises, we believe our skills make us the ideal choice for such a role, although the client is free to choose others.

When a portfolio loses money because of corporate deception, our litigation services seek to recover a substantial percentage of those losses, thereby increasing a fund's performance metric. As fiduciaries, money managers may not have the ability or desire to risk funds on uncertain litigation using typical hourly-rate law firms. Hagens Berman seeks to minimize the burden on the money manager by pursuing cases on a contingent-fee basis.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PRACTICE AREAS**

# Personal Injury and Abuse

For nearly two decades, Hagens Berman's blend of professional expertise and commitment to our clients has made our firm one of the most well-respected and successful mass tort and personal injury law firms in the nation. We deliver exceptional results for our clients by obtaining impressive verdicts and settlements in personal injury litigation.

Our attorneys have experience in wrongful death, brain injury and other catastrophic injury cases, as well as deep experience in social work negligence, medical malpractice, nursing home negligence and sexual abuse cases.

Hagens Berman also has unparalleled experience in very specific areas of abuse law, recovering damages on behalf of some of the most vulnerable people in our society.

**Sexual Abuse Litigation** Hagens Berman has represented a wide spectrum of individuals who have been victims of sexual abuse, including children and developmentally disabled adults. We treat each case individually, with compassion and attention to detail and have the expertise, resources and track record to stand up to the toughest opponents. In the area of sexual abuse, our attorneys have obtained record-breaking verdicts, including the largest personal injury verdict ever upheld by an appellate court in the state of Washington. More about Hagens Berman's sexual abuse practice ca be found on the following page.

**Nursing Home Negligence** Nursing home negligence is a growing problem throughout the nation. As our population ages, reports of elder abuse and nursing home negligence continue to rise. Today, elder abuse is one of the most rapidly escalating social problems in our society. Hagens Berman is uniquely qualified to represent victims of elder abuse and nursing home negligence. Our attorneys have secured outstanding settlements in this area of the law and have committed to holding nursing homes accountable for wrongdoing.

**Social Work Negligence** Social workers play a critical role in the daily lives of our nation's most vulnerable citizens. Social workers, assigned to protect children, the developmentally disabled and elderly adults, are responsible for critical aspects of the lives of tens of thousands of citizens who are unable to protect themselves. Many social workers do a fine job. Tragically, many do not. The results are often catastrophic when a social worker fails to monitor and protect his or her vulnerable client. All too often, the failure to protect a child or disabled citizen leads to injury or sexual victimization by predators. With more than $40 million in recoveries on behalf of vulnerable citizens who were neglected by social workers, Hagens Berman is the most experienced, successful and knowledgeable group of attorneys in this dynamic area of the law.

**Workplace Injury** While many workplace injury claims are precluded by workers compensation laws, many instances of workplace injury are caused by the negligence and dangerous oversight of third parties. In these instances, victims may have valid claims. Hagens Berman's personal injury legal team has successfully brought many workplace injury claims, holding third parties liable for our clients' serious bodily injuries.

**Medical Malpractice** Litigating a medical malpractice case takes acute specialization and knowledge of medical treatments and medicine. Notwithstanding these facts, Hagens Berman pursues meritorious medical malpractice claims in instances where clients have suffered life-altering personal injuries. Our firm's personal injury attorneys handle medical malpractice cases with the dedication and detail necessary to make victims whole. Hagens Berman is very selective in accepting medical malpractice cases and has been successful in recovering significant compensation for victims of medical error and negligence.

HAGENS BERMAN SOBOL SHAPIRO LLP

PRACTICE AREAS

# Sexual Abuse and Harassment

Hagens Berman's attorneys recently achieved a nationwide sexual harassment settlement on behalf of 16,000 women and also tried the first ever sexual harassment case in Washington state, and has represented women violated by Harvey Weinstein, as well as USC alumnae abused by the university's former gynecologist, Dr. George Tyndall. Our firm is committed to protecting and empowering individuals.

At Hagens Berman, we believe no one is above the law, and that no position of power should shield someone from being held accountable.

Right now, we are witnessing the silencing, belittling and abuse that women everywhere in this nation are subjected to. They are subjected to a system that does not respect them. The backlash against the brave survivors who have stepped forward to report sexual assault is unacceptable.

We believe survivors. Our firm's sexual harassment attorneys have protected their rights for decades throughout their legal careers, and we are dedicated to upholding the rights of the most vulnerable. Women should be heard, respected and protected from systemic abuse.

Sexual harassment is present and pervasive in many workplaces, industries and professional environments, and has damaged the lives and careers of countless individuals. It affects hundreds of thousands of women and men in the U.S., 51 percent of which are harassed by an authority figure, making it harder to come forward for fear of retaliation.

All too often, acts of sexual harassment and sexual misconduct are protected by systemic cover-ups by companies and organized agreements between those in power. Particular industries are more susceptible to these cover-ups including: entertainment and sports media, STEM, law enforcement, food service, politics, military, tech, finance, hospitality and transportation. But sexual harassment is pervasive in many other environments and is often obscured from view for years.

In these industries, victims are routinely subjected to widespread policies and practices that create an environment promoting quid pro quo arrangements in which victims feel pressured to take part in sexual acts and feel powerless against unwanted advancements. Victims are also often punished for not taking part.

The firm has represented women violated by Harvey Weinstein, as well as USC alumnae abused by the university's former gynecologist, Dr. George Tyndall, tried the first ever sexual harassment case in Washington state, and achieved a nationwide sexual harassment settlement on behalf of 16,000 women.

Representative sexual harassment successes and cases on behalf of our clients include:

› **USC, Dr. Tyndall Sexual Harassment**
In May of 2018, Hagens Berman filed a class-action lawsuit against the University of Southern California (USC) and Dr. George Tyndall, the full-time gynecologist at USC's student health clinic. Tyndall sexually harassed, violated and engaged in wildly inappropriate behavior with female students who sought his medical care, according to news outlets, which stated he saw tens of thousands of female patients during his time at USC.

Official complaints of Dr. Tyndall's behavior began to surface at USC in the 1990s, but despite the university's knowledge of Dr. Tyndall's behavior, it did not report him to the agency responsible for protecting the public from problem doctors. USC did nothing, for decades, as more and more female students were sent into Dr. Tyndall's office.

The settlement's three-tier structure allows class members to

PRACTICE AREAS

# Sexual Abuse and Harassment

choose how much they want to engage with the claims process. Those who do not want to revisit a private, traumatic event can simply keep the guaranteed Tier 1 payment of $2,500. Those who choose to provide additional information in a claim form about their experience with Tyndall and how it affected them are eligible for up to $20,000 and those who choose to provide an interview are eligible for up to $250,000. The special master and her team of experts will evaluate claims and allocate awards to Tier 2 and Tier 3 claimants. This focus on choice ensures that all class members receive compensation while giving each class member the autonomy to decide for herself how involved she wants to be in the settlement process.

The class-action settlement also goes beyond monetary compensation and forces USC to implement real changes to their policies and procedures to help ensure that what happened at USC does not happen again.

RESULT: $215 million settlement

## › Harvey Weinstein Sexual Harassment

In a first-of-its-kind class action lawsuit, Hagens Berman represented women on behalf of a class of all victims who were harassed or otherwise assaulted by Harvey Weinstein, seeking to hold him and his co-conspirators accountable for a years-long pattern of sexual harassment and cover-ups.

The lawsuit, filed Nov. 15, 2017, in the U.S. District Court for the Central District of California states that Miramax and The Weinstein Company (which Weinstein co-founded) facilitated Weinstein's organized pattern of predatory behavior, equating to an enterprise that violates the Racketeer Influenced and Corrupt Organizations Act, commonly referred to as the RICO Act, the same law brought against members of the Mafia for organized criminal behavior.

The lawsuit brought various charges against Weinstein and his companies for violating the RICO Act, mail and wire fraud, assault, civil battery, negligent supervision and retention, and intentional infliction of emotional distress.

RESULT: Settlement reached

## › Fairfax Behavioral Health

Attorneys from Hagens Berman filed a class-action complaint on behalf of a proposed class of hundreds of patients that were arbitrarily strip-searched and video recorded while receiving treatment for mental illness at one of three Fairfax locations in Washington state.

The suit's named plaintiff recalls being ordered to undress for an invasive strip-search when she presented for inpatient admission, even after disclosing her history of sexual abuse to the staff member. She was not given a gown or towel to cover up during the search, and the staff member watched her undress and left the door open where other staff members could see her.

Video cameras were located in the hallway, the holding area outside bathroom, and the room where the strip search was conducted. The cameras recorded her undressing and the strip-search.

The complaint states that Fairfax's practices—and its failure to limit the discretion of its staff—means that a substantial number of its mental health patients do not have reasonable access to inpatient care for mental health disorders.

The case is currently pending in federal court.

## › CB Richard Ellis Sexual Harassment Litigation

Filed a class action against CB Richard Ellis, Inc., on behalf of 16,000 current and former female employees who alleged that the company fostered a climate of severe sexual harassment and discriminated against female employees by subjecting them to a hostile, intimidating and offensive work environment, also resulting in emotional distress and other physical and economic injuries to the class.

RESULT: An innovative and unprecedented settlement requiring changes to human resources policies and procedures, as well as the potential for individual awards of up to $150,000 per class member. The company agreed to increase supervisor accountability, address sexually inappropriate conduct in the workplace, enhance record-keeping practices and conduct annual reviews of settlement compliance by a court appointed monitor.

PRACTICE AREAS

# Sexual Abuse and Harassment

## › King County Child Sex Abuse

Hagens Berman represented the victim of eight years of sexual abuse as a minor, at the hands of her brother-in-law. The lawsuit states that from 2005 to 2012, the case's defendant repeatedly sexually abused Hagens Berman's client. She was only eleven years old when the abuse began and was a minor during the entire duration of the abuse. In 2013, the state of Washington charged Willis with three counts of child molestation, to which he pled guilty. Court documents state, "Joshua Blaine Willis used his position of trust, confidence, or fiduciary responsibility to facilitate the commission of the … offense[s]…"

Court documents in the civil case filed in June of 2017 detail Willis' highly disgusting and horrifying actions including groping and molestation, exposing himself and other highly sexual and inappropriate behavior.

Following the years of sexual abuse, Hagens Berman's client suffers from Post-Traumatic Stress Disorder and the court awarded damages for treatment of her condition and other emotional distress, as well as loss of earning capacity and other economic damages in her "struggle with consistency and stability."

RESULT: $4,031,000 judgment awarded in a King County Superior Court

## › State of Washington Sexual Assault, DSHS

Our client, a disabled Spokane, Wash. woman, was a patient at Eastern State Hospital. The hospital assigned a male nurse to provide one-on-one care and supervision for our client. The nurse trapped our client in a laundry room and raped her. Hagens Berman determined that the nurse, a state employee, had been reprimanded and accused on previous occasions of sexual assault of vulnerable patients. Hagens Berman initiated a negligence and civil rights lawsuit against the hospital and its administrators for failing to protect our client from a known sexual predator and for allowing that predator to remain on staff with the responsibility to care for vulnerable patients.

RESULT: $2.5 million settlement

## › Workplace Sexual Harassment & Other Investigations

Sexual harassment is present and pervasive in many workplaces. It affects hundreds of thousands of women and men in the U.S., 51 percent of which are harassed by a supervisor, making it harder to come forward for fear of retaliation.

All too often, sexual harassment in the workplace is protected by systemic cover-ups by companies and those in power. Particular industries are more susceptible to these cover-ups including: commercial real estate, law enforcement, politics, military, tech, entertainment, sports media, finance, restaurants and hospitality, advertising and trucking.

In these industries, employees are routinely subjected to widespread policies that create an environment promoting quid pro quo arrangements in which they feel pressured to take part in sexual acts and feel powerless against unwanted advancements. Employees are also often punished for not taking part.

Hagens Berman is also investigating sexual harassment and abuse in various specific areas of study, including STEM programs. The also maintains a keen watch over various work environments that are statistically prone to instances of misconduct. These include hospitality, college campuses and research labs, boarding schools and the entertainment industry, especially within the area of professional music.

The firm remains committed to uncovering instances of sexual harassment in the workplace, and within fields of study and areas prone to harboring misconduct and abusive behavior.

**PRACTICE AREAS**

# Sports Litigation

Hagens Berman has one of the nation's most highly regarded sports law practices. Our attorneys are the vanguard of new and innovative legal approaches to protect the rights of professional and amateur athletes in cases against large, well-financed interests, including the National Collegiate Athletic Association (NCAA), the National Football League (NFL) and the Fédération Internationale de Football Association (FIFA).

## › NCAA: Concussions

Cases of particular nationwide interest for fans, athletes and the general public involve numerous cases filed by Hagens Berman against the NCAA. Recently, the firm has taken on the NCAA for its failure to prevent concussions and protect student-athletes who suffered concussions. Steve Berman serves as lead counsel in multi-district litigation as the firm finalizes a settlement that will bring sweeping changes to the NCAA's approach to concussion treatment and prevention; provide a 50-year medical-monitoring program for student-athletes to screen for and track head injuries; and establish a $5 million fund for concussion research.

The core settlement benefits include a 50-year medical monitoring program overseen by a medical science committee appointed by the court that will screen and track concussions, funded by a $70 million medical monitoring fund, paid by the NCAA and its insurers. Examinations include neurological and neurocognitive assessments to evaluate potential injuries.

The settlement also mandates significant changes to and enforcement of the NCAA's concussion management policies and return-to-play guidelines. All players will now receive a seasonal, baseline test to better assess concussions sustained during the season. All athletes who have sustained a concussion will now need to be cleared before returning to play. A medical professional trained in the diagnosis of concussions will be present at all games involving contact-sports. The settlement also creates reporting mandates for concussions and their treatment.

## › Player Likeness Rights

Hagens Berman attorneys representing student-athletes who claimed that the NCAA illegally used student-athletes' names, images and likenesses in Electronic Arts' popular NCAA Football, Basketball and March Madness video game series reached a combined $60 million settlement with the NCAA and EA, marking the first time the NCAA has agreed to a settlement that pays student-athletes for acts related to their participation in athletics. Settlement checks were sent to about 15,000 players, with average amounts of $1,100 and some up to $7,600.

The firm began this case with the knowledge that the NCAA and member schools were resolute in keeping as much control over student-athletes as possible, and fought hard to ensure that plaintiffs would not be exploited for profit, especially by the organization that vowed to prevent the athlete from exploitation.

The firm also represented NFL legend Jim Brown in litigation against EA for improperly using his likeness in its NFL video games, culminating in a $600,000 voluntary judgment offered by the video game manufacturer.

## › FIFA/U.S. Soccer: Concussions

Several current and former soccer players filed a class action against U.S. soccer's governing bodies, which led to life-changing safety measures brought to millions of U.S. youth soccer players. Players represented by Hagens Berman alleged these groups failed to adopt effective policies to evaluate and manage concussions, leaving millions of players vulnerable to long-lasting brain injury.

PRACTICE AREAS

# Sports Litigation

The settlement against six of the largest youth soccer organizations completely eliminates heading for youth soccer's youngest players, greatly diminishing risks of concussions and traumatic head injuries. Prior to the settlement, no rule limited headers in children's soccer.

It also sets new benchmarks for concussion measurement and safety protocols, and highlights the importance of on-staff medical personnel at youth tournaments. Under the settlement, youth players who have sustained a concussion during practice or a game will need to follow certain return-to-play protocols before they are allowed to play again. Steve Berman, a youth soccer coach, has seen first-hand the settlement's impacts and life-changing effects every time young athletes take to the field,

## › NCAA: Transfer Antitrust

Hagens Berman has also recently taken on the NCAA on behalf of several highly recruited college athletes whose scholarships were revoked after a coaching change, or after the student-athletes sought to transfer to another NCAA-member school. The suit claims that the organization's limits and Draconian transfer regulations violate federal antitrust laws.

It the firm's most recent suit against the sports-governing entity, a Division I student-athlete at Northwestern University was faced with repeated harassment from the university to transfer, in order to underhandedly free up his athletic scholarship. According to the complaint, the university resorted to falsified records of misconduct, verbal harassment and more.

The firm's case hinges on a destructive double-standard. While Non-student-athletes are free to transfer and are eligible for a new scholarship without waiting a year, and coaches often transfer to the tune of a hefty pay raise, student-athletes are penalized and forced to sit out a year before they can play elsewhere, making them much less sought after by other college athletic programs. Hagens Berman continues to fights for student-athletes' rights to be treated fairly and terminate the NCAA's anticompetitive practices and overbearing regulations that limit players' options and freedoms.

## › NCAA: Scholarships/Grants-In-Aid (GIAs)

In a first-of-its-kind antitrust action and potentially far-reaching case, Hagens Berman filed a class-action affecting approximately 40,000 Division I collegiate athletes who played men's or women's basketball, or FBS football, brought against the NCAA and its most powerful members, including the Pac-12, Big Ten, Big-12, SEC and ACC, claiming these entities violated federal antitrust laws by drastically reducing the number of scholarships and financial aid student-athletes receive to an amount below the actual cost of attendance and far below what the free market would bare.

The firm continues to fight on behalf of student-athletes to level the playing field and bring fairness to college sports and players. The case resulted in a $208.9 million settlement, bringing an estimated average amount of $6,500 to each eligible class member who played his or her sport for four years.

In March of 2019, the firm spearheaded the trial on the injunctive aspect of the case which resulted in a change of NCAA rules limiting the financial treatment of athletes. The injunction will prohibit the NCAA from enforcing any rules that fix or limit compensation provided to college-athletes by schools or conferences in consideration for their athletic services other than cash compensation untethered to education-related expenses. According to the Court, the NCAA is "permanently restrained and enjoined from agreeing to fix or limit compensation or benefits related to education" that conferences may make available.

## › Pop Warner

Hagens Berman represents youth athletes who have suffered traumatic brain injuries due to gross negligence, and filed a lawsuit on behalf of former Pop Warner football player Donnovan Hill and his mother Crystal Dixon. The suit claims that the league insisted Hill use improper and dangerous tackling techniques which left the then 13-year-old paralyzed from the neck down.

Hagens Berman sought to hold Pop Warner, its affiliates, Hill's coaches and members of the Lakewood Pop Warner board of directors accountable for the coaches' repeated and incorrect instruction that Hill and his teammates tackle opposing players

**PRACTICE AREAS**

# Sports Litigation

by leading with the head. In January of 2016, the firm reached a settlement on behalf of Donnovan and his mother, the details of which were not released. Sadly, months later, 17-year-old Donnovan passed away. The firm believes that his case will continue to have a lasting impact on young athletes for generations and will help ensure safety in youth sports.

› **MLB Foul Ball Injuries**

Hagens Berman filed a class-action lawsuit on behalf of baseball fans, seeking to extend safety netting to all major and minor league ballparks from foul pole to foul pole. The suit alleges that tens of millions attend an MLB game annually, and every year fans of all ages, but often children, suffer horrific and preventable injuries, such as blindness, skull fractures, severe concussions and brain hemorrhages when struck by a fast-moving ball or flying shrapnel from a shattered bat.

In December of 2015, MLB's commissioner Rob Manfred issued a recommendation to all 30 MLB teams to implement extended safety measures, including additional safety netting at ballparks. While the firm commends the league for finally addressing the serious safety issue at stake, the firm continues to urge MLB and its commissioner to make these more than recommendations to help end senseless and avoidable injuries to baseball's biggest fans.

› **Other Cases**

In addition to its class actions, Hagens Berman has filed several individual cases to uphold the rights of athletes and ensure a fair and safe environment. The firm has filed multiple individual cases to address concussions and other traumatic head injuries among student-athletes at NCAA schools and in youth sports. Hagens Berman continues to represent the interests of athletes and find innovative and effective applications of the law to uphold players' rights.

The firm has also brought many concussions cases on behalf of individual athletes, challenging large universities and institutions for the rights those who have suffered irreversible damage due to gross negligence and lack of even the most basic concussion-management guidelines.

PRACTICE AREAS
# Whistleblower Litigation

Hagens Berman represents whistleblowers under various programs at both the state and federal levels. All of these whistleblower programs reward private citizens who blow the whistle on fraud. In many cases, whistleblowers report fraud committed against the government and may sue those individuals or companies responsible, helping the government recover losses.

Our depth and reach as a leading national plaintiffs' firm with significant success in varied litigation against industry leaders in finance, health care, consumer products, and other fields causes many whistleblowers to seek us to represent them in claims alleging fraud against the government.

Our firm also has several former prosecutors and other government attorneys in its ranks and has a long history of working with governments, including close working relationships with attorneys at the U.S. Department of Justice. The whistleblower programs under which Hagens Berman pursues cases include:

## FALSE CLAIMS ACT

Under the federal False Claims Act, and more than 30 similar state laws, a whistleblower reports fraud committed against the government, and under the law's *Qui Tam* provision, may file suit on its behalf to recover lost funds. False claims acts are one of the most effective tools in fighting Medicare and Medicaid fraud, defense contractor fraud, financial fraud, under-payment of royalties, fraud in general services contracts and other types of fraud perpetrated against governments.

The whistleblower initially files the case under seal, giving it only to the government and not to the defendant, which permits the government to investigate. After the investigation, the government may take over the whistleblower's suit, or it may decline. If the government declines, the whistleblower can proceed alone on his or her behalf. In successful suits, the whistleblower normally receives between 15 and 30 percent of the government's recovery as a reward.

Since 1986, federal and state false claims act recoveries have totaled more than $22 billion. Some examples of our cases brought under the False Claims Act include:

### › In U.S. ex rel. Lagow v. Bank of America

Represented former District Manager at Landsafe, Countrywide Financial's mortgage appraisal arm, who alleged systematic abuse of appraisal guidelines as a means of inflating mortgage values.

RESULT: The case was successful, ultimately triggering a settlement of $1 billion, and our client received a substantial reward.

### › In U.S. ex rel. Mackler v. Bank of America

Represented a whistleblower who alleged that Bank of America failed to satisfy material conditions of its government contract to provide homeowners mortgage relief under the HAMP program.

RESULT: The case succeeded and was settled as part of the 2012 global mortgage settlement, resulting in an award to our client.

### › In U.S. ex rel. Horwitz v. Amgen

Represented Dr. Marshall S. Horwitz, who played a key role in uncovering an illegal scheme to manipulate the scientific record regarding two of Amgen's blockbuster drugs.

RESULT: $762 million in criminal and civil penalties levied by the U.S. Department of Justice and an award to our client.

### › In U.S. ex rel. Thomas v. Sound Inpatient Physicians Inc. and Robert A. Bessler

Represented a former regional vice president of operations for Sound Physicians, who blew the whistle on Sound's alleged misconduct.

RESULT: Tacoma-based Sound Physicians agreed to pay the United States government $14.5 million.

### › In U.S. ex rel. Plaintiffs v. Center for Diagnostic Imaging Inc.

In May 2010, Hagens Berman joined as lead trial counsel a qui tam lawsuit on behalf of two whistleblowers against Center for

PRACTICE AREAS
# Whistleblower Litigation

Diagnostic Imaging, Inc. (CDI), alleging that CDI violated anti-kickback laws and defrauded federally funded health programs by presenting false claims for payment.

RESULT: In 2011, the government intervened in the claims, which the company settled for approximately $1.3 million. The government declined to intervene, however, in the no-written-orders and kickback claims, leaving those claims for the whistleblowers and their counsel to pursue on their own. The non-intervened claims settled for an additional $1.5 million payment to the government.

## ❯ Medtronic

On Feb. 19, 2008 the court unsealed a qui tam lawsuit brought by Hagens Berman against Medtronic, one of the world's largest medical technology companies, for fraudulent medical device applications to the FDA and off-label promotion of its biliary devices.

RESULT: The case settled in 2012 for an amount that remained under seal.

## SECURITIES AND EXCHANGE COMMISSION / COMMODITY FUTURES TRADING COMMISSION

Since implementation of the SEC/CFTC Dodd Frank whistleblower programs in 2011, Hagens Berman has naturally transitioned into representation of whistleblowers with claims involving violations of the Securities Exchange Act and the Commodities Exchange Act.

Unlike the False Claims Act, whistleblowers with these new programs do not initially file a sealed lawsuit. Instead, they provide information directly to the SEC or the CFTC regarding violations of the federal securities or commodities laws. If the whistleblower's information leads to an enforcement action, they may be entitled to between 10 and 30 percent of the recovery.

The firm currently represents HFT whistleblower and market expert, Haim Bodek, in an SEC fraud whistleblower case that prompted the U.S. Securities and Exchange Commission to bring record-breaking fines against two exchanges formerly owned by Direct Edge Holdings (and since acquired by Bats Global

Markets, the second-largest financial exchange in the country). The exchanges agreed to pay $14 million to settle charges that the exchanges failed to accurately and completely disclose how order types functioned on its exchanges and for selectively providing such information only to certain high-frequency trading firms.

Hagens Berman also represents an anonymous whistleblower who brought his concerns and original analysis related to the May 2, 2010 Flash Crash to the CFTC after hundreds of hours spent analyzing data and other information.

Both the U.S. Commodity Futures Trading Commission (CFTC) and the Department of Justice, in separate criminal and civil enforcement actions, brought charges of market manipulation and spoofing against Nav Sarao Futures Limited PLC (Sarao Futures) and Navinder Singh Sarao (Sarao) based on the whistleblower's information.

Hagens Berman has worked alongside government officials and regulators, establishing the credibility necessary to bring a case to the SEC or CFTC. When Hagens Berman brings a claim, we work hard to earn their respect and regulators pay attention.

A few of the firm's most recent whistleblower cases in this area include:

## ❯ EDGA Exchange Inc. and EDGX Exchange Inc.

Represented HFT whistleblower and market expert, Haim Bodek, in an SEC fraud whistleblower case against two exchanges formerly owned by Direct Edge Holdings and since acquired by Bats Global Markets, the second-largest financial exchange in the country for spoofing.

RESULT: The case prompted the U.S. Securities and Exchange Commission to bring record-breaking fine of $14 million against defendants, the largest ever brought against a financial exchange.

PRACTICE AREAS

# Whistleblower Litigation

## ⟩ Nav Sarao Futures Limited PLC

Hagens Berman represents an anonymous whistleblower who brought his concerns and original analysis to the CFTC after hundreds of hours spent analyzing data and other information. The claim brought about legal action against a market manipulator who profited more than $40 million from market fraud and contributed to the May 6, 2010 Flash Crash.
RESULT: Both the CFTC and the Department of Justice, in separate criminal and civil enforcement actions, brought charges of market manipulation and spoofing against Nav Sarao Futures Limited PLC and Navinder Singh Sarao based on the whistleblower's information. The case is still pending under seal.

## INTERNAL REVENUE SERVICE

Hagens Berman also represents whistleblowers under the IRS whistleblower program enacted with the Tax Relief and Health Care Act of 2006.

The IRS program offers rewards to those who come forward with information about persons, corporations or any other entity that cheats on its taxes. In the event of a successful recovery of government funds, a whistleblower can be rewarded with up to 30 percent of the overall amount collected in taxes, penalties and legal fees.

Hagens Berman helps IRS whistleblowers present specific, credible tax fraud information to the IRS. Unlike some traditional False Claims Act firms, Hagens Berman has experience representing governments facing lost tax revenue due to fraud,  making us well-positioned to prosecute these cases.

Appellate Victories

HAGENS BERMAN SOBOL SHAPIRO LLP

**APPELLATE VICTORIES**

# Strengthening Consumer Law

At Hagens Berman, we distinguish ourselves not merely by the results we obtain, but by how we obtain them. Few class-action firms have our firm's combination of resources and acumen to see a case through as long as needed to obtain a favorable outcome. Our attorneys were instrumental in obtaining these federal appellate decisions that have shaped consumer law and bolstered the rights of millions nationwide:

> **In Matter of Motors Liquidation Co.,** 829 F.3d 135 (2d Cir. 2016) (General Motors bankruptcy reorganization did not bar claims stemming from defective ignition switches)

> **George v. Urban Settlement Servs.,** 833 F.3d 1242 (10th Cir. 2016) (complaint adequately alleged Bank of America's mortgage modification program violated RICO)

> **In re Loestrin 24 Fe Antitrust Litig.,** 814 F.3d 538 (1st Cir. 2016) ("reverse payments" for antitrust purposes under **Actavis** are not limited to cash payments)

> **Osborn v. Visa Inc.,** 797 F.3d 1057 (D.C. Cir. 2015) (complaint adequately alleged Visa and MasterCard unlawfully agreed to restrain trade in setting ATM access fees)

> **Little v. Louisville Gas & Elec. Co.,** 805 F.3d 695 (6th Cir. 2015) (Clean Air Act did not preempt state nuisance claims against coal plant for polluting surrounding community)

> **City of Miami v. Citigroup Inc.,** 801 F.3d 1268 (11th Cir. 2015) (reversing dismissal of complaint alleging Citigroup violated Fair Housing Act by pattern of discriminatory lending)

> **Rajagopalan v. NoteWorld, LLC,** 718 F.3d 844 (9th Cir. 2013) (non-party could not invoke arbitration clause against plaintiff suing debt services provider)

> **In re Neurontin Mktg. & Sales Practices Litig.,** 712 F.3d 21 (1st Cir. 2013) (affirming $142 million verdict for injury suffered from RICO scheme by Neurontin manufacturer Pfizer)

> **In re NCAA Student-Athlete Name & Likeness Licensing Litig.,** 724 F.3d 1268 (9th Cir. 2013) (First Amendment did not shield video game developer's use of college athletes' likenesses)

> **Garcia v. Wachovia Corp.,** 699 F.3d 1273 (11th Cir. 2012) (Wells Fargo could not rely on **Concepcion** to evade waiver of any right to compel arbitration)

> **Agnew v. Nat'l Collegiate Athletic Ass'n**, 683 F.3d 328 (7th Cir. 2012) (NCAA bylaws limiting scholarships per team and prohibiting multi-year scholarships are subject to antitrust scrutiny and do not receive pro-competitive justification at pleading stage)

> **In re Lupron Mktg. & Sales Practices Litig.,** 677 F.3d 21, 24 (1st Cir. 2012) (approving cy pres provision in $150 million settlement)

> **In re Pharm. Indus. Average Wholesale Price Litig.,** 582 F.3d 156 (1st Cir. 2009) (AstraZeneca illegally published inflated average wholesale drug prices, thereby giving windfall to physicians and injuring patients who paid inflated prices)

We set ourselves apart not only by getting results but by litigating every case through to finish – to trial and appeal, if necessary. This tenacious drive has led our firm to generate groundbreaking precedents in consumer law.

Hagens Berman has also been active in state courts nationwide. Notable examples of our victories include:

> **Garza v. Gama,** 379 P.3d 1004 (Ariz. Ct. App. 2016) (reinstating certified class in wage-and-hour action prosecuted by Hagens Berman since 2005)

> **In re Farm Raised Salmon Cases,** 42 Cal. 4th 1077 (Cal. 2008) (Federal Food, Drug and Cosmetic Act did not preempt state claims for deceptive marketing of food products)

> **Pickett v. Holland Am. Line-Westours, Inc.,** 35 P.3d 351 (Wash. 2001) (reversing state court of appeals and upholding class action settlement with cruise line)

U.S. Legal Team

HAGENS BERMAN SOBOL SHAPIRO LLP



MANAGING PARTNER

# Steve W. Berman

*Served as co-lead counsel against Big Tobacco, resulting in the largest settlement in world history, and at the time the largest automotive, antitrust, ERISA and securities settlements in U.S. history.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
steve@hbsslaw.com

**YEARS OF EXPERIENCE**
> 40

**PRACTICE AREAS**
> Antitrust/Trade Law
> Consumer Protection
> Governmental Representation
> Securities/Investment Fraud
> Whistleblower/**Qui Tam**
> Patent Litigation

**BAR ADMISSIONS**
> Washington
> Illinois Foreign
> Registered Attorney in
  England and Wales

**COURT ADMISSIONS**
> Supreme Court of the United
  States
> Supreme Court of Illinois
> Supreme Court of
  Washington
> U.S. District Court for the
  Eastern and Western Districts
  of Washington
> U.S. District Court for the
  Northern and Central Districts
  of Illinois
> U.S. District Court for the
  District of Colorado
> U.S. District Court for the
  Eastern District of Michigan
> First Circuit Court of Appeals

Steve Berman represents consumers, investors and employees in large, complex litigation held in state and federal courts. Steve's trial experience has earned him significant recognition and led The National Law Journal to name him one of the 100 most powerful lawyers in the nation, and to repeatedly name Hagens Berman one of the top 10 plaintiffs' firms in the country. Steve was named an MVP of the Year by Law360 in 2016 and 2017 for his class-action litigation and received the 2017 Plaintiffs' Trailblazer award. He was recognized for the third year in a row as an Elite Trial Lawyer by The National Law Journal.

Steve co-founded Hagens Berman in 1993 after his prior firm refused to represent several young children who consumed fast food contaminated with E. coli—Steve knew he had to help. In that case, Steve proved that the poisoning was the result of Jack in the Box's cost cutting measures along with gross negligence. He was further inspired to build a firm that vociferously fought for the rights of those unable to fight for themselves. Berman's innovative approach, tenacious conviction and impeccable track record have earned him an excellent reputation and numerous historic legal victories. He is considered one of the nation's most successful class-action attorneys, and has been praised for securing record-breaking settlements and tangible benefits for class members. Steve is particularly known for his tenacity in forging consumer settlements that return a high percentage of recovery to class members.

## CURRENT ROLE
> Managing Partner, Hagens Berman Sobol Shapiro LLP

## RECENT CASES

> **Emissions Litigation**
  Steve has pioneered pursuing car manufacturers who have been violating emissions standards, including: Mercedes BlueTEC vehicles, GM Chevy Cruze, Dodge Ram 2500 and 3500 trucks, Dodge Ram 1500 and Jeep Cherokee EcoDiesel vehicles, Chevy Silverado, GMC Sierra as well as other models made by Ford, Audi and BMW. Steve and the firm's unmatched work in emissions-cheating investigations is often ahead of the EPA and government regulators.

> **General Motors Ignition Switch Defect Litigation**
  Steve serves as lead counsel seeking to obtain compensation for the millions of GM car owners who overpaid for cars that had hidden safety defects.

> **Climate Change** – New York City, King County, Wash.
  Steve has always been a fighter for the rights of the environment. In 2017, he began the firm's latest endeavor to combat global climate change through novel applications of the law. Steve currently represents the city of New York and Washington state's King County in lawsuits filed against the world's largest producers of oil: BP, Chevron Corp., Exxon Mobil Corp., Royal Dutch Shell PLC and

HAGENS BERMAN SOBOL SHAPIRO LLP

> Second Circuit Court of Appeals
> Third Circuit Court of Appeals
> Fifth Circuit Court of Appeals
> Sixth Circuit Court of Appeals
> Seventh Circuit Court of Appeals
> Eighth Circuit Court of Appeals
> Ninth Circuit Court of Appeals
> Tenth Circuit Court of Appeals
> Eleventh Circuit Court of Appeals
> DC Circuit Court of Appeals
> Federal Circuit Court of Appeals
> U.S. Court of Federal Claims
> Foreign Registered Attorney in
  England and Wales

**EDUCATION**
> University of Chicago Law School,
  J.D., 1980
> University of Michigan, B.A., 1976

MANAGING PARTNER

# Steve W. Berman

ConocoPhillips. The cases seek to hold the Big Oil titans accountable for their brazen impact on global warming-induced sea level rise and related expenses to protect the cities and their millions of residents.

> **Opioids** - Orange and Santa Clara County, Seattle
Steve has been retained by various municipalities, including the states of Ohio, Mississippi and Arkansas, Orange County, as well as the city of Seattle to serve as trial counsel in a recently filed state suit against five manufacturers of opioids seeking to recover public costs resulting from the opioid manufacturer's deceptive marketing.

