THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; *pro hac vice*)
  vmoye@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; *pro hac vice*)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN D. DETTMER, SBN 196046
  edettmer@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
  chigney@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

*Attorneys for Defendant APPLE INC.*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DONALD R. CAMERON, et al., | No. 4:19-cv-03074-YGR |
| Plaintiffs, | **APPLE INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| APPLE INC., | Date: November 16, 2021 |
| Defendant. | Time: 10:00 a.m. |
| | Dept: Courtroom 1, 4th Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |

Gibson, Dunn &
Crutcher LLP

1

2

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 4

I.    Plaintiffs Cannot Meet Rule 23(a)'s Commonality, Typicality and Adequacy Requirements.................................................................................................... 4

        A.    Market Definition is Not a Common Question ................................................. 5

        B.    Anticompetitive Conduct Is Not a Common Question ..................................... 7

        C.    Antitrust Injury and Damages Are Not a Common Question ........................... 7

        D.    The Named Plaintiffs Present Atypical Claims and Cannot Fairly and Adequately Protect the Interests of the Class.................................................. 10

II.    Plaintiffs Cannot Meet Rule 23(b)(3)'s Predominance Requirement Because of a Multitude of Individualized Issues Concerning Antitrust Impact .......................... 13

        A.    Plaintiffs' Theory Of Classwide Impact Rests On Unsupported Assumptions, Not A Reliable Methodology ................................................... 14

        B.    Many Putative Class Members Would Suffer No Injury in the But-For World ............................................................................................................... 17

        C.    Determining Which Developers Are Injured and Which Are Not Requires Individualized Proof ..................................................................... 19

III.    The Proposed Class Action Is Not Manageable Or Superior To Individual Actions ............................................................................................................. 23

CONCLUSION .................................................................................................................... 25

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods. Inc. v. Windsor*,
521 U.S. 591 (1997) ........................................................................................................12

*American Express Co. v. Italian Colors Restaurant*,
570 U.S. 228 (2013) ......................................................................................................1, 5

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ..................................................................................................8, 9

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) .......................................................................................13, 19

*Bayshore Ford Truck v. Ford Motor Co.*,
No. 99-741, 2010 WL 415329 (D.N.J. 2010) ................................................................19

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) .......................................................................................10

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ...........................................................................................8

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
141 F.R.D. 144 (N.D. Cal. 1991) .....................................................................................6

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ............................................................................................24

*CollegeNET, INC. v. Common Application, Inc.*,
355 F. Supp. 3d 926 (D. Ore. 2018) ...............................................................................10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................................................4

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012) ...........................................................................................13

*In re Digital Music Antitrust Litig.*,
321 F.R.D. 64 (S.D.N.Y. 2017) ......................................................................................18

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .......................................................................................4, 13

*Epic Games, Inc. v. Apple Inc.*,
493 F. Supp. 3d 817 (N.D. Cal. 2020) ..............................................................................5

Gibson, Dunn & Crutcher LLP

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
223 F.R.D. 506 (S.D. Ill. 2004) ........................................................................................... 6

*Federal Trade Commission v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ......................................................................................... 7, 24

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (N.D. Cal. 2019) .................................................................................. 16, 20

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*,
695 F.3d 330 (5th Cir. 2012) ............................................................................................... 5

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ............................................................................................................ 11

*Georgine v. Amchem Prods., Inc.*,
83 F.3d 610 (3d Cir. 1998) ................................................................................................ 26

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
352 F.3d. 367 (9th Cir. 2003) ........................................................................................... 10

*Good v. Am. Water Works Co., Inc.*,
310 F.R.D. 274 (S.D.W. Va. 2015) ...................................................................................... 8

*Halvorson v. Auto-Owners Ins. Co.*,
718 F.3d 773 (8th Cir. 2013) ............................................................................................ 13

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006) ............................................................................................... 5

*Heredia v. Sunrise Senior Living LLC*,
2021 WL 819159 (C.D. Cal. Feb. 10, 2021) ....................................................................... 4

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ............................................................................................. 13

*In re Intuniv Antitrust Litig.*,
No. 16-cv-12396, 2019 WL 3947262 (D. Mass. Aug. 21, 2019) ...................................... 20

*Klay v. Humana, Inc.*,
382 F.3d 1241 (11th Cir. 2004) ........................................................................................ 26

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ...................................................................................... 11

*Kottaras v. Whole Foods Market, Inc.*,
281 F.R.D. 16 (D.D.C. 2012) ....................................................................................... 18, 19

*L.A. Mem. Coliseum Comm'n v. Nat'l Football League*,
791 F.2d 1356 (9th Cir. 1986) .......................................................................................... 18

Gibson, Dunn &
Crutcher LLP

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007) ........................................................................................................16

*In re Lithium Ion Batteries Antitrust Litig.*,
No. 13-MD-2420, 2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ....................................14

*NCAA v. Alston*,
141 S. Ct. 2141 (2021) ....................................................................................................24

*New York v. Facebook, Inc.*,
No. 20-3589. 2021 WL 2643724 (D.D.C. June 28, 2021) ................................................7

*O'Connor v. Uber Techs., Inc.*,
No. C-13-3826-EMC, 2015 WL 513807 (N.D. Cal. Sept. 1, 2015) ..................................9

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) .......................................................................................5, 6, 17, 23

*In re Rail Freight Surcharge Antitrust Litig.*,
934 F.3d 619 (D.C. Cir. 2019) ...................................................................................13, 24

*Sample v. Monsanto Co.*,
218 F.R.D. 644 (E.D. Mo. 2003) ......................................................................................6

*Sonner v. Premier Nutrition Corp.*,
971 F.3d 834 (9th Cir. 2020)..............................................................................................4

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021) ...............................................................................................10, 13

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U. S. 442 (2016) ........................................................................................................10

*Valley Drug Co. v. Geneva Pharma., Inc.*,
350 F.3d 1181 (11th Cir. 2003).........................................................................................13

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ...........................................................................................................7

*Vinole v. Countrywide Home Loans*,
571 F.3d 935 (9th Cir. 2009).............................................................................................20

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)...........................................................................................1, 4, 13, 26

*Walters v. Reno*,
145 F.3d 1032 (9th Cir. 1998)..........................................................................................26

*Ward v. Apple Inc.*,
No. 12-cv-05404, 2018 WL 934544 (N.D. Cal., Feb. 16, 2018) .....................................14

Gibson, Dunn &
Crutcher LLP

iv

*Williams v. Apple*,
No. 19-cv-04700, 2021 WL 2186223 (N.D. Cal. May 28, 2021) ........................................17

*Zinser v. Accufix Research Institute*,
253 F.3d 1180 (9th Cir. 2001) ........................................................................................24

### OTHER AUTHORITIES

2 Newberg on Class Actions § 4:67 (5th ed.) ...................................................................26

Herbert Hovenkamp, *Apple v. Pepper: Rationalizing Antitrust's Indirect Purchaser Rule*,
120 Colum. L. Rev. 14 (2020) ..........................................................................................8

https://appfairness.org/members/ ....................................................................................12

### RULES

Fed. R. Civ. P. 23(a) ........................................................................................................4

Fed. R. Civ. P. 23(a)(3) ..................................................................................................11

Fed. R. Civ. P. 23(a)(4) ..................................................................................................11

Fed. R. Civ. P. 23(b) ........................................................................................................4

Fed. R. Civ. P. 23(b)(3) .............................................................................................24, 25

Fed. R. Civ. P. 23(b)(3)(A) .............................................................................................25

Fed. R. Civ. P. 23(b)(3)(B) .............................................................................................25

Fed. R. Civ. P. 23(b)(3)(D) .............................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

