THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
RICHARD J. DOREN, SBN 124666
  rdoren@gibsondunn.com
DANIEL G. SWANSON, SBN 116556
  dswanson@gibsondunn.com
JAY P. SRINIVASAN, SBN 181471
  jsrinivasan@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue Los Angeles, CA 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520

VERONICA S. MOYÉ (Texas Bar No.
24000092; pro hac vice)
  vmoye@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
Telephone: 214.698.3100
Facsimile: 214.571.2900

MARK A. PERRY, SBN 212532
  mperry@gibsondunn.com
CYNTHIA E. RICHMAN (D.C. Bar No.
492089; pro hac vice)
  crichman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

ETHAN DETTMER, SBN 196046
  edettmer@gibsondunn.com
RACHEL S. BRASS, SBN 219301
  rbrass@gibsondunn.com
CAELI A. HIGNEY, SBN 268644
  chigney@gibsondun.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105
Telephone: 415.393.8200
Facsimile: 415.393.8306

Attorneys for Defendant APPLE INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DONALD R. CAMERON, *et al.* <br><br> Plaintiffs <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | Case No. 4:19-cv-03074-YGR <br><br> **DEFENDANT APPLE INC.'S NOTICE OF *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> The Honorable Yvonne Gonzalez Rogers <br><br> Date:        Nov. 16, 2021 <br> Time:        10:00 a.m. <br> Courtroom: 1, 4th Floor |

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER
ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-cv-03074-YGR-TSH

1    **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2        **PLEASE TAKE NOTICE** that on November 16, 2021 at 10:00 a.m. before the Honorable

3    Yvonne Gonzalez Rogers, in Courtroom 1 of the United States District Court, Northern District of

4    California, located at 1301 Clay Street, Oakland, CA 94612, Defendant Apple Inc. will and hereby

5    does move this Court to exclude opinions of Professor Einer Elhauge, Professor Nicholas Economides,

6    and Christian Tregillis, in support of Plaintiffs' Motion for Class Certification, on the grounds they are

7    unreliable, speculative, and irrelevant under Federal Rules of Evidence 401, 403, and 702 as well as

8    *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*,

9    526 U.S. 137 (1999), and related authorities.

10        This motion is based on this Notice of Motion and Motion, the concurrently filed Memorandum

11   of Points and Authorities, all accompanying Declarations and Exhibits, other documents, pleadings,

12   and papers on file in this or related actions, oral argument of counsel, witness testimony, and any other

13   matters of which the Court may take judicial notice.

14        Apple further respectfully requests that prior to the consideration of the opinions of Prof.

15   Elhauge, Prof. Economides, and Mr. Tregillis, an evidentiary hearing should be held to determine

16   whether Apple's *Daubert* and Rule 702 objections should be sustained.

17                                                  GIBSON, DUNN & CRUTCHER LLP

18

19                                                  By: */s/ Daniel G. Swanson*

20                                                      Theodore J. Boutrous Jr.
                                                        Richard J. Doren
21                                                      Daniel G. Swanson
                                                        Mark A. Perry
22                                                      Veronica S. Moyé
                                                        Cynthia E. Richman
23                                                      Jay P. Srinivasan
                                                        Ethan Dettmer
24                                                      Rachel Brass
                                                        Caeli Higney
25

26                                                  *Attorneys for Defendant Apple Inc.*

27

28

1

**CONTENTS**

2   I.      INTRODUCTION ................................................................................................ 1

3   II.     RELEVANT BACKGROUND ............................................................................ 2

4   III.    LEGAL STANDARD ......................................................................................... 4

5   IV.     ARGUMENT ...................................................................................................... 5

6           A.      Plaintiffs' Experts' Opinions Regarding Classwide Injury Must Be Excluded ........... 5

7                   1.      Plaintiffs' Experts' Theory of Classwide Impact Rests On Unsupported
                           Assumptions Regarding But-For Commission Rates, Not A Reliable
8                          Methodology ................................................................................................ 5

9                   2.      Plaintiffs' Experts' Opinions Regarding Injury Are Contrary To The
                           Law ............................................................................................................... 9

10          B.      Prof. Economides's "Yardstick" Analysis Is Unreliable ............................................ 14

11                  1.      Prof. Economides's Windows/PC Yardstick Analysis Relies On
                           Misleading Averages .................................................................................. 14

12                  2.      Prof. Economides's Use of Epic's Self-Distribution Costs In His
13                         Yardstick Results In Double-Counting ...................................................... 15

14                  3.      Prof. Economides's Inconsistent Treatment of China-Based Yardsticks
                           Is Unreliable .............................................................................................. 16

15                  4.      Prof. Economides's Cherry-Picking Renders His Yardstick Analysis
16                         Unreliable ................................................................................................... 17

17                  5.      Prof. Economides's Exclusive Use Of Data From 2018 and 2019
                           Renders His Yardstick Unreliable When Applied To the Entire Class
18                         Period ......................................................................................................... 18

19                  6.      Prof. Economides's Microsoft Yardstick is Unreliable .............................. 19

20                  7.      Prof. Economides's "Rival Profit Yardstick" Is Founded on Baseless
                           Assumptions ............................................................................................... 19

21          C.      Plaintiffs' Experts' Opinions Regarding the Relevant Market and Market
                   Power Are Unreliable and Unhelpful to the Court ...................................................... 20

22                  1.      Prof. Elhauge Fails To Engage In The Threshold Substitutability
23                         Analysis ...................................................................................................... 20

24                  2.      Prof. Elhauge's Application of the Hypothetical Monopolist Test Is
                           Unreliable ................................................................................................... 22

25                  3.      Plaintiffs' Experts' Market Power Opinions Are Unreliable ...................... 22

26          D.      Prof. Elhauge's Undisclosed Opinions On Conduct Should Be Excluded ................. 24

27   V.     CONCLUSION ................................................................................................... 25

28

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abarca v. Franklin Cty. Water Dist.*,
 761 F. Supp. 2d 1007 (E.D. Cal. 2011)..............................................................................17, 22

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
 135 F. Supp. 2d 1031 (N.D. Cal. 2001) ...........................................................................5, 13, 22

*Apple Inc. v. Pepper*,
 139 S. Ct. 1514 (2019) .................................................................................................10, 11, 12, 13

*Apple Inc. v. Samsung Elecs. Co.*,
 No. 11-CV-01846, 2018 WL 1586276 (N.D. Cal. Apr. 2, 2018) ....................................13

*Apple Inc. v. Samsung Elecs. Co.*,
 No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012) ........................11

*Bailey v. Allgas, Inc.*,
 284 F.3d 1237 (11th Cir. 2002)........................................................................................23

*Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*,
 923 F. Supp. 2d 1245 (S.D. Cal. 2013) ...........................................................................24

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962).........................................................................................................21

*Chi. Bridge & Iron Co. v. FTC*,
 534 F.3d 410 (5th Cir. 2008)............................................................................................23

*Claar v. Burlington N. R. Co.*,
 29 F.3d 499 (9th Cir. 1994) .............................................................................................22

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ...........................................................................................................25

*Concord Boat Corp. v. Brunswick Corp.*,
 207 F.3d 1039 (8th Cir. 2000)..........................................................................................10

*Crowley v. EpiCept Corporation*,
 No. 9-CV-0641, 2015 WL 13827908 (S.D. Cal. Mar. 11, 2015) ...................................22

*Dat Thanh Luong v. Napa State Hosp.*,
 No. 17-CV-06675-EMC(JSC), 2019 WL 4083032 (N.D. Cal. Aug. 29, 2019) .............25

ii

Gibson, Dunn &
Crutcher LLP

*Daubert. Estate of Barabin v. AstenJohnson, Inc.*,
740 F.3d 457 (9th Cir. 2014)................................................................................5

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993)...........................................................................2, 4, 5, 6, 25

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010)..................................................................18

*FTC v. Staples*,
190 F. Supp. 3d 100 (D.D.C. 2016) .....................................................................21

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997)......................................................................................1, 13

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008).....................................................................15, 16

*Groupo Televisa, S.A., v. Telemundo Communications Group, Inc.*,
No. 04-CV-20073, 2005 WL 5955701 (S.D. Fla. 2005) .........................................23

*High Tech. Careers v. San Jose Mercury News*,
No. 90-CV-20579, 1995 WL 115480 (N.D. Cal. Mar. 14, 1995)...............................23

*It's My Party, Inc. v. Live Nat., Inc.*,
88 F. Supp. 3d 475 (D. Md. 2015) .......................................................................20

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)............................................................................................5

*In re Lamictal Direct Purchaser Antitrust Litig.*,
957 F.3d 184 (3d Cir. 2020)................................................................................16

*Lust By & Through Lust v. Merrell Dow Pharms., Inc.*,
89 F.3d 594 (9th Cir. 1996).................................................................................5

*Menasha Corp. v. News Am. Mktg. In-Store, Inc.*,
354 F.3d 661 (7th Cir. 2004)..............................................................................23

