Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tedw@hbsslaw.com

Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
Ben M. Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com
benh@hbsslaw.com

*Interim Lead Class Counsel*

[Additional Counsel Listed on Signature Page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| DONALD R. CAMERON, *et al.*,<br><br>                              Plaintiffs,<br><br>        v.<br><br>APPLE INC.,<br><br>                              Defendant. | Case No. 4:19-cv-03074-YGR<br><br>DEVELOPER PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT WITH APPLE INC.<br><br>Date:        October 12, 2021<br>Time:        2:00 p.m.<br>Judge:       Hon. Yvonne Gonzalez Rogers<br>Location: Courtroom 1- 4th Floor |

1

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on October 12, 2021, at 2:00 p.m. or as soon thereafter as the matter may be heard by the Honorable Yvonne Gonzalez Rogers of the United States District Court of the Northern District of California, located in Courtroom 1, at 1301 Clay Street, Oakland, CA 94612, Developer Plaintiffs will and hereby do move the Court pursuant to Federal Rules of Civil Procedure 23 for an order:

1)   preliminarily approving the proposed class action settlement with Apple Inc.;

2)   certifying the settlement class;

3)   appointing Hagens Berman Sobol Shapiro LLP as Class Counsel; and

4)   approving the manner and form of notice and proposed plan of allocation to class members.

This motion is based on this Notice of Motion and Motion for Preliminary Approval of Settlement with Apple Inc., the following memorandum of points and authorities, the accompanying settlement agreement, the pleadings and papers on file in this action, and such other matters as the Court may consider.

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ..................................................................................... 1

II.  BACKGROUND ......................................................................................................... 2

    A.   Procedural History ............................................................................................. 2

    B.   The Settlement ................................................................................................... 3

        1.   The Settlement Negotiations ..................................................................... 3

        2.   The Settlement Consideration and Release of Claims ............................. 4

            a.   Monetary Relief ................................................................................. 4

            b.   Structural Relief ................................................................................. 5

            c.   Settlement Release .............................................................................. 8

        3.   The Notice and Distribution Plan ............................................................. 9

III. LEGAL STANDARD ............................................................................................... 10

IV.  THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL ......................... 11

    A.   The Settlements are Fair, Reasonable and Adequate. ..................................... 11

        1.   The Class Has Been Zealously Represented. .......................................... 11

        2.   The Settlement Agreement Resulted from Arm's-Length Negotiations. ................................................................................................ 11

        3.   The Settlement Represents Substantial Relief for the Class. ................. 12

        4.   The Settlement Treats Class Members Equitably. ................................. 14

        5.   The Settlement Satisfies the Remaining Factors Set Forth in the Northern District's Procedural Guidance ................................................ 15

            a.   The Settlement Class Appropriately is Narrower than the Class Pleaded in the Complaint. ........................................................... 15

            b.   The Settlement Release Tracks the Claims Alleged in the Complaint. ...................................................................................... 17

            c.   Developer Plaintiffs Anticipate a Relatively High Claims Rate. ...................................................................................................... 18

            d.   Angeion Was Selected as Settlement Administrator Through a Competitive Bidding Process. ...................................................... 18

            e.   Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs. ................................................................ 19

|  | | f. | Plaintiffs Intend to Request Reasonable Service Awards for Class Representatives. | 21 |
|  | | g. | Past Distributions | 22 |
| | B. | The Settlement Class Merits Certification. | | 23 |
| | | 1. | Rule 23(a): Numerosity | 23 |
| | | 2. | Rule 23(a): The Case Involves Questions of Law or Fact Common to the Class. | 23 |
| | | 3. | Rule 23(a): Plaintiffs' Claims Are Typical of the Claims of the Class. | 24 |
| | | 4. | Rule 23(a): Plaintiffs Will Fairly and Adequately Represent the Interests of the Class. | 24 |
| | | 5. | Rule 23(b)(2): Injunctive Relief Is Appropriate for Entire Class. | 25 |
| | | 6. | Rule 23(b)(3): Common Questions of Fact or Law Predominate. | 25 |
| | | 7. | The Superiority Requirement is Met. | 26 |
| | C. | The Proposed Notice Program Satisfies Rule 23. | | 26 |
| | D. | The Court Should Appoint Interim Co-Lead Counsel as Settlement Counsel. | | 28 |
| | E. | Proposed Schedule for Notice and Final Approval | | 28 |
| V. | CONCLUSION | | | 28 |

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

### **FEDERAL CASES**

4

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.,*
   276 F.R.D. 364 (C.D. Cal. 2011)..................................................................................27

5

6

*Allapattah Servs. Inc v. Exxon Corp.,*
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) ........................................................................20

7

*Amador v. Baca,*
   2020 WL 5628938 (C.D. Cal. Aug. 11, 2020) .............................................................21

8

9

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ...............................................................................................17, 26

10

*In re Anthem, Inc. Data Breach Litig.,*
   327 F.R.D. 299 (N.D. Cal. 2018) ...................................................................................4

11

12

*In re Apple Pod iTunes Antitrust Litig.,*
   2008 WL 5574487 (N.D. Cal. Dec. 22, 2008) .............................................................26

13

*B.K. by next Friend Tinsley v. Snyder,*
   922 F.3d 957 (9th Cir. 2019)........................................................................................24

14

15

*Brown v. Hain Celestial Grp., Inc.,*
   2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) .............................................................16

16

17

*Castro v. Sanofi Pasteur Inc.,*
   134 F. Supp. 3d 820 (D.N.J. 2015)...............................................................................26

18

*In re: Cathode Ray Tube (CRT) Antitrust Litig.,*
   2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) .............................................................14

19

20

*In re: Cathode Ray Tube (CRT) Antitrust Litig.,*
   2016 WL 3648478 (N.D. Cal. July 7, 2016) ................................................................12

21

22

*In re Checking Account Overdraft Litig.,*
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ........................................................................20

23

*Churchill Vill., LLC v. Gen. Elec.,*
   361 F.3d 566 (9th Cir. 2004)........................................................................................27

24

25

*Congdon v. Uber Techs., Inc.,*
   2019 WL 2327922 (N.D. Cal. May 31, 2019) .............................................................22

26

27

*de Mira v. Heartland Emp't Serv., LLC,*
   2014 WL 1026282 (N.D. Cal. Mar. 13, 2014) .............................................................19

28

*Garner v. State Farm Mut. Auto Ins. Co.*,
  2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) .................................................................... 3

*Goertzen v. Great Am. Life Ins. Co.*,
  2017 WL 8294291 (N.D. Cal. Nov. 6, 2017) .................................................................... 10

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ........................................................................................ 25

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010) .......................................................................................... 18

*In re High-Tech Employee Antitrust Litig.*,
  985 F. Supp. 2d 167 (N.D. Cal. 2013) ........................................................................ 24, 27

*Hubbard v. RCM Techs. (USA), Inc.*,
  2020 WL 6149694 (N.D. Cal. Oct. 20, 2020) .................................................................. 24

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019) (en banc) .................................................................. 17, 23, 26

*In re Ikon Office Sols., Inc., Secs. Litig.*,
  194 F.R.D. 166 (E.D. Pa. 2000) ...................................................................................... 20

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir.1978) ............................................................................................ 25

*In re Linerboard Antitrust Litig.*,
  2004 WL 1221350 (E.D. Pa. June 2, 2004) ................................................................. 20, 21

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998) ........................................................................................ 21

*In re Lithium Ion Batteries Antitrust Litig.*,
  2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) ........................................................ 12, 13, 14

*In re Nat'l Collegiate Athl. Grant-in-Aid Cap Antitrust Litig.*,
  2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) .................................................................... 20

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
  2013 WL 5979327 (N.D. Cal. Nov. 18, 2013) .................................................................. 26

*Nitsch v. DreamWorks Animation SKG Inc.*,
  2017 WL 399221 (N.D. Cal. Jan. 19, 2017) ..................................................................... 11

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) .......................................................................................... 19

*Pecover v. Elec. Arts, Inc.*
  2010 WL 8742757 (N.D. Cal. 2010) ................................................................................ 24

*In re Polyurethane Foam Antitrust Litig.*,
  2015 WL 1639269 (N.D. Ohio Feb. 26, 2015) ................................................. 20

*In re Resistors Antitrust Litig.*,
  2020 WL 2791922 (N.D. Cal. Mar. 24, 2020) ................................................. 14

*In re Static Random Access (SRAM) Antitrust Litig.*,
  2008 WL 4447592 (N. D. Cal. Sept. 29, 2008) ................................................. 27

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ................................................. 21

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., &*
  *Prod. Liab. Litig.*,
  2013 WL 12327929 (C.D. Cal. July 24, 2013) ................................................. 13

*In re Urethane Antitrust Litig.*,
  2016 WL 4060156 (D. Kan. July 29, 2016) ................................................. 20

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ................................................. 21

*In re Vitamins Antitrust Litig.*,
  2001 WL 34312839 (D.D.C. July 16, 2001) ................................................. 20

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  229 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................. 12

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................. 24

**FEDERAL STATUTES**

Sherman Act, 15 U.S.C. § 1 ................................................. 2

**FEDERAL RULES**

Federal Rule of Civil Procedure 23 ................................................. *passim*

**OTHER AUTHORITIES**

2 William B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ............................................ 23

University of San Francisco School of Law, *2018 Antitrust Annual Report:*
  *Class Action Filings in Federal Court* (May 2019) ............................................ 20

Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92
  N.Y.U. L. Rev. 937, 952 (2017) ................................................. 20

*Procedural Guidance for Class Action Settlements* (N.D. Cal.) (2018) ................................................. 16

## I.   PRELIMINARY STATEMENT

Plaintiffs Donald Cameron and Pure Sweat Basketball, Inc. ("Developer Plaintiffs"), on behalf of themselves and other members of the proposed Settlement Class, are pleased to report their proposed Settlement with Apple Inc.  The Settlement, if approved, would resolve the claims of a Settlement Class consisting of approximately 67,000 iOS developers earning more than $0 but less than $1 million from transactions annually in the App Store during the Class Period.  Nearly all domestic iOS developers with paid app transactions—more than 99 percent—fall within the Settlement Class and would recover under the Settlement.  These small developers are the backbone of the iOS app economy, developing apps of all types that improve the functionality and performance of iOS devices.  And they all stand to recover substantial benefits under the Settlement, both from direct monetary payments and structural relief that, going forward, will make iOS app development a more productive enterprise.

