# Exhibit D

## Part 1 of 2

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                     OAKLAND DIVISION

4

5    IN RE APPLE IPHONE

     ANTITUST LITIGATION,          Case No. 11-cv-06714

6    _____        YGR (TSH)

7    DONALD R. CAMERON, et al.,

8        Plaintiffs,

9            vs.                 Case No. 19-cv-03074

                                     YGR (TSH)

10   Apple Inc.,

11       Defendant.

     _____

12

13    **CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER**

14          ZOOM DEPOSITION OF EINER ELHAUGE

15   (Reported Remotely via Video & Web Videoconference)

16      Newton, Massachusetts (Deponent's location)

17              Friday, July 30, 2021

18                  Volume I

19

20

     STENOGRAPHICALLY REPORTED BY:

21   REBECCA L. ROMANO, RPR, CSR, CCR

     California CSR No. 12546

22   Nevada CCR No. 827

     Oregon CSR No. 20-0466

23   Washington CCR No. 3491

24   JOB NO. 4731140

25   PAGES 1 - 324

                                          Page 1

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   OAKLAND DIVISION

 4

 5    IN RE APPLE IPHONE

      ANTITUST LITIGATION,          Case No. 11-cv-06714

 6    _____         YGR (TSH)

 7    DONALD R. CAMERON, et al.,

 8         Plaintiffs,

 9              vs.                  Case No. 19-cv-03074

                                           YGR (TSH)

10    Apple Inc.,

11         Defendant.

      _____

12

13

14

15

16              ZOOM DEPOSITION OF EINER ELHAUGE, taken

17    on behalf of the Defendant, with the deponent

18    located in Newton, Massachusetts, commencing at

19    10:05 a.m., Friday, July 30, 2021, remotely

20    reported via Video & Web videoconference before

21    REBECCA L. ROMANO, a Registered Professional

22    Reporter, Certified Shorthand Reporter, Certified

23    Court Reporter.

24

25
```

Page 2

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              APPEARANCES OF COUNSEL
 2   (All parties appearing via Web videoconference)
 3
 4   For the Developer Plaintiffs:
 5        HAGENS BERMAN SOBOL SHAPIRO LLP
 6        BY:  ROBERT F. LOPEZ
 7        BY:  STEVE W. BERMAN
 8        Attorneys at Law
 9        1301 Second Avenue
10        Suite 2000
11        Seattle, Washington 98101
12        (206) 623-7292
13        robl@hbsslaw.com
14        steve@hbsslaw.com
15   and
16        BY:  BEN HARRINGTON
17        BY:  BENJAMIN J. SIEGEL
18        Attorneys at Law
19        715 Hearst Avenue
20        Suite 202
21        Berkeley, California 94710
22        (510) 725-3000
23        benh@hbsslaw.com
24        bens@hbsslaw.com
25   /////
```

Page  3

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              APPEARANCES OF COUNSEL(cont'd)

 2    (All parties appearing via Web videoconference)

 3

 4   For the Consumer Plaintiffs:

 5        WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP

 6        BY:  BETSY C. MANIFOLD

 7        Attorney at Law

 8        Symphony Towers

 9        750 B. Street

10        Suite 2770

11        San Diego, California 92101

12        (619) 239-4599

13        manifold@whafh.com

14

15   For the Defendant:

16        GIBSON, DUNN & CRUTCHER LLP

17        BY:  DANIEL G. SWANSON

18        Attorney at Law

19        333 South Grand Avenue

20        Los Angeles, California 90071-3197

21        (213) 229-7430

22        dswanson@gibsondunn.com

23

24

25   /////
```

Page  4

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              APPEARANCES OF COUNSEL(cont'd)

 2   (All parties appearing via Web videoconference)

 3

 4   For the Defendant:

 5        GIBSON, DUNN & CRUTCHER LLP

 6        BY:  HARRY R. S. PHILLIPS

 7        Attorney at Law

 8        1050 Connecticut Avenue, N.W.

 9        Washington, DC 20036-5306

10        (202) 887-3706

11        hphillips2@gibsondunn.com

12

13

14   ALSO PRESENT:

15        Scott B. Murray, Director, Commercial

16   Litigation at Apple

17        Soseh Kevorkian, Videographer

18        Luke Martin, Executive Director at Legal

19   Economics LLC

20        Sean Morrissey, Concierge Technician

21

22

23

24

25   /////
```

Page 5

```
 1                   I N D E X

 2    DEPONENT                          EXAMINATION

 3    EINER ELHAUGE                          PAGE

      VOLUME I

 4

 5                   BY MR. SWANSON              10

 6                   BY MS. MANIFOLD           313

 7

 8                   E X H I B I T S

 9    NUMBER                               PAGE

10               DESCRIPTION

11    Exhibit 21   Expert Class Certification    21

12                 Report of Professor Einer

13                 Elhauge dated June 1, 2021;

14

15    Exhibit 22   Documents Relied Upon for     29

16                 Expert Class Certification

17                 Report of Professor Einer

18                 Elhauge (June 1, 2021).

19

20

21

22

23

24

25    /////
```

Page 6

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Newton, Massachusetts; Friday, July 30, 2021

 2                    10:05 a.m.

 3                    ---oOo---

 4        THE VIDEOGRAPHER:  Good morning.  We're

 5   going on the record at 10:05 a.m. on July 30th,        10:05:12

 6   2021.

 7        This is media unit 1 of the

 8   video-recorded deposition of Einer Elhauge, taken

 9   by counsel for defendant in the matter of

10   Donald R. Cameron, et al. versus Apple Inc.,           10:05:29

11   et al.  Case No 4:19-cv-03074-YGR.

12        This deposition is being held by Veritext

13   Virtual via Zoom Web Conferencing.  My name is

14   Soseh Kevorkian from the firm Veritext, and I'm the

15   videographer located in Topanga, California.  Our     10:05:54

16   court reporter is Rebecca Romano, also from the

17   firm Veritext.

18        At this time, would counsel and all

19   present please identify themselves for the record.

20        MR. SWANSON:  Dan Swanson, Gibson Dunn,           10:06:10

21   representing Apple Inc.

22        MS. MANIFOLD:  Betsy Manifold, Wolf

23   Haldenstein on behalf of the consumer plaintiffs.

24   And as the deposition continues in -- with --

25   unless there's objection, I plan to mute myself and   10:06:23
```

Page 7

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    to mute my picture.  If I ask any questions, I        10:06:28

 2    certainly will become visual.

 3              MR. LOPEZ:  This is Rob Lopez of

 4    Hagens Berman for the developer plaintiffs.  I'm

 5    joined by my colleagues Steve Berman, Ben            10:06:39

 6    Harrington and Ben Siegel.  And we also have -- or

 7    excuse me, Professor Elhauge's colleague Luke

 8    Martin on the line as well.

 9              MR. PHILLIPS:  This is Harry Phillips of

10    Gibson Dunn for Apple.  And we also have with us      10:06:55

11    Scott Murray of commercial litigation at Apple.

12              THE VIDEOGRAPHER:  Is that all?

13              Okay, Rebecca, whenever you're ready.

14              MS. MANIFOLD:  I -- I wanted to ask Rob

15    quickly, may I do an -- if you make an objection      10:07:20

16    without having me to say "Join" every time, I

17    automatically will join the objection.  It will

18    make the record cleaner.

19              Do either the developer plaintiffs or

20    Apple have any objection to that?                     10:07:32

21              MR. SWANSON:  No, no objection.

22              MR. LOPEZ:  No objection.

23              MS. MANIFOLD:  Thank you, gentlemen.

24              THE COURT REPORTER:  Okay.  At this time,

25    I will ask counsel to agree on the record that        10:07:33
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | there is no objection to this deposition officer | 10:07:33 |
| 2 | administering a binding oath to the deponent via | |
| 3 | remote videoconference, starting with the noticing | |
| 4 | attorney, please. | |
| 5 |      MR. SWANSON:  No objection. | 10:07:54 |
| 6 |      MR. LOPEZ:  No objection from the | |
| 7 | developer plaintiffs. | |
| 8 |      MS. MANIFOLD:  No objection from the | |
| 9 | consumer plaintiffs. | |
| 10 |      THE COURT REPORTER:  Okay.  If you could | 10:08:02 |
| 11 | raise your right hand for me, please. | |
| 12 |      THE DEPONENT:  (Complies.) | |
| 13 |      THE COURT REPORTER:  You do solemnly | |
| 14 | state, under penalty of perjury, that the testimony | |
| 15 | you are about to give in this deposition shall be | 10:08:02 |
| 16 | the truth, the whole truth and nothing but the | |
| 17 | truth? | |
| 18 |      THE DEPONENT:  I do. | |
| 19 | | |
| 20 | | 10:08:02 |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | ///// | 10:08:17 |

Page 9

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1                    EINER ELHAUGE                    10:08:17

 2    having been administered an oath, was examined and

 3    testified as follows:

 4

 5                      EXAMINATION                    10:08:17

 6    BY MR. SWANSON:

 7         Q.   Good morning, Professor Elhauge.

 8         A.   Good morning.

 9         Q.   I'm Dan Swanson.  I'm representing Apple

10    and I'll be asking the questions for Apple today.    10:08:28

11              Could you please state your full name for

12    the record.

13         A.   Einer Elhauge.

14         Q.   And what is your business address?

15         A.   I work out of my home.  So I guess it's    10:08:43

16    227 Temple Street, Newton, Massachusetts 02465.

17         Q.   And I take it you have been deposed

18    before?

19         A.   I have.

20         Q.   Okay.  Have you ever gone through a        10:08:56

21    virtual deposition?

22         A.   Yes, once before.

23         Q.   Okay.  So you're -- you're generally

24    familiar with the procedures?

25         A.   Yes.                                       10:09:10
```

Page 10

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1         Q.   All right.  And if -- if you are -- or        10:09:10
 2    anyone else wants to take a break at any time,
 3    please let -- let us know and we'll -- we'll do
 4    that.  Otherwise, we'll probably take a break
 5    every -- every hour or so and then we'll figure out   10:09:23
 6    what we'll do around lunchtime.
 7              So is -- is there any reason today,
 8    Professor, that you can't give full and complete
 9    testimony?
10         A.   No.                                          10:09:41
11         Q.   Not -- not taking any medications or
12    suffering from any condition that would prevent
13    that?
14         A.   No, I am not.
15         Q.   Now, your billing rate is $1,250 an hour;    10:09:52
16    is that right?
17         A.   That is correct.
18         Q.   Okay.  And your consulting firm is Legal
19    Economics L.L.C.; is that right?
20         A.   Yes, it is.                                  10:10:08
21         Q.   And are you one of the owners of Legal
22    Economics?
23         A.   I'm the sole owner of Legal Economics.
24         Q.   Okay.  How many hours have you spent on
25    the case, this case to date?                           10:10:22
```

                                                    Page 11

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1        A.   I think probably around 300.              10:10:26

2        Q.   Okay.  And I -- I take it you are

3   assisted by staff at Legal Economics?

4        A.   Yes.

5        Q.   And how many staff members do you have on  10:10:38

6   the -- on the case?

7        A.   Let's see.  I know at least four who

8   worked on the case.  I'm not sure about the others.

9        Q.   Okay.  And did I understand that Mr. --

10  Mr. Martin was one of your staff support people?     10:11:05

11       A.   Yes.

12       Q.   And -- and how has he assisted you?

13       A.   He's been one of the case managers on

14  this case, assisting in analyzing the data and

15  drafting portions of the report.                     10:11:23

16       Q.   Okay.  And who -- who were the other

17  three staff members who assisted you in the case?

18       A.   Alex Krueger, Rajat Krishna and Joshua

19  Yagi.

20       Q.   Mr. Krueger, how -- how has he assisted    10:11:49

21  you?

22       A.   He's been a case manager as well.  He's

23  focused mainly on the data and he also drafted

24  portions of the report and -- you know, and -- and

25  as well as he and Luke have either reviewed          10:12:05
```

Page 12

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    documents or overseen document review.              10:12:09

 2         Q.    Okay.  And Rajat Krishna, how -- how do

 3    you spell Rajat's first name?

 4         A.    R-A-J-A-T, K-R -- so that's the first

 5    name.                                               10:12:23

 6         Q.    Got it.

 7         A.    Second name, K-R-I-S-H-A [sic].

 8         Q.    And what -- what has he done to assist

 9    you in the case?

10         A.    He's done a lot of document review and   10:12:39

11    drafting and outlining of portions of the report.

12         Q.    And then you indicated Joshua -- is it

13    Yagi?

14         A.    Yes.

15         Q.    -- Yagi had assisted you.  What -- what  10:12:50

16    has Mr. Yagi done?

17         A.    Yeah, so I -- he did some document work,

18    I think review and organization.

19         Q.    And how do you spell his last name?

20         A.    Y-A-G-I.                                 10:13:05

21         Q.    All right.  Great.  Thank you.

22               Do you have an estimate of how much Legal

23    Economics has accumulated by way of charges to the

24    developer plaintiffs so far in this case?

25         A.    Yes.                                     10:13:27
```

Page 13

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1        Q.    And -- and what's your estimate?              10:13:28

2        A.    About $2 million.

3        Q.    Thank you.

4              Professor, do you have a -- a Ph.D. or a

5     master's degree in any subject?                        10:13:43

6        A.    No, I do not.

7        Q.    You're a lawyer, correct?

8        A.    Among other things, yes.

9        Q.    And are -- are you a member of the

10    Massachusetts Bar?                                     10:13:55

11       A.    I am.

12       Q.    Do you practice law?

13       A.    No, other than I guess sometimes I join

14    amicus briefs.  But I'm not engaged in the practice

15    of law actively, no.                                   10:14:07

16       Q.    Okay.  And you are a full professor at

17    Harvard Law School; is that right?

18       A.    I am.

19       Q.    Okay.  You indicated in your report,

20    which we'll get to in a moment and mark as an          10:14:19

21    exhibit, that you've served as an expert witness on

22    antitrust economics before competition agencies in

23    the U.S., EC, Korea and Brazil.

24             Did any of those matters concern Apple?

25       A.    No.                                           10:14:39

                                                       Page 14

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | Q.   Did any of them concern Google? | 10:14:41 |
| 2 | A.   So what -- what's the statement you're | |
| 3 | looking at?  Oh, by the way, since -- I got a | |
| 4 | message beforehand that it was okay to have access | |
| 5 | to my report. | 10:14:57 |
| 6 | Q.   Yes. | |
| 7 | A.   So I do have a PDF of it up on a screen | |
| 8 | if that's okay. | |
| 9 | Q.   Sure.  No, that's perfectly fine. | |
| 10 | A.   Okay. | 10:15:05 |
| 11 | Q.   If you want to have that, you can have | |
| 12 | one and that's fine, too. | |
| 13 | A.   I have a hard copy too, but it's easier | |
| 14 | to search for stuff like -- you used the word | |
| 15 | "Brazil," I think, was one of them. | 10:15:14 |
| 16 | Q.   Okay.  Yeah.  It's page 17, paragraph 25. | |
| 17 | A.   Okay.  Okay.  Did any of those cases | |
| 18 | involve -- okay.  I'm sorry.  What was the question | |
| 19 | again?  I forgot now. | |
| 20 | Q.   No, no problem. | 10:15:35 |
| 21 | Did -- did any of those competition | |
| 22 | agency matters concern Google? | |
| 23 | A.   Yes. | |
| 24 | Q.   And -- and which agency that you appeared | |
| 25 | before, did that Google connection arise with | 10:16:02 |

Page 15

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1     respect to?                                        10:16:08

2          A.   I think both the -- the Department of

3     Justice and the FTC.

4          Q.   Okay.  And when -- when was your either

5     appearance or submission to these agencies?        10:16:23

6          A.   I don't know the exact date.  It was over

7     six years ago.

8          Q.   Okay.  And what -- what was the matter

9     that related to Google that -- that occasioned

10    your -- your appearance or submission?             10:16:42

11         MR. LOPEZ:  Professor, let -- let me --

12    Professor, let me interject here.  If at any time

13    during this line of questioning or at all you're

14    concerned about any third-party confidentiality

15    commitments, please state that on the record and --  10:16:54

16    and we can deal with that.

17         THE DEPONENT:  Yes.  I was just about to

18    say these were confidential matters.  So there are

19    no public reports filed in them.  So I can't really

20    discuss the substance of the cases.                10:17:09

21         MS. MANIFOLD:  And at this point I just

22    wanted to state for the record that I join in the

23    developer plaintiffs' objections.  So without

24    interrupting any further, the assumptions should be

25    that the -- the consumer plaintiffs join any        10:17:24

                                           Page 16

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    objections by Mr. Lopez.  Thank you.              10:17:29

 2        Q.   (By Mr. Swanson)  Did -- did the matters

 3    that we're speaking of relate to apps or app

 4    stores?

 5        A.   No.                                       10:17:47

 6        Q.   Did the matters relate to advertising?

 7             MR. LOPEZ:  Again, caution, Professor,

 8    as -- as merited.

 9             THE DEPONENT:  No.

10        Q.   (By Mr. Swanson)  Did -- did the matters  10:18:05

11    relate to search?

12        A.   So I think because if you keep asking

13    everything, that's going to get into revealing

14    confidential information.  So I'm going to have to

15    decline to answer that without asking Google       10:18:18

16    whether they want to intervene.

17             MR. LOPEZ:  And so we'll object

18    accordingly.

19        Q.   (By Mr. Swanson)  This was a

20    representation where you were acting on behalf of  10:18:29

21    Google?

22        A.   Yes.

23        Q.   Was that the first time you had -- had

24    a -- a matter where you were acting for or retained

25    by Google?                                         10:18:41
```

Page 17

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1          MR. LOPEZ:  Same caution.              10:18:47

 2          THE DEPONENT:  Yeah.  Well, sort of

 3    acting on behalf of, yes.  Google did fund some

 4    research I did on the Google Books case and also

 5    another one on patent -- patent holdups in        10:19:09

 6    standard-essential patents.  So -- and I -- the

 7    Google Books case was the first, I think, time I

 8    ever had any work of any sort funded by Google, and

 9    that was -- but I don't remember the order of the

10    other cases and work.                             10:19:34

11          MR. LOPEZ:  At this time we'll designate

12    the deposition transcript as confidential pursuant

13    to the protective order in the matter.

14          MR. SWANSON:  The -- that -- there's a

15    procedure for doing that in considering ex post    10:19:47

16    what actually remains designated, correct,

17    Mr. Lopez?

18          MR. LOPEZ:  I'm sorry.  I didn't -- is

19    there a question Mr. Swanson?  I didn't hear.

20          MR. SWANSON:  Yeah, I -- I -- are you       10:20:01

21    designating this particular Q and A as confidential

22    or are you just invoking the general provision of

23    the protective order that allows you a certain

24    period of time to keep the transcript confidential

25    until you guys --                                 10:20:17
```

Page 18

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. LOPEZ:  Oh, thank you.  The latter.      10:20:19

 2              MR. SWANSON:  Okay.

 3              MR. LOPEZ:  The latter for now, right,

 4      yes.

 5              MR. SWANSON:  Yep.  Understood.            10:20:24

 6         Q.   (By Mr. Swanson)  Professor, so you had a

 7      engagement, if we can call it that, with Google

 8      related to Google Books that's the first instance

 9      that you recall.  There was a -- a matter involving

10      the FTC and the DOJ.                              10:20:43

11              Are there any other -- and then -- and

12      then the patent holdup paper or research.  Any

13      other matters that you can recall where you have

14      been engaged by Google?

15         A.   There may have been one other, but I        10:21:06

16      don't think I actually represented them before an

17      agency in that one.  I was just giving --

18      consulting directly with them.

19         Q.   And -- and are you still engaged on some

20      matter with -- with Google?                       10:21:24

21         A.   No.  As I said, I haven't done anything

22      with Google since, any work for Google since 2014.

23         Q.   Okay.  Thank you.

24              When were you engaged in this matter by

25      or on behalf of plaintiffs as a potential expert?    10:21:50
```

Page 19

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1        A.    Last summer, I think.                    10:21:54

2        Q.    Okay.  And who -- who retained you?

3        A.    Hagens Berman firm.

4        Q.    Okay.  And -- and who -- was there a

5    particular lawyer that you interacted with in        10:22:09

6    connection with that engagement?

7        A.    I think it was mainly Ben Siegel, if I

8    recall correctly.

9        Q.    Are you aware that one of the named

10   plaintiffs in this case is also suing Google          10:22:23

11   concerning an alleged monopolization of an Android

12   app distribution market?

13       A.    I'm not aware, no.

14       Q.    Okay.  So you haven't been retained in

15   that litigation?                                      10:22:38

16       A.    I have not.

17       Q.    Have you had any communications with any

18   of the named plaintiffs in this case?

19       A.    No, I have not.

20       Q.    Do you know -- do you know who they are?   10:22:49

21       A.    I -- one of them -- Mr. Cameron, I guess,

22   but other than that, no.

23       Q.    Okay.

24            MR. SWANSON:  Why don't we mark your

25   expert report for the record as an exhibit.  That     10:23:04

```
 1   means that Mr. Phillips will have to work some          10:23:11

 2   magic on getting the -- the document brought up.

 3   Just you can continue to use your other copy,

 4   Professor, but we do need to validate this document

 5   as your expert report.  I think it would bear the       10:23:25

 6   exhibit number 21.

 7              (Exhibit 21 was marked for identification

 8   by the court reporter and is attached hereto.)

 9              MR. SWANSON:  So we'll -- once that is --

10   and while that's coming up, I'll indicate that the      10:23:38

11   document that we're marking as Exhibit -- or will

12   in due course by our court reporter be confirmed as

13   Exhibit 21.  It is a multi-page document, 249

14   pages, first page of which bears the title Expert

15   Class Certification Report of Professor Einer           10:24:00

16   Elhauge dated June 1st, 2021.

17       Q.   (By Mr. Swanson)  So once that is -- and

18   you've had a chance to look at it, I'd just like

19   you to confirm that that is your expert report.

20              CONCIERGE TECHNICIAN:  Mr. Swanson, is        10:24:32

21   this Tab 1, you said?

22              MR. SWANSON:  This is Tab 1, and it's --

23   it's --

24              MR. PHILLIPS:  It's -- it's been -- it's

25   been introduced as Exhibit 21.  It's in the -- it's     10:24:40
```

Page 21

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1     in the marked exhibit folder.                    10:24:43

2            THE DEPONENT:  How do you move pages?

3     Oh, okay.  Got it.  Never mind.

4            It -- it looks like my report.  Obviously

5     we can't -- can't read through all 250 pages and  10:25:00

6     confirm it's all word for word the same, but it

7     would certainly appear to be my report.

8         Q.   (By Mr. Swanson)  Okay.  Well, if -- if

9     anyone has any concerns, speak up.  But that's what

10    we understand it to be.  And although you'll be    10:25:13

11    working from your PDF copy, they should be

12    identical.  If they aren't, I think I'd be the

13    first one to want to know it.  You'd be the second.

14           Professor, did -- did -- did you draft

15    the report?                                        10:25:37

16        A.   I -- like I said, my process is I

17    participate with staff to create the outline.  They

18    do initial drafting and then I redraft and redraft,

19    go back and forths.  So in the end every paragraph

20    is mine.  Every word is, you know, reviewed and     10:25:56

21    either changed by me or, you know, verified by me.

22    So -- you know, and we're many, many, many rounds,

23    so I am certainly -- to me it's my written product,

24    but I do use staff to do initial drafting and

25    collecting the documents and citations and the data 10:26:17
```

Page 22

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    and the like.                                    10:26:20

2        Q.   Have you reviewed the plaintiffs'

3    complaint or at least the current operative

4    complaint in this case?

5        A.   I -- well, I was going to say yes, but    10:26:31

6    now when you use the word "current operative

7    complaint," now I wonder is there -- whether the

8    version I saw is no longer -- was there a change?

9             I -- I have seen a complaint.

10       Q.   Yes.                                    10:26:47

11       A.   So I can say that.

12       Q.   Okay.  And -- and do you recall when you

13   reviewed that?

14       A.   I think it was last summer.

15       Q.   Okay.  And what -- what do you understand  10:26:57

16   to be the plaintiffs' claim of wrongdoing by Apple

17   in this case?

18       A.   I think it's monopolization, if I recall

19   correctly.

20       Q.   Okay.  If you could turn to paragraph 1    10:27:19

21   of your report on page 6.

22       A.   Okay.

23       Q.   In the second sentence there, you say,

24   "Plaintiffs allege that 'Apple has never permitted

25   anyone else to distribute apps and related digital  10:27:38

Page 23

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    products to the many millions of U.S. owners of its       10:27:41

 2    mobile devices' and that this allows Apple 'to

 3    charge developers a supracompetitive 30 percent

 4    commission on the sale of paid apps and in-app

 5    products.'"                                               10:27:57

 6              Do you see that?

 7         A.   Yes.

 8         Q.   Is that your understanding of the core

 9    assertion of the plaintiffs in this case?

10         A.   Well, I don't know if I -- whether I            10:28:10

11    would characterize it as core versus not core.

12    That's certainly some of the allegations that

13    they've made.  But there's other specific

14    allegations as well.  And I think they are

15    currently I think also claiming that the 15 percent       10:28:30

16    commission is also supracompetitive.  So I would

17    just say these are certain allegations.  I don't

18    know if they're the core ones.

19         Q.   What is your understanding of the means

20    by which plaintiffs contend that Apple has never          10:28:43

21    permitted anyone else to distribute apps and

22    related digital products to iOS device users?

23         A.   Oh, a variety of exclusivity restraints

24    that I detail in -- I think it's Part 3 of -- of my

25    report, but are also discussed in the complaint.          10:29:02
```

Page 24

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1          Q.   And do you understand that plaintiffs are      10:29:10

2     alleging that Apple excluded competition by

3     requiring developers to submit their iOS apps to

4     the App Store?

