Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
Ted Wojcik (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com
tedw@hbsslaw.com

Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 256260)
Ben M. Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com
benh@hbsslaw.com

*Interim Lead Class Counsel*

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| DONALD R. CAMERON, *et al.*,<br><br>                              Plaintiffs,<br><br>        v.<br><br>APPLE INC.,<br><br>                              Defendant. | Case No. 4:19-cv-03074-YGR<br><br>**DEVELOPER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND SERVICE AWARDS**<br><br>Date:       June 7, 2022<br>Time:      2:00 p.m.<br>Judge:    Hon. Yvonne Gonzalez Rogers<br>Location: Courtroom 1- 4th Floor |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on June 7, 2022, at 2:00 p.m. or as soon thereafter as the matter may be heard by the Honorable Yvonne Gonzalez Rogers of the United States District Court for the Northern District of California, located in Courtroom 1, at 1301 Clay Street, Oakland, CA 94612, Developer Plaintiffs will and hereby do move the Court for an award of attorneys' fees, reimbursement of expenses, and service awards. This motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, the declarations in support of the motion, argument by counsel at the hearing before this Court, any papers filed in reply, such oral and documentary evidence as may be presented at the hearing of this motion, and all papers and records on file in this matter.

1

**TABLE OF CONTENTS**

2                                                                        <u>Page</u>

3   I.      PRELIMINARY STATEMENT .................................................................. 1

4   II.     PROCEDURAL HISTORY ..................................................................... 2

5   III.    THE WORK UNDERTAKEN BY THE DEVELOPER PLAINTIFFS ...................... 3

6           A.    Class Counsel completed a substantial pre-litigation
7                 investigation that led to a comprehensive, well-pleaded
                  complaint. .......................................................................... 3
8
            B.    Class Counsel engaged in substantial discovery efforts on behalf
9                 of the Settlement Class. ....................................................... 3

10                1.    Class Counsel coordinated with counsel for Consumer
11                      Plaintiffs and Epic to obtain critical discovery ...................... 3

12                2.    Class Counsel completed substantial written and
                        document discovery. ............................................................ 4
13
                  3.    Class Counsel took and defended more than twenty fact
14                      and 30(b)(6) depositions. .................................................... 6

15          C.    Class Counsel and their experts undertook a large amount of
16                expert discovery and analysis critical to class certification. .............. 6

17          D.    Class Counsel conducted extensive work on an amicus brief and
                  a comprehensive motion for class certification and settled
18                strategically with Apple to maximize recovery for the Settlement
                  Class. ................................................................................ 7
19
20  IV.     THE SETTLEMENT OBTAINED VALUABLE MONETARY AND
            STRUCTURAL RELIEF. ....................................................................... 8

21  V.      ARGUMENT .................................................................................... 9

22          A.    Class Counsel's fee request is reasonable. ................................. 10

23                1.    The requested fee award is reasonable under a
24                      percentage-of-the-fund analysis. ......................................... 11

25                      a.    Class Counsel achieved exceptional results for the
                              Settlement Class, including generating benefits
26                            beyond the cash settlement fund. ............................... 12

27                      b.    This case posed enormous risks and challenges. .............. 15

28

|   | | c. | The market rate for antitrust class action lawyers supports the fee request. | 17 |

c. The market rate for antitrust class action lawyers supports the fee request. ..................................................... 17

d. Counsel's litigation on a contingency basis supports the fee request. ......................................................... 18

e. The burdens faced by Class Counsel support the fee request ............................................................. 19

2. A lodestar cross-check confirms the reasonableness of the requested fees. .................................................. 19

B. Lead Class Counsel requests authorization to distribute fees among Class Counsel. ........................................... 23

C. The litigation expenses advanced were reasonable and necessary to secure the benefits obtained for the Class. ..................... 23

D. Plaintiffs request that the two class representatives be awarded reasonable service awards to compensate them for their dedication to this case. ............................................ 24

E. The Class received appropriate notice of Class Counsel's fee application. .................................................... 25

VI. CONCLUSION ...................................................... 25

# TABLE OF AUTHORITIES

**Pages(s)**

## CASES

*In re Animation Workers Antitrust Litig.*,
2016 WL 6663005 (N.D. Cal. Nov. 11, 2016) ................................................................ 20

*In re Anthem, Inc. Data Breach Litig.*,
2018 WL 3960068 (N.D. Cal. Aug. 17, 2018) ................................................................ 10

*In re Apple Inc. Device Performance Litig.*,
2021 WL 1022866 (N.D. Cal. Mar. 17, 2021) ........................................................ 10, 11

*In re Aremissoft Corp. Secs. Litig.*,
210 F.R.D. 109 (D.N.J. 2002) ........................................................................................ 22

*In re Auto. Refinishing Paint Antitrust Litig.*,
617 F. Supp. 2d 336 (E.D. Pa. 2007) ............................................................................. 15

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) .................................................................................... 22

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ........................................................... 10, 19, 20, 21

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ....................................................................................................... 10

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 3648478 (N.D. Cal. July 7, 2016). .................................................................. 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) .................................................................. 17

*Ching v. Siemens Indus., Inc.*,
2014 WL 2926210 (N.D. Cal. June 27, 2014) ................................................................ 18

*In re Corel Corp., Inc. Secs. Litig.*,
293 F. Supp. 2d 484 (E.D. Pa. 2003) ............................................................................. 13

*de Mira v. Heartland Emp't Serv., LLC*,
2014 WL 1026282 (N.D. Cal. Mar. 13, 2014) ............................................................... 11

*Dyer v. Wells Fargo Bank, N.A.*,
303 F.R.D. 326 (N.D. Cal. 2014) ................................................................................... 21

*Hartless v. Clorox Co.*,
273 F.R.D. 630 (S.D. Cal. 2011) .................................................................................... 23

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983) ................................................................................................. 11

*Hopkins v. Stryker Sales Corp.*,
   2013 WL 496358 (N.D. Cal. Feb. 6, 2013) .......................................................... 19

*In re Hyundai & Kia Fuel Economy Litigation*,
   926 F.3d 539 (9th Cir. 2019) ................................................................................. 17

*Kerr v. Screen Extras Guild, Inc.*,
   526 F.2d 67 (9th Cir. 1975) ............................................................................... 20, 21

*King Drug Co. of Florence v. Cephalon, Inc. (Provigil)*,
   2015 WL 12843830 (E.D. Pa. Oct. 15, 2015) ...................................................... 22

*Larsen v. Trader Joe's Co.*,
   2014 WL 3404531 (N.D. Cal. July 11, 2014) ...................................................... 14

*In re Lidoderm Antitrust Litig.*,
   2018 WL 11375216 (N.D. Cal. Sept. 20, 2018) ................................................... 17

*In re Linerboard Antitrust Litig.*,
   2004 WL 1221350 (E.D. Pa. June 2, 2004) .......................................................... 15

*In re Lithium Ion Batteries Antitrust Litig.*,
   2020 WL 7264559 (N.D. Cal. Dec. 10, 2020) .......................................... 13, 15, 23

*Meijer, Inc. v. Abbott Labs. (Norvir)*,
   2011 WL 13392313 (N.D. Cal. Aug. 11, 2011) ................................................... 18

*In re Mercury Interactive Corp. Sec. Litig.*,
   618 F.3d 988 (9th Cir. 2010) ................................................................................. 25

*In re NCAA Grant-in-Aid Cap Antitrust Litig.*,
   2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) .......................................... 13, 18, 20

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................ 23

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) ..........................................................................*passim*

*In re Pac. Enters. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ................................................................................... 17

*Perez v. Rash Curtis & Assocs*,
   2020 WL 1904533 (N.D. Cal. Apr. 17, 2020) .................................................. 10, 21

*Resurrection Bay Conserv. Alliance v. City of Seward*,
   640 F.3d 1087 (9th Cir. 2011) ............................................................................... 20

*Rodriguez v. W. Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................................ 24

*Stanger v. China Elec. Motor, Inc.*,
    812 F.3d 734 (9th Cir. 2016) ................................................................................ 20

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) ................................................................. 12, 14

*Steiner v. Am. Broad. Co., Inc.*,
    248 F. App'x 780 (9th Cir. 2007) ........................................................................ 21

*Steinfeld v. Discover Fin. Servs.*,
    2014 WL 1309692 (N.D. Cal. Mar. 31, 2014) ................................................... 21

*Stetson v. Grissom*,
    821 F.3d 1157 (9th Cir. 2016) .............................................................................. 20

*Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*,
    2005 WL 1213926 (E.D. Pa. May 19, 2005) ...................................................... 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ...................................................... 18

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., &
    Prod. Liab. Litig.*,
    2013 WL 12327929 (C.D. Cal. July 24, 2013) ........................................... 11, 12

*Vincent v. Hughes Air W.*,
    557 F.2d 759 (9th Cir. 1977) ............................................................................... 23

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) .....................................................................*passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ................................................................ 10, 11, 15, 22

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
    19 F.3d 1291 (9th Cir. 1994) ............................................................................... 18

**STATUTES**

15 U.S.C. § 1 .................................................................................................... 2, 7

**FEDERAL RULES**

Federal Rule of Civil Procedure 23(h) ................................................................... 10