> **Antitrust Litigation**
Corporate fraud has many faces, and Steve has taken on some of the largest perpetrators through antitrust law. Steve serves as co-lead counsel in Visa MasterCard ATM, Batteries, Optical Disc Drives and is in the leadership of a class-action lawsuit against Qualcomm for orchestrating a monopoly that led to purchasers paying significantly more for mobile devices. He serves as interim class counsel in a case against chicken producers for conspiring to stabilize prices by reducing chicken production. Most recently, Steve filed a proposed class-action lawsuit against the world's largest manufacturers of Dynamic Random Access Memory for cornering the market and driving up DRAM.

> **Consumer Protection**
Steve is a leader in protecting millions of consumers in large-scale cases that challenge unfair, deceptive and fraudulent practices. He leads a class action on behalf of owners of Ford vehicles equipped with MyFord Touch, an in-car entertainment system, who claim the system is flawed, putting drivers at risk of an accident while causing economic hardship. Steve recently filed a class-action lawsuit against Facebook for allowing personal data to be harvested for psychographic profiling.

**RECENT SUCCESS**

> **Volkswagen Franchise Dealerships** - $1.6 billion
Lead counsel for VW franchise dealers suit, in which a settlement of $1.6 billion has received final approval, and represents a substantial recovery for the class.

> **Stericycle Sterisafe Contract Litigation** – $295 million
Hagens Berman's team, led by Steve Berman, filed a class-action lawsuit against Stericycle, a massive medical waste disposal company and achieved a sizable settlement for hundreds of thousands of its small business customers.

> **NCAA Grant-in-Aid Scholarships** – $208 million
Served as co-lead counsel in the Alston case that successfully challenged the NCAA's limitations on the benefits student-athletes can receive as part of a scholarship, culminating in a $208 million settlement. The recovery amounts to 100 percent of single damages in an exceptional result in an antitrust case. Steve will co-lead a trial this year on the injunctive aspect of the case that could result in a change of NCAA rules limiting the financial treatment of athletes. The trial may change the landscape for how NCAA football and basketball players are compensated.

> **Dairy Price-Fixing** – $52 million
This antitrust suit's filing unearthed a massive collusion between the biggest dairy producers in the country, responsible for almost 70 percent of the nation's milk. Not only was the price of milk artificially inflated, but this scheme ultimately also cost 500,000 young cows their lives.

MANAGING PARTNER

# Steve W. Berman

## CAREER HIGHLIGHTS

> **State Tobacco Litigation** - $206 billion
Special assistant attorney general for the states of Washington, Arizona, Illinois, Indiana, New York, Alaska, Idaho, Ohio, Oregon, Nevada, Montana, Vermont and Rhode Island in prosecuting major actions against the tobacco industry. In November 1998, the initial proposed settlement led to a multi-state settlement requiring the tobacco companies to pay the states $206 billion and to submit to broad advertising and marketing restrictions – the largest civil settlement in history.

> **Visa MasterCard ATM Antitrust Litigation** - $27 billion
Co-lead counsel in what was then the largest antitrust settlement in history: a class-action lawsuit alleging that Visa and MasterCard, together with Bank of America, JP Morgan Chase and Wells Fargo, violated federal antitrust laws by establishing uniform agreements with U.S. banks, preventing ATM operators from setting ATM access fees below the level of the fees charged on Visa's and MasterCard's networks.

> **Toyota Sudden, Unintended Acceleration** - $1.6 billion
Hagens Berman was co-lead counsel in this massive MDL alleging that Toyota vehicles contained a defect causing sudden, unintended acceleration (SUA). It was the largest automotive settlement in history at the time, valued at up to $1.6 billion. The firm did not initially seek to lead the litigation, but was sought out by the judge for its wealth of experience in managing very complex class-action MDLs. Hagens Berman and managing partner Steve Berman agreed to take on the role of co-lead counsel for the economic loss class and head the plaintiffs' steering committee.

> **Washington Public Power Supply System (WPPSS)** - $700 million settlement
Represented bondholders and the bondholder trustee in a class-action lawsuit stemming from the failure of two WPPSS nuclear projects. The case was one of the most complex and lengthy securities fraud cases ever filed. The default was one of the largest municipal bond defaults in history. After years of litigation, plaintiffs were awarded a $700 million settlement agreement brought against more than 200 defendants.

> **E-books Antitrust Litigation** - $560 million settlement
Fought against Apple and five of the nation's top publishers for colluding to raise the price of e-books, resulting in recovery equal to twice consumers' actual damages. The firm recovered an initial settlement of more than $160 million with defendant publishing companies in conjunction with several states attorneys general. Steve then led the firm to pursue Apple for its involvement in the e-book price hike. Apple took the case to the Supreme Court, where it was ruled that Apple had conspired to raise prices, and the firm achieved an additional $450 million settlement for consumers.

> **Enron Pension Protection Litigation** - $250 million settlement
Led the class-action litigation on behalf of Enron employees and retirees alleging that Enron leadership, including CEO Ken Lay, had a responsibility to protect the interests of those invested in the 401(k) program, an obligation they abrogated. The court selected Steve to co-lead the case against Enron and the other defendants.

> **Charles Schwab Securities Litigation** - $235 million settlement
Led the firm to file the first class-action lawsuit against Charles Schwab on Mar. 18, 2008, alleging that Schwab deceived investors about the underlying risk in its Schwab YieldPlus Funds Investor Shares and Schwab YieldPlus Funds Select Shares.

MANAGING PARTNER

# Steve W. Berman

› **JP Morgan Madoff Lawsuit** - $218 million settlement
Represented Bernard L. Madoff investors in a suit filed against JPMorgan Chase Bank, one of the largest banks in the world.

› **Boeing Securities Litigation** - $92.5 million settlement
Represented a class of tens of thousands of shareholders against Boeing, culminating in a proposed settlement that was the second-largest awarded in the Northwest.

› **NCAA Concussions** - $75 million settlement, and 50-year medical monitoring fund
Led the firm's pioneering NCAA concussions suit that culminated in a proposed settlement that will provide a 50-year medical-monitoring program for student-athletes to screen for and track head injuries; make sweeping changes to the NCAA's approach to concussion treatment and prevention; and establish a $5 million fund for concussion research, preliminarily approved by the court.

› **US Youth Soccer Settlement**
Revolutionary settlement that changed U.S. Soccer regulations and bought sweeping safety measures to the game. Steve spearheaded a lawsuit against soccer-governing bodies, achieving a settlement that ended heading of the ball for U.S. Soccer's youngest players and greatly diminished risk of concussions and traumatic brain injuries. Additionally, the settlement highlights the importance of on-staff medical personnel at youth tournaments, as well as ongoing concussion education for coaches.

**RECOGNITION**

› 2018, 2020 Titan of the Plaintiffs Bar, Law360

› 2016-2020 Class Action MVP of the Year, Law360

› 2018-2019 Honoree for Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute

› 2014-2016, 2018-2019 Elite Trial Lawyers, The National Law Journal

› 2003-2019 Washington Super Lawyers

› 2014-2019 Lawdragon 500 Leading Lawyers in America

› 2018, 2016 Practice Group of the Year (Automotive), Law360

› 2018 State Executive Committee member, The National Trial Lawyers

› 2018 Top Attorney of the Year, International Association of Top Professionals

› 2017 Plaintiffs' Trailblazer, The National Law Journal

› 2017 Class Actions (Plaintiff) Law Firm of the Year in California, Global Law Experts

› 2014 Finalist for Trial Lawyer of the Year, Public Justice

› 2013 One of the 100 most influential attorneys in America, The National Law Journal

› 2000 Most powerful lawyer in the state of Washington, The National Law Journal

› One of the top 10 plaintiffs' firms in the country, The National Law Journal

**OTHER NOTABLE CASES**

› **VW Emissions Litigation** - $14.7 billion settlement
Steve served as a member of the Plaintiffs Steering Committee representing owners of Volkswagen CleanDiesel vehicles that were installed with emissions-cheating software.

› **McKesson Drug Class Litigation** - $350 million settlement
Lead counsel in an action that led to a rollback of benchmark prices of hundreds of brand name drugs, and relief for third-party payers and insurers. His discovery of the McKesson scheme led to follow up

HAGENS BERMAN SOBOL SHAPIRO LLP

**MANAGING PARTNER**

# Steve W. Berman

lawsuits by governmental entities and recovery in total of over $600 million.

> Average Wholesale Price Litigation – $338 million settlement
Steve served as lead trial counsel, securing trial verdicts against three drug companies that paved the way for settlement.

> DRAM Memory Antitrust – $345 million settlement
Forged a class-action suit against leading DRAM (Dynamic Random Access Memory) manufacturers, claiming the companies secretly agreed to reduce the supply of DRAM in order to artificially raise prices.

> Hyundai / Kia Fuel Efficiency – $210 million settlement
Led the firm's aggressive fight as court-appointed co-lead counsel against Hyundai and Kia on behalf of defrauded consumers who alleged the automakers had misrepresented fuel economies in vehicles, securing what was believed to then be the second-largest automotive settlement in history.

> Bextra/Celebrex Marketing and Products Liability Litigation – $89 million settlement
Served as court-appointed member of the Plaintiffs Steering Committee and represented nationwide consumers and third party payers who paid for Celebrex and Bextra. The firm was praised by the court for its "unstinting" efforts on behalf of the class.

> McKesson Governmental Entity Class Litigation – $82 million settlement
Steve was lead counsel for a nationwide class of local governments that resulted in a settlement for drug price-fixing claims.

> NCAA/Electronic Arts Name and Likeness – $60 million settlement
Represented current and former student-athletes against the NCAA and Electronic Arts concerning illegal use of college football and basketball players' names and likenesses in video games without permission or consent from the players.

> State and Governmental Drug Litigation
Steve served as outside counsel for the state of New York for its Vioxx claims, several states for AWP claims and several states for claims against McKesson. In each representation, Steve recovered far more than the states in the NAAG multi-state settlements.

> Exxon Mobile Oil Spill
Steve represented clients against Exxon Mobil affected by the 10 million gallons of oil spilled off the coast of Alaska by the Exxon Valdez (multimillion-dollar award).

> Lumber Liquidators Flooring
Steve was court-appointed co-lead counsel in litigation against Lumber Liquidators representing consumers who unknowingly purchased flooring tainted with toxic levels of cancer-causing formaldehyde. The consumer settlement was confidential.

## PRESENTATIONS

> Steve is a frequent public speaker and has been a guest lecturer at Stanford University, University of Washington, University of Michigan and Seattle University Law School.

## PERSONAL INSIGHT

Steve was a high school and college soccer player and coach. Now that his daughter's soccer skills exceed his, he is relegated to being a certified soccer referee and spends weekends being yelled at by parents, players and coaches. Steve is also an avid cyclist and is heavily involved in working with young riders on the international Hagens Berman Axeon cycling team.

HAGENS BERMAN SOBOL SHAPIRO LLP



PARTNER, EXECUTIVE COMMITTEE MEMBER

# Thomas M. Sobol

*Voted Massachusetts Ten Leading Litigators*
*—The National Law Journal*

**CONTACT**
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1950 office
(617) 482-3003 fax
tom@hbsslaw.com

**YEARS OF EXPERIENCE**
› 38

**PRACTICE AREAS**
› Pharmaceutical Fraud
› Consumer Protection
› Antitrust Litigation

**BAR ADMISSIONS**
› Massachusetts
› Rhode Island

**COURT ADMISSIONS**
› First Circuit Court of Appeals
› Second Circuit Court of Appeals
› Supreme Court of the United States

**EDUCATION**
› Boston University School of Law, J.D., **cum laude**, 1983
› Clark University, B.A., **summa cum laude**, Phi Beta Kappa, 1980

## CURRENT ROLE

› Partner & Executive Committee Member, Hagens Berman Sobol Shapiro LLP

› Leads HBSS's Boston office

› Lead negotiator in court-approved settlements totaling more than $2 billion

› Court-appointed lead or co-lead in ten active antitrust cases alleging injury to businesses and/or consumers caused by the delayed availability of generic drug, including:

- In re Glumetza Antitrust Litigation, No. 19-cv-05822-WHA (N.D. Cal.) (Hon. William Alsup)

- FWK Holdings LLC v. Shire (Intuniv), No. 16-cv-12653 (D. Mass.) (Hon. Allison D. Burroughs)

- In re Zetia (Ezetimibe) Antitrust Litigation, No. 18-md-2836 (E.D. Va.) (Hon. Rebecca Beach Smith)

## CAREER HIGHLIGHTS

› $325 million: third party payer class settlement, In re Neurontin Marketing, Sales Practices, and Products Liability Litigation, No. 04-md-1629 (D. Mass) (Hon. Patti B. Saris)

› ~$200 million: tort victim recoveries via bankruptcy plan, In re New England Compounding Pharmacy, Inc. Products Liability Litigation, MDL No. 2419 (D. Mass.) (Hon. Rya W. Zobel)

› $150 million: direct purchaser class settlement, In re Flonase Antitrust Litigation, No. 08-cv-03149 (E.D. Pa.) (Hon. Anita B. Brody)

› 4% price reduction of most retail drugs: New England Carpenters Health Benefits Fund v. First DataBank, Inc., No. 05-cv-11148 (D. Mass.) (Hon. Patti B. Saris)

› $350 million: consumers and third party payers, San Francisco Health Plan v. McKesson Corp., No. 08-cv-10843 (D. Mass.) (Hon. Patti B. Saris)

› $25 million: State of Connecticut, In re Zyprexa Products Liability Litigation, MDL No. 1596 (E.D.N.Y.) (Hon. Jack B. Weinstein)

## RECENT SUCCESS

› $120 million: direct purchaser class settlement, In re Loestrin 24 Fe Antitrust Litigation, No. 13-md-02472 (D.R.I.) (Hon. William E. Smith)

› $51.25 million: direct purchaser class settlement, In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litigation, No. 18-md-02819 (E.D.N.Y.) (Hon. Nina Gershon)

› $166 million: direct purchaser class settlement, In re Lidoderm Antitrust Litigation, MDL No. 2521 (N.D. Cal.) (Hon. William Orrick)

› $72.5 million: direct purchaser class settlement, In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation, No. 14-md-02503 (D. Mass.) (Hon. Denise J. Casper)

› $94 million: direct purchaser class settlement, In re Celebrex (Celecoxib) Antitrust Litigation, No. 14-cv-

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER, EXECUTIVE COMMITTEE MEMBER

# Thomas M. Sobol

## EXPERIENCE

> Has Led almost 20 generic delay cases, involving various theories, on behalf of both direct and end payers to settlement and distributions to classes (or aggregated groups)

> Helped develop the econometric model used to show the relationship between marketing and the opioid epidemic in the opioids MDL. In re National Prescription Opiate Litigation, No. 17-md-02804 (N.D. Ohio) (Hon. Dan Aaron Polster)

> Originated the Ranbaxy fraudulent ANDA litigation, alleging novel theory that a generic company's fraudulent statements to FDA in order to obtain exclusivities violated federal RICO and antitrust laws, Meijer, Inc. v. Ranbaxy Inc., No. 15-cv-11828 (D. Mass.) (Hon. Nathaniel M. Gorton)

> Served as Lead counsel in the New England Compounding MDL and a member of the creditors' committee in the related bankruptcy, representing more than 700 victims who contracted fungal meningitis or other serious health problems as a result of receiving contaminated products produced, resulting in about a $200 million settlement, In re New England Compounding Pharmacy, Inc. Products Liability Litigation, MDL No. 2419 (D. Mass.) (Hon. F. Dennis Saylor, IV; Hon. Rya W. Zobel)

> In the Vioxx MDL, developed a win-win lien resolution program for consumers and health plans that dispensed with the inefficiencies of resolving insurance liens piecemeal that is now a routine part of mass tort MDLs, In re Vioxx Products Liability Litigation, MDL No. 1657 (E.D. La.) (Hon. Eldon E. Fallon)

> Obtained a $142 million RICO jury verdict against Pfizer for fraudulently marketing its drug Neurontin; negotiated a separate $325 million settlement on behalf of a class of health plans, In re Neurontin Marketing, Sales Practices, and Products Liability Litigation, MDL No. 1629 (D. Mass) (Hon. Patti B. Saris)

> Brought ground-breaking suit alleging widespread fraudulent marketing and sales practices for the prostate cancer drug Lupron (In re Lupron Marketing and Sales Practices Litigation, No. 01-md-1430 (D. Mass.) (Hon. Richard Stearns), which uncovered pricing theories later litigated in the Average Wholesale Price litigation (In re Pharmaceutical Industries Average Wholesale Price Litigation, No. 02-md-1456 (D. Mass) (Hon. Patti B. Saris), over $250 million in settlements) and related litigation against First Databank, (New England Carpenters Health Benefits Fund v. First DataBank, Inc., No. 05-cv-11148 (D. Mass.) (Hon. Patti B. Saris), major price rollback on hundreds of drugs)

> Worked closely with consumer groups trying to bring down the prices of prescription drugs, including serving as lead counsel to the former Prescription Access Litigation (PAL) project, a large coalition of health care advocacy groups that fought illegal, loophole-based overpricing by pharmaceutical companies.

> Since 2002, has represented consumers, consumer groups, health plans, governments and institutions in complex class actions involving waste, fraud, and abuse in the pharmaceutical industry.

> Special Assistant Attorney General for the Commonwealth of Massachusetts and the states of New Hampshire and Rhode Island, including in ground-breaking litigation against tobacco industry (injunctive relief and recovery of more than $10 billion).

> Spent seventeen years at a large Boston firm handling large complex civil and criminal litigation.

## PRO BONO

> Chairman of the board, New England Shelter for Homeless Veterans, 1995 - 2002

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER, EXECUTIVE COMMITTEE MEMBER**

# Thomas M. Sobol

**RECOGNITION**

> Massachusetts Ten Leading Litigators, The National Law Journal
> Massachusetts Super Lawyer 2008-2019
> Nominated in 2011 for Trial Lawyer of the Year by Public Justice for verdict in In re Neurontin Marketing,
> Sales Practices, and Products Liability Litigation, MDL No. 1629 (D. Mass.).

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER, EXECUTIVE COMMITTEE MEMBER**

# Robert B. Carey

*Rob added to HB's office a built-in mock courtroom, complete with jury box, audio-visual equipment to record witnesses and lawyers, and separate deliberation rooms for two juries.* [Download photo »](Download photo »)

### CONTACT
11 West Jefferson St.
Suite 1000
Phoenix, AZ 85003

(602) 840-5900 office
(602) 840-3012 fax
rob@hbsslaw.com

### YEARS OF EXPERIENCE
> 33

### PRACTICE AREAS
> Personal Injury Litigation
> Insurance Bad Faith
> Breach of Contract Claims

### BAR ADMISSIONS
> Arizona
> Colorado

### COURT ADMISSIONS
> U.S. Supreme Court
> United States Court of
  Appeals for the Federal Circuit
> U.S. Court of Appeals,
  Fifth Circuit
> U.S. Court of Appeals,
  Seventh Circuit
> U.S. Court of Appeals,
  Ninth Circuit
> U.S. Court of Appeals,
  Tenth Circuit
> Various federal district courts

### EDUCATION
> University of Denver, M.B.A.,
  J.D., 1986
> Arizona State University, B.S.,
  1983
> Harvard University, John
  F. Kennedy School of
  Government, State & Local
  Government Program, 1992

Mr. Carey handles various types of injury and consumer claims. Mr. Carey was lead counsel on a jury trial that produced the largest medical-malpractice verdict in 2018, secured class certification in class actions on behalf of consumers and workers where damages are almost $2 billion, and investigated the dialysis industry's role in deaths caused by central venous catheter infections and misuse of dialysis solutions.

## CURRENT ROLE

> Partner & Executive Committee Member, Hagens Berman Sobol Shapiro LLP

> Leads Hagens Berman's Phoenix office

> Practice focuses on class-action lawsuits, including auto defect, insurance, right of publicity and fraud cases. Mr. Carey's work also extends to bad-faith insurance, personal injury and medical malpractice, with several trials involving verdicts in the hundreds of millions.

  - Frequently asked to handle jury trials for high-value cases

## RECENT SUCCESS

> In June 2018, a Denver jury awarded a monumental $383.5 million jury verdict against GranuFlo dialysis provider, DaVita Inc. culminating lawsuits brought by families of three patients who suffered cardiac arrests and died after receiving dialysis treatments at DaVita clinics. Each of the three parties was awarded $125 million in punitive damages from the jury, with compensatory damages ranging from $1.5 million to $5 million.

> Over the summer of 2012, Rob was lead counsel in Robin Antonick's case against  Electronic Arts, where a jury heard evidence that Electronic Arts failed to pay Antonick for over 20 years for his work in coding and developing the legendary Madden NFL Football video game. This trial, held in the Northern District of California, resulted in two verdicts for Antonick and was dubbed a "Top Trial Verdict of 2013" by The Daily Journal, a leading legal publication.

> Prevailed at the Arizona Court of Appeals for the second time, keeping intact class certification for tens of thousands of truck drivers suing to recover underpayments caused by misuse of Rand McNally's HHG software by Swift Transportation.

> Helped originate the Toyota Sudden Unintended Acceleration case, filing the initial Hagens Berman complaints for a case that eventually settled for $1.6 billion

> Led Hagens Berman's efforts on the $97 million settlement with Hyundai and Kia corporations over misrepresentations about MPG ratings

> Helped secure a first-ever ($60 million) settlement for collegiate student-athletes (Keller, consolidated with O'Bannon) from Electronic Arts (EA) and the NCAA for the misappropriation of the student-athletes' likenesses and images for the EA college football video game series. This groundbreaking suit went up to the U.S. Supreme Court before a settlement was reached, providing student-athletes—even

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER, EXECUTIVE COMMITTEE MEMBER**

# Robert B. Carey

current ones—with cash recoveries for the use of their likenesses without permission.

› Represented Donnovan Hill against Pop Warner after he was paralyzed at 13. With Rachel Freeman, Rob secured a settlement that "forever changed youth football" (OC Weekly) and was "unprecedented" and owed a debt of gratitude by those who care about the safety of kids playing football (Washington Post). Donnovan died tragically during a 2016 surgery.

› Rob secured a record verdict for a mother suing her deceased son's estate for negligence in starting a home fire. He then took an assignment of the estate's claim and pursued a bad faith claim against the insurer, resulting in lifetime financial security for the badly burned mother.

› After successfully reforming an insurance policy to cover a client – a student-athlete injured in a roll-over accident that caused incomplete tetraplegia and traumatic brain injury – Rob went to the jury, which awarded damages for all harms and losses requested and for insurance bad faith, with a verdict exceeding over 15 times policy limits.

› Rob sued the leading auto carrier for refusal to fully cover a pedestrian struck by the carrier's driver. The verdict was valued over seven figures, and included a finding of willful and wanton conduct, trebling the damages.

› After Rob cross-examined the CEO and CFO of a pharmacy benefits company, the jury entered a verdict for his client in the liability phase of a $75-million dispute.

› During his representation of a driver paralyzed by a car's roof collapse, the insurance company ignored that the agent did not understand or offer required high-end coverages. The jury returned a verdict with a value over seven figures, including a finding for treble damages.

› Rob represented passengers of drunk driver, and persuaded the jury to award future earning capacity, essential services, medical bills and to find willful and wanton conduct against the insurer (treble damages). After a successful trip to the state supreme court, the verdict was maintained and had a value in excess of 15 times the policy limits.

› While serving as Arizona Chief Deputy Attorney General:

   - Helped secure a $4 billion divestiture and a landmark $165 million antitrust settlement

## RECOGNITION

› One of 500 Leading Lawyers in America in 2021 selected by Lawdragon, and the only Arizona attorney to make the list.

› Listed since 2008 as a Top 100 Trial Lawyer by Arizona's Finest Lawyers and National Trial Lawyers

› Recognized by the judges of the Superior Court of Arizona in Maricopa County for outstanding contributions to the justice system.

› Member of Hagens Berman's Toyota team selected as a Finalist for Public Justice's 2014 Trial Lawyer of the Year

› Selected as a Leading Plaintiff Financial Lawyer in America and a Leading Plaintiff Consumers Lawyer in America

› U.S. Department of Justice, recognized for victims' rights efforts

## EXPERIENCE

› Adjunct Professor, Sandra Day O'Connor College of Law, teaching class actions. Has taught law and

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER, EXECUTIVE COMMITTEE MEMBER

# Robert B. Carey

> policy courses at other universities.

> Judge Pro Tempore, Maricopa County Superior Court, presiding over contract and tort jury trials

> In the 90s, he served as trial counsel on claims by counties for damages stemming from tobacco-related illnesses (and acted as special counsel for Hagens Berman in seeking to recover damages in the landmark tobacco litigation), and since then has led dozens of consumer and insurance class actions in various states.

> While serving as Arizona Chief Deputy Attorney General Mr. Carey helped secure a $4 billion divestiture and a landmark $165 million antitrust settlement. He also was a principal drafter of the first major overhaul of Arizona's criminal code and authored the section of the federal Prisoner Litigation Reform Act of 1995 for Senators Dole and Kyl that virtually eliminated frivolous prisoner lawsuits. Mr. Carey oversaw all major legal, policy, legislative and political issues for the Arizona attorney general's office. He developed and spearheaded passage of Arizona's law requiring the DNA testing of all sex offenders and the law requiring that criminals pay the cost of victims' rights.

> Campaign staffer, intern, and staff member for U.S. Senator John McCain, during and after Senator McCain's first run for public office

## LEGAL ACTIVITIES

> Member and Former Chairman, Arizona State Bar Class Action and Derivative Suits Committee

## PUBLICATIONS

> Co-author of "7 Punitive Damages Strategies," Trial Magazine, April 2019

> Co-author of the Arizona chapter of the ABA's "A Practitioner's Guide to Class Actions"

> Co-author of the Arizona and Colorado chapters of the ABA's "A Practitioner's Guide to Class Actions" (2d ed.)

## NOTABLE CASES

> Propane Exchange Tank Litigation

> Hyundai/Kia MPG Litigation

> Swift Truckers Litigation

> Toyota Unintended Acceleration Litigation

> NCAA Student-Athlete Name and Likeness Licensing Litigation

> Hyundai Subframe Defect Litigation

> Hyundai Occupant Classification System / Airbag Litigation

> Hyundai Horsepower Litigation

> Arizona v. McKesson False Claims and Consumer Protection Litigation (representing State of Arizona)

> Apple Refurbished iPhone/iPad Litigation

> Jim Brown v. Electronic Arts

> LifeLock Sales and Marketing Litigation

> Rexall Sundown Cellasene Litigation

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**
# Leonard W. Aragon

*Before attending college, Mr. Aragon fulfilled his dream as a scout for the 2/68 Armored Tank Battalion.*

**CONTACT**
11 West Jefferson St.
Suite 1000
Phoenix, AZ 85003

(602) 840-5900 office
(602) 840-3012 fax
leonard@hbsslaw.com

**YEARS OF EXPERIENCE**
> 19

**PRACTICE AREAS**
> Commercial Litigation
> Mass Tort
> Appellate Advocacy
> Personal Injury

**COURT ADMISSIONS**
> U.S. District Court, District of Arizona
> U.S. District Court, District of Colorado

**EDUCATION**
> Stanford Law School, J.D., 2001
> Arizona State University, B.A., History and Political Science, summa **cum laude**, 1998

**INDUSTRY EXPERIENCE**
> Consumer Fraud
> Software
> Sports Law
> Health Care
> Pharmaceuticals
> Election Law
> Gambling
> Administrative Procedures Act

## CURRENT ROLE
> Partner, Hagens Berman Sobol Shapiro LLP
> Practice focuses on nationwide class actions and other complex litigation
> Currently counsel for plaintiffs in the highly publicized cases **Keller v. Electronic Arts** and **In re NCAA Student-Athlete Name and Likeness Licensing Litigation** which alleges that video game manufacturer Electronic Arts, the National Collegiate Athletic Association, and the Collegiate Licensing Company used the names, images and likenesses of student-athletes in violation of state right of publicity laws and the NCAA's contractual agreements with the student-athletes. The plaintiffs reached a settlement with EA and the CLC in May for $40 million and reached a settlement in June with the NCAA for $20 million. The parties are in the process of seeking approval from the Court for the two settlements.

## RECENT SUCCESS
> Multimillion-dollar jury verdict believed to be the largest in Columbiana County, Ohio history
> Multimillion-dollar class-action settlement on behalf of a nationwide class of student-athletes whose images were used on a website affiliated with CBS Interactive without their permission or compensation
> Obtained two jury verdicts in favor of the original developer of the Madden Football video game franchise in phased trial over unpaid royalties

## RECOGNITION
> Super Lawyers, Rising Star: Class Action/Mass Tort

## LEGAL ACTIVITIES
> Adjunct Professor, Sandra Day O'Connor College of Law, Arizona State University
> State Bar of Arizona Bar Leadership Institute Class I
> Pro bono work in insurance, immigration, family and contract law

## NOTABLE CASES
> In re NCAA Student-Athlete Name and Likeness Licensing Litigation
> Keller v. Electronic Arts Inc.
> Antonick v. Electronic Arts Inc.
> In re Swift Transportation Co., Inc.
> Hunter v. Hyundai Motor America
> Jim Brown v. NCAA; Liebich v. Maricopa County Community College District
> Liebich v. Maricopa County Community College District

## PERSONAL INSIGHT
Before entering the practice of law, Mr. Aragon was a scout for the 2/68 Armored Tank Battalion, communications director for a successful congressional campaign, and waited on season tickets holders at America West Arena so that he could secretly watch the Phoenix Suns.



**PARTNER**

# Gregory T. Arnold

*Greg devotes his practice to pursuing remedies for those injured by antitrust violations, particularly within the pharmaceutical industry.*

**CONTACT**

55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1954 office
(617) 482-3003 fax
grega@hbsslaw.com

**YEARS OF EXPERIENCE**
> 24

**PRACTICE AREAS**
> Antitrust Litigation
> Personal Injury Litigation

**BAR ADMISSIONS**
> Massachusetts
> U.S. District Court, District of Massachusetts
> Court of Appeals, 2nd Circuit

**EDUCATION**
> Fairfield University, B.S., Marketing, 1991
> Villanova University School of Law, J.D., 1996 (served on Law Review)

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP

> Practice focuses on prosecution of large-scale, nationwide class actions, primarily against the pharmaceutical industry

> Works on behalf of large health care providers, seeking recoveries from tortfeasors associated with payments the providers make as a result of the harm they have caused

> Directs Hagens Berman's work on numerous pending direct purchaser class-action cases, including In re Ranbaxy Generic Drug Application Antitrust Litigation, In re Actos Direct Purchaser Antitrust Litigation, In re Lipitor Antitrust Litigation, and In re Effexor XR Antitrust Litigation, as well as multiple actions brought on behalf of end payors, including Louisiana Health Service & Indemnity Comp., et al. v. Janssen Biotech, Inc., et al., and Staley, et al. v. Gilead Sciences, Inc. et al.,

## RECENT SUCCESS

> Part of a team that secured substantial recoveries on behalf of a class of direct purchasers in connection with wrongfully delayed entry of generic versions of various pharmaceutical drugs

> Defeated motion to dismiss in case alleging misconduct on the part of a large Indian generic pharmaceutical manufacturer which caused delays in generic competition on multiple drugs with billions of dollars of annual sales

## EXPERIENCE

> Income Partner, Litigation Department for a large Boston-based law firm

## NOTABLE CASES

> Bankruptcy-related litigation

- Lead efforts on behalf of three law firms protecting the interests of more than 25,000 claimants suffering from asbestos-related diseases to block a proposed plan of reorganization. During more than five years of litigation, Mr. Arnold succeeded in forcing numerous changes to the proposed plan, including the voting methodology, amount of contribution and distributions. He pursued several interlocutory appeals throughout the case and oversaw and managed all aspects of this complex litigation, culminating in a successful 20-day bench trial conducted in the bankruptcy court for the Southern District of New York, after which the court rejected the proposed bankruptcy plan, thereby securing a substantial benefit for the clients.

- One of a team of lawyers representing the interests of the Ad Hoc Committee of Trade Creditors in the In re WorldCom matter, resulting in increasing our clients' recoveries by nearly 50 percent.

PARTNER

# Gregory Arnold

› Mass Torts/Class Actions

- Played pivotal role in representing the Commonwealth of Massachusetts in landmark litigation against the Tobacco Industry, including establishing personal jurisdiction in Massachusetts over the United Kingdom-based parent company to Brown & Williamson. This work product, as well as the resulting court decision, was relied upon by Attorneys General throughout the country in their cases against the tobacco Industry.

- Following the Commonwealth of Massachusetts' action, lead efforts in pursuing a nationwide class action on behalf of all persons injured as a result of the tobacco industry's misconduct.

- Successfully defended a class-action case brought against a major credit card issuer, obtaining a denial of class certification and dismissal of individual's claims.

› Complex Financial Litigation

- Successfully represented a group of more than 65 investors in offshore hedge funds, pursuing recoveries for more than $600 million of invested capital lost due to fraudulent practices of hedge fund manager.

› General Commercial Litigation

- Represented former attorney whose malpractice insurer had refused defense and indemnity after an office worker embezzled millions of dollars in client funds. Following a five-week Superior Court trial, secured a verdict in favor of the client, holding the insurance company responsible for more than $2 million in liability to the insured's former client. Successfully defended insurer's appeal of the trial court decision in the Appeals Court. Subsequently brought a case against the insurance company under Chapter 93a, resulting in a multimillion-dollar recovery for the client.

- Obtained a substantial recovery for a client whose intellectual property was wrongfully assigned to a third party. Achieved a pre-trial settlement with the assigning party while pursuing a bench trial in Middlesex Superior Court against the party using the software.

- Served as "first chair" in a complex, multi-week bench trial in federal court over breach of multimillion-dollar commercial contract concerning sale of radiology equipment, including prevailing on counterclaim seeking to impose multimillion-dollar liability.

› Patent Litigation

- Represented national and international clients on a full range of patent litigation issues, including trials.

- Successful litigator before the United States International Trade Commission, including obtaining favorable outcome for a client protecting their intellectual property rights against an infringer based in Sweden.

› Labor and Employment Litigation

- Defended client interests in a variety of matters, including those involving non-competition agreements, wrongful terminations, and harassment claims.

- Successfully represented companies enforcing non-compete agreements against former employees, as well as new employers/former employees in avoiding the terms of non-compete agreements.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER**

# Gregory Arnold

- Handled trials before administrative bodies, including the U.S. Department of Labor, including defending a client against claims made under the Surface Transportation Assistance Act following the termination of an employee/truck driver.

❯ Other Litigation

- Represented client in an eminent domain trial, resulting in a jury award more than 10 times the Commonwealth's pro tanto offer.

**PERSONAL INSIGHT**

Greg is married with three children and lives in Mansfield, Mass. He played varsity ice hockey in college.



**PARTNER**

# Lauren Guth Barnes

*Ms. Barnes was honored with the American Association for Justice's Marie Lambert Award in 2018, given to a female attorney in recognition of her exemplary leadership to the profession, to her community, to AAJ and to the Women Trial Lawyers Caucus.*

## CONTACT

55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 482-3700 office
(617) 482-3003 fax
lauren@hbsslaw.com

## YEARS OF EXPERIENCE

> 16

## PRACTICE AREAS

> Antitrust Litigation
> Class Actions
> Consumer Rights
> Mass Torts
> Medical Devices
> Pharmaceuticals/Health Care Fraud
> RICO

## BAR ADMISSIONS

> Massachusetts

## COURT ADMISSIONS

> U.S. District Court, District of Massachusetts
> U.S. Court of Appeals, Second Circuit, Eleventh Circuit
> Supreme Court of the United States

## EDUCATION

> Boston College Law School, J.D., **cum laude**, Articles Editor, Boston College Law Review, 2005
> Williams College, B.A., International Relations, **cum laude**, 1998

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP

> Practice focuses on antitrust, consumer protection and RICO litigation against drug and medical device manufacturers in complex class actions and personal injury cases for consumers, large and small health plans, direct purchasers and state governments

> Co-lead class counsel for direct purchasers in In re Glumetza Antitrust Litigation (N.D. CA.)

> Co-lead class counsel for direct purchasers in In re Intuniv Antitrust Litigation (D. Mass.)