| Abbreviation | Referenced Document |
|---|---|
| Ex. __ | Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Developer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s Motion to Exclude Testimony of Professor Einer Elhauge, Professor Nicholas Economides, and Christian Tregillis, filed concurrently. |
| Cons. Opp. __ | Defendant Apple Inc.'s Opposition to Named Consumer Plaintiffs' Motion for Class Certification, filed concurrently in *Pepper,* et al. *v. Apple Inc.*, 4:11-cv-06714-YGR. |
| Mot. __ | Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, filed June 1, 2021 at Dkt. 441. |
| Mot. to Excl. __ | Defendant Apple Inc.'s Motion to Exclude Testimony of Professor Einer Elhauge, Professor Nicholas Economides, and Christian Tregillis, filed concurrently. |
| [Name] Dep. __ | Deposition transcript of named witness, attached as an Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Developer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s Motion to Exclude Testimony of Professor Einer Elhauge, Professor Nicholas Economides, and Christian Tregillis, filed concurrently. |
| Trial Tr. __ | Transcript of the trial held in *Epic Games, Inc. v. Apple Inc., 4:20-cv-05640-YGR-TSH*, from May 3, 2021 to May 24, 2021, in Oakland, CA. |
| Hitt ¶ __ | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated August 10, 2021 and filed concurrently. |
| Malackowski ¶ __ | Expert Report and Declaration of James E. Malackowski, dated August 10, 2021 and filed concurrently. |
| Prince ¶ __ | Expert Report and Declaration of Jeff Prince, Ph. D., dated August 10, 2021 and filed concurrently. |
| Rubin ¶ __ | Expert Report and Declaration of Aviel D. Rubin, Ph. D., dated August 10, 2021 and filed concurrently. |
| Schmalensee ¶ __ | Expert Report and Declaration of Richard Schmalensee, Ph. D., dated August 10, 2021 and filed concurrently. |
| Simonson ¶ __ | Expert Report and Declaration of Itamar Simonson, Ph. D., dated August 10, 2021 and filed concurrently. |
| Willig ¶ __ | Expert Report and Declaration of Robert D. Willig, dated August 10, 2021 and filed concurrently. |
| McFadden ¶ __ | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated June 1, 2021 and filed in *Pepper,* et al. *v. Apple Inc.*, 4:11-cv-06714-YGR at Dkt. 442-11. |
| Economides ¶ __ | Expert Class Certification Report of Plaintiffs' Expert Professor Nicholas Economides, filed June 1, 2021 at Dkt. 332-1. |
| Elhauge ¶ __ | Expert Class Certification Report of Plaintiffs' Expert Professor Einer Elhague, filed June 1, 2021 at Dkt. 332-2. |
| Tregellis ¶ __ | Expert Class Certification Report of Plaintiffs' Expert Christian Tregillis, filed June 1, 2021 at Dkt. 332-3. |

Gibson, Dunn & Crutcher LLP

## INTRODUCTION

Plaintiffs Donald Cameron ("Mr. Cameron") and Pure Sweat Basketball ("Pure Sweat") seek to represent a vast and diverse class of approximately ███ individuals and businesses who developed iOS applications or in-app products that were sold for a non-zero sum over a four-year period. This sprawling class is, however, gerrymandered: Plaintiffs ignore the quarter-million developers of free apps, which constitute the vast majority of the 1.8 million apps in the App Store. They also seek to evade the dynamic, two-sided nature of the App Store, which connects developers and consumers in myriad ways—from gaming to dating, from cooking to banking, from workouts to weather— generating billions of dollars in revenue for developers, pursuant to their varying monetization strategies. Unable to show that such individualized issues could ever be addressed through common proof, Plaintiffs seek to mask the variegation of their novel claims by pointing to generic "common" issues and using cherry-picked data points and averages that obscure the diversity of their proposed class members and actual commission rates in the real world. As the *Epic* trial has already demonstrated, these issues are complex, and any attempt to try them on a classwide basis would devolve into a morass of individuated inquiries regarding (among many other things) impact and damages.

The Supreme Court has repeatedly made clear that Rule 23 "imposes stringent requirements for certification that in practice exclude most claims," *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228-29 (2013), and that certification is proper only when the Court is "satisfied, after a rigorous analysis," that plaintiffs have affirmatively demonstrated the Rule's requirements are met, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). Here, Plaintiffs have failed to meet their heavy burden of showing that class treatment is warranted.

## BACKGROUND

The App Store was introduced in 2008, when Apple decided to open its mobile platform to allow third parties to create, market, and distribute applications to consumers of its iOS devices. Ex. 33, PX-0880 (SDK launch event); Ex. 26, DX-4135 (WWDC 2008 Keynote); Schmalensee ¶¶ 262-263. At its launch, the U.S. App Store provided approximately 500 third-party apps; today, the App Store has more than 1.8 million apps. Schmalensee ¶¶ 263, 266; Hitt ¶ 48. It is because of the App Store that any developer with an idea can invent a new app and sell it to millions of consumers from

Gibson, Dunn &
Crutcher LLP

home.  By paying only $99 and signing a license agreement with Apple, a developer can use Apple's software and intellectual property (including an iOS software development kit offering extensive tools) to create apps that work seamlessly with iOS devices and are more functional, feature-rich, and advanced than on any other platform.  *See* Schmalensee ¶¶ 263-273; Ex. 34, PX-2618 (Developer Agreement); Ex. 23, DX-3352 (Developer Program License Agreement); Ex. 22, DX-3256; Ex. 13, Schiller Dep. 435:21-436:3, 440:12-441:10.  The developer agrees that distribution of such apps will be via the App Store after Apple's human reviewers evaluate them for compliance with App Store Guidelines.  Ex. 23, DX-3352.026 (Developer Program License Agreement), § 6.1.

The App Store encompasses a broad array of diverse apps; developers choose between 27 categories.  As the Court is aware, the "games" category of apps is by far the largest.  Hitt ¶ 50; *id.* at Ex. 3, 5.  Each developer can decide how to monetize its app—whether offering it for free (like the vast majority of apps), or charging a fee for downloads and/or in-app purchases (either one-time, or through a subscription model).  And the diversity of apps and monetization methods is vast.  Plaintiff Cameron, for example (who himself has purchased a premium app for $6.99 (Rollins Decl. Ex. 1), developed an app that helps people search through baby names ███████████████████████████. Ex. 1, Cameron Dep. 62:24-63:12. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Plaintiff Pure Sweat, by contrast, developed an app to provide training resources for basketball players and coaches.  Ex. 5, Czeslawski Dep. 264:12-15.  Pure Sweat originally offered content via a monthly subscription from its own website, but now offers content at a lower price through monthly subscriptions in the App Store, fo██████████████████████████, 116:23-118:3.

Beyond the named plaintiffs, an enormous array of developers make their apps available in the App Store. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Gibson, Dunn &
Crutcher LLP

This deep bench of developers contributes to the App Store's overall profitability (for Apple, developers, and consumers) because greater developer participation on this two-sided transaction platform leads to high-quality apps and devices, which spurs consumer participation and makes the App Store attractive for business. *See, e.g.*, Schmalensee ¶¶ 9-13, 40, 230-250, 298-299.

The App Store has also fostered extensive revenue for developers through means other than app sales and in-app purchases, including sales of physical goods and services (*e.g.*, Amazon, Uber, Instacart), sales of content that can be purchased outside but consumed inside the app (*e.g.*, Netflix, Spotify), and billions of dollars of advertising revenues. Ex. 22, DX-3181; *see* Schmalensee ¶¶ 277, 280, 283. Apple offers significant support services—from marketing to business development to editorial support—much of which is disproportionately valuable to small developers. *See* Schmalensee ¶¶ 294-297; Ex. 8, Trial Tr. 925:18–927:12 (Fischer); Ex. 4, Cue Dep. 286:20–287:9; Ex. 12, Trial Tr. 2742:6–16 (Schiller); Ex. 14, Schmid Dep. 96:19-97:2.

Plaintiffs attack Apple's model, arguing that Apple, through the App Store, has been a monopolist "from the outset." Compl. ¶ 2; *see* Ex. 7, Elhauge Dep. 151:9-153:17 ("from the beginning"); *id.* at 161:6-20 ("from the get-go").[1] They challenge Apple's commission rates to developers as "supracompetitive," Mot. at 6, even though Apple's baseline commission rate of 30% was and remains "industry standard." Ex. 25, DX-3955.003; Ex. 17, Trial Tr. 191:9-10 (Sweeney) ("30 percent is most the prevalent rate charged by the stores, and it was then and it is now."); Ex. 19, Sweeney Dep. 94:6-99:14 (30% is the headline commission charged by Microsoft, Sony, and Nintendo); *see* Schmalensee ¶¶ 81, 256-257. And they seek to certify a class comprised of nearly 6 ▮▮▮▮▮▮ who have developed any type of iOS app or in-app product sold for a non-zero price "at any time on or after June 4, 2015." Mot. at 1.[2] Plaintiffs ask this Court to assume that each and every one of these developers—from Mr. Cameron with only $145 in revenue from his baby-naming

---

[1] Plaintiffs have all but abandoned the monopsony theory contemplated by the Supreme Court in *Apple Inc. v. Pepper,* 139 S. Ct. 1514 (2019). *See* Mot. for Trial Plan.

[2] More than one million app developers have made either free or paid app transactions with consumers through the U.S. storefront of the App Store since June 4, 2015, the start of Plaintiffs' alleged class period. Hitt Rpt. ¶ 56; Elhauge Rpt. ¶¶ 341-345. The putative class comprises only a small fraction—about 5 percent—of that number. *See* Hitt Rpt. ¶ 56 & Fig. 4; Schmalensee Rpt. ¶ 14, 37-39, 170.

app to Match Group, with more than ███████████—was similarly injured because Apple's commissions "would be lower across the board" in a but-for world.  Mot. at 14-16.  But in reality, Plaintiffs' proposed class sweeps in many uninjured class members who would have (i) continued to pay the same "industry standard" commission; (ii) faced offsetting fees for the use of Apple's intellectual property; and/or (iii) been less profitable as a result of different competitive constraints.