*Moussouris v. Microsoft Corp.*,
311 F. Supp. 3d 1223 (W.D. Wash. 2018).............................................................19

*Muffett v. City of Yakima*,
No. CV-10-3092-RMP, 2012 WL 12827492 (E.D. Wash. July 20, 2012)..............14, 17

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) .......................................................................................14

*Olin Corp. v. FTC*,
    986 F.2d 1295 (9th Cir. 1993)................................................................................23

*ProMedica Health Sys., Inc. v. FTC*,
    749 F.3d 559 (6th Cir. 2014)................................................................................21

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009)........................................................................6, 16

*State Farm Fire & Cas. Co. v. Electrolux Home Prods.*,
    980 F. Supp. 2d 1031 (N.D. Ind. 2013) ................................................................17

*U.S. Fid. & Guar. Co. v. Lee Invs. LLC*,
    641 F.3d 1126 (9th Cir. 2011)................................................................................25

*United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku
    Pharma USA*,
    296 F. Supp. 3d 1142 (N.D. Cal. 2017) ................................................................11

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)................................................................................................21

*Wal-Mart Stores, Inc., v. Dukes*,
    564 U.S. 338 (2011)..................................................................................................6

*In re Wholesale Grocery Prod. Antitrust Litig.*,
    946 F.3d 995 (8th Cir. 2019)..................................................................................17

*Young v. Cree Inc.*,
    No. 4:17-CV-06252, 2021 WL 292549 (N.D. Cal. Jan. 28, 2021)..........................5

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)............................................................................19, 20

OTHER AUTHORITIES

5E Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and
    Their Application ¶ 565c (4th ed. 2020 supp.) ......................................................21

ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues 220 (2005) ....15

Steam Team, New Revenue Share Tiers and other updates to the Steam Distribution Agreement
    (Nov. 30, 2018), https://steamcommunity.com/groups/steamworks/announcements/detail/
    1697191267930157838..............................................................................................9

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER
ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

**TABLE OF ABBREVIATIONS**

| Abbreviation | Referenced Document |
|---|---|
| Ex. __ | Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Developer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s Motion to Exclude Testimony of Professor Einer Elhauge, Professor Nicholas Economides, and Christian Tregillis, filed concurrently. |
| Cons. Opp. __ | Defendant Apple Inc.'s Opposition to Named Consumer Plaintiffs' Motion for Class Certification, filed concurrently in *Pepper,* et al. *v. Apple Inc.*, 4:11-cv-06714-YGR. |
| Dev. Opp. __ | Apple Inc.'s Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Class Certification, filed concurrently. |
| Mot. __ | Plaintiffs' Notice of Motion and Motion for Class Certification; Memorandum of Points and Authorities, filed June 1, 2021 at Dkt. 441. |
| [Name] Dep. __ | Deposition transcript of named witness, attached as an Exhibit to the Declaration of Rachel S. Brass in Support of Defendant Apple Inc.'s Opposition to Developer Plaintiffs' Motion for Class Certification and Defendant Apple Inc.'s Motion to Exclude Testimony of Professor Einer Elhauge, Professor Nicholas Economides, and Christian Tregillis, filed concurrently. |
| Trial Tr. __ | Transcript of the trial held in *Epic Games, Inc. v. Apple Inc., 4:20-cv-05640-YGR-TSH*, from May 3, 2021 to May 24, 2021, in Oakland, CA. |
| Hitt ¶ __ | Expert Report and Declaration of Lorin M. Hitt, Ph. D., dated August 10, 2021 and filed concurrently. |
| Malackowski ¶ __ | Expert Report and Declaration of James E. Malackowski, dated August 10, 2021 and filed concurrently. |
| Prince ¶ __ | Expert Report and Declaration of Jeff Prince, Ph. D., dated August 10, 2021 and filed concurrently. |
| Rubin ¶ __ | Expert Report and Declaration of Aviel D. Rubin, Ph. D., dated August 10, 2021 and filed concurrently. |
| Schmalensee ¶ __ | Expert Report and Declaration of Richard Schmalensee, Ph. D., dated August 10, 2021 and filed concurrently. |
| Simonson ¶ __ | Expert Report and Declaration of Itamar Simonson, Ph. D., dated August 10, 2021 and filed concurrently. |
| Willig ¶ __ | Expert Report and Declaration of Robert D. Willig, dated August 10, 2021 and filed concurrently. |
| McFadden ¶ __ | Expert Class Certification Report of Plaintiffs' Expert Daniel L. McFadden, dated June 1, 2021 and filed in *Pepper,* et al. *v. Apple Inc.*, 4:11-cv-06714-YGR at Dkt. 442-11. |
| Economides ¶ __ | Expert Class Certification Report of Plaintiffs' Expert Professor Nicholas Economides, filed June 1, 2021 at Dkt. 332-1. |
| Elhauge ¶ __ | Expert Class Certification Report of Plaintiffs' Expert Professor Einer Elhague, filed June 1, 2021 at Dkt. 332-2. |
| Tregellis ¶ __ | Expert Class Certification Report of Plaintiffs' Expert Christian Tregillis, filed June 1, 2021 at Dkt. 332-3. |

Gibson, Dunn &
Crutcher LLP

## I.  INTRODUCTION

Donald Cameron and Pure Sweat Basketball's ("Plaintiffs'") theory of classwide harm and damages rests on their economists' construct of a "but-for world."  Mot. at 14.  Economists regularly offer opinions on common impact and damages based on the construction of rigorous models built to test actual evidence.  Here, Plaintiffs' experts do nothing of the sort.  Instead, they replace recognized and reliable methodologies with a series of assumptions that cannot be reconciled with real world.  Take Plaintiffs' but-for "competitive" commission rate.  In the real world, entitles Plaintiffs deem "more competitive" charged a default rate of 30%, as did Apple itself on the Mac App Store.  But rather than base their "but-for world" on this readily available real-world evidence—or even consider it— Plaintiffs' experts, Professor Elhauge and Professor Economides, assume that absent Apple's alleged conduct, it would have been forced to charge less than 30% for every developer and every app transaction.  Based solely on that assumption, and ignoring other critical realities—such as the likelihood that Apple would continue to seek to monetize developer use of its intellectual property in the but-for world—Prof. Elhauge concludes that 100% of the putative developer class was impacted by Apple's alleged conduct.  His opinion is plainly inconsistent with the facts, and therefore "there is simply too great an analytical gap between the data and the opinion proffered."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Prof. Economides's damages yardsticks suffer from the same fundamental misspecification.  His yardsticks consist of misleading averages of commission rates from three cherry-picked "PC app stores" and self-distribution costs for a few other stores, which he calculates based on the estimated costs of Epic Games Store alone.  And his damages opinions ignore the likelihood that some developers would likely pass-through at least some of those costs to consumers—thereby potentially reducing (or even eliminating) alleged injuries or damages purportedly suffered by individual class members and precluding a finding of classwide harm.

Plaintiffs' experts' other opinions fail Daubert's reliability standard as well.  Prof. Elhauge assumes, rather than analyzes, the facts undergirding his market definition and market power opinions.  Most egregiously, he assumes without analysis that the App Store provides a single product consisting

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

of all transactions for apps as divergent as Tinder, Lil' Baby Names, Roblox, and Disney+, rather than engaging in ay recognized economic analysis of the question. And to the extent Prof. Elhauge attempts to deploy the Hypothetical Monopolist Test, his approach reflects the same faulty assumption—that all iOS app transactions can be clustered together—and is unreliable for the same reasons. Finally, Plaintiffs point to the App Store's allegedly high profit margins in an attempt to bolster their claim that Apple enjoys monopoly power. But here too Plaintiffs' experts offer accounting-based opinions without adhering to recognized accounting principles, and simply ignore percipient witness testimony, including uncontradicted testimony from Apple's CEO Tim Cook, with respect to the documents they purport to interpret.

At end, Plaintiffs' exerts offer assumption rather than analysis, *ipse dixit* rather than methodology. Plaintiffs' experts' opinions should therefore be excluded under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

## II.   RELEVANT BACKGROUND

In support of their motion for class certification, Plaintiffs submitted reports from three expert witnesses—Prof. Einer Elhauge, Prof. Nicholas Economides, and Christian Tregillis. *See* Dkt. No. 332-2 ("Elhauge"); Dkt. No. 332-1 ("Economides"); Dkt. No. 332-3 ("Tregillis"). Prof. Elhauge and Prof. Economides purport to conduct economic analyses in support of Plaintiffs' claims, while Mr. Tregillis is an accountant tasked with calculating the App Store's operating margins.