The proposed Settlement establishes a $100 million non-reversionary monetary fund from which Settlement Class members will receive direct distributions.  Individual Settlement Class Members will receive a minimum payment of $250; higher payments will be tiered based on historic proceeds, with the highest minimum payment tier providing $30,000.  The Settlement also contains valuable structural relief.  It acknowledges (properly) that this lawsuit was one driver behind Apple's 2021 launch of its Small Business Program, under which small developers qualify for a lower 15 percent commission rate.  Under the Settlement, Apple has committed to maintain the Small Business Program's 15 percent rate for at least another three years.  Apple has also committed to revise its "anti-steering" Guidelines to permit app developers to communicate directly with their customers regarding alternative payment options.  Apple has further agreed to institute and maintain a range of structural reforms that will enable developers to better create, distribute, and monetize their apps.  These structural reforms are valuable.  Developer Plaintiffs conservatively estimate that the Small Business Program element of the Settlement alone adds at least $35.44 million in value.

The Settlement follows over two years of contentious litigation, including voluminous class certification briefing supported by multiple expert reports, and extensive discovery before that.  It

1   is the product of arm's-length negotiations among experienced counsel under the auspices of one of

2   the nation's most respected mediators, the Hon. Layn Phillips (U.S.D.J. Ret.).  The Settlement

3   terms are fair, reasonable, and more than adequate.  The recovery for the Settlement Class is well

4   within the range of approval amounts, and settlement at this stage eliminates the risk of a litigated

5   outcome that could return less value, or nothing at all, to app developers.

6        Developer Plaintiffs respectfully request an Order that: (1) preliminarily approves the

7   proposed Settlement; (2) certifies the Settlement Class; (3) appoints Hagens Berman Sobol Shapiro

8   LLP as Settlement Class Counsel; and (4) approves the manner and form of notice and proposed

9   plan of distribution to Settlement Class members.

10                           **II.    BACKGROUND**

11  **A.    Procedural History**

12       The Court is well-versed in the history of this litigation.  Developer Plaintiffs recount here

13  only the primary events.

14       Developer Plaintiffs filed their initial complaint on June 4, 2019, and their Consolidated

15  Amended Complaint on September 31, 2019.  *See* ECF No. 53.  Asserting claims under the

16  Sherman Act and California's Unfair Competition Law, Developer Plaintiffs contend that Apple

17  monopolizes a relevant market for iOS app and in-app-product distribution services, charging iOS

18  app developers supracompetitive commissions.

19       Apple filed its answer on November 11, 2019.  *See* ECF No. 74.  The Court subsequently

20  coordinated this matter with *In re Apple iPhone Antitrust Litigation,* Case No. 4:11-cv-6714

21  ("Consumer Action") (and later with *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-5640

22  ("*Epic* Action")) for discovery purposes, and substantial discovery ensued.  More than 5 million

23  documents and 20 million pages have been produced in this litigation.  The parties collectively

24  have taken over fifty depositions, including depositions of Apple's senior management. Following

25  protracted negotiations, and motion practice, Apple produced a 13-terabyte transactional dataset

26  that Developer Plaintiffs and their experts have extensively analyzed.

27       Developer Plaintiffs moved for class certification on June 1, 2021, just one week after

28  closing arguments in the *Epic* trial.  *See* ECF No. 331. Developer Plaintiffs' motion was supported

1   by detailed expert reports from Professor Einer Elhauge, Professor Nicholas Economides, and

2   Christian Tregillis, CPA.  On August 10, 2021, after deposing both named Plaintiffs and each of

3   Developer Plaintiffs' experts, Apple filed its opposition to class certification along with seven

4   supporting expert reports.  *See* ECF No. 376.  Apple simultaneously moved to compel Developer

5   Plaintiffs to produce a "trial plan" and to exclude certain of Developer Plaintiffs' experts' opinions

6   under *Daubert*.  *See* ECF Nos. 371 & 380.  Developer Plaintiffs filed administrative motions to

7   strike both of these motions.  *See* ECF Nos. 382 & 384.

8        As this chronology attests, the parties have devoted enormous resources to develop a large

9   discovery record, while aggressively litigating their claims and defenses.  Developer Plaintiffs also

10   stand in the unusual position of having seen not only Apple's fully developed opposition to class

11   certification, but the bench trial of one developer's claims (Epic).  Developer Plaintiffs understand

12   the strengths and vulnerabilities of their case.

13   **B.**    **The Settlement**

14        **1.**    **The Settlement Negotiations**

15        The parties engaged in four remote mediation sessions with the Hon. Layn Phillips

16   (U.S.D.J. Ret.).  The first two occurred in June and July of 2020.  *See* Berman Decl. at ¶ 5.[1]  The

17   sessions were vigorous and detail-driven, but the parties could not reach agreement.  After a year of

18   active litigation, the parties met again on July 28, 2021, and again on August 13, 2021, with the

19   latter session occurring days after Apple submitted its opposition to class certification.  Discussions

20   were more sharply focused in this second round of mediation and, by the end of August 13, 2021,

21   the essential contours of the Settlement had been reduced to a Memorandum of Understanding.

22   *See id.*

23        The Settlement is the product of hard bargaining by experienced counsel, which, coupled

24   with the active involvement of a skilled mediator, supports a "presumption that the settlement is

25   fair and reasonable."  *Garner v. State Farm Mut. Auto Ins. Co.*, 2010 WL 1687832, at *13 (N.D.

26

27       [1] "Berman Decl." means the Declaration of Steve W. Berman in Support of Developer
Plaintiffs' Motion for Preliminary Approval of Class Action Settlement with Defendant Apple Inc.,
filed concurrently herewith.

28

Cal. Apr. 22, 2010); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 327 (N.D. Cal. 2018) (noting that "the Settlement [in that matter] was negotiated at arms' length over several full-day mediation sessions with the help of an experienced mediator—Judge Layn Phillips," and that "Courts in this district have recognized that the assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

### 2.    The Settlement Consideration and Release of Claims

The Settlement provides for monetary and structural relief, both in exchange for a release of claims.  These elements of the Settlement are addressed in turn below.

#### a.    Monetary Relief

Apple has committed to pay $100,000,000 into a Small Developer Assistance Fund.  *See* Berman Decl., Ex. A at § 5.3.  The fund is non-reversionary; under no circumstances will any portion of the fund return to Apple.  *See id.* at § 6.6.  All Members of the Settlement Class will receive a minimum direct distribution from the Small Developer Assistant Fund in the amount of $250, with higher distribution amounts available to Settlement Class Members based on their historic proceeds from distributing apps in the App Store.

| PROCEEDS TIER | PERCENTAGE OF THE SETTLEMENT CLASS[2] | MINIMUM PAYMENT |
|---|---|---|
| $0.01 to $100 | 51% | **$250.00** |
| $100.01 to $1,000.00 | 23% | **$500.00** |
| $1000.01 to $5,000.00 | 11% | **$1,000.00** |
| $5,000.01 to $10,000.00 | 4% | **$1,500.00** |
| $10,000.01 to $50,000.00 | 6% | **$2,000.00** |
| $50,000.01 to $100,000.00 | 2% | **$3,500.00** |
| $100,000.01 to $250,000.00 | 2% | **$5,000.00** |
| $250,000.01 to $500,000.00 | 1% | **$10,000.00** |
| $500,000.01 to $1,000,000.00 | 1% | **$20,000.00** |
| Over $1,000,000.00 | 1% | **$30,000.00** |

---

[2] *See* Berman Decl. ¶ 6.