5          A.   No.   I don't understand that to be the        10:29:28

6     restraint.   I understand that to be the restraint

7     on distribution, not on whether you can run on

8     or -- or safe enough or approved to run on the

9     iOS system.

10         Q.   Did you understand plaintiffs to be            10:29:44

11    alleging that Apple excluded competition by

12    requiring the use of its in-app payment

13    functionality for digital transactions?

14         A.   Yes.

15         Q.   Are you offering any opinion about             10:30:02

16    whether Apple has excluded competition by requiring

17    the use of its in-app payment functionality?

18         A.   Well, I -- you know, I opine that they

19    have excluded rivals from the combination of

20    app -- iOS app distribution and in-app purchases.      10:30:20

21    I don't opine on whether those are -- whether

22    there's a separate market.

23         Q.   A separate market for in-app payment

24    functionality?

25         A.   Yes.                                           10:30:39
```

Page 25

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1          Q.    In other words, you don't opine as to          10:30:40

2     whether there is a tie of that functionality?

3          A.    Yes.  I don't opine on whether or not

4     there's a tie of the initial app distribution to

5     the in-app purchases or whether they're single          10:30:55

6     products or really the exclusion from the former

7     sort of carries over to the exclusion of the

8     latter.  Although I do detail there are particular

9     restraints to make sure that rivals are excluded

10    from the -- you know, the combination of the two,          10:31:12

11    and those are part of the exclusivity restraints.

12             But as I say in my report, my conclusions

13    all hold whether or not they're separate products

14    and whether or not they're tied, so I don't take

15    any position on that issue.          10:31:26

16         Q.    Is it your understanding that there is a

17    claim in the plaintiffs' complaint of tying of the

18    in-app payment functionality?

19             MR. LOPEZ:  Object to the form.

20             THE DEPONENT:  Well, I guess that's more          10:31:44

21    of -- to me that's a legal question and I am not

22    really here to opine about legal issues.

23         Q.    (By Mr. Swanson)  No, it's a question

24    about your understanding.  You know, I'm asking

25    about your understanding based on what you did to          10:31:56

Page 26

1   write your report.                                        10:32:00

2        MR. LOPEZ:  Same objection.

3        THE DEPONENT:  So, I mean, to write the

4   report, I answered the questions, as -- I -- I

5   point out in paragraph 2, counsel asked me to           10:32:11

6   address.  In terms of my reading of the complaint,

7   it does allege these restraints on in-app

8   purchasing, so I guess you -- you could construe

9   those as tying claims.

10       Q.   (By Mr. Swanson)  Do you understand           10:32:36

11  plaintiffs to be alleging that Apple excluded

12  competition by prohibiting developers from telling

13  consumers inside the developers' apps that

14  consumers can pay for in-app digital products

15  outside the app?                                         10:32:50

16       A.   I think that's part of the restraint,

17  yes, that the antisteering provisions reinforce the

18  other exclusivity restraints.

19       Q.   Do plaintiffs allege that

20  supracompetitive commissions resulted from the          10:33:02

21  antisteering provisions?

22       A.   Could you restate that?

23       Q.   Do plaintiffs allege that supra- -- let's

24  just make that clear, S-U-P-R-A -- -competitive

25  commissions resulted from the antisteering             10:33:22

                                                  Page 27

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | provisions? | 10:33:25 |
| 2 | A.   I don't think they make an allegation | |
| 3 | about that in isolation, but they make an | |
| 4 | allegation that the combination of the exclusivity | |
| 5 | restraints did cause supracompetitive commissions. | 10:33:36 |
| 6 | Q.   Do you -- do you understand the | |
| 7 | plaintiffs to be alleging that any single alleged | |
| 8 | restraint in that combination caused | |
| 9 | supracompetitive commissions? | |
| 10 | MR. LOPEZ:  Object to form. | 10:33:55 |
| 11 | THE DEPONENT:  I -- I -- I don't recall. | |
| 12 | I would have to go back and look back at the | |
| 13 | complaint to see any -- whether any language could | |
| 14 | be so construed. | |
| 15 | Q.   (By Mr. Swanson)  Okay.  Is -- is it your | 10:34:07 |
| 16 | opinion that any one of that combination of | |
| 17 | restraints caused supracompetitive commissions? | |
| 18 | A.   Well, I guess yes.  I think the -- the | |
| 19 | exclusivity restraints that I describe in | |
| 20 | paragraph -- Part 3, I think, would suffice to | 10:34:29 |
| 21 | create supracompetitive effects.  But they were | |
| 22 | reinforced by the tie that I describe to the -- | |
| 23 | different tie to -- to -- to mobile devices I | |
| 24 | discuss in the other part, Part 3, and also | |
| 25 | reinforced by the antisteering provisions.  But I | 10:34:50 |

Page 28

| | | |
|---|---|---|
| 1 | do think that just the -- the -- just the simple | 10:34:56 |
| 2 | exclusivity restraints prohibiting developers from | |
| 3 | distributing iOS apps outside of Apple's | |
| 4 | App Stores would suffice to create the | |
| 5 | supracompetitive commissions. | 10:35:13 |
| 6 | Q.  Do you understand plaintiffs to be | |
| 7 | alleging that Apple excluded competition by | |
| 8 | requiring developers to price their paid digital | |
| 9 | products using 99-cent price steers? | |
| 10 | A.  I -- I don't have that understanding, no. | 10:35:27 |
| 11 | MR. SWANSON:  All right.  Let's now mark | |
| 12 | as Exhibit 22 a document that, as I understand it, | |
| 13 | list your relied-upon materials that will be | |
| 14 | brought up in the exhibit room or -- or section. | |
| 15 | (Exhibit 22 was marked for identification | 10:36:00 |
| 16 | by the court reporter and is attached hereto.) | |
| 17 | MR. SWANSON:  For the record, it is a | |
| 18 | multi-page document, appears to be 17 pages, | |
| 19 | entitled Documents Relied Upon for Expert Class | |
| 20 | Certification Report of Professor Einer Elhauge, | 10:36:14 |
| 21 | June 1, 2021. | |
| 22 | Q.  (By Mr. Swanson)  When that pops up, if | |
| 23 | you could confirm that that is, indeed, your | |
| 24 | relied-upon list of materials. | |
| 25 | A.  I believe so, yes. | 10:36:38 |

Page 29

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      Q.   Okay.  So does Exhibit 22 identify, to          10:36:39

2    the best of your knowledge, all documents and

3    information that you relied on in connection with

4    forming the opinions in your report?

5      A.   Yes.                                            10:36:53

6      Q.   Okay.  Would you flip to page 3.

7      A.   Okay.

8      Q.   Are these ten depositions at the top of

9    page 3 the only depositions you rely on for your

10   opinions?                                              10:37:10

11     A.   Yes.

12     Q.   Did you review the deposition testimony

13   of any Epic fact witness?

14           MR. LOPEZ:  Object to the form.

15           THE DEPONENT:  Not -- not that I can           10:37:25

16   recall.

17     Q.   (By Mr. Swanson)  Did you review the

18   deposition of any expert witness in the Epic case?

19     A.   I don't believe so, no.

20     Q.   You don't list any testimony from the          10:37:48

21   Epic trial here in this document, do you?

22     A.   Hm.  I don't -- let's see.  I could have

23   sworn -- well, that is an oversight.  I'm sorry if

24   I didn't.  It -- it does seem like in footnote 275

25   I do cite the trial transcript for Mr. Cook's         10:38:29

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    testimony.                                        10:38:34

 2        Q.   So you reviewed Mr. -- Mr. Cook's

 3    testimony from the Epic trial?

 4        A.   I did yes.

 5        Q.   And you rely on it at least to the extent   10:38:44

 6    of footnote 275?

 7        A.   Yes.

 8        Q.   Did you review and rely on any other

 9    written or oral trial testimony in the Epic case?

10        A.   I'm sorry.  Can you say that again.       10:39:04

11        Q.   Did you review and do you rely on any

12    other written or oral trial testimony in the Epic

13    case?

14        A.   No, I didn't review.  And my -- my staff

15    helped me review a lot of it and so I heard about   10:39:21

16    some of it through them, but I didn't review the

17    trial transcripts or rely on them for anything

18    else, I don't think.

19        Q.   Did you consider it unimportant for you

20    to personally review the testimony from the Epic    10:39:38

21    trial?

22        A.   No, I didn't consider it unimportant.

23    But, you know, in a case like this where you've

24    got, you know, hundreds of thousands of -- of

25    documents and lots of things to look at and a       10:39:53
```

Page 31

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | limited amount of time and, you know, budget, I | 10:39:56 |
| 2 | can't really look at every single document.  I have | |
| 3 | to rely on staff to screen them and bring the | |
| 4 | important parts to my attention. | |
| 5 | Q.   And -- and if there were important parts | 10:40:11 |
| 6 | you would have relied on them? | |
| 7 | MR. LOPEZ:  Objection to form. | |
| 8 | THE DEPONENT:  Yes, if they were relevant | |
| 9 | to my analysis, either, you know -- or -- or cut | |
| 10 | against it, I would have reviewed it and, you know, | 10:40:26 |
| 11 | considered it.  But, you know, I -- I cite in the | |
| 12 | report everything that I relied on for the | |
| 13 | particular proposition I rely on it for. | |
| 14 | Q.   (By Mr. Swanson)  Still on Page 3 of | |
| 15 | Exhibit 22 in the middle there, the list of expert | 10:40:46 |
| 16 | reports, are those -- is that the full list of | |
| 17 | expert reports you reviewed in connection with this | |
| 18 | matter? | |
| 19 | A.   As of that time, yes. | |
| 20 | Q.   And since then, have you reviewed and | 10:41:06 |
| 21 | relied on additional expert reports? | |
| 22 | A.   Oh.  Actually, I -- I didn't see | |
| 23 | Economides there.  What I was thinking of was I | |
| 24 | have seen Professor Economides' report after he | |
| 25 | filed it, so I -- I guess that's already listed | 10:41:27 |

Page 32

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    though.  Yes, so that's the full list then.          10:41:29

 2         Q.   Okay.  As for the -- we'll get to

 3    Professor Economides' report, but as for the list

 4    on page 3 of expert reports, did you review in each

 5    case the full report?                                 10:41:45

 6         A.   No, I didn't read the entire reports, no.

 7         Q.   Okay.  I take it then you didn't review

 8    the written or oral trial testimony of any of these

 9    experts?

10         A.   No, other than in the sense that, you      10:42:07

11    know, my staff sometimes would orally summarize

12    what they were saying in the trial.

13         Q.   But -- but if -- if there had been

14    something that had been orally summarized for you

15    that you were relying on, you would have indicated    10:42:20

16    that?

17         A.   Yeah.  So I think -- yes.  I mean,

18    really, it just -- as far as I could tell every

19    time, it was -- it was just something that was in

20    one of these reports anyway.  So it was just -- you   10:42:31

21    know, it was -- it was just plain out in the trial

22    transcript, but they had everything in the reports

23    already.

24         Q.   Did you review the expert report of Ned

25    Barnes in the Epic case?                              10:42:50
```

Page 33

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.    That name is not striking a chord.          10:42:58

 2        Q.    Okay.  With respect to the list of

 3   Bates-stamped documents, starts on page 3, goes to

 4   page 4 of Exhibit 22, are these the only

 5   Bates-stamped documents that you are relying on for    10:43:16

 6   your opinions?

 7        A.    Yes, I believe so.

 8        Q.    Did you -- did you review each of these?

 9        A.    Yes.

10        Q.    Okay.  And how did you decide which Bates    10:43:27

11   stamped documents that you were going to rely on?

12        A.    Through the drafting process, you know,

13   I -- in the -- throughout the drafting process

14   either I ask a question, do we have support for

15   this, what's the answer to this, can somebody         10:43:48

16   investigate why, and then my staff would, in the

17   next draft of the report, include citations to

18   documents that they thought bore on the questions

19   that I had or might insert them in, you know,

20   sections that they are drafting and then I would      10:44:02

21   look at that portion of the document and --

22   you know, to see whether I -- I agreed that it

23   supported or whatever the point we were making.

24             MR. LOPEZ:  Professor, I'm going to

25   caution you at this point not to reveal any           10:44:19
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    communications with your staff or other experts.         10:44:21

 2         Q.   (By Mr. Swanson)  Professor, did you rely

 3    on any interviews of or communications with any of

 4    the named plaintiffs?

 5         A.   I don't believe so, no.                         10:44:40

 6         Q.   Do you rely on any interviews of or

 7    communications with other developers?

 8         A.   I don't recall any.  If -- if there -- if

 9    it's not said in my report, no.  Whether there was

10    some developer that had some sort of interview or        10:44:59

11    testimony that I'm forgetting about, I -- I'm not

12    sure.

13         Q.   If -- if there were such testimony or

14    interview, you would note it in your report, you

15    believe?                                                 10:45:16

16         A.   Yes.

17         Q.   Did you interview anyone at all in

18    connection with the case?

19         A.   No.  Not me personally, no.

20         Q.   Were there any assumptions provided to         10:45:27

21    you by counsel that you rely on in forming your

22    opinions?

23         A.   I don't think so, no.

24         Q.   You mentioned you rely on the expert

25    report of Professor Economides, right?                   10:45:55
```

Page 35

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   Yes, I -- I -- I do rely on it and --          10:45:59

 2   for -- for certain points, yes.

 3        Q.   Okay.  And -- and you're relying on his

 4   final report as opposed to any kind of draft; is

 5   that correct?                                            10:46:11

 6        A.   Yes.

 7        Q.   Okay.  Are you relying on the expert

 8   report of Mr. Tregillis?

 9        A.   I don't think so.

10        Q.   Have you reviewed Mr. Tregillis' report?      10:46:23

11        A.   No.

12        Q.   Are you aware of Mr. Tregillis' report?

13        A.   Not by that name.

14        Q.   Have -- have you reviewed the motion made

15   by the developer plaintiffs to certify the class as     10:46:42

16   a class action, for the case as a class action?

17        A.   I have -- I have seen that, yes.

18        Q.   Okay.  Did -- And I'm not asking for you

19   to communicate any substance, but did you or staff

20   working under your direction communicate with           10:47:06

21   Professor Economides or his staff prior to

22   submitting your report?

23             THE DEPONENT:  Am I allowed to answer

24   that question, Rob?

25             MR. LOPEZ:  Carefully.  Just again,            10:47:25
```

Page 36

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    none -- none of the substance.                           10:47:25

2           THE DEPONENT:  Okay.  So

3    Professor Economides uses staff at Legal Economics

4    as well.  So, you know, I -- generally a -- a

5    different staff member Thor Sletten.  So we -- but    10:47:36

6    we do have the same firm doing support staff work

7    for us.

8        Q.   (By Mr. Swanson)  Okay.  Did -- and,

9    again, I am not asking what you talked about, but

10   did you communicate with Professor Economides       10:47:53

11   before your respective reports were submitted?

12       A.   I think we had one brief conversation

13   about this case before the reports were submitted.

14       Q.   Have you communicated with any experts

15   retained by Epic concerning any of the litigation    10:48:21

16   against Apple?

17       A.   No, I have not.

18       Q.   Okay.  Have you communicated with anyone

19   with the law firm of Cravath, Swaine & Moore with

20   respect to this case?                                10:48:41

21       A.   No, I have not.

22       Q.   Have you reviewed the expert report

23   submitted on behalf of the consumer plaintiffs by

24   Professor McFadden?

25       A.   I have seen that since this report.  But,   10:48:55

                                                          Page 37

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    yes, I've looked at that.                          10:48:57

2         Q.   Did you review the entire report?

3         A.   No.

4         Q.   Were there specific parts of the report

5    you focused on?                                    10:49:08

6         A.   Yes.

7         Q.   And what -- what parts did you

8    specifically focus on?

9         A.   The -- the pass-through analysis.

10        Q.   Is there a reason that you focused on     10:49:19

11   Professor McFadden's pass-through analysis?

12        A.   Because I figured it might come up in

13   this deposition about whether or not it might be

14   relevant to some of my opinions since I --

15   you know, in -- in the report I talk about the     10:49:37

16   possibility of a pass-through, but don't do any --

17   I don't provide an affirmative economic analysis of

18   it.  In the reports I was interested in what

19   Professor McFadden had done with that.

20        Q.   And after reviewing it, did you conclude  10:49:54

21   that what Professor McFadden had done was relevant

22   to some of your opinions?

23             MR. LOPEZ:  Objection to form.

24             MS. MANIFOLD:  Objection.

25             THE DEPONENT:  I -- it -- how would I put  10:50:08

                                               Page 38

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    it?  I don't think the pass-through issue is at all        10:50:19

2    relevant to my opinions, but I think if one

3    incorrectly thought that it was, then

4    Professor McFadden's opinions coincided with my own

5    about some aspects about the -- the likely small           10:50:39

6    size of any pass-through that might occur.

7         Q.   (By Mr. Swanson)  And what was your

8    understanding of how much pass-through Professor

9    McFadden concluded did occur?

10            MS. MANIFOLD:  Objection.                          10:51:01

11            MR. LOPEZ:  Same --

12            THE DEPONENT:  Well, I didn't mean to

13    focus on --

14            MR. LOPEZ:  Same objection.

15            THE DEPONENT:  So I wasn't focusing on             10:51:05

16    the quantification rather than formula, so -- he

17    basically provided at the same formula that,

18    you know, I confirmed with my own analysis that

19    indicated that the level of the pass-through would

20    be proportionate to marginal cost for app               10:51:24

21    developers and that since marginal costs were very

22    small, that indicated that it would be a very small

23    percentage could -- could be passed through.  And

24    particularly with 99-cent price tiering, which I

25    mentioned in my report, on that Professor McFadden,      10:51:51

                                                  Page 39

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    I think, reached a different conclusion because        10:51:54

2    the -- in that case they are challenging, if I

3    understand correctly, the 99-cent tiering as well.

4    Whereas as I say in my report, I think given -- if

5    you combine that economics with the price tiering,     10:52:08

6    it seemed to me that it's very unlikely to result

7    in any pass-through if -- if -- if the 99-cent

8    tiering remains.

9         Q.   (By Mr. Swanson)  Is it your opinion

10   personally that marginal costs for Apple developers    10:52:30

11   are very small?

12        A.   Yes, generally, yes.

13        Q.   And it's your understanding that

14   Professor McFadden agrees with that?

15             MS. MANIFOLD:  Objection.                     10:52:47

16             MR. LOPEZ:  Object as well.

17             THE DEPONENT:  I -- I don't know if he

18   agrees with that characterization or not.  I think

19   he discusses some of them and some of them have

20   higher marginal costs than others.  So the -- I        10:52:57

21   just only looked at his -- as I -- like I say

22   again, as a sort of third-level alternative issue

23   to my report, since the -- I think the pass-through

24   issue is not relevant to the existence of harm to

25   the developers in the first place.                     10:53:14
```

Page 40

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1          But -- but I am not relying on him for          10:53:16
 2   any assessment that marginal costs are generally
 3   small.  I'm relying on my own understanding of,
 4   you know, the -- that -- the -- that there's not
 5   much marginal cost to just, once you have the app,    10:53:27
 6   giving somebody another copy of the app.
 7       Q.   (By Mr. Swanson)  You had just indicated
 8   that it's very unlikely that there will be
 9   pass-through if the 99-cent tiering remains, given
10   your understanding about marginal cost.  Can you     10:53:47
11   explain why that is the case, why -- why 99-cent
12   tiering is important to that conclusion?
13       A.   Sure.
14          MS. MANIFOLD:  Objection.
15          THE DEPONENT:  So -- I mean, if you have       10:54:04
16   an app itself, say, for 99 cents, you -- to
17   increase the price, you have to increase it to
18   $1.99.  So that's a 100 percent increase.  So
19   obviously, you know -- and -- and the difference in
20   commission that we're talking about here is maybe    10:54:20
21   14, 15 percent.  It's just not possible that that's
22   going to prompt 100 percent pass-through and so --
23   and thus -- I mean, not -- not possible that's
24   going to prompt, you know, I guess a price increase
25   that is -- we're talking about six or seven times    10:54:40
```

Page 41

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1       the magnitude of any commission difference.        10:54:43

2               If you get the higher price, let's say

3       it's 4.99, you'd need a 20 percent increase to go

4       to the next level of 5.99.  So if you combine that

5       with the fact that marginal costs are low, and you    10:54:56

6       assume, I don't know, if marginal costs are around

7       10 percent, a sort of back-of-the-envelope

8       calculation would suggest that a 15 percent

9       commission change could maybe raise prices by

10      2 1/2 percent and it's very unlikely -- you'd have    10:55:12

11      to be at a very high price for the difference

12      between one 99-cent tier and the next 99-cent tier

13      to be 2 1/2 percent.

14              So I conclude from that that even if

15      pass-through were relevant to the opinions in my --   10:55:33

16      in this -- that I offer in this case, it's likely

17      to be -- it's -- it's very unlikely, given the

18      combination of the market conditions and the -- the

19      tiering.

20          Q.   (By Mr. Swanson)  If pass-through is very    10:55:49

21      unlikely, does that imply that in the but-for

22      world, app prices are unlikely to change?

23              MS. MANIFOLD:  Objection.

24              THE DEPONENT:  Yes.  I think app prices

25      are unlikely to change in the but-for world, but if   10:56:09

                                                      Page  42

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1     they do change, it only accentuates the amount of        10:56:14

 2     harm to developers.

 3          Q.   (By Mr. Swanson)  And -- and that opinion

 4     applies to all tiers, Professor, or -- or just the

 5     subset of tiers?                                          10:56:34

 6               MS. MANIFOLD:  Objection.

 7               THE DEPONENT:  I think it's generally

 8     unlikely.  I mean, as I say, since -- since the

 9     degree of pass-through does not actually alter any

10     of my opinions, I -- I -- I have not done any            10:56:45

11     empirical analysis of exactly what -- exactly how

12     often pass-through might occur.  I just think it's

13     generally unlikely, given the combination of the

14     percentage-based commissions and the low marginal

15     costs and price tiering.                                 10:57:05

16          Q.   (By Mr. Swanson)  Did -- well, Professor,

17     was there anything that you saw in

18     Professor McFadden's report that you disagreed

19     with?

20               MS. MANIFOLD:  Objection.                      10:57:19

21               MR. LOPEZ:  I'll object as well.

22               THE DEPONENT:  I can't recall anything I

23     disagreed with and I looked at in his report.

24          Q.   (By Mr. Swanson)  Okay.  Was there

25     anything in Professor McFadden's report that caused      10:57:27
```

Page 43

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    you to reconsider any of your own opinions?              10:57:30

2          A.    No.

3          Q.    Aside from your staff and plaintiffs'

4    counsel, have you discussed the opinions in your

5    report with anyone?                                       10:57:47

6          A.    No.  Well, other than with you right now,

7    I guess.

8          Q.    Well, I appreciate that.

9                All right.  Let's talk a bit about market

10   definition.                                               10:58:08

11               It -- it's your opinion that Apple's

12   alleged conduct is anticompetitive and unjustified,

13   correct?

14         A.    Yes.

15         Q.    Does that opinion depend upon the             10:58:21

16   definition of the relevant market?

17         A.    I am not positive it does.  It may be the

18   direct evidence of anticompetitive effects would be

19   enough and you don't necessarily have to define a

20   market.  You can even for market power from the          10:58:50

21   high prices.  So I guess I wouldn't say that the

22   opinions necessarily depend upon the market

23   definition.

24         Q.    Is the conduct, the alleged conduct that

25   you analyzed, vertical in nature?                         10:59:09

                                                        Page 44

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.    Yes.                                      10:59:12

 2        Q.    Do you agree that without an accurate

 3   definition of the market, there is no way to

 4   measure Apple's ability to lessen or destroy

 5   competition?                                          10:59:33

 6        A.    No, I don't agree that there's no way to

 7   measure it without defining the market.