Federal Rule of Civil Procedure 52 ................................................................... 3, 16

Federal Rule of Civil Procedure 54(d) ........................................................................ 10

**OTHER AUTHORITIES**

California, *Procedural Guidance for Class Action Settlements*,
http://www.cand.uscourts.gov/ClassActionSettlementGuidance .......................... 25

F. Patrick Hubbard, *Substantive Due Process Limits on Punitive Damages
Awards: "Morals Without Technique"?*, 60 Fla. L. Rev. 349 (2008)............................... 19

Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal
Practice*, 47 DePaul L. Rev. 267 (1998) ............................................................... 19

Theodore Eisenberg *et al.*, *Attorneys' Fees in Class Actions: 2009-2013* ............................... 17

# GLOSSARY OF TERMS

| Term | Description |
|---|---|
| Berman Decl. | Declaration of Steve W. Berman in Support of Developer Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Awards, concurrently filed herewith. |
| Cameron Decl. | Declaration of Donald R. Cameron in Support of Developer Plaintiffs' Motion for Attorneys' Fees, Expenses and Service Awards, concurrently filed herewith. |
| Carroll Decl. | Declaration of Katrina C. Carroll in Support of Developer Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Awards on Behalf of Lynch Carpenter LLP, concurrently filed herewith. |
| Class Counsel | Hagens Berman Sobol Shapiro LLP, Sperling & Slater, P.C., Saveri & Saveri, Inc., Freed Kanner London & Millen LLC, Lynch Carpenter LLP. |
| Consumer Action | *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-6714-YGR (N.D. Cal.). |
| Czeslawski Decl. | Declaration of Richard Czeslawski in Support of Developer Plaintiffs' Motion for Attorneys' Fees, Expenses and Service Awards, concurrently filed herewith. |
| ECF No. | Unless otherwise noted, all "ECF No." citations refer to this case: *Cameron et al. v. Apple Inc.*, No. 4:19-cv-0374-YGR (N.D. Cal.). |
| *Epic* Action | *Epic Games, Inc. v. Apple, Inc.*, No. 4:20-cv-5640-YGR (N.D. Cal.). |
| Jagher Decl. | Declaration of Jonathan M. Jagher in Support of Developer Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Awards on Behalf of Freed Kanner London & Millen LLC, concurrently filed herewith. |
| Kelly Decl. | Declaration of Eamon P. Kelly in Support of Developer Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Awards on Behalf of Sperling & Slater, P.C., concurrently filed herewith. |
| Lead Class Counsel | Hagens Berman Sobol Shapiro LLP. |
| Saveri Decl. | Declaration of R. Alexander Saveri in Support of Developer Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Awards on Behalf of Saveri & Saveri, Inc., concurrently filed herewith. |

1

## I.     PRELIMINARY STATEMENT

2          After more than two years of hard-fought litigation, Class Counsel for the Developer

3   Plaintiffs reached a settlement with Apple that secures a $100 million non-reversionary cash fund

4   for the Settlement Class and valuable structural relief that commits Apple to a range of reforms that

5   will enable developers to better create, distribute, and monetize their apps. As part of the structural

6   relief, Apple agreed to relax its anti-steering rules, acknowledged that this litigation was a driver

7   behind its Small Business Program (SBP), and agreed to maintain the SBP's 15 percent

8   commission rate for at least another three years, among other reforms. Although not all of the

9   structural relief in the settlement can be valued with precision, the SBP elements can be valued

10  and, most conservatively, they deliver at least an additional $35.44 million to the Settlement Class.

11  In light of the substantial risks and challenges faced down to obtain these strong results, Plaintiffs

12  respectfully request: (1) an award of $27,000,000 in attorneys' fees—equivalent to 19.9 percent of

13  the $135.44 million in quantifiable relief for the Class and 27 percent of the non-reversionary cash

14  fund; (2) reimbursement of $3,500,000 to cover most (but not all) of the out-of-pocket litigation

15  expenses incurred in this case; and (3) service awards of $5,000 for the two class representatives.

16         Class Counsel's $27 million fee request is reasonable. An award of 19.9 percent of the

17  $135.44 million in quantifiable relief (which includes the $35.44 million in SBP savings counted as

18  part of the common fund under Ninth Circuit law) is below this Circuit's benchmark of 25 percent.

19  But even if one were to disregard the SBP savings, the results obtained for the Settlement Class

20  justify a modest increase from the benchmark to 27 percent. The $100 million non-reversionary

21  cash fund alone constitutes between 30.4 and 34.6 percent of the maximum potential single

22  damages for the Settlement Class. That is a superb recovery, exceeding recoveries deemed

23  sufficient to justify awards of 30 or 33 percent of the common fund in other antitrust class actions.

24  Moreover, the Settlement's structural relief elements (individually, and collectively) confer

25  additional economic and practical benefits on the Settlement Class.

26         Counsel achieved these results despite facing significant risks and challenges. Developer

27  Plaintiffs presented novel monopolization claims challenging the fundamental business model of

28  one of the most well-resourced companies in the world, all on a contingency basis. This Court

1    explained in the preliminary approval order that "it is particularly aware of the risks of trial in this

2    case having tried and written a 185-page decision in the *Epic Games v. Apple* dispute."[1] Class

3    Counsel confronted these challenges with dogged and efficient work, culminating in a

4    comprehensive class certification motion supported by three detailed expert reports. Recognizing

5    the strength of their motion, but also the risks of a negative outcome in the *Epic v. Apple* trial,

6    Class Counsel settled strategically just weeks before this Court's post-trial rulings. This strategy

7    worked to the Class's benefit because the Court's rulings, adverse to Epic on many key issues,

8    would have substantially diminished Plaintiffs' settlement leverage in any future negotiations.

9         The reasonableness of the requested award is further confirmed by a "lodestar cross-check."

10   The requested award would lead to a modest multiplier of 2.47, which is well within the range of

11   multipliers approved in this district and affirmed by the Ninth Circuit. It is reasonable here given

12   the excellent results obtained for the Settlement Class in the face of serious risks and challenges.

13        Beyond fees, the requested expenses—the majority of which were for the experts whose

14   reports provided the foundation for Plaintiffs' class certification motion—were all necessary to the

15   representation of the Class. Additionally, the requested $5,000 service award to the two class

16   representative is also reasonable given the significant commitment to the Class and investment of

17   time provided to this case. Plaintiffs respectfully request that their motion be granted.

18                        **II.    PROCEDURAL HISTORY**

19        Developer Plaintiffs filed their initial complaint on June 4, 2019, and their Consolidated

20   Amended Complaint on September 30, 2019. *See* ECF No. 53. Asserting claims under the Sherman

21   Act and California's Unfair Competition Law, Developer Plaintiffs contended that Apple

22   monopolizes a relevant market for iOS app and in-app-product distribution services, charging iOS

23   app developers supracompetitive commissions.

24        Apple filed its answer on November 11, 2019. ECF No. 74. The Court subsequently

25   coordinated this action with *In re Apple iPhone Antitrust Litigation*, No. 4:11-cv-6714 and *Epic*

26   *Games, Inc. v. Apple, Inc.*, No. 4:20-cv-5640, for discovery purposes.

27   _____

28        [1] ECF No. 453 at 4.

1   Following class and merits-based discovery, Developer Plaintiffs moved for class

2   certification on June 1, 2021, one week after closing arguments in the *Epic* trial. *See* ECF No. 331.

3   On August 11, 2021, Apple filed its opposition to class certification. *See* ECF No. 376.

4   After extensive negotiations culminated in a final settlement agreement with Apple,

5   Developer Plaintiffs moved for preliminary approval of the settlement on August 26, 2021. ECF

6   No. 396. Approximately two weeks later, on September 10, this Court issued its Rule 52 Order

7   regarding the *Epic v. Apple* trial. *See Epic* Action, ECF No. 812. On November 16, 2021, this

8   Court granted Developer Plaintiffs' motion for preliminary approval of the settlement and set

9   deadlines for notice, objections, exclusions, and the final fairness hearing. ECF No. 453.

10   ### III.   THE WORK UNDERTAKEN BY THE DEVELOPER PLAINTIFFS

11   **A.   Class Counsel completed a substantial pre-litigation investigation that led to a comprehensive, well-pleaded complaint.**

12   The initial complaint brought by Lead Class Counsel Hagens Berman followed a detailed,

13   independent investigation into the facts and law underlying Plaintiffs' claims and the conduct at

14   issue. Berman Decl. ¶ 14. That investigation resulted in the comprehensive complaint filed on June

15   4, 2019. ECF No. 1. When Apple raised its intention to move to dismiss, this Court described the

16   complaint as setting forth an "articulated theory" of antitrust liability, *see* Oct. 7, 2019 Hrg. Tr. at

17   15:7, and indicated that the complaint would likely endure a 12(b)(6) motion. *See* Oct. 7, 2019 Hrg.

18   Tr. at 19:9-22 ("You know, a motion to dismiss, I don't -- that's not how this case is going to get

19   resolved."). Ultimately, Apple decided to answer the complaint, rather than file a motion to

20   dismiss. ECF No. 74. More than a year later, Epic brought individual claims against Apple under

21   similar theories. *See Epic* Action, ECF No. 1 (Aug. 13, 2020).