> Co-lead interim class counsel for end payors for In re Humira (Adalimumab) Antitrust Litigation (N.D. Ill.)

> Co-lead interim class counsel for student purchasers in In re Inclusive Access Course Materials Antitrust Litigation (S.D. N.Y.)

## EXPERIENCE

> As co-lead class counsel, helped secure a $72.5 million class settlement for direct purchaser class three days before trial in MDL 2503: In re Solodyn Antitrust Litigation

> Helped reach a $73 million class settlement for direct purchasers in MDL No. 2343: In re. Skelaxin Antitrust Litigation

> Represented the state of Connecticut and helped secure a $25M settlement in its action against Eli Lilly over unlawful promotion of and misrepresentations about Zyprexa

> Represented health benefit providers in the firm's Ketek and copay subsidies class litigation, and individuals harmed by pharmaceuticals such as Yaz, Actos and Granuflo and medical devices including pelvic mesh

> Served as pro bono counsel in a successful constitutional challenge to the Commonwealth of Massachusetts' exclusion of legal immigrants from the state's universal healthcare program

> Served as liaison counsel for In re Fresenius Granuflo/Naturalyte Dialysate Products Liability Litigation

> Active in the fights against forced arbitration federal preemption of consumer rights, working to ensure the public maintains access to the civil justice system and the ability to seek remedies when companies violate the law

> Co-authored an amicus brief to the Supreme Court in Pliva v. Mensing on behalf of practitioners and professors who teach and write on various aspects of pharmaceutical regulation and the delivery of healthcare

> Worked at Conflict Management Group where she worked with members of the United Nations High

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER

# Lauren Guth Barnes

Commissioner for Refugees on a pilot project in Bosnia-Herzegovina designed to ease tensions and encourage reconciliation in post-conflict societies, and contributed to Imagine Coexistence, a book developed out of the collaboration

› Serves on the Board of On The Rise, a Cambridge, MA daytime shelter for homeless women and women in crisis

## LEGAL ACTIVITIES

› American Association for Justice (AAJ)
  - Executive Committee, Member (2014-2015, 2019-present)
  - Board of Governors, Member (2012-present)
  - Law Schools Committee, Co-Chair (2010-present)
  - Committee on the Judiciary, Chair (2018-present)
  - Antitrust Litigation Group, Former Chair (2016-2018)
  - Women Trial Lawyers Caucus, Former Chair (2012-2013)
  - Class Action Litigation Group, Former Co-Chair (2011-2012)
  - New Lawyers Division, Board of Governors (2009-2014)
  - Committees (various), Member
  - AAJ Trial Lawyers Care Task Force, Member (2012-present)
› Public Justice
  - Board of Directors, Member (2018-present)
  - Class Action Preservation Project, Chair (2020-present); Vice Chair (2019-2020)
› Massachusetts Academy of Trial Attorneys
  - Executive Committee, Member (2012-2014; 2017-present)
  - Board of Governors, Member (2011-present)
› Institute for Complex Litigation and Mass Claims at Emory Law, Emerging Leaders Board of Advisors (2015-2017)
› Boston Bar Association, Class Action Committee, Co-Chair (2014-2018)

## RECOGNITION

› Lawdragon 500 Leading Lawyers in America, Plaintiff Financial Lawyers (2020)

› Massachusetts Super Lawyer (2018, 2019)

› AAJ Marie Lambert Award (2018)

› AAJ Distinguished Service Award (2015, 2017, 2018)

› AAJ Women's Caucus Excellence in Leadership Award (2017, 2019)

› AAJ Above and Beyond Award (2016)

› Institute for Complex Litigation and Mass Claims at Emory Law, Emerging Leaders Board of Advisors – inaugural class (2015-2017)

› National Law Journal Boston Rising Star Award (2014)

› Massachusetts Academy of Trial Attorneys President's Award (2014)

› Massachusetts Bar Association Up & Coming Lawyer Award (2013)

PARTNER

# Lauren Guth Barnes

> Massachusetts Rising Star (2014, 2015)

> AAJ New Lawyers Division Excellence Award (2010, 2011, 2013, 2014)

> AAJ New Lawyers Division Above and Beyond Award (2012)

> AAJ Wiedemann & Wysocki Award (2012, 2013)

## NOTABLE CASES

> **$72.5 Million Recovery in Solodyn Antitrust Action**

In July 2018, the Honorable Denise J. Casper of the District of Massachusetts granted final approval to a $72.5 million class settlement for direct purchasers of brand and generic Solodyn. HBSS was co-lead class counsel in this case alleging Medicis entered into a series of reverse payment deals to delay entry of generic Solodyn and used the period of delay to effectuate a product hop, all resulting in overcharges by direct purchasers. The case settled three days before trial.

In re Solodyn Antitrust Litigation, D. Mass., MDL No. 2503

> **$73 Million Recovery for Direct Purchasers of Skelaxin**
On Sept. 24, 2014, Judge Curtis Collier of the Eastern District of Tennessee approved a $73 million settlement for direct purchasers of Skelaxin in litigation alleging Skelaxin's manufacturer colluded with would-be generic competitors, fraudulently delaying generic competition and leading to higher prices. Metaxalone was sold under the brand name Skelaxin since 1962, but the original patent expired in 1979. Manufacturers applied to market generic metaxalone in 2002, and generic competitors remained foreclosed from marketing generic metaxalone until 2010. Hagens Berman served as lead counsel for direct purchasers.
In re Skelaxin (Metaxalone) Antitrust Litigation, E.D.TN., Civil Action No. 1:12-md-2343.

> **Health care coverage for 40,000 legal immigrants in Massachusetts**
On Jan. 5, 2012, the Massachusetts Supreme Judicial Court ruled unanimously that a state law barring 40,000 low-income legal immigrants from the state's universal health care program unconstitutionally violates those immigrants' rights to equal protection under the law and must be struck down. Hagens Berman served as pro bono counsel.
Finch v. Commonwealth Health Insurance Connector Authority, Mass., Civil Action No. SJC-11025.

> **$25 million for the state of Connecticut for Zyprexa fraud**
On Oct. 5, 2009, U.S. District Court Judge Jack B. Weinstein approved a $25 million settlement reached by the parties to conclude the state's Zyprexa litigation that alleged Lilly engaged in unlawful off-label promotion and misrepresented Zyprexa's safety and efficacy, resulting in millions of dollars in excess pharmaceutical costs. Hagens Berman served as outside counsel to Attorney General Richard Blumenthal.
State of Connecticut v. Eli Lilly & Co., E.D.N.Y., Civil Action No. 08-cv-955-JBW.

## PUBLICATIONS

> "How Mandatory Arbitration Agreements and Class Action Waivers Undermine Consumer Rights and Why We Need Congress to Act," Harvard Law and Policy Review, August 2015

## PERSONAL INSIGHT

Unlike many of her colleagues at HBSS, Lauren does not run marathons – unless chasing after her three children counts. Lauren did wrestle in college but refused to don the wrestling singlet. Whenever she can, Lauren rock climbs with her in-laws, breathes deeply at yoga, and hosts dinner parties to, despite usual advice, try totally new recipes. She also keeps the pizza delivery guy on speed dial as back-up for such occasions.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Ian M. Bauer

*Mr. Bauer has been at the forefront of child and social welfare policymaking and litigation in Washington State over the past decade, and has extensive experience in litigation involving abuse, neglect and exploitation of children and vulnerable adults.*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9377 office
(206) 623-0594 fax
ianb@hbsslaw.com

**YEARS OF EXPERIENCE**
› 15

**PRACTICE AREAS**
› Personal Injury Litigation
› Civil Rights

**BAR ADMISSIONS**
› Washington

**COURT ADMISSIONS**
› U.S. District Court, Western District of Washington
› U.S. District Court, Eastern District of Washington
› United State Bankruptcy Court for the Western District of Washington
› Ninth Circuit Court of Appeals

**EDUCATION**
› Connecticut College, B.A., 1999
› Seattle University School of Law, J.D., **magna cum laude**, 2004

**CURRENT ROLE**
› Partner, Hagens Berman Sobol Shapiro LLP
› Practice focuses on personal injury and civil rights cases

**RECENT SUCCESS**
Mr. Bauer has litigated numerous multimillion-dollar cases involving children and vulnerable adults who have suffered profound abuse, neglect or exploitation. Recent recoveries include:
› Settlement on behalf of five children abused and neglected by their biological parents ($9.75 million
› Settlement on behalf of a developmentally-disabled man who was subjected to extensive neglect and financial exploitation ($8.0 million)
› Settlement on behalf of a developmentally-disabled woman who was abused, neglected and financially exploited by her state-paid, in-home caregiver ($5.52 million)
› Settlement on behalf of a young child who was abused and neglected by his biological parents ($5.5 million)
› Settlement on behalf of a young man who was abused and neglected by a non-relative caregiver ($4.0 million)
› Settlement on behalf of a young child who was abused and neglected by her biological mother ($4.0 million)
› Settlement on behalf of a young woman who was abused and neglected by a non-relative caregiver ($3.0 million)
› Settlement on behalf of an infant abused in day care setting ($2.84 million)
› Settlement on behalf of a developmentally-disabled woman abused and neglected by her state-paid, in-home caregiver ($2.5 million)
› Settlement on behalf of a developmentally-disabled woman who was sexually and financially exploited by her state-paid, in-home caregiver ($2.4 million)
› Settlement on behalf of a young woman sexually abused by her biological father ($2.0 million)
› Settlement on behalf of a vulnerable woman sexually assaulted in a hospital emergency room ($1.2 million)

**RECOGNITION**
› Mr. Bauer has received an AV rating from Martindale-Hubbell, the highest peer-reviewed national rating a lawyer can obtain, reflecting a preeminent legal ability and exceptional ethical standards.
› Rising Star, Washington Law & Politics Magazine (2009, 2016, 2017)

**EXPERIENCE**
Prior to joining Hagens Berman, Mr. Bauer's served as an Assistant Attorney General with the Washington State Attorney General's Office. In this role, Mr. Bauer coordinated the defense of civil rights and tort litigation against DSHS, WSDOT, WSP and other state agencies, and supervised two teams of highly-

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER**

# Ian M. Bauer

experienced attorneys and professional staff. Mr. Bauer also carried a significant caseload of high-profile tort and civil rights cases, as well as cases involving the operation and funding of Washington's foster care, mental health and public assistance systems. Mr. Bauer also advised executive-level agency staff and state risk managers on a wide variety of complex legal issues, including tactical litigation decisions, the implications of legislative, judicial, political and policy decisions, and emergent situations involving the risk of significant exposure.

**LEGAL ACTIVITIES**

› Member, Washington Association for Justice
› Member, American Association for Justice

**PERSONAL INSIGHT**

Mr. Bauer is a former collegiate soccer player who continues to follow the game religiously.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Elaine T. Byszewski

*Litigated Milk Antitrust from complaint filing to recent settlement of $52 million*

**CONTACT**
301 North Lake Ave.
Suite 920
Pasadena, CA 91101

(213) 330-7149 office
(213) 330-7152 fax
elaine@hbsslaw.com

**YEARS OF EXPERIENCE**
› 18

**PRACTICE AREAS**
› Consumer Protection
› Qui Tam
› Antitrust Litigation
› Appellate

**BAR ADMISSIONS**
› State Bar of California

**COURT ADMISSIONS**
› U.S. District Court for the
  Central District of California
› U.S. District Court for the
  Northern District of California
› U.S. District Court for the
  Southern District of California
› U.S. Court of Appeals for the
  Ninth Circuit
› U.S. District Court for the
  Eastern District of California

**EDUCATION**
› Harvard Law School, J.D.,
  **cum laude**, 2002
› University of Southern
  California, B.S., Public Policy,
  summa **cum laude**, 1999

## CURRENT ROLE

› Partner, Hagens Berman Sobol Shapiro LLP

› Ms. Byszewski has litigated a number of complex class actions on behalf of consumers, employees and whistleblowers resulting in multimillion-dollar settlements, including cases against Toyota, Ford, AstraZeneca Pharmaceuticals, Berkeley Premium Nutraceuticals, Solvay Pharmaceuticals, Costco, Apple and KB Homes.

› She also litigated a multi-state antitrust action against major dairy cooperatives for colluding in the premature slaughter of a half a million cows to drive up the price of milk, which the defendants described in their attempted petition for review to the United States Supreme Court as "one of the most expensive classes in history."

› Currently, Ms. Byszewski focuses her practice on brief writing for a wide variety of firm cases, including:

  - Auto defect cases;

  - College refund cases seeking return of tuition paid for promised in-person and on campus education; and

  - Antitrust cases, including collusion in the agriculture industry and Hotels Antitrust, a conspiracy to eliminate competition for online search ads using branded keywords.

## RECENT SUCCESS

› Drafted petition for en banc review in **Hyundai/Kia Fuel Economy Litig.**, which was granted and resulted in affirmance of the nationwide class action settlement in 2019.

› Litigated **Milk Antitrust** from complaint filing to settlement of $52 million and received the American Antitrust Institute's 2018 award for Outstanding Antitrust Litigation Achievement in Private Law Practice

› Member of litigation team that settled **Toyota Unintended Acceleration Litigation** for $1.6 billion and was a finalist for Public Justice's 2014 Trial Lawyer of the Year award

## NOTABLE CASES

› **Dairy Cooperatives Antitrust Litigation**

› **Toyota Unintended Acceleration**

› **Hyundai/Kia**

› **Ford Spark Plugs**

› **AstraZeneca Pharmaceuticals (Nexium) Litigation**

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER

# Elaine T. Byszewski

> Merck (Vioxx) Litigation

> Berkeley Nutraceuticals (Enzyte) Litigation

> Solvay Pharmaceuticals (Estratest) Litigation

> Apple iPod Litigation

> Costco Wage and Hour Litigation

## EXPERIENCE

> Prior to joining Hagens Berman, Ms. Byszewski focused her practice on labor and employment litigation and counseling. During law school she worked in the trial division of the office of the Attorney General of Massachusetts.

## PUBLICATIONS

> "Valuing Companion Animals in Wrongful Death Cases: A Survey of Current Court and Legislative Action and A Suggestion for Valuing Loss of Companionship," Animal Law Review, 2003, Winner of the Animal Law Review's 5th Annual Student Writing Competition

> "What's in the Wine? A History of FDA's Role," Food and Drug Law Journal, 2002

> "ERISA and RICO: New Tools for HMO Litigators," Journal of Law, Medicine & Ethics, 2000

## PERSONAL INSIGHT

Ms. Byszewski enjoys spending time outdoors with her husband and their two sons, whether swimming, hiking or scootering around the neighborhood.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Catherine Y.N. Gannon

*Super Lawyers magazine has recognized Ms. Gannon as a "Rising Star" in Washington state from 2016 to 2020.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9319 office
(206) 623-0594 fax
catherineg@hbsslaw.com

**YEARS OF EXPERIENCE**
> 12

**PRACTICE AREAS**
> Securities and Antitrust
> Consumer Protection

**BAR ADMISSIONS**
> Washington
> New York
> Ontario (Canada)

**EDUCATION**
> York University, Osgoode Hall Law School, Senior Editor, Osgoode Hall Law Journal J.D., 2008
> Carleton University, Bachelor of Public Affairs and Policy Management, **summa cum laude**, 2005

**CURRENT ROLE**
> Partner, Hagens Berman Sobol Shapiro LLP
> Practice focuses on securities and antitrust matters, as well as nationwide consumer protection cases involving large corporations
> Extensive experience working with expert witnesses, often in economic and other highly technical areas

**NOTABLE CASES**
> Volkswagen/Audi/Porsche Diesel Emissions Scandal
> Aequitas Capital Management Securities Litigation
> Insulin Overpricing
> In re MyFord Touch Consumer Litigation
> NCAA Grant-In-Aid Cap Antitrust Litigation
> Ford Shelby GT350 Mustang Overheating

**EXPERIENCE**
> Weil, Gotshal and Manges LLP, New York, New York, Securities Litigation and Corporate Governance Group
> McCarthy Tétrault LLP, Toronto, Canada, Complex Commercial Litigation Group
> Department of Finance, Government of Canada, International Trade and Finance group with an emphasis on economic and trade negotiations at the G-20, IMF and the Paris Club

**LEGAL ACTIVITIES**
> iVice President, Board of Directors, Eastside Legal Assistance Program (ELAP)
> Ms. Gannon maintains a broad pro bono practice with an emphasis on healthcare and disability rights. She has successfully served as lead counsel seeking access to specialized education programs for autistic students in the New York City public school district and has repeatedly advocated for prisoners with mental health needs. Ms. Gannon has also served as a volunteer attorney for both Legal Voice and Disability Rights Washington.
> Volunteer, Disability Rights Washington
> Broad pro bono practice with an emphasis on healthcare and disability rights. Successfully served as lead counsel seeking access to specialized education programs for autistic students in the New York City public school district and has repeatedly advocated for prisoners with mental health needs.

**RECOGNITION**
> Rising Star, Washington Super Lawyers, 2016-2020

**PUBLICATIONS**
> Co-author of the American Bar Association's "A Practitioner's Guide to Class Actions – Vermont Chapter" (2017)
> "Designing a New Playbook for the New Paradigm: Global Securities Litigation and Regulation," (2011) Harvard Law School Forum on Corporate Governance and Financial Regulation
> "Legal Vulnerability of Bioethicists in Canada: Is a New Era Upon Us?" (2010) 30 Health Law in Canada 132

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER**

# Catherine Y.N. Gannon

> "The Threat of the Oppression Remedy to Reorganizing Insolvent Corporations," (2009) Annual Review
> of Insolvency Law 429 (with Stephanie Ben-Ishai)

**PERSONAL INSIGHT**

Ms. Gannon previously worked at leading law firms in both New York City and Toronto prior to joining Hagens Berman in Seattle. Outside of work, Ms. Gannon serves on the board of directors for the Eastside Legal Assistance Program, which provides pro bono civil legal services in the greater Seattle area. She has also volunteered with organizations such as Legal Voice, Disability Rights Washington, Advocates for Children of New York and The Innocence Project. A seasoned backpacker, Ms. Gannon once spent six months traveling to more than a dozen countries across five continents. She is fluent in French and can still pack a suitcase in less than 5 minutes.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Kristen A. Johnson

*Public Justice nominated Ms. Johnson and the rest of the Neurontin trial team for Trial Lawyer of the Year for securing a $142 million verdict against Pfizer for suppressing and manipulating results of scientific studies.*

## CONTACT
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1961 office
(617) 482-3003 fax
kristenjp@hbsslaw.com

## YEARS OF EXPERIENCE
> 13

## PRACTICE AREAS
> Class Actions
> Consumer Rights
> RICO
> Antitrust

## BAR ADMISSIONS
> Massachusetts

## COURT ADMISSIONS
> U.S. District Court, District of Massachusetts
> First Circuit Court of Appeals

## EDUCATION
> Boston College Law School, J.D.
> Dartmouth College, **cum laude**, B.A.

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP

> Court-appointed lead counsel for the proposed class of direct purchasers in multidistrict litigation alleging that brand company Merck and generic company Glenmark struck an anticompetitive pay-for-delay agreement to resolve patent-infringement litigation over the drug Zetia. In re Zetia Antitrust Litigation, 2:18-md-2836, E.D. Va., ECF No. 105.

> Member of the HBSS team litigating antitrust claims on behalf of a proposed class of direct purchasers of brand and generic Glumetza.  In re Glumetza Antitrust Litigation, 3:19-cv-05822, N.D. Cal.

> Working with experts in In re: Ranbaxy Generic Drug Application Antitrust Litigation, 1:19-md-02878, D. Mass.

> Instrumental in new case investigation work directed to combating waste, fraud, and pricing abuse in the pharmaceutical industry.

## RECENT SUCCESS

> The First Circuit reversed a district court's dismissal of antitrust litigation premised on wrongfully listing patents covering insulin injector pens in FDA's Orange Book. In re Lantus Direct Purchaser Antitrust Litigation, 18-cv-2086, 1st Cir., Feb. 13, 2020.

> Directed HBSS's litigation efforts, as co-lead counsel for the certified class of direct purchasers, and ran the patent team through the run up to trial in In re Loestrin 24 Fe Antitrust Litigation. The parties have reached a proposed $120 million settlement shortly before trial. In re Loestrin 24 Fe Antitrust Litigation, 1:13-md-02472, D.R.I., ECF Nos. 10, 1050.

> Court-appointed Interim lead/liaison class counsel for the proposed direct purchaser class in multidistrict litigation alleging that Allergan engaged in an anticompetitive scheme to delay generic versions of Restasis from coming to market. The parties have reached a proposed $51.25 million settlement on behalf of the proposed settlement class of direct purchasers of the drug Restasis, In re Restasis Antitrust Litigation, 18-md-2819, E.D.N.Y., ECF No. 50.

## LEGAL ACTIVITIES
> Public Justice, Class Action Preservation Committee
> American Association for Justice

## RECOGNITION

> In 2014 and 2015, the National Law Journal honored Ms. Johnson as one of Boston's Rising Stars, one of 40 outstanding lawyers under 40.

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER

# Kristen A. Johnson

› In 2020, Lawdragon named Ms. Johnson one of 500 Leading Lawyers in America, Plaintiff Financial Lawyers.

› In 2011, Public Justice nominated Ms. Johnson and the rest of the Neurontin trial team for Trial Lawyer of the Year for their work in securing a $142 million verdict against Pfizer for suppressing and manipulating the results of scientific studies that showed Neurontin did not work to treat the off-label indications Pfizer was heavily promoting.

## NOTABLE CASES

› $94 million settlement for the certified class of direct purchasers in In re Celebrex (Celecoxib) Antitrust Litigation, 2:13-cv-361, E.D. Va., ECF Nos. 64, 455 (court-appointed co-lead counsel).

› $98 million settlement for the direct purchaser class in In re Prograf Antitrust Litigation, D. Mass., MDL No. 2242 (team member).

› Personally appointed alternate lead counsel in the In re New England Compounding Pharmacy Litigation Multidistrict Litigation, 12-md-2419, D. Mass. During the nascent stages of the MDL, the court appointed Ms. Johnson liaison counsel to speak for the hundreds of victims who contracted fungal meningitis or suffered other serious health problems as a result of receiving contaminated products made and sold by NECC. This case resulted in a $189+ million settlement on behalf of tort victims.

› Member of the trial team that achieved a $142 million civil RICO verdict against Pfizer for suppressing and manipulating results of scientific studies concerning the drug Neurontin. Post-trial, the third-party payer class settled with Pfizer for an additional $325 million. In re Neurontin Marketing, Sales Practices, and Products Liability Litigation, D. Mass., MDL No. 1629.

› $150 million settlement for the direct purchaser class in In re Flonase Antitrust Litigation, E.D. Pa., 08-cv-3149 (team member).

## PERSONAL INSIGHT

Ms. Johnson grew up in a family law practice (they literally turned a closet into a playroom) in Canfield, Ohio. Her grandfather, uncle, father, brother and sister are all lawyers, all practice together, and her mother runs the law office. Ms. Johnson's career choice was perhaps inevitable, though her departure for Boston makes her a bit of a black sheep.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Reed R. Kathrein

*Mr. Kathrein represents institutional, government and individual investors in securities fraud, and corporate governance cases.*

**CONTACT**
715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3000 office
(510) 725-3001 fax
reed@hbsslaw.com

**YEARS OF EXPERIENCE**
> 44

**PRACTICE AREAS**
> Securities Litigation

**BAR ADMISSIONS**
> State of California
> State of Illinois
> State of Florida

**COURT ADMISSIONS**
> Supreme Court of California
> Supreme Court of Florida
> Supreme Court of Illinois
> U.S. District Court for the Northern District of California
> U.S. District Court for the Northern District of Illinois
> U.S. District Court of Colorado
> U.S. Court of Appeals, Ninth Circuit

**EDUCATION**
> University of Miami, J.D., 1977
> University of Miami, B.A., 1974

**CURRENT ROLE**
> Partner, Hagens Berman Sobol Shapiro LLP
> Regular public speaker on securities, class action and consumer law issues

**RECOGNITION**
> Super Lawyer, Super Lawyers Magazine, 2007 - 2019

**EXPERIENCE**
> Litigated over 100 securities fraud class actions
> Worked behind the scenes in shaping the Private Securities Litigation Reform Act, the Securities Litigation Uniform Standards Act and the Sarbanes-Oxley Act
> Lawyer Representative, Ninth Circuit Court of Appeals
> Lawyer Representative, U.S. District Court for the Northern District of California, 2008-2011
> Chaired the Magistrate Judge Merit Selection Panel, U.S. District Court, Northern District of California, 2006-2008
> Co-chaired the Securities Rules Advisory Committee, U.S. District Court, Northern District of California, 2004-2006

**LEGAL ACTIVITIES**
> Member, National Association of Public Pension Attorneys (NAPPA)
> Member and Speaker, National Conference on Public Employee Retirement Systems (NCPERS)
> Member, Council of Institutional Investors (CII)
> Member, State Association of County Retirement Systems (SACRS)
> Member, National Council on Teacher Retirement (NCTR)
> Member, California Association of Public Retirement Systems (CALAPRS)
> Member, Michigan Association of Public Employee Retirement Systems (MAPERS)
> Member, Illinois Public Pension Fund (IPPFA)
> Member, Standing Committee on Professional Conduct, U.S. District Court, Northern District of California (Term expires 2017)
> Expedited Trial Rules Committee, U.S. District Court, Northern District of California, 2010-2012
> Lawyer Representative to the Ninth Circuit Court of Appeals, U.S. District Court, Northern District of California, 2008-2011
> Chair/ Member, Magistrate Judge Merit Selection Panel, U.S. District Court, Northern District of California, 2006-2008

PARTNER

# Reed R. Kathrein

## PUBLICATIONS

› "A Look at Recent Demographics and Other Statistics in Securities Fraud Class Actions," The NAPPA Report, October 2016

› "Post-Morrison: The Global Journey Towards Asset Recovery," Reed R. Kathrein, Peter E. Borkon, Nick S. Singer, contributing members, NAPPA Morrison Working Group, June 2016

› "Interview with Bernie Madoff," Hagens Berman, HBSS Securities News, Fall 2015

› "Is Your Fund Prepared for Halliburton?," March 2014

› "O Securities Fraud, Where Art Thou?, Enter Robocop," Hagens Berman, HBSS Securities News, November 2013

› "Professor Coffee to SEC: Hire Plaintiffs Bar!," Hagens Berman, HBSS Securities News, May 2013

› "Living in a Post-Morrison World: How to Protect Your Assets Against Securities Fraud," Reed R. Kathrein, Peter E. Borkon, contributing members, NAPPA Morrison Working Group, 2012

› "SEC Action Necessary, But Not Sufficient to Protect Investors," Hagens Berman, HBSS Securities News, November 2012

› "Are You Watching Your Private Equity Valuations?" Hagens Berman, HBSS Securities News, May 2012

› "What Do Trustees Need to Know When Investing In Foreign Equities?," Hagens Berman, HBSS Securities News, November 2011

## PRESENTATIONS

› "Incoming! How the New Administration's Approach to Securities Laws and Regulations Affect Investors and Markets," MAPERS, Spring Conference, May 2017

› "Occupy Wall Street through Reform of the Securities Law," NCPERS, Legislative Conference, February 2012

› "Legal Issues Facing Public Pensions," Opal, Public Funds Summit, January 2012

› "Protection vs. Interference – What the New Federal Regulations Mean to Institutional Investors," NCPERS, Annual Conference, May 2011"The Immediate Need for Congress to Act on Investor Friendly Legislation," NCPERS, Annual Conference, May 2010

› "Investor Friendly Legislation in Congress," NCPERS, Legislative Conference, February 2010

## NOTABLE CASES

› Litigated over 100 securities fraud class actions including cases against 3Com, Adaptive Broadband, Abbott Laboratories, Bank of America, Capital Consultants, CBT, Ceridian, Commtouch, Covad, CVXT, ESS, Harmonics, Intel, Leasing Solutions, Nash Finch, Northpoint, Oppenheimer, Oracle, Pemstar, Retek, Schwab Yield Plus Fund, Secure Computing, Sun Microsystems, Tremont (Bernard Madoff), Titan, Verifone, Whitehall, and Xoma

› Litigated many consumer, employment and privacy law cases including AT&T Wiretapping Litigation, Costco Employment, Solvay Consumer, Google/Yahoo Internet Gambling, Vonage Spam, Apple Nano

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER**

# Reed R. Kathrein

Consumer, Ebay Consumer, LA Cellular Consumer, AOL Consumer, Tenet Consumer and Napster Consumer

**PERSONAL INSIGHT**

Reed is a recovering rock-and-roll drummer and banjo ukulele player. His rock band, the Stowaways, was voted 4th best in the State of Illinois out of 300 bands in the Jaycees Battle of the Bands. Reed's mother made his band costume of blue jean bell bottoms, sailor shirts and hats. The next year everyone wore blue jean bell bottoms to Woodstock. His prized possession is a 30lb Jeff Ocheltree snare drum made by Led Zeppelin John Bonham's  drum technician. The rest of his kit is patterned after Dave Matthews Band's drummer, Carter Beauford. In his spare time, Reed works on playing Stairway to Heaven (drums) in his garage or Somewhere Over the Rainbow (banjo ukulele) in the High Sierra mountains.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Daniel J. Kurowski

*2020 "Rising Star" in Illinois, Super Lawyers*

**CONTACT**

455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611

(708) 628-4963 office
(708) 628-4950 fax
dank@hbsslaw.com

**YEARS OF EXPERIENCE**
> 16

**PRACTICE AREAS**
> Consumer Rights Litigation
> Sports Litigation
> Antitrust Litigation
> Pharmaceutical Fraud

**CLERKSHIPS**
> Hon. Paul E. Plunkett,
  Northern District of Illinois
> Hon. Maria Valdez, Northern
  District of Illinois

**BAR ADMISSIONS**
> Illinois

**COURT ADMISSIONS**
> U.S. Court of Appeals, Seventh
  Circuit
> U.S. Court of Appeals, Second
  Circuit
> U.S. District Court, Northern
  District of Illinois
> U.S. District Court, Central
  District of Illinois
> U.S. District Court, Southern
  District of Illinois

**EDUCATION**
> John Marshall Law School,
  J.D., **cum laude**, 2005
> Loyola University Chicago,
  B.B.A., with Honors, 2002

## CURRENT ROLE

> Associate, Hagens Berman Sobol Shapiro LLP

> Daniel J. Kurowski is a partner at Hagens Berman Sobol Shapiro LLP. Since 2006, Mr. Kurowski has focused his practice on protecting the interests of individuals and small companies prejudiced by large corporations and organizations, often in consolidated multi-district litigation proceedings. Based in Chicago, with cases located throughout the country, his current work with the firm covers a diverse variety of complex cases including:

- Representing student-athletes in individual personal injury and class-action litigation pertaining to concussions/traumatic brain injuries suffered during sporting activities, including in **In Re National Collegiate Athletic Association Student-Athlete Concussion Injury Litigation** (N.D. Ill.), **May all v. USA Water Polo, Inc.** (C.D. Cal.) and **In Re NFL Players' Concussion Injury Litig.** (E.D. Pa.).

- Representing consumers of electricity in action alleging claims against nearly two dozen defendants for perpetuating an extensive fuel oil fraud, resulting in users of electricity in Puerto Rico being overcharged by more than $1 billion dollars for electricity since 2002.

- Representing purchasers with antitrust, consumer fraud and/or unjust enrichment claims against sellers and manufacturers of retail products.

## RECENT SUCCESS

> **In re Pre-Filled Propane Sales & Marketing Practices Litigation** (W.D. Mo.) ($35 million in settlements involving multiple defendants)
> **In re Bayer Combination Aspirin Sales & Marketing Practices Litigation** (E.D.N.Y.) ($15 million settlement)
> **In re Aurora Dairy Organic Milk Marketing & Sales Practices Litigation** (E.D. Mo.) ($7.5 million settlement)
> **Silk v. Bowling Green State University** (Ohio Court of Claims) ($712,500 individual settlement for student-athlete injured as a result of alleged failures to properly manage athlete's concussions)
> **In re NFL Players' Concussion Injury Litigation** (E.D. Pa.) (over $3.3 million in approved claims for former NFL players)

## RECOGNITION

> Illinois Rising Star, Super Lawyers Magazine, 2015 - 2020

## EXPERIENCE

> Federal judicial law clerk, Hon. Paul E. Plunkett and Hon. Maria Valdez
> Intern, U.S. Department of Housing and Urban Development's Office of Fair Housing and Equal Opportunity, the U.S. Attorney's Office for the Northern District of Illinois and with Hon. Ronald A. Guzman and his staff
> During law school, Mr. Kurowski received multiple academic scholarships, served as a staff member and Lead Articles Editor for The John Marshall Law Review, and received an award for an appellate brief submitted in a national moot court competition

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER

# Daniel J. Kurowski

## LEGAL ACTIVITIES

> Seventh Circuit Council on eDiscovery and Digital Information

> Member of American Association for Justice, Illinois State Bar Association, Chicago Bar Association

> Investigator, Chicago Bar Association, Judicial Evaluation Committee

## NOTABLE CASES

> Aurora Dairy Corporation Organic Milk Marketing & Sales Practices Litigation (E.D. Mo.)

> Bayer Corp. Combination Aspirin Product Marketing & Sales Practices Litigation (E.D.N.Y.)

> Bisphenol-A (BPA) Polycarbonate Plastic Products Liability Litigation (W.D. Mo.)

> Pre-Filled Propane Tank Marketing & Sales Practices Litigation (W.D. Mo.)

> RC2 Corp. Toy Lead Paint Products Liability Litigation (N.D. Ill.)

## PERSONAL INSIGHT

Dan enjoys staying active by competing in cyclocross races and equally intense races chasing after his two children. Dan is also a board member for the DuPage Cycling Foundation, a 501(c)(3) non-profit corporation that raises fund for community non-profits through the hosting and promotion of cycling events.