## ARGUMENT

Rule 23(a) requires that Plaintiffs prove by a preponderance of the evidence: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  Fed. R. Civ. P. 23(a).  "[D]istrict courts . . . must perform a 'rigorous analysis [to ensure] that the prerequisites of Rule 23(a) have been satisfied.'"  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (citation omitted).  Plaintiffs also must satisfy Rule 23(b)(3)'s heightened burden of showing that common questions predominate over individual ones and that a class action is the superior method of adjudication.  Fed. R. Civ. P. 23(b); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

## I.    Plaintiffs Cannot Meet Rule 23(a)'s Commonality, Typicality and Adequacy Requirements

Plaintiffs are wrong that "common questions abound, including whether Plaintiffs identify a relevant market, whether Apple's business practices are anticompetitive, and whether the Class has been injured."  Mot. at 8.  Mere fashioning of yes/no questions does not render them common.  If it did, practically all class actions would satisfy Rule 23(a)'s commonality requirement—a proposition the Supreme Court rejected in *Dukes*.  564 U.S. at 350 ("any competently crafted class complaint literally raises common questions") (citation omitted).  Instead, what matters is "the capacity of a classwide proceeding to generate common answers apt to drive [] resolution of the litigation."  *Id.* Common answers on the key elements of Plaintiffs' claims are not possible here, where there is no single market in which all class members experience uniform conduct.[3]  Nor can Mr. Cameron or Pure Sweat—idiosyncratic, small developers who have relied comparatively little on App Store purchases—fairly and adequately represent the proposed sweeping, diverse class.

---

[3]  Nor could Plaintiffs' UCL claim proceed on a classwide basis, as it is barred by *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020).  *See Heredia v. Sunrise Senior Living LLC*, 2021 WL 819159, at *4 (C.D. Cal. Feb. 10, 2021) (*Sonner* "made clear that a plaintiff's failure to plead inadequate remedies at law dooms the claim for equitable relief at any stage.").

Gibson, Dunn &
Crutcher LLP

### A.      Market Definition is Not a Common Question

Plaintiffs' claim that market definition is a common issue hinges on the untenable position that there is just a single relevant market. *See, e.g.*, Schmalensee ¶¶ 45, 52-58, 61.  The Court cannot accept that claim at face value and must assess the merits of Plaintiffs' proposed market, given its relevance to class certification. *See Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 349 (5th Cir. 2012) ("factual determinations" pertaining to market definition "were necessary for the district court to decide whether to certify a class for Appellants' antitrust claims"); *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 229 (2d Cir. 2006) (rejecting argument that plaintiff need not put forward a tenable market definition at class certification).  Unless Plaintiffs can show that the billions of transactions in the App Store took place in a single market, there is no *common* way to assess market (or monopoly) power or to apply rule of reason analysis that is distinct to each market.[4]  And an "accurate definition of the relevant market" is necessary to establish every element of Plaintiffs' Section 2 claim—market power, anticompetitive conduct, antitrust injury, and damages. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018); *see* Schmalensee ¶ 41.

Plaintiffs assert a single relevant market for "distribution of iOS apps and in-app products" (Mot. at 3), but such "[s]ingle-brand markets are . . . extremely rare." *Epic Games, Inc. v. Apple Inc.*, 493 F. Supp. 3d 817, 835 (N.D. Cal. 2020) (quotation marks omitted).  The critical support for such an aberrational market definition is the declaration of Prof. Elhauge, which is fundamentally unreliable and should be excluded. *See* Mot. to Excl. at __.  Regardless, instead of proving that his single market definition applies classwide, Prof. Elhauge *assumes* it does, testifying that he cannot comprehend a situation where there is "a correct market definition for one class member and a different correct market definition for other class members." Ex. 7, Elhauge Dep. 133:20-134:24.

In reality, Apple competes in multiple, distinct markets that vary by the nature of the transaction. *See* Schmalensee ¶¶ 15-18, 41-68; Hitt ¶¶ 226-69 & App'x MD; Willig ¶¶ 113-114.  As Epic's CEO testified, "we live in a multiplatform, multi-ecosystem world now." Ex. 17, Trial Tr. 257:25-258:5 (Sweeney).  But not all apps can take advantage of all platforms. *See*, *e.g*, Ex. 13, Schiller

---

[4]  Because Plaintiffs will have to "rely on market specific evidence of [Apple's] power in particular markets that will vary from one putative class member to another," "individualized questions" will also "predominate" with respect to market definition. *Heerwagen*, 435 F. 3d at 229.

Dep. 66:12-14 ("Q. Are you aware of anyone who has accessed a banking app from a game console? A. I'm not aware either way.").   A developer engaging in a gaming app transaction faces different competition—a consumer could also make that purchase on a gaming console or a PC (Ex. 19, Sweeney Dep. 146:15-147:2)—than does a developer engaging in a baby naming app transaction, where the consumer could transact on a Kindle or through a traditional bookstore (Ex. 31, LBN_0000277 at -78). *See* Schmalensee ¶¶ 48-51; Hitt ¶¶ 247, 290, 353; Willig ¶¶ 87-89, 113-114.   Some developers, like Yoga Buddhi, can transact directly with consumers through their own web sites.   Ex. 16, Simon Dep. 30:2-6.   And, as Plaintiff Cameron recognized, consumer price-sensitivity—which informs a developer's pricing strategy—varies between app transactions.   Ex. 31, LBN_0000277 ("finding the right name for a child is such an important task, that I can't imagine anyone choosing on the basis of price alone, or choosing a lesser app in order to save 1 or 2 dollars").   Individualized issues with respect to consumers further compound the lack of commonality on these two-sided transaction platforms, where "the optimal balance of the prices charged on each side of the platform" must be considered together as part of the analysis, *Amex*, 138 S. Ct. at 2228.   *See* Schmalensee ¶¶ 44-45, 47, 61, 74.

In short, "[c]ommon proof of actual injury to each class member requires that all class members operate in the same relevant market, otherwise, they could not be affected in a common manner by the challenged conduct."   *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513 (S.D. Ill. 2004). The varying competitive conditions facing different app transactions means that not all app developers operate in the same relevant market and "could not be affected in a common manner by the challenged conduct."   *Id.*; *see Sample v. Monsanto Co.*, 218 F.R.D. 644, 650-51 (E.D. Mo. 2003) (denying class certification because "genetically modified seeds are not homogenous products" and "[t]he market for seeds is highly individualized"); *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 154 (N.D. Cal. 1991) (denying class certification where plaintiff "ignore[d] the crucial differences in how defendants set prices for different purchasers").[5]

---

[5] Plaintiffs' purported evidence of the App Store's profit margins does not yield a common inquiry into market power, as (among other things) profit margins can be addressed only after the relevant market is properly defined.  Further, there is no reliable way to identify all costs of running the App Store.  *See* Ex. 3, Cook Dep. 163:1-23; Malackowski ¶¶ 30-31, 233-268.

### B.    Anticompetitive Conduct Is Not a Common Question

Plaintiffs' theory of "common" anticompetitive conduct rests on the legally untenable theory that Apple unlawfully maintains a general policy of refusing to deal with would-be competing iOS app stores.  Mot. at 4.  But because even an alleged monopolist is expected to make decisions in a free market about with whom it will deal, such policies are not themselves unlawful, *see Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) ("[T]he Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"); *Federal Trade Commission v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) ("As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals[.]'"), and a valid Section 2 claim must turn on analysis of "*specific instances* in which that policy was enforced" against a rival with which Apple had a course of dealing.  *New York v. Facebook, Inc.*, No. 20-3589, --- F. Supp. 3d ---, 2021 WL 2643724, at \*9-12 (D.D.C. June 28, 2021) (emphasis added) ("unilateral refusals to deal [are] essentially 'per se lawful' or 'presumptively legal'" (citation omitted)); *Qualcomm*, 969 F.3d at 993-94.

Here, the "specific instances" relied on by Plaintiffs, *see, e.g.*, Elhauge ¶ 308, relate to Apple allegedly preventing Epic from opening its own store in 2020, where there is no suggestion that the Epic Games Store would have been a viable channel for every member of the class, let alone non-game developers of apps such as Mr. Cameron's baby-naming app or a workout app such as Pure Sweat. Indeed, a large percentage of the putative developer class made their last sale well before Epic requested that Apple allow it to open a game app store in 2020.  Hitt ¶ 216.  And Mr. Cameron and Pure Sweat have not even alleged that they would use the Epic Games Store if one were available.  *See* Ex. 7, Elhauge Dep. 240:10-21 (testifying that he doesn't know "whether Mr. Cameron likely would have used the App Store as his only iOS distribution channel").

### C.    Antitrust Injury and Damages Are Not a Common Question

Plaintiffs likewise have failed to demonstrate a common method for proving injury and damages on a class-wide basis.  To the extent they claim to make that showing through common proof, that proof would need to be premised on a proper measure of injury and damages.  Here, that measure

is the "profits that they could have earned in a competitive retail market" absent Apple's allegedly anticompetitive conduct.  *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019).