**Professor Elhauge.** Prof. Elhauge addresses Apple's liability. Specifically, he opines that "[e]vidence common to the class indicates that all class members paid an anticompetitively inflated commissions [sic] to Apple during the class period," because in the but-for world, Apple would face more intense competition for all developers, so "one would accordingly expect Apple to respond by reducing commissions for *all* developers." Elhauge ¶¶ 16, 340-394. Prof. Elhauge conducts no empirical analyses to support this opinion, but instead bases it on the facts that Apple has historically maintained a two-tiered commission structure with a specific ratio and has not negotiated individual commissions. *Id.* ¶ 351. He also conducts no analysis of what commission rates Apple, or other app stores, would actually charge in the but-for world, and does not quantify the minimum amount of harm

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

or injury that every developer allegedly incurred.  Ex. 6, Elhauge Dep. 181:10-25.  As a predicate to his finding of classwide harm, Prof. Elhauge also opines that the relevant market is the "market for domestic iOS app and digital in-app-purchase ("IAP") distribution services" in the United States.  *Id.* ¶¶ 3-6, 27-179.  Based on his finding that the market consists of *only* iOS app transactions, he unsurprisingly concludes that Apple possesses monopoly power in such a market based on Apple's market share and supposed profit margins.  *Id.* ¶¶ 7-8, 180, 198.

**Professor Economides.**  Prof. Economides assumes Apple is liable and addresses damages.  Ex. 7, Economides Dep. 27:2-28:10.  Prof. Elhauge calculates a "overcharge measure of harm," whereby he takes "the average price that would exist in the but-for world and compare[s] it with the . . . . commissions that Apple charges in the present world."  *Id.* at 38:13-25.  To determine what those lower average "but-for" commissions would have been, he does not construct an economic model or offer any type of empirical analysis.  Instead, Prof. Economides attempts to "find 'yardsticks,'" that purportedly can be used to estimate the commission rates developers would have paid in the but-for world.  Economides ¶ 9.

First, looking to the "Windows PC app distribution market," he purports to take 2019 data from three "PC app stores distributing 3rd-party apps," which charged commission rates between 12% and 28%, and five "PC app stores self-distributing apps," for which he claims to estimate self-distribution costs.  *Id.* ¶¶ 30-39.  He then takes as his "yardstick" the average of these commission rates and self-distribution costs, "weighted" by sales volume (revenue), which he calculates to be 14.5%.  *Id.*  He thus flattens a spread of real-world effective commission rates ranging up to 28% (which *exceeds* Apple's average commission rate in each of the last three years of the class period, *id.* at ¶ 73 & Table 8), and blends them with estimated self-distribution costs (something else entirely), to manufacture a single, uniform average of 14.5%—an artificial rate more than ten percentage points lower than the actual effective commission rates for both Steam and the Microsoft Store.  Alternatively, Prof. Economides points to a "yardstick based on the profit margins of other online marketplaces" and—assuming that either one rival entrant would gain 35% market share or exactly two rival entrants would

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

1 gain 25% each—estimated that the but-for average commission rates would be 14.8% or 13%,
2 respectively.  *Id.* ¶¶ 9, 40-55.

3      Prof. Economides's "overcharge" measure of harm does not account for pass-through of
4 Apple's commissions, in whole or in part, to consumers.  Economides ¶¶ 9, 63.  In other words, it
5 assumes that developers bore the entirety of the alleged overcharge—not passing along any of it (or
6 any of the savings in the but-for world) to consumers.

7      **Mr. Tregillis.**  Finally, Mr. Tregillis opines on what he calls the App Store's operating margins,
8 which he says represent "how effectively a company is able to generate profit from its core operations."
9 Tregillis ¶ 25.  He compares those purported App Store margins to supposed operating margins for
10 several "other marketplace companies," and concludes that they have earned "much lower operating
11 margins than has Apple on the App Store."  *Id.* ¶¶ 8, 79-105.  Prof. Economides relies on Mr. Tregillis's
12 analyses for his own opinions relating to Apple's and its rivals' profit margins.  Economides ¶¶ 19, 25,
13 45.

14 ### III. LEGAL STANDARD

15      "Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to 'ensure that
16 any and all [expert] testimony … is not only relevant, but reliable.'"  *Kumho Tire Co. v. Carmichael*,
17 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).
18 When considering such testimony, the court has a "special obligation," *see Kumho*, 526 U.S. at 147-
19 48, to act as "gatekeeper" by assessing the soundness of the expert's methodology and excluding
20 testimony that does not satisfy Rule 702 or *Daubert*.  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d
21 457, 463 (9th Cir. 2014); *see Daubert*, 509 U.S. at 589–90.  For expert testimony to be sufficiently
22 reliable, there must be "good grounds" for the testimony—it cannot be based on "subjective belief or
23 unsupported speculation."  *Daubert*, 509 U.S. at 590.  The proponent of expert testimony bears the
24 burden of establishing its admissibility in support of class certification.  *Lust By & Through Lust v.
25 Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).  Admissibility must be proven by a
26 preponderance of the evidence.  *Daubert*, 509 U.S. at 592 n.10. Plaintiffs may not correct deficiencies
27 in proffered testimony by sandbagging Apple with "new opinion[s]" or "strength[ened] existing
28

Gibson, Dunn &
Crutcher LLP

opinions" on rebuttal.  *Young v. Cree Inc.*, No. 4:17-CV-06252, 2021 WL 292549, at *12 (N.D. Cal. Jan. 28, 2021) (Gonzalez Rogers, J.) (quotation marks omitted).

## IV.  ARGUMENT

### A.  Plaintiffs' Experts' Opinions Regarding Classwide Injury Must Be Excluded

Plaintiffs' theory of common antitrust injury and damages depends on proof of a common "but for" world.  Rather than deploy a reliable methodology to assess a competitive landscape untainted by the challenged conduct, their economists build their but-for world based on counterfactual assumptions. Their resulting opinions regarding common impact should be excluded.  *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041 (N.D. Cal. 2001) (rejecting expert model that "contains entirely too many assumptions and simplifications that are not supported by real-world evidence").[1]

#### 1.  Plaintiffs' Experts' Theory of Classwide Impact Rests On Unsupported Assumptions Regarding But-For Commission Rates, Not A Reliable Methodology

Plaintiffs rely on Prof. Elhauge—who offers *no* economic model or rigorous analysis—to demonstrate classwide injury.  Mot. at 14-16; Declaration of Rachel S. Brass, Ex. 7[2], Elhauge Dep. 184:16-21 (assuming "payment of an anticompetitively inflated commission in the actual world necessarily mean[s] that a developer would have higher profits in the but-for world").  Their other expert, Prof. Economides, testified that he was "*assuming* that the developers in the class all got injured."  Ex. 6, Economides Dep. 28:4-7 (emphasis added).  To the extent Prof. Economides purports to offer an opinion on classwide harm that is "independent[]" from Prof. Elhauge's opinion, he could not articulate "exactly what method Prof. Elhauge used" or how his was different.  *Id.* at 37:5-38:2. Further, there is no analysis of injury as distinct from damages in his report, and any claim that he

---

[1]  Plaintiffs likely will argue that Apple's numerous challenges to their experts' opinions speak only to the weight such opinions should be afforded and not to their admissibility.  That is wrong, for the reasons explained.  But should the Court agree, it should accord those opinions the proper weight of zero.  *See Reed v. Advocate Health Care*, 268 F.R.D. 573, 594 (N.D. Ill. 2009) (finding that expert testimony was "essentially inadmissible," but holding instead that it failed to "show common impact or damages" on the merits of the motion for class certification); *see also Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 354-55 (2011) (testimony of expert who "could not calculate whether 0.5 percent or 95 percent" of class members were injured was "worlds away" from showing common impact).

[2]  All exhibit references are to the Declaration of Rachel S. Brass unless otherwise indicated.

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

offers an opinion on classwide harm cannot be reconciled with his testimony to the contrary, or his general assumption regarding "Apple's liability," which necessarily entails a finding of impact.  Ex. 6, Economides Dep. 27:2-16.   Regardless, neither Prof. Elhauge nor Prof. Economides offers a discernable methodology for demonstrating classwide impact that satisfies *Daubert*.  *See Daubert*, 509 U.S. at 593.

Instead, Prof. Elhauge simply asserts that his "analysis concludes that Apple would have lowered [its 30% default] commission rate, and that that's a methodology we can use to show [classwide] injury." Ex. 7, Elhauge Dep. 195:12-23.  But that "methodology" hinges on an *assumption* that as a result of competition from some unspecified app stores and sideloading options, *all* of the App Store's commissions would have dropped below 30% in the but-for world—for every transaction and developer.  *See* Ex. 7, Elhauge Dep. 193:19-199:20 (conceding his "opinion on [classwide] impact depend[s] on Apple reducing its default commission rate below 30 percent in the but-for world"); Ex. 7, Elhauge Dep. 179:9-181:25;  Ex. 6, Economides Dep. 201:18–202:1, 222:5–25; *see also* Schmalensee ¶¶ 20, 131-133; Hitt ¶¶ 110-112.  He offers no testable methodology for arriving at that assumption:  he does not construct a model of App Store commission rates in the but-for world, or examine whether developers would have actually used an alternative distribution channel or what those channels would have cost.  Hitt ¶¶ 114, 185, 284–286; Ex. 6, Economides Dep. 198:3-200:6.  That is particularly problematic given his recognition that Apple and other iOS app stores would "have varying profit-maximizing commissions in the but-for world" and therefore charge different commission rates, but he offers no accounting of what those rates would have been—other than assuming they would have been less than 30%.  Elhauge ¶ 325; Ex. 7, Elhauge Dep. 195:24-196:10 (admitting that he never considered whether Apple would maintain a 30% commission).