1

2          Importantly, the minimum payment amounts set forth above are just that, minimums.  They

3   would apply only if *every* member of the Settlement Class submits an approved claim.  While the

4   Parties have developed a robust and streamlined claims process, *see infra* at Section II.B.3, a 100-

5   percent claims rate is not likely.  The proposed Settlement Administrator, Angeion Group LLC

6   ("Angeion"), estimates a claims rate of 35 percent in this matter.  *See* Weisbrot Decl. at ¶ 35.[3]  In

7   that event, the minimum payment amounts will increase proportionally in each tier.  *See* Berman

8   Decl., Ex. A at § 6.3.

9          The Settlement proposes that any leftover funds after distributions to Settlement Class

10  Members (for example, from uncashed checks) will be used as a *cy pres* distribution to Girls Who

11  Code, a nonprofit organization that works to close the gender gap in computer science and

12  programming.  *See id.* at § 6.6.  Apple has advised Developer Plaintiffs that both the company and

13  its counsel have supported this organization in financial and other ways in the past.

14                    **b.      Structural Relief**

15         In addition to the monetary relief just described, the Settlement provides for important and

16  valuable structural relief in five areas of particular concern to the iOS developer community.

17         **Commissions / Small Business Program**.  Through the Settlement, Apple acknowledges

18  that this litigation (together with other considerations) was a factor in Apple's January 1, 2021

19  launch of the Small Business Program.  *See id.* at § 2.3.  Under the Small Business Program,

20  existing and new developers earning up to $1,000,000.00 in proceeds annually are entitled upon

21  enrollment to a reduced commission rate of 15 percent on paid apps and in-app purchases.  *See id.*

22  Under the Settlement, Apple has agreed to maintain the 15-percent commission tier for U.S.

23  developers enrolled in the Small Business Program for at least three years after Final Approval.

24  *See id.* at § 5.1.1.  This is a valuable assurance to the Settlement Class.

25

26

27         _____
           [3] "Weisbrot Decl." means the Declaration of Steven Weisbrot of Angeion Group Regarding the
28  Proposed Notice Program, filed concurrently herewith.

DEVELOPER PLS.' MOT. FOR PRELIM. APPROVAL OF
SETTLEMENT WITH APPLE INC. – Case No. 4:19-cv-03074-
YGR                                                    -5-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Named Plaintiff Pure Sweat Basketball's CEO, Richard Czeslawski, addresses the benefits in an accompanying declaration.  As Mr. Czeslawski explains, the Settlement "furthers the substantial direct benefits of the Small Business Program . . . by locking in the benefits of the Reduced Commission, from 30% to 15%, for at least three more years, providing invaluable business planning value."  Czeslawski Decl. at ¶ 7.[4]  As elaborated below, Professor Nicholas Economides estimates that the Small Business Program, and Apple's three-year commitment to maintain its 15% tier, will save the Settlement Class $177.2 million in commissions.  *See infra* at Section IV.A.3.

**Steering**.  Apple has agreed to revise its App Store Guidelines to permit developers of all app categories to communicate with consenting customers outside their app, including via email and other communication services, about purchasing methods other than in-app purchase.  *See* Berman Decl., Ex. A at § 5.1.3.  Under the App's Store existing Guidelines, developers may not use contact information (emails, phone numbers, etc.) obtained within an app to contact their user base outside the app.  As a practical matter, this prevents developers from alerting their customers to alternative payment options.  The proposed Settlement lifts this restriction, and it does so for all app categories.

This injunctive relief is extremely valuable.  By informing customers of alternative payment options, developers can avoid paying Apple's commissions and, moreover, exert competitive pressure on Apple to discipline its pricing.  Mr. Czeslawski considers this a "game changer" because the "ability to effectively communicate with [his] customers is the lifeblood of [his] business."  *See* Czeslawski Decl., at ¶¶ 9, 12.  Mr. Czeslawski anticipates that Pure Sweat Basketball, and other Settlement Class Members, will "take full advantage of this change in Customer Communications as a way to further reduce the commissions paid to Apple."  *Id.* at ¶ 12; *see also* Economides Decl. at ¶ 24 (describing this structural relief as "a major change from

---

[4] "Czeslawski Decl." means the Declaration of Richard Czeslawski in Support of Developer Plaintiffs' Motion for Preliminary Approval of Class Action Settlement with Apple, Inc., filed concurrently herewith.

Apple's previous policies [that] could bring substantial benefits to developers").[5]  Under the

Settlement, this modification to Apple's App Store Guidelines must be maintained for at least three

years from Final Approval.

**Discoverability.**  For at least three years after Final Approval, Apple will continue to

"conduct robust experimentation to drive continuous improvement" in App discoverability,

including in ways that will "give new and high-quality apps a chance to be found."  *See* Berman

Decl., Ex. A at § 5.1.2.  Innovations on discoverability are important to iOS developers, many of

which have developed high-quality apps that, for reasons beyond their control, have not gained

prominence in the App Store or its search results.  Named Plaintiff Donald Cameron is one such

developer.  Like other small developers, Mr. Cameron has "a limited budget for advertising and

promotion" and while he believes he has created "one of the best baby naming apps available," it

has been difficult for him to get the app discovered.  *See* Cameron Decl. at ¶ 7.[6]  Mr. Cameron

believes that Apple's commitment to continuous improvement on issues of discoverability "is vital

so that new and high-quality apps have a better chance of being found."  *Id.*

**Pricing Freedom**.  Under Apple's existing guidelines, iOS developers can price their Apps

and in-app products only at price tiers ending in $0.99.  There are presently 100 such tiers.  Under

the terms of the Settlement, Apple will expand its pricing tiers from 100 to 500 (by December 31,

2022), and maintain those tiers for at least three years from Final Approval.  *See* Berman Decl., Ex.

A at § 5.1.4.  This enhanced pricing freedom will allow iOS developers to more carefully calibrate

their prices to compete and enhance revenues.  Mr. Cameron, for example, has priced his app at

$2.99 and, under the current pricing tiers, can only adjust that price (up or down) in dollar

increments, which constitutes a "huge price jump or a steep decline."  Cameron Decl. at ¶ 5.  Mr.

Cameron believes that greater pricing flexibility under the Settlement will enable him to better

compete and "adjust prices in the market."  *Id.*  Mr. Czeslawski agrees.  *See* Czeslawski Decl. at ¶

---

[5] "Economides Decl." means the Declaration of Professor Nicholas Economides, filed
concurrently herewith.

[6] "Cameron Decl." means the Declaration of Donald R. Cameron in Support of Developer
Plaintiffs' Motion for Preliminary Approval of Class Action Settlement with Apple Inc., filed
concurrently herewith.

1   14 ("The more than five-fold increase in price tiers will allow Pure Sweat the flexibility to

2   competitively price its subscriptions, and, thus, allow it to better react to market trends and

3   conditions, compete for new customers, retain current customers by, among other things, offering

4   customers plans that suit their specific needs.").

5         **App Review**.  iOS developers have expressed concern that Apple's App Review standards

6   are not always applied fairly or in a consistent manner.  Under the Settlement, Apple will create

7   new content for its website alerting developers to an appeal process, which is available to any

8   developer who "believes that there has been unfair treatment by Apple in the review of any of the

9   U.S. developer's apps, or in-app products, or updates."  *See* Berman Decl., Ex. A at § 5.1.5.  Apple

10   will be required under the Settlement to maintain this appeal process, and the website callout, for at

11   least three years.  *See id.*  This is an important commitment for iOS developers.

12         **Transparency**.  For at least three years from Final Approval, Apple will publish an annual

13   "transparency report" that (at a minimum) will provide (a) meaningful statistics on the number of

14   apps rejected and reasons why, (b) the number of customer and developer accounts deactivated,

15   and (c) objective data regarding search queries and results, and the number of apps removed from

16   the App Store.  *See id.* § 5.1.6.  These data points will provide developers with better insight into

17   Apple's App Store review, rejection and search functions.  This is valuable information for

18   developers trying to gain a foothold in the App Store.  As Mr. Cameron explained, transparency

19   reports "will help developers like me understand why [our] apps are being found (or not), and

20   improve our search results.  *See* Cameron Decl. at ¶ 10.  Mr. Cameron believes that having

21   transparency reports will help him "compet[e] against more well-resourced competitors in

22   [Apple's] very large digital store."  *Id.*

23           **c.**      **Settlement Release**

24         In exchange for the monetary and injunctive consideration just described, the Settlement

25   Class would release Apple from all past, present and future claims "related to the same facts

26   underlying the claims asserted in the Action."  Berman Decl., Ex. A at §§ 10.1, 10.2.  The proposed

27   Release does not purport to relinquish claims of any iOS developer not within the Settlement Class.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.    The Notice and Distribution Plan

Plaintiffs have attached to this motion a declaration from the Settlement Administrator, Angeion, that includes proposed class notices, a sample claim form, and proposes a comprehensive notice program. *See* Weisbrot Decl. at ¶¶ 13-28, Exs. B, C, & D.  The proposed notice program provides individual direct notice to all reasonably identifiable Settlement Class Members via email and mail, along with a dedicated website and toll-free telephone line where Settlement Class Members can learn more about their rights and options pursuant to the terms of the Settlement.  *See id.* at ¶¶ 23-24.

For direct notice, Angeion will send individual direct notice by email and mail to all of the approximately 67,000 members of the proposed Settlement Class whose contact information can be obtained.  Apple requires emails and physical addresses from developers when they establish individual developer accounts, and Apple has agreed to provide that data to Angeion.  It is thus likely that Angeion will have contact information for all or nearly all Settlement Class Members. Angeion will also employ additional methods to help ensure that as many Settlement Class Members as possible receive notice via email. For example, prior to distributing email notice, Angeion will engage in an email updating process to help ensure the accuracy of recipient email addresses.  *See* Weisbrot Decl. at ¶¶ 14-22.