 8        Q.    Do you agree that absent an accurate

 9   definition of the relevant market, an economist

10   can't accurately assess whether the defendant has    10:59:46

11   monopoly power?

12             MR. LOPEZ:  Object to the form.

13             THE DEPONENT:  No.  I thought it seemed

14   very helpful, but I don't agree that you can never

15   assess the existence of monopoly power without       10:59:58

16   defining the market.  Not as a matter of -- I'm not

17   testifying as a matter of economics on all this,

18   not for the matter of law, since I'm not opining on

19   legal issues.

20        Q.    (By Mr. Swanson)  Understood.              11:00:11

21             Do you agree that absent an accurate

22   definition of the relevant market, an economist

23   can't accurately assess whether challenged conduct

24   is anticompetitive?

25             MR. LOPEZ:  Object to the form.             11:00:24
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              THE DEPONENT:  No.  Again, I -- I think        11:00:25
 2      it's highly relevant, but I think as a matter of
 3      economics you can access whether conduct is
 4      anticompetitive sometimes without defining the
 5      relevant market.                                       11:00:36
 6          Q.  (By Mr. Swanson)  Well, without an
 7      accurate definition of the relevant market, can an
 8      economist accurately assess whether vertical
 9      conduct is anticompetitive?
10              MR. LOPEZ:  Object to the form.                11:00:48
11              THE DEPONENT:  Yes.  I think you
12      sometimes can.  You can show -- with direct proof
13      of anticompetitive effects, you don't need
14      necessarily to find a relevant market because the
15      main point of defining a relevant market is to draw   11:01:02
16      inferences about power and effects.  So if you have
17      direct proof of power and direct proof of effects,
18      I don't think you necessarily need to define a
19      relevant market, although I, in fact, do define a
20      relevant market, and I think it is often quite        11:01:17
21      helpful to figure out the competitive paradigm --
22      parameters.
23          Q.  (By Mr. Swanson)  Do you agree that
24      absent an accurate definition of the relevant
25      market, an economist can't accurately assess          11:01:27
```

Page 46

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    whether there are procompetitive business              11:01:31

2    justifications for challenged conduct?

3              MR. LOPEZ:  Object to the form.

4              THE DEPONENT:  No, I don't think defining

5    relevant market is always necessary to determine       11:01:39

6    whether there's procompetitive justifications.

7        Q.  (By Mr. Swanson)  Now, it's your opinion,

8    is it not, that the relevant product market in this

9    case is the market for iOS app and digital in-app

10   purchase distribution services?                        11:01:57

11       A.  Yes.  And I -- although just -- the

12   caveat is I don't draw any conclusion about whether

13   one could further divide that into submarkets for

14   the iOS app distribution and the IAP

15   distribution.                                          11:02:13

16       Q.  You're not drawing any conclusion as to

17   whether or not those are separate products, I take

18   it?

19       A.  Right.  I think that -- that there's --

20   they're clearly one -- there is a market for them      11:02:23

21   in combination.  Whether there are also submarkets

22   for them I do not opine.

23       Q.  Are you defining the relevant market in

24   the actual world or the but-for world?

25       A.  Both.                                          11:02:45

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   So all of the aspects of the relevant        11:02:48

 2   market are present and observable in the actual

 3   world, the relevant market as you've defined it?

 4        A.   I don't know.  I'd have -- I'd have to

 5   think more about that.  When you say they're all        11:03:08

 6   observable, just as -- as a matter of linguistics,

 7   you can't really observe things that are in the

 8   but-for world.  But I think the evidence here that

 9   does define the relevant market as iOS apps and IAP

10   distribution services.  So I think that -- that        11:03:35

11   evidence does exist.  Whether all aspects are

12   observable that would exist in the but-for world, I

13   think that's a more difficult question.

14        Q.   Well, are there aspects of your relevant

15   market definition that do not presently exist?        11:03:50

16        A.   I -- I'm not even sure.  I don't even

17   know what that means.  Can you clarify?

18        Q.   Well, is your relevant market description

19   an accurate description of the world today?

20        A.   Yes.                                          11:04:18

21        Q.   Okay.  Your relevant market includes

22   distribution services for both iOS apps and

23   digital in-app purchases, correct?

24        A.   Yes.

25        Q.   Okay.  Let's take a look at your report,      11:04:34
```

Page 48

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    Exhibit 21, at page 3, paragraph 3.                11:04:45

2         A.   Page -- there must be something different

3    in my pagination because I have --

4         Q.   Oh, I'm sorry.   It's -- paragraph --

5    paragraph 3 is on page 7, I think.                 11:05:02

6         A.   Okay.

7         Q.   I'm sorry.

8         A.   Okay.   You said paragraph.   Maybe I

9    missed --

10        Q.   Yeah, paragraph -- yeah, I'm sorry.   I    11:05:11

11   had -- I had it wrong in my notes.   It's page 7,

12   paragraph 3.

13        A.   Okay.

14        Q.   And then focusing -- although again, if

15   you need, at any time I direct you to your report,  11:05:19

16   feel free to look and read any -- any part you

17   want.

18             I'm focusing on the second sentence of

19   paragraph 3:

20             "Digital IAP distribution services        11:05:32

21   include mechanisms used to make in-app purchases of

22   digital products, such as app upgrades, but does

23   not include mechanisms for the in-app purchase of

24   physical goods and services, such as buying

25   physical goods through the Amazon app or rides       11:05:46
```

Page 49

1    through the Uber app."                          11:05:50

2           Do you see that?

3      A.    Yes.

4      Q.    Is Uber a member of the class?

5      A.    I don't know whether they're a member of   11:05:59

6    the class.  I think it would depend upon whether

7    they ever pay a commission, I guess, which I'm not

8    sure that they do.  But I haven't investigated that

9    question.

10     Q.    Okay.  Well, if you assume Uber has not   11:06:18

11   ever paid a commission, in your view, is Uber not a

12   participant in the relevant market that you've

13   defined?

14           MR. LOPEZ:  Object to the form.

15           THE DEPONENT:  Well, Uber -- well,        11:06:46

16   they're not a member of the class, so -- but there

17   is -- there is free distribution for free apps.  So

18   I guess they might participate in that form of a

19   distribution, but just not any paid distribution.

20   So they wouldn't be a class member.               11:07:04

21     Q.    (By Mr. Swanson)  Is free distribution a

22   part of the same relevant market that you've

23   defined?

24     A.    You know, I -- I have to think about

25   that.  That's a good question, but I -- I just      11:07:19

Page 50

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    haven't really thought about it.  I'd have to think        11:07:28

 2    about whether there's substitution for any

 3    developers who do need to charge a price for

 4    digital aspects of their apps.  They can't really

 5    turn to -- well, it's not just free distribution,          11:07:43

 6    it's a -- they have to freely provide the apps

 7    and -- and charge nothing for digital products

 8    within the app.  So I guess they would not be able

 9    to substitute.

10            So I think that -- I think there would            11:07:55

11    probably be a separate market, but I'd have to

12    think about it more.

13        Q.   So your inclination is that free

14    distribution would be a separate market that's not

15    relevant to this case?                                     11:08:06

16            MR. LOPEZ:  Object to the form.

17            THE DEPONENT:  I think probably, but I --

18    I haven't worked through that issue.

19        Q.   (By Mr. Swanson)  Is it your

20    understanding that a developer who currently is            11:08:19

21    utilizing only free distribution could not switch

22    to some form of paid or in-app purchase

23    distribution?

24        A.   They -- they could.  The problem is the

25    other way.  They can't switch from paid to unpaid          11:08:40
```

Page 51

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    if they -- if they need money.  So the -- the          11:08:44

 2    fact -- I mean, both of them are foreclosed

 3    because, like I said, they couldn't -- I mean, they

 4    could -- they could do both.  The question is are

 5    they really substitutes.  And if you can't -- if        11:09:09

 6    nobody wants to pay for your product, you can't

 7    just go start charging for your product.  But I'm

 8    not quite sure that the switching -- I'm having a

 9    hard time seeing the relevance to any issues here

10    about -- about the ability to escape the market        11:09:21

11    power or the exclusion.

12         Q.   Well, let's take an example of a -- a

13    free app, a somewhat renowned one, in this case

14    Fortnite, which, at least before it was removed

15    from the App Store, was a free-to-download app.        11:09:45

16    You -- you're aware of that, right?

17         A.   I have not investigated that.

18         Q.   You're not aware of that then?

19         A.   I -- I can't testify from personal

20    knowledge about that.  I -- I -- my understanding      11:10:07

21    is they do charge for in-app purchases.  Whether

22    they also charge for initial download or did, I --

23    I -- I wouldn't be surprised if the answer was no,

24    but I haven't -- I -- I can't testify about that

25    based on my own knowledge.                             11:10:27
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   Well, you're aware that there are many        11:10:29

 2   apps that offer in-app purchase but that do not

 3   charge for an initial download, correct?

 4        A.   Yes, obviously, yeah.  And they're -- and

 5   they're all part of this market, as I defined it.      11:10:41

 6        Q.   And you're also aware, are you not, that

 7   many consumers download such apps but do not make

 8   an in-app purchase?

 9        A.   Yes.

10        Q.   So those apps with respect to those          11:10:59

11   consumers are completely free, correct?

12             MR. LOPEZ:  Object to the form.

13             THE DEPONENT:  Yes.

14        Q.   (By Mr. Swanson)  Are -- are those

15   transactions, those downloads for free and usage of    11:11:10

16   the app for free without ever making in-app

17   purchase, part of the relevant market you defined

18   in this case?

19        A.   I don't know.  As I said before, I'd have

20   to think more about the question about whether the     11:11:27

21   market could be further divided between those.  I

22   don't think it would alter any of my conclusions

23   either way though.

24        Q.   So it's your view that whether or not

25   those transactions are a part of your relevant         11:11:45
```

Page 53

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    market is not pertinent to the opinion you've          11:11:49

2    reached in this case?

3        A.    I don't think it would alter any of the

4    conclusions.

5        Q.    And what percentage of transactions in       11:12:01

6    the Apple App Store are free?

7              Do you have an understanding?

8        A.    I think most of them are, I believe.

9        Q.    And you have not made any determination

10   before reaching the opinions in your report about      11:12:26

11   whether or not those transactions are in your

12   relevant market?

13       A.    No, I think the conclusions would hold

14   either way about power and effects and exclusion.

15   So I didn't -- I didn't reach a conclusion about        11:12:41

16   whether you could separate them out or not,

17   especially since they are not in the class, so I

18   just didn't focus on that.

19       Q.    So you haven't focused on it, but you

20   have a firm opinion that it doesn't make any            11:12:57

21   difference to your opinions that have been

22   expressed in your report?

23       A.    As I sit here today, I -- I'm not seeing

24   how it would affect any of my opinions in this

25   case.                                                   11:13:11

Page 54

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1        Q.   Okay.                                        11:13:12

2        A.   Or rather say it -- it might be -- change

3    the expression of them, just as the potential

4    subdivision of, you know, the initial app

5    distribution from the IAP distribution services,      11:13:25

6    but wouldn't change the ultimate conclusions on

7    anything.

8        Q.   And -- and just to be clear, your

9    ultimate conclusions as you sit here today you

10   think would not change if free transactions were in   11:13:37

11   a separate market?

12       A.   Correct.

13            MR. LOPEZ:  Object to the form.

14            MR. SWANSON:  Have we been going for

15   about an hour?                                         11:13:52

16            MR. LOPEZ:  We have.

17            MR. SWANSON:  Would we vote for a short

18   break?

19            MR. LOPEZ:  I think that sounds good.  Is

20   that good for you, Professor?                          11:13:59

21            THE DEPONENT:  Sure.

22            THE VIDEOGRAPHER:  We're going off the

23   record at 11:14 a.m.  This is end of media 1.

24            (Recess taken.)

25            THE VIDEOGRAPHER:  We're on the record at     11:30:35

                                                  Page 55

```
 1    11:30 a.m.  This is beginning of media 2 in the         11:30:36

 2    deposition of Einer Elhauge.

 3         Q.   (By Mr. Swanson)  All right.  Professor,

 4    you agree that the App Store is two-sided platform,

 5    right?                                                   11:30:54

 6         A.   Yes.

 7         Q.   And you agree that the relevant market at

 8    issue here in this case is a two-sided market,

 9    right?

10         A.   Yes.                                           11:31:01

11         Q.   And you also agree that the App Store is

12    a special kind of two-sided platform, namely a

13    two-sided transaction platform, right?

14         A.   Yes.

15         Q.   Do you agree that two-sided transaction        11:31:16

16    platforms exhibit strong indirect network effects?

17         A.   Yes.

18              MR. LOPEZ:  Objection.

19              THE DEPONENT:  Sorry.

20              MR. SWANSON:  Was that an objection or?        11:31:30

21              MR. LOPEZ:  Yes, object to the form.

22              MR. SWANSON:  Okay.

23         Q.   (By Mr. Swanson)  All right.  You can

24    answer.

25         A.   What was -- what's the question again?         11:31:38
```

Page 56

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1      Q.   Oh.  I'll try again.  And then we'll deem      11:31:39
 2  there to be an objection to form.
 3           You agree, don't you, that two-sided
 4  transaction platforms exhibit strong indirect
 5  network effects?                                        11:31:53
 6      A.   Yes.
 7      Q.   And you agree that any relevant market in
 8  this case must -- must be defined as a two-sided
 9  transaction market, don't you?
10           MR. LOPEZ:  Object to the form.               11:32:06
11           THE DEPONENT:  No.
12      Q.   (By Mr. Swanson)  Well, is your relevant
13  market, the one that you've defined, a two-sided
14  transaction market?
15      A.   Yes.  I mean, that is the relevant market     11:32:23
16  for the core anticompetitive effects, but I don't
17  think any market relevant in the case has to be
18  one -- for example, there's markets for smartphones
19  and tablets that I discuss or perhaps even high-end
20  smartphones and tablets, and those are not            11:32:41
21  two-sided transaction markets.
22      Q.   Are -- are those alleged as relevant
23  markets in the plaintiffs' complaint?
24      A.   I don't know if they are.  I -- I -- I
25  discuss them not as relevant to the anticompetitive   11:33:00
```

Page 57

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    effects, but as relevant to arguments about tying        11:33:03

2    the time power to impose those exclusivity

3    restraints and to rebut arguments that the -- and

4    the anticompetitive effects in the relevant market

5    might be dissipated by competition in the              11:33:26

6    associated device markets.

7        Q.   Do you understand -- sorry.

8             Do you understand there to be any claim

9    in this case of monopolization of a smartphone or a

10   tablet market?                                          11:33:48

11       A.   No, I do not understand that to be a -- a

12   claim in this case.

13       Q.   Do you understand there to be any claim

14   in this case of a restraint of trade of any

15   smartphone or tablet market?                            11:33:57

16            MR. LOPEZ:  Objection.  Form.

17            THE DEPONENT:  No.

18       Q.   (By Mr. Swanson)  In your opinion, is

19   the iOS operating system a two-sided platform?

20       A.   The operating system itself, I don't           11:34:19

21   think is, and I think it is integral to the device

22   itself for the iPhone.

23       Q.   Is the operating system integral to the

24   App Store?

25       A.   No.                                            11:34:39
```

Page 58

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. LOPEZ:  Objection.  Form.              11:34:40

 2         Q.   (By Mr. Swanson)  And why is it integral

 3    to the device and not to the App Store?

 4              MR. LOPEZ:  Objection.  Form.

 5              THE DEPONENT:  I mean, the -- the device    11:34:49

 6    lacks any utility without the operating system and

 7    every device that Apple sells has its iOS

 8    operating system associated with it.  So I think

 9    for each one it's integral to that particular

10    device.  But I would say smartphones and tablets     11:35:10

11    are different from each other, so that -- that's

12    really the product that's sold and the iOS is

13    just part of what the device needs to have -- or

14    whatever operating system the operating device

15    needs to have to be -- have any utility to          11:35:29

16    consumers.

17         Q.   (By Mr. Swanson)  Well, does the

18    App Store have any utility absent the iOS

19    operating system?

20              MS. MANIFOLD:  Objection.                 11:35:39

21              MR. LOPEZ:  I'll join.

22              THE DEPONENT:  Well, I think the app sort

23    of has separate utility because you -- you could

24    have a phone without an App Store or you could get

25    your stuff some other way.  And certainly you can   11:35:52
```

Page 59

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    have -- you -- you could have iOS app              11:35:54

2    distribution without using the operating system.

3    So I think those are separate.

4         Q.   (By Mr. Swanson)  How -- how do you

5    distribute apps that are built out of the           11:36:11

6    components of the operating system without an

7    operating system?

8              MR. LOPEZ:  Objection.  Form.

9              THE DEPONENT:  Well, I don't -- I don't

10   think the apps are built out of the components of   11:36:24

11   the operating system.  The apps are separate code

12   that works with the operating system.  But you

13   could, as -- as the case in other app distribution

14   markets, for example, download an iOS app -- apps

15   of the restraints.  You could download an iOS       11:36:39

16   app, say, onto your computer and then transport it

17   over to your iOS device.

18        Q.   (By Mr. Swanson)  Is it your opinion that

19   the APIs that come with the license that the

20   developers obtained from Apple are not part of the  11:37:02

21   iOS operating system?

22             MR. LOPEZ:  Objection.

23             THE DEPONENT:  I would say that

24   they're -- they're something that Apple uses to

25   condition access to the iOS operating system.  I    11:37:17
```

Page 60

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    guess you need some way to condition the access,         11:37:25

2    but that it's really the conditioning on that, on

3    being exclusive on app distribution, that I'm

4    focusing on.  So I think they -- they are using

5    their control over AIPs [sic] as part of their          11:37:43

6    operating system in order to prevent app developers

7    from being able to run on the operating system

8    without agreeing to app exclusivity.

9         Q.   (By Mr. Swanson)  Is it your view that

10   APIs are not part of the operating system?              11:38:02

11        A.   I think -- I think that -- well, I think

12   that they are, but that's what's being conditioned

13   as part of the tie that I discuss in part 3, that

14   you're conditioning the ability to run on the

15   operating system using your control over the           11:38:26

16   operating system, including APIs, in order to

17   prevent developers from using the rival iOS app

18   distributors.

19        Q.   APIs are Apple's intellectual property,

20   are they not?                                           11:38:42

21        A.   I haven't been in an opinion that --

22   however, or looked into the issue about whether to

23   the extent too much be copied by intellectual

24   property or not.  But I would not -- I -- I think

25   they -- they have control over it, whether it's        11:38:58
```

Page 61

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    under intellectual property law or otherwise.        11:39:03

2        Q.   Well, do any of your opinions rest on an

3    assumption or conclusion that APIs are not

4    protected by intellectual property owned by Apple?

5        A.   No.                                          11:39:21

6        Q.   Do you agree that failing to analyze the

7    App Store as a two-sided transaction platform would

8    lead to mistaken inferences of the kind that could

9    chill the conduct the antitrust laws are designed

10   to protect?                                          11:39:39

11       A.   I don't know -- I don't know what --

12   whether in this particular case or have some

13   chilling effect, I don't know.  I mean, I think the

14   correct way to analyze it is as a two-sided market

15   and that you might make mistakes if you do.  You     11:39:57

16   know, I think the main mistake here of not doing

17   the two-sided market is actually not to chill

18   conduct, but the opposite, to allow anticompetitive

19   conduct by failing to consider the two-sided

20   effects.                                             11:40:16

21       Q.   Do you agree that recognizing that the

22   App Store is a two-sided transaction platform is

23   critical to the proper economic analysis of the

24   plaintiffs' claims in this case?

25           MS. MANIFOLD:  Objection.                    11:40:29
```

Page 62

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1            MR. LOPEZ:  Same.                        11:40:33

 2            THE DEPONENT:  Could you say that whole

 3    sentence again?

 4        Q.   (By Mr. Swanson)  Sure.

 5            Do you agree that recognizing that the    11:40:36

 6    App Store is a two-sided transaction platform is

 7    critical to the proper economic analysis of the

 8    plaintiffs' claims in this case?

 9        A.   I think it is the -- the proper economic

10    analysis of plaintiffs' claims and it improves it.  11:40:52

11    I don't know that I would say it's critical that

12    you couldn't do an analysis without a two-sided

13    market approach, mainly because in this particular

14    market, it turns out that there are no charges

15    to -- you know, one-sided at the consumers.  So    11:41:12

16    that although it's important for various, I would

17    say, more subsidiary points in the case, I -- I

18    think -- I -- I'm not sure I would say it really

19    was critical to be able to do analysis at all.

20        Q.   And -- and it is your opinion that the    11:41:32

21    consumer side of this two-sided platform are not

22    charged the price by Apple, correct?

23            MR. LOPEZ:  Objection.

24            THE DEPONENT:  They are not charged a

25    price for distribution.  Obviously, they're --     11:41:51
```

Page 63

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    they're charged an app price, but they don't pay        11:41:52

 2    for distribution services or no distribution fee

 3    or -- or rebates or anything, so they're not in --

 4    in that perspective, it's much cleaner, two-sided

 5    market, and that the anticompetitive effect can be      11:42:10

 6    seen from the commission level change itself.

 7         Q.   (By Mr. Swanson)  And it is common in

 8    two-sided markets and with two-sided platforms for

 9    one side to receive the service or the product for

10    free, below cost?                                       11:42:30

11         A.   It sometimes happens, yes, or sometimes

12    it's just a -- a lower price.  There's all kinds of

13    variations in two-sided markets.

14         Q.   And -- and in this case, Apple provides

15    the service to consumers for free, which is below       11:42:48

16    cost -- free is below cost, right?

17         A.   Yes.  I mean, I'm not sure what the

18    marginal cost would be, but like I said, it's

19    generally -- to consumers it's free, yes.

20         Q.   I don't know if you still have              11:43:09

21    paragraph 3 open in front of you from your report.

22         A.   I do.

23         Q.   Okay.

24         A.   Yes.

25         Q.   I wanted to look toward the end of that     11:43:16
```

Page 64

1    paragraph, which I think would be the second to          11:43:18

2    last sentence, the one that starts, "Key aspects."

3    "Key aspects of both iOS app and digital IAP

4    distribution services are transactional in nature."

5         Do you see that?                                    11:43:38

6    A.   Yes.

7    Q.   What key aspects are you referring to?

8    A.   Well, it's a simultaneous transaction on

9    which, you know, for each download of the app or

10   distribution of the in-app purchase, we're handling      11:43:50

11   a monetary payment and Apple is distributing the

12   product from the developer to the consumer and --

13   you know, and -- and the more -- the more

14   developers you have, the more valuable that is to

15   consumers to have that distribution.  And,               11:44:14

16   likewise, more consumers will come to a distributor

17   the more valuable that is to the app developers.

18   Q.   Is there a reason you refer to a market

19   for iOS app distribution rather than a market

20   for iOS digital app transactions?                        11:44:30

21   A.   I -- I refer to a market for both of

22   them.  Sometimes, just to be as a shorthand, as I

23   say, I just call it iOS app distribution just

24   because linguistically it just comes -- trips

25   easier off the tongue to talk about iOS app              11:44:53

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    distributors.  But there's no particular reason why      11:44:56

 2    the shorthand is that.  It's just about most

 3    convenient shorthand for the combination of iOS

 4    app distribution and digital IAP mechanisms.

 5         Q.   Well, is it then your testimony that          11:45:08

 6    market for iOS app distribution is synonymous

 7    with market for iOS digital app transactions?

 8              MS. MANIFOLD:  Objection.

 9              THE DEPONENT:  The -- the market

10    definition I use encompasses both.  I wouldn't say      11:45:20

11    that they are necessarily synonymous.  You could

12    separate them out.  And when it -- when it becomes

13    relevant, I do talk about them separately.  I just

14    note in this paragraph that sometimes for brevity,

15    I just call it, you know, iOS -- iOS app              11:45:37

16    distribution and iOS app distributors.

17         Q.   (By Mr. Swanson)  Well, what is the

18    relevant product here?  Is it digital transactions

19    or is it some type of distribution service if

20    they're different?                                    11:45:52

21         A.   Well, this market for iOS app

22    distribution and the digital IAP mechanisms.

23         Q.   So you don't agree that the relevant

24    product is digital transactions?

25              MS. MANIFOLD:  Objection.                   11:46:07
```

Page 66

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1            THE DEPONENT:  I mean, I guess they         11:46:15
 2    are -- I suppose they are all digital transactions.
 3    But digital transactions could encompass other
 4    things as well, right, so I don't know if I go --
 5    you know, if I send somebody some money on Venmo, I   11:46:35
 6    guess that's a digital transaction, but that's not
 7    part of the relevant market.  And if you're
 8    distributing an Android app, that's a digital
 9    transaction, but that's not part of the market.  So
10    I think my definition is more precise.              11:46:48
11        Q.   (By Mr. Swanson)  It's your understanding
12    that there are digital transactions in this -- in
13    an iOS app that are not subject to a commission
14    if they have a positive price?
15        A.   Well, I mean, a digital transaction, like   11:47:03
16    if -- if you take an Uber ride, I guess there's a
17    transaction that is mediated through digital
18    mechanism.  But Uber doesn't pay for that because
19    it's not a digital product.  So when I talk -- like
20    when I'm talking about a digital IAP mechanism, I'm   11:47:22
21    careful to say it means the in-app purchase of a
22    digital product, not just any digital transaction.
23        Q.   Well, is it your view that Uber and
24    Amazon product purchases and other such
25    transactions are not physical transactions?         11:47:44
```

Page 67

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      A.    The product is physical.  There is a              11:47:49

2    transaction that's digital and that -- you know,

3    you -- you click on something and the -- the money

4    goes out through -- through a digital mechanism.

5    So we're -- we're -- we're certainly -- that's why        11:48:01

6    I'm careful to define the differences, not just a

7    digital payment mechanism, but it's for in-app

8    purchases of digital products.  Otherwise,

9    they're -- wouldn't be in a relevant market and are

10   not covered by the exclusivity restraints.               11:48:16

11      Q.    So your opinion is that an Uber ride

12   transaction is a digital transaction that Apple has

13   not imposed a commission on?

14      A.    I mean, you -- you could describe it as a

15   digital transaction.  That's not the way -- but I'm      11:48:35

16   careful to say it the first time, but I -- you

17   know, I don't repeat it every time.  So I do just

18   talk about digital IAP mechanisms.  But that's not

19   the kind of in-app purchase that is within the

20   relevant market as I discuss it.                          11:48:51

21      Q.    So again, coming back to what the product

22   is in your relevant market, some digital

23   transactions are the product in a relevant market

24   and some digital transactions are not a product in

25   your relevant market?  Is that the case?                  11:49:11

Page 68

```
 1            MR. LOPEZ:  Objection.  Form.              11:49:13

 2            THE DEPONENT:  Perhaps you can clarify.

 3    Are you using the words -- phrase "digital

 4    transactions" to include digital payment mechanisms

 5    for physical products?                              11:49:21

 6       Q.   (By Mr. Swanson)  I'm using it in an

 7    economic sense.  Is that -- does that term not have

 8    any --

 9       A.   I -- I think it's ambiguous, so -- I

10    mean, if you -- if you're reading it to include any  11:49:36

11    digital payment mechanism, whether or not the

12    product is physical, the answer would be one way.