22   **B.   Class Counsel engaged in substantial discovery efforts on behalf of the Settlement Class.**

23

24   **1.   Class Counsel coordinated with counsel for Consumer Plaintiffs and Epic to obtain critical discovery.**

25   From the beginning of the case, Class Counsel sought to maximize efficiency and avoid

26   duplication by coordinating discovery efforts with the Consumer Plaintiffs. For example,

27   Developer and Consumer Plaintiffs jointly drafted proposed orders and protocols for coordinated

28

discovery, protection of confidential materials, expert discovery, and a discovery schedule. After the *Epic* case was related and the Court ordered discovery coordinated, Class Counsel continued to work collaboratively, now with two plaintiff groups, to aggressively pursue discovery. Berman Decl. ¶ 15. Apple often resisted these efforts, and Plaintiffs brought a series of discovery motions that were instrumental in developing a strong record in support of Plaintiffs' claims. *Id.*

### 2. Class Counsel completed substantial written and document discovery.

Developer Plaintiffs propounded detailed written discovery, including 89 document requests and thirteen interrogatories. Class Counsel also issued subpoenas to third parties for data and documents, including subpoenas to Google, Amazon, App Annie, and Epic. *Id.* ¶ 16.

Class Counsel spent thousands of hours analyzing Apple's written discovery responses and the documents produced by Apple and third parties. In total, Plaintiffs obtained documents from at least 19 Apple custodians and several third parties. Five million documents constituting 20 million pages were ultimately produced in this litigation. Apple also produced a 13-terabyte transactional dataset that Developer Plaintiffs and their experts have extensively analyzed. *Id.* ¶ 17.

To obtain this discovery, Developer Plaintiffs brought and prevailed, at least in part, on seven contested motions to compel, with some of the results summarized below.

| Discovery letter brief | Date filed | Outcome |
|---|---|---|
| Joint Statement Regarding Apple's Production of Documents Responsive to Consumer Plaintiffs' 2nd Set of Requests for Production of Documents, ECF No. 145 | Nov. 13, 2020 | Granted in part, ECF No. 192 |
| Joint Letter Brief Regarding Apple's Production of Cost and Expense Documents and Data, ECF No. 146 | Nov. 13, 2020 | Granted in part, ECF No. 192 |
| Joint Statement Regarding Apple's Production of Transactional Data, ECF No. 147 | Nov. 13, 2020 | Granted, ECF No. 192 |
| Joint Discovery Letter Brief Regarding Additional Apple Custodians, ECF No. 177 | Dec. 7, 2020 | Granted, ECF No. 192 |
| Joint Discovery Letter Brief Re: Number of Apple Depositions, ECF No. 199 | Dec. 17, 2020 | Granted, ECF No. 200 |
| Joint Discovery Letter Brief Regarding Cue and Federighi Depositions, ECF No. 241 | Jan. 20, 2021 | Granted, ECF No. 268 |
| Joint Discovery Letter Brief Regarding Cook Deposition, ECF No. 242 | Jan. 20, 2021 | Granted, ECF No. 268 |

These motions necessitated large amounts of time for meet-and-confers, briefing, and hearing preparation. Often, Plaintiffs coordinated briefing and argument with the Consumer Plaintiffs and/or Epic. Berman Decl. ¶ 19. In part due to the accelerated Epic discovery schedule, disputes had to brought to the court over a very short period of time, requiring intensive work by Class Counsel. The seven joint discovery letter briefs identified in the chart, for example, were filed in a two-month period that included the winter holidays. Moreover, as explained in Section III.B.3 *infra*, as these disputes were being briefed and argued, Counsel was also taking depositions of high-ranking Apple executives, intensifying the workload for Plaintiffs' core team of lawyers and staff.

For these and other reasons, Plaintiffs prioritized their discovery disputes based on issues critical to the case. For instance, following protracted negotiations with Apple over several months, on November 13, 2020, Plaintiffs filed two joint letter briefs in pursuit of materials germane to class certification and the merits: (1) ECF No. 146: Joint Letter Brief Regarding Apple's Production of Cost and Expense Documents and Data, and (2) ECF No. 147: Joint Statement Regarding Apple's Production of Transactional Data. The former joint letter brief involved a dispute over the data fields that Apple would produce in its transactional database, and the latter cost and expense information for the App Store that Apple claimed not to maintain.[2] The court largely granted Plaintiffs' motions,[3] and the data and information Apple was compelled to produce proved essential to Developer Plaintiffs' expert reports supporting class certification and, in particular, their showing of classwide impact and damages. Berman Decl. ¶ 20.

Other motion practice by Plaintiffs led to favorable discovery orders, including orders compelling Apple to produce documents from additional custodians (ECF No. 192); compelling Apple to produce additional deponents (ECF No. 200); and an order, after hotly contested briefing, compelling the full-length depositions of high-ranking Apple executives, including CEO Tim Cook, Senior Vice President of Services Eddy Cue, and Senior Vice President of Engineering

---

[2] *See* ECF No. 192 at 7.

[3] *See id.* at 6-7.

Craig Federighi (ECF No. 268). These depositions elicited testimony that featured prominently in Plaintiffs' motion for class certification. Berman Decl. ¶ 21.

### 3. Class Counsel took and defended more than twenty fact and 30(b)(6) depositions.

Developer Plaintiffs took 15 fact depositions (many of which lasted ten hours), with 484 exhibits introduced by the plaintiff groups at these depositions. To increase efficiency, Developer Plaintiffs, Epic, and the Consumer Plaintiffs coordinated on the topics for examination and split the allocated hours. In all, there were 44 fact and expert depositions in the coordinated cases up to date of settlement. Berman Decl. ¶ 22.

Because of the requirement to coordinate depositions with Epic and Epic's abbreviated discovery schedule, Developer Plaintiff took these depositions in rapid succession, with ten of them—including the depositions of the highest-level Apple executives—compressed within a two-week period from the January 28 to February 12, 2021. Berman Decl. ¶ 23. As a result, prior to moving for class certification, Developer Plaintiffs had already taken most, if not all, of the depositions needed for the merits. Moreover, Developer Plaintiffs' questioning at these depositions was important because Epic only asserted individual injunctive-relief claims; by contrast, Developer Plaintiffs had to show that class certification, and classwide damages, were appropriate. Plaintiffs elicited testimony critical for their theory of common impact and damages from several of Apple's most senior executives, including Eddy Cue and Phil Schiller, among others. *Id.*

In part to establish the facts needed for class certification, Developer Plaintiffs also served a 30(b)(6) deposition notice with 40 topics. Apple chose to spread these topics over several witnesses, so Class Counsel questioned these witnesses as individuals as well as corporate representatives of Apple. Plaintiffs also prepared extensively for, and defended, three expert and two class representative depositions. *Id.* ¶ 24.

### C. Class Counsel and their experts undertook a large amount of expert discovery and analysis critical to class certification.

Over the course of this litigation, Plaintiffs' experts provided critical support. These experts included Einer Elhauge, Professor of Law at Harvard University, and Nicholas Economides, Professor of Economics at NYU's Stern School of Business, and their team at Legal Economics, as

1   well as accounting expert Christian Tregillis and his team at Hemming Morse, LLP. The experts

2   provided insights into the cutting-edge technology markets at issue, informing Plaintiffs' legal

3   analyses and the discovery taken. For example, the experts assisted counsel with multiple rounds of

4   questions and answers with Apple about transactional and cost data, including meet and confers

5   that ultimately led to the successful motion to compel discussed *supra* (*see* Section III.B.2).

6   Plaintiffs' experts also assisted Class Counsel in preparing for the Rule 30(b)(6) depositions of

7   Apple's corporate designees, particularly with regard to issues affecting class certification, impact,

8   and damages. Plaintiffs and their economic and accounting experts also conducted extensive

9   analyses of the 13-terabyte transactional dataset produced by Apple, Apple's accounting

10  documents, and other documents and data produced in the course of discovery. Berman Decl. ¶ 25.

11       The experts' work culminated in the reports filed in support of Developer Plaintiffs' motion

12  for class certification, which totaled 472 pages. Professor Elhauge submitted a report that assessed

13  the core issues of defining the relevant market and assessing market power, common impact, and

14  other liability related topics. ECF No. 459-3. Professor Economides, in turn, assessed whether

15  damages to class members could be accurately determined using common evidence, and developed

16  a methodology for doing so. ECF No. 459-2. Finally, Mr. Tregillis analyzed financial information

17  available in this matter to calculate the operating profit and operating margin of both the App Store

18  and other internet marketplace platforms. ECF No. 459-4. These calculations were essential inputs

19  for one of Professor Economides's damages models.

20  **D.    Class Counsel conducted extensive work on an amicus brief and a comprehensive
21       motion for class certification and settled strategically with Apple to maximize
        recovery for the Settlement Class.**

22       Understanding the impact the *Epic v. Apple* trial could have on their case, on February 5,

23  2021, Class Counsel submitted an amicus brief regarding trial elements. *Epic* Action, ECF No.