HAGENS BERMAN SOBOL SHAPIRO LLP



PARTNER

# Thomas E. Loeser

*Mr. Loeser obtained judgments in cases that have returned billions of dollars to millions of consumers and more than $100 million to the government.*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9337 office
(206) 623-0594 fax
toml@hbsslaw.com

**YEARS OF EXPERIENCE**
> 21

**PRACTICE AREAS**
> Consumer Rights
> False Claims Act/**Qui Tam**
> Government Fraud
> Corporate Fraud
> Data Breach/Identity Theft and Privacy

**INDUSTRY EXPERIENCE**
> Automotive
> Consumer Fraud
> Cyber and Intellectual Property Crimes
> Racketeering
> False Claims
> Government Fraud
> Technology
> Software
> Recreation
> Athletic Apparel

**BAR ADMISSIONS**
> California
> Illinois
> District of Columbia

**COURT ADMISSIONS**
> District of Columbia
> U.S. District Court for the District of Columbia

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP

> Practice focuses on class actions, False Claims Act and other whistleblower cases, consumer protection and data breach/identity-theft/privacy cases

> Successfully litigated class-action lawsuits against mortgage lenders, appraisal management companies, automotive manufacturers, national banks, home builders, hospitals, title insurers, technology companies and data processors

> Currently prosecuting consumer protection class-action cases against banks, automobile manufacturers, lenders, loan servicing companies, technology companies, national retailers, payment processors and False Claims Act whistleblower suits now under seal

> Obtained judgments in cases that have returned billions of dollars to millions of consumers and more than $100 million to the government

## RECOGNITION

> The National Trial Lawyers: Top 100, 2019 -2020
> Washington Super Lawyers, 2016 - 2020
> Washington Top Lawyers, 2016 - 2020
> Martindale-Hubbell® AV Preeminent rating, 2015 - 2020
> Lawdragon 500 Leading Lawyers in America - 2019
> Lawdragon 500 Leading Lawyers in America, Plaintiff Financial Lawyers - 2020

## EXPERIENCE

> Experience trying cases in federal and state courts in San Francisco, Los Angeles and Seattle

> Served as lead or co-lead counsel in 12 federal jury trials and has presented more than a dozen cases to the Ninth Circuit Court of Appeals

> As a federal prosecutor in Los Angeles, Mr. Loeser was a member of the Cyber and Intellectual Property Crimes Section and regularly appeared in the Central District trial courts and the Ninth Circuit Court of Appeals

> Assistant U.S. Attorney, U.S. Department of Justice

> Wilson Sonsini Goodrich & Rosati

## NOTABLE CASES

> **Volkswagen Emissions Defect Litigation**
> **Shea Homes Construction Defect Litigation**

**PARTNER**

# Thomas E. Loeser

> U.S. District Court for the Eastern District of California
> U.S. District Court for the Northern District of California
> U.S. District Court for the Southern District of California
> U.S. District Court for the Central District of California
> Supreme Court of California
> U.S. District Court for the Eastern District of Michigan
> U.S. District Court for the Western District of Washington
> Supreme Court of Washington
> Ninth Circuit Court of Appeals

**EDUCATION**

> Duke University School of Law, J.D., **magna cum Laude**, Order of the Coif, Articles Editor Law and Contemporary Problems, 1999
> University of Washington, M.B.A., **cum laude**, Beta Gamma Sigma, 1994
> Middlebury College, B.A., Physics with Minor in Italian, 1988

> Meracord/Noteworld Debt Settlement Litigation
> Defective RV Refrigerators Litigation
> New Jersey Medicare Outlier Litigation
> Center for Diagnostic Imaging Qui Tam Litigation
> Countrywide FHA Fraud Qui Tam Litigation
> Chicago Title Insurance Co. Litigation
> KB Homes Captive Escrow Litigation
> Aurora Loan Modification Litigation
> Wells Fargo HAMP Modification Litigation
> JPMorgan Chase Force-Placed Flood Insurance Litigation
> Wells Fargo Force-Placed Insurance Litigation
> Target Data Breach Litigation
> Cornerstone Advisors Derivative Litigation
> Honda Civic Hybrid Litigation
> Hyundai MPG Litigation

**LANGUAGES**

> French
> Italian

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Robert F. Lopez

*Mr. Lopez continues practice on qui tam matters at the firm, representing whistleblowers in cases involving violations of federal and state laws that prohibit the making of false claims for government payments.*

## CONTACT

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9304 office
(206) 623-0594 fax
robl@hbsslaw.com

## PRACTICE AREAS

> Complex Commercial
  Litigation
> Health Care &
  Pharmaceuticals Litigation
> Intellectual Property Litigation
> Privacy Litigation
> Antitrust Litigation
> Securities Litigation
> **Qui Tam** Litigation

## BAR ADMISSIONS

> Washington

## COURT ADMISSIONS

> Western District of
  Washington
> Eastern District of Washington
> U.S. Court of Appeals for the
  Ninth Circuit

## EDUCATION

> Gonzaga University, B.A.,
  English Literature; Arnold
  Scholar
> University of Washington
  School of Law, J.D.

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP

> Offers a broad range of legal experience in the fields of:

  - Complex commercial litigation
  - Health care and pharmaceuticals litigation
  - Product defect litigation
  - False Claims Act litigation
  - Intellectual property litigation
  - Privacy litigation
  - Securities litigation
  - Antitrust litigation
  - Creditor-debtor litigation

> Member of firm's **In re Carrier IQ, Inc. Consumer Privacy Litigation** team

> Member of the firm's team representing the plaintiffs and proposed class in *Free Range Content Inc. v. Google Inc.*, an class-action case based on allegations that Google unlawfully denies payments to thousands of website owners and operators who place ads on their sites sold through Google AdWords

> Continues practice on **qui tam** matters at the firm, representing whistleblowers in cases involving violations of federal and state laws that prohibit the making of false claims for government payments

## EXPERIENCE

> Experienced in prosecuting and defending appeals in the federal and state courts of appeal; representing institutions and consumers in nationwide class-action lawsuits, including in the federal multidistrict litigation setting; advising clients in non-litigation settings with respect to trademark, trade-name, copyright and Internet-communications law

> Member of firm's team representing one of the relators in the 2012 settlement with Amgen Inc., in which the company agreed to pay $612 million to the U.S. and various state governments in order to resolve claims that it caused false claims to be submitted to Medicare, Medicaid and other government insurance programs

> Member of the firm's team that prosecuted **In re Charles Schwab Corp. Securities Litigation**

> Experienced in class-action litigation against DaimlerChrysler Corporation relating to product defects in its Neon automobiles, nationwide class-action cases against Trex Company, Inc. and Fiber Composites, Inc.

> Founding Member and Partner, Socius Law Group PLLC

> Partner, Betts, Patterson & Mines, P.S.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER**

# Robert F. Lopez

**NOTABLE CASES**

› In re Pharmaceutical Industry Average Wholesale Price Litigation

› Amgen Inc. Qui Tam Litigation

› In re Metropolitan Securities Litigation

› In re Charles Schwab Corp. Securities Litigation

› In re Carrier IQ, Inc. Consumer Privacy Litigation

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Jessica R. MacAuley

*Ms. MacAuley was a fundamental part of the In re: Celebrex Antitrust Litigation trial team, which resulted in a $94 million settlement.*

**CONTACT**

55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1967 office
(617) 482-3003 fax
jessicam@hbsslaw.com

**YEARS OF EXPERIENCE**
> 8

**PRACTICE AREAS**
> Antitrust Litigation
> Consumer Rights
> Pharmaceutical Fraud

**BAR ADMISSIONS**
> Massachusetts
> District Court of Massachusetts
> Second Circuit Court of Appeals

**EDUCATION**
> Northeastern University, B.A., **cum laude,** 2005
> The Pennsylvania State University, Dickinson School of Law, J.D., 2012

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP
> Practice focuses on nationwide antitrust class actions and consumer fraud
> Member of the HBSS team of attorneys litigating on behalf of direct purchasers in In re: Restasis Antitrust Litigation. Ms. MacAuley directed day-to-day efforts for HBSS and was the leader of a team of attorneys investigating allegations related to the defendant's (Allergan) filing of sham citizen petition. Ms. MacAuley successfully argued the motion for final approval of the $51.25 million settlement for the direct purchaser class.
> Led a team of attorneys investigating privilege claims made by defendants in the In re Glumetza Antitrust Litigation and is now part of the team preparing for trial.
> Integral part of a trial team for class of direct purchasers in the In re: Celebrex Antitrust Litigation, which settled before trial for $94 million.
> Counsel in the In re: Suboxone Antitrust Litigation and the In re: Niaspan Antitrust Litigation. Tasked with overseeing the litigation for the HBSS office.
> Instrumental in reaching a $98 million settlement for direct purchasers of the immunosuppressant, Prograf.
> Oversaw discovery efforts, including managing meet and confers with defendants and directing factual issues for depositions, on behalf of direct purchasers In re: Solodyn Antitrust Litigation, a multi-district litigation challenging anticompetitive conduct by pharmaceutical drug makers that settled pre-trial with four defendants totaling over $76 million.

## EXPERIENCE

> During law school Ms. MacAuley was a certified legal intern for the Rural Economic Development Clinic, advising clients on Marcellus shale exploration land rights, FDA regulations for artisanal cheese makers and formation of corporate entities for dairy farmers.

## RECOGNITION

> "Rising Star," Massachusetts Super Lawyers Magazine, 2015 - 2019

## NOTABLE CASES

> In re Glumetza Antitrust Litigation
> In re Prograf Antitrust Litigation
> In re Solodyn Antitrust Litigation
> In re Celebrex Antitrust Litigation
> In re Restasis Antitrust Litigation

## PERSONAL INSIGHT

Jessica has long been active in social justice movements, starting in kindergarten when she led an unsuccessful boycott of Columbus Day.

HAGENS BERMAN SOBOL SHAPIRO LLP



PARTNER

# Barbara Mahoney

*Ms. Mahoney received her doctorate in philosophy from the Universität Freiburg (Germany), where she graduated magna cum laude.*

## CONTACT

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9308 office
(206) 623-0594 fax
barbaram@hbsslaw.com

## YEARS OF EXPERIENCE
> 19

## PRACTICE AREAS
> Civil RICO
> Consumer Rights
> Environmental Litigation
> Intellectual Property
> State False Claims

## INDUSTRY EXPERIENCE
> Pharmaceutical Industry
> Class Action Litigation

## BAR ADMISSIONS
> Washington

## COURT ADMISSIONS
> U.S. District Court, Western District of Washington
> U.S. District Court, Eastern District of Washington
> Ninth Circuit Court of Appeals

## EDUCATION
> University of Washington, J.D., 2001
> Universität Freiburg, PhD, philosophy, **magna cum laude**, 1993

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP

> Focuses primarily on national class actions and pharmaceutical litigation

> Currently part of the firm's legal team representing 2014-16 BMW i3 REx owners in a class action regarding a defect in the range extender that causes the cars to suddenly reduce speed and power without warning when transitioning from pure battery mode to the range extender.

> Represents consumers in a nationwide class action against Dometic Corporation seeking compensation for RV and boat owners who experienced extensive loss of property due to fires and explosions caused by defective refrigerators sold by Dometic.

> Extensively involved in several suits against McKesson relating to allegations the company engaged in a scheme that raised prices of 400+ brand-name prescription drugs. Resulted in two national class-action settlements for $350 million and $82 million. In related litigation, Ms. Mahoney represented Virginia, Connecticut, Arizona, Oregon, Utah and Montana in individual cases against McKesson.

> Extensively involved in **In re: Generic Pharmaceuticals Pricing Antitrust Litigation** on behalf of putative class of direct purchasers in MDL alleging generic drug manufacturers engaged in price fixing.

> Represents Kentucky homeowners in a putative class action against Louisville Gas & Electricity to recover the cost of removing coal ash and dust from their homes.

> Previously, she was involved in pioneering litigation against oil and energy companies for the village and tribe of Kivalina to recover the cost of extensive damage to the village caused by global warming.

## RECOGNITION

> Rising Star, Washington Law & Politics, 2005

## EXPERIENCE

> Worked in several areas of commercial litigation, including unlawful competition, antitrust, securities, trademark, CERCLA, RICO, FLSA as well as federal aviation and maritime law

> Associate, Calfo Harrigan Leyh & Eakes LLP (formerly Danielson Harrigan Leyh & Tollefson)

> Law Clerk, Justice Sanders, Washington Supreme Court

> Law Clerk, Judge Saundra Brown Armstrong, U.S. District Court, N.D. California

## LEGAL ACTIVITIES

> Downtown Neighborhood Legal Clinic

> Q Law

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER**

# Barbara Mahoney

› Cooperating Attorney with American Civil Liberties Union of Washington

**NOTABLE CASES**

› New England Carpenters v. First DataBank ($350 million class-action settlement)

› Douglas County v. McKesson ($82 million class-action settlement)

**LANGUAGES**

› Fluent in German

› Reads Swedish and French

**PERSONAL INSIGHT**

Ms. Mahoney lives in West Seattle with her partner and is very active in local athletic organizations. She is a former board member of Rain City Soccer, where she also organized a summer-long program on basic skills. She is also active in Seattle Frontrunners, a masters track club. She enjoys reading, running, soccer and studying foreign languages.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Sean R. Matt

*Leads the firm's innovation in organizing and prosecuting individual class cases across many states involving the same defendants and similar factual and legal issues, an approach that continues to be a key factor in the firm's success*

## CONTACT

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9327 office
(206) 623-0594 fax
sean@hbsslaw.com

## YEARS OF EXPERIENCE

> 28

## PRACTICE AREAS

> Securities Litigation
> Consumer Rights
> Antitrust Litigation
> Insurance
> Products Liability

## INDUSTRY EXPERIENCE

> Complex Financial Instruments
> Investments
> Pharmaceuticals
> Automotive

## COURT ADMISSIONS

> Supreme Court of Washington
> U.S. District Court, Western District of Washington
> U.S. District Court, District of Colorado
> Ninth Circuit U.S. Court of Appeals

## EDUCATION

> Indiana University, B.S., Finance, Highest Distinction, 1988
> University of Oregon School of Law, J.D., Order of the Coif (top 10%), Associate Editor of the Law Review, 1992

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP, since its founding in 1993

> Practice focuses on multi-state and nationwide class actions and complex commercial litigation encompassing securities and finance, consumer, antitrust, insurance and products

> Diverse experience in most of the firm's practice areas, involving appearances in state and federal courts across the country at both the trial and appellate levels

> Key member of the firm's securities litigation team, most recently co-leading the prosecution and settlement of the **In re Charles Schwab Securities Litigation**, the **In re Oppenheimer Champion Income Fund Securities Class Actions** and the **Oppenheimer Core Bond Fund Class Action Litigation**

> Key member of the firm's pharmaceutical litigation team that confronts unfair and deceptive pricing and marketing practices in the drug and dietary supplement industries including Average Wholesale Price Litigation, the **First Databank/McKesson Pricing Fraud Litigation** and the **Enzyte Litigation**

> Key member of the firm's automobile defect litigation team

## RECOGNITION

> In 2014, Public Justice nominated Mr. Matt and the **In re Toyota Motor Corp. Sudden, Unintended Acceleration** team for the Trial Lawyer of the Year Award for their work in securing a $1.6 billion settlement for car owners.

> In 2020, Lawdragon named Mr. Matt one of 500 Leading Lawyers in America, Plaintiff Financial Lawyers.

## PUBLICATIONS

> Providing a Model Responsive to the Needs of Small Businesses at Formation: A Focus on Ex Ante Flexibility and Predictability, 71 Oregon Law Review 631, 1992

## NOTABLE CASES

> **Mercedes Emissions** ($763 settlement)

> **In re Charles Schwab Securities Litigation** ($235 million settlement)

> **In re Oppenheimer Champion Income Fund Securities Fraud Class Actions** ($52.5 million proposed settlement)

> **Oppenheimer Core Bond Fund Class Action Litigation** ($47.5 million settlement)

> **Morrison Knudsen and Costco Wholesale Corp. Securities Litigation**

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER**

# Sean R. Matt

› **In re Pharmaceutical Industry Average Wholesale Price Litigation** ($338 million settlement)

› **In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation**

› **In re Checking Account Overdraft** cases pending against many of the country's largest banks

› **Washington State Ferry Litigation**, which resulted in one of the most favorable settlements in class litigation in the history of the state of Washington

› **Microsoft Consumer Antitrust** cases

› State Attorneys General **Tobacco Litigation**, assisted with client liaison responsibilities, working closely with assistant attorneys general in Oregon, Ohio, Arizona, Alaska and New York, as well as assisting in all litigation matters

**PERSONAL INSIGHT**

Sean, whose four-man team won cycling's prestigious Race Across America with a time of six days and three hours, still occasionally rides a bike.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Martin D. McLean

*Mr. McLean is a true trial attorney having tried 30 cases to verdict in various state and federal courts.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9359 office
(206) 623-0594 fax
martym@hbsslaw.com

**YEARS OF EXPERIENCE**
> 17

**PRACTICE AREAS**
> Personal Injury
> Civil Rights
> Insurance Bad Faith
> Public Records Act

**BAR ADMISSIONS**
> U.S. District Court for the Western District of Washington
> U.S. District Court for the Eastern District of Washington
> Ninth Circuit Court of Appeals
> Supreme Court of Washington

**EDUCATION**
> Seattle University School of Law, J.D., **cum laude**, 2002

**CURRENT ROLE**
> Associate, Hagens Berman Sobol Shapiro LLP
> Represents individuals who have suffered catastrophic personal injury or loss
> Clientele includes a wide range of individuals, including children who have suffered harm while in state care, elderly adults who have experienced abuse or neglect in nursing homes and individuals harmed by medical negligence.
> Mr. McLean has been at the forefront of litigation involving the Washington Public Records Act.

**RECENT SUCCESS**
> During his tenure with Hagens Berman's personal injury team, Mr. McLean has contributed to numerous lawsuits resulting in multimillion-dollar recoveries on behalf of the firm's clients.

**EXPERIENCE**
> Mr. McLean is a seasoned trial attorney, with extensive experience in all phases of litigation.

**NOTABLE CASES**
> Marx v. DSHS, $3 million judgment on behalf of developmentally-disabled patient sexually abused at state-run hospital
> Tamas v. State of Washington, $525,000 judgment on behalf of three children seeking publicrecords from state agency
> Wright v. DSHS, $2,850,000 judgment against the state of Washington for negligent child abuse investigation
> Rudolph v. DSHS, $900,000 judgement on behalf of family of a vulnerable adult severely neglected in state-licensed adult family home

**PERSONAL INSIGHT**
Mr. McLean spent a year living in Italy studying art, history, Italian and wine-drinking. When not practicing law, Mr. McLean enjoys his new favorite hobby: raising his young son with his wife.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# David P. Moody

*Mr. Moody has successfully secured many multimillion-dollar recoveries on behalf of vulnerable citizens who have been abused, neglected or exploited.*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9323 office
(206) 623-0594 fax
davidm@hbsslaw.com

**YEARS OF EXPERIENCE**
> 27

**PRACTICE AREAS**
> Personal Injury Litigation
> Civil Rights

**INDUSTRY EXPERIENCE**
> Children, Elderly and
Incapacitated Citizens who are
Victims of Neglect or Abuse

**BAR ADMISSIONS**
> Washington

**COURT ADMISSIONS**
> U.S. Supreme Court
> U.S. Court of Appeals, Ninth
Circuit

**EDUCATION**
> George Washington University
School of Law, J.D., 1993
> University of Washington, B.A.,
1990

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP

> A trial attorney with a passion for representing children, the disabled, elderly and incapacitated citizens

## NOTABLE CASES

> Mr. Moody has secured many multimillion-dollar recoveries on behalf of vulnerable citizens who have been abused, neglected or exploited, including:

- Largest jury verdict ever upheld against the State of Washington, DSHS ($17.8 million)

- Largest single-plaintiff settlement against the State of Washington, DSHS ($8.8 million)

- Largest recovery on behalf of three foster children ($7.3 million)

- Largest single-plaintiff settlement on behalf of a child in Snohomish County, Washington ($5 million)

- Largest judgment on behalf of an incapacitated child in Spokane County, Washington ($4 million)

- Judgment for a disabled woman in Santa Clara County, California ($4 million)

- Largest judgment ever obtained against Eastern State Hospital ($3 million)

- Largest judgment ever obtained against the State of Washington, Child Study and Treatment Center ($3 million)

- Judgment for a boy neglected and abused in Snohomish County, Washington ($2.85 million)

- Judgment for a girl neglected and abused in Pierce County, Washington ($2.85 million)

- Settlement on behalf of brain-injured infant abused in day care setting ($2.84 million)

- Largest single-plaintiff jury verdict on behalf of an incapacitated adult in Kitsap County, Washington ($2.6 million)

- Judgment in the amount of $2.5 million for a client abused at Eastern State Hospital

- Largest single-plaintiff settlement on behalf of a developmentally disabled male in eastern Washington ($2.25 million)

- Several additional settlements in excess of $1 million

## PERSONAL INSIGHT

David is proud to be a native Washingtonian and enjoys strong ties to the eastern side of the state. David's grandfather Jack Edward Moody was born and raised in Dayton, Washington, and David's great-grandfather Edward Maple Moody was the Sheriff of Columbia County, Washington. David's maternal grandmother, Eva Armstrong, was one of the first female graduates of Whitman College in Walla Walla, Washington.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# David S. Nalven

*Extensive experience in prosecution of antitrust, fraudulent marketing and unfair pricing claims against manufacturers of pharmaceutical products and medical devices, representing prescription drug wholesalers and retailers, health insurers and consumers.*

**CONTACT**
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 482-3700 office
(617) 482-3003 fax
davidn@hbsslaw.com

**YEARS OF EXPERIENCE**
› 35

**PRACTICE AREAS**
› Pharmaceuticals and Medical
  Devices
› Antitrust Litigation
› Consumer Rights
› Securities Litigation

**BAR ADMISSIONS**
› Massachusetts
› New York

**CLERKSHIPS**
› John R. Gibson, U.S. Court of
  Appeals for the Eighth Circuit,
  1985-1986

**EDUCATION**
› New York University School
  of Law, J.D., 1985; Senior
  Research Editor, Annual
  Survey of American Law;
  Recipient, Philip Cohen award
  for greatest contribution by
  an editor to Annual Survey of
  American Law
› University of Pennsylvania,
  B.A., English, **magna cum
  laude**, 1980

## CURRENT ROLE

› Partner, Hagens Berman Sobol Shapiro LLP

› Practice focuses on prosecution of federal and multi-state class actions involving the pharmaceutical and medical device industries

› Served in leadership roles in nationwide antitrust class actions against the manufacturers of Ovcon 35, OxyContin, Tricor, Wellbutrin XL, Toprol XL, Norvir, Doryx, Prograf, Nexium and others

› Prosecuted fraudulent marketing class actions against the manufacturers of Serostim, Nexium, Actimmune and Zyprexa, as well as substantial matters against medical device manufacturers DePuy Spine, Inc. and Becton Dickinson

› Worked extensively on the nationwide Average Wholesale Price Litigation and in the representation of the state of Connecticut in multiple prescription drug pricing matters

## EXPERIENCE

› Chief of Business and Labor Protection Bureau, Massachusetts Attorney General's Office, Commonwealth of Massachusetts, 1999-2004

› Partner, Prince, Lobel & Tye, LLP, Boston, MA, 1991-1999

› Private practice repr esenting plaintiffs and defendants in civil and criminal business litigation, New York and Massachusetts, 1986-1991

› Clerk to John R. Gibson, U.S. Court of Appeals for the Eighth Circuit, 1985-1986

## NOTABLE CASES

› Average Wholesale Price Litigation
› Tricor Antitrust Litigation
› DePuy Spine Artificial Disc Litigation
› Prograf Antitrust Litigation
› Lidoderm Antitrust Litigation

## PERSONAL INSIGHT

› David is an avid short-distance cyclist (home to work) and lover of city life.



**PARTNER**

# Ben Harrington

*Ben focuses on challenging fraudulent business practices and enforcing antitrust laws, drawing from his extensive experience representing both plaintiffs and defendants at all stages of litigation.*

**CONTACT**

715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3000 office
(510) 725-3001 fax
benh@hbsslaw.com

**YEARS OF EXPERIENCE**
› 13

**INDUSTRY EXPERIENCE**
› Antitrust Litigation
› Consumer Rights
› Pharmaceutical Fraud

**BAR ADMISSIONS**
› California
› New York

**COURT ADMISSIONS**
› U.S. District Court for the Southern District of New York
› U.S. District Court for the Eastern District of New York

**CLERKSHIPS**
› Honorable Nina Gershon, U.S. District Court for the Eastern District of New York, 2014-2016
› Honorable Harris Hartz, U.S. Court of Appeals, Tenth Circuit, 2008-2009

**EDUCATION**
› University of California, Hastings College of the Law, J.D., **summa cum laude**, 2008
› The Evergreen State College, B.A., 2001

**CURRENT ROLE**
› Partner, Hagens Berman Sobol Shapiro LLP

**EXPERIENCE**
› Prior to joining Hagens Berman, Ben worked as a litigation associate in the New York office of Quinn Emanuel Urquhart & Sullivan LLP

**PERSONAL INSIGHT**
If Ben is not working you will probably find him chasing after his young daughter, noodling on a guitar or tending to his ever-growing stable of bicycles.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Christopher A. O'Hara

*Plays key role in working with notice and claims administrators on all the firm's class settlements and class notice programs*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9351 office
(206) 623-0594 fax
chriso@hbsslaw.com

**YEARS OF EXPERIENCE**
› 33

**PRACTICE AREAS**
› Antitrust Litigation
› Consumer Rights
› Tax Law
› Securities Litigation
› Pharmaceutical Fraud

**BAR ADMISSIONS**
› Washington
› Arizona

**COURT ADMISSIONS**
› U.S. Court of Appeals, Ninth Circuit

**EDUCATION**
› University of Washington, B.A., Political Science, French Language and Literature, 1987
› Seattle University School of Law, J.D., **cum laude**, 1993

## CURRENT ROLE

› Partner, Hagens Berman Sobol Shapiro LLP

› Practice focuses on antitrust, consumer, tax and securities class actions

› Serves as plaintiffs' counsel in Hotel Occupancy Tax litigation against major online travel companies in various jurisdictions across the country

› Active member of firm's Microsoft defense team negotiating claims administration policy and processing rules in twenty consumer and antitrust class-action state settlements around the country

› Key role in working with claims administrators on all class settlements and class notice programs

## RECENT SUCCESS

› Worked on related litigation against Expedia on behalf of a nationwide class of consumers who purchased hotel reservations and paid excessive "taxes and fees" charges. That case resulted in summary judgment in plaintiffs' favor and an eventual settlement for cash and credits totaling $134 million. Mr. O'Hara also played a leading role for the firm on the $235 million settlement of **In re Charles Schwab Securities Litigation** and the $1.6 billion settlement of **In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices and Products Liability Litigation.**

› Mr. O'Hara deposed more than a dozen of Big Tobacco's expert witnesses, research scientists and marketing executives for the tobacco litigation, focusing predominantly on the state of Arizona case. Coordinated Arizona's national and local expert witnesses, while contributing to all aspects of discovery and motion practice. Mr. O'Hara played a leading role in the firm's successful defense of the state of Arizona against claims brought by several Arizona counties in the aftermath of the state's tobacco litigation.

## RECOGNITION

› Rising Star, Washington Law and Politics, 2003

## EXPERIENCE

› Crowell & Moring, Paralegal, 1988-1990
› Cozen & O'Connor, Associate, 1993-1997

## NOTABLE CASES

› **Tobacco Litigation** ($206 billion multi-state settlement)
› **Expedia Litigation** ($134 million settlement)
› **Charles Schwab Yieldplus Funds Litigation** ($235 million settlement)
› **Toyota Unintended Acceleration Litigation** ($1.6 billion settlement)
› **Microsoft Antitrust Litigation**

## LANGUAGES

› French

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Jerrod C. Patterson

*Served as federal prosecutor for over nine years, prosecuting tax cases, fraud, and other financial crimes. Extensive experience trying complex cases to verdict.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9378 office
(206) 623-0594 fax
jerrodp@hbsslaw.com

**YEARS OF EXPERIENCE**
› 19

**PRACTICE AREAS**
› Antitrust Litigation
› Racketeering
› Automotive Litigation

**BAR ADMISSIONS**
› Washington
› New York
› District of Columbia

**CLERKSHIPS:**
› The Hon. Louis F. Oberdorfer,
  U.S. District Court for D.C.
› U.S. Senate Judiciary
  Committee (Sen. Leahy)
  Washington, D.C.

**EDUCATION**
› University of California,
  Berkeley School of Law (Boalt
  Hall), J.D., May 2002; top 15%
  of graduating class
› Johns Hopkins University,
  School of Advanced
  International Studies
  (SAIS) M.A. in International
  Economics and International
  Relations, December 1997,
  Graduated with distinction
  (top 10%)
› Brown University A.B. in
  International Relations, May
  1995, **magna cum laude**

## CURRENT ROLE

› Partner, Hagens Berman Sobol Shapiro LLP

› Practice focuses on antitrust and other fraud and RICO cases, including Generic Pharmaceuticals Pricing Antitrust, Dodge RAM 2500 and 3500 Emissions, and Ford/GM/FCA CP4 Injection Pump Defect

› Extensive experience in handling complex multidistrict cases.

› Mr. Patterson brings to the firm extensive trial experience and a history of prosecuting complex fraud cases, including tax fraud, bank fraud, wire fraud, money laundering and prescription fraud.

## RECOGNITION

› Organized Crime and Drug Enforcement Task Force "Best Financial Investigation in the Nation" – 2012

› U.S. Attorney General "Outstanding Performance as a Special Assistant U.S. Attorney" – 2010

› Assistant Attorney General "Outstanding Tax Division Attorney" – 2009

› Assistant Attorney General "Outstanding Tax Division Attorney" – 2008

## NOTABLE CASES

› **In re Animation Workers Antitrust Litig.,** 14-cv-4062 LHK (N.D. Cal.):  Class-action antitrust case against major animation studios for conspiring to fix wages of their animators. The parties settled the case for $169M.

› **In re Generic Pharmaceuticals Pricing Antitrust Litig.** (E.D. Pa.):  Class-action antitrust case against over two dozen generic pharmaceutical manufacturers for conspiring to fix the price of generic drugs.

› **In re Lithium Ion Batteries Antitrust Litig.,** 12-cv-5129 YGR (N.D. Cal.):  Class-action antitrust case against large battery producers for conspiring to fix prices.  The parties settled the case for a total of $113 million.

› As a federal prosecutor, led or co-chaired 11 federal jury trials, and 22 bench trials

## EXPERIENCE

› Prior to joining Hagens Berman, Mr. Patterson served as an Assistant United States Attorney at the U.S. Attorney's Office in Seattle, WA.
  - Prosecuted complex fraud cases, including tax fraud, bank fraud, wire fraud, money laundering, and prescription fraud
  - Served as Project Safe Childhood Coordinator; led efforts to investigate and prosecute child

**PARTNER**

# Jerrod C. Patterson

 pornography and child exploitation cases
 - Led prosecution of large-scale drug trafficking organizations, including cartels and street gangs, to interdict drug smuggling and investigate money laundering

› Trial Attorney, U.S. Department of Justice Washington, D.C., Tax Division, Northern Criminal Enforcement Section
 - Co-chaired prosecution of two defendants, in separate trials, for scheme to defraud the Cleveland Catholic Diocese

› Special Assistant U.S. Attorney, U.S. Attorney's Office for D.C. Nov. 2006 - May 2007
 - Prosecuted 22 bench trials in Sex Offense/Domestic Violence Section

› Associate, Wilmer Cutler Pickering (WilmerHale)

**PERSONAL INSIGHT**

Although not a Washington state native, Mr. Patterson has quickly adopted Seattle as his hometown. In his spare time, he and his family enjoy the local wineries, lakes and hiking trails.



**PARTNER**

# Rio Pierce

*A magna cum laude graduate of Harvard Law School, Rio focuses his practice on ensuring fair and free markets for the benefit of consumers.*

**CONTACT**

715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3000 office
(510) 725-3001 fax
riop@hbsslaw.com

**YEARS OF EXPERIENCE**
> 7

**PRACTICE AREAS**
> Consumer Protection
> Intellectual Property

**BAR ADMISSIONS**
> California

**COURT ADMISSIONS**
> U.S. District Court for the Central District of California
> U.S. District Court for the Northern District of California
> U.S. District Court for the Southern District of California

**CLERKSHIPS:**
> Honorable Jerome Farris of the U.S. Court of Appeals for the Ninth Circuit, 2013 - 2014

**EDUCATION**
> Harvard Law School, **magna cum laude**, 2013
> Duke University, **magna cum laude,** 2005

**CURRENT ROLE**
> Partner, Hagens Berman Sobol Shapiro LLP

**RECENT SUCCESS**
> Achieved favorable settlements for group of 80 tenants in tort suit against landlords for slum housing conditions.

**RECOGNITION**
> Chayes Fellow, National Prosecuting Authority in Cape Town, South Africa
> Teaching Fellow, Copyright EdX

**EXPERIENCE**
> Prior to joining Hagens Berman, Mr. Pierce worked as an associate for two years at Munger, Tolles & Olson, where he gained significant experience in class action and complex commercial litigation. Mr. Pierce also did extensive pro bono work on immigration matters.
> Law Clerk, U.S. Court of Appeals for the Ninth Circuit, Judge Jerome Farris, 2013-2014
> Associate, Munger Tolles & Olson, 2014-2016

**LEGAL ACTIVITIES**
> American Association for Justice

**PUBLICATIONS**
> "A Heavy Hand or A Light Touch: What Force Will California's Anti-SLAPP Statute Have After Baral v. Schnitt?" California Litigation Review, 2015

**PERSONAL INSIGHT**
A proud California native, Rio loves exploring the whole state, especially Big Sur. Prior to law school, Rio worked at Miramax for several years and still loves a good indie film. In his free time, Rio enjoys making pies.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Shana E. Scarlett

*Northern California Super Lawyer, 2013 - 2020*

**CONTACT**
715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3000 office
(510) 725-3001 fax
shanas@hbsslaw.com

**YEARS OF EXPERIENCE**
⟩ 19

**PRACTICE AREAS**
⟩ Antitrust Litigation
⟩ Consumer Protection
⟩ Securities Litigation

**INDUSTRY EXPERIENCE**
⟩ Technology Companies
⟩ Internet Companies
⟩ Agricultural Companies

**BAR ADMISSIONS**
⟩ California

**COURT ADMISSIONS**
⟩ U.S. District Courts for the
  Northern, Southern, Eastern
  and Central Districts of
  California
⟩ U.S. Court of Appeals,
  Second Circuit
⟩ U.S. Court of Appeals, Ninth
  Circuit
⟩ U.S. Court of Appeals,
  Federal Circuit

**EDUCATION**
⟩ Stanford Law School, J.D.
⟩ University of British Columbia,
  B.A.

## CURRENT ROLE
⟩ Partner & Management Committee Member, Hagens Berman Sobol Shapiro LLP
⟩ Managing Partner of Hagens Berman's Berkeley office
⟩ Practice is devoted entirely to representing plaintiffs in complex litigation, and primarily in the areas of antitrust and unfair competition

## RECENT SUCCESS
⟩ Ms. Scarlett has played a leading role in obtaining sizable settlements for antitrust plaintiffs in the following cases:

- In re Broiler Chicken Antitrust Litig., No. 16-CV-08637 (N.D. Ill.) (co-lead counsel for indirect purchaser class; recovery to date of $106 million)

- In re Animation Workers Antitrust Litig., No. 14-cv-4062 (N.D. Cal.) (team at Hagens Berman acting as co-lead counsel for class of workers; recovery of nearly $169 million)

- In re Lithium Ion Batteries Antitrust Litig., No. 13-md-02420 (N.D. Cal.) (team at Hagens Berman acting as co-lead counsel for indirect purchaser class; recovery of $113.45 million)

- In re EBooks Antitrust Litig., No. 11-md-02293 (S.D.N.Y.) (team at Hagens Berman acting as co-lead counsel for indirect purchaser class; recovery of $568 million)

- In re Optical Disk Drive Antitrust Litig., No. 10-md-02143 (N.D. Cal.) (team at Hagens Berman acting as lead counsel for indirect purchaser class; recovery of $205 million)

- In re Railway Industry Employee No-Poach Antitrust Litigation, MDL No. 2850 (W.D. Pa.) (team at Hagens Berman on executive committee; recovery of $48.95 million)

## RECOGNITION
⟩ Lawdragon Leading Plaintiff Lawyer, 2020
⟩ Lawdragon 500 Leading Lawyers in America, Plaintiff Financial Lawyers, 2020
⟩ Band 2 Ranking by Chambers and Partners, 2020
⟩ Northern California Super Lawyer, 2013 - 2020
⟩ Rising Star Award for Northern California, Super Lawyers, 2009 – 2011

## EXPERIENCE
⟩ Associate, Coughlin Stoia Geller Rudman & Robbins LLP (2004-2007)
⟩ Associate, Milberg Weiss Bershad Hynes & Lerach LLP (2002-2004)
⟩ Associate, Lieff Cabraser Heimann & Bernstein LLP (2001-2002)

## LEGAL ACTIVITIES
⟩ Panelist, American Antitrust Institute, Taken and Defending Depositions of Economists in Panelist, American Antitrust Institute, Taken and Defending Depositions of Economists in Private Class Actions (November 2019)

⟩ Panelist, American Bar Association, Key Considerations for Working with Expert Witnesses in Class Actions (September 2019)

⟩ Panelist, American Antitrust Institute, The Consumer and Food Sovereignty: Concentration and its Effects on Food Prices, Choice, and Quality (December 2018)

⟩ Panelist, Complex Litigation E-Discovery Forum: Tar and Validation Protocols (September 2018)

⟩ Panelist, Civil Law Symposium: Class Actions for the Northern District Practice Program (September 2018) (spoke at the request of Judge Gonzalez Rogers on distribution of settlements and best practices of notice)

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER

# Shana E. Scarlett

> Panelist, The Impact Fund, Advanced Class Notice Issues (August 2018)

> Panelist, American Bar Association Meeting: Procedural Steps and Pitfalls in Antitrust Class Actions (May 2018)

> Panelist, Northern District Judicial Conference: Class Actions (April 2018)

> Panelist, Class Certification – Making Sense of Class Certification Doctrine, Economics and Econometrics, American Antitrust Institute (Nov. 2017)

## NOTABLE CASES

> Ms. Scarlett is also serving as lead or co-lead class counsel in the following cases currently being litigated:

  - In re Pork Antitrust Litig., No. 18-CV-01776 (D. Minn.) (co-lead counsel for indirect purchaser class)

  - In re Beef Purchasers Antitrust Litig. (Peterson v. JBS USA Food Co. Holdings et al.), No. 0:19-cv-01129 (D. Minn.) (co-lead counsel for indirect purchaser class)

  - In re Turkey Antitrust Litig., No. 1:19-cv-08318 (N.D. Ill.) (co-lead counsel for direct purchaser class)

  - Jien v. Perdue Farms, Inc., No. 19-cv-2521 (D. Md.) (co-lead counsel for class of hourly and salaried workers)

## PERSONAL INSIGHT

Shana is Canadian and the daughter of the noted Canadian jurist, the Hon. Edward D. Scarlett. When not in the Berkeley office of Hagens Berman, Shana usually can be found in Canada with her four sisters, nine nieces and nephews.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Craig R. Spiegel

*After helping obtain recent substantial settlements in cases against drug companies for deceptive marketing, Mr. Spiegel now helps in the firm's litigation efforts against auto manufacturers and others for illegal emissions of pollutants.*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 268-9328 direct
(206) 623-0594 fax
craigs@hbsslaw.com

**YEARS OF EXPERIENCE**
› 41

**PRACTICE AREAS**
› Consumer Rights

**BAR ADMISSIONS**
› California State Bar Association
› Illinois State Bar Association
› Washington State Bar Association

**EDUCATION**
› Harvard Law School, J.D., **cum laude**, 1979
› St. Olaf College, B.A., **summa cum laude**, 1975

## CURRENT ROLE

› Partner, Hagens Berman Sobol Shapiro LLP

› Practice primarily focuses on class actions concerning unfair pricing of pharmaceutical drugs. Recent cases include actions against AstraZeneca and Merck.