But a proper measure of lost profits is inherently individualized.  *See, e.g.*, *see* Herbert Hovenkamp, *Apple v. Pepper: Rationalizing Antitrust's Indirect Purchaser Rule*, 120 Colum. L. Rev. 14, 22 (2020) ("Lost profit damages . . . require information about the impact of the unlawful practice on *both* the volume of sales and the reseller's margin").  And that is particularly true in this case, where lost profits must be determined after accounting for each developer's "decision to pass-through, and if so, the extent of pass-through, a lower commission rate in the but-for world" to consumers of its apps in order to maximize profits and minimize losses—an inquiry that "will vary by developer and by app, leading to differential impact of Apple's challenged conduct across developers," and must take into account indirect network effects.[6]  *See* Hitt ¶¶ 361-363; Schmalensee ¶¶ 9-12, 125-128, 186, 234.  Indeed, Plaintiffs' expert admits that any actual measure of lost profits would vary between developers.  *See* Ex. 7, Elhauge Dep. 245:8-18 (lost profits would "depend[] on the particular profit function in a particular market" and the nature of "marginal costs" for each developer, as well as its "pricing tiers"); *id.* at 231:10-232:2 (It is "too difficult to persuasively establish exactly what the price response would be . . . ."); *see also id.* at 232:3-234:25; Economides Dep. 238:15-241:11, 241:17-14, 267:12-271:16 ("The developers may have found it optimal to charge a lower price.  They might even have found it optimal to charge a higher price, depending on the elasticity of demand differences.").

Recognizing that lost profits are "inherently individualized," courts rarely certify classes that rely upon lost profits as a measure of injury and damages.  *See, e.g.*, *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342-43 (4th Cir. 1998) ("Plainly plaintiffs' claim for lost profits damages was not a natural candidate for classwide resolution; the calculation of lost profits is too dependent upon consideration of the unique circumstances pertinent to each class member." (quotation marks omitted)); *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 290 (S.D.W. Va. 2015) ("Proof of lost profits is generally an individualized inquiry").  That is why Plaintiffs have eschewed a proper model

---

[6] Prof. Economides has proffered an analysis that, although paying lip service to indirect network effects on this two-sided transaction platform (Economides Dep. 79:5-80:15), fails to take such effects into account.  *See* Economides Dep. 250:21-251:20 ("I'm just covering my behind . . . . I'm just putting this footnote [about indirect network benefits] for completeness."); *see* Schmalensee ¶ 196.

APPLE INC.'S OPPOSITION TO CLASS CERTIFICATION, 4:19-CV-03074-YGR

of lost profits in favor of the "fundamentally different" measure of harm that is being pursued by consumers in *Pepper*—an overcharge measure based on Apple's but-for commission. *See, e.g.*, Ex. 6, Economides Dep. 38:22-25 ("You can call it an overcharge measure of harm. Yes, you can."); Ex. 7, Elhauge Dep. 228:22-229:2 (Economides calculates "an overcharge measure of damages"); Schmalensee ¶ 190-191 ("[T]his approach is not a lost profits analysis but rather is equivalent to an overcharge methodology assuming zero pass through."); Economides Dep. 237:6-238:14.

The Supreme Court has recognized that an overcharge measure is a "fundamentally different" measure of harm from the lost profits that would be permissible for developers to seek in a case such as this. *Pepper*, 139 S. Ct. at 1525. In *Pepper*, the Supreme Court held that Apple could potentially be subject to "multiple suits" brought by both the consumers of apps and app developers. *Id.* In doing so, the Court rejected Apple's argument that allowing consumers and developers to sue would "result in 'conflicting claims to a common fund—the amount of the alleged overcharge,'" *id.* at 1524, because "the two suits would rely on *fundamentally different theories of harm* and would not assert dueling claims." *Id.* at 1525 (emphasis added). Consumers would "seek damages based on the difference between the price they paid and the competitive price"—*i.e.*, "the *full amount* of the unlawful overcharge," while developers would merely seek the "fundamentally different" measure of "lost profits that they could have earned in a competitive retail market" for their apps. *Id.*

Plaintiffs seek to evade the Supreme Court's instructions by labeling their overcharge assessment a "conservative" estimate of lost profits (Economides ¶¶ 63-64; Ex. 6, Economides Dep. 237:14-15), but that is simply subterfuge to create an ostensibly common injury by pointing to an inflated *cost* of distributing through the App Store. *See, e.g.*, Ex. 7, Elhauge Dep. 229:6-231:9 (Economides's model is "conservative," because he has "established a uniform floor" on "lost profits"); Ex. 6, Economides Dep. 237:6-238:14.[7] As Prof. Schmalensee explains, however, an overcharge in

---

[7] If Economides's unreliable methodology were, in fact, a "conservative" measure of lost profits, that model would be an inappropriate basis on which to award class certification, as it would amount to an intentional waiver of damages for members of the putative class. *See O'Connor v. Uber Techs., Inc.*, No. C-13-3826-EMC, 2015 WL 513807, at *14 (N.D. Cal. Sept. 1, 2015) (explaining that such waiver can make class representation inadequate), *rev'd on other grounds*, 904 F.3d 1087 (9th Cir. 2018). Many developers have enormous amounts of billings through the App Store. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Economides Dep. 136:24-137:2 (7 developers with more than $1 billion in revenue).

Gibson, Dunn &
Crutcher LLP

costs such as this does not guarantee lost *profits* except under "very specific and unrealistic assumptions," including that a developer would not pass through lower commissions to consumers because the developer is acting as a monopolist.  *See* Schmalensee ¶¶ 161-162, 184-191, 195.   Yet some apps "clearly face intense competition" from other apps, and such competition, combined with low barriers to entry, means that most of their gains from lower commissions "would be competed away and, in effect, what would have been lost profits in the absence of competition would become gains to consumers."  *Id.* ¶¶ 126-128, 163; *see* Ex. 6, Economides Dep. 129:5-130:3 ("Most of them have competitors."). "On the more realistic assumption that all developers face some competition," Prof. Economides's measure would thus "*overstate* lost profits for developers that face strong competition, with the overstatement depending on the intensity of competition each faces"—which is hardly a "conservative" measure common to the class.  Schmalensee ¶¶ 189, 193 (emphasis added).

Finally, binding precedent forecloses Plaintiffs' halfhearted claim that they were injured due to mere "elimination of market alternatives."  *See* Mot. at 14.  "Every class member must have Article III standing in order to recover individual damages."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).  "Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."  *Id.*   Thus, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court," *id.* at 2205, and a claim of reduced choice does not necessarily imply injury under the Sherman Act. *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 (9th Cir. 2012) (even "allegations that an agreement has the effect of reducing consumers' choices . . . does not sufficiently allege an injury to competition," since such effects "are fully consistent with a free, competitive market"); *see, e.g.*, Ex. 7, Elhauge Dep. 239:6-239:21 (no metric for establishing common injury or damages on this basis).[8]

### D.   The Named Plaintiffs Present Atypical Claims and Cannot Fairly and Adequately Protect the Interests of the Class

---

[8]  Plaintiffs' cases are distinguishable: in both, plaintiffs asserted a concrete, pecuniary injury.  *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d. 367, 378 (9th Cir 2003) (plaintiff "presents an allegation of 'injury-in-fact that was reasonably proximate to the violation without undue duplication, complex apportionment, or alternative plaintiffs more directly affected by the violation'"); *CollegeNET, INC. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 942 (D. Ore. 2018) ("Plaintiff has also been injured," alleging "that it has lost over 200 college customers to Common Application in the last 10-15 years"), *on remand*, 711 F. App'x 405 (9th Cir. 2017).

Gibson, Dunn & Crutcher LLP

Even if they had adequately met Rule 23(a)'s commonality requirement—and they have not—Plaintiffs' motion should also denied because Mr. Cameron's and Pure Sweat's claims are far from "typical," and conflicts of interest will prevent them from "adequately protect[ing] the interests of the class." Fed. R. Civ. P. 23(a)(3), (4); *see Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982) (commonality and typicality "tend to merge" with each other and with adequacy).

Plaintiffs offer no facts to support their conclusory claim that they "have [no] conflicts with the Class." Mot. 9. *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 150 (N.D. Tex. 2014) (adequacy "is the plaintiff's burden to prove—not the defendant's burden to disprove"). In reality, the putative class contains tens of thousands of app developers of all types and sizes—from hobbyists like Mr. Cameron to corporate behemoths such as Facebook and Microsoft—that are impacted by the App Store policies and stand to gain (or lose) from this litigation in divergent ways. *See, e.g.*, Hitt ¶¶ 21, 224-225, 329; Schmalensee ¶¶ 42-53, 62-68, 256; Ex. 7, Elhauge Dep. 198:9-11 ("Apple has had a very strong policy against disfavoring small developers, and the Steam method does disfavor small developers."). Mr. Cameron himself is both a named plaintiff in this action and a member of the putative class in the *Pepper* action (Rollins Ex. 1), which means as both a developer and consumer, he stands to press conflicting damages arguments against himself in both actions. *See* Mot. for Trial Plan; Economides Dep. 257:1-258:12 ("It's possible" developers are members of alleged consumer class).