While Prof. Elhauge's failure to base his conclusion on anything but assumption is alone a sufficient ground for exclusion, his opinion is irreconcilable with the evidence.  When Apple's CEO was asked in the *Epic* trial what Apple would do if other iOS app stores were available, he did not respond that he would cut Apple's commission rates as Plaintiffs' experts claim.  He instead replied, "[w]e'd have to differentiate in some way" to meet consumer demand.  Ex. 2, Trial Tr. 3934:23-3935:2

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

(Cook); *see also* Schmalensee ¶ 134.  Indeed, when the App Store first opened in 2008, well before Apple could be said to have any market power, Apple adopted a 30% default commission rate in exchange for offering an app transaction platform that is secure, private, and easy to use for developers and consumers alike.  It has continued to do so for many apps, while also implementing lower rates in certain circumstances such as a rate of 0% for free-to-download apps and apps subject to the "Reader Rule" or the "Multi-Platform Rule," and a rate of 15% for subscription renewals after the first year, for the Video Partner Program, and for the Small Business Program on the first $1 million.  *See* Ex. 28, DX-4338 (App Review Guidelines § 3.1.3(a) (reader rule), § 3.1.3(b) (multiplatform rule)); DX-Ex. 22, 3256.003-.004 (subscriptions); Ex. 24, DX-3421 (video partner program); Ex. 27, DX-4168 (small business program).  Perhaps most tellingly, Apple itself maintains a 30% rate for the MacOS App Store, despite sideloading options available for MacOS.  Schmalensee ¶ 135.

Profs. Elhauge and Economides ignore this, as well as evidence that, in the real world, 30% was the predominant default commission rate offered by many transaction platforms, and has become industry standard.  *See* Hitt ¶¶ 151-52, 185-186 & Fig. 23; Schmalensee ¶ 135.

- **Android:**  On the Android platform, Google Play, Amazon, and Samsung charged default 30% commissions on app sales and in-app purchases throughout the class period, despite competing with one another and developers such as Epic who distributed directly to consumers.  Hitt ¶¶ 84, 87, 89, 151-52 & Fig. 23 (Google Play); ██████████████████████ ████████████████████████████████[3]

- **Microsoft:**  The Microsoft Store charged a 30% default rate to all developers from January 2015 to October 2017, and continued to charge 30% for games until August 1, 2021.  Hitt ¶ 98; ██████████████████.

- **Steam:**  Valve charged a 30% default rate for the vast majority of developers on Steam, an app distribution platform that focuses on games and provides for cross-platform purchases.  Hitt

---

[3] ████████████████████████████████████████████
██████████████████████████████

*(Cont'd on next page)*

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

¶ 92. ███████████████████████████████████████

████████████████████████████████[4]

- **Game Consoles:** ████████████████████████████████

████████████████████████████████████████

The "effective commission rate[s]" on these platforms were not materially different from Apple's effective commission rates during the class period, and may have been higher in some years. *Compare, e.g.*, Economides ¶ 38 & Table 4 (calculating "effective commission rate" of 28% for third-party transactions on Microsoft Store), *and* Ex. [x],[5] (commission rates were 30% for games making less than $10 million); Ex. 37, ██████████████████[6] *with* Economides ¶ 73 & Table 8 (calculating average commission rates of ███████████ for Apple during the class period). Even Prof. Elhauge does not dispute that, in the but-for world, Steam might enter with the same 30% default commission rate. Ex. 7, Elhauge Dep. 198:23-200:6. Given this reality, in which disparate and competing app transaction platforms charge 30% default commissions, there is no reason to think that Apple would be forced to lower its default commission rate across the board in the but-for world. *See* Schmalensee ¶¶ 134-138; Hitt ¶¶ 193-197. But this is precisely what Plaintiffs' experts assume.

That these opinions are based on guesswork, not reliable economics is underscored by the fact that Plaintiffs' own experts do not agree about the commission rates other app stores would charge in the "but-for" world. Prof. Economides assumes that "all firms in the market would charge the same commission rate to developers." *See* Ex. 6, Economides Dep. 226:1-230:5. But this ignores the fact that Apple offers a highly differentiated App Store with superior app review, privacy protection, security, convenience, performance and design—all of which drives a robust network of developers

---

[4] *See also* Cons. *Daubert* Mot. at p. 10. ██████████████████████████

████████████████████████████

[5] Ex. 30, Steam Team, New Revenue Share Tiers and other updates to the Steam Distribution Agreement (Nov. 30, 2018), https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.

[6] ████████████████████████████████████ This means it ██████████████████ Apple's effective rate in 2019. *See* Economides at Table 8.

*(Cont'd on next page)*

and consumers.  *See* Rubin ¶¶ 57-78, 82-105.[7]  Prof. Elhauge, on the other hand, recognizes that it would not be correct to "assume that all firms … in the but-for world would charge the same commission rate to developers,"  (Ex. 7, Elhauge Dep. 257:18-23), but offers no opinion or methodology for assessing what other iOS app stores would have charged in the but-for world (*id.* 198:3-200:6) much less takes that competition into account in his report.

Nor do either of Plaintiffs' experts provide a method to determine whether, and to what extent, each developer would transact through the Apple App Store, or through an alternative iOS app store, or directly with consumers.  *See* Hitt. ¶¶ 282-86.  As a result, they fail to wrestle with a highly individualized, multi-factored inquiry, one that is incompatible with their assumption of uniform change in a but for world.  To the contrary, many developers and consumers would choose to continue to transact through the App Store in the but-for world, either in full or in part, either because Apple would likely continue to charge commissions comparable to those offered on other platforms (*see*, *supra*, at pp. 6-8), or because the App Store would offer benefits that others could not match (Hitt. ¶ 314-320), even if its commissions were higher.  Perhaps some would move outside the App Store, but that is pure speculation, because Plaintiffs' experts do not even attempt to analyze those factors. As a result, they cannot reliably establish harm to any, much less all, developers.  *See Concord Boat Corp. v. Brunswick Corp.t*, 207 F.3d 1039, 1056-57 (8th Cir. 2000) (excluding expert testimony that did not "incorporate all aspects of the economic reality").

## 2.  Plaintiffs' Experts' Opinions Regarding Injury Are Contrary To The Law

Plaintiffs' experts offer opinions about an "overcharge" measure of harm.  *See* Ex. [x], Ex. 6, Economides Dep. 38:22-25 ("You can call it an overcharge measure of harm.  Yes, you can."); Ex. 7, Elhauge Dep. 228:22-229:2 (Economides calculates "an overcharge measure of damages"); Schmalensee ¶¶ 190-191.  That is contrary to the Supreme Court's express directive in *Apple Inc. v.*

---

[7]  Even the named plaintiffs in *Pepper* preferred the App Store in the face of alternatives.  *See, e.g.*, Ex. 39, Pepper Dep. 78:11-14 (explaining that even with a jailbroken iPhone, he never downloaded apps outside of the App Store); *id.* at 146:2-147:12 (Pepper "would hope" that any alternative to the App Store "would do something similar" with regard to privacy and security); Lawrence Dep. 230:25-231:21, 247:14-16 (It was "much easier" to acquire apps on the App Store as compared to Windows, and the App Store has "improved" his mobile phone experience); Ex. 15, Schwartz Dep. 88:18-21 (App Store "is quick and convenient").

*Pepper*, 139 S. Ct. 1514, 1525 (2019).  In *Pepper*, the Supreme Court held that Apple could potentially be subject to "multiple suits" brought by both the consumers of apps and app developers.  *Id.*  In doing so, the Court rejected Apple's argument that allowing consumers and developers to sue would "result in 'conflicting claims to a common fund—the amount of the alleged overcharge,'" *id.* at 1524, because "the two suits would rely on *fundamentally different theories of harm* and would not assert dueling claims."  *Id.* at 1525 (emphasis added).  The Court explained consumers would "seek damages based on the difference between the price they paid and the competitive price"—*i.e.*, "the *full amount* of the unlawful overcharge," while developers would merely seek the "fundamentally different" measure of "lost profits that they could have earned in a competitive retail market" for their apps.  *Id.*  That is decidedly not the subject of Plaintiffs' experts opinions.