The content of the direct notice emails will be the Email Notice attached to the Weisbrot Declaration. *See* Weisbrot Decl. Ex. C.  Angeion will also send postcard notice to each Settlement Class Member with a physical mailing address. The proposed Postcard Notice is attached to Weisbrot Declaration as Exhibit D.  These notice documents will, inter alia, inform Settlement Class Members that the settlement funds will be distributed to Settlement Class Members according to proceed tiers, as described *supra*, in Section II.B.2.a.  *See id.* at ¶¶ 23-24.

Angeion will establish a case-specific toll-free hotline and case-specific website, with the domain reserved as SmallAppDeveloperAssistance.com.  *See id.* at ¶¶ 23, 26.  On the settlement website, Settlement Class Members will be able to view general information about this class action, read relevant Court documents, and review important dates and deadlines pertinent to the Settlement.  For example, the detailed long-form notice will be available for download on the

DEVELOPER PLS.' MOT. FOR PRELIM. APPROVAL OF
SETTLEMENT WITH APPLE INC. – Case No. 4:19-cv-03074-
YGR

-9-

1    website ("Class Notice").  *See id.* at ¶ 25, Ex. B.  The Settlement Website will be designed to be

2    user-friendly and make it easy for Settlement Class Members to find information about the

3    Settlement, and it will also have a "Contact Us" page where Settlement Class Members can send an

4    email with any additional questions to a dedicated email address.  *See id.* at ¶ 23.

5         Using a tool displayed prominently on the Settlement Website, any Settlement Class

6    Member will be able to determine the Settlement payment tier to which they are assigned and

7    submit a Claim Form.  Settlement Class Members will be provided with log-in information via the

8    mail and email notice which they can use to view a pre-populated Claim Form that is streamlined

9    for ease of submission.  *See id.* at ¶ 24.  Settlement Class Members will have the ability to

10   download the Class Notice, Summary Notice and Claim Form from the Settlement Website.  A

11   copy of the Claim Form is attached to the Weisbrot Declaration as Exhibit E.

12        Claimants will be given digital payment options such as via PayPal, which will provide

13   Settlement Class Members with convenient access to their settlement funds while greatly reducing

14   the transaction costs associated with mailing paper checks to thousands of claimants.  However,

15   claimants also will have the option to request and receive a paper check.  *See id.* at ¶ 30.

16                          **III.    LEGAL STANDARD**

17        Federal Rule of Civil Procedure 23(e) requires judicial approval of any compromise or

18   settlement of class action claims.  Preliminary approval is not a dispositive assessment of the

19   fairness of the proposed settlement; rather, preliminary approval assesses only whether the

20   proposed settlement falls within the "range of possible approval."  *Goertzen v. Great Am. Life Ins.*

21   *Co.*, 2017 WL 8294291, at *2 (N.D. Cal. Nov. 6, 2017) (Gonzalez Rogers, J.).  Preliminary

22   approval establishes an "initial presumption of fairness, such that notice may be given to the class

23   and the class may have a full and fair opportunity to consider the proposed [settlement] and

24   develop a response."  *Nitsch v. DreamWorks Animation SKG Inc.*, 2017 WL 399221, at *1 (N.D.

25   Cal. Jan. 19, 2017).[7]  A settlement may preliminarily be approved upon a "showing that the court

26   will likely be able to (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for

27

28        [7] Internal quotation, bracket and ellipses marks omitted here and throughout.

purposes of judgement on the proposal." Fed. R. Civ. P. 23(e)(1).  Factors courts consider under Rule 23(e)(2) include whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal;
> > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

All of the requirements for preliminary approval are met here.

### IV.     THE SETTLEMENT WARRANTS PRELIMINARY APPROVAL

**A.     The Settlements are Fair, Reasonable and Adequate.**

**1.     The Class Has Been Zealously Represented.**

Developer Plaintiffs' Complaint was the product of extensive investigation and analysis, setting forth what this Court has described as an "articulated theory" of antitrust injury.  *See* ECF No. 66 at 16.  As described above, interim Class Counsel have aggressively pursued and analyzed a massive discovery record, which includes millions of documents and voluminous transactional data, some of which was produced only after motions to compel.  Class Counsel have conducted and/or defended at least seventeen depositions, retained prominent economic and accounting experts, and prepared a thorough motion for class certification.  *See* ECF No. 332-4 at ¶¶ 5-7. Named plaintiffs likewise have furthered the interests of the class by reviewing submissions, conferring with Class Counsel, producing documents, and sitting for depositions.  *See* ECF No. 332-15 & 332-16.  The Settlement Class has been adequately represented.

**2.     The Settlement Agreement Resulted from Arm's-Length Negotiations.**

The Settlement is the product of sustained negotiations between experienced counsel with a track record of success in antitrust and class-action matters.  Negotiations occurred at arm's length, over several sessions, including before one of the nation's leading mediators (Hon. Layn R.

Phillips (Ret.)).  Having worked on this case for years, including through the *Epic* trial, counsel understand both the risks and potential recovery of further litigation.  Counsel's determination that the settlement is fair and reasonable is afforded "great weight" in the settlement approval analysis. *See In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 229 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017) (observing that "competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation").

> ### 3.      The Settlement Represents Substantial Relief for the Class.

Preliminary approval requires consideration of whether the "relief provided for the class is adequate."  Fed. R. Civ. P. 23(e)(2)(C).  It is here.

The $100 million Small Developer Assistance Fund established under the proposed Settlement is itself substantial and more than adequate relief.  For context, if the Settlement Class were to obtain class certification, survive summary judgment and prevail at trial, its members would stand to recover between approximately $289 million and $329 million in single damages. *See* Economides Decl. at ¶ 10.[8]  While the Small Developer Assistance Fund affords prospective relief, not damages, it is equivalent to between 30.4 and 34.6 percent of single damages.  That is a substantial monetary recovery, particularly in comparison to other antitrust settlements upheld in this district.  In *In re Cathode Ray Tube (CRT) Antitrust Litig.*, for example, the court approved a settlement representing 20% of single damages, citing a survey of 71 settled antitrust cases which showed a weighted mean settlement of 19%.  *See* 2016 WL 3648478, at *7 & n.19 (N.D. Cal. July 7, 2016).  This Court recently described a recovery of 11.7% of single damages as an "excellent" result.  *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *20 (N.D. Cal. Dec. 10, 2020).

Moreover, the relief afforded by this Settlement is not limited to the Small Developer Assistance Fund.  The Settlement's structural relief elements (individually, and collectively) confer additional economic and practical benefits on the Settlement Class.  *See In re Toyota Motor Corp.*

---

[8] These calculations are based on the transactional data Apple has produced in this action, which extends through April 26, 2021. *See id.* at ¶ 8.

1   *Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2013 WL 12327929, at \*29. n.7

2   (C.D. Cal. July 24, 2013) (in valuing a settlement, "Plaintiffs' experts appropriately have included

3   the non-monetary benefits"). As set forth above, and in the accompanying declarations of Named

4   Plaintiffs, commitments in the Settlement to improve app discoverability, pricing freedom, app

5   review, and transparency will all assist the Settlement Class in monetizing and their apps. *See*

6   *supra* at Section II.B.2.b. Apple's further commitment to permit outside-app communications—

7   specifically authorizing developers of all apps to alert customers to alternative payment

8   mechanisms—will confer additional economic benefits on the Settlement Class. *See id.*;

9   Economides Decl. at ¶¶ 23-24.

10         Developer Plaintiffs do not endeavor to quantify the value of this entire panoply of

11   structural relief. The Small Business Program, however, can be valued and it is appropriate to do

12   so given Apple's acknowledgment that this litigation was a driving factor behind the program's

13   adoption. *See* Berman Decl., Ex. A at § 2.3. Professor Economides has performed the valuation.

14   He shows that the Small Business Program, coupled with Apple's agreement under the Settlement

15   to maintain the program for at least three additional years, will save the Settlement Class $177.2

16   million, and all U.S. iOS developers $190.2 million. *See* Economides Decl. at ¶¶ 21-22.

17         Developer Plaintiffs recognize that this litigation may not be solely responsible for the

18   Small Business Program. Apple has cited two other contributing factors—the Coronavirus and a

19   desire to propel innovation by small developers. *See* Berman Decl., Ex. A at § 2.3. Weighing this

20   litigation equal to these other factors would be reasonable, but even assuming the litigation played

21   a lesser role, it still conferred millions of additional dollars on the Class. For example, even if the

22   litigation was 20 percent responsible for the Small Business Program, that would mean that the

23   litigation delivered an additional $35.44 million to the Settlement Class ($177.2m x .20).

24   Combining that amount with the $100 million Small Developer Assistance Fund yields $135.44

25   million, which represents between 41.2 and 46.9 percent of the Settlement Class's single damages.

26   That is a remarkable recovery, and it does not even account for the other valuable structural

27   reforms Apple has agreed to implement.