13    But if you're reading it to include only mechanisms

14    to pay for digital products, then the answer would

15    be another answer.  So I -- I don't think            11:49:56

16    economics -- abstract economics tells you how you

17    are defining the phrase in your question.  So if

18    you could clarify, then I could give you a more

19    helpful answer I think.

20       Q.   Well, sir, you tell me.  What -- what are    11:50:12

21    the -- what are the attributes of the product in

22    your relevant market?  How do I identify when a

23    transaction is a product in your relevant market?

24       A.   It is -- either the download, initial

25    installation of an iOS app, or it is an in-app       11:50:30
```

Page 69

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    purchase of digital products within an iOS app.        11:50:36

2        Q.   And you are excluding in your view, an

3    Uber transaction is not an in-app purchase of a

4    digital product?

5        A.   Right.                                         11:50:55

6        Q.   And that is because what?

7        A.   It's a physical product or physical

8    service.

9        Q.   Okay.  And -- and is that because the

10   payment takes place outside of the app?               11:51:07

11       A.   No, it's not because a payment occurs

12   outside the app.  It's just because it's not a --

13   digital products.  We're not -- we're not -- the

14   distributions are not of something digital.

15   There's just a payment that occurs.  And that's --    11:51:25

16   the payment might be mediated by digitality, but

17   the actual distribution is not being done by Apple

18   of the physical good if it's Amazon or not being

19   done -- or the ride, which is being done by Uber.

20       Q.   Are there multiple products in your           11:51:51

21   relevant market?

22       A.   No, it's just one product, the market for

23   these sorts of transactions.

24       Q.   And in your opinion, all of these sorts

25   of transactions are reasonably interchangeable?       11:52:06

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1     A.  Well, I would say the -- either -- I       11:52:12

2  think all the -- the distribution -- initial

3  distribution are all reasonably interchangeable.

4  The in-app purchases are all reasonably

5  interchangeable.  Whether they are inherently part    11:52:24

6  of a single product is something I don't opine on.

7  But there is not a question of interchangeability

8  so much as whether or not, as a matter of

9  economics, it's efficient to combine them together

10  in order to monetize the benefits of app       11:52:40

11  distribution.

12     Q.  Is -- is a zero-priced download of an app

13  from the App Store a product in your relevant

14  market?

15     A.  I guess this goes back to what we talked    11:53:09

16  about before.  And I think a free app -- I mean, it

17  does involve distribution, but there's no charge

18  for it.  So I think it would be different,

19  actually, I think, fall within the -- the price

20  discrimination market distinction.  It would be    11:53:30

21  outside the market because they're charging a

22  commission to pay for paid apps and paid IAPs, but

23  nothing for the free ones and it fits the part of

24  my report that emphasizes that for targeted price

25  discrimination markets, you also have to show that    11:53:50

Page 71

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | the anticompetitive effect is felt by some set of | 11:53:52 |
| 2 | customers but not the other.  So I'd say the -- the | |
| 3 | ones who are not being charged any commission are | |
| 4 | not being affected by the inflation in commission. | |
| 5 | So I would say it's a -- it's a separate market | 11:54:03 |
| 6 | under the price description market concept. | |
| 7 | Q.   So -- so now that you've thought about | |
| 8 | it, your conclusion is that zero-priced | |
| 9 | transactions are not in your relevant market? | |
| 10 | A.   I think so, yes. | 11:54:22 |
| 11 | Q.   Are subscription transactions in the | |
| 12 | relevant market that you define? | |
| 13 | A.   Yes. | |
| 14 | Q.   If a subscription is effectuated outside | |
| 15 | the app subsequent to the app download, is that | 11:54:40 |
| 16 | transaction in your relevant market? | |
| 17 | A.   So I guess it depends on whether it's an | |
| 18 | in-app purchase or not.  So there might be ways for | |
| 19 | some subscriptions to get them outside the app.  In | |
| 20 | that case, it would be an out-of-app purchase and | 11:55:15 |
| 21 | thus not within the relevant market. | |
| 22 | Q.   If a developer has only one app that is | |
| 23 | free to download and that only has an out-of-app | |
| 24 | subscription option, is that developer a member of | |
| 25 | the class? | 11:55:34 |

Page 72

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   No, I don't think so, because they        11:55:37

 2   wouldn't pay any commission to Apple.

 3        Q.   Do you agree that only other two-sided

 4   platforms can compete with a two-sided platform for

 5   transactions?                                       11:55:57

 6             MS. MANIFOLD:  Objection.

 7             THE DEPONENT:  I don't know if that's

 8   uniformly true across all conceivable two-sided

 9   markets, but I think it was true in this case.

10        Q.   (By Mr. Swanson)  Do you agree with the   11:56:19

11   view that Apple is a retailer that sells iOS apps

12   and in-app content and app developers are suppliers

13   that manufacture apps and in-app content and supply

14   them through Apple?

15             MR. LOPEZ:  Objection.  Form.             11:56:34

16             THE DEPONENT:  I'm sorry.  Could you say

17   that whole thing again.

18        Q.   (By Mr. Swanson)  Do you agree with the

19   view that Apple is a retailer that sells iOS apps

20   and in-app content and app developers are suppliers  11:56:44

21   that manufacture apps and in-app content and supply

22   them through Apple?

23        A.   No.

24             MR. LOPEZ:  Same objection.

25             THE DEPONENT:  As I say, I think I cover   11:56:55
```

Page 73

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    in my report I -- I distinguish them from          11:56:57

 2    retailers.  They're -- they're instead selling

 3    transactions, so -- so on that I agree with Apple's

 4    expert Professor Schmalensee.

 5         Q.   (By Mr. Swanson)  Are you aware that      11:57:10

 6    Professor McFadden has opined that the App Store is

 7    a retailer and that app developers are wholesale

 8    suppliers?

 9              MS. MANIFOLD:  Objection.

10              THE DEPONENT:  I'm unaware of that.       11:57:19

11         Q.   (By Mr. Swanson)  Okay.  If Professor

12    McFadden holds that view, do you disagree with him?

13              MS. MANIFOLD:  Objection.

14              THE DEPONENT:  I do.  I think it's a

15    market for transactions.  What they're selling is   11:57:29

16    these distribution services.  It's not like they're

17    taking possession and then reselling the product at

18    some later point in time the way a retailer would.

19    So at least to the extent -- if -- if the use of

20    the word "retailer" is trying to make them suggest  11:57:47

21    that the economics are the same as they are for

22    ordinary brick to mortar retailers, then I would

23    disagree.

24         Q.   (By Mr. Swanson)  Professor, are you

25    offering any opinions about the existence of        11:58:03
```

Page 74

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    relevant submarkets within your iOS app              11:58:07

 2    distribution market?

 3         A.   I do -- well, I don't opine whether

 4    there's a submarket for iOS app distribution

 5    versus in-app purchases.  I do opine that there is   11:58:21

 6    not a separate distribution market for games versus

 7    nongames, and I -- I didn't see any other good

 8    evidence for submarkets within the app distribution

 9    market or IAP market.

10         Q.   Is it your opinion that the iOS app        11:58:49

11    distribution market is a submarket of some broader

12    market?

13         A.   No.

14         Q.   So do you plan to offer any opinions

15    about the existence of relevant submarkets?          11:59:05

16         A.   Yes.  What I just said.

17         Q.   I -- I did -- fair enough.

18              Do you plan to offer any opinions that

19    that there are relevant submarkets in this case?

20         A.   Oh, I -- I -- I don't plan to offer an     11:59:24

21    opinion there's any relevant submarket to the IAP

22    distribution and IAP mechanisms market.  If there

23    was an argument that there's a broader market for

24    all app distribution, I would say that you could

25    break that down into the iOS app distribution        11:59:51
```

Page 75

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    versus other app distribution.                    11:59:54

2         So I do -- I do get into the issue of

3    whether or not in a broader market there would be

4    market power and one -- and I talk about how I

5    think even in that broader market there would be   12:00:05

6    market power.  But if you took that view, then my

7    conclusion about a relevant market would be a

8    submarket of that broader, I think too broadly

9    defined, submarket.

10        Q.   How do you measure price in a two-sided   12:00:19

11   transaction market?

12             MS. MANIFOLD:  Objection.

13             THE DEPONENT:  Well, it's the price --

14   combination of price to both sides.  And in this

15   case, it's just clean because only one side is      12:00:28

16   actually being charged.  So here, it turns out to

17   just be the commission being charged to the

18   developers.

19        Q.   (By Mr. Swanson)  Does a measure of price

20   charged by a two-sided transaction platform need to 12:00:44

21   account for benefits that a platform provides to

22   one or both sides?

23        A.   Yes.

24        Q.   If a platform charges one side a positive

25   price and provides a subsidized benefit to the      12:01:01
```

Page 76

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    other side, how would you calculate the two-sided        12:01:04

 2    price?

 3         A.   Well, the question is what the difference

 4    is from the conduct is what I would say.  And so as

 5    I go through in the last part of my report, there's     12:01:15

 6    no benefit from this exclusionary conduct for the

 7    consumers.  So whatever you think the baseline

 8    benefit might be, the point is -- is they're only

 9    harmed by the difference.  So the combined effect

10    is even worse than the effect on the commission.        12:01:33

11         Q.   You talk about the impact on consumers.

12    Does Apple charge consumers a price?  I thought --

13              MS. MANIFOLD:  Objection.

14         Q.   (By Mr. Swanson) -- we heard -- you told

15    us that Apple did not charge consumers anything.         12:01:48

16         A.   They don't charge consumer --

17              MS. MANIFOLD:  Objection.

18              Sorry.

19              THE DEPONENT:  Sorry, I -- I shouldn't

20    rush my answer before any -- somebody want to make      12:01:57

21    an objection or something?

22              MS. MANIFOLD:  I made the objection.  My

23    apologies for interrupting -- interrupting both

24    gentlemen.

25              Thank you.  Objection made.                   12:02:04
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1          MR. SWANSON:  No problem.                    12:02:06

2          THE DEPONENT:  Could you say that

3    question again.

4      Q.  (By Mr. Swanson)  Let me see.  Do you

5    agree that Apple does not charge consumers        12:02:17

6    anything?

7      A.  Yes.

8      Q.  Okay.  Is it your opinion that in the

9    but-for world, Apple would pay some type of rebate

10   to consumers?                                      12:02:33

11     A.  No.

12         Sorry.  I'm rushing my answers again.

13     Q.  And -- and is -- is there a -- a price to

14   consumers in the but-for world that would be lower

15   than zero?                                         12:02:49

16         MS. MANIFOLD:  Objection.

17         THE DEPONENT:  No, they would just

18   benefit in non- -- nonprice ways.

19     Q.  (By Mr. Swanson)  So in your opinion, are

20   consumers indirectly affected by the price in the  12:03:04

21   two-sided transaction market?

22         MR. LOPEZ:  Objection.

23         THE DEPONENT:  I don't know if I would

24   call it indirect because it seems like part of the

25   whole notion of two-sided market is to say that    12:03:20

                                                    Page 78

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    it's all -- they all count as part of it.  So I --        12:03:23

 2    I -- I think the -- I -- I would disagree with the

 3    indirect characterization.

 4         Q.   (By Mr. Swanson)  Well, is there anything

 5    in the but-for world that Apple would do                   12:03:34

 6    differently with consumers in terms of direct

 7    charge?

 8              MR. LOPEZ:  Objection.

 9              THE DEPONENT:  No, not in terms of direct

10    charge, but as I discuss, the effects would be             12:03:46

11    different on the quantity and quality of apps and

12    the freedom to choose distributors for consumers.

13         Q.   (By Mr. Swanson)  In economic analysis of

14    two-sided markets, what are the economic

15    characteristics of the side of the platform that          12:04:10

16    gets the lower or zero price?

17              MS. MANIFOLD:  Objection.

18              THE DEPONENT:  What -- I'm sorry.  Can

19    you say that again, that question.

20         Q.   (By Mr. Swanson)  Yes.  In economic             12:04:22

21    analysis of two-sided markets, what are the

22    economic characteristics of the side of the

23    platform that gets the lower or the zero price?

24         A.   I guess it would depend on the particular

25    market what their economic characteristics are.           12:04:40
```

Page 79

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1       Q.   In -- in terms of relative elasticity of          12:04:44

2   demand, is there any -- anything that economic

3   theory teaches about who gets the lower or zero

4   price?

5       A.   So I -- I don't know if we can draw any           12:05:06

6   general conclusions or -- I mean, it wouldn't be an

7   elasticity measure relative to price changes if

8   they're not paying any price, but there might be

9   elasticity of demand relative to quality or

10  something like that in -- in the market.  But if --       12:05:21

11  if you're not paying anything, then it's not a -- a

12  price-driven or price-responsive elasticity.

13      Q.   Why -- why would Apple charge consumers

14  nothing and developers a commission in their

15  economics?                                                12:05:40

16      A.   Oh.  Well, you know, it's not just Apple.

17  It's all the other major app distributors as well.

18  So, you know, it -- it must be that it's -- I infer

19  from that pattern that it's just a more efficient

20  way to run the market, most likely reason being          12:06:01

21  that you want to collect as many consumers as

22  possible in order to make the market attractive to

23  distributors, and that as an empirical matter, that

24  if you charge consumers, you would drive too many

25  to participate in -- in the distribution market,         12:06:16

Page 80

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    they would, you know, be less likely to participate    12:06:19

2    and less likely to try things out.

3              So I think, you know, one could have

4    imagined the different world, but I guess given the

5    actual tendency of -- of -- of how consumers         12:06:37

6    were -- would likely respond, it seems like the

7    businesses have concluded that this is the most

8    efficient way to price in this two-sided market.

9         Q.   Is the relevant two-sided price in this

10   case the commission rate or the actual dollar       12:06:58

11   commission payment in a particular transaction?

12        A.   I -- I would say it's the -- well, the

13   commission rate, I mean, obviously it -- it results

14   in a dollar amount.  But Apple has always charged a

15   percentage rather than a -- a fixed fee, as do I     12:07:19

16   think all the large app distributors.

17        Q.   Could you turn to page 96 of your report,

18   paragraph 186.

19        A.   Okay.

20        Q.   You state here that -- in paragraph 186     12:07:53

21   that irrelevant market is not a single-brand market

22   because you've defined the market to be neutral as

23   to who is actually providing the iOS app and

24   digital IAP distribution services.

25              Do you see that?                           12:08:12
```

Page 81

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   Yes.                                    12:08:13

 2        Q.   What do you mean by defining the market

 3   to be neutral?

 4        A.   I mean that I haven't defined it to be

 5   the Apple provision of iOS app and digital IAP      12:08:22

 6   distribution services.  So it's not a -- it's not

 7   being defined as a single brand operating within

 8   a -- a market.  So it's not a brand-specific

 9   definition.  In the but-for world, there will be

10   all kinds of other providers.  And even in the      12:08:40

11   actual world, there's a few fringe providers in the

12   market who are not Apple, so it's not a

13   single-brand market.

14        Q.   Can you redefine a single-brand market in

15   a neutral way that you describe if the brand's      12:08:57

16   product is protected by intellectual property

17   rights?

18        A.   I don't think -- think that intellectual

19   property rights extend to exclusivity on app

20   distribution.                                       12:09:10

21        Q.   Well, don't intellectual property rights

22   extend to whether or not someone else can compete

23   and offer the same product if they don't have those

24   rights?

25        A.   Well, I mean, every exclusivity restraint  12:09:24
```

Page 82

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | uses a property right to impose some exclusivity | 12:09:28 |
| 2 | condition.  That doesn't mean that you have -- that | |
| 3 | the property right gives you the antitrust right to | |
| 4 | impose such exclusivity.  So if I'm -- I'm selling | |
| 5 | some garden variety product but this guy has got | 12:09:44 |
| 6 | monopoly power and he said I'm not going to sell it | |
| 7 | to you, Mr. Distributor, unless you give me | |
| 8 | exclusivity, that's true that he has property | |
| 9 | rights.  But that's still an exclusivity restraint. | |
| 10 | Likewise here, I think even though they | 12:10:02 |
| 11 | have intellectual property over the operating | |
| 12 | system, conditioning access to the operating system | |
| 13 | on agreeing to exclusivity on app distribution is | |
| 14 | the -- the relevant concern. | |
| 15 | Q.  Well, if the company makes a garden | 12:10:17 |
| 16 | variety product, another company can make an | |
| 17 | identical product, can they not, without violating | |
| 18 | any law? | |
| 19 | MR. LOPEZ:  Object to the form. | |
| 20 | THE DEPONENT:  Well, they may or may not | 12:10:33 |
| 21 | be able to, depending on the market circumstances. | |
| 22 | They're not prevented to by property law, but there | |
| 23 | may be practical reasons they can't make the same | |
| 24 | product.  Maybe the first firm has the only access | |
| 25 | to supplies that could do it or the only -- even | 12:10:47 |

Page 83

1    without intellectual property rights, maybe they          12:10:52

2    have the only know-how or maybe they just, you

3    know, have the only plant that's actually been made

4    that can do it.

5            So there's all kinds of sources of              12:11:00

6    monopoly power, other than intellectual property

7    rights, you know, and I think -- but -- but at some

8    point there's a -- there's underlying property

9    right that would have to prevent the rival in the

10   sense that the rival can't sort of invade the plant    12:11:18

11   of the first firm and say, "Well, you're

12   monopolist, but not once I start taking over your

13   plant and inserting my people in your assembly

14   line." So in that sense, I guess property rights

15   could prevent or -- or -- or helping to prevent        12:11:32

16   the -- the monopolization from being undone. But,

17   aside -- there -- assuming that we -- that that

18   kind of property right protection is allowed, I

19   think it is the case that sometimes rivals can't

20   make the same garden variety product.                  12:11:51

21       Q.   (By Mr. Swanson) Well, intellectual

22   property -- intellectual property rights are

23   allowed, are they not?

24       A.   Yes, they are allowed, but that doesn't

25   alter the ability to condition them on exclusivity     12:12:03

Page 84

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    restraints.                                      12:12:06

 2         Q.   Well, if a product is protected from

 3    copying intellectual property rights, then another

 4    company cannot make or distribute that property --

 5    that product, can they?                          12:12:22

 6         A.   Right.  But that's different from being

 7    able to condition it on exclusivity on something

 8    else.

 9         Q.   So if a single brand involves a product

10    protected by intellectual property rights, can it  12:12:38

11    be redefined in the neutral way?  Can a market for

12    that single brand be redefined in the neutral way

13    that you described?

14         A.   I'm not understanding the premise here.

15    The whole point is there's not a single brand.     12:12:53

16    It's -- multiple brands could produce iOS app

17    distribution services and -- and -- and -- and do,

18    in fact.

19         Q.   And to produce iOS distribution

20    services, would another company need to use the    12:13:10

21    word "Apple"?

22         A.   I don't know if they -- I mean, the -- I

23    don't think -- I don't think they need a

24    requirement.  I guess in terms of marketing your

25    product, you might want to identify, you know, the  12:13:33
```

Page 85

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    devices on which it could run.  But that's the --        12:13:36

2    you know, Apple does have a device market, is in a

3    device market, but I am not defining a market for

4    Apple smartphones, for example.  That's -- that's

5    not a relevant market and that would be the one        12:13:51

6    covered, I think, by that sort of intellectual

7    property issue.

8        Q.    Could a rival iOS distributor use the

9    term "iOS"?

10       A.    I -- I think so, again, in terms of        12:14:08

11   defining well, this is -- this is an app that could

12   run on these kinds of devices, you know.  So I

13   don't think there's any prohibition against using

14   that terminology.

15       Q.    Is it your opinion that a rival iOS        12:14:19

16   distributor could use any of Apple's iOS code?

17       A.    Well, I think they'd have to get access

18   to the IA -- the A -- APIs in order to run on the

19   operating system.  And as -- as I say in the

20   report, I -- I'm -- exclusivity restraint is not        12:14:47

21   that Apple is picking which apps that they allow to

22   run.  The problem is conditioning that on

23   exclusivity in app distribution.

24       Q.    So is it your opinion that a rival iOS

25   distributor would need to use some of Apple's iOS        12:15:08

                                                        Page 86

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   code?                                           12:15:13

 2       A.   I -- I -- I don't know -- have enough

 3   technical know-how to know whether exactly --

 4   what -- what exactly the code is, whether it's part

 5   of the OS code, whatever they need.  But just as a   12:15:25

 6   practical matter from what I read in this case,

 7   there are technical ways that Apple can prevent an

 8   app from running on its operating system unless

 9   they agree to exclusivity and that they do exercise

10   those methods.                                  12:15:44

11       Q.   Well, are you assuming that Apple has no

12   right under intellectual property to prevent a

13   rival iOS app distributor from using its code?

14       A.   I think they can condition it.  There's a

15   difference between what is called a unilateral     12:16:01

16   refusal to deal and giving something on a condition

17   of exclusivity.  So that's always been a big

18   important distinction in the economics of these

19   exclusivity restraints.  Here, we have the latter.

20   So, I mean, there's not -- none of the -- my        12:16:19

21   analysis is objecting to Apple saying for this app

22   or it's not going to allow it to run on our

23   operating system because we think it's a bad app

24   for some reason.  The problem is saying to

25   condition that, you can only run on our system if    12:16:31
```

Page 87

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    you have -- give us exclusivity over the                    12:16:34

2    distribution of your app.

3        Q.   Well, setting aside any contractual

4    conditions, if a company uses Apple's code to

5    distribute iOS apps, does that company use or            12:16:56

6    practice Apple's intellectual property?

7            MR. LOPEZ:  Objection.

8            THE DEPONENT:  I -- if -- if they -- I --

9    I -- I don't know enough about the -- the technical

10   details, but it would not alter any of my              12:17:12

11   conclusions one way or the other.

12       Q.   (By Mr. Swanson)  Your -- your

13   conclusions would hold if Apple has a right under

14   the intellectual property laws to exclude rival app

15   distributors?                                          12:17:30

16       A.   Not whether intellectual property rights

17   exclude rival app distributors.  It can exclude

18   apps, but not on the basis of rivalry, it seems to

19   me.

20       Q.   Well, intellectual property laws don't      12:17:44

21   ask how or why a -- an infringer is using someone's

22   protected intellectual property, do they?

23       A.   I mean, to me, this -- you're asking a

24   legal question, so -- so is it okay if I refer to

25   law then?                                              12:18:10

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   Well, I -- what -- what I'm really trying        12:18:14

 2   to ask is what are your assumptions?