24  326. Responding to Epic and Apple's Joint Submission, Class Counsel provided legal authority on

25  the relevant market analysis, the law governing Sherman Act claims, the Foreign Trade Antitrust

26  Improvements Act, California's Unfair Competition Law, and developer-focused issues. *Id.*

27       Then, on June 1, 2021, Developer Plaintiffs submitted a comprehensive motion for class

28  certification, just one week after closing arguments in the *Epic* trial. *See* ECF No. 331. As

explained above, Developer Plaintiffs' motion was supported by three detailed expert reports. The motions and the supporting reports provided strong support for the propositions that, *inter alia*, Apple's unlawful conduct caused injury to all or nearly all developers and that there was common evidence and a common methodology to prove damages.

Following the motion, Class Counsel prepared for and defended depositions of their three experts, each of which was taken by seasoned antitrust counsel. Berman Decl. ¶ 29. On August 10, 2021, Apple filed its opposition to class certification along with seven supporting expert reports. ECF No. 376. Apple simultaneously moved to compel Plaintiffs to produce a "trial plan" and to exclude certain of Developer Plaintiffs' experts' opinions under *Daubert*. ECF Nos. 371 & 380. Developer Plaintiffs filed administrative motions to strike these motions on August 13. ECF Nos. 382 & 384. Consumer Plaintiffs refiled these motions to strike in their own action, and the Court granted the former by Order dated November 8, 2021. *See* Consumer Action, ECF No. 573.

At that point, Plaintiffs had presented a strong motion for class certification, and had seen not only Apple's opposition to class certification, but also the bench trial of one developer's (Epic's) claims. Counsel understood the strengths and vulnerabilities of the developer case and settled strategically at that point—with the Settlement signed on August 24, 2021— to maximize recovery for the Settlement Class. ECF No. 451-1 at 36. This was an opportune time to settle. Just two weeks later, the Court issued its post-trial order in *Epic v. Apple*. The Court's rulings, adverse to Epic on many key issues, would have substantially diminished Plaintiffs' settlement leverage.

## IV.   THE SETTLEMENT OBTAINED VALUABLE MONETARY AND STRUCTURAL RELIEF.

The proposed Settlement establishes a $100 million monetary fund—the Small Developer Assistance Fund (SDAF)—from which Settlement Class members will receive direct distributions. The fund is non-reversionary; under no circumstances will any portion of the fund return to Apple. ECF No. 451-1 at § 1.29.

The Settlement also contains valuable structural relief. It acknowledges that this lawsuit was one driver behind Apple's 2021 launch of its Small Business Program, under which small developers (those earning up to $1 million per year) qualify for a lower 15% commission rate.

1  Under the Settlement, Apple has committed to maintain the Small Business Program's 15% rate for

2  at least another three years. Apple has also committed to revise its "anti-steering" Guidelines to

3  permit app developers to communicate directly with their customers regarding alternative payment

4  options. Apple has further agreed to institute and maintain a range of structural reforms that will

5  enable developers to better create, distribute, and monetize their apps.  *Id.* at § 5.1.[4]

6      Professor Economides estimates that the SBP, coupled with Apple's three-year

7  commitment under the Settlement to maintain its 15% tier, will save the Settlement Class $177.2

8  million in commissions. ECF No. 459-7 at ¶ 21. Developer Plaintiffs recognize that this case may

9  not be solely responsible for the SBP. Apple has cited two other contributing factors—the

10 Coronavirus and a desire to propel innovation by small developers. ECF No. 451-1 at § 2.3.

11 Weighing this litigation equal to these factors would be reasonable, but even assuming the case

12 played a lesser role, it still conferred millions of additional dollars on the Class. For example, even

13 if the litigation was 20% responsible for the SBP, that would mean that the litigation delivered an

14 additional $35.44 million to the Settlement Class ($177.2m x 0.20). Combining that amount with

15 the $100 million SDAF yields at least $135.44 million in quantifiable relief for the Class.

16                                    **V.      ARGUMENT**

17      Developer Plaintiffs respectfully request an award of $27 million in attorneys' fees—equal

18 to 19.9 percent of the $134.55 million in quantifiable relief obtained by the settlement.[5] Applying a

19 lodestar crosscheck, the requested fee award would result in a 2.47 multiplier of Class Counsel's

20 total lodestar of $10,923,265, not including fees spent on this motion, or fees Developer Plaintiffs

21 will incur through final approval, settlement distribution, and appeals. Plaintiffs also request

22 reimbursement of expenses incurred in this litigation of $3.5 million, which is approximately

23 $213,000 less than the expenses actually incurred by Class Counsel ($3,713,173.84). Finally,

24 Plaintiffs request that this Court grant service awards of $5,000 to the two class representatives.

25

26      [4] *See also* ECF No. 396 at 5-8 (discussing structural reforms in detail).

27      [5] Plaintiffs explain below that under Ninth Circuit case law, the total value of the settlement
   should include both the $100 million value of the SDAF and at least $35.44 million of the
28 quantifiable value of SBP. *See infra* at Section V.A.1.

1

**A.     Class Counsel's fee request is reasonable.**

Federal Rules of Civil Procedure 23(h) and 54(d) permit courts overseeing class actions to award reasonable attorneys' fees and costs. The Supreme Court has explained that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."[6]

In the Ninth Circuit, district courts may employ two different methods to calculate reasonable attorneys' fees: (1) the "lodestar" method, which multiplies the number of hours reasonably expended on the litigation by reasonable hourly rates, or (2) the "percentage-of-recovery" method.[7] "[C]ourts have discretion to choose which calculation method they use," but "their discretion must be exercised so as to achieve a reasonable result."[8] However, "the primary basis of the fee award remains the percentage method," with the lodestar used "merely [as] a cross-check on the reasonableness of a percentage figure."[9]

The benefits of applying the percentage-of-recovery method in this case are threefold. **First**, the method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."[10] **Second**, employing the percentage-of-recovery method incentivizes counsel to take cases on behalf of classes because it is consistent "with contingency fee calculations in the private market."[11] **Third**, it "reduc[es] the burden on the courts that a complex lodestar calculation requires," permitting courts to instead

---

[6] *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).

[7] *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015).

[8] *Bluetooth*, 654 F.3d at 942.

[9] *Vizcaino*, 290 F.3d at 1050 & n.5; *accord Perez v. Rash Curtis & Assocs*, 2020 WL 1904533, at *15 (N.D. Cal. Apr. 17, 2020) (Gonzalez Rogers, J.) (quoting *Vizcaino*, 290 F.3d at 1050).

[10] *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (citation omitted); *In re Anthem, Inc. Data Breach Litig.*, 2018 WL 3960068, at *5 (N.D. Cal. Aug. 17, 2018) (percentage-of-recovery method ensures that "Class Counsel's interests are aligned with the Class, and Class Counsel are incentivized to achieve the best possible result").

[11] *In re Apple Inc. Device Performance Litig.*, 2021 WL 1022866, at *2 (N.D. Cal. Mar. 17, 2021); *Anthem*, 2018 WL 3960068, at *5 ("[M]any courts utilize a percentage approach, which approximates the manner in which plaintiff contingent fee lawyers undertake work outside the class action context." (quoting 5 NEWBERG ON CLASS ACTIONS § 15:62 (5th ed. 2018))).

1    "focus on showing that a fund conferring benefits on a class was created through the efforts of

2    plaintiffs' counsel."[12] "In contrast, the lodestar [method] create[s] an unanticipated disincentive to

3    early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in

4    a gimlet-eyed review of line-item fee audits."[13]

5         In this case, while Plaintiffs believe that the percentage-of-the-fund method should be the

6    primary one used, both methods support Class Counsel's fee request.

7         **1.    The requested fee award is reasonable under a percentage-of-the-fund analysis.**

8         The fees requested by Plaintiffs are reasonable under a percentage-of-the-fund analysis. The

9    Ninth Circuit has established a benchmark of 25 percent to be used as a "helpful 'starting point'"

10   for analysis.[14] "That percentage amount can then be adjusted upward or downward depending on

11   the circumstances of the case."[15] Courts in this district have recognized that "in most common fund

12   cases, the award exceeds the benchmark."[16] At bottom, the Ninth Circuit asks district courts to

13   "reach[] a reasonable percentage" after "consider[ing] all the circumstances of the case."[17]

14        As a starting point, to determine the value of the common fund for the purpose of the

15   percentage-of-the-fund analysis, courts in the Ninth Circuit have included nonmonetary relief, in

16   addition to monetary compensation where, as here, it can be reasonably ascertained and valued.[18]

17   The Ninth Circuit held in *Staton* that the precise question is whether the value of the relief for class

18

19

20        [12] *Apple*, 2021 WL 1022866, at *2 (internal quotation marks omitted). As the Supreme Court
     has cautioned, requests for attorneys' fees "should not result in a second major litigation." *Hensley
21   v. Eckerhart*, 461 U.S. 424, 437 (1983).

22        [13] *Wal-Mart*, 396 F.3d at 121 (internal quotation marks omitted).

23        [14] *Online DVD*, 779 F.3d at 949, 955.