## NOTABLE CASES

› Involved in the firm's antitrust class-action lawsuit against the NCAA accusing the sports-governing body of engaging in anti-competitive practices in regards to its scholarships or Grants in Aid (GIAs) program. In March of 2017, U.S. District Judge Claudia Wilken approved a sweeping $209 million settlement for student-athletes, and in March of 2019, a trial on the injunctive aspect of the case resulted in a change of NCAA rules limiting the financial treatment of athletes.

› Helped obtain a substantial settlement for the state of New York and New York City in their litigation against Merck for losses suffered from deceptive marketing of the prescription drug Vioxx

› Instrumental in obtaining a settlement for a class of Massachusetts consumers and third-party payors in their litigation against AstraZeneca, in which the class claimed that AstraZeneca deceptively marketed the prescription drug Nexium as superior to Prilosec

› Deeply involved in the firm's lawsuits on behalf of thalidomide victims, who suffered severe personal injuries when their mothers ingested thalidomide during their pregnancies in the late 1950s and early 1960s, without knowing that thalidomide had not been approved by the FDA

## RECOGNITION

› Honoree for Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2019

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Ronnie Seidel Spiegel

*Ms. Spiegel has played a key role in litigating some of the largest antitrust cases in history, working on all aspects of these cases from filing through trial.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 268-9343 direct
(206) 623-0594 fax
ronnie@hbsslaw.com

**YEARS OF EXPERIENCE**
> 22

**PRACTICE AREAS**
> Antitrust Litigation
> Securities Litigation

**BAR ADMISSIONS**
> Washington
> Pennsylvania

**COURT ADMISSIONS**
> U.S. District Court, Eastern
  District of Pennsylvania
> U.S. District Court, Western
  District of Washington
> U.S. District Court, Eastern
  District of Michigan

**EDUCATION**
> Temple University Beasley
  School of Law, J.D., Temple
  Law Review (Editorial Board),
  1994
> Boston University, B.A.,
  International Relations, 1990

**CURRENT ROLE**

> Partner, Hagens Berman Sobol Shapiro LLP
> Extensive organizational, discovery, briefing and trial team experience in large antitrust price-fixing cases
> Specializes in managing large-scale e-discovery
> Deep experience with foreign discovery, translation issues, and translation objection process
> Manager and coordinator of all-party, joint discovery effort in largest US antitrust case

**PRIOR EXPERIENCE**

> Lead Antitrust Attorney and Manager of firm's North Carolina office, Spector Roseman Kodroff & Willis, Philadelphia, PA, Attorney, 1994-2000
> Business Law Instructor, Central Piedmont Community College, Charlotte, NC, 2000-2001

**RECOGNITION**

> The National Trial Lawyers: Top 100, 2019 - 2020
> Lawdragon 500 Leading Plaintiff Financial Lawyers, 2019 - 2020

**NOTABLE CASES**

> In re Polyether Polyols Antitrust Litigation (Urethanes)
> In re Automotive Parts Antitrust Litigation
> In re Cathode Ray Tube (CRT) Antitrust Litigation
> In re TFT-LCD (Flat Panel) Antitrust Litigation
> In re Containerboard Antitrust Litigation
> In re DRAM Antitrust Litigation
> In re SRAM Antitrust Litigation
> In re Brand Name Prescription Drugs Antitrust Litigation
> In re NASDAQ Market-Makers Antitrust Litigation
> In re Vitamins Antitrust Litigation
> In re High Fructose Corn Syrup Antitrust Litigation
> In re Commercial Tissue Paper Antitrust Litigation
> In re Flat Glass Antitrust Litigation
> In re Linerboard Antitrust Litigation
> In re Air Cargo Antitrust Litigation
> In re Fasteners Antitrust Litigation
> In re Korean Air Antitrust Litigation
> In re OSB Antitrust Litigation

**PUBLICATIONS**

> Drafting Team, "Commentary on Rule 45 Subpoenas to Non-Parties, Second Edition," **The Sedona Conference Working Group Series**, January 2020.

HAGENS BERMAN SOBOL SHAPIRO LLP

**PARTNER**

# Ronnie Seidel Spiegel

**LEGAL ACTIVITIES**

› Member of the American Bar Association's Antitrust Section

› Member of the Sedona Conference Working Group 1 Series, Brainstorming Group and Drarting Team on Rule 45 Commentary.

› Mother Attorneys Mentoring Association of Seattle (former Board Member)

› MAMA Seattle Ladder Down, Participant (2021)

**PERSONAL INSIGHT**

When not working, Ms. Spiegel enjoys being a soccer mom cooking for family and friends, and exploring her adopted home state of Washington.

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Shayne C. Stevenson

*Since fighting against sweatshops and the exploitation of undocumented workers with the workers' rights organization he founded at Yale, Shayne has focused his legal career on prosecuting cases against individuals and businesses who victimize others by violence, deception and fraud.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 268-9340 direct
(206) 623-0594 fax
shaynes@hbsslaw.com

**YEARS OF EXPERIENCE**

› 20

**PRACTICE AREAS**

› Whistleblower Law (False Claims Act, SEC, IRS, CFTC)
› Appellate Litigation
› Civil & Human Rights Litigation

**BAR ADMISSIONS**

› Washington

**CLERKSHIPS:**

› Honorable Betty B. Fletcher, Ninth Circuit Court of Appeals, 2001-02
› Honorable Charles S. Haight, Jr., Southern District of New York, 2000-01

**EDUCATION**

› Yale Law School, J.D., 2000
› Gonzaga University, B.A., Philosophy and Political Science, Truman Scholar, **summa cum laude** (first-in-class), 1996

## CURRENT ROLE

› Partner, Hagens Berman Sobol Shapiro

› Leads the firm's whistleblower practice and litigates select class-action cases

› Litigates and argues both False Claims Act and class-action cases in federal district courts and on appeal at the courts of appeal nationwide

› Experienced in successfully handling whistleblower cases against some of the world's largest financial companies, medical device and pharmaceutical companies, hospitals, mortgage companies and others

› Represents dozens of whistleblowers under the Dodd-Frank whistleblower programs of the Securities and Exchange Commission (SEC) and the Commodity Futures Trading Commission (CFTC), including two of the most prominent whistleblowers under these programs, with cases in regional enforcement offices across the country

› Currently represents several qui tam relators under the federal and various state False Claims Act laws, in both declined and intervened cases and many still under investigation. His False Claims Act practice includes, among other areas of focus, Medicare and Medicaid health care fraud, financial fraud, mortgage fraud, defense industry and other procurement fraud, education fraud, and grant-funding fraud.

› Litigates class-action cases on behalf of veterans, consumers, workers and investors

› Litigates select human rights and other public interest matters, including previous litigation against the Rio Tinto mining conglomerate that reached the Supreme Court in 2013 for war crimes on the island of Bougainville, in Papua New Guinea, and a current pending suit against SeaWorld

› Previously a felony prosecutor who successfully tried several multi-week jury trials and argued several cases in trial and appellate courts

## RECENT SUCCESS

› Mr. Stevenson represents Dodd-Frank SEC whistleblower Haim Bodek in the recent SEC action against the New York Stock Exchange and affiliated exchanges for, among other things, their unlawful and undisclosed use of order types. In the Matter of New York Stock Exchange LLC, et al. (SEC order) (2018)

› Mr. Stevenson helped represent a class of over 126,000 military servicemembers challenging Bank of America's alleged violations of the Servicemember Civil Relief Act, which requires financial institutions to limit the interest charged on loans to active duty servicemembers. In February of 2018, the Court granted final approval of a nationwide class settlement of nearly $42 million for these military families. Childress v. Bank of America Corp., et al., 15-cv-00231 (E.D.N.C.) (2018).

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER

# Shayne C. Stevenson

> Mr. Stevenson represented the highly publicized anonymous Dodd-Frank CFTC whistleblower who single-handedly brought to authorities, through his proprietary analysis of market and trading data, the international market manipulator later identified as Navinder Sarao, whose market manipulation through spoofing contributed to the "Flash Crash." Mr. Sarao was extradited and pled guilty in November of 2016. CFTC v. Nav Sarao Futures Ltd. 15-cv-3398 (N.D. Ill.) (civil); U.S. v. Sarao 15-cr-75 (N.D. Ill.) (criminal)

> Mr. Stevenson also represented another high-profile Dodd-Frank SEC whistleblower, the algorithmic trader and market structure expert Haim Bodek, rewarded in 2017 for his single-handed identification of securities law violations by a major U.S. financial exchange. Mr. Bodek was twice featured on the front page of the Wall Street Journal for his efforts, which led to the largest SEC fine in history against a financial exchange. In the Matter of EDGA Exchange, Inc., et al. (SEC Order)

> Mr. Stevenson handled both False Claims Act whistleblower cases against Bank of America that culminated in the historic $1 billion settlement between the Department of Justice and Bank of America addressing mortgage fraud and whistleblower awards to both clients in unrelated litigation. First, whistleblower client Mr. Kyle Lagow (in U.S. ex rel. Lagow v. Countrywide Financial Corp.) (E.D.N.Y.) sparked a Department of Justice investigation of Countrywide and Bank of America's fraudulent mortgage origination and appraisal practices. Second, whistleblower client Mr. Gregory Mackler (in U.S. ex rel. Mackler v. Bank of America) (E.D.N.Y.) helped the Department of Treasury recover several million dollars from Bank of America for allegedly violating its agreement with the Department to properly administer the Home Affordable Mortgage Program (HAMP) for struggling homeowners.

## EXPERIENCE

> King County Prosecuting Attorney's Office, Felony Prosecutor

> Law Clerk, Honorable Betty B. Fletcher, Ninth Circuit Court of Appeals, 2001-02

> Law Clerk, Honorable Charles S. Haight, Jr., Southern District of New York, 2000-01

> U.S. Attorney's Office, District of Connecticut, Intern

## PUBLICATIONS

> Author, "The Honorable Betty B. Fletcher: A Tribute to a Legal Trailblazer," Federal Bar Association, November 2012

## PRESENTATIONS

> Speaker: "Whistleblowers & Financial Fraud," National Whistleblower Conference. San Francisco, CA. Jan. 22-23, 2018

> Speaker: "Financial Fraud," National Qui Tam Conference. Los Angeles, CA. Nov. 3-4, 2016

> Speaker: "Representing Dodd-Frank Whistleblowers," Taxpayers Against Fraud Education Fund, Annual Conference. Washington, D.C. Nov. 16, 2015.

> Speaker: "Secrets from the Plaintiff's Bar," Hospital and Health Care Law Conference. Seattle, WA. Apr. 24, 2015.

> Speaker: "False Claims in the Financial Sector," False Claims and Qui Tam Enforcement Conference. New York, New York. Jan. 21-22, 2015.

> Lecture: "Access to Civil Remedy," Business, Social Responsibility, & Human Rights, University of Washington School of Law. Seattle, Washington. Nov. 4, 2014.

> Speaker: "Enforcement of Financial Fraud," False Claims Act: National Qui Tam Conference. San Francisco, California. Oct. 27-28, 2014.

HAGENS BERMAN SOBOL SHAPIRO LLP

PARTNER

# Shayne C. Stevenson

> Lecture: "Human Rights Law After Kiobel," University of Washington School of Law. Seattle, Washington. Nov. 12, 2013.

> Speaker: "Financial Fraud Enforcement," False Claims Act: All Points of View, National Conference. San Francisco, California. Apr. 18-19, 2013.

> Lecture: "Strategy after Kiobel and Bauman," International Human Rights Seminar, University of Washington School of Law. Seattle, Washington. Apr. 17, 2013.

> Lecture: "Alien Tort Statute and Human Rights Litigation," University of Washington School of Law. Seattle, Washington. Nov. 13, 2012.

> Speaker: "Protecting Whistleblowers, Protecting the Public," Whistleblowing: Law, Compliance, and the Public Interest. Government Accountability Project. Seattle University School of Law. Seattle, Washington. Mar. 23, 2012.

## MEDIA INTERVIEWS

> "CFTC Calls for Whistleblower Tips as Enforcement Evolves," Law360, Sept. 19, 2019 _view »_

> "Pharma Co. Inks $17.5m Deal to End FCA Kickback Suit," Law360, Apr. 30, 2019 _view »_

> "Attorneys Reflect on Escobar's FCA Impact 2 Years Later," Law360, June 15, 2018 _view »_

> "SeaWorld Visitors Ask 9th Cir. to Flip Whale Abuse Suit," Law360, Mar. 12, 2018. _view »_

> "Dodd-Frank Whistleblowers Help Clean Up Our Markets," (Guest Column) ValueWalk, Feb. 6, 2018. _view »_

> "Attorneys React to DOJ's New Memo on FCA Dismissals," Law360, Jan. 26, 2018. _view »_

> "Limiting Whistleblower Rewards Weakens Program," Bloomberg Law, Nov. 2, 2017.

Read more of Mr. Stevenson's media interviews »

## NOTABLE CASES

> **In the Matter of Cargill, Inc.** (CFTC Order) (represented CFTC whistleblower in action against the largest private company in the United States)

> **Childress v. Bank of America Corp., et al., Eastern District of North Carolina** (represented class of over 125,000 military servicemembers and secured nearly $42 million settlement for violations of the SCRA)

> **In the Matter of New York Stock Exchange, et al. (SEC Order)** (represents SEC whistleblower in action tying record fine against financial exchange) (2018)

> **United States v. Sarao & CFTC v. Nav Sarao Futures Ltd., Northern District of Illinois**; (represented anonymous CFTC whistleblower in market manipulation prosecution)

> **In the Matter of EDGA Exchange, Inc., et al.** (SEC Order) (represented SEC whistleblower in action culminating in largest fine against a U.S. exchange in history)

> **U.S. ex rel. Lagow v. Bank of America, Eastern District of New York** (False Claims Act – FHA fraud)

> **U.S. ex rel. Mackler v. Bank of America, Eastern District of New York** (False Claims Act – HAMP fraud)

> **U.S. ex rel. Nowak v. Medtronic, Inc., District of Massachusetts** (False Claims Act – off-label marketing of medical devices)

> **U.S. ex rel. Kite v. Besler Consulting, et al., District of New Jersey** (False Claims Act – Medicare "outlier" fraud)

> **U.S. ex rel. Polansky v. Pfizer, Inc., Eastern District of New York** (False Claims Act – off-label marketing of Lipitor)

> **Sarei v. Rio Tinto, Central District of California** (Alien Tort Statute – international human rights litigation)

> **Tittle v. United States Postal Service, Western District of Washington** (Privacy Act – employee class action)

> **Hutchinson v. British Airways PLC, Eastern District of New York** (Montreal Convention – consumer class action)



**PARTNER**

# Andrew M. Volk

*Worked extensively on consumer claims against Expedia resulting in the largest summary judgment award in Washington state history*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9371 office
(206) 623-0594 fax
andrew@hbsslaw.com

**YEARS OF EXPERIENCE**

> 29

**PRACTICE AREAS**

> Patent Litigation
> Intellectual Property
> ERISA Litigation
> Hotel Tax Litigation

**BAR ADMISSIONS**

> New York
> Oregon
> Washington

**EDUCATION**

> Cornell Law School, J.D.,
  **cum laude**, Articles Editor for
  Cornell International Law
  Review, 1991
> Columbia University, B.A.,
  English, 1986

## CURRENT ROLE

> Partner, Hagens Berman Sobol Shapiro LLP

> Practice focuses on consumer litigation, including automobile defect litigation against General Motors and Kia

> Worked on hotel tax collection cases against the major online travel companies (OTC). The firm achieved settlements on behalf of Brevard County, Florida, the village of Rosemont, Illinois and the city of Denver, Colorado.

> Extensively involved in ERISA cases for breach of fiduciary duties, including settlements of claims on behalf of employees of Enron, Washington Mutual Bank, General Motors, the Montana Power Company and Sterling Savings Bank

## RECENT SUCCESS

> Worked on litigation against Expedia on behalf of a nationwide class of consumers who purchased hotel reservations and paid excessive "taxes and fees" charges. That case resulted in summary judgment in plaintiffs' favor and an eventual settlement for cash and credits totaling $134 million.

## EXPERIENCE

> Mr. Volk was extensively involved in the tobacco litigation in the late 1990s.

> Legal Writing and Research, University of Oregon School of Law, Instructor

> Attorney, Legal Aid Society, New York City

## NOTABLE CASES

> **Expedia Litigation** ($134 million settlement)

> **Tobacco Litigation** on behalf of States (resolved in $206 billion settlement)

> **Enron ERISA Litigation** ($265 million settlement)

> **Washington Mutual Bank ERISA Litigation** ($49 million settlement)

> **General Motors ERISA Litigation** ($37.5 million settlement)

HAGENS BERMAN SOBOL SHAPIRO LLP



**PARTNER**

# Garth Wojtanowicz

*Named a "Rising Star" by Super Lawyers Magazine in 2006, 2007, 2010*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9326 office
(206) 623-0594 fax
garthw@hbsslaw.com

**YEARS OF EXPERIENCE**
> 20

**PRACTICE AREAS**
> Consumer Protection
> Securities Litigation
> Unfair Competition

**BAR ADMISSIONS**
> Washington
> California

**EDUCATION**
> University of Washington
  School of Law, J.D., 2000
> University of Washington, B.A.,
  English, 1997

## CURRENT ROLE
> Partner, Hagens Berman Sobol Shapiro LLP
> Practice focuses on consumer protection cases
> Currently working on cases against Fresenius Medical Care, N.A. and DaVita, Inc., the first and second largest dialysis companies in the United States, relating to those companies' use of GranuFlo.>
  Also working on a nationwide class action against medical waste disposal company Stericycle, Inc., challenging that company's pricing practices which resulted in hundreds of millions of dollars in over-charges to doctors' offices, dentist offices, hospitals and similar businesses

## RECOGNITION
> "Rising Star" by Super Lawyers Magazine in 2006, 2007 and 2010

## EXPERIENCE
> Member, Cornerstone Law Group, PLLC
> Associate, Danielson Harrigan Leyh & Tollefson, LLP
> Assistant City Attorney, Seattle City Attorney's Office, Civil Division

## NOTABLE CASES
> Toyota Sudden, Unintended Acceleration (SUA) class-action lawsuit on behalf of Toyota owners and lessees, which resulted in an historic settlement recovery valued at $1.6 billion

## PERSONAL INSIGHT
Mr. Wojtanowicz volunteers his time as a non-profit director for Girls Giving Back and the Blossoming Hill Montessori School and has worked as a volunteer attorney for the Northwest Immigrant Rights Project.

HAGENS BERMAN SOBOL SHAPIRO LLP



SENIOR COUNSEL

# Lucas E. Gilmore

*Dedicated plaintiff attorney with more than a decade of experience prosecuting securities fraud, shareholder derivative, antitrust, and consumer class actions.*

**CONTACT**
715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3000 office
(510) 725-3001 fax
lucasg@hbsslaw.com

**YEARS OF EXPERIENCE**
› 10

**PRACTICE AREAS**
› Securities

**BAR ADMISSIONS**
› California

**COURT ADMISSIONS**
› U.S. District Court for the Northern District of California
› U.S. District Court for the Northern District of California (Bankruptcy Court)
› U.S. District Court for the Central District of California
› U.S. District Court for the Southern District of California
› U.S. Court of Appeals, Ninth Circuit
› U.S. Court of Appeals, Second Circuit

**EDUCATION**
› University of California Hastings College of the Law, JD, 2007
› Vanderbilt University, BA, **cum laude**, 2002

## CURRENT ROLE

› Senior Counsel, Hagens Berman Sobol Shapiro LLP
› Advises institutional, government and individual investors on issues related to corporate governance, shareholder rights and securities litigation
› Key member of the firm's investor fraud team in which he, along with a group of attorneys, financial analysts, and investigators, counsels the firm's investor clients on their legal claims and prosecutes financial fraud cases

## EXPERIENCE

› Litigated dozens of securities class actions against the largest companies and banks, including BNY Mellon, BP, Citibank, Deutsche Bank, HSBC, Quality Systems, Symantec, U.S. Bank and Wells Fargo
› Prosecuted a number of cases related to the financial crisis, including several actions arising out of the issuance of residential mortgage-backed securities and other complex financial products
› Represented litigants in all phases of litigation, at both the trial court and appellate levels

## LEGAL ACTIVITIES

› Member, National Association of Public Pension Attorneys (NAPPA)
› Member, State Association of County Retirement Systems (SACRS)

## RECOGNITION

› Super Lawyers, Rising Star: Securities 2014 - 2017

## PUBLICATIONS

› "The Fraud-on-the-Market Presumption Is Alive and Well," Association of Business Trial Lawyer, San Diego, ABTL Report, Fall 2014

## PERSONAL INSIGHT

Outside of the office, Mr. Gilmore enjoys boxing and serving as Defensive Coordinator of his sons' flag football teams.

HAGENS BERMAN SOBOL SHAPIRO LLP



SENIOR COUNSEL
# Kevin K. Green

*Mr. Green is a career appellate lawyer. He has argued in multiple federal circuits, 10 different states and seven state supreme courts. He also works on critical motions and issues likely to go on appeal.*

**CONTACT**
533 F Street
Suite 207
San Diego, CA 92101

(619) 929-3340 office
keving@hbsslaw.com

**YEARS OF EXPERIENCE**
> 25

**PRACTICE AREAS**
> Appellate
> Consumer Rights
> Securities
> Investor Fraud
> Employment Litigation

**BAR ADMISSIONS**
> California

**COURT ADMISSIONS**
> U.S. Supreme Court
> United States Courts of Appeals for the Second, Third, Seventh, Eighth, Ninth, Tenth, Federal and District of Columbia Circuits
> U.S. District Courts for the Northern, Central, Eastern and Southern Districts of California

**CLERKSHIPS**
> Supreme Court of Indiana (Hon. Theodore R. Boehm, Associate Justice)
> U.S. District Court for the Southern District of California (Hon. Barry T. Moskowitz, Chief Judge 2012-19)

**EDUCATION**
> Notre Dame Law School, J.D., 1995
> University of California, Berkeley, B.A., with honors and distinction, 1989

## CURRENT ROLE
> Senior Counsel, Hagens Berman Sobol Shapiro LLP
> Concentrates on appeals as well as consumer rights, securities and employment litigation
> Certified Appellate Specialist, State Bar of California Board of Legal Specialization (since 2006)

## LEGAL ACTIVITIES
> Appellate Advisory Committee, Judicial Council of California (since 2013)
> Co-Chair, CAOC Amicus Curiae Committee (since 2011)
> California Lawyers Association, Committee on Appellate Courts (since 2019)
> Magistrate Judge Merit Selection Panel, Southern District of California (2013-17)
> Working Group, Access to Appellate Justice Program, San Diego County Bar Association (launched 2019)
> Working Group, San Diego Appellate Inn of Court (launched 2016)
> Working Group, Civil Appellate Self-Help Workshop (launched 2014)
> California Lawyers Association, Committee on Administration of Justice (2016-19) (during State Bar transition)
> Chair, Appellate Court Committee, San Diego County Bar Association (2010)
> State Bar of California, Committee on Appellate Courts (2006-09)

## RECOGNITION
> Top 100 California Appellate Lawyers, American Society of Legal Advocates (since 2015)
> Super Lawyer (since 2008)
> Legal Aid Society of San Diego, Outstanding Service Award (2015)
> Consumer Attorneys of California, Presidential Award of Merit (2013 & 2016)

## NOTABLE DECISIONS
> **Colbert v. Rio Tinto PLC**, 824 F. App'x 5 (2d Cir. 2020) (vacating dismissal of securities fraud complaint)
> **Mayall v. USA Water Polo**, 909 F.3d 1055 (9th Cir. 2018) (viable claims alleged concerning duty to implement concussion and return-to-play protocols)
> **Hernandez v. Restoration Hardware**, 4 Cal. 5th 260 (2018) (agreeing with CAOC as amicus curiae that unnamed class members must intervene for standing to appeal)
> **Friedman v. AARP, Inc.**, 855 F.3d 1047 (9th Cir. 2017) (UCL claim stated that AARP unlawfully

HAGENS BERMAN SOBOL SHAPIRO LLP

**SENIOR COUNSEL**

# Kevin K. Green

transacted insurance without license)

> **George v. Urban Settlement Serv.**, 833 F.3d 1242 (10th Cir. 2016) (reinstating RICO class complaint against Bank of America)

> **Duran v. U.S. Bank**, 59 Cal. 4th 1 (2014) (CAOC amicus curiae addressing representative evidence in class actions)

> **Wong v. Accretive Health**, 773 F.3d 859 (7th Cir. 2014) (upholding $14 million securities settlement)

> **Harris v. Superior Court**, 207 Cal. App. 4th 1225 (2012) ($65 million resolution for employee class after reversal)

> **Lynch v. Rawls**, 429 F. App'x 641 (9th Cir. 2011) ($15 million derivative settlement after first Ninth Circuit reversal on presuit demand requirement)

> **Kwikset Corp. v. Superior Court**, 51 Cal. 4th 310 (2011) (rejecting stringent interpretation of UCL standing prerequisites)

> **Luther v. Countrywide Fin. Corp.**, 195 Cal. App. 4th 789 (2011) (Securities Act class actions permitted in state court, leading to $500 million settlement)

> **In re F5 Networks, Inc. Derivative Litig.**, 207 P.3d 433 (Wash. 2009) (Washington follows demand futility standard, not universal demand rule)

> **Troyk v. Farmers Group**, 171 Cal. App. 4th 1305 (2009) (auto insurance policy violated disclosure statute; settled on appeal for $100 million monetary relief)

> **Smith v. Am. Family Mut. Ins. Co.**, 289 S.W.3d 675 (Mo. Ct. App. 2009) (reinstating $17 million jury verdict for plaintiff class)

> **Alaska Elec. Pension Fund v. Brown**, 941 A.2d 1011 (Del. 2007) (en banc) (intervening shareholders who show corporate benefit may seek attorney fees)

> **Ritt v. Billy Blanks Enters.**, 870 N.E.2d 212 (Ohio Ct. App. 2007) (reversing on class certification, leading to $40 million settlement)

> **McKell v. Washington Mutual**, 142 Cal. App. 4th 1457 (2006) (reversing and holding federal lending regulations did not foreclose UCL claims)

> **Lebrilla v. Farmers Group**, 119 Cal. App. 4th 1070 (2004) (reversing and ordering certification of California class; settled at trial for substantial class-wide relief)

> **Lavie v. Procter & Gamble Co.**, 105 Cal. App. 4th 496 (2003) (seminal precedent on California's reasonable consumer standard)

## PUBLICATIONS

> **Amicus Curiae Update**, Forum (regular column for CAOC's periodical) (since 2012)

> Distinguishing Mayor McCheese from Hexadecimal Assembly Code for Madden Football: The Need to Correct the 9th Circuit's 'Nutty' Rule barring Expert Testimony in Software Copyright Cases (Oct. 2017) (with David Nimmer and Peter S. Menell) (available at SSRN)

> **Forfeiture at the Pleading Stage: Ask Permission First, Don't Apologize Later**, California Litigation (Vol. 28, No. 1, 2015) (with Rupa G. Singh) (Journal of State Bar Litigation Section)

> **Closing the Appellate Justice Gap**, Los Angeles Daily Journal (Feb. 10, 2015)

> **Appellate Review in California Class Actions**, California Litigation (Vol. 24, No. 2, 2011) (Journal of State Bar Litigation Section)

> A Tool for Mischief: Preemptive Defense Motions Under BCBG Overtime Cases to Reject Class

SENIOR COUNSEL

# Kevin K. Green

Certification, Forum (Vol. 39, No. 1, Jan./Feb. 2009) (with Kimberly A. Kralowec)

› The Unfair Competition Law After Proposition 64: The California Supreme Court Speaks, Competition (Vol. 15, No. 2, Fall/Winter 2006) (Journal of State Bar Antitrust & Unfair Competition Law Section)

## PRESENTATIONS

› Judicial Council CJER Webinar (Expanding Access to Justice in Appellate Courts, June 2020)

› Bridgeport Class Action Conference (Appellate Review of Issues in Class Actions, Jan. 2020)

› CAOC Webinar (Evidence at Class Certification: The Evolving Appellate Landscape, June 2019)

› San Diego County Bar Association (New Mandatory Disclosures Before Mediation, Jan. 2019)

› Bridgeport Class Action Conference (Expert Evidence at Class Certification, Jan. 2019)

› California Lawyers Association Webinar (New Mandatory Disclosures Before Mediation, Dec. 2018)

› Bridgeport Class Action Conference (Consumer Protection Cases Predicated on Omissions, Jan. 2018)

› State Bar Webinar (Material Omission Claims Under California's UCL, FAL and CLRA, Sept. 2017)

› Bridgeport Consumer Litigation Conference (Material Omissions, Jan. 2017)

› CAOC Webinar (Ninth Circuit Practice: Everything but the Brief, Nov. 2016)

› Bridgeport Class Action Litigation Conference (Objectors, Sept. 2016)

› CAOC Annual Convention (Class Action Update, Nov. 2014)

› San Diego County Bar Association (Moderator, Pleasing the Court: Making Your Oral Argument Count, Oct. 2014)

› State Bar of California Annual Meeting (Forfeiture: A Four-Letter Word in the Court of Appeal, Sept. 2014)

› Consumer Attorneys of San Diego, Class Action Symposium (Appellate Perspective on Class Actions, May 2014)

› State Bar of California Golden State Institute (California Supreme Court Panel, Oct. 2012)

› State Bar of California Annual Meeting (Moderator, Preparing an Appellate Record, Sept. 2009)

› CAOC Annual Convention (Employment Litigation Panel, Nov. 2008)

## PERSONAL INSIGHT

Concerned a legal career meant taking life too seriously, Kevin spent several years after college blending work and travel. He taught English in Switzerland, toiled as a luggage porter in Australia and scaled a live volcano in Guatemala. He ran with the bulls at Pamplona before easing into a monastic life of appellate practice.



**SENIOR COUNSEL**

# Anne F. Johnson

*Ms. Johnson specializes in high-stakes, complex litigation challenging Big Pharma's schemes to block consumer access to less expensive generic drugs, as well as mass actions fighting corporate indifference and greed.*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
annej@hbsslaw.com

**YEARS OF EXPERIENCE**
- 18

**PRACTICE AREAS**
- Personal Injury
- Antitrust
- Consumer Protection

**INDUSTRY EXPERIENCE**
- Pharmaceuticals
- Automotive

**BAR ADMISSIONS**
- New York
- Texas

**COURT ADMISSIONS**
- U.S. District Courts for the Southern and Eastern Districts of New York

**EDUCATION**
- Brooklyn Law School, **cum laude**
- James Madison University, **magna cum laude**

**CURRENT ROLE**
- Senior Counsel, Hagens Berman Sobol Shapiro LLP

**RECENT SUCCESS**
- Ms. Johnson was instrumental in achieving a $200+ million aggregate settlement for her clients in General Motors LLC Ignition Switch Litigation.

**EXPERIENCE**
- Prior to joining Hagens Berman, Ms. Johnson was a partner at a Texas litigation firm and an associate at two New York City plaintiffs' class-action firms.
- Led the discovery, briefing and trial preparation teams on behalf of court-appointed co-lead counsel for the wrongful death and personal injury plaintiffs in **General Motors LLC Ignition Switch Litigation**, one of the largest product liability litigations in U.S. history.
- Member of the trial team in the first pay-for-delay pharmaceutical antitrust case to go to trial after the U.S. Supreme Court's watershed decision in **FTC v. Actavis**.
- Developed and filed multiple pharmaceutical antitrust cases challenging drug companies' schemes to prevent less expensive generic versions of brand name drugs from entering the market, including by using sham litigation, sham citizen petitions, pay-for-delay settlements and "product hopping."

**ACTIVITIES**
- Fundraising volunteer for Annie's List, which helps to elect progressive women to office in Texas
- Organized the American Constitution Society's Constitution in the Classroom program for New York City schools

**RECOGNITION**
- Brooklyn Law Review

**NOTABLE CASES**
- General Motors LLC Ignition Switch Litigation
- Solodyn Antitrust Litigation
- Suboxone Antitrust Litigation
- Nexium Antitrust Litigation
- Provigil Antitrust Litigation
- Tricor Antitrust Litigation

**PERSONAL INSIGHT**
When she's not working, Anne is on her porch listening to records – rhythm and blues, country or rock 'n' roll – with her family and dogs.

HAGENS BERMAN SOBOL SHAPIRO LLP

**OF COUNSEL**

# Karl Barth

*Key member on firm's securities fraud cases against companies such as Boeing, Einstein Noah Bagel Corp., Pepsi Puerto Rico Bottling Co., PriceCostco, Templeton Vietnam Opportunities Fund and Wall Data.*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
karlb@hbsslaw.com

**YEARS OF EXPERIENCE**
> 25

**PRACTICE AREAS**
> Securities Litigation
> Investor Rights

**BAR ADMISSIONS**
> Washington

**EDUCATION**
> Georgetown University Law Center, J.D.
> University of Virginia, B.S. Accounting, Certified Public Accountant

**CURRENT ROLE**

> Of Counsel, Hagens Berman Sobol Shapiro LLP

> Previously with the firm from 1994 through 2004 before he rejoined in 2010

> Key member on firm's securities fraud cases against companies such as Boeing, Einstein Noah Bagel Corp., Identix, Midcom Communications, MidiSoft, Oppenheimer Delta Partners, Pepsi Puerto Rico Bottling Co., PriceCostco, Templeton Vietnam Opportunities Fund and Wall Data

> Represents investors seeking to protect assets and recover investment losses from companies engaged in securities and accounting wrongdoing

**EXPERIENCE**

> Certified Public Accountant

> Certified Fraud Examiner

> Certified in Financial Forensics

> Consultant at a national financial consulting firm specializing in expert witness testimony on accounting and financial issues

> Graduated from Georgetown University Law Center, and from the University of Virginia with a B.S. in Accounting



**OF COUNSEL**

# Jeniphr A.E. Breckenridge

*Ms. Breckenridge has practiced with the firm since its founding in 1993.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9325 office
(206) 623-0594 fax
jeniphr@hbsslaw.com

**YEARS OF EXPERIENCE**
> 31

**PRACTICE AREAS**
> Securities / Investor Fraud
> Consumer Rights
> Products Liability

**INDUSTRY EXPERIENCE**
> Aeronautics
> Pharmaceutical Fraud

**COURT ADMISSIONS**
> Supreme Court of Washington
> USDC, Western District of Washington
> U.S. Court of Appeals, Third Circuit

**EDUCATION**
> University of Maryland Law School, J.D., Notes and Comments Editor, Maryland Law Review
> Georgetown University, B.A.