To make the class conflict even more plain, large developers such as Microsoft, Sony, and Nintendo (who have separate platforms for app developers and consumers) are members of the disparate putative class because they too have developed iOS applications or in-app products and sold them for a non-zero price, yet they (like Apple) too have charged 30% commission rates for apps on their own platforms, suggesting that Mr. Cameron and Pure Sweat believe members of their own class have engaged in anticompetitive conduct. *See* Schmalensee ¶ 256. And Pure Sweat has gone so far as to *sue* Google, the largest member of the putative class, as an alleged monopolist of Android app distribution. *See, e.g.*, Compl. ¶¶ 2-3, 28-29, Dkt. 129, *In re Google Play Developer Antitrust Litig.*, No. 3:20-cv-05792-JD (N.D. Cal.) (alleging that "Google and Apple split the lucrative mobile apps world between them," and that the "suit concerns the anticompetitive conduct Google has engaged in to (1) establish and maintain its monopoly in the U.S. market for the distribution of Android OS apps,

1  and (2) extend that monopoly to the market of in-app digital content."); *see also, e.g.*, Economides ¶¶

2  32-34 (discussing Google); Elhauge ¶¶ 213, 443-464 (same).

3       Neither named Plaintiff is a game developer, even though game digital transactions are the

4  largest relevant market in which the App Store participates and the most likely affected, if at all, by the

5  challenged restraints. *See, e.g.*, Hitt ¶¶ 29, 36, 186 & Fig. 31; Schmalensee ¶¶ 62, 128, 286. Instead,

6  they are small developers who have atypical business models and are uninjured, or even benefit, from

7  the single App Store. *See, e.g.*, Schmalensee ¶¶ 126-127, 139, 146. ███████████

8  ███████████████████████████████████████████████),

9  indicating that any costs he incurs from Apple's commission are more than compensated by the benefits

10  of the App Store. Pure Sweat offered only a subscription-based app that relied only on web-based

11  payments (not subject to commissions) until 2019. Ex. 5, Czeslawski Dep. 93:17–21, 102:18–103:2;

12  *see also* Ex. 7, Elhauge Dep. 240:5-240:9 (no opinion whether Pure Sweat was initially injured). Then,

13  when Pure Sweat added in-app purchasing in 2019, it proceeded to *lower* its subscription price from

14  the previous range of $7.99-$9.99 to $4.99 and ceased offering a web-based (commission-free)

15  payment option, despite being subject to Apple's commission. Ex. 5, Czeslawski Dep. 116:23–118:3.

16  Further, Pure Sweat has shown no interest in sideloading and third-party app stores (PSB Dep. 183:9-

17  186:10)—a key aspect of Plaintiffs' claims (Ex. 6, Economides Dep. 39:22-40:22, 62:12-63:5). And,

18  as small developers, both Plaintiffs benefit from the support services offered by Apple in exchange for

19  its commissions. Ex. 5, Czeslawski Dep. 190:16-191:17; Schmalensee ¶¶ 294-297.[9]

20       Where, as here, the "interests of those within the single class are not aligned," the adequacy

21  requirement is not met. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 626 (1997). As explained

22  below (see *infra* Pt. II.B), any class members—such as those whose business models hinge primarily

23  on using Apple's IP for free app distribution such as Ticketmaster—stand "uninjured" because they

24  would be the same or worse off in the but-for world. *See* Schmalensee ¶ 37, 165-172, 277-278, 280,

---

[9] Tellingly, neither Mr. Cameron nor Pure Sweat are members of the Coalition for App Fairness, a well-funded organization consisting of large corporate developers that Epic created for litigation advocacy purposes. *See* https://appfairness.org/members/. The Coalition and some of its members are currently resisting producing documents that could shed further light on potential conflicts. Similarly, Plaintiffs have confirmed that they have had thousands of communications with individual developers, both members of the Coalition and otherwise, but are refusing to produce them. The parties are still in motion practice to resolve the Plaintiffs', the Coalition's and certain individual developers' objections.

283.  Small developers may also face increased competition from rivals in the but-for world, who would benefit from their higher volume through self-distribution, sideloading, lower revenue-based commission rates, or exclusive deals.  *See also Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) ("A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class.").

## II.  Plaintiffs Cannot Meet Rule 23(b)(3)'s Predominance Requirement Because of a Multitude of Individualized Issues Concerning Antitrust Impact

Even if Rule 23(a) was satisfied—and it is not here—"the predominance criterion [under Rule 23(b)] is far more demanding."  *Amchem*, 521 U.S. at 623–24.  When considering predominance, a key factual determination is whether plaintiffs' proposed evidence sweeps in uninjured class members. This is because, among other things, "individual injury (also known as antitrust impact) is an element of the cause of action; to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation."[10]  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008).  If many class members suffered no injury, the "need to identify those individuals will predominate" and render class treatment inappropriate."  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018); *see Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 779 (8th Cir. 2013).

Here, Plaintiffs' theory of common impact is based on nothing more than their experts' unreliable *ipse dixit* about a hypothetical world that cannot be reconciled with real world evidence.[11] Applying that real world evidence and economic principles to determine how competition might play out in the but-for world demonstrates that large swaths of the putative class are unlikely to have been injured by Apple's alleged conduct, meaning common proof of antitrust impact will not predominate. *See, e.g.*, *In re Rail Freight Surcharge Antitrust Litig.*, 934 F.3d 619, 624-25 (D.C. Cir. 2019); *In re Asacol*, 907 F.3d at 47, 51-58 (no predominance where 10% uninjured).  Plaintiffs have therefore failed to carry their "burden . . . to provide *a viable method* for demonstrating class-wide antitrust injury based on common proof."  *Ward v. Apple Inc.*, No. 12-cv-05404, 2018 WL 934544, at *3 (N.D. Cal., Feb.

---

[10]  In addition, Article III does not give federal courts the power to grant relief to any uninjured plaintiff, class or not.  *See, e.g.*, *TransUnion*, 141 S. Ct. at 2208-2213.

[11]  Even if some of Plaintiffs' expert's opinions were admissible (and they are not), the Court still must resolve "critical factual disputes" in a "battle of the experts" regarding commonality, *Ellis*, 657 F.3d at 982, 984, even if doing so overlaps with the merits, *Dukes*, 564 U.S. at 351.

Gibson, Dunn & Crutcher LLP

16, 2018) (Gonzalez Rogers, J.) (emphasis added); *see In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018) (Gonzalez Rogers, J.).

### A.   Plaintiffs' Theory Of Classwide Impact Rests On Unsupported Assumptions, Not A Reliable Methodology

Plaintiffs rely on Prof. Elhauge—who offers *no* economic model or rigorous analysis—to demonstrate classwide injury. Mot. at 14-16; Ex. 7, Elhauge Dep. 184:16-21 (assuming "payment of an anticompetitively inflated commission in the actual world necessarily mean[s] that a developer would have higher profits in the but-for world"); Ex. 6, Economides Dep. 27:13-28:10 ("assuming" Apple is liable and that "the developers in the class all got injured").[12]  Instead, Prof. Elhauge simply asserts that his "analysis concludes that Apple would have lowered [its 30% default] commission rate, and that that's a methodology we can use to show [classwide] injury." Ex. 7, Elhauge Dep. 195:12-23. But that "methodology" hinges on an *assumption* that as a result of competition from some unspecified app stores and sideloading options, *all* of the App Store's commissions would have dropped below 30% in the but-for world—for every transaction and developer.  *See* Ex. 7, Elhauge Dep. 193:19-199:20 (conceding his "opinion on [classwide] impact depend[s] on Apple reducing its default commission rate below 30 percent in the but-for world"); Schmalensee ¶¶ 20, 130-133 ("Professor Elhauge's but-for world resembles the actual world with the exception of reduced commission rates, and his reasoning is circular: because it is so in the actual world, therefore it is so in the but-for world.").

Prof. Elhauge offers no testable methodology for arriving at that assumption:  he does not construct a model of App Store commission rates in the but-for world, or examine whether developers would have actually used an alternative distribution channel or what those channels would have cost. Hitt ¶¶ 74-76, 276-79.  In fact, he recognizes that Apple and other iOS app stores would "have varying profit-maximizing commissions in the but-for world" and therefore charge different commission rates, but he offers no accounting of what those rates would have been—other than assuming they would have been less than 30%.  Elhauge ¶ 325; Ex. 7, Elhauge Dep. 195:24-196:10 (admitting that Elhauge never considered whether Apple would maintain a 30% commission).

---

[12]  To the extent Plaintiffs claim that Prof. Economides offers an independent opinion on classwide injury, that opinion is also fatally flawed for the reasons discussed herein, and in Apple's accompanying Motion to Exclude Plaintiffs' Experts.