Plaintiffs' experts' cannot overcome this flouting of the Supreme Court's instructions by labeling their overcharge assessment a "conservative" estimate of lost profits.  Economides ¶ 64, Ex. 6, Economides Dep. 38:13-39:17.  That is simply subterfuge to create an ostensibly common injury by pointing to an inflated *cost* of distributing through the App Store.  *See, e.g.*, Ex. 7, Elhauge Dep. 229:6-231:9 (Economides's model is "conservative," because he has "established a uniform floor" on "lost profits").  As Prof. Schmalensee explains, an overcharge in costs does not guarantee lost *profits* except under "very specific and unrealistic assumptions," including that a developer would not pass through lower commissions to consumers because the developer is acting as a monopolist.  *See* Schmalensee ¶¶ 184-195.  This is precisely the assumption that Prof. Economides makes.  *See* Ex. 6, Economides Dep. 246:24-248:5; Schmalensee ¶¶ 162, 185, 192-193.  But there can be no serious suggestion here that all app developers are monopolists; many "clearly face intense competition" from other apps, and such competition, combined with low barriers to entry, means that most of their gains from lower commissions "would be competed away and, in effect, what would have been lost profits in the absence of competition would become gains to consumers."  *Id.* ¶¶ 126-128, 163.  "On the more realistic assumption that all developers face some competition," Prof. Economides's measure would thus "*overstate* lost profits for developers that face strong competition, with the overstatement depending

on the intensity of competition each faces"—which is hardly a "conservative" of injury.  *Id.* ¶ 193 (emphasis added).

Because Plaintiffs' experts' opinions regarding injury are based on an "overcharge measure" as opposed to "lost profits," they are contrary to the law and therefore unreliable.  *See United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017) ("[E]xclusion of opinions that are … contrary to the law is appropriate through the *Daubert* process."); *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *6 (N.D. Cal. June 30, 2012) (excluding opinion that was contrary to the law as "unreliable under FRE 702 and *Daubert*").

### 3.  Plaintiffs' Experts' Injury Opinions Rest On The Unfounded Assumptions

Plaintiffs' experts' opinions regarding injury are also unreliable because they rest on the unfounded (and entirely unrealistic) assumption that *all* app prices would remain unchanged in the but-for world.  *See* Economides ¶ 64 ("I calculate damages assuming that developers would not change their prices."); Elhauge ¶ 64 n.61 (no position as to "whether in this case there would actually be any such pass through.").  Such an assumption ignores the variation inherent in different developers' business models and cost structures, which would affect their decisions regarding whether to pass through some, all, or none of Apple's commission rates to consumers when setting their app prices.  *Pepper*, 139 S. Ct. at 1528 (Gorsuch J., dissenting) (but-for app prices may depend on "the market power of each app developer, how each set its prices, and what it might have charged consumers for apps if Apple's commission had been lower").  Some developers, for example, might determine that they best maximize profits by passing through the entirety of any Apple commission as a result of intense app-vs.-app competition—both in the but-for and now.  Hitt ¶¶ 362-365; *see also* Schmalensee ¶¶ 163, 186 ("In case of intense competition among developers, lowering the commission rate uniformly across developers would have no effect on their profits; developers would compete the gains away.").  Other developers, by contrast, may adopt a different approach now than they would in the but-for world, depending on how their own competitive landscape was affected by the change in commission structure.  *See* Schmalensee ¶ 128.  Still others may decide to not pass-through an inflated

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

1  or reduced commission rate because of low app-vs-app competition in their markets, maintaining app

2  prices and absorbing any costs or savings.  *See* Hitt ¶¶ 362-365; Schmalensee ¶ 186.[8]

3         In any of these cases, a proper assessment of the developer's injury and damages would consist

4  of the amount of "lost profits [for offering app products and services] that they could have earned in a

5  competitive retail market" but-for Apple's current commission rates, *Pepper*, 139 S. Ct. at 1524

6  (Gorsuch J., dissenting)—a calculation Plaintiffs' experts cannot reliably make without addressing

7  pass-through in the actual and but-for worlds.  *See* Hitt ¶ 360.[9]  Simply ignoring pass-through, as

8  Plaintiffs' experts do (Schmalensee ¶¶ 186-187), renders their opinions unreliable and an unhelpful

9  determination of the but-for world.  *See Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846, 2018

10  WL 1586276, at *22 (N.D. Cal. Apr. 2, 2018) ("[W]hen such a foundational assumption . . . is not

11  supported by any explanation, let alone 'sound economic reasoning,' the resulting opinion is not

12  admissible under *Daubert*."); *see also Joiner*, 522 U.S. at 146.

13         **4.  Plaintiffs' Experts Ignore Other Economic Realities in the But-For World**

14         Plaintiffs' experts' simplistic but-for world is dependent on other "assumptions and

15  simplifications that are not supported by real-world evidence" as well.  *Am. Booksellers*, 135 F. Supp.

16  2d at 1041.  In particular, Profs. Elhauge and Economides both assume that Apple would not alter its

17  current approach to licensing and monetizing its intellectual property in the but-for world.  Specifically,

18  Prof. Elhauge opines that Apple would most likely reduce its commission rates due to new entrants,

19  but he admits that he "do[es]n't have any opinion" about whether *any* would-be iOS distributor could

20

21  [8]  ███████████████████████████████████████████████████████████

22  ██████████████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████████████████

24  ██████████████████████████████████████████████████████████████

25  ██████████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████████████

27  [9]  That the economic opinions regarding pass-through offered in the Developer and Consumer actions respectively are irreconcilable with one another is a further problem that underscores the reliability problems infecting each of them.  *See, e.g.*, Schmalensee ¶¶ 220-222 (explaining conflicting methodologies proposed by Economides and McFadden); *see also* Mot. for Trial Plan.

28

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn &
Crutcher LLP

even compete with the App Store absent access to Apple's intellectual property.  *See* Ex. 7, Elhauge Dep. 278:13-20.  And while Prof. Economides acknowledges that developers using alternative channels would "value the tools, SDK, and testing" provided by Apple, he nonetheless assumes that Apple's $99 annual fee would not increase in a but-for world.  Economides ¶ 70; Ex. 6, Economides Dep. 112:16-113:1.  That assumption is simply implausible.  *See* Malackowski ¶¶ 28, 196-200; Hitt ¶¶ 324-334.  Plaintiffs' experts concede that the App Store is a two-sided transaction platform (Economides ¶ 42; Elhauge ¶ 40), in which "the optimal balance of the prices charged on each side of the platform is essential for two-sided platforms to maximize the value of their services and to compete with their rivals," *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2281 (2018).  Because Plaintiffs' experts assume that in the but-for world Apple would not (as it does not in the actual world) impose any fee on the consumer side, it defies economic logic to assume that Apple will reduce its commissions on the developer side without any offsetting increase in licensing fees.

If Apple's but-for commission rates were lower, Apple could and likely would charge fees to generate additional revenue in exchange for the compulsory use of its intellectual property, in which it has invested $100 billion in research and development.  *See* Hitt ¶ 324; Schmalensee ¶¶ 148–153.  Apple could, for example: (i) raise its annual license fee above $99 or impose a graduated fee based on in-app revenues; (ii) adopt Epic's model for Unreal Engine, which imposes a royalty on developer profits and credits it against Epic Game Store commissions; (iii) license specific technologies (*i.e.* Metal) for a fee or royalty; or (iv) charge for app review to the extent (assuming a materially lower default commission rate) app review even remains a feature of the but-for world.  *See* Hitt ¶¶ 335-343; Schmalensee ¶¶ 148-153; Willig ¶¶ 189-207.  Indeed, Plaintiffs' experts agreed that Apple could not only continue to require all apps to go through app review but also "impose a neutral fee … that applied to every app" for such review.  Ex. 7, Elhauge Dep. 283:7–284:19; *see also* Ex. 6, Economides Dep. 225:9–25.  Yet neither takes into account the resulting offset to alleged reductions in commissions for many developers in the but-for world.  *See* Ex. 6, Economides Dep. 113:2–114:1; Schmalensee ¶ 116.

For each and all of these reasons, Plaintiffs' experts injury-related opinions should be excluded.

Gibson, Dunn & Crutcher LLP

13
DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

**B. Prof. Economides's "Yardstick" Analysis Is Unreliable**

Prof. Economides does not evaluate whether some or all developers were injured. Rather, he assumes that they were, and that Apple is liable to all of them (Ex. 6, Economides Dep. 27:2-28:19), and then attempts to calculate damages using a "yardstick" approach based on data from a handful of other app distributors. Economides ¶¶ 30-39 & Table 4. That "yardstick" approach is only as good as its inputs, and there is no reliable method to selecting those inputs here. *Muffett v. City of Yakima*, No. CV-10-3092-RMP, 2012 WL 12827492, at *3 (E.D. Wash. July 20, 2012) ("the reliability of the yardstick approach is based on the comparability of that yardstick to the business … involved in the litigation"). Rather, there are at least seven distinct problems in his store selection, each and all of which render the results he reaches unreliable.[10]

**1. Prof. Economides's Windows/PC Yardstick Analysis Relies On Misleading Averages**

Prof. Economides's "Windows PC App Distribution Market" yardstick (Economides ¶¶ 38–39) is based on a weighted average that includes many transactions at a 30% default commission, such as transactions from the Steam and Microsoft stores. *See* Economides ¶ 39 n.77; Elhauge ¶ 63 n.60; *see also supra* Pt. A.1. But Prof. Economides effectively obscures those commission rates by blending the data from Steam and the Microsoft Store (more comparable platforms to the App Store) with data from

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *See* Ex. 6,

Economides Dep. 188:12-16 ("Q. What would happen if your yardstick analysis excluded WeGame?