28

DEVELOPER PLS.' MOT. FOR PRELIM. APPROVAL OF
SETTLEMENT WITH APPLE INC. – Case No. 4:19-cv-03074-
YGR

1    The value of the Settlement must also be weighed against the risks of further litigation.

2    Developer Plaintiffs believe this to be a strong case, but the path forward is not without peril.  As

3    this Court knows, "[a]ntitrust cases are particularly risky, challenging, and widely acknowledge[d]

4    to be among the most complex actions to prosecute."  *In re Lithium Ion Batteries Antitrust Litig.*,

5    2020 WL 7264559, at *15.  "'The best case can be lost and the worst case can be won, and juries

6    may find liability but no damages.  None of these risks should be underestimated.'"  *Id.* (quoting *In*

7    *re Super. Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990)).

8    Additional risk is present here because Developer Plaintiffs have not yet passed the class

9    certification hurdle, and the outcome of the *Epic* trial looms over everything.  A trial outcome

10   adverse to Epic could pose an obstacle to Developer Plaintiffs' ability to establish liability or

11   substantial damages for any class of developers.  The Settlement takes these risks off the table,

12   ensuring that the Settlement Class receives meaningful, immediate, and assured relief.

13       **4.      The Settlement Treats Class Members Equitably.**

14       In addition to evaluating the adequacy of the Settlement overall, the Court must consider

15   whether the "proposal treats class members equitably relative to each other."  Fed. R. Civ. P.

16   23(e)(2)(D).  A plan of allocation is "governed by the same standards of review applicable to

17   approval of the settlement as a whole: the plan must be fair, reasonable and adequate."  *In re:*

18   *Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *7 (N.D. Cal. Dec. 17, 2015).

19   Courts routinely uphold allocation plans that divide settlement funds on a pro rata basis.  *See id.*

20   (collecting cases); *see also In re Resistors Antitrust Litig.*, 2020 WL 2791922, at *2 (N.D. Cal.

21   Mar. 24, 2020) (finding plan to allocate "on a pro rata basis based on the dollar value of approved

22   purchases . . . [to be] fair, reasonable, and adequate.").

23       The allocation plan here provides a minimum payment to every member of the Settlement

24   Class, with higher payments available to those who have participated more extensively in the iOS

25   app ecosystem.  As addressed above, each Settlement Class Member's recovery will be tied to the

26   historic proceeds they have generated through the App Store.  *See supra* at Section II.B.2.a.

27   Settlement Class Members with higher proceeds, and who thus paid higher commissions, will

28   recover more than Settlement Class Members with lower proceeds.  This is an equitable

methodology of allocation because it ties payments to each Settlement Class Member's contribution to the App economy and graduates payments based on Developer Plaintiffs' theory of harm.

However, one unique consideration here is the issue of "discoverability."  As reflected in the Consolidated Complaint, Developer Plaintiffs contend that the App Store renders many apps undiscoverable, meaning consumers do not purchase them because they are difficult to find among the nearly two million apps sold within the only iOS App Store available.  *See* ECF No. 53 at ¶¶ 94-96.  Discoverability is addressed in the Settlement, as noted above.  To improve discoverability, Apple has committed to "continue to conduct robust experimentation to drive continuous improvement."  *See* Berman Decl., Ex. A at § 5.1.2.

Given that Settlement Class Members' proceeds in the App Store can be influenced by discoverability issues outside their control, Developer Plaintiffs believe that an equitable means of allocating the settlement fund is to group Settlement Class Members into tiers, which the Settlement here does.  This assures that individual Settlement Class Members recover amounts tied to their App Store proceeds, but without making proceeds the sole determinant of the amount each Settlement Class Member recovers.  Settlement Class Members with comparable proceeds will be treated equally at each of the ten payment tiers contemplated by the allocation scheme.

### 5. The Settlement Satisfies the Remaining Factors Set Forth in the Northern District's Procedural Guidance

This District's Procedural Guidance for Class Action Settlements ("Procedural Guidance") instructs parties to address certain factors in any motion to preliminarily approve a class settlement.[9]  A number of these factors are addressed throughout this submission. The remaining applicable factors are addressed below.

#### a. The Settlement Class Appropriately is Narrower than the Class Pleaded in the Complaint.

The Procedural Guidance requires that where, as here, a litigation class has not been certified, a motion for preliminary approval must address "any differences between the settlement

---

[9] *See* https://www.cand.uscourts.gov/forms/procedural-guidance-for-class-action-settlements/.

class and the class proposed in the operative complaint and [provide] an explanation as to why the differences are appropriate in the instant case."  Procedural Guidance § 1(a).

Here, the Settlement Class definition is narrower than class definition in the Consolidated Complaint because it is limited to developers who earned proceeds in the App Store of no more than $1,000,000 in calendar years 2015 through 2021.  *See* ECF No. 53 at ¶ 114.[10]  Although narrower, the Settlement Class Definition still covers more than 99 percent of the developers in the class initially proposed in the Consolidated Complaint.  *See* Economides Decl. at ¶ 6.  It excludes only 586 developers.  *See id.*  By definition, the only developers not participating in the settlement are the very largest developers operating in the iOS ecosystem, for example Google, Microsoft, and Epic.

There is nothing remarkable about moving to certify a narrower settlement class than is pleaded in a complaint. "Class definitions are often revised, for example, to reflect the contours of a settlement."  *Brown v. Hain Celestial Grp., Inc.*, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014).  The narrower definition is appropriate here for at least two reasons.

***First***, narrowing the class definition enhances the cohesiveness of the class and, in doing so, puts to rest one of Apple's chief arguments in opposition to class certification—that a class of small developers and "corporate behemoths" cannot be certified under Rule 23.  *See* ECF No. 379 at 11 (contenting that Named Plaintiffs are not "typical" of class containing corporate giants); *id*. at 3-4 (contending that impact analysis differs for "Mr. Cameron with only $145 in revenue" and "Match Group, with more than $1 billion in revenue"); *id*. at 24-25 (contending that developers "with substantial claims (such as Epic) have the resources to bring their own suits and have a strong pecuniary interest 'individually controlling the prosecution . . . of separate actions' as opposed to relying on Mr. Cameron and Pure Sweat to advance the divergent interests of the class" (quoting Rule 23(b)(3)(A)).

---

[10] Developer Plaintiffs' motion for class certification added to the class definition a Class Period of June 4, 2015 to the present.

To be clear, Developer Plaintiffs have answers to all of these arguments and believe that the litigation class proposed in the Consolidated Complaint could be certified.  But nothing is certain in litigation.  Moreover, Apple's contentions regarding absent large developers carry more force with respect to a settlement class.  As the Supreme Court has cautioned, aspects of Rule 23 "designed to protected absentees by blocking unwarranted or overbroad class definitions . . . demand undiluted, even heighted attention in the settlement context."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  The reason is that the class definition in litigated proceedings is inherently provisional.  The court can always "adjust the class, informed by the proceedings as they unfold." *Id.*; *In re Hyundai & Kia Fuel Econ. Litig*., 926 F.3d 539, 557 (9th Cir. 2019) (en banc).  This is not the case with respect to a settlement class, where the finality of the class definition can support, as here, a more circumscribed approach.

*Second*, this is not a situation in which the class definition has been amended to exclude class members with the smallest claims or who otherwise require the class action vehicle to recover.  Quite the opposite.  The 586 large developers that fall outside the Settlement Class are, by definition, the developers most capable of bringing their own actions against Apple.  Indeed one of them (Epic) already has.  Nothing in the Settlement Agreement prevents these developers from bringing their own case, with their own counsel, under their own theories.

The Settlement Class definition also departs from the Consolidated Complaint's definition by explicitly excluding certain parties who cannot properly recover.  For example, the Settlement excludes from the class defense counsel and their immediate family; Court staff in which this matter is assigned; developers who opt-out; and any other individual whose claim have been adjudicated to verdict.  *See* Berman Decl., Ex. A at § 1.27.  These are standard and appropriate class exclusions.

### b.   The Settlement Release Tracks the Claims Alleged in the Complaint.

The Procedural Guidance also requires identification of "any differences between the claims to be released and the claims in the operative complaint and an explanation as to why the differences are appropriate in the instant case."  Procedural Guidance § 1(c).  The Settlement release here extends beyond the specific claims asserted in the Consolidated Complaint, but only to

1    encompass potential claims "related to the same facts" and only to those claims "that can be

2    released as a matter of law."  Berman Decl., Ex. A at ¶¶ 10.2, 10.3.  This is an appropriate release.

3    As the Ninth Circuit has recognized, a release may properly extend to "claims not alleged in the

4    underlying complaint where those claims depended on the same set of facts as the claims that gave

5    rise to the settlement."  *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).