 3        A.   I'm doing an economic analysis of the

 4   effects of the condition.  So you're asking whether

 5   intellectual property right gives you the right to        12:18:26

 6   perform and do these various antitrust violations.

 7   I am not going to opine about law, but to answer

 8   your question, I would say it seems to me this is

 9   the very point that was rejected in the Microsoft

10   decision, where the court specifically said it was        12:18:39

11   a ridiculous argument basically to say that because

12   you have intellectual property rights, you had

13   conditioned them on any, you know, exclusive

14   restraint you want.  But I think the analogy they

15   drew was just because you own a baseball bat             12:18:51

16   doesn't mean you can hit people with it.

17             So there is -- I think there's a very

18   well-known distinction in law as well, but I would

19   just say as an economic matter in this case, it's

20   very different to say I'm just going to exercise my       12:19:05

21   rights to exclude, whatever my property rights to

22   exclude are in a nondiscriminatory, unconditioned

23   way versus exercising in a way that discriminates

24   against rivals or that conditions access to

25   exclusivity on something else, which is what's           12:19:28
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   going on here.                                  12:19:31

 2        Q.   Well, has Apple ever licensed any company

 3   to distribute iOS apps in competition with Apple?

 4        A.   Well, it -- it shouldn't have to license

 5   that.  It needs -- it provides licenses for the    12:19:46

 6   apps to run on their app system.  The trouble is

 7   they're conditioning that on exclusivity on app

 8   distribution.

 9        Q.   Are you saying that it's a conditional

10   refusal to deal?                                   12:20:02

11        A.   Well, all -- all exclusive dealing are

12   conditional refusals to deal.  It's dealing only on

13   a condition of exclusivity.

14        Q.   Well, is there any instance where Apple

15   has had a preexisting relationship with a company   12:20:18

16   where Apple allowed that company to distribute iOS

17   apps to third parties for payment on the App Store?

18        A.   No.  The -- the whole preexisting

19   relationship doctrine is about unconditioned

20   refusals to deal.  It's not about agreements to      12:20:40

21   deal conditioned on exclusivity.  That's why it's a

22   whole different doctrine.

23        Q.   Well, is it your opinion that any company

24   could distribute iOS apps without a license from

25   Apple?                                              12:20:58
```

Page 90

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. LOPEZ:  Object to this entire line as        12:20:59

 2    calling for improper legal conclusions.

 3              THE DEPONENT:  I think in the but-for

 4    world they could, without the restraints.

 5        Q.   (By Mr. Swanson)  So in your but-for            12:21:08

 6    world, app -- App Market X distributes apps on

 7    Apple's iOS devices and that distributor needs no

 8    intellectual property license from Apple whatsoever

 9    to do that?

10              MR. LOPEZ:  Same objection.                    12:21:34

11        Q.   (By Mr. Swanson)  Is that the assumption

12    you're making in your but-for world?

13        A.   Well, I -- I -- your -- your question

14    assumed more than my but-for world.  So you're --

15    the -- I -- I am not assuming that the app            12:21:44

16    distribution would have to occur on the device

17    itself.  The app distribution could occur outside

18    the device and then people could copy over the app.

19    But within the app, yes, that they -- they could

20    not condition -- to the extent you need an app in     12:22:01

21    order to -- on the device to do the distribution,

22    Apple wouldn't be able to exclude rival app

23    distributors based upon the fact that they're

24    competing with them.  That would be the very tying

25    restraint that I detail.                               12:22:20
```

Page 91

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   Well, are you saying that in the but-for    12:22:23

 2   world, Apple is compelled to license competing app

 3   distributors?

 4        A.   It would not be able to condition access

 5   based upon the fact that they're rivals.  I don't    12:22:38

 6   think they would have necessarily the duty to

 7   license all of them.  So, for example, if there was

 8   some app distributor who was clearly distributing

 9   malware, it could just -- you know, neutrally

10   applying principles under the app review, it could   12:22:55

11   maintain the integrity of its devices by excluding

12   them.  But what it couldn't do is impose an

13   exclusivity condition by using that power to

14   exclude anybody who competed with it in the app

15   distribution market.                                 12:23:16

16        Q.   In your but-for world --

17             MR. LOPEZ:  Again, same -- again, same

18   objection to this entire line.  It calls for

19   improper legal conclusions.

20        Q.   (By Mr. Swanson)  In -- in your but-for    12:23:23

21   world, there are no exclusivity restraints,

22   correct?

23        A.   None of the ones that I identify as

24   problematic.

25        Q.   Okay.  So in your but-for world, is there  12:23:35
```

Page 92

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    a compulsory intellectual property license that         12:23:39

 2    Apple gives to rival iOS app stores?

 3         A.   No.  It's not -- not a compulsory

 4    license.  It's just an obligation not to impose

 5    exclusivity restraint as a condition of access.          12:23:55

 6         Q.   Well, is that a -- is that, in your

 7    but-for world, a condition that Apple not exercise

 8    its intellectual property rights?

 9         A.   No.  It's just the standard doctrine that

10    you -- the fact that you have property rights            12:24:09

11    doesn't entitle you to attach anticompetitive

12    exclusionary conditions to them.

13         Q.   Well, is charging a payment for use of

14    intellectual property exclusionary?

15              MR. LOPEZ:  Same objection.                    12:24:30

16              THE DEPONENT:  Generally, no.  I guess I

17    could imagine cases where charging a certain price

18    might be exclusionary, but -- or if you manipulate

19    the price in a way to achieve effectively an

20    exclusivity condition, it could be exclusionary.         12:24:51

21    But the mere -- if you have some standard fixed

22    price for a product that's above cost, normally

23    that's not anticompetitive.

24         Q.   (By Mr. Swanson)  And are there any

25    licenses from Apple to competing app stores in your      12:25:05
```

Page 93

1    but-for world?                                    12:25:11

2        A.   To the extent they need to license them,

3    yes, in order for them to be able to compete.  It's

4    not clear to me whether that's a necessary

5    technological feature or whether these licenses are    12:25:28

6    just something that Apple has used to impose these

7    exclusivity conditions.

8        Q.   Well, my question is what do you assume

9    in the but-for world?  Do you assume there are

10   licenses from Apple of its intellectual property to    12:25:43

11   competing iOS app distributors?

12       A.   I think there would be, 'cause it --

13   it -- it could not say that -- you couldn't just

14   exclude them all just because they're an app --

15   rival app distributors.  That doesn't mean you have    12:26:02

16   to license everybody.  There could be, you know,

17   reasons on the merits why some should not be

18   licensed and some should.  And I think it could

19   neutrally apply those principles, as I indicate in

20   my procompetitive justification section.              12:26:18

21       Q.   Is it your opinion that the licenses

22   Apple would provide in the but-for world would be

23   free licenses?

24       A.   I think they would be nondiscriminatory.

25   Whether they have to be free or not, I don't know.     12:26:36

                                              Page 94

1    You know, right now it has -- has some fees for the          12:26:41

2    app distribution and to have app access, so I guess

3    it could -- it could charge that in a neutral way

4    as long as it's not manipulating it to impose

5    effective exclusivity conditions.                             12:27:02

6        Q.   And an effective exclusivity condition

7    would be one which prevented a rival app store from

8    participating in the marketplace?

9        A.   Not just any old rival app store, but if

10   it prevented a group of them.  So, for example, I             12:27:19

11   think Apple charges $99 a year to app developers.

12   If it just charged the same $99 to a -- a developer

13   that developed an -- its own app store app, that, I

14   think, is fine.  If some rival app store couldn't

15   pay the $99, that wouldn't be exclusionary.  It's             12:27:43

16   the same price.  But if Apple were to say, Well, we

17   charge $99 to developer unless you're a developer

18   of an app that offers rival app distribution, then

19   we charge them $10 million each.  That would be

20   manipulating the price to effectively impose an               12:27:59

21   exclusivity condition.

22       Q.   Well, if a rival app store on iOS were

23   able to earn a billion dollars in profit, would you

24   find it to be exclusionary if Apple required a

25   $10 million royalty payment?                                  12:28:19

Page 95

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1              MR. LOPEZ:  Objection.                    12:28:22

2              THE DEPONENT:  I think -- unless it was

3     based upon some neutral principle.  I mean, if it's

4     doing it only to rival app distributors, I think

5     that would be exclusionary.  On the other hand,      12:28:34

6     if -- because that would be really just a condition

7     that's punishing rivalry.  If Apple changed its

8     whole system and said well, we're actually going to

9     charge every app a percentage of the revenue that

10    they make from our -- in general, I -- I guess they   12:28:52

11    could do that.  But that doesn't seem at all

12    likely, given the consistent method of pricing that

13    they've used.

14         Q.  (By Mr. Swanson)  Well, is it your

15    assumption that everything will stay the same in      12:29:11

16    the but-for world except for the royalty rate?

17              MR. LOPEZ:  Objection.  Form.

18              THE DEPONENT:  No.

19         Q.  (By Mr. Swanson)  Have you identified any

20    aspects of license compensation that would be         12:29:35

21    different in the but-for world in your report?

22         A.  For -- for license compensation, just the

23    commission difference.

24         Q.  How about payment for the license?

25         A.  That's -- that's the commission that they    12:30:05
```

Page 96

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    charge.                                        12:30:07

 2         Q.   Right.  And then there's an annual fee

 3    for developers you mentioned of $99?

 4         A.   Yeah.  I haven't made any assumption

 5    about that changing.                           12:30:15

 6         Q.   You note in your report that there is a

 7    enterprise developer program where Apple charges

 8    $299 annually for a license.  You aware of that?

 9         A.   Let me see.

10              Yes.                                  12:30:40

11         Q.   And that higher charge, $299, is for a

12    license to use Apple's intellectual property in a

13    way that generates no commission revenue for Apple,

14    correct?

15         A.   Well, no, not immediately.           12:30:57

16         Q.   And do you have an understanding as to

17    why that fee is higher than the fee for the

18    Developer Program License Agreement?

19         A.   I'm not sure why the fee is different.

20    Perhaps because it's -- it seems like it's         12:31:31

21    resulting in an app that goes to multiple

22    employees.

23         Q.   And is there -- are you making any

24    assumption in your but-for world, for example, that

25    Apple would not raise its license fee to a higher    12:31:48
```

Page 97

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   amount like $299?                                  12:31:55

 2       A.   I -- I haven't made any assumption that

 3   they would alter the developer -- the annual fee to

 4   developers.

 5       Q.   How about for developers who only would    12:32:14

 6   use a nonApple app store to distribute?  Would

 7   Apple keep the fee the same at $99, or is it

 8   possible Apple could raise that fee?

 9            MR. LOPEZ:  Objection.

10            THE DEPONENT:  I think -- I think if they   12:32:38

11   charged an additional fee just because they're

12   using a rival, then that would be effectively, you

13   know, charging a penalty to try to impose an

14   exclusivity condition.

15       Q.   (By Mr. Swanson)  Well, would that be       12:32:50

16   charging something to earn a return on Apple's

17   intellectual property?  Is that exclusionary?

18            MR. LOPEZ:  Objection.

19            THE DEPONENT:  I don't think it would be,

20   because it's being conditioned on who you           12:33:05

21   distribute through.  If -- if instead there's

22   something just about the app that was different and

23   they would charge 299 whether the app was run on --

24   distributed through Apple or by somebody else, that

25   would be one thing.  But to only charge more        12:33:18
```

Page 98

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    because you are distributing through a rival app        12:33:20

 2    distributor is manipulating the price to try to

 3    penalize rivalry and thus imposing an effective

 4    exclusivity condition.

 5            MR. LOPEZ:  Mr. Swanson, we've been going        12:33:35

 6    about an hour, so let's take a break soon, please.

 7            MR. SWANSON:  Yeah, okay.  Why don't we.

 8    Can we keep it to ten minutes this time?

 9            MR. LOPEZ:  Yeah.

10            MR. SWANSON:  Okay.  Great.                      12:33:43

11            THE VIDEOGRAPHER:  We're going off the

12    record at 12:33 p.m.  This is end of media 2.

13            (Recess taken.)

14            THE VIDEOGRAPHER:  We're on the record at

15    1:18 p.m.  This is the beginning of Media No. 3 in      01:18:42

16    the deposition of Einer Elhauge.

17        Q.  (By Mr. Swanson)  Okay.  Welcome back.

18            Professor, do you agree that the purpose

19    of market definition is to identify substitutes

20    that are relevant for evaluating the competitive        01:18:59

21    constraints on the party at issue?

22        A.  That's one of the reasons for market

23    definition, yes.

24        Q.  And do you agree that products don't need

25    to be identical to be substitutes?                      01:19:13
```

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1      A.   Yes.                                           01:19:16

2      Q.   What are the substitute products in the

3  market you define?

4      A.   Substitutes would be any alternative way

5  of distributing iOS apps or iOS in-app               01:19:29

6  transactions.

7      Q.   Is it your opinion that when a

8  transaction platform sells transactions that all

9  transactions sold on the platform necessarily

10 belong in the same product market?                    01:19:49

11     A.   I think -- well, at least in this case I

12 think so, unless there's some distinguishing

13 feature among them or if one can justifies a -- a

14 price discrimination market.  But with those

15 exceptions, I think it would mean that the -- the    01:20:10

16 underlying product is generally the same and

17 certainly it's the same here.

18     Q.   So you can't -- well, can you identify

19 any other circumstances where transactions on a

20 platform would fall into different product markets?   01:20:27

21     A.   Well, we talked about in the morning I

22 think that the market for distribution of fee apps,

23 even though those are also transactions that

24 involve the same kind of product, are probably a

25 different price discrimination market and therefore  01:20:52

                                                    Page 100

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    can be distinguished for that reason.                    01:20:55

2        Q.   And it's your opinion that transactions

3    sold on a platform can fall into different

4    geographic markets; is that correct?

5        A.   They could, yes.                                01:21:12

6        Q.   Do they in this case?

7        A.   Yes.  In this case I define, at least for

8    purposes of the class report, a U.S. market

9    following what the Apple experts concluded for game

10   transactions in the Epic case.                           01:21:29

11       Q.   Is there a geographic market for every

12   country in which the App Store has a storefront in

13   your opinion?

14       A.   I haven't investigated whether there's a

15   separate geographic market for every nation where      01:21:44

16   there's a storefront.

17       Q.   Have you investigated whether there is a

18   geographic market for China?

19       A.   I haven't investigated whether there's a

20   separate geographic market for China.                   01:21:57

21       Q.   Okay.  Is -- are -- are you familiar with

22   the app that Mr. Cameron offers?

23       A.   I -- I -- I -- I'm -- I'm not familiar

24   with it, no.

25       Q.   So you haven't heard of Lil' BabyNames,        01:22:19

Page 101

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    the app, before?                                           01:22:21

2        A.   I -- I think in some discussion I heard

3    somebody talk about it, but I've -- I have never

4    seen it or used it.

5        Q.   You understand that Mr. Cameron's app is          01:22:33

6    a paid download?

7        A.   I assume so, since he's in the class.

8        Q.   Do you understand that his app does not

9    have any in-app purchase option?

10       A.   I -- I haven't investigated that.                 01:22:50

11       Q.   Okay.  Is it your opinion that paid

12   downloads of Mr. Cameron's app are interchangeable

13   reasonably with all other paid downloads and in-app

14   purchases through the App Store?

15           MR. LOPEZ:  Object to the form.                     01:23:09

16           THE DEPONENT:  The -- the apps may be

17   different, but the -- the transaction of

18   downloading is the same.  So I think it's just like

19   credit card transactions.  As I say, you can -- you

20   can use credit cards to buy everything from cars to    01:23:22

21   toilet paper.  That doesn't mean that there's not a

22   credit card transaction market that is -- that

23   covers them both.  So I think it's the same thing

24   here.  But you distinguished between app markets

25   and the app distribution market for iOS apps.          01:23:39

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    Q.   (By Mr. Swanson)  Does a merchant           01:23:45

2    participate in the credit card transactions market

3    if it does not accept American Express cards?

4        A.   It might, if there's a common credit card

5    transaction market with AMEX and -- and MasterCard   01:23:58

6    and Visa.

7        Q.   Well, is that what you were referring to

8    earlier, a common credit card transaction market

9    with all of the major credit cards?

10       A.   That -- yeah.  And so I think -- if we're   01:24:18

11   talking about the AMEX.  If we're talking about the

12   AMEX case, I believe that was the market that was

13   the one that they analyzed in that case.

14       Q.   Do consumers participate in the credit

15   card transaction market if they have only one        01:24:32

16   credit card?

17       A.   Yes.

18       Q.   So to participate in a two-sided

19   transaction market, one doesn't need to possess all

20   the means to transact in that market?                01:24:47

21       A.   Yeah, you don't have every credit card in

22   order to be in the credit card market.

23       Q.   And a merchant that accepted only

24   American Express would be in that market, just as a

25   merchant that accepted only Visa and MasterCard      01:25:08

Page 103

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    would be in that market?                          01:25:11

2         A.   Yes.

3         Q.   In -- in your report you go through a

4    ranking of substitutes to the App Store from

5    inclusive to most distant; is that a fair         01:25:25

6    statement?

7         A.   I missed the last part of that question.

8    I -- I go through a ranking and then what did you

9    say?

10        Q.   You go through a ranking of substitutes  01:25:34

11   to App Store transactions from the closest to the

12   most distant substitutes; is that -- is that a fair

13   statement?

14        A.   So I guess I would add the word "iOS"

15   before "app," I think, in that sentence.          01:25:49

16        Q.   Fair enough.

17             You are of the opinion that the closest

18   substitutes are other iOS app distributors and

19   direct distribution; is that correct?

20        A.   Yes.                                     01:26:07

21        Q.   And your opinion is that non-iOS

22   transaction platforms are more distant partial

23   substitutes; is that correct?

24        A.   Yes.

25        Q.   You determine how close substitutes are  01:26:23

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    by assessing how likely it is that both developer       01:26:26

 2    and consumer demand would shift from Apple's iOS

 3    App Store to the potential substitute in response

 4    to a price change; is that -- is that correct?

 5            THE DEPONENT:  Can you say that sentence         01:26:41

 6    again.

 7        Q.   (By Mr. Swanson)  Sure.

 8            You determine how close substitutes are

 9    by assessing how likely it is that both developer

10    and consumer demand would shift from Apple's iOS         01:26:53

11    App Store to the potential substitute in response

12    to price changes?

13        A.   Yes.  And I guess the only thing I might

14    add to that is that it's for the same set of

15    transactions.  So if they would use it for              01:27:12

16    something else that -- that's got a substitute for

17    the transactions, they'd use on the iOS

18    App Store.

19        Q.   So what do you mean by "the same set of

20    transactions"?                                           01:27:26

21        A.   Well, if you have -- you know, if you

22    have a certain set of transactions, I suppose it

23    doesn't change at all, but if you add another

24    option out there, say some, I don't know, new --

25    new gaming console, but nobody is actually changing      01:27:39
```

Page 105

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | any of the transactions they're now doing for iOS | 01:27:42 |
| 2 | to the gaming console, they're just adding other | |
| 3 | transactions on the gaming console, that is not a | |
| 4 | shift of demand for those transactions and thus | |
| 5 | would not be relevant to figuring out whether it | 01:27:56 |
| 6 | should -- has a pricing constraint and therefore | |
| 7 | wouldn't be in the market. | |
| 8 | Q.    Is it your opinion that a shift by | |
| 9 | developers but not by consumers at the same time | |
| 10 | would not be constraint? | 01:28:18 |
| 11 | A.    Well, I guess it -- it all depends on | |
| 12 | whether the shift by the developers lowers the | |
| 13 | number of transactions on the iOS app platform -- | |
| 14 | app distribution platform. | |
| 15 | Q.    If -- if developers shifting away reduces | 01:28:38 |
| 16 | the number of transactions, would indirect network | |
| 17 | effects lead to lesser consumer participation on | |
| 18 | the platform? | |
| 19 | MR. LOPEZ:  Objection. | |
| 20 | THE DEPONENT:  It -- it -- it might and | 01:28:56 |
| 21 | lead to more consumer participation in other | |
| 22 | platforms.  But the developer could use both as | |
| 23 | well, so I don't know.  You'd have to specify more | |
| 24 | in a hypothetical.  So if the developer is still -- | |
| 25 | all the developers are still available on the | 01:29:13 |

Page 106

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    App Store, then I wouldn't expect that to change          01:29:15

 2    consumer -- the network effect on the consumer

 3    interest.

 4         Q.   (By Mr. Swanson)  What empirical analysis

 5    did you conduct to assess the extent to which            01:29:29

 6    developer and consumer demand would shift to other

 7    platforms in response to a price change?

 8              MS. MANIFOLD:  Objection.

 9              THE DEPONENT:  Yeah.  So I -- I reviewed,

10    I guess, the -- the facts and their economic            01:29:42

11    significance.  I looked at some of the percentages

12    involved, how many were some of the positive

13    substitutes.  There were statistics calculated

14    about such things or -- or found about such things

15    as how many people who own iPhones actually own an     01:30:01

16    Android and could thus possibly switch to using an

17    Android app on a smartphone.

18              Similar issues for gaming consoles and

19    computers for the percentage of iOS apps that are

20    even available in the non-iOS version, calculated      01:30:22

21    some figures relative to that that bore on the

22    likelihood of substitution and then, in terms of

23    the market definition, validated that using

24    statistics that bore on the horizontal -- the

25    hypothetical monopolist test and determined that      01:30:43
```

Page 107

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    given the fact that the Apple prices were well         01:30:48

 2    above the competitive level, according to the

 3    reports of Professor Economides and Professor Evans

 4    and my own analysis, that their profit margins were

 5    highly in excess of competitive levels, that that      01:31:06

 6    indicated that -- those statistics indicated that

 7    the market defined as iOS app distribution and

 8    in-app purchases was -- the market was no broader

 9    with that -- to that.  That market was a valid

10    market under the hypothetical monopolist test.         01:31:27

11        Q.   (By Mr. Swanson)  What -- what evidence

12    did you have or empirical data did you have of a

13    price increase on the App Store?

14        A.   Well, they -- they didn't change their

15    prices.  There -- there wasn't any -- price           01:31:46

16    increase.  The prices were already at the

17    competitive -- at -- at the monopoly level.  It's

18    been at the monopoly level all along.

19        Q.   Was that an assumption of your analysis

20    or a conclusion?                                        01:32:04

21        A.   It's a conclusion of my analysis.

22        Q.   Isn't it a fact that the data, for

23    example, reflected in Professor Economides' report,

24    and, I think, your own analysis shows that over the

25    class period, the average commission on the            01:32:20
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    App Store has declined by 10 percent?                01:32:23

2        A.   I don't know if it's 10 percent.  It's

3    declined -- the average commission has declined

4    slightly, but that's because they introduced the

5    15 percent tier.  And that's -- that's really to    01:32:40

6    purchase services.  So I wouldn't really just call

7    that a reduction in price for the distribution

8    services.  They're offering the 15 percent in order

9    to get developers -- certain developers to invest

10   either in video integration with Apple TV or to    01:32:54

11   invest in maintaining subscriptions for longer than

12   one year, both of which benefit the Apple.

13            So those aren't -- those aren't a

14   response to competition, I guess, is what I would

15   stress.  Those -- they don't indicate waning       01:33:11

16   monopoly power.  There's something even an absolute

17   monopolist would want to give discounts in exchange

18   for investments that are profitable to the

19   monopolist.

20       Q.   Do you agree that Apple would get         01:33:27

21   discounts in the but-for world?

22       A.   I think they would still have two pricing

23   tiers in the but-for world, that the same economic

24   motivation that makes them maintain a differential

25   in the current world would also operate in the --  01:33:43

                                        Page 109

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1     in the but-for world because they would still want      01:33:45

 2     investment in video integration and they would

 3     still want investment in subscriber retention.

 4         Q.   So the but-for world is competitive, but

 5     in your opinion, Apple would not give discounts; is     01:33:56

 6     that correct?

 7         A.   I don't know how you got that from my

 8     statement.  I -- I don't know if you call it a

 9     discount after getting something in exchange.  I

10     think there would still be two price tiers.  So        01:34:09

11     there would still be -- it wouldn't be

12     30 percent -- 50 -- 15 percent.  It would two

13     different commissions, both lower, but it would

14     still be the case that the video partners and those

15     who retain subscribers for longer than a year would    01:34:23

16     pay a lower commission than the base commission

17     rate.

18         Q.   And your opinion is that Apple would not

19     give any discount from those two assumed but-for

20     world price tiers; is that correct?                    01:34:41

21             MS. MANIFOLD:  Objection.

22             THE DEPONENT:  Can you say the question

23     again.