          [15] *de Mira v. Heartland Emp't Serv., LLC*, 2014 WL 1026282, at *1 (N.D. Cal. Mar. 13, 2014).

24        [16] *Id.* (quoting *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008)).

25        [17] *Vizcaino*, 290 F.3d at 1048.

26        [18] *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod.
     Liab. Litig.*, 2013 WL 12327929, at *29 & n.7 (C.D. Cal. July 24, 2013) (citing *Staton v. Boeing
27   Co.*, 327 F.3d 938, 973-74 (9th Cir. 2003), and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th
     Cir. 1998), *overruled in part on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338
28   (2011)) (holding that plaintiffs' experts appropriately included non-monetary benefits in
     calculating total value of common fund).

members can be "accurately ascertained."[19] In *Toyota Motor*, for example, the court held that the *Staton* test was satisfied where plaintiffs submitted expert reports that calculated the value of two types of nonmonetary relief at $877 million.[20] Analogously here, Professor Economides used Apple's transactional data and reasonable projections based on that data to calculate the savings on commissions due to the SBP at $177.2 million for Settlement Class Members (from inception through the three future years of existence guaranteed by the Settlement). Apple has identified this litigation as one of three factors prompting the SBP (ECF 451-1 at § 2.3), but Counsel has conservatively attributed 20% of the savings to the litigation and Settlement, equivalent to $35.44 million.[21] Combining that amount with the $100 million SDAF yields a total common fund of $135.44 million against which the reasonableness of Class Counsel's fee request may be assessed.

Class Counsel's $27 million fee request is 19.9% of the $135.44 million common fund, which is well below the Ninth Circuit's 25% benchmark. But even if one were not to count any of the SBP savings for the Class as part of the common fund, Counsel's 27% fee request ($27 million of the $100 SDAF) would be reasonable under each of the factors district courts may consider in the Ninth Circuit: (1) whether counsel achieved exceptional results for the class; (2) whether the settlement generated benefits beyond the cash settlement fund; (3) whether the case was risky for class counsel; (4) the market rate for the particular field of law; (5) whether the case was handled on a contingency basis; and (6) the burdens class counsel experienced while litigating the case.[22]

      **a.**    **Class Counsel achieved exceptional results for the Settlement Class, including generating benefits beyond the cash settlement fund.**

Class Counsel achieved an excellent outcome for the Settlement Class. Indeed, the $100 million SDAF established under the proposed Settlement is by itself an excellent result. According to Professor Economides's calculations, even if the Settlement Class were to obtain class certification, survive summary judgment, and prevail at trial, its members would stand to recover

---

[19] *Staton*, 327 F.3d at 974.

[20] *See Toyota Motor*, 2013 WL 12327929, at 29 & n.7. That $877 million was a large portion of a common fund valued at over $1.6 billion. *See id.*

[21] *See supra* at Section IV (explaining basis for that attribution).

[22] *Online DVD*, 779 F.3d at 954-55.

between approximately $289 million and $329 million in single damages.[23] Thus, the $100 million SDAF is equivalent to between 30.4 and 34.6 percent of potential single damages, and that is a superb monetary recovery in an antitrust class action. In *In re Cathode Ray Tube (CRT) Antitrust Litigation*, the court approved a settlement representing 20% of single damages and cited a survey of 71 settled antitrust cases which showed a weighted mean recovery of 19% of single damages.[24] This Court recently described a recovery of 11.7% of single damages as an "excellent" result and awarded Class Counsel just under 30% of the settlement fund.[25] Other courts have explained that in this district, even in megafund cases,[26] "[f]ar lesser results (with 20% recovery of damages or less) have justified upward departures from the 25% benchmark."[27] In fact, courts, including in antitrust action in this district, have awarded *33 percent* or more in fees where class plaintiffs recovered less than 20 percent of potential single damages for the class.[28]

Moreover, as set forth above, the relief afforded by this Settlement is not limited to the SDAF. The Settlement's structural relief elements (individually, and collectively) confer additional economic and practical benefits on the Settlement Class. To begin with, when the $35.44 million of the SBP savings is counted as part of the common fund, the total $135.44 million fund represents 41.2 to 46.9 percent of the Settlement Class's potential single damages.

But even if the Court concludes that this relief should not be counted as part of the common

---

[23] *See* ECF No. 459-7 at ¶ 10. These calculations are based on the transactional data Apple has produced in this action, which extends through April 26, 2021. *See id.* ¶ 8.

[24] *See* 2016 WL 3648478, at *7 & n.19 (N.D. Cal. July 7, 2016).

[25] *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *19-*20, *23 (N.D. Cal. Dec. 10, 2020).

[26] A megafund is generally defined as a "common fund[] of $100 million or more." *See Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*, 2005 WL 1213926, at *9 (E.D. Pa. May 19, 2005).

[27] *See In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *3 (N.D. Cal. Dec. 6, 2017), *aff'd*, 768 F. App'x 651 (9th Cir. 2019) (citing cases).

[28] *See* Order Granting Award of Attys.' Fees, Reimb. of Expenses & Incentive Payments, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-1819-CW (N.D. Cal. Oct. 14, 2011), ECF No. 1407 (33 percent awarded to IPP counsel); *Id.* at ECF No. 1375 (showing that 33 percent awarded, $41.322 million, was 15% of possible damages estimated by IPPs' expert in *SRAM*); *In re Corel Corp., Inc. Secs. Litig.*, 293 F. Supp. 2d 484, 489-90, 498 (E.D. Pa. 2003) (1/3 fee awarded from settlement fund that comprised about 15% of damages).

fund, the Ninth Circuit has held that the value of nonmonetary relief should be considered as a "'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself."[29] Indeed, the Ninth Circuit has held that "whether counsel's performance 'generated benefits beyond the cash settlement fund'" is an independent factor "courts may consider in assessing a request for attorneys' fees that was calculated using the percentage-of-recovery method."[30] Courts have cited non-monetary relief obtained in settlements as a factor supporting an upward departure from the 25 percent benchmark.[31] As attested to by the Named Plaintiffs, the broad benefits of the SBP, including the Settlement locking in the program for an additional three years, is of substantial value to the Settlement Class and other developers as well.[32]

This is not the only valuable structural relief obtained by the Settlement. As set forth in more detail in the preliminary approval motion, and in the declarations of the Named Plaintiffs accompanying that motion, commitments in the Settlement to improve app discoverability, pricing freedom, app review, and transparency will all assist the Settlement Class in monetizing and distributing their apps.[33] To provide one example, as Class Counsel and Counsel for Apple discussed with the Court at the preliminary approval hearing, Apple's commitment to publishing an annual transparency report will provide developers with objective data on, *inter alia*, search queries and results, so that developers can determine whether Apple is making meaningful improvements

---

[29] *Staton*, 327 F.3d at 974.

[30] *Online DVD*, 779 F.3d at 954-55 (quoting *Vizcaino*, 290 F.3d at 1049).

[31] *See, e.g.*, *Vizcaino*, 290 F.3d at 1049 (awarding counsel 28% of the cash settlement fund and explaining: "During the litigation, Microsoft agreed to hire roughly 3000 class members as regular employees and to change its personnel classification practices . . . ."); *Larsen v. Trader Joe's Co.*, 2014 WL 3404531, at *9 (N.D. Cal. July 11, 2014) (awarding counsel 28% and discussing that "[t]he settlement agreement also provides the equitable relief that Trader Joe's will stop using the disputed labels.")).

[32] *See* ECF No. 396 at 5-6, 12-13 (citing Declaration of Named Plaintiff Pure Sweat Basketball's CEO, Richard Czeslawski).

[33] *See id.* at 5-8.

to the search and discoverability of apps, common issues raised by developers.[34]

The Settlement also secured Apple's commitment to permit outside-app communications—specifically authorizing developers of all apps to alert customers to alternative payment mechanisms—which will confer additional economic benefits on the Settlement Class.[35] By informing customers of alternative payment options, developers can avoid paying Apple's commissions and, moreover, exert competitive pressure on Apple to discipline its pricing. Mr. Czeslawski—Named Plaintiffs Pure Sweat Basketball's CEO—considers this a "game changer" because the "ability to effectively communicate with [his] customers is the lifeblood of [his] business."[36] In its preliminary approval order, this Court "f[ound] [that] these structural benefits are valuable to the settlement class."[37]

### b. This case posed enormous risks and challenges.

That this recovery was obtained despite the case's risks, challenges, and complexities also supports the reasonableness of the fee request.[38] As this Court knows, "[a]ntitrust cases are particularly risky, challenging, and widely acknowledge[d] to be among the most complex actions to prosecute."[39] "The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated."[40] And this case was

---

[34] *See* ECF No. 451-1 at § 5.1.6; Nov. 2, 2021 Hr'g Tr. ("Prelim. Approval Hr'g Tr.") at 6-7. At the hearing, counsel for Apple and the Class committed to showing at final approval what the transparency report will look like, which Plaintiffs will do. *See* Prelim. Approval Hr'g Tr. at 6-7.

[35] *See* ECF No. 45-1 at § 5.1.3; ECF No. 459-7 at ¶¶ 23-24.