## CURRENT ROLE

> Of Counsel, Hagens Berman Sobol Shapiro LLP, where she has practiced since the firm's founding

> Practice concentrates on class actions, including consumer, automobile defects, securities litigation fraud, and wage and hour claims

## RECOGNITION

> Lawdragon 500 Leading Plaintiff Financial Lawyers, 2020

## NOTABLE CASES

> Metropolitan Securities Litigation
> Boeing Securities Litigation
> Raytheon Securities Litigation
> Average Wholesale Price Litigation
> In re Pet Food Products Liability Litigation
> Toyota Unintended Acceleration Litigation
> State Tobacco cases



**OF COUNSEL**

# Erin C. Burns

*Ms. Burns devotes her practice to serving those who have been injured by antitrust violations in a variety of industries.*

**CONTACT**

55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 482-3700 office
(617) 482-3003 fax
erinb@hbsslaw.com

**YEARS OF EXPERIENCE**
› 19

**PRACTICE AREAS**
› Antitrust
› Class Actions

**BAR ADMISSIONS**
› Pennsylvania
› United States Courts of Appeals for the District of Columbia and the Third Circuits
› U.S. District Court for the Eastern District of Pennsylvania
› U.S. District Court for the Eastern District of Michigan

**EDUCATION**
› Villanova University School of Law, J.D., 2002
› University of Delaware, B.A. Psychology, 1999

## CURRENT ROLE

› Of Counsel, Hagens Berman Sobol Shapiro LLP

## EXPERIENCE

› Prior to joining Hagens Berman, Ms. Burns founded ECB Law LLC, and previously worked as an associate attorney at NastLaw LLC and RodaNast P.C.

› Erin was a member of the Law & Briefing Committee for In re Zoloft (Serataline Hydrochloride) Products Liability Litigation, MDL No. 2342 (E.D. Pa.) and also served as a member of the deposition team for Shane Group, Inc., et al. v. Blue Cross/Blue Shield of Michigan, Case No. 2:10-cv-14360-DPH-MKM (E.D. Mich.). She was also mediation counsel for In re Skelaxin (Metaxalone) Antitrust Litigation, MDL No. 2343 (E.D. Tenn.).

## RECENT CASES

› In re Zetia (Ezetimibe) Antitrust Litigation, MDL No. 2836 (E.D. Va.).
› In re Avandia Marketing, Sales Practices and Products Liability Litigation, MDL No. 1871 (E.D. Pa.).
› In re Ranbaxy Generic Drug Application Antitrust Litigation, MDL No. 2878 (D. Mass.).

## NOTABLE CASES

› In re Zoloft (Serataline Hydrochloride) Products Liability Litigation, MDL No. 2342 (E.D. Pa.).
› Shane Group, Inc., et al. v. Blue Cross/Blue Shield of Michigan, Case No. 2:10-cv-14360-DPH-MKM (E.D. Mich.).
› In re Skelaxin (Metaxalone) Antitrust Litigation, MDL No. 2343 (E.D. Tenn.).

## LEGAL ACTIVITIES

› Member of the American Bar Association and Pennsylvania Bar Association

› Featured panelist for the Legal Intelligencer's first annual Litigation Summit, speaking about taxation of costs under 28 U.S.C. §1920 for e-discovery expenses (2012)

› Chairperson of the Young Lawyers' Division and member of the Board of Directors of the Lancaster Bar Association (2005)

› Vice-Chairperson of the Young Lawyers' Division (2004)

› Leader for the Law Explorers Post (2004 – 2006). Erin taught monthly class for high school-aged children interested in careers in law. Her work included mock trial activities, sample law school and bar

HAGENS BERMAN SOBOL SHAPIRO LLP

**OF COUNSEL**

# Erin C. Burns

exam questions and guest speakers.

**PERSONAL INSIGHT**

When not practicing law, Erin spends as much time as possible with her husband and four children. She has spent nearly as much time patching up scraped knees and elbows as she has writing briefs. She and her husband have also served as foster parents. Erin also enjoys using their smoker to try to make various kinds of barbeque, with varying degrees of success.

HAGENS BERMAN SOBOL SHAPIRO LLP



**OF COUNSEL**

# Mark S. Carlson

*Mr. Carlson is an active member of the legal community frequently making presentations to legal forums and industry groups on intellectual property law.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9346 office
(206) 623-0594 fax
markc@hbsslaw.com

**YEARS OF EXPERIENCE**
> 33

**PRACTICE AREAS**
> Patent Infringement
> Trademark and Trade Dress Infringement
> Trade Secret Misappropriation
> Complex Litigation

**BAR ADMISSIONS**
> Washington
> U.S. District Court, Western District of Washington
> U.S. Court of Appeals, Federal Circuit
> Numerous other jurisdictions pro hac vice

**EDUCATION**
> University of Puget Sound School of Law, J.D., **cum laude**, 1987
> University of Washington, B.A., History, 1984

## CURRENT ROLE

> Of Counsel, Hagens Berman Sobol Shapiro LLP

> Working in intellectual property since 1987, handling a full range of intellectual property litigation focused primarily on patent infringement disputes

> Currently representing FlatWorld Interactives in patent infringement litigation against Apple, Samsung and LG involving touch screen gesture recognition technology in the iOS and Android operating systems, Thought Inc. against Oracle involving software application data persistence technology, and the University of Utah in patent infringement litigation regarding RNA interference therapies for genetic diseases

> Active member of the legal community making presentations in legal forums and industry groups on intellectual property law

> Active participant in the Seattle Intellectual Property Inn of Court and Washington State Patent Law Association

## RECENT CASES

> Twice litigated against AT&T on wireless handset, network and telematics patents

> Twice litigated on behalf of The Nautilus Group in patent, trademark, false advertising and unfair competition cases involving the BowFlex exercise machine and other exercise equipment

> Represented the owner of tradedress rights to the Stanley Classic vacuum bottle in trade dress litigation against Thermos

> Represented a software patent licensor in litigation against Microsoft over the scope of a license for relational database technology

## EXPERIENCE

> Dorsey & Whitney, Patent Litigation Group
> Bogle & Gates, Intellectual Property Litigation Group

## PUBLICATIONS/PRESENTATIONS

> "The European Privacy Directive for Personal Data," American Electronics Association Newsline for the Washington State Council

> "Recovery of Pure Economic Loss in Product Liability Actions: An Economic Comparison of Three Legal Rules," University of Puget Sound Law Review

> "Patent Litigation and the Non-Practicing Entity," ITRI IP Executives Conference, University of Washington Foster School of Business, 2012

HAGENS BERMAN SOBOL SHAPIRO LLP

**OF COUNSEL**

# Mark S. Carlson

> "Vernor v. Autodesk, the Future, or Demise, of the First Sale and Essential Step Defenses in Copyright," Seattle Intellectual Property Inn of Court, 2011

> "What Are My Odds? A Disciplined Approach to Assessing Case Value and Litigation Risk," Seattle Intellectual Property Inn of Court, 2010

> "Medimmune v. Genentech: Consequences for Patent Licenses, Litigation and Settlements," 2009

> "E-Discovery and the New Federal Rules," 2008

> "Recent Developments in Pharmaceutical Patents," 2008

## LEGAL ACTIVITIES

> Seattle Intellectual Property Inn of Court

> Washington State Patent Law Association

> American Intellectual Property Law Association

## NOTABLE CASES

> Thought v. Oracle

> FlatWorld v. Apple; v. Samsung; v. LG

> University of Utah v. Max Planck Institute, et al.

> Airbiquity v. AT&T, et al.

> Timeline v. Microsoft; v. Oracle; v. Sagent

> The Nautilus Group v. Icon Health and Fitness

HAGENS BERMAN SOBOL SHAPIRO LLP



**OF COUNSEL**

# Jeannie Evans

*Successfully litigates multimillion- and multibillion-dollar antitrust and other complex fraud cases.*

**CONTACT**

455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611

(708) 628-4966  office
(708) 628-4950 fax
jeannie@hbsslaw.com

**YEARS OF EXPERIENCE**
> 24

**PRACTICE AREAS**
> Antitrust Litigation
> Investor Fraud
> Securities

**BAR ADMISSIONS**
> Illinois
> California

**CLERKSHIPS:**
> Hon. Alex Kozinski, U.S. Court of Appeals for the Ninth Circuit, summer 1997. Hon. Susan Illston, U.S. District Court for the Northern District of California, summer 2003

**EDUCATION**
> Harvard Law School, J.D. **cum laude**, 1997
  Executive Editor, Harvard Journal of Law and Public Policy; Federalist Society; Asia Law Society
> Brigham Young University, B.A., Political Science, **summa cum laude**, Ezra Taft Benson Scholar; University Honors, 1994
  Editor-in-Chief, Journal of International and Area Studies

**CURRENT ROLE**
> Of Counsel, Hagens Berman Sobol Shapiro LLP
> Represents plaintiffs in complex litigation, focusing on antitrust and financial fraud claims

**EXPERIENCE**
> Jeannie has successfully represented both plaintiffs and defendants in multimillion- and multibillion-dollar disputes in state and federal courts across the country
> Co-Founder and Managing Partner of Agrawal Evans LLP, a trial and appellate boutique firm based in Chicago
> Kirkland & Ellis LLP (Chicago)
> Wilson Sonsini Goodrich & Rosati (Palo Alto)

**AWARDS & RECOGNITION**
> President, Harvard Law Society of Illinois, 2016-2017
> Chicago Chapter Chair, J. Reuben Clark Law Society, 2016-2017
> BYU Law School Board of Advisors, 2017
> Best Lawyers, Women of Influence Nominee, 2017
> Illinois Super Lawyer, 2016 - 2018

**PRESENTATIONS**
> Basics of Accounting for Lawyers 2015, Practicing Law Institute (PLI)
> Basics of Accounting for Lawyers 2014, Practicing Law Institute (PLI)
> Preparing the Expert Witness for Deposition 2013, Pincus Professional Education

**LANGUAGES**
> Cantonese (Chinese)
> Mandarin (Chinese)

**PERSONAL INSIGHT**

Jeannie loves the outdoors — body surfing in the ocean, hiking in the mountains, running, or playing tennis with her husband and four children.

HAGENS BERMAN SOBOL SHAPIRO LLP



**OF COUNSEL**

# Philip J. Graves

*Mr. Graves brings to the firm more than 20 years of experience as a patent and intellectual property litigator, having represented companies in patent cases in many technical fields.*

**CONTACT**

301 North Lake Ave., Suite 920
Pasadena, CA
91101

(213) 330-7147 office
(213) 330-7152 fax
phillipg@hbsslaw.com

**YEARS OF EXPERIENCE**
> 29

**PRACTICE AREAS**
> Intellectual Property

**BAR ADMISSIONS**
> U.S. Supreme Court
> Supreme Court of California
> U.S. Court of Appeals, Federal Circuit
> U.S. Court of Appeals, Ninth Circuit
> U.S. District Court, Central District of California
> U.S. District Court, Northern District of California
> U.S. District Court, Eastern District of California
> U.S. District Court, Southern District of California

**EDUCATION**
> Columbia University School of Law (J.D., 1990)
> Harlan Fiske Stoler Scholar
> Writing and Research Editor, Columbia Business Law Review
> University of Washington (B.A., **cum laude**, 1987)
> Phi Beta Kappa
> Robert A. Dahl Award

## CURRENT ROLE

> Of Counsel, Hagens Berman Sobol Shapiro, head of the firm's intellectual property practice

> Practice focuses on intellectual property, including cases involving trademark infringement, copyright infringement, unfair competition and misappropriation of trade secrets

## EXPERIENCE

> Before joining Hagens Berman, Mr. Graves' practice focused on represented technology companies in patent cases involving network security, web-hosting, image capture, digital signature and encryption technologies, nano-scale manufacturing and biotech, among many other technical fields.

## LEGAL ACTIVITIES

> State Bar of California

> Alaska Bar Association

> Los Angeles Intellectual Property Law Association

   - 2015 Judges' Night, Chair

   - 2011 Spring Seminar, Chair

> American Intellectual Property Law Association

> Federal Circuit Bar Association

## AWARDS & RECOGNITION

> Pasadena Top Attorney, Pasadena Magazine (2016)

> **40 Angelenos to Know in Intellectual Property Law**, Los Angeles Business Journal (2012)

> Southern California Super Lawyers®, Intellectual Property Litigation, Business Litigation (2004-2018)

## PUBLICATIONS

> **Preparing to Defend a Section 337 Action: What District Court Litigators Need to Know**, Lead Author, New Matter (Fall 2014)

> **Intellectual Property: It's Not Just for Specialists Anymore**, Co-Presenter, Association of Corporate Counsel (Southern California Chapter), Long Beach, CA (June 19, 2014)

> **Section 337: Whether to Respond or Default**, Lead Author, Intellectual Property Today (June 9, 2014)

**OF COUNSEL**

# Philip Graves

> U.S. Patent Litigation under Section 337, Presenter, Shijingshan Scientific and Technological Services Alliance/Beijing Intellectual Property Office/Zhongguancun Scientific and Technological Park, Beijing, China (May 6, 2014)

> Double Exposure: Keeping Your Confidential Information Out of the Public Eye in the Wake of Apple v. Samsung, Lead Author, ABA Landslide Magazine (May/June 2013 Issue)

> Potential Ramifications of Already v. Nike, Lead Author, Law360 (September 6, 2012)

> U.S. Patent Litigation Involving Pharmaceutical Patents, Co-Presenter, Taiwan Medical and Pharmaceutical Industry Technology and Development Center, Taipei, Taiwan (May 25, 2012)

> Developments in Trademark Law and the Internet: Domain Name Disputes, Banner Ads, Pop-Ups, and Related Issues, Author, 2004 Intellectual Property Institute of the State Bar of California

> Damages in Copyright and Patent Infringement Actions, Author, Intellectual Property Law Section of the Alaska Bar Association

**NOTABLE CASES**

> Stamps.com, several patent infringement cases involving online postage generation and delivery, network security, digital signature and encryption technology. As lead trial counsel, obtained a jury verdict in Stamps.com's favor, avoiding over $30 million in damages.

> Web.com Group, patent infringement suits in Arizona and Texas concerning a variety of backend and client-facing content hosting and delivery functionalities, as well as several business litigation matters in California in which Mr. Graves obtained a dismissal of one suit on summary judgment and affirmance of another favorable judgment on appeal.

> Fotona d.d., a European manufacturer of medical lasers, in a patent infringement action involving dental laser surgery technology. Following a three day evidentiary hearing, Mr. Graves obtained a favorable resolution of the case and a full award of attorneys' fees for the client.

> Developer of motion capture technology, breach of contract action involving rights in the technology. As lead trial counsel, obtained a verdict in favor of the client as well as an award of all of the client's attorneys' fees.

> Designer and importer of consumer electronics products, represented in a patent infringement action venued in the International Trade Commission. The complainant dismissed its complaint on the eve of trial, following the filing of the parties' pretrial briefs and witness statements.

> Large publicly traded company, in several patent infringement suits in California and Texas involving rapid prototyping technology.

> Technology development company, represented in a patent infringement suit involving imaging systems used at tourist attractions and theme parks.

> Cosmetics company, represented in consolidated suits alleging unfair competition and infringement of patents covering various prostaglandin analogs.

**PERSONAL INSIGHT**

Phil took a break from his judicial clerkship in 1991 to travel a war zone (Croatia, Serbia, Kosovo) and was chased down a mountainside by Kosovar rebels.

OF COUNSEL

# Laura Hayes

*Ms. Hayes is involved in class-action lawsuits against pharmaceutical companies and is committed to the vigorous prosecution of antitrust cases.*

**CONTACT**
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1977 office
(617) 482-3003 fax
lhayes@hbsslaw.com

**YEARS OF EXPERIENCE**
› 14

**PRACTICE AREAS**
› Antitrust Litigation
› Pharmaceutical Fraud

**CLERKSHIPS**
› Connecticut Judicial Branch
› Appellate Division of the
  Rhode Island Office of the
  Public Defender

**BAR ADMISSIONS**
› Supreme Judicial Court
  of the Commonwealth of
  Massachusetts

**COURT ADMISSIONS**
› U.S. District Court for the
  District of Massachusetts

**EDUCATION**
› Boston University School of
  Law, J.D., 2007
› Middlebury College School of
  Arabic
› Boston University, B.S., magna
  cum laude

**CURRENT ROLE**
› Of Counsel, Hagens Berman Sobol Shapiro LLP

**RECENT CASES**
› In re Intuniv Antitrust
› In re Effexor Antitrust
› In re Loestrin 24 Fe Antitrust Litigation
› In re Celebrex (Celecoxib) Antitrust Litigation

**EXPERIENCE**
› Member of the team responsible for $94 million settlement on behalf of direct purchaser class in In re Celebrex (Celecoxib) Antitrust Litigation, 2:13-cv-361, E.D. Va., ECF Nos. 64, 455, and the $120 million settlement (motion for preliminary approval pending) in In re Loestrin 24 Fe Antitrust Litigation, 1:13-md-02472, D.R.I., ECF Nos. 10, 1050.
› Prior to joining Hagens Berman, Laura was an associate at Gargiulo Rudnick LLP, where she litigated Medicaid and Medicare fraud cases. She also has years of work experience doing contract work on a variety of complex litigations.
› Following law school, Laura was a clerk for the Connecticut Judicial Branch. In that role, she addressed novel pre-emption and spoliation of evidence questions.
› She is a graduate of Boston University School of Law, where she acted as articles editor for the Journal of Science and Technology Law.
› She received her Bachelor of Science degree from Boston University with a concentration in journalism.

**PERSONAL INSIGHT**
Laura spends her free time in fall and winter managing and training sprint sled dogs and getting them and her husband to races in the Northeast, Quebec and sometimes Europe. She runs the B team in four-dog sled classes. Laura also serves on the board of the United States Federation of Sled Dog Sports.

HAGENS BERMAN SOBOL SHAPIRO LLP



OF COUNSEL

# John D. Jenkins

*John has extensive experience in the government and private sector as a trial attorney and manager of complex investigations and prosecutions.*

**CONTACT**
(714) 222-2333  office
johnj@hbsslaw.com

**PRACTICE AREAS**
› Investor Fraud
› Securities

**EDUCATION**
› University of Southern California, B.A. and J.D.

## CURRENT ROLE

› Of Counsel, Hagens Berman Sobol Shapiro LLP

› John Jenkins has considerable experience as a trial lawyer, corporate advisor, president of an internationally recognized investigative and security firm and expert in complex investigations and prosecutions.

## EXPERIENCE

› Former Deputy District Attorney in Orange County, California

› Prior to joining Hagens Berman, Mr. Jenkins was a lawyer at Hill, Wynne, Troop & Meisinger. He also has more than 20 years of experience managing domestic and international investigations. He was previously the president of CoreFacts, before and after the sale of CoreFacts as the investigative consulting platform to what became CoreLogic, Inc. (NYSE: CLGX), a leading global risk mitigation and business solutions provider. Prior to CoreFacts, he was an executive at two leading global investigative consulting firms.

## ACTIVITIES

› Member, Board of Governors at the University of Southern California

› Member, Board of Directors of Lear Capital

## PERSONAL INSIGHT

In his spare time, John enjoys fishing with his son and watching his twin daughters compete as saber fencers.

**OF COUNSEL**

# Robert A. Jigarjian

*Rob brings a combination of securities industry and complex litigation experience to the firm and its clients.*

**CONTACT**
715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3000 office
(510) 725-3001 fax
robertj@hbsslaw.com

**YEARS OF EXPERIENCE**
> 27

**PRACTICE ARES**
> Investor Fraud
> Securities

**BAR ADMISSIONS**
> California

**COURT ADMISSIONS**
> All California District and State Courts,
> U.S. Court of Appeals, Ninth Circuit,
> U.S. Court of Appeals, Second Circuit

**EDUCATION**
> Hamilton College, AB, 1981
> Tulane University, MBA, 1985
> Golden Gate University, JD, 1993

## CURRENT ROLE

> Of counsel, Hagens Berman Sobol Shapiro LLP
> Practice primarily focuses on identifying and developing securities and derivative actions

## EXPERIENCE

> Prior to joining Hagens Berman, he worked as a partner at law firms practicing primarily in securities and derivative litigation. Rob also owned his own firm within the same practice areas.

> While in law school, Rob interned with the United States Securities and Exchange Commission and worked for two prominent securities class action firms.

> Before attending law school, Rob worked for several years as an institutional sales trader for a boutique Wall Street investment bank where he specialized in analyzing and trading bank-issued securities with the firm's institutional investor clients.

## LEGAL ACTIVITIES

> Rob served as a voluntary discovery referee for the California Superior Court for the county of Marin to help minimize judicial resources during discovery disputes.

## NOTABLE CASES

> Matters on which Rob has worked and helped investors, corporations and a bankruptcy trustee to obtain significant recoveries include the following:

> In re Equitec Rollup Litigation, No. C-90-2064 (N.D. Cal.)
> In re Prison Realty Securities Litigation, No. 3:99-0452 (M.D. Tenn.)
> In re Digex, Inc. Shareholders Litigation, C.A. No. 18336 (Del. Ch.)
> Isco v. Kraemer, No. CV 95-08941 (Super. Ct., Maricopa Co., Ariz.
> Saito v. McKesson HBOC, Inc., No. 376, 2001 (Del.)
> Saito v. McCall (Del. Ch.) Scheonfeld, et al. v. XO Communications, Inc., No. 01-018358 (N.Y. Sup. Ct., Nassau County)
> In re Salomon Analyst Litigation (S.D.N.Y.) Hermerding v. Tripathi, et al., Adv. No. 09-5004 (Bankr. N.D. Cal.)

## PERSONAL INSIGHT

A Maine native and recent Seattle transplant, Ted is working hard to master the intricacies of composting and to remember that the ocean lies to the west now, not the east.



**OF COUNSEL**

# Michella A. Kras

*State Bar of Arizona President's Volunteer Service Award, 2010*

**CONTACT**
11 West Jefferson St.
Suite 1000
Phoenix, AZ 85003

(602) 224-2627 office
(602) 840-3012 fax
michellak@hbsslaw.com

**YEARS OF EXPERIENCE**
> 17

**PRACTICE AREAS**
> Commercial Litigation
> Complex Civil Litigation

**BAR ADMISSIONS**
> Arizona
> U.S. District Court for the District of Arizona

**EDUCATION**
> Arizona State University College of Law, J.D., **magna cum laude**, 2003
> Arizona State University, B.A., 1997

## CURRENT ROLE

> Of Counsel, Hagens Berman Sobol Shapiro LLP

> Practice focuses on class actions and complex litigation

> Extensive expertise in complex litigation in a variety of commercial contexts, including actions involving various contractual breaches, RICO violations, securities fraud, negligent and intentional torts, and federal and state employment law

## RECOGNITION

> State Bar of Arizona President's Volunteer Service Award, 2010

> Rising Star, Southwest Super Lawyers, 2014

## EXPERIENCE

> Member of the commercial and securities litigation group in the Phoenix office of an international law firm where she worked on complex litigation matters involving private securities offerings, private lending, asset purchase agreements, shareholder and member disputes, and federal and state wage and hour disputes

> Associate, Steptoe & Johnson LLP, 2007-2013

> Associate, Gammage & Burnham, work included civil litigation, employment law, election law, health care law and estate planning, 2004-2007

> Judicial Law Clerk, Arizona Supreme Court, work consisted of a variety of appeals, including civil cases, criminal actions and attorney discipline, 2003-2004

## LEGAL ACTIVITIES

> Consistent commitment to pro bono work. She's worked on several pro bono matters, including obtaining Special Juvenile Immigrant Status for a teenager that was brought to the United States as a toddler and later abandoned by her parent

> Volunteer and member of the steering committee for Wills for Heroes, an organization that provides free estate planning for Arizona's first responders

## NOTABLE CASES

> Successfully litigated and obtained summary judgment on multiple matters involving breach of contract, conversion, intentional interference and breach of fiduciary duty, even successfully piercing the corporate veil

HAGENS BERMAN SOBOL SHAPIRO LLP



**OF COUNSEL**

# James J. Nicklaus

*During his legal career, Mr. Nicklaus has represented clients in antitrust, securities fraud, product liability and patent litigation.*

**CONTACT**

55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1973 office
(617) 482-3003 fax
jamesn@hbsslaw.com

**BAR ADMISSIONS**
› Massachusetts

**COURT ADMISSIONS**
› U.S. District Court for the
  District of Massachusetts

**EDUCATION**
› Harvard Law School, J.D.,
  magna cum laude, 1993
  Harvard Legal Aid Bureau,
  Student Representative
  on Committee on Clinical
  Education
› Harvard College, B.A.,
  East Asian Languages and
  Civilizations, cum laude, Phi
  Beta Kappa, 1990

**CURRENT ROLE**

› Of Counsel, Hagens Berman Sobol Shapiro LLP

› Practice focuses on pharmaceutical antitrust litigation and investigations of potential violations of
  antitrust law by pharmaceutical companies

**EXPERIENCE**

› Prior to joining Hagens Berman, Mr. Nicklaus worked for other firms in the Boston area, including
  representing clients in insurance coverage, product liability and lender liability litigation at Michienzie
  & Sawin LLC and representing clients in insurance coverage, patent, product liability, antitrust and
  securities fraud litigation at Willcox, Pirozzolo & McCarthy, P.C. Mr. Nicklaus began his legal career as
  an associate and junior partner at Hale and Dorr LLP (now WilmerHale).

HAGENS BERMAN SOBOL SHAPIRO LLP



**OF COUNSEL**

# Greer N. Shaw

*Greer works hard for every client, large and small, with integrity and creativity.*

**CONTACT**
301 North Lake Ave.
Suite 920
Pasadena, CA 91101

(213) 330-7145 office
(213) 330-7152 fax
greers@hbsslaw.com

**YEARS OF EXPERIENCE**
> 23

**PRACTICE AREAS**
> Appeals
> Complex Commercial
> Intellectual Property
> Patent Litigation
> Trademark and Trade Dress Infringement
> Trade Secret Misappropriation

**BAR ADMISSIONS**
> California
> Arizona
> Massachusetts

**COURT ADMISSIONS**
> U.S. Court of Appeals, Federal Circuit
> U.S. Court of Appeals, Ninth and First Circuits
> U.S. District Court, Central, Northern, Eastern and Southern Districts of California
> U.S. District Court, Districts of Arizona, Massachusetts, Nebraska and E.D. of Texas

**CLERKSHIPS:**
> Honorable Bailey Aldrich, U.S. Court of Appeals, First Circuit

**EDUCATION**
> Boston University School of Law, J.D., **magna cum laude**; Managing Editor, Boston University Law Review
> University of California, Berkeley, B.A.

## CURRENT ROLE
> Of Counsel, Hagens Berman Sobol Shapiro LLP

## RECOGNITION
> Southern California Super Lawyers®, Intellectual Property Litigation, 2014-2016; 2019-2020

## EXPERIENCE
> Snell & Wilmer LLP, 2011-2015
> Graves & Shaw LLP, 2009-2011
> Kirkland & Ellis LLP, 2004-2009
> Goodwin Procter LLP, 1998-2003
> U.S. Court of Appeals, First Circuit, 1997-1998

## LEGAL ACTIVITIES
> Intellectual Property Owners Association; Litigation Committee (2014-2015)
> Los Angeles Intellectual Property Law Association; Board of Directors (2012-2015)
> USC Intellectual Property Institute; 2015 Planning Committee
> The Judge Paul R. Michel Intellectual Property American Inn of Court; Reporter (2008-2009), Team Captain (2009, 2012); Program Chair (2012-2014)
> American Intellectual Property Law Association

## PRESENTATIONS
> "Nautilus, Ariad, and Beyond; The Current State of § 112's Definiteness, Enablement, and Written Description Requirements in Litigation and Prosecution," Co-Presenter, Webinar produced by the State Bar of California, Patent Interest Group (March 18, 2015)
> "LAIPLA Goes to Court - Settlement of IP Disputes," Moderator (with Hon. George Wu, Hon. Gary Feess (Ret.) and Hon. Suzanne Segal, U.S. District Court, Central District of California), presented by the Los Angeles Intellectual Property Law Association (January 13, 2015)
> "Careers in Intellectual Property and Entertainment Law," Panelist, sponsored by the Los Angeles Intellectual Property Law Association and Pepperdine University School of Law (October 1, 2014)
> "Intellectual Property: It's Not Just for Specialists Anymore," Co-Presenter, Association of Corporate Counsel (Southern California Chapter), Long Beach, CA (June 19, 2014)
> "Hot Topics for In-House Patent Practitioners," Moderator, "Washington in the West 2014" conference,

HAGENS BERMAN SOBOL SHAPIRO LLP

**OF COUNSEL**

# Greer Shaw

presented by Los Angeles Intellectual Property Law Association (January 24, 2014)

> "Hot Topics and Notable Developments in IP Law," Co-Presenter, Association of Corporate Counsel (Mountain West Chapter), Salt Lake City, UT (June 28, 2013)

> "Design Patent Infringement 2013," Co-Presenter, Webinar produced by The Knowledge Group, LLC (January 29, 2013)

> "Litigating Patents in the Central District: Local Practices and the Patent Pilot Program from the Practitioner's Perspective," Moderator, Litigation Roundtable, Los Angeles Intellectual Property Law Association, Los Angeles, CA (May 30, 2012)

> "U.S. Patent Litigation Involving Pharmaceutical Patents," Co-Presenter, Taiwan Medical and Pharmaceutical Industry Technology and Development Center, Taipei, Taiwan (May 25, 2012)

> "Washington in the West Conference," Chairperson, sponsored by Los Angeles Intellectual Property Law Association (February 14, 2012)

> "Dual Actor Infringement: Drafting and Enforcing Telecommunication and Computer Science Claims Following BMC, Muniauction, SiRF and Akamai," Panelist, Los Angeles Intellectual Property Law Association, 2011 Spring Seminar (June 4, 2011)

> "IP Law – Where Do I Fit In?," Panelist, Sponsored by The Palmer Center, the Los Angeles Intellectual Property Law Association, and the Pepperdine University Career Development Office (October 28, 2008)

> "Patents & The Supreme Court," Moderator, Panel presentation of the 10th Annual "Washington in the West" Conference presented by the Los Angeles Intellectual Property Law Association (January 31, 2007)

> "Recent Developments In False Designation of Origin and Willful Patent Infringement," Panelist, Fifth Annual Technology Law Conference, Pepperdine University School of Law, Sponsored by the Association of Corporate Counsel (June 25, 2004)

**PERSONAL INSIGHT**

When he is not helping clients who have been ripped off or wrongly accused, Greer enjoys scaling mountains, exploring canyons, and rappelling down waterfalls with the Altadena Mountain Rescue Team of the Los Angeles County Sheriff's Department.

HAGENS BERMAN SOBOL SHAPIRO LLP



**OF COUNSEL**

# Benjamin J. Siegel

*Mr. Siegel is an experienced litigator with a focus on antitrust law who has represented clients in state and federal courts, on appeals, as well as before arbitrators and governmental agencies, and has achieved significant settlements.*

**CONTACT**

715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3033 office
(510) 725-3001 fax
bens@hbsslaw.com

**YEARS OF EXPERIENCE**
› 13

**PRACTICE AREAS**
› Antitrust Litigation

**BAR ADMISSIONS**
› California

**COURT ADMISSIONS**
› U.S. District Court for the Northern District of California
› U.S. District Court for the Eastern District of California
› U.S. Court of Appeals
› Ninth Circuit

**CLERKSHIPS**
› Hon. Thomas M. Reavley, U.S. Court of Appeals for the Fifth Circuit

**EDUCATION**
› The University of Texas School of Law, The University of Texas LBJ School of Public Affairs, J.D., M.P.A., Order of the Coif, High Honors, 2007
› Articles Editor, Texas Law Review; Texas Law Review Best Litigation Note, Volume 85; Texas Law Public Interest Fellowship; LBJ Foundation Award, First in Class
› Yale University, B.A. Political Science, **cum laude**, Phi Beta Kappa, 2000

**CURRENT ROLE**
› Of Counsel, Hagens Berman Sobol Shapiro LLP

**EXPERIENCE**
› Following his work at Boies, Schiller & Flexner LLP in 2008-2009, Mr. Siegel has litigated cases on behalf of plaintiffs for the past seven years.

**LEGAL ACTIVITIES**
› Alameda County Bar Association

**RECENT CASES**
› *In re Optical Disk Drive Prods. Antitrust Litigation, No. 3:10-md-2143-RS (N.D. Cal.)*
› *In re NCAA Grant-In-Aid Antitrust Litigation, 4:14-md-02541-CW (N.D. Cal.)*
› *In re Resistors Antitrust Litigation, 5:15-cv-03820-JD (N.D. Cal.)*

**PUBLICATIONS**
› Benjamin Siegel, Constitutional Rights and the Counter-Majoritarian Dilemma (May 15, 2007) (unpublished Master's thesis, University of Texas at Austin).
› Benjamin Siegel, Note, Applying a "Maturity Factor" Without Compromising the Goals of the Class Action, 85 Texas L. Rev. 741 (2007) (Texas Law Review Best Litigation Note, Volume 85).
› Benjamin Siegel et al., Beyond the Numbers: Improving Postsecondary Success through a Central Texas High School Data Center, LBJ School of Public Affairs, Policy Research Report No. 148 (2005).
› Benjamin Siegel, California Must Protect Health Care for Medi-Cal Children, 15 Youth L. News 1 (2004), available at http://www.youthlaw.org.
› Jenny Brodsky, Jack Habib & Benjamin Siegel, Lessons for Long-Term Care Policy, World Health Organization, Publication No: WHO/NMH7CCL/02.1 (2002).
› Jenny Brodsky, Jack Habib, Miriam Hirschfeld & Benjamin Siegel, Care of the Frail Elderly in Developed and Developing Countries: the Experience and the Challenges, 14 Aging Clinical & Experimental Research 279 (2002).

**PERSONAL INSIGHT**

When not working to enforce the nation's antitrust laws, Mr. Siegel enjoys spending time with his wife and two young children in his hometown of Oakland, California. He also likes playing softball and pick-up basketball with his friends.