Gibson, Dunn & Crutcher LLP

Prof. Elhauge's assumption also is contradicted by evidence of how competition has played out in the real-word, where *non-monopolists* routinely charge 30% default commission rates in the face of head-to-head app stores and sideloading on the same device. *See* Schmalensee ¶¶ 134-135, 256. Windows PC app transaction platforms—which Plaintiffs claim "provides a useful (albeit conservative) model of how competition would unfold" (Mot. 17)—prove the point. Valve's Steam, purported to be "the leading PC game app store" (Economides ¶ 27), has charged a 30% headline commission for sales of games and in-game content since it began distributing third-party games in 2005. Hitt ¶¶ 92, 138, 151 & Fig. 23; *see* Ex. 36, VALVE000639, -45 (███████████████ ████████████████████████). Similarly, the Microsoft Store has charged a 30% headline rate for games for most of its existence, including at the time Plaintiffs' experts submitted their reports. *See* Economides ¶ 28 (relying on Microsoft commission rates that become effective in August 2021). And, although facing competition from multiple third-party app stores, Apple's Mac App Store has sustained a 30% commission since it opened. *See* Hitt ¶ 95; Economides ¶ 70; Elhauge ¶ 80. In the Android environment, Google Play, Samsung's Galaxy Store, and Amazon's Appstore all charge a headline 30% on app sales and in-app purchases despite competition from one another, numerous other Android app stores, and direct distributors such as Epic. Hitt ¶¶ 83-90, 151 & Fig. 23.[13]

Like those platforms, Apple has maintained a 30% default commission rate since the App Store opened. Schmalensee ¶¶ 135-136. At the same time, it has implemented lower rates—including a 0% rate for free apps and apps subject to the "reader rule" and "multiplatform rule," and a 15% rate for video programming, the second year of subscriptions, and (most recently) all apps distributed by developers earning less than $1 million per year. *See* Schmalensee ¶¶ 276, 280-282; Ex. 28, DX-4338 (App Review Guidelines § 3.1.3(a) (reader rule), § 3.1.3(b) (multiplatform rule)); Ex. 22, DX-3256.003-.004 (subscriptions); Ex. 24, DX-3421 (video partner program); Ex. 27, DX-4168 (small business program). Neither Plaintiffs nor their expert explain why Apple would abandon this pricing strategy in the but-for world when it is better than the "industry standard" in the actual world.

---

[13] Even developers as successful as Epic pay 30% to the three major game console platforms—Sony, Nintendo, and Microsoft Xbox. *See* Sweeney Dep. 223:25-224:15. Facebook charges 30% to games sold on its Oculus VR platform. *See* Schmalensee Ex. 1. And many platforms charge commissions at or above 30% for eBooks, audiobooks, and video streaming. Schmalensee ¶ 256.

Gibson, Dunn & Crutcher LLP

Plaintiffs' assumption that Apple would be forced to "shift[] downwards" its commission structure as a "natural response to marketwide competition" (Mot. 16), also ignores the fact that Apple offers a highly differentiated App Store with uniquely premium features. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc*., 551 U.S. 877, 896-97 (2007) (higher product quality can increase consumer demand despite higher prices); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 147-49 (N.D. Cal. 2019) (rejecting plaintiffs' impact model for ignoring effect of product quality on price); *see also, e.g.*, Schmalensee ¶¶ 134-138, 288-293.  No evidence suggests that in a but-for world, Apple would abandon its commitment to the privacy, security, and user experience that defines its brand.  Ex. 3, Cook Dep. 107:22-108:3 (security and privacy Apple offers is a "competitive advantage for Apple in the marketplace"); *see also* Ex. 19, Sweeney Dep. 170:14-25 (Epic CEO Tim Sweeney testifying that protection of users' privacy is "[a]bsolutely" a worthwhile goal); Ex. 9, Hayter Dep. 159:7-10 (similar); Rubin ¶¶ 59-61, 127-33, 136-37.  Apple would instead continue to review each and every app submitted to ensure it meets high standards of privacy protection and does not contain malware or offensive content.   Rubin ¶¶ 59-80, 127-33, 136-137.   Unsurprisingly, iOS users value these features. [14] Simonson ¶¶ 56-58, 61-63.  And Plaintiffs' experts do not contend that Apple would fail to maintain the leading market share in the face of competition.  *See* Economides ¶¶ 52-54 (Apple would maintain 50-65% market share even after entry of competitors); Ex. 7, Elhauge Dep. 257:15-17 (no opinion as to whether Apple's market share "would be more or less than 65%").  Therefore, they offer no logical reason why Apple could not sustain a 30% default rate in the but-for world—a rate that many of its competitors have used even without Apple's competitive advantages.

Further, in the but-for world, the App Store would continue to benefit from indirect network effects that increase demand for its store.  *See* Schmalensee ¶¶ 30-31, 124, 136; Ex. 7, Elhauge Dep. 56:3-57:6 (App Store exhibits "strong indirect network effects"); *see id.* at 80:13-81:8, 161:21-162:13. In a two-sided transaction platform, "the value of the services that [the] platform provides increases as the number of participants on both sides of the platform increases."  *Amex*, 138 S. Ct. at 2281; *see* Schmalensee ¶¶ 26-34, 230-250.  Thus, a developer values—and will be willing to pay a premium

---

[14]  Although Apple's security policies and procedures are valuable to iOS users, they impact different developers and consumers in vastly different ways depending on the app.  Rubin ¶¶ 126-137.

APPLE INC.'S OPPOSITION TO CLASS CERTIFICATION, 4:19-CV-03074-YGR

Gibson, Dunn &
Crutcher LLP

for—a platform that provides a bigger and broader consumer audience.  Schmalensee ¶¶ 298-99; Hitt ¶ 223.  Indeed, Pure Sweat itself *reduced* the price of its app after moving from website subscriptions to the App Store, confirming that it believed Apple's commission rate would be compensated by the substantive increase in exposure to consumers.  Ex. 5, Czeslawski Dep. 116:23–118:3.

### B.    Many Putative Class Members Would Suffer No Injury in the But-For World

Assessing how competition might play out in the but-for world—based on actual evidence and economic principles—reveals that large swaths of the putative class are unlikely to have been injured by Apple's alleged conduct.  Plaintiffs have thus failed to carry their burden on class certification to "show[] that the number of uninjured class members would be de minimis." *Williams v. Apple*, No. 19-cv-04700, 2021 WL 2186223, at *8 (N.D. Cal. May 28, 2021).

***First***, other allegedly "more competitive" commission structures demonstrate that many developers have not been injured.  Plaintiffs' experts point to Steam as the "leading" app distributor in the "more competitive" Windows PC app distribution market  (Elhauge ¶ 30(C)(c); Economides ¶¶ 27, 36), but under Steam's current rate structure, Valve charges 30% for all apps that have generated less than $10 million in revenues.[15]  The vast majority—99.5%—of putative developer class members have apps that earned less than $10 million through the App Store.  *Id.* at ¶ 169.  Thus, 99.5% of putative developer class members would have paid 30% in the but-for world under Steam's current commission model.  According to Plaintiffs' own logic, these developers cannot have been injured or suffered damages.  It is only by averaging Steam's commissions together with those of Chinese app store WeGame and other, less comparable stores, that Plaintiffs find injury.

***Second***, all PC app transaction platforms deemed "more competitive" by Plaintiffs' experts charged a 30% commission on games before November 2018.  Hitt ¶ 212.  And all of those PC app transaction platforms charged a 30% commission rate on non-games before October 2017.  *Id.*  By Plaintiffs' own logic then—with the PC market providing a "model of how competition would unfold" (Mot. 17)—the default but-for commission rate charged by Apple and other iOS app transaction platforms would have resulted in 34.8% of putative developer class members not having a paid App

---

[15]  Once an app has reached $10 million in lifetime revenues, Valve lowers the rate to 25%, and then lowers it further to 20% if it reaches $50 million.  Hitt ¶ 92.

Store transaction after those periods—meaning that the only rate they would have paid in the but-for world would have been equal to the one they now challenge:  30%.  Hitt ¶¶ 212-214.  These developers cannot have been injured or suffered damages.

**Finally,** not only would many developers have suffered no injury, but many would likely be *worse-off* in Plaintiffs' but-for world.  Many developers could face offsetting fees for use of Apple's IP that would swamp any benefit from a reduced commission rate.  *See, infra*, at __.  For example, if Apple increased its annual developer fee by only $100 (to $199), any developer that generated less than $100 in revenue per year would actually be *worse* off.  Hitt ¶ 330-33.  These developers account for 75.6% of the putative developer class.  *Id.* ¶ 333.  Such "offsets" must be taken into account to determine each putative class member's "'*net*' injury incurred as a result of the [alleged] antitrust violation." *L.A. Mem. Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1366–67 (9th Cir. 1986) (holding that "if benefits accrued to [a plaintiff] because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct."); *see In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 95 (S.D.N.Y. 2017) (denying certification because individualized issues relating to class members' offsetting benefits from the alleged conduct predominated); *Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) (same); *see* Schmalensee ¶ 114.