████████████████████████████████████████████████████████████████████

████████████████████████████████████████). 

"While averaging may be tolerable in some situations," it renders a methodology unreliable when it "mask[s] important differences" between putative class members. *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 494 (N.D. Cal. 2008) (citing ABA Section of Antitrust Law, Econometrics: Legal, Practical, and Technical Issues 220 (2005)). Here, Prof. Economides's use of

---

[10] To the extent, contrary to Prof. Economides's testimony, Plaintiffs claim that his yardstick analysis also serves as common proof of impact, it is unreliable for that purpose as well.

averages artificially obscures the individualized nature of commission rates developers would face in the but-for world, which will depend on each developer's brand and monetization strategy, the genre of app, and how it is ultimately distributed (e.g., self-distribution, rival iOS stores, and/or the App Store), among other factors. Hitt ¶¶ 150-152; Schmalensee ¶ 182. Prof. Economides does not consider any of these factors; he simply applies the average yardstick to every putative class member without discretion. *See* Ex. 6, Economides Dep. 137:3-138:19, 191:4-194:14; Hitt ¶¶ 123, 126. Prof. Economides's "weighted average" yardstick commission rate thus "mask[s] important differences" in the data and is unreliable. *Graphics Processing Units*, 253 F.R.D. at 494; *see also In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) ("the District Court abused its discretion when it assumed, absent a rigorous analysis, that averages are acceptable"); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 594-95 (Sept. 28, 2009) (opinions on classwide antitrust impact and damages "fail[ed] to satisfy" Rule 702 due to "reliance on averages").

### 2. Prof. Economides's Use of Epic's Self-Distribution Costs In His Yardstick Results In Double-Counting

Prof. Economides yardstick methodology is also unreliable because it is heavily weighted toward self-distribution based on the estimated cost of one store—the Epic Games Store. First, self-distribution does not involve commission rates or licensing the distributor's IP, but rather a totally different set of fixed and non-fixed costs. Ex. 6, Economides Dep. 170:8-172:19 (citing "marketing costs, payment processing costs, hosting costs, people costs, and so on and so on"). And even if it was relevant to commission rates, the commission rates charged by Epic Games Store, Steam, and the Microsoft Store *already reflect* competition with self-distribution, such that including the self-distribution data in the yardstick effectively counts it twice. *See* Ex. 6, Economides Dep. 167:9-170:7; Hitt ¶ 154.

Second, Prof. Economides does not even use actual distribution costs for four of the five "stores self-distributing apps." Hitt ¶¶ 157-158. Instead, he "estimated costs" for all of the self-distributing stores "based on the costs incurred by the Epic Games Store" in 2019. Economides ¶ 38; Ex. 6, Economides Dep. 170:8-177:6. Applying Epic's costs to the other stores' transactions implements a yardstick within the yardstick, assuming without basis that one recent entrant's estimated costs from

15

Gibson, Dunn & Crutcher LLP

a single year apply to every self-distribution transaction in the class period. *See* Hitt ¶¶ 157-158. Unsurprisingly, Prof. Economides does not identify any evidence or undertake any analysis to show that other stores incurred costs comparable to Epic's 2019 costs in distributing their own apps. *Id.* ¶ 378.

Third, Prof. Economides provides no analysis for his implicit assumption that self-distribution would be a viable option for each putative class member. Ex. 6, Economides Dep. 68:2-70:9; Hitt ¶¶ 190, 294-305. For example, Plaintiff Cameron generated approximately $400 in revenue from his app during the class period (Ex. 1, Cameron Dep. 85:22-86:4, 87:12-88:18), and Pure Sweat has disclaimed any interest or ability to self-distribute (Ex. 5, Czeslawski Dep. 132:8-23, 175:13-176:3, 179:5-181:15). Still, in applying his "average" but-for commission rate yardstick to each and every developer, Prof. Economides implicitly assumes that self-distribution was as viable an option for Pure Sweat as it is for Epic. Ex. 6, Economides Dep. 203:25-204:13 ("the way I have calculated my – my yardstick is for the average . . . what every developer, on the average, expects to get.").

At bottom, Prof. Economides's use of Epic's 2019 self-distribution costs as a yardstick for each developer's but-for effective commission rate "was by [his] *ipse dixit*"—designed to produce his intended result. *In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019); *see also Muffett*, 2012 WL 12827492, at *3 (excluding yardstick analysis that "lack[ed] any evidence of comparability"); *Abarca v. Franklin Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1023 (E.D. Cal. 2011) ("[A]n expert opinion cannot be based on assumptions of fact without evidentiary support, or on speculative or conjectural factors."). Removing these inappropriate yardsticks dramatically increases Prof. Elhauge's average but-for commission rate—from 14.5% to ███. Hitt ¶ 389.

### 3. Prof. Economides's Inconsistent Treatment of China-Based Yardsticks Is Unreliable

Prof. Economides's yardstick is also tainted by his approach to China-based data. As a general matter, Prof. Economides took pains to include in his yardstick only U.S. sales. Ex. 6, Economides Dep. 187:4-189:13. In fact, he agreed it is important that the yardstick "pertains to the same geographic market as the relevant market in the case" (Ex. 6, Economides Dep. 121:24-122:3), and had "not examined the Chinese Windows app distribution market" (*id.* 146:10-15). A exception is his use of

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

over $7 billion WeGame transactions related to a self-distribution platform for Tencent games available only in China during the class period.  Hitt ¶ 380 & Fig. 22.  According to Prof. Economides, he included WeGame, which operates almost entirely in China, because it is "a big store."  Ex. 6, Economides Dep. 187:4-189:13.  This internally inconsistent approach makes no sense.

First, WeGame makes little sense as a yardstick.  The data relate to a different geographic market (China) and a different business model (self-distribution), making them at best remotely probative.  Hitt ¶ 159; *see also* Ex. 6, Economides Dep. 121:24-122:3; Ex. 7, Elhauge Dep. 204:20-205:18 ("the relevant market here is the U.S. market"); *Wholesale Grocery*, 946 F.3d at 1002; *Muffett*, 2012 WL 12827492, at *3; *State Farm Fire & Cas. Co. v. Electrolux Home Prods.*, 980 F. Supp. 2d 1031, 1039 (N.D. Ind. 2013) (excluding expert testimony for failure to verify that data could be used for an "apples to apples" comparison).  Moreover, they skew Prof. Economides's results because ████████████████████████████████████.  Ex. 6, Economides Dep. 188:3-7; Hitt ¶ 159.  Indeed, *removing* WeGames from his data alone (while leaving other self-distribution stores), increases his yardstick commission rate from 14.5% to ████, and reduces his calculated aggregate damages accordingly.  Hitt ¶ 390.

Second, if Prof. Economides truly believes the Chinese market is relevant, then there is no explanation for his failure to address data from what he calls "a thriving ecosystem of rival app stores": "the Android market in China."  Economides ¶ 34.  The Android market would seem to provide more data and a more comparable benchmark for the App Store than a single developer's self-distribution platform.  But the Android market in China would also introduce a much higher commission for gaming app transactions (50%) than the App Store charges into the yardstick, Ex. 6, Economides Dep. 144:22-145:3; Ex. 29, DX-5324.054—so he ignored it.  This "unwarranted dismissal of the evidence or outright blindness to contrary evidence" warrants exclusion.  *See Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010).

### 4.  Prof. Economides's Cherry-Picking Renders His Yardstick Analysis Unreliable

Prof. Economides's average yardsticks are rendered further unreliable because they rest on cherry-picked inputs, designed to support his opinion that Apple's default commission rate would be

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

lower in a but-for world. He includes what he deems to be favorable yardsticks while excluding viable alternatives that do not support his opinion. Most glaringly, Prof. Economides rejects the "Mac OS App Distribution" yardstick out of hand, even though the Mac OS App Distribution is real-world evidence confirming that Apple would charge a rate of 30% in the presence of rival app distribution and sideloading options. Hitt ¶¶ 145-149. In an attempt to justify his choice, Prof. Economides claims that Apple sets the Mac App Store commission equal to the iOS commission (implying it was anticompetitive by association), without separately analyzing whether the 30% commission rate is, in fact, competitive. Economides ¶ 37 & n.67; Ex. 6, Economides Dep. 152:6-153:21. The real-world evidence demonstrates that it is. *See*, *supra*, at pp. 6-8. Prof. Economides's rationale is also contrary to basic economic logic: He assumes, without explanation, the Mac App Store maintains a non-profit-maximizing commission rate merely to conform with the rates charged by the iOS App Store. *See* Ex. 6, Economides Dep. 152:6-153:21.