6                    **c.      Developer Plaintiffs Anticipate a Relatively High Claims Rate.**

7                 Angeion estimates a 35% claims filing rate.  That estimate is based on comparisons to

8    similar settlements, as well as considerations that include the comprehensive direct notice efforts

9    via email and mail to Settlement Class Members; the simplicity of the Claim Form and claim

10   submission process; and the anticipated earned media that this Settlement will garner.  *See*

11   Weisbrot Decl. at ¶ 29.

12                   **d.      Angeion Was Selected as Settlement Administrator Through a
                             Competitive Bidding Process.**

13

14                Prior to engaging Angeion as the notice and claims administrator, interim Class Counsel

15   sent a Request for Proposal ("RFP") to other leading settlement administrators.  The RFP included

16   a carefully drafted template for the candidates to complete.  It required each firm to make the same

17   assumptions about the notice and administration of the settlements, ensuring an apples-to-apples

18   comparison.  All three administrators responded with the completed template, as well as additional

19   information explaining their proposals.  It was only after this competitive bidding process that

20   Class Counsel, in consultation with Apple, chose Angeion as providing the best value for the

21   Settlement Class.  All three administrators proposed direct notice through email.  The claims

22   payment methods proposed included digital payments by email and paper checks.  Angeion's

23   initial proposal was the most competitively priced.  *See* Berman Decl. at ¶¶ 7-8.

24                In the last two years, Angeion has worked Hagens Berman Sobol Shapiro LLP on three

25   other cases.  *See id.* at ¶ 9.  Angeion estimates total administration costs will be approximately

26   $125,000, or around 0.125% of the Small Developer Assistance Fund.  The funds for

27   administration will be paid from the Small Developer Assistance Fund.  *See* Weisbrot Decl. at ¶ 33.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

e.      **Counsel Will Request Reasonable Attorneys' Fees and Reimbursement of Costs.**

When it comes time to evaluate the adequacy of the proposed settlements, the Court also looks to the potentially requested attorney's fees. *See* Fed. R. Civ. P. 23(e)(2)(C)(iii); *see also* Procedural Guidance at § 6.  Here, the Settlement Agreement provides that any Court-awarded fees will be paid from the Small Developer Assistance Fund.  *See* Berman Decl., Ex. A at § 6.1.2.  Plaintiffs will make a request for attorneys' fees of up to $30 million.  The notice advises the Class of this request.  *See* Weisbrot Decl. Exs. B, C, & D.

A fee award of $30 million, which again is the maximum amount plaintiffs will request, represents 30 percent of the Small Developer Assistance Fund.  Even if one were to look solely at this monetary relief, such a request would be reasonable.  When applying the percentage-of-the-fund method, the Ninth Circuit has established a benchmark percentage of 25 percent to be used as the "starting point" for analysis.  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949, 955 (9th Cir. 2015).  "That percentage amount can then be adjusted upward or downward depending on the circumstances of the case."  *de Mira v. Heartland Emp't Serv., LLC*, 2014 WL 1026282, at *1 (N.D. Cal. Mar. 13, 2014).  Courts in this district have recognized that "'in most common fund cases, the award *exceeds* the benchmark.'"  *Id.* (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008)).  Indeed, federal courts in this district and across the country routinely award class counsel fees equivalent to, and often exceeding, 30 percent of the common fund,[11] including in so-called "megafund" cases, even where the common fund exceeds 100 million dollars.[12]  Recently, in the 2018 Antitrust Annual Report, Professor Joshua Davis found that among

_____

[11] *See* Eisenberg, Miller & Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 952 (2017) (finding that among antitrust class action settlements surveyed with a mean recovery of $501.09 million and a median recovery of $37.3 million, the mean and median percentages awarded were 27 percent and 33 percent, respectively).

[12] *Allapattah Servs. Inc v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (awarding 31.33% fee on $1.075 billion settlement fund); *accord In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *6 (D. Kan. July 29, 2016) (awarding 33.33% fee on $835 million settlement; "Counsel's expert has identified 34 megafund cases with settlements of at least $100 million in which the court awarded fees of 30 percent or higher."); *see also, e.g.*, *In re Polyurethane Foam Antitrust Litig.*, 2015 WL 1639269, at *7 (N.D. Ohio Feb. 26, 2015) (awarding 30% fee on $147.8 million settlement fund); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1366 (S.D. Fla. 2011) (awarding 33.3% fee on $410 million settlement fund); *In re Linerboard Antitrust*

1    antitrust class action settlements surveyed between 2013 and 2018, the median fee awarded for

2    settlements between $100 and $249 million was 30 percent—and the monetary portion of the

3    settlement here is at the lowest end of that range, at $100 million.[13]

4            Moreover, as explained above, the Settlement also provides substantial non-monetary relief

5    to the Class.  *See supra* at Section IV.A.3.  This includes structural relief that will benefit the

6    Settlement Class (and other developers) regarding discoverability of their apps (particularly

7    important for small developers), steering, increased pricing freedom, app review, App Store

8    transparency, and the establishment and maintenance (for at least three years) of the reduced

9    commission rate of 15 percent for U.S. developers enrolled in the Small Business Program.  As

10   addressed above, the establishment of the Small Business Program alone, coupled with Apple's

11   agreement under the Settlement to maintain the program for at least three additional years, will

12   save the Settlement Class $177.2 million in commissions.  This non-monetary relief, which adds

13   substantial value to the Settlement should be considered by the Court in awarding fees.  *See*

14   *Amador v. Baca*, 2020 WL 5628938, at *12 (C.D. Cal. Aug. 11, 2020) (Wilson, J.) (finding an

15   upward adjustment warranted where lawsuit led to institutional policy changes); *Staton v. Boeing*

16   *Co.*, 327 F.3d 938, 972-74 (9th Cir. 2003) (concluding that "the actual percentage award was much

17   higher" in light of the injunctive relief, which was a "relevant circumstance" in determining a

18   reasonable fee); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1240 (9th Cir. 1998)

19   (considering both monetary and non-monetary value of the settlement).

20

21

22   *Litig.*, 2004 WL 1221350, at *1 (E.D. Pa. June 2, 2004) (awarding 30% fee on $202.5 million
     settlement fund); *In re Cardizem CD Antitrust Litig.*, No. 99-md-1278, Order No. 49 at 18-20 (E.D.

23   Mich. Nov. 26, 2002) (awarding 30% of a $110 million dollar fund, which produced a multiplier of
     3.7); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *9 (D.D.C. July 16, 2001) (awarding

24   33.7% fee on $365 million settlement fund); *In re Ikon Office Sols., Inc., Secs. Litig.*, 194 F.R.D.
     166, 170 (E.D. Pa. 2000) (awarding 30 % fee on $111 million settlement fund); *see also In re Nat'l*

25   *Collegiate Athl. Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *5, *9 (N.D. Cal. Dec. 6,
     2017) ("federal district courts across the country have, in the class action settlement context,

26   routinely awarded class counsel fees in excess of the 25% 'benchmark,' even in so-called 'mega-
     fund' cases").

27   [13] *See* 2018 Antitrust Annual Report: Class Action Filings in Federal Court at 23, published
     May 2019, available at https://www.huntington.com/-/media/pdf/commercial/antitrust-annual-

28   report-050819.

1    To date, Plaintiffs have invested 20,576 hours and approximately $10,591,088 in attorneys'

2    fees in this litigation.  A $30 million attorneys' fee award—the maximum amount requested—

3    would therefore result in a lodestar multiplier of 2.83.  That is within the range of awards in other

4    class action settlements.  The Ninth Circuit has affirmed a multiplier of 6.85, holding that it "falls

5    within the range of multipliers that courts have allowed."  In *Vizcaino v. Microsoft Corp.*, a leading

6    Ninth Circuit case on attorneys' fees, the Ninth Circuit affirmed a fee award with a 3.66 multiplier.

7    *See* 290 F.3d 1043, 1050-51 (9th Cir. 2002); *see also id.* at 1052-54 (describing district court cases

8    in the Ninth Circuit approving multipliers as high as 6.2).  In *In re Linerboard Antitrust*

9    *Litigation*, the district court explained that "during 2001-2003, the average multiplier approved in

10   common fund class actions was 4.35 and during 30 year period from 1973-2003, [the] average

11   multiplier approved in common fund class actions was 3.89."  2004 WL 1221350, at *16 (citing

12   Stuart J. Logan, et al., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action

13   Reports 167 (2003)).  Plaintiffs also will invest significant additional attorney resources in this case

14   between now and the final approval hearing.

15       Plaintiffs will also request reimbursement of certain costs and expenses, not to exceed $3.5

16   million.  *See* Procedural Guidance at § 6 (instructing class counsel to state "whether and in what

17   amounts they seek payment of costs and expenses, including expert fees").  Those expenses include

18   at least $2,823,445 in expert costs.  *See* Berman Decl. at ¶ 4.  The funds spent on experts were

19   critical to achieving the settlement, which came after plaintiffs filed the expert reports of Professor

20   Einer Elhauge, Professor Nicolas Economides, and accountant Christian Tregillis, each of whom

21   was deposed.  The importance of the experts' testimony in this antitrust case is indicated by the fact

22   that Apple submitted seven expert reports in support of their opposition to class certification.

23              **f.    Plaintiffs Intend to Request Reasonable Service Awards for Class**
                        **Representatives.**

24       Pursuant to § 7 of the Procedural Guidance, Developer Plaintiffs intend to request Service

25   Awards of $5,000 for named Plaintiffs Donald Cameron and Pure Sweat Basketball.  This Court

26   has previously upheld service awards of $5,000, observing that "[t]he Ninth Circuit has repeatedly

27

28

1   held that $ 5,000 is a reasonable amount." *See Congdon v. Uber Techs., Inc.*, 2019 WL 2327922,

2   at *9 (N.D. Cal. May 31, 2019).