24         Q.   (By Mr. Swanson)  And your assumption is

25     that Apple would not give any discount from those      01:34:51
```

                                                    Page 110

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   two assumed price tiers in a but-for world?          01:34:57

 2        A.   I wouldn't call it an assumption.  I

 3   would call it a conclusion based on my economic

 4   analysis.

 5        Q.   So is it your assumption that -- based on   01:35:07

 6   your conclusion that there will be two price tiers

 7   in the but-for world that Apple, in the but-for

 8   world -- in the but-for world, will give no

 9   discounts?

10        A.   I -- I conclude from my economic analysis   01:35:19

11   that Apple would only have two tiers in the but-for

12   world.  I don't assume the conclusion.

13        Q.   Do you assume or conclude that Apple will

14   give no discounts in the but-for world?

15        A.   I -- I --                                   01:35:38

16             MR. LOPEZ:  Objection.

17             THE DEPONENT:  -- I don't assume it.  I

18   conclude it.

19        Q.   (By Mr. Swanson)  Okay.  You conclude

20   that there will be no discounts by Apple in the      01:35:41

21   but-for world?

22        A.   No, I don't assume there's no discounts.

23   I just told you there would be two tiers.  And

24   since -- at least the way you're using the

25   terminology, I think you're calling the lower price  01:35:50
```

Page 111

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    tier a discount from the base one.  So obviously      01:35:53

 2    I'm saying that that would continue, which is -- so

 3    I'm not sure -- I'm not sure what you're driving at

 4    when you claim that I'm saying that there's no

 5    discounts.  There's -- there's going to be two        01:36:03

 6    tiers, and one of them's lower than the other.

 7         Q.   Well, either someone's taking this down

 8    wrong or I'm reading it wrong.

 9         "Question:  Do you assume or conclude

10    that Apple will give no discounts in the but-for      01:36:15

11    world?

12         Objection.

13         The Deponent:  I don't assume it.  I

14    conclude it."

15         A.   I was focusing on the -- I'm sorry.  I --    01:36:24

16    I misspoke then.  I was just focusing on the first

17    part of your -- you keep trying to use assumption

18    instead of conclusion.

19         I -- I -- there's -- there's not going to

20    be discount from the two tiers, but there would      01:36:35

21    still be the two tiers.  So I guess in part,

22    there's a question, what do you mean by a discount.

23    If you mean some individually negotiated discount

24    for particular app developers, I don't think so.

25    And I'm not exactly sure what you want to call the    01:36:50
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    fact that they're going to have a lower price tier      01:36:53

 2    where they get some benefit out of it.  You could

 3    call that a price discount, but I -- or you could

 4    call it a payment for special services rendered.

 5            But any event, the -- the fact of my           01:37:05

 6    conclusion is there would be two tiers in the

 7    but-for world that commissions Apple's charging and

 8    the lower of those two tiers will would be based on

 9    the same conditions about the video program,

10    partnership program, and the subscriber retention     01:37:20

11    program.

12        Q.   How about the small business program?

13        A.   That's a good question whether that would

14    be true in the but-for world, since Mr. Cook

15    testified that one of the reasons they adopted it     01:37:38

16    involved this litigation.  So I guess in a but-for

17    world, this litigation will not be an issue, so

18    perhaps that wouldn't have been adopted.

19        Q.   So for purposes of assessing impact and

20    damages, your testimony is that the finder of fact    01:37:58

21    should assume that the small business program would

22    not apply in the but-for world?

23        A.   No, I -- I -- I wouldn't say that --

24            MR. LOPEZ:  Objection.

25            THE DEPONENT:  -- because Mr. Cook            01:38:16
```

Page 113

1    testified that -- as well that it was driven by              01:38:17

2    COVID and concerned the economy, concerned about

3    small developers.  So all of those, that would be

4    true in the but-for world.  So I think -- you know,

5    the data that I analyzed in this report didn't              01:38:37

6    include any -- the -- the -- the very recent time

7    period during which the small developer discount

8    has been offered.  So I haven't -- I haven't done

9    any analysis of that yet.

10            But given the -- the first part of his              01:38:55

11   testimony, that would suggest they would give that

12   discount in the but-for world as well.

13       Q.   (By Mr. Swanson)  So in your opinion, in

14   the but-for world those were eligible for the small

15   business program would receive the lower tier              01:39:10

16   but-for price or commission?

17       A.   Yes.  I think likely, yes.

18       Q.   So you think that the small business

19   program indeed was not implemented because of the

20   litigation?                                                01:39:30

21            MR. LOPEZ:  Objection.

22            THE DEPONENT:  I -- I -- I don't know.

23   All I have is Tim Cook's testimony on -- on the

24   motivation for that.  And obviously it didn't exist

25   until 2021, so it came relatively late in the class        01:39:47

Page 114

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   period.                                          01:39:55

 2       Q.   (By Mr. Swanson)  Is it your

 3   understanding that developers will be seeking

 4   damages for the period through 2021?

 5       A.   Through what date in -- I think they're  01:40:12

 6   seeking damages for everything since -- I'm

 7   forgetting the beginning of the class period.  I

 8   think it was 2015, is it?

 9       Q.   Yeah, I believe so.  Beginning of the

10   class period.                                    01:40:28

11       A.   Yeah.  So everything from then until, I

12   guess, whenever the -- the trial lasts.  But I've

13   only seen data through September 2019 so far.

14       Q.   So it's important for you to make a

15   determination as to whether the small business    01:40:46

16   program would exist in the but-for world, correct?

17       A.   Not for the time period that I've covered

18   so far.  But for the period after it's introduced,

19   then I think that would be a -- a relevant inquiry,

20   whether we think that price would have existed in  01:41:07

21   the but-for world or not.

22       Q.   Okay.  And you believe that in fact, that

23   program would exist in the but-for world?

24       A.   I think if you credit Tim Cook's

25   testimony that suggested he was motivated by COVID 01:41:20
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    and also political concerns for small developers,          01:41:26

 2    then those reasons would equally apply in the

 3    but-for world, so I think we -- we would think that

 4    there -- they maintain a differential.  It would

 5    just be a differential from a lower price.  So I'd       01:41:39

 6    expect them to be at the second tier, whatever, the

 7    same tier that the video partners and the

 8    subscriber -- those retained subscribers for more

 9    than one year get.

10         Q.   Is the small business program a -- a           01:41:54

11    reflection of economic price discrimination?

12         A.   Not according to the testimony of

13    Tim Cook.  He didn't -- he didn't list any markets

14    driven reason or competitive reason for the price

15    difference.  He says it was more about political or      01:42:16

16    litigation concerns, which is sort of the opposite

17    of that.  And that's, as I say in the report, I

18    think actually an affirmative indicator of market

19    power.

20         Q.   Is it your opinion as an economist, which      01:42:33

21    is what you profess to be, correct, that the small

22    business program is price discrimination?

23              MR. LOPEZ:  Object to form.

24              THE DEPONENT:  It's a price difference,

25    but it's not a price difference that was motivated       01:42:44
```

Page 116

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    by market conditions according to Tim Cook.        01:42:47

 2         Q.   (By Mr. Swanson)  Is that the economic

 3    definition of price discrimination?  Motivation is

 4    how you define price discrimination as an

 5    economist?                                         01:43:01

 6         A.   Well, I mean, generally all the economic

 7    analysis is of -- of how to maximize profits with

 8    price discrimination because of economic analysis.

 9    In terms of -- you know, I -- I think the abstract

10    distinctions of any price difference as price       01:43:18

11    discrimination really comes from antitrust law

12    rather, I think, than from -- I mean, the economic

13    literature doesn't -- is not -- does not analyze

14    price discrimination that is not motivated by

15    market factors as far as -- I haven't seen          01:43:32

16    literature that analyzes non-market-based price

17    discrimination.

18         Q.   Well, are you familiar with first, second

19    and third degree price discrimination?

20         A.   Yes.                                      01:43:45

21         Q.   And -- and what is first degree price

22    discrimination?

23         A.   Basically perfect price discrimination,

24    where you figure out for each particular individual

25    customer in the market how much they'd be willing   01:43:58
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    to pay.                                              01:44:01

 2         Q.   And what is second degree price

 3    discrimination?

 4         A.   Second degree -- I forget now which is

 5    second and third.  But the other ones are basically  01:44:07

 6    imperfect forms of price discrimination.  One is

 7    where you identify different prices for different

 8    customers based on characteristics that correlate

 9    with their likely willingness to pay are imperfect

10    and then the other one is you use sort of a common    01:44:28

11    pricing schedule for everybody that has the effect

12    of creating price discrimination and charging

13    people different prices in a way that correlates,

14    again imperfectly, to their willingness to pay.

15         Q.   Is the small business program an instance   01:44:47

16    of second or third degree price discrimination?

17         A.   No.  It doesn't appear to be.

18         Q.   Is that a no or a no --

19         A.   Well, no.  I mean, I --

20         Q.   -- could be --                              01:45:05

21         A.   The evidence to the contrary from an

22    economic perspective is one that the prices are not

23    being based upon willingness to pay.  I mean, there

24    was obviously -- Apple was not distinguishing on

25    this for many, many years.  The only change in       01:45:18
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    2021 -- so it wouldn't make any sense that suddenly      01:45:23

 2    in 2021 this would be a reason for it -- because we

 3    also have the evidence that Steam, if anything, has

 4    the opposite kind of price difference where they

 5    charge more money or higher percentage, I should        01:45:36

 6    say, to apps that have less sales and -- I mean

 7    more -- more -- more -- less sales and they charge

 8    a smaller commission to apps have a lot of sales.

 9         Q.   And was that price discrimination of the

10    second or third degree?                                 01:45:54

11         A.   I think that's not price discrimination

12    of that sort.  I think it's a price difference.

13    There it seems to me more plausible that it just

14    reflects something about Steam's costs per app

15    because there's economies of scale in distributing      01:46:16

16    apps that have lots and lots of sales, so you might

17    want to give them a smaller commission because

18    you're -- even with a smaller commission, you're

19    charging them a lot more absolute dollars.  So I

20    suspect that's more what drove that.  And -- and        01:46:31

21    so, you know, if the same factors operate, which

22    you would think would in the iOS app distribution

23    market, you might have expected the opposite sort

24    of pricing.  But -- but Apple has always had a

25    policy of treating small developers at least as         01:46:48
```

Page 119

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    well, if not better, than large developers.        01:46:51

 2         Q.   Is it your testimony as an economist, not

 3    a lawyer, but as an economist, that the small

 4    business program is not second or third degree

 5    price discrimination?                               01:47:05

 6         A.   Yeah, I don't think it is.  It's a price

 7    difference, but I would not say it's either second

 8    or third degree price discrimination because it's

 9    not -- it's not designed to maximize profits by

10    pricing higher to those with a higher willingness   01:47:18

11    to pay.

12         Q.   And the same question with respect to

13    Steam's price tiers post 2018?

14         A.   Yeah --

15              MR. LOPEZ:  Objection.                     01:47:33

16              THE DEPONENT:  -- for Steam, I mean, I --

17    it's -- I don't have as much direct testimony about

18    why Steam's doing it, but absent other evidence --

19    I'd need some evidence of why they might think that

20    a higher rate should -- that that's the smaller      01:47:48

21    developers or at least the smaller apps, developers

22    of smaller revenue apps, that they would be willing

23    to pay more than the others, maybe I might.  My

24    intuition would be that's probably not the driver,

25    it's probably something about economies of scale.    01:48:08
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1        Q.   (By Mr. Swanson)  Going back to average      01:48:13

2   commission on the App Store, is it your testimony

3   that since 2015, the average commission on the

4   App Store has not declined by 10 percent?

5        A.   There's been some decline.  I can't         01:48:29

6   remember whether it was by 10 percent.  I think

7   it's just a few percentage points was my

8   recollection, and that it's not a -- there's been

9   no decline in either commission tier.  It's just a

10  greater portion of the market is now at the          01:48:44

11  15 percent commission tier.  So there's not really

12  a drop in prices.  It's just -- you know,

13  they're -- they're getting more investment in the

14  video program and in subscriber retention, which,

15  as I mentioned, is not really -- not really a drop    01:49:00

16  in price.  It's kind of a purchase of investment

17  services.

18       Q.   So let's be crystal clear on this.

19  Focused on the average commission that the class

20  paid since 2015, it's your testimony you don't        01:49:15

21  think that that average commission has declined by

22  10 percent?

23       A.   I give the same answer I gave last time.

24  I don't have a different answer to the same

25  question.                                             01:49:30
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   You think it's a couple of percent.  So       01:49:30

 2   you think it's 3 percent, that it's dropped

 3   3 percent?

 4        A.   Are you talking a percent like -- are you

 5   talking about percentage points or are you talking      01:49:41

 6   a percent?  So if -- if the commission -- if the

 7   average commission, say, went down from 30 to

 8   27 percent, are you calling it a 3 percent drop?

 9   Are you calling that a 10 percent drop because

10   3 percent is 10 percent of 30?                           01:49:52

11        Q.   Well, 30 percent is the price, which I

12   believe you testified to.  Then I think a

13   27 percent commission would be a 10 percent drop.

14   Wouldn't you agree?

15        A.   Okay.  Well, I -- I was precise to say         01:50:04

16   percentage points in my answer.  That's why, when

17   you talk about percentages you have to ask is it

18   percentage points or is it percentage of original

19   price to be clear.

20             My recollection was it was a couple            01:50:15

21   percentage points and -- but it could possibly be

22   as many as three percentage points, maybe.  I -- I

23   don't really recall, but I -- what I do know is it

24   did not reflect any drop in actual commission

25   rates.  It just -- it just reflected a different        01:50:37
```

Page 122

```
 1    ratio of those at the two constant commission       01:50:42

 2    tiers.

 3         Q.   So what is the relevance of the average

 4    commission?

 5         A.   Well, it's the average -- I mean, that --  01:50:53

 6    that is being charged in the market and the

 7    average -- I mean, I think the average commission

 8    would fall in the but-for world, so you want to

 9    compare it to some average now, but it would be

10    mediated to a drop in each tier.                     01:51:06

11         Q.   So --

12         A.   But I -- I don't think there is any

13    economic relevance to the fact that in the actual

14    world, the average commission has dropped, at least

15    not in the sense of any indicator about market       01:51:19

16    power, both for the reason I've already given about

17    it's really just a mix, change over time that

18    reflects getting more services, but also because

19    what really matters is the but-for level, not the

20    past level.  So I -- I wouldn't put any economic     01:51:36

21    significance on the statistic you're talking about

22    regarding the drop in average commission over time.

23         Q.   Well, that wasn't my question.

24              Do you put any significance on average

25    commissions at all?                                  01:51:51
```

Page 123

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | A.   Yeah.  I mean, they're an indicator of | 01:51:55 |
| 2 | the average commission that's paid.  So it's a | |
| 3 | total amount being -- it enables you to calculate | |
| 4 | the total amount being paid out there.  And then to | |
| 5 | compare that to a but-for average or to an average | 01:52:06 |
| 6 | in other markets provides a very useful indicator | |
| 7 | of market power and anticompetitive effects. | |
| 8 | Q.   Should you be comparing the actual prices | |
| 9 | charged as opposed to an average? | |
| 10 | A.   Well, average is an average of actual | 01:52:24 |
| 11 | prices, so -- so it does reflect actual prices.  So | |
| 12 | it's not -- it's not -- being actual and average is | |
| 13 | not mutually exclusive. | |
| 14 | Q.   Okay.  Well, then, the average price in | |
| 15 | the actual world in your actual market has declined | 01:52:39 |
| 16 | by 10 percent.  Do you dispute that? | |
| 17 | MR. LOPEZ:  Objection.  Form. | |
| 18 | THE DEPONENT:  This average commission | |
| 19 | has declined.  I -- again, I -- if you want to show | |
| 20 | me a chart or something I can look at, but I don't | 01:52:51 |
| 21 | recall the exact number of percentage points that | |
| 22 | it had dropped over this period.  But it does not | |
| 23 | reflect any drop in either tier, as I've said. | |
| 24 | Q.   (By Mr. Swanson)  Have you studied | |
| 25 | whether the average commission price reduction on | 01:53:09 |

Page 124

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    the App Store has led consumers and developers to      01:53:13

 2    shift from other platforms to the App Store?

 3         A.   I -- I haven't, because there hadn't been

 4    any drop in either tier.  So what -- whatever

 5    category you fall into as a developer there's          01:53:36

 6    nothing there that would cause a shift from other

 7    platforms into the iOS platform because it's not

 8    actually a drop into what they receive.

 9         Q.   Well, what -- have -- have you got any

10    data showing shifting behavior in response to a        01:54:02

11    price -- an actual world price increase on the

12    App Store?

13         A.   Well, the price stayed constant, so there

14    was no shift.  It's just been at monopoly levels

15    the entire time.  There's no before or after period    01:54:22

16    that you can use in this case.

17         Q.   You agree that cluster markets are

18    markets that consist of multiple products that are

19    not substitutes for each other, correct?

20         A.   Yes, sometimes.  Not -- not all mark- --     01:54:43

21    things are not substitutes for each other as

22    cluster markets, but in a cluster market it does --

23    encompasses one market things that are not

24    substitutes for each other.

25         Q.   Is your iOS app distribution market          01:54:54
```

Page 125

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    definition a cluster market?                     01:54:58

 2         A.   No.

 3         Q.   Isn't it true that your relevant market

 4    groups together different types of nonsubstitute

 5    app transactions?                                01:55:11

 6         A.   No.

 7         Q.   Do you agree that the rationale for

 8    clustering nonsubstitutable goods into a single

 9    market must be regarded as a severe exception for

10    ordinary market definition criteria which define 01:55:25

11    markets in terms of substitutability?

12              MR. LOPEZ:   Objection.  Legal conclusion.

13              THE DEPONENT:   I don't recall the severe

14    exception, no, because I -- I wouldn't put that

15    term out.  There's -- I mean, things are often   01:55:39

16    considered part of a single product that are not

17    substitutes.  Like shoes and shoelaces are not

18    substitutes for each other, but -- and we recognize

19    that the shoes with shoelaces is a single product.

20    So that comes up.  And there's lots of cluster   01:55:54

21    markets like hospital services markets.

22              So I don't regard it as a severe

23    exception.  I just regard it as a concept that, as

24    I discuss in my report, does not apply to this

25    market.                                          01:56:08
```

Page 126

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Swanson)  Do you agree that the      01:56:10

 2   critical question that must be answered when

 3   determining whether a particular product should be

 4   included in a cluster market is whether the items

 5   are subject to the same competitive conditions?      01:56:18

 6        A.   Can you say that again.

 7        Q.   You agree that the critical question that

 8   must be answered when determining whether a

 9   particular product should be included in a cluster

10   market is whether the items are subject to the same   01:56:33

11   competitive conditions?

12        A.   That seems overbroad as a statement

13   because often things are clustered together, not

14   subject to the same conditions, but rather because

15   there's a lot of economies of scope providing them   01:56:53

16   together, including in particular in hospital

17   services markets, where many services are clustered

18   together that are not subject to the same market

19   conditions.

20        Q.   In your opinion, are there differences      01:57:11

21   between the substitution possibilities of different

22   groups of consumers on the App Store?

23        A.   I'm not sure what you mean by that.

24        Q.   You can't answer that question?

25        A.   I don't understand the question.  Could     01:57:28
```

Page 127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    you clarify?                                      01:57:29

 2        Q.   Are there different groups of consumers

 3    on the App Store who have different substitution

 4    possibilities?

 5            MS. MANIFOLD:  Objection.                 01:57:39

 6            THE DEPONENT:  Substitution possibilities

 7    for what?  For the apps that they want?

 8        Q.   (By Mr. Swanson)  For the transactions

 9    that they want to engage in.

10            MR. LOPEZ:  Object to the form.           01:57:47

11            THE DEPONENT:  Different substitution

12    possibilities.

13            I would say no, because Apple has

14    foreclosed all the substitution possibilities.

15    They -- they would be able to use rival app       01:57:58

16    distributors in the but-for world, but in the

17    actual world they have been foreclosed from doing

18    so.

19        Q.   (By Mr. Swanson)  Are you aware of the

20    app that named plaintiff Pure Sweat has offered?  01:58:12

21        A.   I am not.

22        Q.   Is there some reason why you haven't

23    studied the apps offered by the named plaintiffs?

24        A.   Because I'm doing a -- a market-wide

25    economic analysis.  I'm not doing a legal analysis 01:58:29
```

Page 128

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    of particular class members and their              01:58:34

 2    representativeness.

 3         Q.   Well, if -- if your opinion that all of

 4    the relative evidence is common to all developers,

 5    wouldn't it be a good test to see whether or not    01:58:47

 6    your opinions hold for the two named plaintiffs?

 7         A.   I think they -- they hold for all

 8    identified members of the class, whether they're

 9    named or not, for reasons that are general.  Or --

10    or if they don't hold -- they don't hold for all of  01:59:06

11    them, then that's still a class-wide determination.

12    So I -- all the analysis I do applies across all

13    members of the class, named or unnamed.

14         Q.   Okay.  So you're convinced to a certainty

15    that your opinions apply to the apps and the         01:59:20

16    characteristics of the apps of the named

17    plaintiffs?

18              MR. LOPEZ:  Object to form.

19              THE DEPONENT:  If they're in the class,

20    it applies to their app distribution.  I'm not --    01:59:34

21    as I said already, I'm not defining markets by

22    apps.  Apps differ from each other and can be in

23    different markets, but the -- what's common, just

24    as with credit card transactions, is the

25    transaction market.  So I agree with                 01:59:51
```

Page 129

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    Professor Schmalensee or Apple's expert in the Epic      01:59:54

 2    case that here, the market is the transactions and

 3    that is a common two-sided product common to all

 4    the distribution.  It's not -- it's not an

 5    app-specific market.                                      02:00:08

 6         Q.   (By Mr. Swanson)  Are you familiar with

 7    the reader rule?

 8         A.   Yes.

 9         Q.   Okay.  What is it?

10         A.   It basically says if you make out-of-app       02:00:17

11    purchases of content, you can, you know, read them

12    on, say, your Kindle.  You know, the Kindle in one

13    manifestation is offered as an iOS app.

14         Q.   Are you sure of that?  That -- that's

15    your understanding of the reader rule?                   02:00:42

16         A.   Yeah.  I discuss in my report the reader

17    rule says, you have or such should be something you

18    purchased elsewhere and that, you know, for

19    preexisting customers, the reader provision.  And

20    so one of the -- the class examples is the Kindle       02:01:00

21    reader.

22         Q.   And before the reader rule, if an iOS

23    user wanted to buy content in the Kindle app,

24    Amazon would be charged the commission for that,

25    correct?                                                 02:01:19
```

Page 130

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    A.   Well, I think they -- if you bought it        02:01:21

2  within the app, yes.  So I really think that -- I'm

3  not sure whether anything was different before the

4  reader rule was announced.  It just seems to me the

5  reader rule, what it does is just define the           02:01:34

6  boundaries of what an in-app transaction is by

7  being clear about what's out-of-app and what's

8  in-app.

9    Q.   Does the reader rule apply identically to

10 all apps?                                              02:01:46

11   A.   It applies to all apps that offer similar

12 kinds of content like books, magazines, videos.

13   Q.   So it depends on the genre of the app; is

14 that correct?

15   A.   I think just depends upon what kind of         02:02:03

16 content.  Let me see.

17        I was hoping for a -- a quote that might

18 have the -- the rule in detail.  But I think

19 it's -- as I recall, it says, you know, it's got to

20 be a certain kind of content you purchase elsewhere   02:02:34

21 as opposed to, say, you know, like an interactive

22 program or something, because that would be

23 something like a video -- they specify what it is,

24 video magazines, maybe newspapers, books.  It's --

25 it's that sort of one-directional content that is     02:02:50

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    purchased elsewhere, but you can't put -- you can't      02:02:54

 2    buy it in the app.  That would be prohibited.

 3         Q.  If the finder of fact concludes that

 4    there are multiple relevant markets, would it still

 5    be your opinion that the evidence regarding market      02:03:11

 6    power and conduct and impact for developers in one

 7    market would be the same as the evidence regarding

 8    market power conduct and impact in the other

 9    markets?

10            MR. LOPEZ:  Object to the form.              02:03:25

11    Objection.

12            THE DEPONENT:  Well, at least for the one

13    contested issue I know about, I explicitly say in

14    the report yes, that even if one defines

15    separate -- the fact finder found separate relevant     02:03:36

16    markets for initial app distribution and subsequent

17    in-app purchases, my conclusions about power and

18    anticompetitive effects would be unaltered.  We

19    just would have power in both and exclusive

20    restraints in both, but the total amount of           02:03:56

21    anticompetitive effect and the effect on

22    commissions would be the same.