[36] *See* ECF No. 396-4 at ¶¶ 9, 12; *see also* ECF No. 459-7 at ¶ 24 (describing this structural relief as "a major change from Apple's previous policies [that] could bring substantial benefits to developers").

[37] ECF No. 453 at 5.

[38] *See Online DVD*, 779 F.3d at 955 (identifying this factor).

[39] *Batteries*, 2020 WL 7264559, at *15; *see also In re Linerboard Antitrust Litig.*, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) (the "antitrust class action is arguably the most complex action to prosecute" (quoting *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)); *In re Auto. Refinishing Paint Antitrust Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) ("[A]ntitrust class action is arguably the most complex action to prosecute. The legal and factual issues involved are always numerous and uncertain in outcome." (citation omitted)).

[40] *Batteries*, 2020 WL 7264559, at *15 (quoting *In re Super. Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990)); *see also Wal-Mart Stores*, 396 F.3d at 118 ("Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on

1   particularly challenging and risky.

2       *First*, Plaintiffs' liability theories challenged core principles of Apple's business model in

3   the iOS ecosystem, presenting novel and complex issues of antitrust law. Thus, Apple had every

4   incentive to expend the enormous resources of one of the largest companies in the world defending

5   this case, which it did. And if the Court disagreed with Plaintiffs' positions on these legal issues,

6   that alone could lead to zero recovery for the Settlement Class.

7       *Second*, and relatedly, the bench trial of one developer's claims versus Apple (Epic's)

8   presented many of the same legal issues as in the Developer Plaintiffs' case, and a trial outcome

9   adverse to Epic could pose an obstacle to Developer Plaintiffs' ability to establish liability or

10  substantial damages for any class of developers. At the time of settlement, Developer Plaintiffs had

11  seen the full trial and understood the strengths of their case, but also recognized potential

12  deficiencies in Epic's showing. The Court issued its Rule 52 post-trial order approximately two

13  weeks after Plaintiffs reached the settlement with Apple, and that decision, which rejected Epic's

14  Sherman Act claims, confirmed the hurdles that Plaintiffs would have faced in prevailing on the

15  merits in this Court.

16      *Third*, at the time of settlement, Developer Plaintiffs had not passed the class certification

17  threshold. Developer Plaintiffs presented a class certification motion supported by three

18  outstanding experts, who had all been deposed by the time of settlement, and Plaintiffs had

19  reviewed Apple's opposition to Plaintiffs' class certification motion. Plaintiffs believe that the

20  strength of their class certification papers is one factor that led to the excellent monetary and

21  nonmonetary relief obtained by the Settlement. However, Class Counsel also understood

22  experience, including in the *Batteries* case, that class certification is never certain and that if the

23  Court denied certification, counsel's likelihood of obtaining significant monetary or structural

24  relief for developers would vastly decrease.

25      Class Counsel's ability to secure a large settlement fund and structural relief in the face of

26

27  —————————————————

    appeal." (quoting *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y.
28  1998)).

1

these risks supports the fee award requested.[41]

2

### c. The market rate for antitrust class action lawyers supports the fee request.

3

4

Whether the Court holds that the percentage of fees sought from the common fund is 19.9

5

or 27 percent, both fall well within the market rate for class counsel in the "particular field of law,"

6

which often includes comparisons to the fee percentages awarded in analogous cases.[42] In a 2021

7

analysis for the 2020 Antitrust Annual Report, Professor Joshua Davis found that among antitrust

8

class action settlements surveyed between 2009 and 2020, the median fee awarded for settlements

9

between $100 million and $249 million was *30 percent*—and only in the range from $250 million

10

to $499 million (and higher) did that median fee percentages drop to 25% (here, the fee request is

11

19.9% if the common fund is considered $135.44 million and 27% if considered $100 million). *See*

12

Berman Decl., Ex. 14 at 29. Professors Theodore Eisenberg, Geoffrey Miller, and Roy Germano

13

found in an earlier 2017 study discussed in an NYU Law Review article (EMG Study), that of the

14

19 antitrust settlements surveyed between 2009 and 2013 with a mean recovery of $501.09 million

15

and a median recovery of $37.3 million, the mean and median percentages awarded were 27

16

percent and 30 percent, respectively.[43]

17

In large antitrust class actions, courts within this district, including by this Court, have

18

awarded fees exceeding what is requested here. Data from analogous cases show that Counsel's

19

percentage fee request—whether identified as 27 or 19.9 percent of the common fund—is

20

21

[41] The *en banc* court in *In re Hyundai & Kia Fuel Economy Litigation*, 926 F.3d 539, 571 (9th Cir. 2019) (alteration in original), noted that upward departures are not unusual in high-risk cases:

22

> We have affirmed fee awards totaling a far greater percentage of the class recovery than the fees here. *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-48 (9th Cir. 2002) (no abuse of discretion to award fees constituting 28% of the class's recovery given "risk" assumed in litigating); *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (no abuse of discretion where the "$4 million award (thirty-three percent [of the class's recovery]) for attorneys' fees is justified because of the complexity of the issues and the risks").

23

24

25

26

[42] *See Online DVD*, 779 F.3d at 955; *Vizcaino*, 290 F.3d at 1049-50.

27

[43] Theodore Eisenberg *et al.*, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937, 952 (2017).

28

1    reasonable.[44] And counsel here obtained structural relief for the Class as well.

2         **d.    Counsel's litigation on a contingency basis supports the fee request.**

3         The Ninth Circuit has held that a fair fee award should consider the contingent nature of the

4    fee.[45] It is also well established that attorneys who take on the risk of a contingency case should be

5    compensated for the risk they assume.[46] As the *NCAA* court recently explained,

6              In short, contingent fees are good for clients and the public alike. In
              exchange for increased predictability, decreased bean counting, and
7              unlimited protection against downside risks—including the risk of a
              zero[-]dollar recovery—a client agrees to pay its attorneys an
8              enhanced fee if and only if the client recovers. And because contingent
              fees are almost always determined as a percentage of the client's
9              recovery, such fees are necessarily aligned with and proportional to
              the results achieved for that client—in short, the client only pays for
10             what it gets. Lest contingent fees disappear altogether, the law must
              recognize both sides of the bargain—namely, a significant upside fee
11             for successful contingent representations.[47]

12        Class Counsel litigated this case purely on a contingency fee basis—with no upfront

13   retainer fees or allowance for expenses. Berman Decl. ¶ 6. The contingent nature of Class

14   Counsel's engagement incentivized counsel to both achieve excellent results for the Class and to do

15   so as efficiently as possible. It also presented a very real risk that Counsel would receive nothing at

16   all, including no reimbursement for the substantial cash outlays this case required for experts and

17   other litigation expenses.[48] The market rate for contingency representation is generally 33 percent,

---

18        [44] *See, e.g.*, *In re Lidoderm Antitrust Litig.*, 2018 WL 11375216, at *3 (N.D. Cal. Sept. 20,
19   2018) (27.5 percent for direct purchaser settlement); *In re Cathode Ray Tube (CRT) Antitrust
     Litig.*, 2016 WL 4126533, at *1 (N.D. Cal. Aug. 3, 2016) (27.5 percent for IPP settlement); *In re
20   TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *8 (N.D. Cal. Apr. 3, 2013) (28.6
     percent for IPP settlement); *Order Granting Award of Attys.' Fees, Reimb. of Expenses &
21   Incentive Payments, supra note 28 (33 percent for IPP settlement); *Meijer, Inc. v. Abbott Labs.
     (Norvir)*, 2011 WL 13392313, at *2 (N.D. Cal. Aug. 11, 2011) (33 percent for direct purchaser
22   settlement).

         [45] *See, e.g.*, *Online DVD*, 779 F.3d at 954-55 & n.14; *Vizcaino*, 290 F.3d at 1050.
23
         [46] *See In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1299 (9th Cir. 1994); *see
24   also, e.g.*, *Ching v. Siemens Indus., Inc.*, 2014 WL 2926210, at *8 (N.D. Cal. June 27, 2014)
     ("Courts have long recognized that the public interest is served by rewarding attorneys who assume
25   representation on a contingent basis with an enhanced fee to compensate them for the risk that they
     might be paid nothing at all for their work.").

26       [47] *NCAA*, 2017 WL 6040065, at *4 (citation omitted).

27       [48] *Id.* at *5 ("[C]ounsel for the classes have spent more than three years investigating and
     litigating this case, without receiving any compensation to do so. Such burdens are significant,
28   even for law firms of the stature of plaintiffs' counsel").

---

1    which further confirms the reasonableness of the fee request here.[49]

2                    **e.    The burdens faced by Class Counsel support the fee request.**

3            The Ninth Circuit instructs district courts to consider the burdens class counsel experienced

4    while litigating the case (e.g., cost, duration, and foregoing other work). This litigation has been

5    pending for two-and-a-half years. As explained in Section V.A.2, *infra*, Class Counsel has

6    advanced substantial sums out-of-pocket (more than $3.71 million) and devoted substantial time to

7    this litigation—20,531 hours, for a lodestar of more than $10.92 million—and foregone other work

8    while litigating this case. Berman Decl., ¶ 6.