HAGENS BERMAN SOBOL SHAPIRO LLP



**OF COUNSEL**

# Nick Styant-Browne

*Served as lead counsel in the trial against Australia's major newspaper publishers, including "News," which resulted in the deregulation of the system of distribution of newspapers and magazines throughout Australia.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9373 office
(206) 623-0594 fax
nick@hbsslaw.com

**YEARS OF EXPERIENCE**
> 28

**PRACTICE AREAS**
> Human Rights
> Environmental Protection
> Consumer Rights

**BAR ADMISSIONS**
> Washington State Bar Association
> Australian State Bars including Victoria, NSW, and WA
> Supreme Court of Papua New Guinea

**EDUCATION**
> University of Melbourne

## CURRENT ROLE

> Of Counsel, Hagens Berman Sobol Shapiro LLP

> Practiced class-action and multi-plaintiff litigation since 2001

> Current projects include Rio Tinto Litigation for human rights and environmental abuses at the Panguna mine on the Pacific island of Bougainville

> Has been lead counsel in both bench and jury class action trials in Federal Court

## EXPERIENCE

> Senior partner (one of five) at Australia's largest plaintiff law firm working on class actions, environmental litigation and antitrust litigation

## LEGAL ACTIVITIES

> Past elected member, Council of Greenpeace, Australia

## NOTABLE CASES

> Served as co-counsel on Australia's then-largest class action against a wholly owned subsidiary of Exxon, arising out of a gas plant explosion which shut down the gas supply to Melbourne and most of the State of Victoria for 10 days

> **Rio Tinto Litigation**
Mr. Styant-Browne's practice has involved several projects in the Pacific Rim, acting principally on behalf of the indigenous peoples of poor developing Pacific nations claiming environmental and human rights abuses. His successes and passion for the causes of indigenous peoples have led to him being retained by the national governments of Pacific States including Tuvalu and the Kingdom of Tonga

> **BHP Environmental Litigation**
Mr. Styant-Browne's meticulous outlining of the environmental devastation caused by the Ok Tedi mine in Papua New Guinea helped force mining companies adopt stricter environmental standards in developing countries

> **Toyota Unintended Acceleration Litigation**

> **Thalidomide Drug Litigation**



**OF COUNSEL**

# Hannah Schwarzdchild

*Hannah has litigated cases involving employee and consumer rights, and now focuses on antitrust claims in the pharmaceutical industry.*

**CONTACT**
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1966 office
(617) 482-3003 fax
hannahs@hbsslaw.com

**YEARS OF EXPERIENCE**
> 32

**BAR ADMISSIONS**
> State of California (inactive)
> State of Pennsylvania

**PRACTICE AREAS**
> Antitrust Litigation
> Consumer Rights

**COURT ADMISSIONS**
U.S. District Court for the
> Northern District of California
> Ninth Circuit Court of Appeals
> U.S. District Court for
  the Eastern District of
  Pennsylvania
> Third Circuit Court of Appeals

**EDUCATION**
> University of California,
  Berkeley, Boalt Hall School of
  Law, J.D., 1989
  AmJur Award, 1988; Best
  Brief Award, Moot Court
  Competition, 1987
> University of California,
  Berkeley, A.B., History, Phi
  Beta Kappa, 1986

**CURRENT ROLE**
> Of Counsel, Hagens Berman Sobol Shapiro LLP
> Practice focuses on consumer and antitrust litigation
> Involved in multi-district antitrust litigation involving brand pharmaceutical products, including Zetia, Niaspan and Suboxone, among others.

**EXPERIENCE**
> Prior to joining Hagens Berman, Ms. Schwarzschild coordinated large-scale litigation projects in Boston and Philadelphia. Over the past 25 years, she has litigated employment and consumer rights cases in federal and state courts and administrative agencies, including jury and bench trials and appeals.

**PUBLICATIONS**
> Same-Sex Marriage and Constitutional Privacy, Berkeley Women's Law Journal, 1989.

**PERSONAL INSIGHT**
Hannah grew up in and around New York City. Before law school, she helped build a community arts facility in San Francisco's Mission District in the 1980s and worked on nuclear arms control at the Ploughshares Fund. Hannah has been working for LGBT rights and Middle East peace and justice for more than 20 years. These days, her best times are spent noodling around Cambridge and Cape Cod with her partner and stepdaughter in search of interesting food, art, wildlife and humans.

HAGENS BERMAN SOBOL SHAPIRO LLP



**OF COUNSEL**

# Nathaniel A. Tarnor

*Mr. Tarnor has litigated a wide variety of legal matters and takes pride in pursuing justice on behalf of his clients for as long as it takes to win.*

**CONTACT**

555 Fifth Avenue
Suite 1700
New York, NY 10017

212-752-5455 office
212-210-3980 fax
nathant@hbsslaw.com

**YEARS OF EXPERIENCE**
> 16

**BAR ADMISSIONS**
> State of Illinois
> State of New York
> District of Columbia

**PRACTICE AREAS**
> Antitrust Litigation
> Anti-Terrorism
> Consumer Rights
> Investor Fraud
> Whistleblower Litigation

**COURT ADMISSIONS**
> U.S. Supreme Court
> U.S. Courts of Appeals for the 2nd and 7th Circuits, and for the District of Columbia
> U.S. District Court for the District of Columbia
> U.S. District Courts for the Northern & Central Districts of Illinois
> U.S. District Court for the Eastern & Southern District of New York

**EDUCATION**
> Chicago-Kent College of Law, J.D., CALI Award, 2004
> University of Illinois, B.A., Phi Beta Kappa, **summa cum laude**, Milton Ravoke Award, 2000

## CURRENT ROLE

> Of Counsel, Hagens Berman Sobol Shapiro LLP

> Represents American terrorism victims against Chiquita Brands International for violations of U.S. anti-terrorism laws in Columbia

> Practice concentrates on complex federal litigation

## EXPERIENCE

> Milberg LLP, New York, NY, 2009-2016

> Practice areas include antitrust, class actions, consumer protection, contractual disputes, securities and whistleblower representation in conjunction with the U.S. Department of Justice and the U.S. Securities & Exchange Commission

> Pro Bono: Represented families of American terrorism and torture victims before the U.S. Supreme Court and Second Circuit.

> Previously provided legal assistance to human rights victims from around the world in conjunction with other prominent law firms.

## RECOGNITION

> Chicago-Kent International Law Moot Court Honor Society, 2002-2004

> Captain, Chicago-Kent International Law Moot Court Team, 2002-2004

> Highest Oralist Score 2003 Philip C. Jessup International Law Moot Court Regional Competition Chicago-Kent Moot Court Team

> CALI Award Commercial Payment Systems Law

## PERSONAL INSIGHT

Nathaniel enjoys competing in endurance sports and hiking with his family.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Tory Beardsley

*Ms. Beardsley has experience in prosecuting a variety of cases, including wrongful death, medical malpractice, negligence, fraud, consumer protection, data breach and bad faith insurance cases.*

**CONTACT**

11 West Jefferson St.
Suite 1000
Phoenix, AZ 85003

(602) 224-2642 office
(602) 840-3012 fax
toryb@hbsslaw.com

**YEARS OF EXPERIENCE**
› 6

**PRACTICE AREAS**
› Consumer Rights

**INDUSTRY EXPERIENCE**
› Consumer Fraud
› Medical Negligence

**BAR ADMISSIONS**
› Arizona

**COURT ADMISSIONS**
› U.S. District Court for the District of Arizona
› U.S. District Court for the District of Colorado

**EDUCATION**
› Arizona State University Sandra Day O'Connor College of Law, J.D.
› University of Arizona, B.A., Journalism & English Literature

**CURRENT ROLE**
› Associate, Hagens Berman Sobol Shapiro LLP
› Ms. Beardsley has experience prosecuting wrongful death, medical malpractice, negligence, negligence per se, intentional and negligent infliction of emotional distress, unjust enrichment, fraud, consumer protection, data breach and bad faith insurance cases.

**RECENT CASES**
› Member of the trial team representing the families of three patients who died after receiving dialysis at DaVita clinics. The case culminated with a $383.5 million jury verdict.
› Ms. Beardsley has also aided in prosecuting data breach cases litigated by the firm in Arizona.

**RECENT SUCCESS**
› In June 2018, Ms. Beardsley was on the trial team where a Denver jury awarded a monumental $383.5 million jury verdict against GranuFlo dialysis provider, DaVita Inc. culminating lawsuits brought by families of three patients who suffered cardiac arrests and died after receiving dialysis treatments at DaVita clinics. Each of the three parties was awarded $125 million in punitive damages from the jury, with compensatory damages ranging from $1.5 million to $5 million.

**EXPERIENCE**
› Prior to beginning her litigation career at Hagens Berman, Ms. Beardsley specialized in land use and development with other firms in the Phoenix area, working closely with the local municipalities and politicians to gain approval on proposed developments and ensure developments compliance with city code and zoning ordinance.

**ACTIVITIES**
› Chair - Herberger Young Leadership Board; Member

**PERSONAL INSIGHT**

When she's not dedicating her time to the law, Tory enjoys staying active in a variety of ways. You can find her swimming, hiking, trail running or on her road bike. Tory is also active at Phoenix's Herberger Theater Center as chair of the Young Leadership Board, an auxiliary board tasked with fundraising and cultivating the next generation of theater patrons.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Jacob Berman

*Whether in his legal practice or volunteer work, Jake dedicates his time to helping those who need it most.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-8382 office
(206) 623-0594 fax
jakeb@hbsslaw.com

**PRACTICE AREAS**
> Class Actions
> Mass Torts
> Personal Injury Litigation

**INDUSTRY EXPERIENCE**
> Personal injury
> Mass Tort
> Class-action Law

**BAR ADMISSIONS**
> California

**COURT ADMISSIONS**
> U.S. District Court for the Northern District of California

**EDUCATION**
> Loyola Law School, J.D., May 2018, Hobbs/Poehls District Attorney Practicum, Consumer Law Society, Member (Fall 2014–2018)

> University of Denver, Denver, CO, B.A., Political Science, June 2013

**CURRENT ROLE**
> Associate, Hagens Berman Sobol Shapiro LLP

**EXPERIENCE**
> Prior to joining Hagens Berman, Jake worked on personal injury matters at Robinson Calcagnie Inc. where he represented plaintiffs in numerous catastrophic injury cases and managed all aspects of the case from client onboarding to settlement. Jake conducted and defended depositions in personal injury cases and mass torts and planned and implemented a strategy to retain stronger personal injury cases for the firm. He also drafted complaints, discovery motions, pre-trial motions and assisted in trial preparation.

> Previously, he worked as a law clerk for the Los Angeles District Attorney, Victim Impact and Juvenile Unit where he conducted juvenile adjudication hearings, including direct and cross examination, presenting evidence, and arguing motions to dismiss and suppress. He also conducted felony preliminary hearings, including direct and cross examination, and presenting evidence.

> Jake was also a summer associate at prominent plaintiffs firms where he drafted arguments for opposition to motion for summary judgement in a consumer auto-defect class-action case, reviewed exhibits and organized deposition questions to depose opposing counsel's defense experts and composed jury instructions in an auto-defect class-action case and product defect class-action case. Jake also has experience writing research memoranda on topics such as appeals bonds, class certification and summary judgment.

**RECOGNITION**
> Published OCTLA Magazine, Volunteer Outreach in Communities Everywhere, Most Valuable Worker Award (2008),

**PERSONAL INSIGHT**
Jake Berman was born and raised in the Seattle area. He has a passion for coaching sports and being active in the outdoors. As a former collegiate cyclist, Jake is constantly competing in new sports or exploring a new trail run.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Hannah Brennan

*Hannah is committed to improving access to medicines – both domestically and abroad – and has experience in drug pricing, patent and international right to health litigation.*

**CONTACT**

55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1950 office
(617) 482-3003 fax
hannahb@hbsslaw.com

**YEARS OF EXPERIENCE**
> 7

**PRACTICE AREAS**
> Antitrust Litigation
> Civil & Human Rights
  Litigation
> Consumer Rights
> Medical Devices
> Pharmaceutical Fraud
> RICO

**INDUSTRY EXPERIENCE**
> Drug Pricing
> Patent
> International Right to Health
  Litigation
> International Trade
  Agreements

**BAR ADMISSIONS**
> Massachusetts

**COURT ADMISSIONS**
> Third Circuit

**CLERKSHIPS**
> Honorable Timothy B. Dyk of
  the United States Court of
  Appeals for the Federal Circuit
> Honorable Theodore McKee,
  Former Chief Judge of United
  States Court of Appeals for
  the Third Circuit

## CURRENT ROLE

> Associate, Hagens Berman Sobol Shapiro LLP

> Practice focuses on drug pricing, consumer access to medications, healthcare fraud, antitrust and patent fraud

> Member of the HBSS team representing a proposed class of insulin consumers in their claims against Eli Lilly, Novo Nordisk and Sanofi for fraudulently and unfairly increasing the cost of live-saving insulin medications. HBSS has been named lead counsel in this case.

> Member of the HBSS team litigating claims against GSK for its fraudulent marketing of the diabetes medication, Avandia. HBSS has been named lead counsel in this case.

> Member of the HBSS team litigating claims against the Commonwealth of Massachusetts for its failure to enforce the Endangered Species Act to protect the Northern Atlantic right whale.

## RECENT SUCCESS

> **Successful Third Circuit appeal of sealing orders in In re Avandia Marketing, Sales Practices and Products Liability Litigation.** Hannah briefed and argued the class plaintiffs' appeal of two district court orders sealing the entire summary judgment record. The Third Circuit issued a precedential opinion adopting the standard the plaintiffs urged for the public's common law right of access and vacated the district courts' orders. The Third Circuit also instructed the district court to consider the First Amendment argument the plaintiffs' advanced. In re Avandia Mktg., Sales Practices & Prod. Liab. Litig., 924 F.3d 662 (3d Cir. 2019). Hannah also successfully briefed the issue on remand to the United States District Court for the Eastern District of Pennsylvania: the Court unsealed all of the summary judgment records at issue. In re Avandia Mktg., Sales Practices & Prod. Liab. Litig., No. 07-MD-01871, 2020 WL 5358287 (E.D. Pa. Sept. 3, 2020).

> **Successful Third Circuit appeal of summary judgment ruling in In re Avandia Marketing, Sales Practices and Products Liability Litigation.** Hannah lead the team that briefed the class plaintiffs' appeal of the district court's grant of summary judgment in favor of the defendant. The Third Circuit issued a precedential opinion siding with the plaintiffs on all three issues presented in the appeal. The Third Circuit remanded the case to the district court and ordered further discovery for the plaintiffs.

> **$51.25 million class recovery in In re Restasis Antitrust Litigation.** Assisted in the litigation of claims against Allergan for engaging in an anticompetitive scheme to keep generic versions of the eye medication, Restasis, off the market. The alleged scheme included fraud on the U.S. Patent and Trademark Office, sham litigation against generic manufacturers, meritless citizen petitions to the Food and Drug Administration and sham transfer of patents to a Native American Tribe in an attempt to avoid invalidation. In re Restasis Antitrust Litigation, 18-md-2819, E.D.N.Y., ECF No. 50.

> **$94 million class recovery in In re Celebrex Antitrust Litigation.** Hannah was member of the HBSS team that litigated claims against Pfizer for fraudulently obtaining patents from the U.S. Patent and

HAGENS BERMAN SOBOL SHAPIRO LLP

ASSOCIATE

# Hannah Brennan

Trademark Office and then asserted those patents to delay generics competition in violation of federal antitrust law. The case settled mere weeks before trial. In re Celebrex (Celecoxib) Antitrust Litigation, 2:13-cv-361, E.D. Va., ECF Nos. 64, 455.

EDUCATION
> Yale Law School, J.D., 2013
> Brown University, B.A., 2009

## EXPERIENCE

> Prior to joining Hagens Berman, Ms. Brennan clerked for the Honorable Timothy B. Dyk of the United States Court of Appeals for the Federal Circuit and the Honorable Theodore McKee, Chief Judge of United States Court of Appeals for the Third Circuit.

> She was awarded a Yale Gruber Fellowship in Global Justice and Women's Rights to work for Public Citizen's Global Access to Medicines Program. At Public Citizen, she worked on a broad range of healthcare issues, including: negotiation of the intellectual property provisions of the Trans-Pacific Partnership Agreement, compulsory licensing of HIV medications in Peru, and policies for improving access to Hepatitis C medications for veterans, Native Americans and prisoners.

> In law school, Ms. Brennan worked in the Global Health and Justice Clinic, where she helped develop a human rights approach to intellectual property law. She also served in the Workers and Immigrants' Rights Advocacy Clinic, where she obtained a substantial settlement for a group of Latino construction workers with unpaid wage claims. She further represented Connecticut DREAMers in their legislative and regulatory campaigns to secure financial aid for undocumented students at Connecticut state universities.

> Prior to law school, Ms. Brennan served as Fulbright Scholar in Lima, Peru, where she researched labor rights abuses in the domestic housework industry and advocated for greater government regulation of this area.

## LEGAL ACTIVITIES

> Member, American Association for Justice

## RECOGNITION

> Charles G. Albom Prize for Excellency in Appellate Advocacy

## PUBLICATIONS

> Hannah Brennan, Unsealing Court Records: Key Learnings from the Third Circuit's Avandia Jurisprudence, American Association for Justice Trial Magazine (forthcoming).

> Hannah Brennan, Christine Monahan, Zain Rizva, & Amy Kapczynski, **Government Patent Use: How a Little Known Statute Can Bring Down Drug Prices and Transform Health**, 18 Yale J. of L. & Tech. 275 (2016).

> Hannah Brennan, **The Cost of Confusion: The Paradox of Trademarked Pharmaceuticals**, 22 Mich. Telecomm. & Tech. L. Rev. 1 (2016)

> Hannah Brennan & Burcu Kilic, **Freeing Trade at the Expense of Local Crop Markets?: A Look at the Trans-Pacific Partnership's New Plant Related Intellectual Property Rights From Human Rights Perspective**, Harv. Hum. Rts. J. Online (2015)

> Burcu Kilic, Hannah Brennan, & Peter Maybarduk, **What Is Patentable Under the Trans-Pacific Trade Partnership?**, 40 Yale J. Int'l L. Online 1 (2015)

> **Inside Views: The TPP's New Plant-Related Intellectual Property Provisions**, Intellectual Property Watch (Oct. 17, 2014)

> A Human Rights Approach to Intellectual Property and Access to Medicines, Yale Global Health and Justice Partnership

HAGENS BERMAN SOBOL SHAPIRO LLP

**ASSOCIATE**

# Hannah Brennan

**LANGUAGES**

› Spanish

**PERSONAL INSIGHT**

Hannah's favorite city is Lima, her favorite state is Vermont and her favorite 90s action movie is **The Fugitive**.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Rochella T. Davis

*Rochella is experienced in handling issues of first impression in complex matters.*

**CONTACT**
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1976 office
(617) 482-3003 fax
rochellad@hbsslaw.com

**YEARS OF EXPERIENCE**
> 3

**PRACTICE AREAS**
> Antitrust Litigation
> Pharmaceutical Fraud

**CLERKSHIPS**
> Supreme Court of the United
  States Virgin Islands

**BAR ADMISSIONS**
> New York

**EDUCATION**

> Suffolk University Law
  School, J.D., Trial & Appellate
  Advocacy Concentration with
  distinction, 2017, Journal of
  Trial & Appellate Advocacy

> Johns Hopkins University,
  M.S., 2022

> University of the Virgin Islands,
  B.A., summa cum laude, 2014

## CURRENT ROLE

> Associate, Hagens Berman Sobol Shapiro LLP

> Rochella focuses on nationwide  antitrust class actions. She is actively involved in class action suits challenging anticompetitive conspiracies among pharmaceutical manufacturers and anticompetitive conduct in other industries.

> Key member of a team of attorneys analyzing causation issues and developing generic entrant causation theories; instrumental in drafting, serving, and negotiating third-party discovery; actively involved in party discovery negotiations; and a part of the trial preparation team in In Re Glumetza Antitrust Litigation.

> Key role in drafting, serving, and negotiating discovery and now a member of a team of attorneys tasked with addressing privilege issues and investigating privilege claims in In Re Lantus (Insulin Glargine) Antitrust Litigation.

> Actively involved in preparing for and drafting key submissions, such as pleadings and motions in In Re Inclusive Access Antitrust Litigation (Student Textbook Price-Fixing Antitrust).

## EXPERIENCE

> Prior to joining Hagens Berman, Ms. Davis served as an appellate law clerk to Chief Justice Rhys S. Hodge of the Supreme Court of the United States Virgin Islands where she conducted legal research and analyzed issues of first impression.

> In law school, Ms. Davis represented criminal defendants accused of misdemeanors as a certified student attorney in the Suffolk Defenders Clinic.

## PRO BONO

> Suffolk University Law School Pro Bono Honors, 2017. Rochella completed 270 hours of pro bono service in law school.

## LEGAL ACTIVITIES

> American Bar Association, Antitrust Division

> New York Bar Association, Antitrust Division

> Virgin Islands Bar Association

## RECOGNITION

> Robert A. Fuchs Memorial Prize in Labor Law, 2016

## PUBLICATIONS

> Talent Can't Be Allocated: A Labor Economics Justification for No-Poaching Agreement Criminality in Antitrust Regulation, 12 Brook. J. Corp. Fin. & Com. L. 279 (2018).

> To Whom Should We Point Our Stylus?: Allocating the Burden of Review in E-discovery of Social Media Content, 22 Suffolk J. Trial & App. Advoc. 121 (2017).

## PERSONAL INSIGHT

When she's not vigorously representing her clients' interests, Rochella enjoys cooking and exploring food culture in new cities.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# John DeStefano

*Mr. DeStefano takes special pride in protecting the public against broad-based frauds and swindles and the corruption of honest enterprise.*

**CONTACT**
11 West Jefferson St.
Suite 1000
Phoenix, AZ 85003

(602) 224-2628 office
(602) 840-3012 fax
johnd@hbsslaw.com

**PRACTICE AREAS**
> Consumer Protection
> Commercial Litigation
> Privacy Rights
> Appellate Advocacy

**BAR ADMISSIONS**
> U.S. Supreme Court
> U.S. Court of Appeals, Ninth Circuit
> U.S. Court of Appeals, Tenth Circuit
> U.S. District Court, District of Arizona
> Supreme Court of Arizona

**EDUCATION**
> University of Arizona Law School, J.D., Senior Managing Editor, Arizona Law Review
> Harvard University, B.A., Classics

## CURRENT ROLE
> Associate, Hagens Berman Sobol Shapiro LLP
> Practice focuses on consumer, insurance, and antitrust class actions as well as appellate representation

## RECENT SUCCESS
> Obtained court approval of $400 million settlement to compensate Hyundai and Kia owners for misstatement of EPA fuel economy ratings. Settlement payments averaged $353 for Hyundai owners and $667 for Kia owners.
> Obtained appellate reversal of judgment for defendant in multimillion-dollar business ownership dispute
> In class action against Liberty Mutual insurance for deceptively reducing payments to accident victims for the value of their totaled vehicles, defeated motion to dismiss so that all claims can proceed

## EXPERIENCE
> Snell & Wilmer LLP 2009-2013
> American Inns of Court Pegasus Scholar 2012: study of commercial, media, and privacy law with barristers and judges in the U.K.
> U.S. District Court for the District of Arizona, Law Clerk to the Hon. Neil V. Wake 2008-2009
> U.S. Court of Appeals for the Ninth Circuit, Law Clerk to the Hon. William C. Canby, Jr. 2007-2008

## RECOGNITION
> Super Lawyers, Rising Star: Class Action/Mass Tort 2015 - 2017
> Arizona Foundation for Legal Services & Education, Top Pro Bono Attorneys in Arizona Award 2013

## NOTABLE CASES
> In re Pre-Filled Propane Tank Antitrust Litigation
> In re Hyundai & Kia Fuel Economy Litigation
> Jim Brown v. Electronic Arts Inc.
> In re NCAA Student-Athlete Name and Likeness Licensing Litigation
> Antonick v. Electronic Arts Inc.
> In re Swift Transportation Co., Inc.
> Represented an international human rights organization as amicus curiae in the U.S. Supreme Court case Moloney v. United States, opposing the enforcement of a foreign law enforcement subpoena for confidential academic research in the U.S. (pro bono)
> Olberg v. Allstate Insurance Co.

HAGENS BERMAN SOBOL SHAPIRO LLP

**ASSOCIATE**

# John DeStefano

> Lundquist v. First National Insurance Company of America

> Gunn v. Continental Casualty Co.

**LEGAL ACTIVITIES**
> American Association for Justice
> Program Chair (current), Treasurer (past), Lorna Lockwood American Inn of Court
> Volunteer Lawyers Program of Arizona

**PERSONAL INSIGHT**
When John's great-grandfather came from Italy to Boston, he lost his life savings to a man he met named Charles Ponzi. A century later, John takes special pride in protecting the public against broad-based frauds and swindles and the corruption of honest enterprise.

HAGENS BERMAN SOBOL SHAPIRO LLP



ASSOCIATE

# Rachel E. Fitzpatrick

*Ms. Fitzpatrick was a member of the trial team responsible for a $5.25 million dollar jury verdict on behalf of an Ohio plaintiff who was badly burned while trying to rescue her paraplegic son.*

**CONTACT**
11 West Jefferson St.
Suite 1000
Phoenix, AZ 85003

(602) 224-2636 office
(602) 840-3012 fax
rachelf@hbsslaw.com

**YEARS OF EXPERIENCE**
> 9

**PRACTICE AREAS**
> Complex Civil Litigation
> Consumer Fraud
> Mass Tort

**BAR ADMISSIONS**
> Arizona

**EDUCATION**
> Arizona State University, B.S., **magna cum laude,** 2007
> Arizona State University Sandra Day O'Connor College of Law, J.D., 2011

## CURRENT ROLE
> Associate, Hagens Berman Sobol Shapiro LLP
> Practice focuses on complex civil litigation and nationwide class actions, including consumer fraud and mass tort
> Ms. Fitzpatrick worked on behalf of student-athlete plaintiffs in the highly publicized cases **Keller v. Electronic Arts** and **In re NCAA Student-Athlete Name and Likeness Licensing Litigation**. The cases allege that video game manufacturer Electronic Arts, the National Collegiate Athletic Association and the Collegiate Licensing Company violated state right of publicity laws and the NCAA's contractual agreements with student-athletes by using the names, images and likenesses of the student athletes in EA's NCAA-themed football and basketball video games.

## RECENT SUCCESS
> In March 2012, Ms. Fitzpatrick was a member of the trial team responsible for a $5.25 million dollar jury verdict on behalf of an Ohio plaintiff who was badly burned while trying to rescue her paraplegic son from his burning home. The verdict is believed to be the largest in Columbiana County, Ohio history.

## NOTABLE CASES
> **Keller v. Electronic Arts Inc.**, U.S. Court of Appeals, Ninth Circuit, Case No. 10-15387
> **In re: NCAA Student-Athlete Name and Likeness Licensing Litigation**, U.S. District Court, ND Cal., Case No. 3:09-CV-01967-CW
> **Antonick v. Electronic Arts, Inc.**, U.S. District Court, ND Cal., Case No. 3:11-CV-01543-CRB

## PERSONAL INSIGHT
Ms. Fitzpatrick spent three years as a professional NFL cheerleader for the Arizona Cardinals and traveled with the squad to Iraq, Kuwait and the United Arab Emirates to perform for troops stationed overseas.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Anthea D. Grivas

*Working on behalf of consumers, continuing a long-standing dedication to public interest legal advocacy.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9307 office
(206) 623-0594 fax
antheag@hbsslaw.com

**YEARS OF EXPERIENCE**
> 19

**PRACTICE AREAS**
> Consumer Protection
> Anti-Trust
> Civil and Human Rights

**BAR ADMISSIONS**
> Washington

**EDUCATION**
> University of Washington
  School of Law, J.D., 2001
> University of Washington, B.A.
  Political Science, 1995

## CURRENT ROLE

> Associate, Hagens Berman Sobol Shapiro LLP

> Significant complex multi-party litigation experience with an emphasis on anti-trust price-fixing, product liability and nationwide class action cases on behalf of consumers. Ms. Grivas develops successful litigation theories and strategies, drafts legal motions and handles all aspects of large-scale multi-firm case discovery.

> Ms. Grivas' contributions to the firm have included:

- Member of **In re Automotive Parts Antitrust Litigation** team

- Drafted interrogatories and discovery motions, managed multi-firm review and oversaw in-house deposition preparation in **In re Toyota Motor Corp. Sudden, Unintended Acceleration** matter

- Extensive discovery work in an anti-trust case brought against several of the world's largest manufacturers of TFT-LCD products

- Part of team working on class-action litigation brought by collegiate student athletes who suffered concussions/traumatic brain injuries

- Litigation against a large, publicly traded medical waste disposal company on behalf of small businesses

- Nationwide class-action cases brought by homeowners with catastrophic property damage claims against makers of water connectors

- Litigation involving the world's largest fruit and vegetable company, claiming it misled consumers about its environmental record

## RECENT SUCCESS

> **NCAA Concussions** – part of HB legal team whose efforts resulted in settlement providing medical-monitoring program for current and former student-athletes, sweeping changes to the NCAA's approach to concussion treatment and prevention, and a $5 million concussion research fund.

> **In re Toyota Motor Corp. Sudden, Unintended Acceleration** – part of HB legal team that obtained record settlement on behalf of auto purchasers.

> **In re TFT-LCD (Flat Panel) Antitrust Litigation** – part of HB legal team that obtained settlement on behalf of TFT-LCD product purchasers.

> **Trabakoolas v. Watts Water Technologies, Inc.** – part of HB legal team that obtained settlement on behalf of customers.

> **Dole Bananas** – part of HB legal team whose efforts resulted in settlement on behalf of local communities in Guatemala.

HAGENS BERMAN SOBOL SHAPIRO LLP

ASSOCIATE

# Anthea D. Grivas

## RECOGNITION

› Ms. Grivas has been recognized by the University of Washington's law school for her commitment to advocacy on behalf of the public interest, and was awarded the university's annual dean's list award for high scholarship.

› Public Justice recognized the **In re Toyota Motor Corp. Sudden, Unintended Acceleration** team for its work on behalf of auto consumers.

## EXPERIENCE

› Ms. Grivas has a long-standing dedication to legal advocacy on behalf of traditionally underrepresented groups. She is a former co-chair of an organization that helps prepare Violence Against Women Act self-petitions on behalf of survivors of domestic violence, has represented refugees with disabilities in INS administrative proceedings, worked as an advocate for families receiving Temporary Assistance for Needy Families benefits, and has visited womens' shelters to conduct public assistance trainings.

› As a summer law clerk, Ms. Grivas worked on Arc of Washington vs. Quasim, a significant case brought on behalf of individuals with developmental disabilities. She was tasked with researching and constructing a legal argument against the state of Washington's claim of deliberative process privilege, and her work helped expose a state audit report containing what the Seattle Post-Intelligencer described as "damning revelations" regarding the state's limited oversight of services for disabled individuals.

› Ms. Grivas also has a strong technical background, incorporating over a decade of electronic discovery institutional knowledge, and has seven years of experience in litigation impacting the software industry, including work in the compliance phase of US v. Microsoft.

## LEGAL ACTIVITIES

› Northwest Immigrant Rights Project

› Solid Ground/Fremont Public Association

› Public Interest Law Association

› Women's Law Caucus

› Immigrant Families Advocacy Project

› American Civil Liberties Union of Washington

› KCBA Neighborhood Legal Clinics program

## PUBLICATIONS

› Author, "An Unreal Dream: The Impact of DNA Technology on the American Criminal Justice System," (DeNovo, XVI.IV, 2002)

## NOTABLE CASES

› Toyota Motor Corp. Sudden, Unintended Acceleration

› In re TFT-LCD flat panel litigation

› NCAA Concussions

## PERSONAL INSIGHT

Ms. Grivas is a lifelong musician who has performed at the Northwest Folklife Festival, Northwest Orchestra Festival, the Nippon Kan theater and as principal violinist and concertmaster with a local symphony orchestra.

HAGENS BERMAN SOBOL SHAPIRO LLP



ASSOCIATE

# Kristie A. LaSalle

*Ms. LaSalle is committed to combatting fraud, waste and abuse in the pharmaceutical industry.*

**CONTACT**
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 475-1951 office
(617) 482-3003 fax
kristiel@hbsslaw.com

**YEARS OF EXPERIENCE**
> 8

**PRACTICE AREAS**
> Antitrust Litigation
> Pharmaceutical Fraud

**CLERKSHIPS**
> Law Clerk, Staff Attorney's Office for the U.S. Court of Appeals for the Second Circuit

**BAR ADMISSIONS**
> Massachusetts
> New York

**COURT ADMISSIONS**
> U.S. Supreme Court
> U.S. Court of Appeals, First Circuit
> U.S. Court of Appeals, Third Circuit
> U.S. Tax Court
> U.S. District Court for the District of Massachusetts

**EDUCATION**
> Brooklyn Law School, JD, **magna cum laude,** 2012
> Swarthmore College, BA 2006

## CURRENT ROLE

> Associate, Hagens Berman Sobol Shapiro LLP
> Practice focuses on nationwide class-action litigation against pharmaceutical companies that violate antitrust, consumer protection and anti-fraud laws.
> Responsible for managing a team of lawyers across several law firms in In re Lantus Antitrust Litigation, No. 16-cv-16252 (D. Mass), a case challenging an anticompetitive scheme by drugmaker Sanofi-Aventis designed to prevent competition and keep insulin prices unaffordable.
> Litigating a case against generic drugmaker Ranbaxy (now Sun Pharmaceuticals) forchallenging a decade-long campaign of deceit regarding its ability to manufacture safe, effective drugs and follow the manufacturing regulations enforced by the FDA. Ms. LaSalle is responsible for developing the evidence of the fraud, and developing and successfully arguing a novel legal theory to meet the defendants' wrongdoing.
> Ms. LaSalle is regularly called upon to handle consequential briefing in cases involving especially complex or convoluted regulatory regimes at both the trial and appellate court levels.

## EXPERIENCE

> After law school, Ms. LaSalle served for two years as a law clerk in the Staff Attorney's Office for the U.S. Court of Appeals for the Second Circuit, where she handled motions practice and appeals of complex class-action litigation.

## RECOGNITION

> Order of the Barristers
> Scholarly Journal Writing Award

## PUBLICATIONS

> Kristie LaSalle, "The Other 99% of the Expressive Conduct Doctrine: the Occupy Wall Street Movement and the Importance of Recognizing the Contribution of Conduct to Speech," 18 Tex. J. on Civ. Rights & Civ. Liberties 1 (2013)
> Kristie LaSalle, "A Prescription for Change: Citizens United's Implications for Regulation of Off-Label Promotion of Prescription Pharmaceuticals," 19 J.L. Pol'y 867 (2011)
> Kristie LaSalle & Kristen Johnson, The Misapplication of the Presumption of Patent Validity, 33 Antitrust Health Care Chronicle 11 (2018)
> Lauren G. Barnes & Kristie A. LaSalle, Private Antitrust Claims Explained, presented at Am. Ass'n for Justice Annual Convention, Boston, July 27, 2017

## PERSONAL INSIGHT

Kristie is the unexpected combination of a performing improviser, competitive weightlifter and Ravenclaw.

HAGENS BERMAN SOBOL SHAPIRO LLP



ASSOCIATE
# Abbye Klamann Ognibene

*Ms. Ognibene believes in taking on corporations in the fight for plaintiffs' rights, including the right to online privacy and to fair pricing in medical care and consumer goods.*

**CONTACT**
55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 482-3700 office
(617) 482-3003 fax
rochellad@hbsslaw.com

**YEARS OF EXPERIENCE**
› 4

**PRACTICE AREAS**
› Antitrust Litigation
› Class Actions
› Consumer Rights

**CLERKSHIPS**
› Supreme Court of the United
  States Virgin Islands

**BAR ADMISSIONS**
› California
› District of Columbia
› New York

**COURT ADMISSIONS**
› U.S. District Court for the
  Northern District of California
› U.S. District Court for the
  Central District of California
› U.S. Court of Appeals, Ninth
  Circuit

**EDUCATION**
› University of Michigan, J.D.,
  cum laude, 2016
› University of Missouri
  Columbia, B.J., cum laude,
  2011

**CURRENT ROLE**
› Associate, Hagens Berman Sobol Shapiro LLP
› Core team member in Staley v. Gilead, which seeks to hold HIV drug manufacturers accountable for allegedly using their market power to artificially inflate prices for HIV medication and prevent safer medications from coming to market sooner.
› Involved in cutting-edge litigation in In re Humira (Adalimumab) Antitrust Litigation, alleging novel theories regarding the suppression of competition for the blockbuster biologic drug, Humira.