Moreover, different developers have different monetization strategies, some of which would be less profitable in the but-for world.  *See* Hitt ¶¶ 68, 238, 250, 276; *see also* Ex. 16, Simon Dep. 65:22–67:21, 69:10–22 (explaining monetization strategies that Yoga Buddhi considered); Ex. 11, Ong Dep. 17:3–9, 71:21–72:2 (explaining that Match Group monetizes its apps through subscriptions, single use in-app purchases, and advertising).  For example, a smaller developer may be disadvantaged in competition with larger rivals who will benefit from their higher volume through self-distribution, sideloading, or lower volume-based rates.  Or a developer that primarily offers ad-supported services might benefit little from a reduction in commissions but be harmed by the resulting reduction in prices charged by rivals that rely on a paid-download model or in-app purchases.  And since "benefits must be offset against losses" for each developer, these developers who would be worse off in the but-for world—*even assuming lower commission rates*—are uninjured.  *Kottaras*, 281 F.R.D. at 25.

Changes to the App Store business model would also negatively impact free app developers,

whom Plaintiffs exclude from their putative class.  But despite gerrymandering them out of their class, Schmalensee ¶¶ 37-39, Plaintiffs cannot ignore free apps entirely.  Many paid app developers *also* develop free apps, *see* Hitt ¶ 66, and therefore any benefit to their free apps from Apple's current policies would need to be offset against the alleged harm to their paid ones.  *See* Schmalensee ¶¶ 23, 114-116, 170.  For example, in the but-for world, Apple could choose to monetize in-app advertising, which many free apps rely on for revenue.  Schmalensee ¶¶ 166-170, 277;  Malackowski ¶ 204; Willig ¶ 226-235.  This would leave a developer who earns minimal revenue on its paid app (and thus pays little commission), and earns most of its money from advertising on its free apps, worse off in the but-for world.  *See* Ex. 7, Elhauge Dep. 210:13-19 (claiming that a developer is injured if it has only one $0.99 app for which there is only one purchase and a second free app that has "been downloaded 10 million times").  Plaintiff Cameron would similarly be likely to be harmed in the but-for world, as a 1% increase in the annual $99 developer fee would more than offset his alleged injury in 2020, when he sold only one app for $2.99, yielding an overcharge claim (on his methodology) of two nickels.

### C.  Determining Which Developers Are Injured and Which Are Not Requires Individualized Proof

Even assuming Plaintiffs could show that a sufficiently large number of class members suffered injury as a result of the challenged restraints (and they have not), their class certification bid still would fail because determining *which* developers have been injured (and to what extent) requires individualized proof.  *See Bayshore Ford Truck v. Ford Motor Co.*, No. 99-741, 2010 WL 415329, at *10-13 (D.N.J. 2010) (individualized issues predominated where class members' ability to earn profits depended on competition, customer, and employee issues unique to each member); *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 947 (9th Cir. 2009) ("fact-intensive individual analysis").  The individual developers in the putative class face widely varying circumstances.  Hitt ¶¶ 344-348.

Identifying injured developers "with any degree of confidence would require an assessment of individual-specific facts."  *In re Intuniv Antitrust Litig.*, No. 16-cv-12396, 2019 WL 3947262, at *8 (D. Mass. Aug. 21, 2019); *see Asacol*, 907 F.3d at 51.  To determine whether a given developer was injured and, if so, the extent of the injuries, Plaintiffs must compute "the optimal price and quantity [of apps sold] that would have prevailed in the but-for world, and compar[e] profits between the actual and

Gibson, Dunn & Crutcher LLP

the but-for world." Schmalensee ¶ 191.  They therefore would need to show, among other things, (1) whether each developer would have actually used an alternative distribution channel; (2) if so, what distribution channels the developer would have used, including the share of transactions on each distribution channel and the commission rates and rules for each at any given time; (3) the extent to which each developer would have faced higher fees for use of Apple's intellectual property; (4) whether and to what extent each developer would have changed its prices as a result of different available commission rates and varying competitive conditions, either increasing its profit margins or passing on savings to consumers (which, of course, will vary significantly from app-to-app); (5) how the competitive environment would have affected sales for each developer; and (6) whether alternative distribution channels would offer reduced quality, security, or privacy, and the extent to which the developer values those features.  *See, e.g.*, Hitt ¶¶ 275-278.

Plaintiffs offer *no* answer to how such questions could be answered with common proof.  In fact, Profs. Elhauge explicitly disclaimed investigating them, as evidenced by the fact that he does not know what percentage of developers would have been harmed if Apple charged a default commission rate of 30% in the but-for world.  Ex. 7, Elhauge Dep. 194:14-195:23; *see* Economides Dep. 242:15-244:17.  Similarly, Prof. Elhauge could not say whether less than 100% of putative class members would have suffered harm had Apple charged a default 30% commission rate until 2018 (*id.* 196:11-198:2), or had it employed the commission structure used by Steam—the largest Windows PC gaming app developer—in a market Plaintiffs view as untainted by anticompetitive conduct (*id.* 198:23-199:20).  Nor could he opine on what commissions the App Store or alternative iOS app stores might charge in the but-for world (*id.* 140:20-143:17, 147:10-18, 199:21-200:6), and did not investigate how or whether developers might choose to transact through multiple distributors in a but-for world (*id.* 198:3-22).  Prof. Economides likewise falls short—primarily because he *assumes* the inquiry will be a common one by using average data that masks the individualized nature of this complex inquiry.

### 1.     Developers would be subject to varying but-for commission

While Prof. Economides purports to "model" commission rates of 13%, ███ or 14.8% that would have prevailed in the but-for world, his calculations are based on cherry-picked "benchmarks" charged by a subset of PC transaction platforms and his estimation of the supposed costs developers

would pay to directly distribute apps to consumers. *See* Mot. to Excl. at ___. Moreover, his benchmarks are *average* commissions across an array of diverse distribution channels, which ignore the fact that actual commissions vary depending on distribution channels. For example, Prof. Economides's use of weighted averages in his "yardstick" analyses ignores the fact that many of the individual transactions in his yardstick, such as those in Steam or the Microsoft Store, were at a 30% headline commission that would be no different in the but-for world. Hitt ¶¶ 92, 98. By using a uniform average commission (of 13%, ██████ or 14.8%, depending on the "yardstick") in the but-for world, Prof. Economides masks the individualized, channel-dependent nature of each developer's but-for commission and thus the individualized nature of the inquiry into whether each developer has been harmed. Hitt ¶¶ 150-152; *see* Schmalensee ¶¶ 22, 181-182 ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████. *See* Hitt Fig. 23 (summarizing headline commission rates). Plaintiffs have identified no app store, on any platform, that charges the same commission (at any rate) to all developers, all the time.

There is no reason to assume, therefore, as Plaintiffs' experts do, that moving to a collection of differentiated iOS-app stores would give rise to a single uniform commission. Instead, it would have widely varying effects on different app developers, which could be predicted, if at all, only on an individualized basis. *See* Hitt ¶¶ 275-281; Elhauge ¶ 325 (conceding "there would be significant variation in the different firms' individually profit-maximizing commissions."); Ex. 7, Elhauge Dep. 257:18-23 (platforms would charge different commission rates in the but-for world). For example, the impact on Mr. Cameron would be different than the impact on Electronic Arts, because "the game stores in general have higher effective commission rates." Ex. 6, Economides Dep. 186:8-18; *see also* Hitt Fig. 27 (showing differentiated commission rates for games and non-games).

> **2. Developers would face varying costs to use Apple IP in the but-for world**

Plaintiffs and their experts also ignore the likelihood that Apple would *raise* fees for use of its intellectual property by developers—particularly for those using it to monetize their apps outside of the App Store. *See* Schmalensee ¶¶ 19, 21, 117-118, 133, 143-144, 172 ("[I]t is likely that in a but-for

world, other elements of Apple's multi-dimensional pricing policies would change while the 30 percent commission would not."). Apple has invested more than $100 billion in research and development since 2005, which has resulted in, among other things, IP assets that Apple licenses to developers to build iOS apps. Malackwoski ¶¶ 19-21, 82-127, 143-65. Plaintiffs' experts implausibly assume that Apple would reduce its commissions—by more than half—without any offsetting increases in fees to compensate for this benefit. *See, e.g.*, Ex. 7, Elhauge Dep. 97:04-05 ("I haven't made any assumption about that changing."); Economides Dep. 110:24-114:1, 224:23-225:25 ("$99 is the present standard fee, and I would expect it to stay the same."). Apple is, however, unlikely to continue licensing these technologies to developers using its current business model—without additional compensation—if developers could distribute iOS apps outside of the App Store. Schmalensee ¶¶ 143-144. Rather, Apple likely would monetize technology licensed to others to build software through various other models common for software licensing, such as increased annual developer fees, a royalty on developer profits, charging for app review, or licensing specific technologies for a fee. *See* Schmalensee ¶¶ 143-158; Malackowski ¶¶ 196-207; Willig ¶¶ 193-207; *see also* Ex. 7, Elhauge Dep. 93:13-95:5. At the same time, it could change other aspects of its monetization policy, such as introducing special discounts for limited groups of developers. Schmalensee ¶¶ 159-160.