Prof. Economides also rejects any potential Android yardstick, claiming that rates in the Android environment are uninformative because Google has purportedly engaged in anticompetitive conduct in the Google Play store. Economides ¶ 33. However, he levels no similar critique against Samsung, which also charges default 30% commissions on the Android platform. Hitt ¶¶ 144; Ex. 6, Economides Dep. 138:20-139:22. But Samsung transactions are inexplicably excluded. *See id.*

### 5. Prof. Economides's Exclusive Use Of Data From 2018 and 2019 Renders His Yardstick Unreliable When Applied To the Entire Class Period

Prof. Economides's averages also are misleading to the point of being unhelpful because he calculates them using only reported commission rates from 2019, despite the fact those rates were not in effect for the majority of the Developer class period. Hitt ¶ 138. In fact, the Epic Game Store did not exist until December 2018. *Id.* The result is that his analysis fails to capture variations in distributors' rates over time. Prof. Economides himself recognized it is "important for [the yardstick] to be comparable to the market in question over the whole class period." Ex. 6, Economides Dep. 122:4-7. As a result, his yardstick methodology cannot be reliably applied to determine but-for prices for app transactions that took place before 2019. *Id.*; *see also Moussouris v. Microsoft Corp.*, 311 F.

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Supp. 3d 1223, 1244 (W.D. Wash. 2018) (excluding expert testimony based on unrepresentative and statistically insufficient data).

### 6.  Prof. Economides's Microsoft Yardstick is Unreliable

Prof. Economides made several critical errors in calculating the weighted average commission rate he uses as a yardstick.  *See* Hitt ¶¶ 379-387.  "Opinions that are derived from erroneous or incomplete data are appropriately excluded."  *Moussouris*, 311 F. Supp. at 1244.  To calculate his weighted average, Prof. Economides used unverified figures from an internal Microsoft presentation from May 2020 containing approximate 2019 sales numbers for the companies in his yardstick.  Ex. 6, Economides Dep. 181:17-182:9 (admitting he spoke to no one and read no testimony about the document).  As he admits, he simply took those numbers "at face value."  *Id.* at 194:19-199:6; Hitt ¶ 378; *see ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (affirming exclusion where expert created a but-for world based on a "set of profit and volume projections without knowing the circumstances under which [they] were created or the assumptions on which they were based").  That was error because Prof. Economides misinterprets the data, causing him to overestimate the level of sales for those companies.  Hitt ¶ 378.  He then compounded that error with multiple additional data-entry errors, such as misreporting Steam's effective commission rate as ███████████ ███████ commingling data from 2018 and 2019, and inconsistently using different types of sales figures for different companies.  *Id.* ¶¶ 379-386.  Taken together, these errors render Prof. Economides's Microsoft benchmark unreliable, and correcting for them *increases* his average commission rate.  *Id.* ¶ 387.

### 7.  Prof. Economides's "Rival Profit Yardstick" Is Founded on Baseless Assumptions

Prof. Economides's "rival profit" yardstick also relies on unrealistic assumptions about but-for market share that are not based on any testable methodology and are contrary to the actual facts of the case.  He assumes that hypothetical rival platforms would capture 35% market share (one-entrant scenario) or 50% total market share (two-entrant scenario), Economides ¶ 48, based entirely on extrapolation from an internal Epic planning document from 2019, *see id.*; Hitt ¶ 161.  But that assumption is unreasonable because ██████████████████████████████████████ █████████████████████████████ in the time since the document Professor Economides relied

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP

upon was created.  Hitt ¶ 162.  Therefore, the rival profit yardstick analysis should also be excluded.  See *ZF Meritor*, 696 F.3d at 292 (affirming exclusion where expert created a but-for world based on a "set of profit and volume projections without knowing the circumstances under which [they] were created or the assumptions on which they were based").

### C. Plaintiffs' Experts' Opinions Regarding the Relevant Market and Market Power Are Unreliable and Unhelpful to the Court

Plaintiffs' experts' opinions regarding common impact and damages require proof that Apple possesses market power in a relevant market, such that it could engage in anticompetitive conduct to "inflate" commissions.  Plaintiffs rely on Prof. Elhauge to define the relevant market, but rather than engage on economic analysis or assessment of that question, he simply assumes the App Store provides a "single product" that does not vary across app transactions.  Elhauge ¶ 154.  That alone compels exclusion, and dooms the remainder of Plaintiffs' experts market power opinions.  *See It's My Party, Inc. v. Live Nat., Inc.*, 88 F. Supp. 3d 475, 488 (D. Md. 2015) (excluding Elhauge's market definition opinions where his methodology was "not based on sound logic or reasoning").

### 1.  Prof. Elhauge Fails To Engage In The Threshold Substitutability Analysis

The key inquiry in defining a relevant market is whether a product is "reasonably interchangeable" with another product.  *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  The aggregation of disparate products into a single market is permissible only when they "are subject to the same competitive conditions."  *FTC v. Staples*, 190 F. Supp. 3d 100, 125 (D.D.C. 2016) (describing cluster markets); *see also ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565-66 (6th Cir. 2014) (noting that clustering involves analyzing two distinct product markets together as a matter of "administrative-convenience" when those markets face similar "competitive conditions").  For that reason, "[t]he rationale for clustering nonsubstitutable goods into a single market must be regarded as a *severe exception* to ordinary market definition criteria, which define markets in terms of substitutability." 5E Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 565c (4th ed. 2020 supp.) (emphasis added); *see also* Willig ¶¶ 80-86 (explaining cluster markets).   Prof. Elhauge, however, does not consider reasonable interchangeability at all; he simply *assumes* that the App Store provides a "single product—a two-sided

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn &
Crutcher LLP

iOS app distribution platform—for every single transaction" that does not vary between transactions. Elhauge ¶ 154.[11]  That assumption is not reliable economic analysis nor consistent with observable real world evidence and should be excluded.

The error in Prof. Elhauge's assumption is underscored by the fact that courts have identified "practical indicia" used to assess whether products are "reasonably interchangeable" with one another—including, as particularly relevant here, (i) industry and public recognition of the market as a separate economic entity, (ii) a product's peculiar characteristics and uses, (iii) distinct customers, (iii) specialized vendors, (iv) distinct prices, and (v) sensitivity to price changes.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  Prof. Elhauge does not consider even one of these indicia, much less all of them.  And he does not otherwise evaluate whether different app transactions (such as gaming app transactions) might constitute their own relevant market.

Reference to readily observable evidence further highlights the error in Prof. Elhauge's reliance on assumption rather than analysis.  Willig ¶¶ 113-151; Hitt ¶¶ 250-269.  Consider game app transactions—a topic about which Prof. Elhauge was on notice given his awareness of the *Epic v. Apple* litigation.  Elhauge Dep. 31:11-18; Willig ¶¶ 116-135.  The same can be said for TV and video streaming app transactions—they face distinct competitive conditions, which indicates they are not properly clustered together with other types of app transactions, and should be regarded as distinct markets.  *See* Hitt ¶¶ 260-266; Willig ¶¶ 136-151.

Prof. Elhauge's failure to consider this evidence or employ any discernable, reliable economic methodology to support his assumption that all types of iOS app transactions constitute a single product market renders his opinions unreliable.[12]  *See Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994); *Am. Booksellers Ass'n*, 135 F. Supp. 2d at 1041; *see also Crowley v. EpiCept Corporation*, No. 9-CV-0641, 2015 WL 13827908, *5 (S.D. Cal. Mar. 11, 2015) (excluding opinions regarding market

---

[11]  Elhauge's claim that "Apple's experts do not appear to dispute this basic point that consumers and developers are always purchasing the same product," (Elhauge ¶ 155) is wrong.  Schmalensee ¶ 48; Hitt ¶¶ 51-55; Willig ¶ 113.

[12]  Nor can Prof. Elhauge remedy this failure by arguing that "[c]luster market principles do not apply" (Elhauge ¶ 167) and pointing to price discrimination markets instead.  As Prof. Willig explains, Prof. Elhauge's argument is based on a misinterpretation of the Horizontal Merger Guidelines and their logic. Willig ¶¶ 90-101.

21

Gibson, Dunn & Crutcher LLP

1  share based on unfounded assumptions); *Abarca*, 761 F. Supp. 2d at 1023.  They should be excluded.