3          Named Plaintiffs have been actively involved in the litigation.  Both reviewed pleadings

4   and consulted with interim Class Counsel regarding case developments.  Both were deposed and

5   devoted numerous hours to preparing for deposition.  Both conducted document searches and

6   collected materials for production.  *See* ECF No. 332-15 & 332-16.  Neither derived a personal

7   benefit beyond any recovery to the class.  In addition, a $5,000 service award represents just 0.005

8   percent of the Small Developer Assistance Fund, such that named Plaintiffs do not stand to recover

9   substantially more than other Settlement Class Members.  *See Congdon*, 2019 WL 2327922, at *9

10  (service award of $5,000 "proportional" where it represented 0.25% of total recovery).

11          **g.     Past Distributions**

12          The Procedural Guidance, at § 11, instructs that lead class counsel should provide certain

13  information "for at least one of their past comparable class settlements."  The charts below are for

14  three cases in which Hagens Berman Sobol Shapiro LLP was co-counsel for plaintiffs in antitrust

15  class actions: *Edwards v. National Milk Producers Federation ("In re Milk IPP Antitrust Case")*,

16  No. 11-cv-04766-JSW (N.D. Cal.); *In re Dynamic Random Access Memory (DRAM) Antitrust*

17  *Litigation* (*In re DRAM IPP Antitrust Case*), No. 02-md-01486-PJH (N.D. Cal.); and *Pecover et al.*

18  *v. Electronic Arts, Inc.* (*"Electronic Arts IPP Antitrust Case"*), No. 08-cv-2820-CW (N.D. Cal.).

19

20

| **In re DRAM IPP Antitrust Case** | |
|---|---|
| *All figures are best estimates based on public records* | |
| | **% Total Settlement** |
| **Settlement** $310.72 million | **100%** |
| **Claims paid** $188,872,426 | **61%** |
| Class members sent notice 175.5 million* | |
| Actual claims 445,554 (0.25%) | |
| Opt-outs 5 (0.0%) | |
| Average recovery per claimant $423.90** | |
| **Residual** $2.3 million | **0.75%** |
| Cy pres distribution $0 | |
| Reversion $0 | |
| **Attorney fees awarded** $78.3 million | **25%** |
| Portion of distributed fund 41% | |
| **Attorney Costs** $11.8 million | **4%** |
| **Administrative costs** $1.047 million | **0.3%** |

*No direct notice to class members; publication only.
**Median recovery not available.

| **In re Milk IPP Antitrust Case** | |
|---|---|
| *All figures are best estimates based on public records* | |
| | **% Total Settlement** |
| **Settlement** $52 million | **100%** |
| **Claims paid** $35,316,020 | **68%** |
| Class members sent notice 186.2 million* | |
| Actual claims 3,542,640 (1.9%) | |
| Opt-outs 1 (0.0%) | |
| Average recovery per claimant** | |
| **Residual** 0 | |
| Cy pres distribution $0 | |
| Reversion $0 | |
| **Attorney fees awarded** $13 million | **25%** |
| Portion of distributed fund 37% | |
| **Attorney Costs** $2.4 million | **4.61%** |
| **Administrative costs** $1.5 million | **2.81%** |

*No direct notice to class members; publication only.
**$7.51 for individuals and $210.28 for organizations.

| **Electronic Arts IPP Antitrust Case** | |
|---|---|
| *All figures are best estimates based on public records* | |
| | **% Total Settlement** |
| **Settlement** $27 million | **100%** |
| **Claims paid** $11,592,317 | **43%** |
| Class members sent notice 14.076 million | |
| Actual claims 143,775 (1.02%) | |
| Opt-outs 5 (0.0%) | |
| Average recovery per claimant $80.63* | |
| **Residual** $5.033 million | **18.64%** |
| Cy pres distribution $0 | |
| Reversion $0 | |
| **Attorney fees awarded** $7.3 million | **27%** |
| Portion of distributed fund 63% | |
| **Attorney Costs** $2 million | **7.4%** |
| **Administrative costs** $1.170 million | **0.3%** |

*Median recovery not available.

1

**B.      The Settlement Class Merits Certification.**

2

Preliminary approval also requires the Court to determine whether it is likely to "certify the

3

class for purposes of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1)(B)(ii).  While the Court

4

must assess all applicable requirements of Rule 23, "they are applied differently in litigation

5

classes and settlement classes."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d at 556.  A critical

6

distinction is that, in the settlement context, the Court need not be concerned with the

7

manageability at trial because "by definition, there will be no trial."  *See id.* at 557.  This can have

8

profound implications on, *inter alia*, the predominance and superiority inquiries.  "A class that is

9

certifiable for settlement may not be certifiable for litigation if the settlement obviates the need to

10

litigate individualized issues that would make a trial unmanageable."  *See id.*; *see also* 2 William

11

B. Rubenstein, *Newberg on Class Actions* § 4:63 (5th ed. 2018) ("Courts ... regularly certify

12

settlement classes that might not have been certifiable for trial purposes because of manageability

13

concerns.").

14

      **1.      Rule 23(a): Numerosity**

15

The numerosity requirement is generally satisfied by classes containing 40 or more

16

members.  *See Hubbard v. RCM Techs. (USA), Inc.,* 2020 WL 6149694, at *1 (N.D. Cal. Oct. 20,

17

2020) (Gonzalez Rogers, J.).  The Settlement Class here has approximately 67,000 members.  *See*

18

Economides Decl. at ¶ 6.  That more than satisfies numerosity.

19

      **2.      Rule 23(a): The Case Involves Questions of Law or Fact Common to the Class.**

20

To satisfy the commonality requirement, "[e]ven a single [common] question will do," *Wal-*

21

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).  "Antitrust liability alone constitutes a

22

common question that will resolve an issue that is central to the validity of each class member's

23

claim in one stroke."  *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 167, 1180 (N.D.

24

Cal. 2013).  To establish antitrust liability here, Plaintiffs must identify a relevant market and

25

Apple's monopoly power.  These are manifestly common questions, as is the question of whether

26

the Settlement Class has been injured.  The commonality requirement is met.

27

28

DEVELOPER PLS.' MOT. FOR PRELIM. APPROVAL OF
SETTLEMENT WITH APPLE INC. – Case No. 4:19-cv-03074-
YGR

1

**3.      Rule 23(a): Plaintiffs' Claims Are Typical of the Claims of the Class.**

2

Typicality requires that the Named Plaintiffs' claims be "reasonably coextensive with those

3

of absent class members; they need not be substantially identical." *B.K. by next Friend Tinsley v.*

4

*Snyder*, 922 F.3d 957, 969-70 (9th Cir. 2019). "In antitrust cases, typicality usually will be

5

established by plaintiffs and all class members alleging the same antitrust violations by

6

defendants." *High-Tech,* 985 F. Supp. 2d at 1181; *Pecover v. Elec. Arts, Inc.* 2010 WL 8742757, at

7

*11 (N.D. Cal. 2010).

8

Here, while Developer Plaintiffs could have obtained certification of the class defined in the

9

Consolidated Complaint, the narrower Settlement Class definition obviates typicality challenges

10

and coheres the class.  Named Plaintiffs, like all members of the Settlement Class, are small

11

developers earning Class Period proceeds of $101 and $148,950, respectively.  *See* Economides

12

Decl. at ¶ 7.  These revenues are typical of the Settlement Class, which includes only those

13

developers who have earned less than $1 million in every year of the Class Period.  Named

14

Plaintiffs have an interest in maintaining the reduced 15% commissions for small developers, as

15

provided for by the Settlement Agreement, as do all small developers.  *See* Czeslawski Decl. at ¶¶

16

6-9.  And like all small developers, Named Plaintiffs have an interest in the various structural relief

17

called for by the Settlement Agreement.  *See id.* at ¶¶ 10-16; Cameron Decl. at ¶¶ 5-10.  Named

18

Plaintiffs are typical of the Settlement Class.

19

**4.      Rule 23(a): Plaintiffs Will Fairly and Adequately Represent the Interests of the Class.**

20

The adequacy requirement of Rule 23(a) entails two separate inquiries: (a) whether the

21

class representatives have interests that are antagonistic to or in conflict with the interests of the

22

class and (b) whether the representatives are represented by counsel of sufficient diligence and

23

competence to fully litigate the case.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.

24

1998); *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978).  Both

25

requirements are met here.

26

***First***, Named Plaintiffs have been actively involved at each step of this litigation, as already

27

addressed.  *See supra* at Section IV.A.5.f.  They have no conceivable conflict of interest with the

28

Settlement Class.  Named Plaintiffs have suffered the same alleged injury as all Settlement Class

Members.  To the extent Named Plaintiffs prevail on their claims, they will establish liability and

antitrust injury for the entire Settlement Class.

   **Second**, Class Counsel have extensive experience in antitrust and complex litigation,

including in this Court, and have leveraged that experience to forcefully advance the Settlement

Class's interests.  Class Counsel are committed to prosecuting this action to maximize and have a

proven track record of litigating efficiently and strategically to achieve that outcome.  *See* ECF No.