23         Q.  (By Mr. Swanson)  What if -- what if the

24    finder of fact determined that there was a digital

25    game transaction market, a video streaming            02:04:08
```

Page 132

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    transaction market and seven other markets that are      02:04:12

 2    served by the App Store?

 3           Would it be your opinion that the

 4    evidence as to monopoly power, anticompetitive

 5    conduct and impact would be exactly the same for         02:04:25

 6    all developers, regardless of the market?

 7         A.   I think --

 8           MR. LOPEZ:  Objection.

 9           THE DEPONENT:  -- I'd have to know more

10    about what the basis for that finding would be,          02:04:34

11    given that we don't observe that sort of price

12    discrimination in the actual world.  So --

13    you know.  So -- so therefore, it's very easy in

14    the actual world.  In your hypothetical world, I

15    think I'd need a lot more facts to figure out how        02:04:49

16    could they have reached that conclusion and would

17    whatever the reasons they gave for that conclusion

18    bear on the anticompetitive effects I predict or

19    not.

20         Q.   (By Mr. Swanson)  Isn't your assertion         02:05:02

21    that the correct definition of the relevant market

22    is the same for all class members dependent on the

23    assumption that there's only one relevant market?

24         A.   Oh, no.  I mean, if there was multiple

25    relevant markets, there was just a correct set, I        02:05:16
```

Page 133

1    guess I would say, of market definitions.  So       02:05:19

2    whatever the correct set is is a fact of the world

3    that is common to all class members.  It's just

4    if -- in some hypothetical worlds, different

5    markets might cause different implications for       02:05:35

6    maybe some other issue.  But -- but the market

7    definition itself would still be common to all

8    class members.

9        Q.   Well, it wouldn't be common to a class

10   member who didn't participate in that market since   02:05:51

11   it wouldn't be relevant to that class member's

12   claim, would it?

13       A.   Well, it would still be common to them.

14   I mean, the facts necessary to establish this would

15   be the -- and methodology -- all the evidence,       02:06:01

16   method and conclusion would all be common to them

17   and -- and -- and the other person in the class.

18            I wouldn't -- there was -- there's not

19   like a -- a correct market definition for one class

20   member and a different correct market definition     02:06:16

21   for other class members.  So I think -- I think it

22   is common, even if there -- even if we incorrectly,

23   mind you, assume those kind of submarkets you were

24   talking about.

25       Q.   Is it your opinion that the methodology     02:06:38

Page 134

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    evidence and analysis used to define the relevant          02:06:41

 2    market would be the same, even if every class

 3    member brought a separate antitrust suit?

 4         A.   Yes.  Everything I say in here in this

 5    report I would have to do for an individual class          02:06:54

 6    member as well.

 7         Q.   Do you agree that Epic was a member of

 8    the class when the class action was filed?

 9         A.   I suppose it was.  I don't -- maybe it

10    opted out of the class since it had it's own               02:07:10

11    lawsuit.  I -- I don't know the details of that.

12         Q.   So was the methodology, evidence and

13    analysis used to define the relevant market in the

14    Epic case the same that would be used in the

15    separate case by Donald Cameron?                           02:07:25

16              MR. LOPEZ:  Objection.

17              THE DEPONENT:  Well, I mean, I think that

18    the correct market definition methodology would be

19    the same no matter who brings it because there's

20    only one correct market.  I -- I think in the Epic         02:07:43

21    case -- I mean, obviously the Epic plaintiffs

22    reached a conclusion about dividing the app

23    distribution market and in-app distribution market

24    that was relevant to their claims there but isn't

25    relevant to me here.  So I didn't reach that issue,        02:08:00
```

Page 135

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    but it's -- either way you resolve it would be a          02:08:03

2    common issue.

3         Q.   (By Mr. Swanson)  You mentioned your

4    hypothetical monopolist test.

5              You -- you looked at a profit-maximizing        02:08:20

6    price that Apple charges, correct?

7         A.   Yes.

8         Q.   And that was the starting point for your

9    hypothetical monopolist analysis; is that correct?

10        A.   Well, I think the starting point was to         02:08:46

11   order the substitutes and then to pick -- then

12   start with a narrow set and ask for that narrow

13   set, could they -- did the evidence indicate they

14   were able to raise prices significantly above

15   competitive levels.                                       02:09:04

16        Q.   What -- what profit-maximizing price did

17   you look at for Apple?

18             MS. MANIFOLD:  Objection.

19             THE DEPONENT:  Well, I'm looking at the

20   price that they actually charge and whether they're      02:09:15

21   able to sustain that, even though it's much higher

22   than a competitive level.

23        Q.   (By Mr. Swanson)  So you didn't look at

24   the average commission level?

25        A.   I did look at the average commission            02:09:32
```

Page 136

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    level, yes.                                              02:09:34

2        Q.   Okay.  So you found the average

3    commission level to be meaningful in this context?

4        A.   I think the difference between it and

5    competitive levels is meaningful and statistic that   02:09:44

6    you can apply across the market.  What I was saying

7    was not particularly meaningful was the slight drop

8    over time of Apple's average commission because it

9    just didn't -- it didn't indicate any drop in

10   prices, it just indicated a different mix of types    02:10:08

11   of developers and investments.

12       Q.   Well, to apply the hypothetical

13   monopolist test, then, is it your testimony that

14   you should look at the price, not the mix?

15       A.   No, I think to apply the hypothetical        02:10:19

16   monopolist test it makes sense to use the average

17   price because the -- the benchmarks that we have

18   for the but-for world, you know, have to use some

19   sort of average as well so that it is -- I think --

20   I think it's a good measure of the overall power in   02:10:39

21   the market.

22       Q.   Does the profit-maximizing price you

23   calculate for your hypothetical monopolist test

24   exclude free transactions?

25       A.   Yes.                                          02:11:00

                                                       Page 137

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    Q.   So the -- the price you used for the        02:11:03

2    hypothetical monopolist test would be the same,

3    regardless of whether free transactions were

4    1 percent or 99 percent of all transactions?

5    A.   Well, I think they're in a different         02:11:16

6    market, as I said.  But they are mathematically

7    undefined.  There is no commission percentage for

8    free transactions because zero over zero is not a

9    mathematically defined thing, so it wouldn't -- I

10   mean, considering it wouldn't alter the average    02:11:33

11   commission and it wouldn't alter the market shares

12   at all either.

13   Q.   Well, there is a price.  It's zero, isn't

14   there, regardless of whether you want to divide by

15   zero or not, there's a price -- or multiplied by    02:11:50

16   zero?

17   A.   Well, there's not a percentage-based

18   commission, zero resid- -- because there's no --

19   it's zero of -- over zero.  And so this is where I

20   differ with Apple's expert.  I think it was maybe   02:12:01

21   Lafontaine or maybe Professor Hitt, I'm forgetting

22   right now, but where they try to include zero over

23   zero as a zero dollar -- a 0 percent commission and

24   thus, you know, I think in any mathematically

25   incorrect way try to say that that was lowering the  02:12:21

Page 138

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   average commission.  It's not.  It's just          02:12:24

 2   mathematically undefined.

 3        Q.   So if Apple gave away all transactions

 4   for free, you would claim that the conduct was

 5   still anticompetitive?                             02:12:35

 6        A.   If it's giving everything for free --

 7        Q.   Even though you couldn't calculate an

 8   average --

 9        A.   Even -- even -- well, if it's giving

10   everything away for free because -- even when      02:12:49

11   developers charge an app price --

12        Q.   Yes.

13        A.   -- that you're saying Apple to say,

14   that's okay, you charge whatever you want, it's

15   free?                                              02:13:01

16            I don't know.  I'd have to think about

17   that.  I guess maybe there would be a predatory

18   pricing claim if they're charging a lot less than,

19   you know, for marginal costs for providing the

20   service.  I'd have -- you know, I'd have to see     02:13:16

21   what the -- what anticompetitive effects that might

22   have, if any.  But I don't know.  I don't -- we

23   have to know a lot more about this hypothetical

24   world.

25        Q.   In your hypothetical monopolist test,    02:13:28
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    when you are considering whether Apple's          02:13:32

2    profit-maximizing price is 5 percent higher than

3    commissions in competitive markets, you look at one

4    of Professor Economides' yardsticks.

5          Do you recall that?                         02:13:47

6      A.   I think I looked at both of his.

7      Q.   Well, for -- for competitive markets

8    you -- you looked at two of his commissions, but

9    one of them you looked at from the standpoint of

10   competitive markets, as I recall --               02:14:01

11     A.   Not --

12     Q.   -- perhaps.  Correct?

13     A.   Both his but-for and his -- and, yes,

14   the -- the Windows app distribution market.

15     Q.   Yes.  Let's call it the Windows yardstick  02:14:13

16   if -- if that helps to identify it.

17          You looked at the Professor Economides'

18   Windows yardstick, correct?

19     A.   Yes.

20     Q.   And have you verified the accuracy of      02:14:24

21   Professor Economides' calculations for the Windows

22   yardstick?

23     A.   No.  My -- as I say in my report, that

24   was a conclusion I offer on the premise that if --

25   if his analysis were found to be reliable by the   02:14:41
```

Page 140

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    finder of fact, it would produce the conclusion       02:14:44

 2    that I -- I draw from it.

 3         Q.   Are you offering the opinion that his

 4    Windows yardstick is reliable?

 5         A.   I am not independently assessing his         02:14:55

 6    yardstick.

 7         Q.   You also considered in connection with

 8    your hypothetical monopolist test whether Apple's

 9    profit-maximizing commission in the actual world is

10    higher than commissions that other experts find       02:15:11

11    would have prevailed in the but-for world, correct?

12         A.   Yes.

13         Q.   And there, Professor Economides has

14    another yardstick which you looked at.  Should we

15    call that the but-for world yardstick?                02:15:31

16         A.   Sure.

17         Q.   Okay.  Did you consider

18    Professor Economides' but-for world yardstick to be

19    a reliable economic model?

20         A.   I didn't do any independent assessment of   02:15:45

21    it.  I mean, it and -- and the other one you talked

22    about certainly looked reasonable, but I haven't

23    done an independent economic analysis.  I'm just

24    drawing the inference assuming it's reliable and

25    correct, this is what the implications would be for   02:16:02
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    a market definition.                                02:16:05

2         Q.   So you didn't indicate in your report

3    that you thought Professor Economides' but-for

4    world yardstick involved a reliable economic model?

5         A.   I -- I don't think I offer an affirmative   02:16:18

6    opinion about that.  I simply said -- I offered the

7    conditional one and I said that yes, I -- in

8    paragraph 119 what I said was a conclusion that

9    either of their models was reliable would be

10   independently sufficient to establish that the       02:16:33

11   domestic iOS app distribution -- it should say

12   market there -- was sufficiently broad under the

13   hypothetical monopolist test.

14        Q.   Turn to paragraph 115 on page 60.

15        A.   Okay.                                       02:16:52

16        Q.   There you say, "Reliable economic models

17   indicating that the average commission in the

18   domestic iOS app distribution market would be at

19   least 5 percent lower if there were competition in

20   the market would also be sufficient to establish     02:17:01

21   that this market is sufficiently broad."

22             So are you or are you not saying

23   Professor Economides' yardstick, which you refer to

24   in paragraph 116, is a reliable economic model?

25        A.   No.  As I say in paragraph 119, I'm         02:17:22

                                             Page 142

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    saying if you conclude they are reliable, it has        02:17:23

 2    its implication, which is just what I say in

 3    paragraph 115.  If you think there's a reliable

 4    economic model indicating this, it has this

 5    implication, and I point to two expert models that      02:17:33

 6    are out there, his and Professor Evans'.  And I

 7    also point out that Apple has not put forward any

 8    estimates of their own, this is the only expert

 9    opinions we have about the but-for price; that

10    therefore, if either one of those is reliable, it       02:17:51

11    independently suffices to establish a -- a -- a

12    separate market.

13            But I myself am not, you know, vetting

14    one or the other.  I mean, I don't find anything

15    unreliable in them, but I'm not -- did not              02:18:08

16    independently assess the reliability of their

17    methodology.

18        Q.   What -- what is your opinion, then,

19    because you say you conducted a hypothetical

20    monopolist test and that requires finding that the      02:18:19

21    actual price is higher than the price in the

22    but-for world, doesn't it?

23        A.   Yes, it's much higher than the price in

24    the but-for world.

25        Q.   And if you have reliable evidence that         02:18:38
```

Page 143

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
1    the but-for world price is lower, how can you reach        02:18:41

2    that conclusion about the hypothetical monopolist

3    test?

4         A.   Well, I -- there's two reasons.  One

5    is -- this is a conditional opinion here.  If these        02:18:52

6    are -- if this is a reliable economic model, it

7    would independently show that the hypothetical

8    monopolist test was satisfied.  I also point out

9    that the -- in the Windows app distribution market,

10   commissions are, in fact, lower and                        02:19:10

11   Professor Economides has quantified the extent to

12   which they're lower.

13            And then in part 3, I analyze direct

14   evidence of Apple's power over price, which

15   independently, separate from what Economides and          02:19:26

16   Evans might say, also provides independent proof

17   that the hypothetical monopolist test was

18   satisfied.

19            And then finally, I discuss the

20   qualitative evidence that indicates that the              02:19:37

21   alternatives outside the positive market would not

22   be sufficiently constraining to prevent a 5 percent

23   price increase.

24        Q.   And your conditional hypothetical

25   monopolist test, then, doesn't actually come to a         02:19:56
```

Page 144

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    conclusion, does it, if you can't say that it rests      02:19:59

 2    on reliable assessments?

 3              MR. LOPEZ:  Objection.

 4              THE DEPONENT:  I -- I -- I don't -- I

 5    don't agree.  You know, I think often that is          02:20:08

 6    exactly what expert opinions say.  They say if the

 7    fact finder finds X, here is the economic

 8    implication of it.  You know, some issues were left

 9    to the fact finder or, perhaps in this case, the

10    judge.  And so I -- I am offering economic opinion     02:20:26

11    that this has an implication for market definition.

12    But I -- you know, I've never viewed as my role in

13    every case to recreate the wheel for everything

14    else some other expert might be doing.  We have

15    our -- our different assignments.                      02:20:45

16         Q.  (By Mr. Swanson)  And how does your

17    assignment differ from Professor Economides'?

18         A.   Well, I'm doing market definition, but he

19    is the one doing damages and who investigated

20    the -- the issue of what the but-for level of         02:21:02

21    pricing would be.

22         Q.  The but-for level of pricing of the

23    commission or the but-for level of pricing of apps?

24              MS. MANIFOLD:  Objection.

25              THE DEPONENT:  The commission.             02:21:17
```

Page 145

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Swanson)  Which of you is          02:21:20

 2   addressing the issue of common impact on class

 3   members?

 4        A.    I think we both are for different issues.

 5   I'm -- I -- the commonality of the fact of impact I    02:21:31

 6   think would be me.  And commonality on damages and

 7   damages methodology would be Professor Economides.

 8        Q.    Does Professor Economides, as you

 9   understand it, address commonality impact at all?

10             MR. LOPEZ:  Objection.                       02:21:51

11             THE DEPONENT:  Well, I think -- I mean, I

12   think when you quantify damages for everybody you,

13   you know, along the way show that there is an

14   impact on everybody.  So I guess the distinction is

15   my assessment of commonality of impact need not       02:22:05

16   involve a quantification of those damages.  It's

17   enough for me that there is an impact on

18   everybody -- every member of the class, I should

19   say.

20        Q.   (By Mr. Swanson)  Are you aware that         02:22:19

21   Dr. Evans presented a hypothetical monopolist test

22   in the Epic case and concluded from it that Apple

23   was a monopolist because it could profitably raise

24   its current App Store commission by more than

25   5 percent?                                             02:22:34
```

Page 146

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   I forget that part of it.  If -- if you        02:22:38

 2   did that, I would say that's a highly unduly

 3   conservative test for market definition because of

 4   the Cellophane Fallacy.

 5        Q.   Did you -- I apologize if I've asked you        02:22:51

 6   this, but did you review all of Dr. Evans' expert

 7   reports in the Epic case?

 8        A.   I -- I -- I looked at all of them.  I

 9   didn't read every single page of all of them.

10        Q.   And are you relying on Dr. Evans' expert       02:23:10

11   reports in the Epic case?

12        A.   Only -- well, there's a few things.  I

13   think mainly just this, though, that I -- I'm

14   relying on him for the position that if he's right

15   about what the competitive but-for commission would   02:23:27

16   have been, that that opinion, coupled with my

17   analysis, suffices to show the relevant market that

18   I define.

19             MR. LOPEZ:  Mr. Swanson, we've been going

20   a little over an hour.  Is it a good time for a         02:23:44

21   break?

22             MR. SWANSON:  Yeah, good time for a

23   break.

24             MR. LOPEZ:  Ten minutes?

25             MR. SWANSON:  Ten minutes.  All right.         02:23:50
```

                                              Page 147

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1            MR. LOPEZ:  Thank you.                    02:23:52

 2            THE VIDEOGRAPHER:  We're going off the

 3     record at 2:23 p.m.  This is the end of media 3.

 4            (Recess taken.)

 5            THE VIDEOGRAPHER:  We're on the record at  02:35:58

 6     2:36 p.m.  This is the beginning of media 5 [sic]

 7     in the deposition of Einer Elhauge.

 8        Q.   (By Mr. Swanson)  All right.  Professor,

 9     how do you define monopoly power?

10        A.   A substantial degree of market power.     02:36:18

11        Q.   And how do you define market power?

12        A.   Market power is a power over price or an

13     ability to exclude rivals.

14        Q.   Is that a legal definition or an economic

15     definition?                                       02:36:38

16        A.   Well, I think the market power -- the

17     first part of the power over price is an economic

18     definition.  The power to exclude part I think

19     comes more from, I guess, the -- the legal

20     standards, but whether such a power exists is an   02:37:02

21     economic conclusion.

22        Q.   As an economist do you agree that market

23     power is the ability to raise price profitably by

24     restricting output?

25        A.   That could be one measure of it, yes.     02:37:17
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   Is there another measure as an economist      02:37:25
 2   that you're aware of?
 3        A.   Well, yes, it could be just a power to
 4   exclude even if you don't raise prices.  And,
 5   you know, depending -- the one problem with, I         02:37:41
 6   guess, the power to exclude by reducing output, it
 7   sort of already assumes you know your market
 8   definitions.  So sometimes it's easier to define it
 9   as just a power to raise prices over competitive
10   levels.                                                02:37:58
11        Q.   How many members of the developer class
12   possess monopoly power in the markets in which they
13   sell their apps?
14             MR. LOPEZ:  Objection.
15             THE DEPONENT:  I have not assessed the       02:38:10
16   market power of any individual app developer.
17        Q.   (By Mr. Swanson)  Did you believe it's
18   likely, based on what you do know, that many
19   members of the developer class possess monopoly
20   power in the markets in which they sell their apps?    02:38:23
21             MR. LOPEZ:  Objection.
22             THE DEPONENT:  I -- as I said, I just
23   have not analyzed that issue.
24        Q.   (By Mr. Swanson)  So you have no opinion
25   as to whether all developers have monopoly power or    02:38:32
```

Page 149

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   no developers have monopoly power?                02:38:35

 2        A.   I think it's unlikely that all of them

 3   have monopoly power.  And whether any of them have

 4   monopoly power, I -- I don't know.  I haven't

 5   investigated it.                                   02:38:55

 6        Q.   How do you define monopsony power?

 7        A.   Monopsony power is a -- is a -- the same

 8   thing as monopoly power, only reversed as a buyer.

 9   It's just a buyer of power to lower prices or,

10   you know, use your power to exclude rivals.        02:39:11

11        Q.   Monopsony power, I'm sorry, is --

12   includes the power to exclude rivals?

13        A.   Yes.

14        Q.   Turn to page 9 of your report.  I wanted

15   to focus on your summary conclusion 7D.            02:39:38

16        Okay.  You state in paragraph 7D that

17   Apple has possessed monopoly power in the relevant

18   market you've defined throughout the class period.

19        Do you see that?

20        A.   Yes.                                     02:40:05

21        Q.   So are you referring to the period from

22   2015, 2015 forward?

23        A.   Yes.

24        Q.   Does your report contain any opinion of

25   yours about whether Apple had monopoly power, a    02:40:19
```

Page 150

```
 1    substantial market power prior to the beginning of       02:40:21

 2    the class period in 2015?

 3              MS. MANIFOLD:  Objection.

 4              THE DEPONENT:  I -- all the evidence I've

 5    seen suggests that its power was the same before,         02:40:32

 6    but I was only -- for purposes of the class-wide

 7    opinions, I -- I -- it was only relevant to me to

 8    reach opinions about during the class period.

 9        Q.   (By Mr. Swanson)  So have you reached any

10    opinion about whether Apple has monopoly power in        02:40:50

11    2012?

12              MS. MANIFOLD:  Objection.

13              THE DEPONENT:  I believe so.  I mean,

14    it's not -- not an opinion necessary for any of my

15    conclusions.  But all the evidence I've seen would       02:41:03

16    indicate that its power went back to the inception

17    of the iPhone.

18        Q.   (By Mr. Swanson)  So your -- your belief,

19    although not an opinion you're expressing in this

20    case, is that Apple was a monopolist from its first      02:41:18

21    sale in the App Store?

22        A.   I believe I said from the beginning it

23    imposed exclusivity and had a 100 percent market

24    share in that market from the evidence that I have

25    seen.                                                    02:41:35
```

1      Q.   So is that an opinion that you will offer        02:41:38

2   in this case?

3           MR. LOPEZ:  Objection.

4           THE DEPONENT:  It's not an affirmative

5   part necessary for my conclusions.  I think it is        02:41:47

6   an opinion I might offer in rebuttal to certain

7   arguments that I've seen, but I haven't -- I don't

8   think it's necessary for any of my conclusions.

9      Q.   (By Mr. Swanson)  Did you -- are you

10   aware of Dr. Evans' opinion that Apple did not have      02:42:07

11   monopoly power at the inception of the App Store?

12      A.   I'm not aware of -- of that opinion.

13      Q.   If Dr. Evans had that opinion you

14   disagree with it?

15      A.   Well, from the evidence I've seen yes.  I        02:42:29

16   guess I'd have to see what evidence he offered

17   for -- for that conclusion.  I mean, maybe he's

18   referring to the fact that initially there was no

19   paid apps, and so they -- they were just giving

20   their own apps certainly, but no app store, even.        02:42:45

21   So I'm not sure what he means by exactly the

22   inception of the iPhone, so I'd -- I'd have to look

23   more at his opinions to see what his basis is.

24      Q.   So -- so is it -- is it an opinion of

25   yours or just a belief that Apple had monopoly          02:43:02

Page 152

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | power in 2008? | 02:43:07 |
| 2 | MS. MANIFOLD:  Objection. | |
| 3 | THE DEPONENT:  I guess I would say -- | |
| 4 | well, 2008, I -- I don't remember the exact date | |
| 5 | when the App Store was first out and when they | 02:43:16 |
| 6 | first took paid apps. | |
| 7 | Q.  (By Mr. Swanson)  Okay.  2008. | |
| 8 | A.  Well, I'm -- I -- I don't know that, but | |
| 9 | maybe I'd have to look at that.  So it's not -- | |
| 10 | it's not a belief in the sense it's not like a | 02:43:31 |
| 11 | belief of faith.  It -- I would say it's a | |
| 12 | preliminary opinion based upon the evidence that | |
| 13 | I've seen.  But if I see contrary evidence, I guess | |
| 14 | I might draw a contrary conclusion about that.  But | |
| 15 | since I -- I didn't do a more thorough | 02:43:50 |
| 16 | investigation because it wasn't relevant to any of | |
| 17 | my opinions on class or for this report in general. | |
| 18 | Q.  Okay.  You calculated a market share on | |
| 19 | what you, I think, deem to be market share for | |
| 20 | Apple in what you called a broader, but incorrect, | 02:44:13 |
| 21 | market for mobile devices, for -- for -- for | |
| 22 | distribution services on mobile devices. | |
| 23 | Do you recall that? | |
| 24 | A.  Yeah, for app and digital in-app purchase | |
| 25 | distribution services on mobile devices. | 02:44:32 |

Page 153

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   And -- and what is your definition of        02:44:34

 2   mobile device?

 3        A.   It's basically, you know, smartphones and

 4   tablets.  So things you can carry around easily

 5   with you without being, you know, tethered to        02:44:45

 6   something bulkier.

 7        Q.   Are laptops or MacBooks with wireless

 8   connections not mobile devices in your opinion?

 9        A.   I think they're different.  They're

10   computers, although I do conservatively, for        02:45:02

11   purposes of defining the tablet market, include

12   certain laptops that have -- I can -- if I remember

13   there's some technical thing that some laptops kind

14   of resemble tablets even though they -- they seem

15   fairly different, and so one source included them.   02:45:25

16   Sorry.  Let me look at that and -- and tell you --

17   be more precise what I mean by that.

18             Yes.  This is at page 101.  There's these

19   two-in-one laptops with detachable screens that

20   is -- one data source are actually included in the   02:45:43

21   tablet market.  To be conservative, I included

22   them, but it does seem to me that the form and

23   function is different from Apple's tablets.