9            **2.    A lodestar cross-check confirms the reasonableness of the requested fees.**

10           The Ninth Circuit has held that "a crosscheck using the lodestar method can confirm that a

11   percentage of recovery amount does not award counsel an exorbitant hourly rate."[50] Here, Class

12   Counsel invested 20,531 hours, representing $10,923,265 in attorneys' fees, in this litigation. This

13   does not include time on this fee motion, and the lodestar will increase through final approval,

14   distribution of the settlement funds, and any appeals. Plaintiffs' fee request equates to a 2.47

15   multiplier of the current lodestar, which is within the range of multipliers awarded in similar cases.

16           Lodestar is calculated "by multiplying the number of hours the prevailing party reasonably

17   expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate

18   for the region and for the experience of the lawyer."[51] The lodestar calculation here is reasonable.

19   First, Class Counsel's current billing rates, summarized in each firm's declaration, are within the

20

21           [49] *Vizcaino*, 290 F.3d at 1049 (explaining that fees requested were at or below "the standard
22   contingency fee for similar cases," supporting the reasonableness of the request); F. Patrick
     Hubbard, *Substantive Due Process Limits on Punitive Damages Awards: "Morals Without*
23   *Technique"?*, 60 Fla. L. Rev. 349, 383 (2008) (discussing "'the usual 33-40 percent contingent
     fee'" (quoting *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 677 (7th Cir. 2003))); Herbert
24   M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DePaul L. Rev.
     267, 286 (1998) (reporting the results of a survey of Wisconsin lawyers, which found that "[o]f the
25   cases with a [fee calculated as a] fixed percentage [of the recovery], a contingency fee of 33% was
     by far the most common, accounting for 92% of those cases"); *Hopkins v. Stryker Sales Corp.*,
26   2013 WL 496358, at *3 (N.D. Cal. Feb. 6, 2013) (awarding 30% fee because the "case was
     conducted on an entirely contingent fee basis against a well-represented Defendant").

27           [50] *Online DVD*, 779 F.3d at 949 (internal quotation marks and citation omitted).

28           [51] *Bluetooth*, 654 F.3d at 941.

range that have been approved as reasonable by courts in this judicial district.[52] Second, the

lodestar in this case reflects the meaningful steps that Lead Class Counsel took to ensure that Class

Counsel's work was efficient, and the hours expended for only reasonable and necessary work.

Lead Class Counsel, Hagens Berman, limited work on this case to only five firms, with 60.5

percent of the hours billed by Lead Class Counsel. Berman Decl. Ex. 6. Class Counsel also audited

the hours included in the lodestar, deleting potentially duplicative, less efficient, or non-

compensable time. *Id.* ¶ 46. Lastly, this lodestar is supported by detailed time records. *Id.* ¶ 44.

A court may give an upwards adjustment to a lodestar (through a positive multiplier) to

reflect a host of "reasonableness" factors, including: (1) the amount involved and the results

obtained, (2) the time and labor required, (3) the novelty and difficulty of the questions involved,

(4) the skill requisite to perform the legal service properly, (5) the preclusion of other employment

by the attorney due to acceptance of the case, (6) the customary fee, (7) the experience, reputation,

and ability of the attorneys, and (8) awards in similar cases.[53] These are referred to as the *Kerr*

"reasonableness" factors after the Ninth Circuit's opinion in *Kerr v. Screen Extras Guild, Inc.*, 526

F.2d 67, 70 (9th Cir. 1975).[54] Each of these factors supports the requested multiplier of 2.47.

***Results for the Class.*** The first factor—"benefit obtained for the class"—is the most

---

[52] Berman Decl., Ex. 1; Saveri Decl., Ex. 2; Jagher Decl., Ex. B; Kelly Decl., Ex. A; Carroll Decl., Ex. B; *see, e.g.*, *In re Animation Workers Antitrust Litig.*, 2016 WL 6663005, at *6 (N.D. Cal. Nov. 11, 2016) (hourly rates ranging from $275 to $1,200 were "fair, reasonable, and market-based, particularly for the 'relevant community' in which counsel work" more than five years ago); *NCAA*, 2017 WL 6040065, at *9 (reputable survey of 2015 rates for California attorneys showed range of $200 to $1,080). Class Counsel's lodestar is based on the 20,531 hours they have invested in prosecuting this action, multiplied by the *current* hourly rates for the timekeepers that worked on this case, consistent with Ninth Circuit law. Berman Decl. ¶ 42; *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016) ("The lodestar should be computed either using an hourly rate that reflects the prevailing rate as of the date of the fee request, to compensate class counsel for delays in payment inherent in contingency-fee cases, or using historical rates and compensating for delays with a prime-rate enhancement."); *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 740 (9th Cir. 2016) (same, holding that it is an abuse of discretion for a district court to calculate lodestar otherwise).

[53] *Bluetooth*, 654 F.3d at 941-42.

[54] The Supreme Court has since called into question the relevance of two of the original *Kerr* factors: the contingent nature of the fee, and the "desirability" of the case. *See Resurrection Bay Conserv. Alliance v. City of Seward*, 640 F.3d 1087, 1095 n.5 (9th Cir. 2011). Other factors such as "time limitations imposed by the client or the circumstances" and "the nature and length of the professional relationship with the client" do not readily apply here.

important consideration in assessing fees.[55] As outlined above (*see supra*, Section V.A.1.a), Class Counsel obtained exceptional results, including a substantial monetary recovery, as well as several important structural reforms. These results alone support an upwards lodestar adjustment.

*Counsel's Expenditure of Resources.* Class Counsel has devoted substantial resources to this case during the pendency of more than two years of litigation. Class Counsel prevailed on seven fiercely contested motions to compel, leading to the discovery of documents and data critical to Developer Plaintiffs' case. Class Counsel also took the depositions of fifteen Apple employees, including some of highest-ranking Apple executives, and elicited testimony that was relied on in Plaintiffs' class certification motion. Class Counsel and their dedicated team also reviewed millions of pages of documents produced by Apple and subpoenaed third parties. This same team gathered an enormous amount of evidence that was used in support of Developer Plaintiffs' comprehensive motion for class certification and the supporting expert reports.

Attorneys and professionals at Class Counsel's firms have spent 20,531 hours working on this case toward the lodestar of $10,923,265 (no hours in connection with this fee motion are being counted toward the lodestar). *See* Berman Decl. ¶ 42, Ex. 6. Class Counsel also has $3,713,173.84 in unreimbursed expenses. *See id.* ¶ 52, Exs. 4 & 7.

*Comparison to other cases.* The sixth and eighth *Kerr* factors—the customary fee and awards in similar cases—both support Class Counsel's fee request. Class Counsel's requested lodestar multiplier of 2.47 is within the range of multipliers approved in this district and affirmed by the Ninth Circuit.[56] For example, in *Vizcaino*, the Ninth Circuit upheld a 28% fee award that constituted a 3.65 multiplier. The court also surveyed the multipliers applied in common fund settlements between $50 and $200 million, and found that 20 of the 24 cases it surveyed had a

---

[55] *Bluetooth*, 654 F.3d at 942.

[56] *See, e.g.*, *Steiner v. Am. Broad. Co., Inc.*, 248 F. App'x 780, 783 (9th Cir. 2007) (affirming fee award with multiplier of 6.85 as "fall[ing] well within the range of multipliers that courts have allowed"); *Perez*, 2021 WL 4503314, at *5 (approving fees of 37% of $75 million settlement fund, a lodestar multiplier of 4.8); *Steinfeld v. Discover Fin. Servs.*, 2014 WL 1309692, at *2 (N.D. Cal. Mar. 31, 2014) (approving fee that resulted in a 3.5 multiplier); *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) (finding a 2.83 multiplier appropriate).

1    multiplier between 1.0 and 4.0.[57] Similarly, a decision in the Southern District of New York

2    explained that "Courts regularly award lodestar multipliers of up to eight times the lodestar, and in

3    some cases, even higher multipliers."[58] A recent empirical study of attorneys' fees in class action

4    settlements found that the mean multiplier for recoveries greater than $67.6 million was 2.72.[59]

5        **High Level of Skill Required.** Class Counsel explained in detail in Section V.A.1.b, *supra*,

6    that this case was risky and presented novel and difficult challenges that had to be met head on to

7    achieve this Settlement. These risks include those that attend antitrust cases in general, widely

8    acknowledged as some of the most complex cases. In addition, here Plaintiffs challenged the

9    business model of one of the largest and most well-lawyered companies in the world, presenting

10   novel and complex issues of procedural and antitrust law. Developer Plaintiffs also faced the added

11   risk of being undercut by an adverse outcome in the *Epic v. Apple* trial, which would pose an

12   enormous obstacle to establishing liability and proving damages. In the preliminary approval order,

13   the Court explained that "it is particularly aware of the risks of trial in this case having tried and

14   written a 185-page decision in the *Epic Games v. Apple* dispute." ECF No. 453 at 4.