**EXPERIENCE**
› Prior to joining Hagens Berman, Ms. Ognibene was an associate at Pierce Bainbridge Beck Price & Hecht, where she helped launch a class-action practice group.
› She also worked on cutting-edge class-action litigation at Lieff Cabraser Heimann & Bernstein, focusing on digital privacy and antitrust cases.
› While in law school, Abbye worked for more than two years as a law clerk to the legal team of DeBoer v. Snyder, consolidated sub nom. Obergefell v. Hodges, which guaranteed the nationwide right to marry for same-sex couples.

**LEGAL ACTIVITIES**
› Member, American Association for Justice

**RECOGNITION**
› Robert A. Fuchs Memorial Prize in Labor Law, 2016

**PERSONAL INSIGHT**
Before attending law school, Abbye worked in radio journalism in her home state of Missouri. She spends her time outside of the office with her family and two large rescue dogs, preferably in Vermont with a glass of whiskey in one hand and a good book in the other.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Christopher R. Pitoun

*Christopher R. Pitoun has focused on consumer litigation since graduating from law school and has gained broad experience representing individuals, municipalities and small businesses in all forms of complex litigation.*

**CONTACT**

301 North Lake Ave.
Suite 920
Pasadena, CA 91101

(213) 330-7148 office
(213) 330-7152 fax
chrisp@hbsslaw.com

**YEARS OF EXPERIENCE**
› 10

**PRACTICE AREAS**
› Consumer Protection
› Intellectual Property

**BAR ADMISSIONS**
› California
› U.S. District Court, Central District of California
› U.S. District Court, Northern District of California
› U.S. District Court, Southern District of California
› U.S. District Court, Eastern District of California

**EDUCATION**
› Loyola Law School, Los Angeles, J.D. 2011, Note and Comment Editor, Loyola of Los Angeles Entertainment Law Review
› University of Chicago, M.A. 2005
› University of Michigan, B.A., with High Honors, 2004
› London School of Economics, General Course, 2003

## CURRENT ROLE
› Associate, Hagens Berman Sobol Shapiro LLP
› Practice focuses on class actions and other complex litigation

## EXPERIENCE
› Prior to joining Hagens Berman, Chris worked as an associate at a large plaintiff's firm gaining extensive experience representing plaintiffs in business litigation involving copyright and trademark disputes, breach of contract claims and breach of fiduciary duty claims. He also worked on a number of nationwide class actions involving products liability matters in the pharmaceutical and construction industries.
› Office of the Attorney General of California, Business and Tax Division, Winter 2010

## LEGAL ACTIVITIES
› Federal Bar Association
› American Association For Justice (AAJ)
› Consumer Attorneys Association of Los Angeles (CAALA)

## NOTABLE CASES
› *Ford F-150 & Ranger Fuel Economy and Sales Practices Litigation*
› *Sake House Restaurants Racial Discrimination Litigation*
› *Fiat Chrysler Gear Shifter Rollaway, Litigation*
› *Countrywide Financial, et al. Pretextual Appraisal Litigation*
› *EZconn Corp., Litigation*
› *Students v. USC and Dr. Tyndall*

## PERSONAL INSIGHT
› Prior to attending law school, Chris taught English and French to high school students in China.
› Chris later decided to become a lawyer while marketing the film "Michael Clayton."

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Whitney K. Siehl

*Ms. Siehl works tirelessly and has achieved millions of dollars in settlements for her clients. Her passion and empathy is unmatched.*

**CONTACT**

455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611

(708) 628-4963 office
(708) 628-4950 fax
whitneyk@hbsslaw.com

**YEARS OF EXPERIENCE**
> 8

**PRACTICE AREAS**
> Civil & Human Rights Litigation
> Class Actions
> Employment Litigation
> Personal Injury Litigation
> Sexual Abuse & Harassment

**BAR ADMISSIONS**
> Illinois

**COURT ADMISSIONS**
> United States District Court for the Northern District of Illinois
> United States Court of Appeals for the Seventh Circuit
> Supreme Court of the United States

**CLERKSHIPS**
> Extern for Judge George C. Smith on the Southern District of Ohio

**EDUCATION**
> The Ohio State University Moritz College of Law, J.D., cum laude, 2013
> Northwestern University, B.A., 2009

## CURRENT ROLE

> Associate, Hagens Berman Sobol Shapiro LLP
> Ms. Siehl's Plaintiffs' litigation practice focuses on complex class-action and individual cases in the areas of sexual abuse, sexual harassment, and sports law
> Represents an actress and entertainment industry class against The Weinstein Company, Harvey Weinstein and related companies for racketeering and sexual assault
> Represents students and alumnae of the University of Southern California in a class-action lawsuit against the university and Dr. George Tyndall for his alleged decades-long sexual abuse of patients

## EXPERIENCE

> Prior to joining Hagens Berman, Ms. Siehl was an associate in the Chicago office of a well-respected Plaintiffs' firm representing families and children in birth injury and birth trauma litigation nationwide.
> She worked previously at another Chicago firm where she gained experience in all aspects of civil litigation with a focus on medical malpractice and professional liability matters.

## RECENT SUCCESS

> Ms. Siehl played a significant role in a $4 million settlement for a child who suffered severe and permanent brain damage due to the medical providers' delay in recognizing a placental abruption.
> Assisted in a $3.5 million settlement for a child with a hypoxic-ischemic brain injury that resulted from too much Pitocin and a physician's failure to recognize fetal distress.

## RECOGNITION

> 2020, 2021 Rising Star, Super Lawyers Magazine for Class Actions
> 2019 Rising Star, Super Lawyers Magazine for Plaintiffs' Personal Injury
> 2017 Award for Excellence in Pro Bono Service from the United States District Court for the Northern District of Illinois and the Chicago Chapter of the Federal Bar Association
> 2013 Member of National Champion Team for Sutherland Cup National Constitutional Law Moot Court Competition
> CALI Award for Highest Grade in Legislation Clinic, Dispute Systems Design, and Comparative Legal Professions
> Named a Public Service Fellow with Dean's Special Recognition

## LEGAL ACTIVITIES

> Women's Bar Association of Illinois
  - Officer Positions
  - Financial Secretary - 2020 - 2021
  - Recording Secretary - 2019 - 2020
  - Board of Directors - 2017 - Present
> American Association for Justice Birth Trauma Litigation Group, Member

HAGENS BERMAN SOBOL SHAPIRO LLP

**ASSOCIATE**

# Whitney K. Siehl

> Illinois Trial Lawyers Association, Member

## ACTIVITIES

> Professional Board Member, PAWS Chicago – the Midwest's largest no-kill animal shelter; TEAM PAWS Marathon Team 2015-present

## PRO BONO

> In 2017, Ms. Siehl received an Award for Excellence in Pro Bono Service from the United States District Court for the Northern District of Illinois and the Chicago Chapter of the Federal Bar Association for her dedication to representing underserved individuals in employment discrimination matters.

## PUBLICATIONS

> #Us Too: Gender Inequality in the Legal Profession, American Association for Justice, Birth Trauma Litigation Group Newsletter, Lead Article, February 2018.

## PERSONAL INSIGHT

Whitney is an avid golfer and chairs the annual golf outing for the Women's Bar Association of Illinois. She was previously a member of the Miami University cross country and track teams, where the cross country team was selected as NCAA Academic All-Americans. She serves as a pace group leader for Chicago Marathon training and with the 2021 Chicago Athlete Magazine Ambassador Team, helps inspire busy professionals to live healthier lives. To date, she has completed 10 marathons, a half Iron distance triathlon, and numerous short course triathlons including the 2019 Escape from Alcatraz Triathlon in San Francisco.



**ASSOCIATE**

# Emilee Sisco

*Ms. Sisco practices in the areas of sports litigation, antitrust and consumer protection. As a former Division I athlete, she has worked on the firm's cases against the NCAA, furthering the rights of college-athletes across the nation.*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
emilees@hbsslaw.com

**YEARS OF EXPERIENCE**
> 5

**PRACTICE AREAS**
> Antitrust Litigation
> Consumer Rights
> Sports Litigation

**BAR ADMISSIONS**
> Washington

**COURT ADMISSIONS**
> U.S. District Court, Western
  District of Washington

**EDUCATION**
> Seattle University School of
  Law, J.D.
> University of Oregon, B.A.

**CURRENT ROLE**
> Associate, Hagens Berman Sobol Shapiro LLP

**EXPERIENCE**
> Law Clerk for Washington State Office of the Attorney General – Antitrust Division

**LEGAL ACTIVITIES**
> During 2L and 3L years in law school, Ms. Sisco was a fulltime volunteer intern for the WSBA Moderate Means Program. She volunteered more than 250 hours of pro bono service during law school.

**RECOGNITION**
> Honoree for Outstanding Antitrust Litigation Achievement in Private Law Practice, American Antitrust Institute, 2019

**RECENT CASES**
> *Namoff v. Fleishman & Shapiro, P.C. et al*
> *In re: National Prescription Opiate Litigation*
> *In re: NCAA Athletic Grant-In-Aid Cap Antitrust Litigation*
> *In re: General Motors LLC Ignition Switch Litigation*

**LANGUAGES**
> Latin

**PERSONAL INSIGHT**

Ms. Sisco was a Division I volleyball athlete for the University of Oregon and University of Colorado. She was a member of the U.S. Women's Volleyball A3 team and was also a three-sport varsity athlete throughout high school, earning top 10 state finishes in two events at the WIAA Track & Field Championship.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Danielle Smith

*Ms. Charles is an investor and consumer rights attorney with a background in litigation and public entities.*

**CONTACT**
715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3038 office
(510) 725-3001 fax
daniellec@hbsslaw.com

**YEARS OF EXPERIENCE**
> 9

**BAR ADMISSIONS**
> California

**PRACTICE AREAS**
> Class Actions
> Complex Civil Litigation
> Consumer Rights
> Investor Fraud
> Securities

**COURT ADMISSIONS**
> U.S. District Court for the Northern District of California
> U.S. District Court for the Southern District of California

**EDUCATION**
> Harvard Law School, J.D., 2012
> Columbia University, B.A., 2009

**CURRENT ROLE**
> Associate, Hagens Berman Sobol Shapiro

**RECENT CASES**
> BlackRock iShares ETF August 24, 2015 Flash Crash Litigation
> **Colman et al. v. Theranos, Inc., et al.,** Case Number: 5:16-cv-06822

**ACTIVITIES**
> Oakland NAACP – Legal Redress Chair
> Board Member, Conservatory of Vocal and Instrumental Arts, Oakland, CA

**LEGAL ACTIVITIES**
> Member, Alameda County Bar Association

**PRESENTATIONS**
> California School Boards Association - Annual Workshop for California Council of School Attorneys, December 2015.

**PERSONAL INSIGHT**
When she's not working to protect her clients' interests, Danielle enjoys biking, movies and volunteering.

HAGENS BERMAN SOBOL SHAPIRO LLP



ASSOCIATE

# Shelby R. Smith

*Shelby has dedicated her career to serving vulnerable victims of violent crimes.*

## CONTACT

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9370 office
(206) 623-0594 fax
shelby@hbsslaw.com

## YEARS OF EXPERIENCE
> 19

## PRACTICE AREAS
> Personal Injury Litigation
> Sports Concussions
> Social Work Negligence
> Nursing Home/Adult Family Home Negligence
> Daycare/School Negligence
> Civil Rights
> Privacy Rights
> Consumer Protection

## BAR ADMISSIONS
> Washington
> U.S. District Court, Western District of Washington

## EDUCATION
> Seattle University, J.D., Member, Public Interest Law Society, 2000
> University of Washington, B.A., **cum laude**, Sociology, 1996

## CURRENT ROLE
> Associate, Hagens Berman Sobol Shapiro LLP
> Prosecutes personal injury cases and class action cases on behalf of consumers
> Currently represents student-athletes in personal injury litigation pertaining to concussions/traumatic brain injuries suffered during sporting activities
> Currently represents victims who have suffered severe personal injuries due to their mothers ingesting thalidomide during pregnancy in the late 1950's and early 1960's without knowing that the drug had not been approved by the FDA
> She continues to represent victims of domestic violence and sexual assault to obtain protection orders so that their abusers cannot have any contact with them
> Also represents crime victims who wish to keep their counseling records private during criminal Proceedings

## NOTABLE CASES
> **Volkswagen Emissions Defect Litigation**
> **Mercedes BlueTEC Emissions Litigation**
> **GM Ignition Switch Recall**
> **Corvette Overheating**
> **Harvey Weinstein Sexual Harassment RICO**
> **USC and Dr. George Tyndall Sexual Abuse**

## EXPERIENCE
> Litigation associate, Williams Kastner, where she planned and executed a civil caseload involving defense of physicians, hospitals, dentists and other healthcare providers. While at Williams Kastner, Ms. Smith developed successful litigation strategies, handled case discoveries, secured depositions, managed trial preparation, drafted and argued legal motions, and conducted voir dire and jury trials.
> Prior to working at Hagens Berman, Ms. Smith worked for 10 years at the King County Prosecuting Attorney's Office, working on cases in a diverse set of areas, including the sexual assault, violent crime, district court, domestic violence, felony filing and special drug units. During her 10 years as a prosecutor, Ms. Smith tried over 100 felony jury trials. She spent five years in the Domestic Violence Unit and Special Assault Unit where she handled hundreds of cases involving physical and sexual abuse of children and adults.

## LEGAL ACTIVITIES
> Consistent commitment to pro bono work and services for victims of domestic violence and sexual assault

## PERSONAL INSIGHT
Shelby Smith was born and raised in Seattle, and graduated from Garfield High School—which also boasts Quincy Jones and Jimi Hendrix as alums. She has a passion for live music and fashion, and has never met a sport she did not enjoy competing in: while raising three children and practicing law, Shelby plays on competitive indoor and outdoor soccer teams, and runs at least one marathon and two half-marathons every year.



**ASSOCIATE**

# Jessica Thompson

*Jessica began her legal career at an AMLaw 100 firm representing Fortune-ranked corporations in antitrust, intellectual property and financial services industries. Though grateful for the intense training that those matters provided, Jessica is proud to now be working for the good guys.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 268-9398 office
(206) 623-0594 fax
jessica@hbsslaw.com

**YEARS OF EXPERIENCE**
> 11

**PRACTICE AREAS**
> Commercial Litigation
> Class Actions

**BAR ADMISSIONS**
> District of Columbia
> Maryland
> Washington

**EDUCATION**
> University of Baltimore School of Law, Baltimore, Maryland, J.D. **magna cum laude**, 2010
  - Honors: Class Rank 21/333; G.P.A. 3.68
  - Honors: Highest Grade in the Class Award, Evidence
  - Law Review: Staff Editor, University of Baltimore Law Review
> University of Baltimore, Baltimore, Maryland, B.A. **cum laude**, 2005
  - Major: Community Studies and Civic Engagement

## CURRENT ROLE
> Associate, Hagens Berman Sobol Shapiro LLP
> Practice focuses on complex consumer protection cases, primarily within the realms of automotive and emissions litigation
> Ms. Thompson is currently involved in many of the firm's high-profile auto cases, including litigation against General Motors for faulty ignition switches that are linked to more than 120 fatalities, and emissions-cheating cases brought against Mercedes, Fiat Chrysler and GM. She worked on the Volkswagen CleanDiesel emissions lawsuits brought on behalf of consumers and of franchise dealers.

## RECENT SUCCESS
> Conducting internal investigations on behalf of financial services company into compliance with business conduct rules such as trade allocation and trade errors
> Defending mobile merchandiser against consumer class actions filed throughout the country alleging unauthorized charges to cell phone customers
> Representing health insurance providers in a multidistrict antitrust suit consolidated in the Northern District of Alabama
> Represented chemical manufacturer in trade secret and contract case against competitor. Won temporary restraining order in Michigan state court.
> Defended international hospitality company in contract suit challenging its national sales program

## EXPERIENCE
> Crowell & Moring LLP, Washington, D.C., Associate, 2011 - 2014
> Cadwalader, Wickersham & Taft LLP, Washington, D.C., Associate, 2011
> Howrey LLP, Washington, D.C., Litigation Associate, 2010 - 2011
> Howrey LLP, Washington, D.C., Summer Associate, 2009
> Montgomery County State's Attorney's Office, Rockville, MD, Student Attorney, 2010

## ACTIVITIES
> Webinar: "Garden Leaves and Other Strategies to Protect Trade Secrets When Losing Employees," Crowell & Moring, March 28, 2013 - Present
> Workshop: "Don't Sign that Yet!," Crowell & Moring, Washington, D.C., March 5, 2013 - Present

## PUBLICATIONS
> "The ITC Can Play a Critical Role in Combating International Trade Secret Theft," Intellectual Property Today, Jan. 20, 2012
> Client Alerts & Newsletters:

HAGENS BERMAN SOBOL SHAPIRO LLP

**ASSOCIATE**

# Jessica Thompson

- "Consensus Grows as Congress Continues to Refine Its Efforts to Create a Federal Civil Cause of Action For Certain Trade Secret Theft," Regulatory Alert (May 12, 2014)
- "Federal Trade Secret Reform Continues With Two New Attempts to Improve Protection," Regulatory Alert (July 22, 2013)
- "Supreme Court Rejects Attempt by Class Action Plaintiff to Plead Around Federal Court Jurisdiction," (Mar. 22, 2013)

**PERSONAL INSIGHT**

Jessica comes from a working-class Baltimore family. Though she has dutifully relearned the pronunciation of words like water (not "wooder") and wash (not "warsh"), she continues to inquire about "dem O's" and refuses to participate in the singing of "Shout" at the seventh-inning stretch. It's an abomination.



**ASSOCIATE**

# Breanna Van Engelen

*Breanna advocates on behalf of consumers in complex litigation, including in antitrust cases and cases involving unfair competition.*

**CONTACT**

1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
breannav@hbsslaw.com

**PRACTICE ARES**
› Antitrust Litigation
› Consumer Rights

**BAR ADMISSIONS**
› Washington

**EDUCATION**
› University of Michigan Law
  School, J.D.
› Washington State University,
  B.A., **magna cum laude**

**CURRENT ROLE**

› Associate, Hagens Berman Sobol Shapiro LLP

**EXPERIENCE**

› Prior to joining Hagens Berman, Breanna was an associate at K&L Gates LLP in Seattle, where she focused on Internet and technology law. Breanna took one of the first electronic impersonation cases in Washington state to trial.  At trial, she secured an $8.9 million dollar verdict for her clients – the largest verdict ever awarded to a non-celebrity in an electronic impersonation/invasion of privacy case.

**MEDIA INTERVIEWS**

› Brooke Jarvis, **How One Woman's Digital Life Was Weaponized Against Her**, WIRED (Nov. 11, 2017, 6:00 AM) (https://www.wired.com/story/how-one-womans-digital-life-was-weaponized-against-her/)

**PRESENTATIONS**

› "Taking the Distribution of Intimate Images to Trial,"  Presentation at 9th Annual Domestic Violence Symposium, Seattle, WA, Sept. 2017

**PERSONAL INSIGHT**

Breanna grew up in Idaho, where she learned to ski in the winter and race horses on mountain trails in the summer. Before becoming an attorney, Breanna taught at a pre-school in eastern Washington. When she's not working, you can find Breanna on her parents' ranch in Texas, taking care of the land and snuggling animals.

HAGENS BERMAN SOBOL SHAPIRO LLP



ASSOCIATE

# Mark Vazquez

*During law school, Mark served as an editor for the DePaul Law Review, graduated from the top of his class, and earned the CALI Excellence for the Future Award in all five of his legal writing and trial advocacy courses.*

**CONTACT**

455 N. Cityfront Plaza Drive
Suite 2410
Chicago, IL 60611

(708) 628-4962 office
(708) 628-4950 fax
markv@hbsslaw.com

**YEARS OF EXPERIENCE**
› 8

**BAR ADMISSIONS**
› Illinois

**CLERKSHIPS**
› Hon. John Z. Lee, Northern District of Illinois
› Hon. Jesse G. Reyes, Illinois Appellate Court, First District

**EDUCATION**
› DePaul University College of Law, J.D., **summa cum laude**, 2012
› Editor, DePaul Law Review
› University of Chicago, B.A., 2006

**CURRENT ROLE**

› Associate, Hagens Berman Sobol Shapiro LLP

**EXPERIENCE**

› Mark comes to Hagens Berman with a variety of clerkship experience, having clerked for both Judge John Z. Lee at the federal trial level and Justice Jesse G. Reyes at the state appellate level.

› During law school, Mark served as an editor for the DePaul Law Review, graduated from the top of his class, and earned the CALI Excellence for the Future Award in all five of his legal writing and trial advocacy courses.

**PUBLICATIONS**

› People v. Kladis and the Illinois Courts' Treatment of Evidence Spoliation by Law Enforcement, Illinois State Bar Association Criminal Justice Newsletter, Vol. 56, No. 1 (August 2012)

**PERSONAL INSIGHT**

An avid musician, Mark has been playing bass and guitar for various rock, blues, jazz, and country acts since he was in grade school. You can frequently hear him alongside his father at bar association events throughout Chicago—that is, should you be able to hear anything in a crowded room full of lawyers.



**ASSOCIATE**

# Gordie Verhovek

*Gordie advocates for the rights of children, developmentally disabled adults and other vulnerable citizens who have been subjected to abuse, neglect or exploitation.*

**CONTACT**

55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(206) 623-7292 office
(206) 623-0594 fax
gordiev@hbsslaw.com

**YEARS OF EXPERIENCE**
> 5

**BAR ADMISSIONS**
> Washington

**PRACTICE AREAS**
> Personal Injury

**EDUCATION**
> University of California, Berkeley, J.D., 2014
> Washington State University, B.A., magna cum laude, 2010

**CURRENT ROLE**
> Associate, Hagens Berman Sobol Shapiro LLP

**EXPERIENCE**
> Prior to joining Hagens Berman, Gordie was an associate at K&L Gates LLP in Seattle.

**PUBLICATIONS**
> Co-Author, "The Political Foundations of Miranda v. Arizona and the Quarles Public Safety Exception," 19 Berkeley Journal of Criminal Law 206 (2014)

**PERSONAL INSIGHT**
Gordie grew up in Seattle and attended O'Dea High School. He is a former college football player turned medium-distance runner.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Bradley J. Vettraino

*Mr. Vettraino focuses on enforcing the antitrust laws against pharmaceutical monopolists and has spent his entire career challenging corporate misconduct.*

**CONTACT**

55 Cambridge Parkway
Suite 301
Cambridge, MA 02142

(617) 482-3700 office
(617) 482-3003 fax
bradleyv@hbsslaw.com

**YEARS OF EXPERIENCE**
> 7

**BAR ADMISSIONS**
> Illinois
> Massachusetts
> Missouri

**COURT ADMISSIONS**
> U.S. District Court, District of Massachusetts
> U.S. District Court, Southern District of Illinois

**EDUCATION**
> Washington University in St. Louis School of Law, J.D., 2013
> Metropolitan State University of Denver, B.A., 2009

## CURRENT ROLE

> Associate, Hagens Berman Sobol Shapiro LLP
> Practice focuses on pharmaceutical antitrust litigation and prosecuting other healthcare-related fraud.
> Core member of the team litigating In re Zetia (ezetimibe) Antitrust Litigation, MDL No. 2836 (E.D. Va.), a federal antitrust suit against Merck & Co and Glenmark Pharmaceuticals alleging the two unlawfully agreed to delay access to generic ezetimibe for years, resulting in billions in overcharges to purchasers.
> Responsible for day-to-day management of in In re Lantus Direct Purchaser Antitrust Litigation, 16-cv-12652 (D. Mass), alleging that Sanofi-Aventis wrongfully listed and asserted patents, unlawfully extending its monopoly over its multi-billion dollar per-year injectable insulin glargine product, Lantus.
> Core member of the team litigating antitrust claims against Amgen and Teva in In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litigation, which alleges alleging a multi-faceted market allegation scheme.
> Instrumental in overcoming motions to compel arbitration against class representatives in multiple cases.

## RECOGNITION

> Rising Star, Super Lawyers Magazine
> Upon graduating law school, Mr. Vettraino received the Dan Carter-Earl Tedrow Memorial Award, as the student who most embodied the aims of the legal profession.

## LEGAL ACTIVITIES

> Member, American Association For Justice

## EXPERIENCE

> Before joining Hagens Berman, Mr. Vettraino was an associate at a nationwide class-action firm, where he prosecuted numerous securities, merger and acquisition, and consumer class actions on behalf of both individuals and large public pension funds.
> After graduating from Washington University in St. Louis School of Law in 2013, Mr. Vettraino worked for two preeminent toxic tort and products liability firms representing individuals harmed by corporate negligence and greed.

## PERSONAL INSIGHT

When not driving his wife crazy by singing the same five songs to their infant son on repeat, Brad enjoys spending his free time fly fishing (with limited success).

HAGENS BERMAN SOBOL SHAPIRO LLP



ASSOCIATE

# Ted Wojcik

*Ted is devoted to working on behalf of those harmed by corporate misconduct, and has experience advocating for individuals in several contexts.*

**CONTACT**
1301 Second Avenue
Suite 2000
Seattle, WA 98101

(206) 623-7292 office
(206) 623-0594 fax
tedw@hbsslaw.com

**YEARS OF EXPERIENCE**
› 5

**BAR ADMISSIONS**
› Georgia

**CLERKSHIPS**
› Judge Mark H. Cohen, U.S. District Court for the Northern District of Georgia, Atlanta, GA, 2016-2018
› Judge Marjorie Allard, Alaska Court of Appeals, Anchorage, AK, 2015-2016

**EDUCATION**
› Yale Law School, J.D., 2015
› Dartmouth College, A.B., 2011, *magna cum laude*

**CURRENT ROLE**

› Associate, Hagens Berman Sobol Shapiro LLP

**EXPERIENCE**

› Prior to joining Hagens Berman, Ted served as a clerk to U.S. District Judge Mark H. Cohen, and prior to that, for Judge Marjorie Allard in the Alaska Court of Appeals.

› During law school, Ted interned for the Alaska Public Defender Agency in Palmer, Alaska, and the New Orleans City Attorney's Office. He also worked as a student attorney in the landlord/tenant and immigration legal services clinics, and was an editor for the Yale Law Journal.

› Before law school, Ted worked for a year as a high school teacher in the Marshall Islands.

**PERSONAL INSIGHT**

A Maine native and recent Seattle transplant, Ted is working hard to master the intricacies of composting and to remember that the ocean lies to the west now, not the east.

HAGENS BERMAN SOBOL SHAPIRO LLP



**ASSOCIATE**

# Wesley A. Wong

*Mr. Wong is an investor rights attorney who assists in the development and prosecution of securities class-action cases, derivative actions and opt-out litigation. Mr. Wong has experience working in all stages of litigation, including at trial.*

**CONTACT**

715 Hearst Ave.
Suite 202
Berkeley, CA 94710

(510) 725-3000 office
(510) 725-3001 fax
wesleyw@hbsslaw.com

**YEARS OF EXPERIENCE**
› 2

**PRACTICE ARES**
› Investor Fraud
› Securities

**INDUSTRY EXPERIENCE**
› General Civil Litigation
› Complex Civil Litigation
› Class Actions
› Financial Services Regulatory Compliance

**BAR ADMISSIONS**
› California

**COURT ADMISSIONS**
› U.S. District Court for the Eastern District of California
› U.S. District Court for the Northern District of California

**EDUCATION**
› University of San Francisco School of Law, J.D., 2016
› San Francisco State University, B.S., cum laude, 2012

## CURRENT ROLE
› Associate, Hagens Berman Sobol Shapiro LLP
› Mr. Wong's practice focuses on securities litigation.

## RECENT SUCCESS
› Mr. Wong represented and defended a major rapid transit public transportation system serving the San Francisco Bay Area in a $75 million breach of contract and implied covenant of good faith/fair dealing case at trial. He successfully tried the case to verdict as a key member of the trial team and obtained a complete defense verdict.

## EXPERIENCE
› Litigated a variety of cases at all stages of litigation, including at trial
› Worked in the financial services industry as an analyst prior to law practice
› Prior experience working with banking industry regulators to resolve regulatory compliance matters

## ACTIVITIES
› The Risk Management Association, Golden Gate Chapter, Young Professionals Board Member 2017-2018

## LEGAL ACTIVITIES
› Asian American Bar Association of the Greater Bay Area

## PERSONAL INSIGHT
When he's not practicing law, Wesley enjoys writing, directing and producing short films and music videos. Wesley has worked with electronic dance music and hip hop music artists in the management, production, dealmaking and financing of various projects.

U.K. Legal Team



CO-MANAGING DIRECTOR, HAGENS BERMAN UK LLP

# Michael J. Gallagher Jr.

*Michael, through his understanding of regulatory and legal issues, serves diverse and global clients seeking to enforce their rights against well-financed corporations.*

**CONTACT**

Hagens Berman UK LLP
10 Finsbury Square
Finsbury, London
EC2A 1AF

+00-1-332-334-0334 office
+00-1-206-623-0594 fax
michaelg@hbsslaw.com

**YEARS OF EXPERIENCE**
> 19

**PRACTICE AREAS**
> Antitrust & Competition
> Automotive Litigation
> Consumer Rights
> Group Litigation
> Investor Fraud

**INDUSTRY EXPERIENCE**
> Finance
> Management and
  Administration

**BAR ADMISSIONS**
> Foreign Registered Attorney,
  England and Wales
> New York
> Pennsylvania

**COURT ADMISSIONS**
> Foreign Registered Attorney in
  England and Wales
> Sixth Circuit Court of Appeals
> U.S. District Courts for the
  Eastern, Northern, Southern
  and Western Districts of New
  York
> U.S. District Courts for the
  Eastern, Middle and Western
  Districts of Pennsylvania

**CURRENT ROLE**

> Co-Managing Director and Partner, Hagens Berman UK LLP

> Michael's work focuses on competition litigation, group litigation, and consumer protection, as well as building the firm's practice offerings for its global clients.

**CAREER HIGHLIGHTS**

> In Re Dealer Management Systems

> Sullivan v. Barclays (Euribor)

> In Re Libor-Based Financial Instruments

**RECENT SUCCESS**

> Mr. Gallagher supported, now-Senator Elizabeth Warren, and the Congressional Oversight Panel, in reviewing the U.S. Department of the Treasury's use of the Troubled Asset Relief Program's funds by overseeing the Treasury's actions, assessing the impact of spending to stabilize the economy, evaluating market transparency and ensuring effective foreclosure mitigation efforts.

**EXPERIENCE**

> Prior to joining Hagens Berman, Michael was a partner at multiple prominent plaintiff law firms, where he represented plaintiffs in multiple international antitrust and consumer protection litigations in various jurisdictions (each case valued in excess of $500 million) and lead a team of partners and associates litigating those actions.

> Mr. Gallagher also was responsible for administration and development of United Kingdom and European Union global offices, doing so with a focus on diversity and operational improvements.

> His litigation work focuses on complex litigation extensively in finance and commodity markets.

**PRO BONO**

> Mr. Gallagher provides Pro Bono services to the Institute for Human Identity, one of the oldest LGBTQ affirming therapy sites in the country. He regularly volunteers his service for issues of social justice including immigration rights support, diversity, equity and inclusion.

**LEGAL ACTIVITIES**

> Pure Equitas International Consultancy – Board Member and Advisor

> Member, AAJ Antitrust Subcommittee

CO-MANAGING DIRECTOR

# Michael J. Gallagher Jr.

**CLERKSHIPS**

> Sixth Circuit Court of Appeals, Honorable Helene N. White, 2013 - 2014
> U.S. Securities and Exchange Commission, Law Clerk for the Division of Enforcement - Trial Unit, May 2012 - September 2013) under Chairperson Mary Schapiro
> Antitrust Division of the U.S. Department of Justice, September 2010 - January 2011

**EDUCATION**

> Rutgers University Law School, Camden, J.D., 2011 Lax Scholar and Kaplan Scholar
> Franklin and Marshall College, B.A. in International Business Relations and Non-Profit Management
> Additional coursework in finance and management from Wharton School of Business at the University of Pennsylvania, Fox School of Business at Temple University, and Tohoku Gaukin University

## PUBLIC SERVICE

> Trustee, David Adamany Trust, 2016 – Present

> Board Member, New York Civil Liberties Union, 2015-2018; Investment Committee member, 2016-2018

> Supporter, Project HOME

## RECOGNITION

> Pennsylvania Governor's Award for Community Service

> American Civil Liberties Union's Pennsylvania Advocacy Award

## NOTABLE CASES

> In Re Dealer Management Systems Antitrust Litigation

> Sullivan v. Barclays (Euribor) Commodities Litigation

> In Re Libor-Based Financial Instruments Antitrust Litigation

> In re Term Commodities Cotton Futures Litigation

> Sonterra Capital Master Fund, LTD. V. Barclays Bank

> In re Aluminum Warehousing Antitrust Litigation

> United States of America ex rel., Beverly Brown v. Celgene Corporation

> In re Keurig Green Mountain Coffee Antitrust Litigation

> In re Lithium Ion Batteries Antitrust Litigation

> In re Dole Food Co., Inc., Stockholder Litigation

> In re London Silver Market, Ltd. Antitrust Litigation

> In re Commodity Exchange, Inc. Gold Futures and Options Trading Litigation

> Castro v. Sanofi Pasteur, Inc. (re Menactra)

> In re American Express Anti-Steering Rules Litigation

> In re Longtop Financial Technologies Limited Securities Litigation

> In re Crude Oil Commodity Futures Litigation

## PERSONAL INSIGHT

Michael's husband is a former Broadway dancer who is now a psychotherapist. In addition to having two left feet, Michael is regularly psychoanalyzsed every time he does not put away the dishes. However, because of being married to a psychotherapist, Michael is regularly reminded interpersonal relationships are of utmost importance and prides himself on personal engagement and connection with clients and those he works with. Michael enjoys his daily workouts and meditations, is an aspiring farmer, and is obsessed with all things animals – especially his dog, a Cavalier King Charles Spaniel.



SENIOR SOLICITOR, HAGENS BERMAN UK LLP

# Molly Ahmed

*Ms. Ahmed is a highly experienced litigation solicitor with experience in complex and high-value commercial disputes, often with substantial multi-jurisdictional elements.*

**CONTACT**

Hagens Berman UK LLP
10 Finsbury Square
Finsbury, London
EC2A 1AF

0203 150 1445 office
+00-1-206-623-0594 fax
mollya@hbsslaw.co.uk

**YEARS OF EXPERIENCE**
› 18

**PRACTICE AREAS**
› Antitrust & Competition
› Automotive Litigation
› Commercial Litigation
› Dispute Resolution
› Group Litigation
› Investor Fraud

**INDUSTRY EXPERIENCE**
› Banking
› Corporate Governance
› Economic Torts
› Fraud
› Insolvency
› Partnership
› Trusts

**COURT ADMISSIONS**
› England & Wales

**EDUCATION**
› University of Bristol Postgraduate Diploma in Commercial Law, 2014
› College of Law Legal Practice Course Postgraduate Diploma in Law, 2002 - 2004
› University College London BA (Hons) Classics Platt Prize for Greek, 1995 – 1998

## CURRENT ROLE
› Senior Solicitor and Partner, Hagens Berman UK LLP

## EXPERIENCE
› Prior to joining Hagens Berman's London office, Ms. Ahmed served as general counsel at a firm of expert witnesses in banking and financial litigation and was senior legal counsel for a well-known family office, which had a portfolio of complex, cross-border litigation with a claim value of in excess of £1 billion.

› She trained at Field Fisher Waterhouse and spent a large part of her private practice career in the dispute resolution department of Fox Williams LLP.

## LEGAL ACTIVITIES
› Ms. Ahmed is a regular speaker at legal conferences and contributes to legal journals.

## NOTABLE CASES
› Alliance Bank JSC v Aquanta Corporation & Ors

› Lictor Anstalt v Mir Steel

› Tchenguiz & Ors v Grant Thornton UK LLP & Ors

## PERSONAL INSIGHT
Molly has a zest for travel, art and theatre. She has travelled extensively, including a four-month solo trip to every country in Central America. Always keen for a challenge, she recently put herself in the famous black chair and appeared on the BBC's Mastermind, where her specialist subject was the life of the cellist Jacqueline du Pre.