While the precise effects would depend on how Apple modified its overall revenue model, and whether those fees were ultimately borne by developers or consumers, *see, e.g.*, *Amex*, 138 S. Ct. at 2281 (describing the "optimal balance of the prices charged on each side of the platform"), such fees in some cases would likely offset alleged reductions in commissions for many developers. And determining if and the extent to which that were so requires considering individualized issues for tens of thousands of disparate members of the class.

### 3.  Developers would vary in how they price their apps in the but-for world

Plaintiffs make the extraordinary assumption that not a single developer facing a lower commission would change the price of apps in the but-for world. *See, e.g.*, Economides ¶ 64 ("I calculate damages assuming that developers would not change their prices."); Ex. 6, Economides Dep. 241:12-16 (agreeing with such an assumption); Ex. 7, Elhauge Dep. 42:24-25, 247:9-15 ("I think app prices are unlikely to change in the but-for world . . . ."). By making that blanket assumption, across

1   ████████████ developers, *see, e.g.*, Ex. 7, Elhauge Dep. 177:12-179:15, Economides's model

2   erroneously assumes that Plaintiffs fully absorb cost increases and decreases resulting from Apple's

3   commission, rather than passing them through at least in part to consumers.  Economides ¶ 55 ("[M]y

4   model does not rely on pass-through occurring"); Ex. 7, Elhauge Dep. 40:6-8; 40:23-25; 42:15-19;

5   43:7-13 (although I "have not done any empirical analysis," pass-through is "not relevant" and "very

6   unlikely").  This assumption runs directly counter to evidence confirming that many developers pass-

7   through Apple's commission in whole or in part to consumers, and it is in sharp conflict with the

8   analysis of Professor McFadden who calculates an approximately 80% pass-through rate, and thus

9   greatly overstates the commonality of injuries and damages allegedly suffered by the putative class.

10  *See, e.g.*, Ex. 7, Elhauge Dep. 250:9-251:22, 255:2-255:24 (developers would pass-through even small

11  amounts if Apple removed allegedly anticompetitive pricing tiers); *See, e.g.*, ████████████

12  ████████████████████████████████████

13  ████████████ Ex. 1, Cameron Dep. 150:24-151:8, 158:11-160:22 (same for Cameron).

14      Indeed, in seeking to claim the full amount of any alleged overcharge in commissions for

15  themselves, Plaintiffs proffer a damages model runs directly counter to the Supreme Court's

16  instructions in *Pepper* regarding what may constitute a viable antitrust claim.  *See, e.g.*, *Rail Freight*,

17  934 F.3d at 626 ("No damages model, no predominance, no class certification.").  Because Plaintiffs

18  have chosen to ignore that developers pass through Apple's commission (in varying degrees) to

19  consumers—apparently to downplay predominant individualized issues—their model inexplicably

20  *includes* damages sought by consumers, making it an impermissible "dueling claim" by both putative

21  classes.  *See* Mot. for Trial Plan; *see also, e.g.*, Schmalensee ¶¶ 24-25, 129, 192-195, 222 (properly

22  determining lost profits requires avoiding "double-counting").

23  **III.     The Proposed Class Action Is Not Manageable Or Superior To Individual Actions**

24      A class action is neither "manageable" nor "superior" to individual actions in this case.  Fed.

25  R. Civ. P. 23(b)(3).  Aside from failing to heed the Supreme Court's warnings in *Pepper* about

26  duplicative damages (*see* Mot. for Trial Plan),[16] Plaintiffs launch fundamentally the same assault as

---

[16]  The novelty and complexity of the legal issues in this damages action "weigh heavily" against certification.  *Zinser v. Accufix Research Institute*, 253 F.3d 1180, 1192 (9th Cir. 2001); *Qualcomm*,

(Cont'd on next page)

did Epic on Apple's business model—alleging that Apple monopolized a single-brand iOS app distribution market by requiring developers to sell iOS apps through the App Store, and seeking an order forcing Apple to provide a compulsory license to its IP.[17]  But in *Epic*, the parties required a three-week trial encompassing more than 4,000 pages of transcripts, more than 850 admitted exhibits, and 26 witnesses to develop facts relating to only one specific developer.  There can be no question that the Court's analysis will depend in numerous ways on facts that are unique to each developer and/or its category of apps, making a class action involving tens of thousands of developers simply unmanageable.  *See* Fed. R. Civ. P. 23(b)(3)(D).  Indeed, even the few developers that Epic called at trial demonstrated fundamental differences.  *See, e.g.*, Ex. 16, Simon Dep 46:13–25, 51:13–21 (Yoga Buddhi creates health and wellness apps that sells its content exclusively through a subscription); Ong. Dep. 12:13–23, 17:3–9, 71:21–72:2 (Match Group creates dating apps including Tinder which offer services for free but which also offer premium content both through subscriptions and single use in-app purchases).  Extrapolating those differences to thousands upon thousands of small and large developers across a broad swath of industries would be a nightmare, and would require extensive discovery and testimony by numerous witnesses on the merits that itself would likely result in decertification due to individual differences.  In fact, Plaintiffs have already subpoenaed more than 70 third parties.

Even if a class action could somehow be maintained and litigated with great difficulty, it would hardly be "superior" to individual actions by aggrieved developers for "fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Many developers with substantial potential claims (such as Epic) have the resources to bring their own suits and have a strong pecuniary interest

---

969 F.3d at 990-91 ("novel business practices—especially in technology markets" require careful scrutiny) (citation omitted); *NCAA v. Alston*, 141 S. Ct. 2141, 2166 (2021) (internal citation omitted).  That is especially true here, where Plaintiffs' claims present "questions at the frontier edges of antitrust law in the United States." Ex. 38, *Epic* Preliminary Injunction Order at 10.  There is not a "prior track record of trials" dealing with the novel claims at issue "from which the district court can draw the information necessary to make the predominance and superiority analysis required by rule 23." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 747, 750 (5th Cir. 1996).

[17]   The Court expressly asked Epic CEO Tim Sweeney about coordination between Epic and the class plaintiffs about their respective lawsuits but Mr. Sweeney deferred that question to his lawyers.  Ex. 17, Trial Tr. at 155:13-25 (Sweeney).  Apple has since sought communications between Epic and class plaintiffs about such coordination but class plaintiffs have refused to produce or log such communications.  These communications are the subject of motion practice before Judge Hixson.

"in individually controlling the prosecution . . . of separate actions," as opposed to relying on Mr. Cameron and Pure Sweat to advance the divergent interests of the class. Rule 23(b)(3)(A). Indeed, one prominent putative class member (Epic) has already opted out and tried its case against Apple. *See* Rule 23(b)(3)(B) (court must consider "the extent and nature of any litigation concerning the controversy already begun by or against class members"). By contrast, developers with low-dollar claims are generally "small developers" (like Mr. Cameron and Pure Sweat), who—to the extent they even seek to upend the App Store—are comparatively less inclined to demand substantial changes. *See* Mot. 2, 23-24 ("nearly all developers paying commissions" benefit from the Small Business Program, and a large number of duplicative lawsuits is only a "potential" alternative to class litigation).

Plaintiffs rely on broad statements about the practical benefits of aggregating large numbers of potential small claims against a "well resourced and lawyered adversary." *See* Mot. 2-3, 23-24. But neither practicality, nor "efficiency," nor "pragmatism" in seeking to provide a forum (Mot. 3) can replace Rule 23's stringent commonality and predominance requirements, which account for those concerns yet set rigorous standards. *See, e.g.*, 2 Newberg on Class Actions § 4:67 (5th ed.) (explaining that "the judicial economy purpose is closely linked to the predominance requirement" because "[t]he greater the predominance of common issues, the more economical a class action is likely to be. Conversely, courts have found that class actions are *not* economical when there are *too many* individual issues to be resolved" (emphasis added)); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004), *abrogated in part on other grounds*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ("the more common issues predominate . . . the more desirable a class action . . . .").[18]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for class certification.

---

[18] Certification under Rule 23(b)(2) is similarly unwarranted, as Plaintiffs have failed to show that Apple "acted or refused to act on grounds generally applicable to the class," as the rule requires, and does not authorize certification where class members primarily seek 'individualized award[s] of monetary damages" *Dukes*, 564 U.S. at 361 (quotation marks omitted); *see, e.g.*, *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998). Such a class must be so cohesive that it is appropriate to order the same remedy for all members, which it is not here. *See Georgine v. Amchecm Prods., Inc.*, 83 F.3d 610 (3d Cir. 1998), *aff'd, Amchecm Prods., Inc. v. Windsor*, 521 U.S. 561, 624 (1997)).

Gibson, Dunn & Crutcher LLP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GIBSON, DUNN & CRUTCHER LLP

DATED:  August 10, 2021

By     /s/ Daniel G. Swanson
       Theodore J. Boutrous Jr.
       Richard J. Doren
       Daniel G. Swanson
       Jay P. Srinivasan
       Mark A. Perry
       Cynthia E. Richman
       Veronica S. Moyé
       Ethan Dettmer
       Rachel S. Brass
       Caeli Higney

       *Attorneys for Defendant Apple Inc.*