2  **2.  Prof. Elhauge's Application of the Hypothetical Monopolist Test Is Unreliable**

3  The same problem infects Prof. Elhauge's Hypothetical Monopolist Test ("HMT").  Prof.

4  Elhauge begins his HMT analysis by comparing Apple's average App Store commission during the

5  class period (which he calculates at 28.4%) to average commissions "in more competitive app

6  distribution markets."  Elhauge ¶ 112.  But by using only average commissions, he assumes, once

7  again, that all app transactions can be clustered together in a single market.  Willig ¶ 103 ("[R]ather

8  than attempt to demonstrate that market definition is indeed a classwide question, Elhauge instead

9  implicitly assumes it is so, because otherwise focusing only on averages—which necessarily blur all

10  intraclass differences—would not be justified.").  In so doing he ignores market reality, including the

11  substantial evidence that different types of app transactions face competitive constraints from different

12  non-iOS platforms such that clustering is improper.  *See* Willig ¶¶ 113-114; Hitt ¶¶ 251-269.  Second,

13  Prof. Elhauge uses Prof. Economides's flawed yardstick commission rates as the basis for the

14  commissions in "more competitive app distribution markets."  *See* Elhauge ¶¶ 112-14, 116, 119.  But,

15  as explained above, these benchmarks are unreliable because they are based on averages that entirely

16  ignore the diversity of commission rates charged by different transaction platforms in the actual world,

17  and are infected by faulty data and erroneous assumptions.  This is precisely the type of assumption-

18  based analysis held to be an unreliable "[g]arbage in, garbage out" expert opinion not admissible under

19  *Daubert*.  *See Menasha Corp. v. News Am. Mktg. In-Store, Inc*., 354 F.3d 661, 665-66 (7th Cir. 2004).[13]

20  **3.  Plaintiffs' Experts' Market Power Opinions Are Unreliable**

21  In addition to his market definition-based opinions, Prof. Elhauge attempts to demonstrate

22  market power by reference to Apple's supposed App Store profit margins.  Elhauge ¶ 106 ("Apple's

23  extraordinarily high profit margins provide direct evidence" of market power) (citing Tregillis ¶ 8).

24  But there is no basis in the economic literature for the proposition that accounting profits constitute

---

[13]  The Hypothetical Market Test is also ill-suited to this case; it is not used by the Department of Justice outside of horizontal merger review and not binding on courts, as courts have repeatedly observed.  *See Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 434 n.13 (5th Cir. 2008) ("[T]he Merger Guidelines are not binding on the courts and the agency during adjudication."); *Olin Corp. v. FTC*, 986 F.2d 1295, 1300 (9th Cir. 1993) ("Certainly the Guidelines are not binding on the courts, or, … the Commission." (citations omitted)).

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

direct evidence of market power.  Schmalensee ¶¶ 94-95 (explaining difference between accounting profitability and economic profitability in context of evaluating market power).  For that reason, many courts have disparaged the "evidentiary value of high profits to indicate monopoly power," *High Tech. Careers v. San Jose Mercury News*, No. 90-CV-20579, 1995 WL 115480, at *3 (N.D. Cal. Mar. 14, 1995), no doubt because "such profits could just as easily be obtained as a result of good management, superior efficiency, or differences in accounting, none of which is inconsistent with an efficient market."  *Bailey v. Allgas, Inc*., 284 F.3d 1237, 1252 (11th Cir. 2002).

Even if accounting profitability could speak to market power, Plaintiffs' experts also failed to use reliable accounting methods to reach their conclusions.  *Groupo Televisa, S.A., v. Telemundo Communications Group, Inc.*, No. 04-CV-20073, 2005 WL 5955701, *2–3 (S.D. Fla. 2005) (excluding Tregillis's opinions where he crafted a methodology that was not shown to have been used or reviewed by others in the relevant industry) *see also Brighton Collectibles, Inc. v. RK Tex. Leather Mfg.*, 923 F. Supp. 2d 1245, 1254 (S.D. Cal. 2013) (excluding expert testimony for not adhering to "tried and true" accounting methods).  Here, Mr. Tregillis failed to use Generally Accepted Accounting Principles ("GAAP") in allocating costs, or otherwise evaluating Apple's financial performance renders his conclusions unreliable.  Malackowski ¶¶ 225-273.  For example, he incorrectly points to Apple's enterprise-level Products & Services descriptions and characterizes them as reportable segments under GAAP, when Apple's audited financial statements make clear that interpretation is not only wrong, but affirmatively misleading.  *Id.* at ¶¶ 233-52.  The fact that Apple does not prepare detailed fully-burdened financial data at the segment level is equally problematic for the conclusions Mr. Tregillis urges, as it misrepresents an affirmative decision by Apple to not allocate such expenses in managing the business; "if joint costs are not and cannot be allocated at the segment level, those costs cannot be meaningfully allocated at the category level of operations, or more specifically, to the App Store." *Id.* at ¶¶ 251, 258; Schamalensee ¶ 127.  Finally, to the extent Plaintiffs' experts rely on ad-hoc, internal use documents, those documents were also not prepared in conformity with GAAP, or even primarily to address financial performance.  Malackowski ¶¶ 254-68.  They are not fully-burdened P&Ls that would reflect the performance of the App Store on a standalone basis, and an attempt to allocate costs

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn &
Crutcher LLP

1    to them to create a standalone profitability determination for an individual business line is arbitrary and

2    outside the scope of recognized accounting.  *Id.* at ¶¶ 254-273.[14]  They should be excluded.

3       **D.  Prof. Elhauge's Undisclosed Opinions On Conduct Should Be Excluded**

4           Finally, to the extent Prof. Elhauge offers opinions on two topics that were neither pleaded by

5    Plaintiffs nor alluded to in this litigation, they should be excluded.  *See Daubert*, 509 U.S. at 591

6    ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-

7    helpful."); *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) (similar).  First, while Developer

8    Plaintiffs have not asserted a tying claim in this case, Prof. Elhauge nonetheless opines that Apple

9    anticompetitively ties iOS devices to iOS app distribution.  Elhauge ¶¶ 12, 223, 281–97.  His opinion

10   therefore that "Apple's iOS devices are 'separate' from the iOS app distribution," that they exist in

11   separate markets, that Apple exercises market power in those separate markets, or that Apple has tied

12   these two purportedly separate products together, Elhauge ¶¶ 283, 287, is pure invention.   Second, to

13   the extent that Prof. Elhauge seeks to offer any opinion on the question of monopsony, that would be

14   improper, as he disclaimed that theory in deposition.  Ex. 7, Elhauge Dep. 170:5 (I'm not quite sure

15   what that means"); *id.* at 169:25-171:14 (disclaiming knowledge or study of a monopsony theory).

16   Where, as here, he offers no opinion regarding monopsony in his report, any attempt to do so is

17   improper.  *U.S. Fid. & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1138 (9th Cir. 2011) (sustaining

18   exclusion of opinions not included in report); *Dat Thanh Luong v. Napa State Hosp.*, No. 17-CV-

19   06675-EMC(JSC), 2019 WL 4083032, at *1 (N.D. Cal. Aug. 29, 2019) ("As with all expert witnesses,

20   their trial testimony shall be limited to what was disclosed in the reports.").

21

22   ───────────────

23   [14]  Mr. Tregillis' profit margin comparator analysis fares no better; he freely admitted *is not* analysis at
     all.  Ex. 19, Tregillis Dep. 142:18-143:3.  For such an exercise, Tregillis strongly agreed that "that there
24   needs to be judgment employed"—but he disclaimed using judgment at any level of the comparator
     analysis.  *Id.* at 145:14-20; 146:14-22.  He undertook no responsibility in selecting the companies (or
25   the source database); instead, he explained that Plaintiffs' counsel supplied a list of five companies.  *Id.*
     at 22:14-18; 49:15-16; 146:24-147:14.  Beyond that, he did not make any attempt to analyze any other
26   potential comparators, *id.* at 153:22-154:23, rejecting any suggestion that his report was an attempt to
     identify comparators at all, *id.* at 142:18-143:3.  He also did not undertake an analysis of the specific
27   aspects of the companies that may compare to the App Store and could not confirm basic features of
     the companies that would be part of that inquiry, such as whether they processed payments.  *Id.* at
28   154:24-155:5; 157:23-158:9; 161:11-23; 163:13-164:5; 171:12-18; 175:4-13.

24

### V.   CONCLUSION

For the foregoing reasons, the Court should grant Apple's motion to exclude the opinions of Prof. Elhauge, Prof. Economides, and Mr. Tregillis.

DATED:          August 10, 2021                           GIBSON, DUNN & CRUTCHER LLP


By: */s/ Daniel G. Swanson*

Theodore J. Boutrous Jr.
Richard J. Doren
Daniel G. Swanson
Mark A. Perry
Veronica S. Moyé
Cynthia E. Richman
Jay P. Srinivasan
Ethan Dettmer
Rachel Brass
Caeli Higney

*Attorneys for Defendant Apple Inc.*

DEFENDANT APPLE INC.'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF PROFESSOR EINER ELHAUGE, PROFESSOR NICHOLAS ECONOMIDES, AND CHRISTIAN TREGILLIS, 4:19-CV-03074-YGR-TSH

Gibson, Dunn & Crutcher LLP