331-8.  Rule 23(a)(4)'s requirements are met.

   **5.  Rule 23(b)(2): Injunctive Relief Is Appropriate for Entire Class.**

   Certification under Rule 23(b)(2) is appropriate where the defendant "has acted or refused

to act on ground that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  The

App Store restraints challenged in this litigation apply generally and the structural relief set forth in

the Settlement would benefit all Settlement Class Members. Certification under Rule 23(b)(2) is

thus appropriate.

   **6.  Rule 23(b)(3): Common Questions of Fact or Law Predominate.**

   Class certification is appropriate under Rule 23(b)(3) when "questions of law or fact

common to class members predominate over any questions affecting only individual members."

Fed. R. Civ. P. 23(b)(3).  The predominance requirement "tests whether proposed classes are

sufficiently cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  This

"is a test readily met in certain cases alleging . . . violations of the antitrust laws."  *Id.* at 625.

   In most antitrust cases, the fundamental questions to be adjudicated concern the

Defendant's conduct—its genesis, effects, and rationale.  So it is here.  As the *Epic* trial previewed,

establishing liability in this action will require resolution of a series of threshold issues that are

common the Settlement Class.  The Court must define a relevant market, a common question.  *See*

*In re Apple Pod iTunes Antitrust Litig.,* 2008 WL 5574487, at *4 (N.D. Cal. Dec. 22, 2008).  The

Court must determine whether Apple maintains monopoly power in that market, another common

question. *See id.*; *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 846 (D.N.J. 2015).  Next the

1    Court must determine whether the challenged restraints can be upheld with procompetitive

2    justifications, one more common question.  *See In re NCAA Student-Athlete Name & Likeness*

3    *Licensing Litig.,* 2013 WL 5979327, at *4 (N.D. Cal. Nov. 8, 2013).  The classwide impact of

4    Apple's conduct can likewise be established with common proof, including expert analysis based

5    on a common methodology.  *See* ECF No. 332 at 17-21.  Because this is a settlement class, the

6    Court need not evaluate any manageability issues arising from class treatment, nor are there

7    substantial manageability issues in this case anyway.  *See In re Hyundai & Kia Fuel Econ. Litig.*,

8    926 F.3d at 556.  The predominance requirement is met.

9              **7.       The Superiority Requirement is Met.**

10            The superiority inquiry requires assessment of whether a "class action is superior to other

11   available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

12   This requires assessment of whether the settlement will "achieve economies of time, effort, and

13   expense, and promote . . . uniformity of decision as to persons similarly situated without sacrificing

14   procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615.

15            Here, it would be inefficient to litigate the predominating common issues in countless

16   individual proceedings, rather than on a class basis. *See High-Tech*, 985 F. Supp. 2d at 1228-29

17   ("[T]he nature of Defendants' alleged overarching conspiracy and the desirability of concentrating

18   the litigation in one proceeding weigh heavily in favor of finding that class treatment is superior. . .

19   ."). Moreover, the Settlement Class is comprised only of small developers and for many of them, if

20   not all, damages are too small to justify litigation. Class treatment is superior so that these

21   Settlement Class Members have "the opportunity of meaningful redress." *In re Static Random*

22   *Access (SRAM) Antitrust Litig.*, 2008 WL 4447592, at *7 (N. D. Cal. Sept. 29, 2008); *In re*

23   *Aftermarket Auto. Lighting Prods. Antitrust Litig.*, 276 F.R.D. 364, 375 (C.D. Cal. 2011).

24   **C.       The Proposed Notice Program Satisfies Rule 23.**

25            Rule 23(e)(1) requires that a court approving a class action settlement "direct notice in a

26   reasonable manner to all class members who would be bound by the proposal." In addition, for a

27   Rule 23(b)(3) class, the Rule requires the court to "direct to class members the best notice that is

28   practicable under the circumstances, including individual notice to all members who can be

DEVELOPER PLS.' MOT. FOR PRELIM. APPROVAL OF
SETTLEMENT WITH APPLE INC. – Case No. 4:19-cv-03074-
YGR                                                                                        -26-

1    identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B).  Notice "is satisfactory if it

2    generally describes the terms of the settlement in sufficient detail to alert those with adverse

3    viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*,

4    361 F.3d 566, 575 (9th Cir. 2004); *see also* Fed. R. Civ. P. 23(c)(2)(B) (describing specific

5    information to be included in the notice).

6          The notice plan proposed here is the best practicable in the circumstances and, given the

7    comprehensive contact information available, should reach an unusually large segment of the

8    Settlement Class.  Helpfully, Settlement Class Members were required to provide Apple with an

9    email and mailing address when establishing their developer account, and this entire body of

10   contact information will be made available to Angeion, the Administrator.  As set forth in the

11   accompanying declaration of Steven Weisbrot, the Administrator will use Apple's contact

12   information to direct both email and mailed notice to all or virtually all Settlement Class Members.

13   Angeion will employ email verification tools to facilitate delivery, and further notice will be

14   provided through the earned media this Settlement will garner.  *See* Weisbrot Decl. at ¶¶ 13-26

15         Notice will be provided in plain terms and easy-to-understand language.  To encourage

16   engagement, Angeion's initial email and mailed notices will be in a short-form versions of the

17   long-form notice, which will be accessible on a settlement website Angeion will create and

18   maintain.  *See id.*  All forms of notice will contain the information required by Rule 23(c)(2)(B).

19   *See id.* Ex. C (Email Notice), Ex. D (Postcard Notice), Ex. B (Class Notice).  All forms of notice

20   will identify the minimum payment tiers available under the Settlement and direct developers to a

21   website where they can input their Apple Developer Accounts to learn which Settlement tier they

22   fall under.  The entire claim submission process will be executable on the Settlement

23   Administrator's website, which will minimize burdens and encourage claims, particularly for the

24   tech-savvy Settlement Class here.  *See id.* at ¶ 24.

25         These notice provisions satisfy Rule 23 and will provide the Settlement Class with a fair

26   opportunity to review and respond to the proposed Settlement.

27

28

**D.** **The Court Should Appoint Interim Co-Lead Counsel as Settlement Counsel.**

Rule 23(c)(1)(B) provides that "[a]n order that certifies a class action . . . must appoint class counsel under Rule 23(g). All Rule 23(g) factors weigh in favor of appointing (a) Hagens Berman as Settlement Class Counsel and (b) Saveri & Saveri, Inc., Freed Kanner London & Millen, LLC, and Sperling & Slater, P.C. as constituents of Plaintiffs' Executive Committee. The Court issued these appointments on an interim basis in 2019. *See* ECF No. 65. The same considerations that guided the Court's interim Order apply here. If appointed, counsel will continue to vigorously pursue this action and devote all necessary resources toward obtaining the best possible result for the Settlement Class.

**E.** **Proposed Schedule for Notice and Final Approval**

| Event | Proposed Deadline |
|---|---|
| Entry of Order Granting Preliminary Approval and Directing Notice | Subject to Court's Discretion |
| Notice Campaign and Claims Period Begins ("Notice Date") | 45 Days from Preliminary Approval Order |
| Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Service Awards | 30 Days from Notice Date |
| Exclusion and Objection Deadline | 60 Days from Notice Date |
| Motion for Final Approval and Response to Objections | 100 Days from Notice Date |
| Claims Period Closes | 120 Days from Notice Date |
| Final Approval Hearing | At least 135 Days from Notice Date (at the convenience of the Court) |

## V.     CONCLUSION

For the foregoing reasons, Developer Plaintiffs respectfully request that the Court enter the accompanying Proposed Order preliminarily approving the Settlement.

| | |
|---|---|
| 1 | DATED: August 26, 2021 |

HAGENS BERMAN SOBOL SHAPIRO LLP

By ___*/s/ Steve W. Berman*_____
     STEVE W. BERMAN (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Theodore Wojcik (*pro hac vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tedw@hbsslaw.com

Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 260260)
Ben M. Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com
benh@hbsslaw.com

*Interim Lead Class Counsel*

Joseph M. Vanek (*pro hac vice*)
Eamon P. Kelly (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile: (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

Guido Saveri (SBN 22349)
R. Alexander Saveri (SBN 173102)
Cadio Zirpoli (SBN 179108)
Sarah Van Culin (SBN 293181)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813
guido@saveri.com

1

rick@saveri.com
cadio@saveri.com

2

sarah@saveri.com

3

Kimberly A. Justice

4

Jonathan M. Jagher (*pro hac vice*)
FREED KANNER LONDON & MILLEN LLC

5

923 Fayette Street
Conshohocken, PA 19428

6

Telephone: (610) 234-6487
Facsimile: (224) 632-4521

7

kjustice@fklmlaw.com
jjagher@fklmlaw.com

8

9

Douglas A. Millen (*pro hac vice*)
Brian M. Hogan (*pro hac vice*)

10

FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, #130

11

Bannockburn, IL 60015
Telephone: (224) 632-4500

12

Facsimile: (224) 632-4521
dmillen@fklmlaw.com

13

bhogan@fklmlaw.com

14

*Plaintiffs' Executive Committee*

15

16

17

18

19

20

21

22

23

24

25

26

27

28