24        Q.   Are switch devices not mobile devices in

25   your opinion?                                        02:46:00
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1       A.   No.  They -- they're, I think,                02:46:03

2    three-and-a-half times the size, so they don't fit

3    conveniently in your pocket and they don't have the

4    same functionality as these mobile devices.  You

5    can't make calls on them.  You can only do -- play     02:46:16

6    games on them, certain more limited functions.  So

7    I would not say they're part of the smartphone or

8    tablet market.

9       Q.   Can Steam be accessed on some tablets

10   like the Microsoft Surface?                            02:46:34

11      A.   The Microsoft Surface -- oh.  Yeah, I

12   believe Steam operates on any Microsoft operating

13   system or can.

14      Q.   Are transactions on the Steam store in --

15   in this mobile -- mobile market?                       02:46:50

16      A.   On this -- on the laptop you said?

17      Q.   On the -- on the -- yes, on the Steam

18   insofar as it's --

19           (Simultaneously speaking.)

20           THE DEPONENT:  You said -- you said the        02:47:04

21   Surface though.  That's a laptop, not a tablet, I

22   would say.

23      Q.   (By Mr. Swanson)  And is that your

24   opinion?

25      A.   I think so.  Yes.  Now -- so I -- and          02:47:12

                                            Page 155

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    this one data source talked about detachable                02:47:17

2    screens.  It doesn't seem to me that the Surface

3    really has a detachable screen.  So, I mean, having

4    used both of them, I would say they're -- they're

5    very different, the Surface versus a -- a tablet.           02:47:32

6         Q.    What would you detach the Surface from?

7         A.    We detach it from the keyboard, I guess,

8    if that -- but I -- I don't know exactly what they

9    mean by two-in-one laptops with detachable screens.

10        Q.    Uh-huh.                                          02:47:49

11        A.    But maybe they include Surfaces, but I'm

12   not positive that that's what they were including.

13        Q.    Would you have -- do you have any Windows

14   tablet in this mobile market?

15        A.    The Windows tablets are incredibly small        02:48:02

16   market share, I believe, in this market, so we're

17   -- I have it down here in figure 4 they're -- I

18   guess it's not incredibly small.  They're small.

19   They're 10 to 18 percent.

20        Q.    So -- and Steam, the Steam store can be          02:48:25

21   accessed on those Microsoft tablets, correct,

22   whatever they are?

23             MR. LOPEZ:  Objection.  Foundation.

24             THE DEPONENT:  I -- I believe so, yes.

25        Q.    (By Mr. Swanson)  Okay.  So are                  02:48:39

                                                    Page 156

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1   transactions through the Steam store on Microsoft        02:48:41

 2   tablets in this mobile market?

 3        A.   Well, in this overly broadly defined

 4   market.  I mean, as I say in the report, I don't

 5   think that app -- the distribution in this broader      02:49:01

 6   market is correct.  Here I'm defining the

 7   smartphone markets and the tablet markets.  But for

 8   the purposes of the overly broad definition of the

 9   app in digital IAP distribution markets, I'm

10   including the App Store and the Google Play Store      02:49:34

11   as the two providers.  They're combined using them

12   as a denominator.  And here I -- I'm not

13   including -- yeah, here I'm following, you know,

14   the definition that's also being used by Apple

15   itself in its statements, a revenue share of all      02:50:02

16   app and digital IAP distribution services on mobile

17   devices and including basically Google, Android, I

18   guess, devices and these iOS devices.

19            This other source that I looked at for

20   power in the tablet market, as I said, I think is      02:50:20

21   overly broad, but to be conservative there to find

22   market power, I went with that definition.

23            MR. LOPEZ:  I didn't want to cut you off,

24   but I'm going to object again to that question on

25   the basis of foundation.                              02:50:34
```

Page 157

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   (By Mr. Swanson)  My question to you,        02:50:38

 2   Professor, is did you include Steam transactions in

 3   this mobile market since Steam is available on

 4   mobile devices?

 5             MR. LOPEZ:  Same objection.                   02:50:51

 6             THE DEPONENT:  Well, I -- I don't think

 7   that Steam is available on these mobile devices.  I

 8   think they're only available on -- on the computers

 9   that -- one data source, I thought, was incorrectly

10   including certain kinds of laptops in -- in the        02:51:11

11   market and I went through that to be conservative,

12   but I'm not including them for purposes of

13   section -- the -- the section C that goes from

14   pages 102 to 103.

15        Q.   (By Mr. Swanson)  Well, are you looking       02:51:28

16   at the App Store transactions that could be entered

17   into on these mobile devices or not?

18        A.   I -- I wouldn't include them as mobile

19   devices.

20        Q.   You don't include Microsoft tablets as       02:51:42

21   mobile devices?

22        A.   If it's a true tablet.  But if it's a

23   laptop, no.

24        Q.   Right.

25             And do you understand that Steam is          02:51:51
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

 1   available on Microsoft tablets?                          02:51:54

 2       A.   But I think true Microsoft tablets are --

 3   are very trivial market share, so that's why I

 4   think there's a -- a fine approximation to

 5   calculate the share in this overly broad market for     02:52:08

 6   all app distribution by including the App Store and

 7   the Google Play Store.

 8       Q.   So you disregarded it because you believe

 9   it's a trivial market share?  Is that why you

10   didn't include Steam transactions?                       02:52:23

11       A.   Well, we don't have any good data for it.

12   At least I don't currently.  And frankly, if there

13   was, I would include them in this calculation.  It

14   would not in any way change the class-wide nature

15   of the calculation.  It might change the numbers        02:52:41

16   somewhat, but it would remain the class-wide number

17   in a class-wide methodology.

18           Here I'm just trying to establish this --

19   you know, the existence of class-wide methodologies

20   for addressing the relevant issues on this              02:52:54

21   alternative market definition, that is -- that's

22   one I disagree with.

23       Q.   Professor, how does evidence that a firm

24   has been able to successfully exclude rivals

25   directly prove that the firm has market power?          02:53:10

                                                             Page 159

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   Well, unless you have power, you're not        02:53:13

 2   going to be able to exclude your rivals, because if

 3   you're able to impose a -- a condition that

 4   excludes your rivals, you must have enough market

 5   power to be able to impose that condition.           02:53:24

 6        Q.   Can you identify any specific iOS app

 7   stores that Apple excluded?

 8        A.   iOS app stores that they excluded.

 9   Well, sure.  I mean, I -- because -- what, Cydia

10   was one that had a very high market share and --    02:53:49

11   not high market share.  They had a -- a significant

12   amount of sales and, you know, typing exclusivity

13   restraints has sharply reduced those sales.

14        And I think Epic obviously was one and

15   they want to enter into this market, but they're    02:54:07

16   being excluded by the use of restraints.  And --

17   let's see.  I mentioned another one as well.

18        Yeah, and -- and I -- I would say not

19   that they've attempted to do so, but that Google,

20   Amazon and Steam are all very likely entrants and   02:54:39

21   thus they're being excluded currently by these

22   exclusivity restraints.  But in the but-for world,

23   I conclude that they are highly likely to enter.

24        Q.   And your opinion is that if Google

25   entered the but-for world, the relevant market that 02:54:56
```

Page 160

```
 1   you define would be more competitive, thanks to        02:54:59

 2   Google's participation?

 3       A.   Yes.  If Google was competing with Apple

 4   in the same market, the -- the market would be more

 5   competitive.                                           02:55:11

 6       Q.   Have you analyzed whether Apple's

 7   30 percent default commission rate was

 8   supracompetitive when adopted in 2008?

 9           MS. MANIFOLD:  Objection.

10           THE DEPONENT:  Yes.  I think this goes         02:55:28

11   back to the question you raised before.  My

12   preliminary opinion is it had monopoly power then,

13   so the price was anticompetitive from the get-go.

14       Q.   (By Mr. Swanson)  Is that opinion -- does

15   that opinion appear in your report?                    02:55:42

16       A.   No.  As I've already said, it wasn't

17   necessary for any of my conclusions.  But I think

18   it would be relevant if somebody tried to make the

19   argument that because it was 30 percent back then,

20   that that's a competitive commission.                  02:55:56

21       Q.   Are you familiar with the term "critical

22   mass" as it's used in connection with multisided

23   platforms?

24       A.   Yes.

25       Q.   Can you define the term?                      02:56:11
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        A.   Well, since the big issue in two-sided        02:56:15

 2   platforms is getting enough -- both sides onto the

 3   platform because there's these indirect network

 4   effects, you -- you need a critical mass of both

 5   developers and consumers to attract each other onto    02:56:29

 6   the platform.  So you need sufficient ones so it's

 7   economic to run the platform.

 8        Q.   What happens to platforms that do not

 9   attain critical mass?

10        A.   You -- you don't have enough -- I guess       02:56:46

11   you lose economies of scale and network effects and

12   so you can't operate as efficiently as if you can

13   get the critical mass.

14        Q.   Do you agree that an entrant into the

15   relevant market you define must attain critical        02:57:03

16   mass to be an effective competitor?

17             MS. MANIFOLD:  Objection.

18             MR. LOPEZ:  I'll join.

19             THE DEPONENT:  I mean, to be -- to

20   maximize its potential to be effective, it may be      02:57:17

21   they don't get to the critical mass but still are

22   an effective constraint.  So, you know, even less

23   efficient rivals can be a competitive constraint if

24   they're in the market.  But they wouldn't be as

25   efficient as they could be if they weren't able to     02:57:33
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    get to their critical mass.                        02:57:36

 2         Q.   (By Mr. Swanson)  How long would it take

 3    an entrant to attain critical mass in the relevant

 4    market you've defined?

 5              MR. LOPEZ:  Objection.                    02:57:43

 6              THE DEPONENT:  I have not reached a

 7    conclusion about that.

 8         Q.   (By Mr. Swanson)  Do you have an opinion

 9    as to when the App Store -- Apple's App Store

10    attained critical mass?                            02:57:56

11              MS. MANIFOLD:  Objection.

12              THE DEPONENT:  I -- I haven't reached a

13    conclusion about that.

14         Q.   (By Mr. Swanson)  Is it your opinion that

15    it happened instantly?                             02:58:04

16              MS. MANIFOLD:  Objection.

17              THE DEPONENT:  I'd have to investigate,

18    but my recollection was it was quite rapid, that

19    the iPhone was out and there was very quickly lots

20    and lots of apps on it and that there was no other  02:58:18

21    real game in town at the time.  They were,

22    you know, the market leader in developing this

23    whole -- this kind of smartphone with all these

24    apps on it.  So, you know, I think in some ways it

25    was easier in their day because they were the --    02:58:38
```

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    they had the first mover advantage.                        02:58:42

2        Q.   (By Mr. Swanson)  Do you think Apple

3    attained critical mass with 500 apps on the

4    App Store?

5        A.   I think it was certainly enough at the          02:58:50

6    time to be able to offer it.  I mean, they -- they

7    did offer it and the device was quite profitable

8    from the get-go.  So -- I mean, I think critical

9    mass, not necessarily an abstract number that

10   applies no matter what.  It may depend upon who       02:59:09

11   your rivals are.

12           So, you know, today to have 500 apps when

13   there's a million apps out there may not be enough,

14   but when you have the first 500 apps, then it could

15   be more than enough.                                     02:59:25

16       Q.   Well, at what point did Apple and

17   Google Play have the same number of apps on their

18   respective app stores?

19           MR. LOPEZ:  Objection.

20           THE DEPONENT:  I -- I don't know that        02:59:38

21   they have exactly the same number of apps on their

22   two app stores.  I haven't calculated that.

23       Q.   (By Mr. Swanson)  So you don't know

24   when -- when they each had the same number of apps

25   on their app stores?                                    02:59:53

                                                          Page 164

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1              MR. LOPEZ:  Objection.                    02:59:55

 2              THE DEPONENT:  You're having -- I guess

 3     you're testifying what's an factual premise that at

 4     some point they had exactly the same number of

 5     apps.  I haven't investigated to see whether that's   03:00:03

 6     true or not or -- and I don't really see the

 7     economic relevance to this case of it.

 8         Q.   (By Mr. Swanson)  Do you have an opinion

 9     as to whether the App Store attained critical mass

10     before or after it attained monopoly power?          03:00:17

11         A.   No.  I think -- I think for the

12     monopolist, you're the first mover, you have as

13     much mass as is going to be there.  So I think you

14     still had a monopoly over the product and I think

15     it's just a matter of building it up over time to     03:00:45

16     be sustainable.  But they -- they didn't really

17     have any competition in the very early days for

18     these developers.

19         Q.   When -- when, in your opinion, did Apple

20     first have competition for the developers?           03:01:02

21         A.   Well, there's never been any competition

22     for the developers on the iOS devices because

23     they had exclusivity from the very beginning, but

24     there could have been.  And I guess in the early

25     days, despite the restraints, Cydia was able to      03:01:18
```

                                                        Page 165

```
1   sell to jailbroken phones.  So they had some        03:01:23

2   competition there, but it was always dwarfed by

3   Apple.

4        Q.   And so your opinion is that Apple and

5   Google were never in competition for developers,     03:01:37

6   even back in the beginning?

7        A.   I think so, because developers could

8   always sell apps on both.  They -- they reach a

9   distinct and separate group of consumers.  So as I

10  explained in my report, it is an economic error to   03:01:56

11  confuse multihoming use of both of them with

12  competition between them or -- because there's

13  not -- they don't indicate substitution.  So if I'm

14  a developer and I offer an app on the

15  Google Play Store, it's not going to take away        03:02:12

16  sales from the iOS App Store because a very small

17  number of people even have both phones and probably

18  a lot -- lot of them are using them for different

19  purposes anyway.

20       Q.   In the but-for world, is it your opinion    03:02:30

21  that any rival app store will be preinstalled on

22  iOS devices?

23       A.   I -- I haven't reached a conclusion about

24  whether they would be preinstalled or just

25  something that could be installed later.             03:02:49
```

Page 166

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1        Q.   Well, in your but-for world, does every        03:02:53
 2   rival app store get downloaded by a consumer onto
 3   their iPhone?
 4        A.   Not necessarily.  I think it could be
 5   some consumers would prefer to just stick with the      03:03:10
 6   Apple App Store.  And that's fine.  That -- that
 7   would be their competitive choice.
 8        Q.   Do you have an opinion as to what
 9   percentage of consumers in the but-for world will
10   choose to remain with the Apple App Store and not       03:03:24
11   download an alternative app store?
12             MS. MANIFOLD:  Objection.
13             THE DEPONENT:  Yeah, I -- I don't.  As I
14   say in my report, the -- the -- the harm remains
15   common no matter what the particular consumers or       03:03:39
16   developers would do.
17        Q.   (By Mr. Swanson)  Well, if a consumer
18   doesn't download an alternative store, then a
19   developer can't reach that iOS consumer, can
20   they?                                                   03:03:54
21             MR. LOPEZ:  Objection.
22             THE DEPONENT:  Well, they might be able
23   to reach them outside the OS -- iOS device and
24   then they could copy over the iOS app into their
25   iOS device.  So that's one possibility.  But also       03:04:11
```

Page 167

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    the mere existence of a competitive constraint        03:04:13

 2    would lower commissions.  And -- and that, as I

 3    point out, would likely mean that developers would

 4    offer higher quality apps.  So those consumers

 5    would be harmed for that reason as well.               03:04:32

 6         Q.   (By Mr. Swanson)  Well, if, in the

 7    but-for world, 65 percent of consumers don't

 8    download -- don't download an alternative app store

 9    and 35 percent download alternative app stores and

10    only patronize those stores, will there be            03:04:50

11    competition for developers between those various

12    stores?

13              MR. LOPEZ:  Objection and object to the

14    form.

15              THE DEPONENT:  I mean, yeah, I think the     03:05:06

16    distributors would still -- well, they could

17    compete.  I mean, it -- it would seem to me if

18    that's the case, it would be logical for developers

19    just distribute to the both of them.  You don't

20    have to choose one or the other.  Just the            03:05:21

21    consumers may choose one or the other if they want,

22    but you want to reach both sets of customers.  So I

23    would think that the developers would distribute

24    both ways.

25         Q.   (By Mr. Swanson)  And that's just like      03:05:33
```

Page 168

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    Apple and Google right now, correct, in your view?       03:05:34

 2          MR. LOPEZ:  Objection.

 3          THE DEPONENT:  No, I don't think so,

 4    because there's not the same potential.  You can't

 5    run an iOS app on the Android device and you           03:05:41

 6    can't run an Android app on the iOS devices.

 7       Q.  (By Mr. Swanson)  But you can run the

 8    functionally identical app on either device if

 9    you're a developer, correct?

10          MR. LOPEZ:  Objection.                          03:05:54

11          THE DEPONENT:  Well, sometimes it's a

12    different app, though, on -- on the other device.

13    And while its consumers could switch back and forth

14    in this hypothetical world, they could just

15    download the other app distributor rather than the    03:06:07

16    one you hypothesize they pick.

17          You can't just -- you know, unless you

18    have both sorts of smartphones, you can't just

19    switch back and forth.  And, you know, only

20    2 percent of people who own an iPhone also own an     03:06:21

21    Android, a smartphone.  And of those, some of them

22    at least are probably using them for personal

23    versus work use.  So it's not clear even they can

24    substitute usage for the same kind of apps.

25       Q.  (By Mr. Swanson)  Are you aware that the      03:06:39
```

                                             Page 169

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | developer plaintiffs here allege that Apple has | 03:06:41 |
| 2 | abused monopsony power as a bottleneck retailer as | |
| 3 | an alternative allegation? | |
| 4 | A.   I -- I'm not sure -- I -- I -- I don't | |
| 5 | recall that.  I'm not quite sure what that means. | 03:06:58 |
| 6 | Q.   Have you analyzed whether Apple possesses | |
| 7 | monopsony power? | |
| 8 | A.   I -- I have not.  I think -- if I recall | |
| 9 | correctly -- now, it's been a while since I looked | |
| 10 | at this -- this is an alternative market definition | 03:07:16 |
| 11 | if you define market differently than one for app | |
| 12 | distribution and an iOS app distribution and | |
| 13 | in-app purchases, if you saw them instead as a | |
| 14 | purchaser.  But I -- I conclude it's a two-sided | |
| 15 | market for transactions, and so I think it's -- | 03:07:35 |
| 16 | given that, it's more natural just to think of them | |
| 17 | as -- as purchasers and, therefore, Apple as a | |
| 18 | monopolist.  But I guess you could have, you know, | |
| 19 | alternative market definitions where you view them | |
| 20 | as a monopsonist who is purchasing developer apps | 03:07:54 |
| 21 | to distribute.  That's just not my view of the -- | |
| 22 | of the right two-sided market definition here | |
| 23 | though. | |
| 24 | Q.   Are the opinions provided in your report | |
| 25 | valid under both a monopoly theory of harm and a | 03:08:10 |

Page 170

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    monopsony theory of harm?                              03:08:13

2          MR. LOPEZ:  Objection.

3          THE DEPONENT:  I -- I -- I think so.

4    If -- I mean, I may need to hear more about what,

5    you know, the details are about the monopsony        03:08:22

6    theory.  But generally, you know, the fact that you

7    could frame things an alternative way doesn't

8    really change the economic conclusion that they're

9    just flip sides of each other and -- so either way,

10   it's an exercise of power that is raising your        03:08:36

11   overall take of Apple and all these transactions

12   and whether you view them as increasing your take

13   as a purchaser or as a seller I don't think really

14   changes much.

15         Q.   (By Mr. Swanson)  What is the time frame    03:08:56

16   of your but-for world?  Is it 2015 forward?

17         A.   Yes.

18         Q.   What's the first event in the but-for

19   world that differs from the actual world?

20         A.   Well, I mean, we -- we don't have this     03:09:12

21   exclusivity restraint and -- so therefore, we have

22   competition now.  I think the competition would

23   exist from the beginning because the constraint

24   lasted, you know, earlier than that.  The class

25   period, as I understand it, is just defined this     03:09:24

                                             Page 171

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

1    way because of statute of limitations purposes.              03:09:26

2              So as I understand, you can't go further

3    back in terms of harm and everything.  But I think

4    there wouldn't have been these exclusivity

5    restraints for years before either.  All I'm just     03:09:39

6    saying is at least by June 2015, we would have had

7    meaningful competition and there would have been

8    lower commissions as a result.

9         Q.   Well, when are you assuming that

10   commissions are lower than if it's before the start   03:09:59

11   of the class period?

12        A.   In terms of the commissions being lower,

13   I'm saying that's true from at least June 2015 on.

14   I'm -- I'm not -- not necessary for me to reach any

15   conclusion before then because that's not something   03:10:17

16   being covered by this lawsuit.

17        Q.   Does your but-for world involve any

18   redesign of the iPhone or any other iOS device?

19        A.   No, I don't think so.  I think to the

20   contrary, I offer the conclusion that there would     03:10:37

21   be no reason to think that the absence of this

22   exclusivity restraint would lower the amount that

23   Apple invested in its devices.

24        Q.   So the identical devices would exist in

25   the actual -- in the but-for world; is that what      03:10:57

                                                           Page 172

```
 1   you're saying?                                        03:11:00

 2       A.   Yeah, I think the devices would be the

 3   same.  If anything, I think the difference might

 4   just be they'd invest it -- with competition they

 5   have more incentives to invest in better app review   03:11:10

 6   and do a better job of screening out malicious

 7   apps.  So I think it would be -- the app store part

 8   would be better, but the devices, it seems -- the

 9   evidence indicates that firms that have no

10   exclusivity in app distribution like, say, Samsung    03:11:29

11   or Apple itself in the Mac market, they invest very

12   similarly in those devices.

13       Q.   Would the iOS operating system be any

14   different in the but-for world compared to the

15   actual world?                                         03:11:46

16            MR. LOPEZ:  Objection.

17            THE DEPONENT:  I think only in the sense

18   if you couldn't condition it in this

19   anticompetitive way on exclusivity, but I don't

20   think that makes -- means that the iOS itself         03:11:58

21   would be any different.

22       Q.   (By Mr. Swanson)  Would there be any

23   change in the computer code to permit sideloading?

24            MR. LOPEZ:  Objection.

25            THE DEPONENT:  So that you have to ask a      03:12:10
```

Page 173

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

```
 1    technical expert whether you need to change that        03:12:12

 2    code in order to allow installation of rival app

 3    distribution or not.  I think, you know, Apple

 4    excludes in part through various technical ways,

 5    but in part through a lot of exclusionary             03:12:26

 6    agreements, as I mention in part 3 of the report.

 7    Whether those technical ways count as part of the

 8    iOS code or not is something you would have to ask

 9    a -- a computer expert.

10         Q.   (By Mr. Swanson)  Well, what -- what        03:12:42

11    technical ways, to use your term, would be absent

12    in the but-for world?

13         A.   Let's see.  Well, so for example, in

14    paragraph 251, in explaining how they extend the

15    restraint to in-app purchases and that the other     03:13:47

16    requirement is that developers have to incorporate

17    Apple's IAP/API into programming code in a way that

18    makes the app request that Apple initiate an in-app

19    purchase transaction whenever the user selects a

20    digital good to purchase.  So that's a requirement   03:14:05

21    that's causing a technical change in programming

22    code for the developer.

23              Then another example -- I'm not finding

24    the detail, but there was various technological

25    restraints that basically make certain apps expire   03:14:54
```

Page 174

CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

| | | |
|---|---|---|
| 1 | after -- like one that says seven days -- here, | 03:14:59 |
| 2 | paragraph 273, the technical restraints for free | |
| 3 | Xcode provisioning make it expire after seven days. | |
| 4 | So that's a technical restraint that is reinforcing | |
| 5 | a bunch of contractual restraints. | 03:15:14 |
| 6 | And for -- I can't remember -- one of the | |
| 7 | other ones had a different length of exclusionary | |
| 8 | period.  And then there are -- yes.  To get access | |
| 9 | to the Xcode that they need in order to write and | |
| 10 | create new native iOS apps, they have to sign | 03:15:37 |
| 11 | with these Xcode agreements.  So they're using | |
| 12 | their -- you know, control over the Xcode in order | |
| 13 | to impose that restraint.  And the limitations on | |
| 14 | jailbreaking itself are, you know, in -- in part | |
| 15 | technological and they've increased the difficulty | 03:15:57 |
| 16 | of jailbreaking over time by how they design the | |
| 17 | iOS devices and iOS operating system as I talk | |
| 18 | about in paragraph 280. | |
| 19 | Q.   And in your but-for world, jailbreaking | |
| 20 | is something that is easy to do? | 03:16:17 |
| 21 | MR. LOPEZ:  Objection. | |
| 22 | THE DEPONENT:  Well, in the but-for | |
| 23 | world, I think -- I think it would have to alter -- | |
| 24 | you could jailbreak it -- well, either it -- it | |
| 25 | would have to be designed -- essentially you | 03:16:34 |

Page 175