15       **Class Counsel has foregone other employment for this case.** Hagens Berman dedicated a

16   core team of experienced antitrust attorneys to this action, supported by attorneys and staff from

17   only four other firms. The consequence of this is that several of these professionals worked nearly

18   exclusively on this case and forwent other employment while doing so. Class Counsel have

19   dedicated a total of 20,531 hours to this case, and many attorneys and other professionals have

20   devoted many thousands of hours each. *See, e.g.*, Berman Decl. ¶ 47, Exs. 1, 6. Counsel's choice to

21   commit resources to the Settlement Class in lieu of other work supports the request for fees.

22       **Class Counsel's Reputation.**  Class Counsel Hagens Berman, Sperling & Slater, Saveri &

23

---

24       [57] *Vizcaino*, 290 F.3d at 1050-51 & n.6.

25       [58] *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) (collecting cases); *see also, e.g.*, *Wal-Mart Stores*, 396 F.3d at 123 (finding 3.5 multiplier reasonable); *King Drug Co. of Florence v. Cephalon, Inc. (Provigil)*, 2015 WL 12843830, at *6 (E.D. Pa. Oct. 15, 2015)

26   (awarding a $140.8 million fee equating to 27.5% of the settlement fund and a 4.12 multiplier); *In re Aremissoft Corp. Secs. Litig.*, 210 F.R.D. 109, 134-35 (D.N.J. 2002) (awarding 28% of a

27   settlement, resulting in a lodestar multiplier of 4.3).

28       [59] EMG Study, 92 N.Y.U. L. Rev. at 967.

1    Saveri, Freed Kanner, and Lynch Carpenter are among the most well-respected class action

2    litigation firms in the country. The firms have been recognized in courts throughout the U.S. for

3    their ability and experience in handling major class litigation efficiently and obtaining outstanding

4    results for their clients. *See* Berman Decl., Ex. 13; Saveri Decl., Ex. 1; Jagher Decl., Ex. A; Kelly

5    Decl., ¶ 2; Carroll Decl., Ex. A.

6    **B.    Lead Class Counsel requests authorization to distribute fees among Class Counsel.**

7           Consistent with customary practice, including by this Court, Lead Class Counsel requests

8    the Court's authorization to distribute any awarded attorneys' fees in a manner that, in the

9    judgment of Lead Class Counsel, fairly compensates each law firm for its contribution to the

10   prosecution of Plaintiffs' claims. "[F]ederal courts routinely affirm the appropriateness of a single

11   fee award to be allocated among counsel and have recognized that lead counsel are better suited

12   than a trial court to decide the relative contributions of each firm and attorney."[60]

13   **C.    The litigation expenses advanced were reasonable and necessary to secure the benefits obtained for the Class.**

14

15          Counsel who have created a common fund for the benefit of a class are entitled to be

16   reimbursed for out-of-pocket expenses reasonably incurred in obtaining the settlement.[61] As the

17   Ninth Circuit has recognized, in class actions litigated on a wholly contingent basis, "litigation

18   expenses make the entire action possible."[62] Here, Class Counsel's unreimbursed expenses were

19   reasonably incurred and necessary for the litigation of the case. Berman Decl. ¶ 52. Class Counsel

20   advanced these expenses, described in detail in the declarations of Class Counsel, interest free, and

21   with no assurance that they would ever be reimbursed. *Id.*

22

23          [60] *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x

24   716 (9th Cir. 2012); *see, e.g.*, *Batteries*, 2020 WL 7264559, at *23 (Gonzalez Rogers, J.)
     (authorizing Co-Lead Counsel to allocate awarded fees and expenses among themselves and

25   supporting counsel).

26          [61] *See Vincent v. Hughes Air W.*, 557 F.2d 759, 769 (9th Cir. 1977); *Omnivision*, 559 F. Supp.
     2d at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to

27   paying clients in non-contingency matters." (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir.
     1994))).

28          [62] *Online DVD*, 779 F.3d at 953.

1      Expert witnesses constitute the largest expenditures, $3.37 million, or 89 percent of the

2    expenses incurred. *Id.* ¶ 59. The work of these experts supported Plaintiffs' strong class

3    certification motion, which is likely responsible in part for the excellent Settlement obtained. Other

4    notable expenses include the creation and maintenance of an electronic document database, which

5    hosted the voluminous discovery produced in this litigation, and deposition costs. *Id.* ¶ 57.

6       Reasonable litigation expenses in this case total $3,713,173.84.  *See* Berman Decl. ¶ 52,

7    Exs. 4 & 7. However, Plaintiffs only seek reimbursement of $3.5 million, the amount identified in

8    the class notice. Class Counsel respectfully request that the Court approve reimbursement of these

9    reasonable litigation expenses, to be deducted from the gross settlement fund.

10   **D.**    **Plaintiffs request that the two class representatives be awarded reasonable service awards to compensate them for their dedication to this case.**

11

12       Plaintiffs request modest service awards for each of the two class representatives in the

13    amount of $5,000 each. "[Service] *awards* are fairly typical in class action cases."[63] In the Ninth

14    Circuit, service awards "compensate class representatives for work done on behalf of the class, to

15    make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to

16    recognize their willingness to act as a private attorney general."[64]

17       In this case, the $5,000 service awards are well-deserved. Both class representatives are

18    current App Store developers and took a significant risk by bringing an action in their names

19    against one of the world's largest corporations. In addition, each class representative took his

20    responsibilities seriously and devoted substantial time to the case. Apple deposed both class

21    representatives, and each spent several sessions preparing for these depositions with counsel.

22    Defendants also propounded 165 document requests and three interrogatories to each class

23    representative. The class representatives provided valuable input throughout the case, reviewed

24    pleadings, and, in consultation with counsel, reviewed and approved of the Settlement. In light of

25    the value of the settlement proceeds and the class representatives' extraordinary service to the

26

27        [63] *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (emphasis in original).

28        [64] *Id.* at 958-59.

1  Settlement Class and developers writ large, the requested awards are reasonable. Berman Decl. ¶¶
2  61-65; Cameron Decl. ¶ 4-10; Czeskawski Decl. ¶¶ 4-10.
3  **E.      The Class received appropriate notice of Class Counsel's fee application.**
4          Class Counsel's notice to the Settlement Class through the class notice and this motion for
5  fees, expenses, and service awards has been sufficient to provide Class Members with an
6  opportunity to review and evaluate this fee request prior to the deadline for objections.[65] The class
7  notice advised Settlement Class Members that Class Counsel would seek attorneys' fees of "no
8  more than 30% of the Small Developer Assistance Fund," costs and expenses of "no more than
9  $3.5 million," and service awards "up to $5,000.00 from the Settlement Fund."[66] As required by the
10 Court and described in the notice, this motion is being filed thirty-five days before the deadline for
11 requests for exclusion or objections to the settlement.[67]

**VI.      CONCLUSION**

13         For the foregoing reasons, Plaintiffs respectfully request an award of $27,000,000
14 in attorneys' fees, reimbursement of expenses incurred in the amount of $3,500,000, and $5,000 in
15 service awards to each of the two class representatives.

16 DATED: February 14, 2022                  HAGENS BERMAN SOBOL SHAPIRO LLP
17

18                                           By ___/s/ Steve W. Berman_____
19                                               STEVE W. BERMAN (*pro hac vice*)
                                             Robert F. Lopez (*pro hac vice*)
20                                           Theodore Wojcik (*pro hac vice*)
                                             1301 Second Avenue, Suite 2000
21                                           Seattle, WA 98101
                                             Telephone: (206) 623-7292
22                                           Facsimile:  (206) 623-0594
23                                           steve@hbsslaw.com
                                             robl@hbsslaw.com
                                             tedw@hbsslaw.com
24

---

25  [65] *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 995 (9th Cir. 2010); U.S. District Court for the Northern District of California, *Procedural Guidance for Class Action Settlements* ¶¶ 6, 9 (updated Dec. 5, 2018),
26  http://www.cand.uscourts.gov/ClassActionSettlementGuidance.

27  [66] ECF No. 453, Ex. B at ¶ 15.

28  [67] *See* ECF No. 453 at 7; *see also* Procedural Guidance, *supra* note 66, at ¶ 9.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Shana E. Scarlett (SBN 217895)
Benjamin J. Siegel (SBN 260260)
Ben M. Harrington (SBN 313877)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
shanas@hbsslaw.com
bens@hbsslaw.com
benh@hbsslaw.com

*Interim Lead Class Counsel*

Joseph M. Vanek (*pro hac vice*)
Eamon P. Kelly (*pro hac vice*)
Alberto Rodriguez (*pro hac vice*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile:  (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

R. Alexander Saveri (SBN 173102)
Cadio Zirpoli (SBN 179108)
Travis L. Manfredi (SBN 281779)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile:  (415) 217-6813
rick@saveri.com
cadio@saveri.com
travis@saveri.com

Kimberly A. Justice
Jonathan M. Jagher (*pro hac vice*)
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6487
Facsimile:  (224) 632-4521
kjustice@fklmlaw.com
jjagher@fklmlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Douglas A. Millen (*pro hac vice*)
Brian M. Hogan (*pro hac vice*)
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, #130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile:  (224) 632-4521
dmillen@fklmlaw.com
bhogan@fklmlaw.com

*Plaintiffs' Executive Committee*